*Exhibit A*

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF FLORIDA**

| | |
|---|---|
| SHANNON OLSON, | ~~Civil Action~~Case No.: |
| | ────────────8:23-cv-00590-TPB |
| *Plaintiff*, | |
| | **JURY TRIAL DEMANDED** |
| v. | |
| | |
| TAKEDA PHARMACEUTICALS AMERICA, INC~~., TAKEDA PHARMACEUTICALS USA, INC., f/k/a TAKEDA PHARMACEUTICALS NORTH AMERICA, INC., TAKEDA PHARMACEUTICALS COMPANY, LIMITED, TAKEDA PHARMACEUTICALS COMPANY LIMITED, N.A~~., JODI GAYLE-GARCIA, in her individual and official capacities, MATTHEW HAND, in his individual and official capacities, GREGORY CROUCH, in his individual and official capacities, CHRISTINE MEALEY, in her individual and official capacities, HEIDI MILLER, in her individual and official capacities, | |
| | |
| *Defendants*. | |

## AMENDED COMPLAINT

COMES NOW, Plaintiff Shannon Olson, by and through undersigned counsel, and files

this Amended Complaint for declaratory relief and monetary damages pursuant to Title VII of

the Civil Rights Act of 1964 as amended, 42 U.S.C. §§2000e, *et seq.* ("Title VII"), the

Americans with Disabilities Act 42 U.S.C. §§12101, *et seq.* ("ADA"), and the Florida Civil

Rights Act, Fla. Stat. §§760.01 *et seq.* ("FCRA") against Defendants Takeda Pharmaceuticals

America, Inc., ~~Takeda Pharmaceuticals USA, Inc. f/k/a Takeda Pharmaceuticals North America,~~

~~Inc., Takeda Pharmaceuticals Company Limited, Takeda Pharmaceuticals Company Limited,~~

~~N.A., (collectively, "Defendants" or "~~("Takeda"), Jodi Gayle-Garcia ("Ms. Gayle-Garcia"),

Matthew Hand ("Mr. Hand"), Gregory Crouch ("Mr. Crouch"), Christine Mealey ("Ms. Mealey"), and Heidi Miller ("Ms. Miller") (collectively, "Individual Defendants", "Defendants" or "Takeda") in their individual and official capacities, and in support of the relief sought, Plaintiff pleads as follows:

<u>**NATURE OF THE ACTION**</u>

Plaintiff has dutifully fulfilled her role as a Takeda sales representative for more than 23 years. During her career, she has earned Takeda hundreds of millions of dollars in revenue, received awards from Takeda's President for her performance and dedication to the company, and otherwise serves as one of Takeda's most valuable employees.

From the time she was hired in 1999, Plaintiff never endured or experienced misconduct, discrimination, or was otherwise discriminated against, for any reason. But Plaintiff's wonderful career and work environment drastically changed once Ms. Gayle-Garcia began working as the Manager of the Jacksonville District's Neuroscience Division—the division to which Plaintiff had worked her entire career. Shortly after Ms. Gayle-Garcia became Plaintiff's direct supervisor, it became readily apparent that Ms. Gayle-Garcia is a staunch advocate and champion of Takeda's Diversity, Equity, and Inclusion Policy. In fact, Takeda's DEI policy became Ms. Gayle-Garcia's weapon of choice which she used for not only the benefit of Mr. Jordan Davis, a close family friend and a young man with whom Ms. Gayle-Garcia has a particularly special relation; Ms. Gayle-Garcia weaponized Mr. Davis' race as a means to discriminate and disparately treat Plaintiff, Mr. Davis' high performing colleague who, unlike Mr. Davis shined both objectively and subjectively in terms of her benefit to the corporation.

As discussed in further detail below, Ms. Gayle-Garcia vested Mr. Davis, a Takeda employee identically situated to Plaintiff, with privileges and immunities to which Plaintiff had certainly not been afforded; indeed, Mr. Davis' behavior, conduct, and abject disregard of Takeda

2

policies and the job duties and work obligations imposed upon him as a Takeda sales representative fell nothing short of conscious shocking. Of course, it is reasonable to wonder why Mr. Davis remained employed and why Ms. Gayle-Garcia would allow this behavior to occur. Unfortunately, the answers to both questions are the bases upon which this action is based in part.

Boiled down to its essence, Ms. Gayle-Garcia weaponized Takeda's DEI policy to offer Mr. Davis a job, and then to further the interests of maintaining Mr. Davis under her employ for purposes of satisfying DEI statistical standards and expectations, Ms. Gayle-Garcia allowed Mr. Davis to do whatever he wanted, so long as (1) he remained an employee which in turn, effected the DEI interests of Takeda and all Defendants, and (2) Plaintiff performed not only the duties and functions of her job, but also, the duties and functions of Mr. Davis' job. In short, so long as Plaintiff did not stand out in the eyes of leadership against Mr. Davis, an African American male under 40.

As explained in greater detail below, Ms. Gayle-Garcia and other Takeda employees named in this action engaged in a series of unlawful actions that epitomize the type of harassment, discrimination, retaliation, and disparate treatment federal and state law exist to prevent. Worst of all, the entirety of this action would have been avoided had Plaintiff not been a Caucasian female.

After enduring the workplace hostility for months on end, Plaintiff finally began to speak out as she could no longer hold the sheer workload under which she was involuntarily thrust and required to bear, nor could she emotionally and mentally endure the pervasive hostility, discrimination, retaliation, harassment, and overall disrespect she had faced day in and day out for nearly a year. But of course, this too was weaponized.

Upon speaking out against the disparate treatment with which Defendants treated Plaintiff while her counterpart, Mr. Davis, collected a paycheck for the work Plaintiff performed without contribution, Takeda then weaponized its newly adopted COVID-19 mandatory vaccination policy as a means to further harass, discriminate, create a hostile workplace, and retaliate in hopes that subjecting Plaintiff to further unlawful treatment would culminate in her constructive termination or resignation. But Plaintiff was resilient. She did not quit, she did not cave or violate her sincerely held religious beliefs, and she for reasons unknown, somehow managed to remain within the employ of Takeda—but that is only for now, and her career is hanging on by a thread.

It is because of this reason Plaintiff files this action to seek redress from Takeda's disparate treatment, harassment, hostility, and discrimination and to obtain equitable relief preserving her career and employment with a company she once loved so dearly. As explained in further detail below, Plaintiff is entitled to declaratory relief alleviating her of the pain and injury causes and damages sustained due to the unlawful conduct explained below—all of which conduct Takeda engaged in against Plaintiff because of her membership in one or more protected class(es).

It is with regret that Plaintiff must file this action to further redress Takeda's unlawful discrimination, failure to accommodate, and retaliation because she exercised her fundamental rights to exercise her religion, remain free from workplace discrimination on the basis of her religion and her disability, receive accommodations for her sincerely held religious beliefs and disability, and her fundamental right to report unlawful actions taken against her, but Takeda's unwillingness to resolve this matter absent court intervention has left Plaintiff no alternative. Expanding upon the aforesaid, this action is commenced as follows:

**THE PARTIES**

1.      Plaintiff Shannon Olson is a citizen of the United States and at all times material was a citizen of the State of Florida, residing in Pinellas County, Florida.

2.      Defendant Takeda Pharmaceuticals America, Inc. is a Japanese global, research and development-driven pharmaceutical company that maintains its principal place of business in the United States in Middlesex County, Massachusetts. Takeda conducts substantial business in the State of Florida and Plaintiff's employer as intended by Title VII, the ADA, and the FCRA as Takeda employed more than fifty (50) persons who reside and work at Takeda's office located in this district at all times relevant.

3.      ~~Defendant~~ Takeda is Japan's largest pharmaceutical company and Plaintiff's employer. Takeda that maintains its principal place of business in the United States in Middlesex County, Massachusetts. Takeda conducts substantial business in the State of Florida and Plaintiff's employer as intended by Title VII, the ADA, and the FCRA as Takeda employed more than fifty (50) persons who reside and work at Takeda's office located in this district at all times relevant.

4.      Defendant Jodi Gayle-Garcia at all times relevant was Takeda's Jacksonville District Manager and Plaintiff's direct supervisor. As a District Manager and Supervisor, Defendant Gayle-Garcia is Takeda's agent. Defendant Gayle-Garcia at all times relevant was responsible for final decisions and determinations concerning policy enforcement, performance, conduct, employment and personnel decisions, leave of absence and performance reviews, awards, and all oversight concerning *inter alia* Plaintiff and Mr. Jordan Davis.[1] Defendant Gayle-Garcia is being sued in her official and individual capacities.

---

[1] Mr. Jordan Davis is Plaintiff's counterpart and relevant to this action. However, Mr. Davis is not a Defendant in this action.

5.      Defendant Matthew Hand at all times relevant was Takeda's Interim Jacksonville District Manager and Plaintiff's direct supervisor once Ms. Gayle-Garcia was promoted and departed from her post as the District Manager. As an Interim District Manager and Supervisor, Defendant Hand is Takeda's agent. Defendant Hand at all times relevant was responsible for final decisions and determinations concerning policy enforcement, performance, conduct, employment and personnel decisions, leave of absence and performance reviews, awards, and all oversight concerning *inter alia* Plaintiff and Mr. Jordan Davis. Defendant Hand is being sued in his official and individual capacities.

6.      Defendant Gregory Crouch is a Senior Level Management employee of Takeda to whom Plaintiff was a subordinate. As Senior Level Management, Defendant Crouch is Takeda's agent. Defendant Crouch is being sued in his official and individual capacities.

7.      Defendant Christine Mealey is Takeda's Employee Relations Partner and Takeda's agent. Defendant Mealey is being sued in his official and individual capacities.

87.      Defendant Heidi Miller is Takeda's Employee Relations Partner and Takeda's agent. Defendant Miller is being sued in his official and individual capacities.

## JURISDICTION AND VENUE

98.      Jurisdiction of this Court is invoked pursuant to 28 U.S.C. §§ 451, 1331, 1337, 1343 and 1345. This action is authorized and instituted pursuant to Section 706(f)(1) and (3) of Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C.§ 2000e-5(f)(1) and (3) ("Title VII"), 42 U.S.C. § 12117 ("ADA"), and Section 102 of the Civil Rights Act of 1991, 42 U.S.C. § 1981a.

109.      This Court has supplemental jurisdiction pursuant to 28 U.S.C. § 1367 over Plaintiff's FCRA claims brought pursuant to Fl. Stat. §§ 760.01, *et seq.*, in that such claims are so closely related to Plaintiff's federal claims upon which this Court's original jurisdiction is based

6

as to satisfy the same case or controversy requirement prescribed by Article III of the United States Constitution.

~~11~~10.    Venue is proper in this District pursuant to 28 U.S.C. §§ 1391(b)(2) and 1391(c), in that the employment practices alleged to be unlawful were committed within the jurisdiction of the United States District Court for the Middle District of Florida.

## ADMINSTRATIVE PROCEDURES

~~12~~11.    On or about December 22, 2021, Plaintiff filed a Charge of Discrimination ("Charge") with the Equal Employment Opportunity Commission ("EEOC") on the basis that Takeda discriminated against her on the basis of her race, sex, religion, age, disability, and retaliation in satisfaction 42 U.S.C. § 2000e5(e)(b) and (e) and 42 U.S.C. § 12117(a).

~~13~~12.    On or about December 15, 2022, the EEOC concluded its investigation and issued Plaintiff a Notice of Right to Sue, which *inter alia* provided Plaintiff ninety (90) days to commence this action in federal court.

~~14~~13.    On arch 15, 2023, which is within the prescribed 90-day filing window, Plaintiff commenced this action.

~~15~~14.    Accordingly, Plaintiff has exhausted all administrative remedies and she has fully satisfied all conditions precedent to maintaining this action, in that Plaintiff filed her formal complaint with the EEOC within 180 days of the last date of discrimination complained of herein and this action was within ninety (90) days of December 15, 2022, the date on which Plaintiff received the EEOC's Dismissal and Notice of Rights.

## STATEMENT OF FACTS

1.    On December 13, 1999, Takeda hired me as its Professional Sales Representative. For over 23 years, I dutifully fulfilled all obligations of my job and performed at or in excess of Takeda's reasonable expectations.

7

2.       From my hire until April of 2019, my age, race, and gender never interfered with my ability to thrive in my career. But that all changed in April 2019, when Takeda restructured its Salesforce and Jodi Gayle-Garcia became the District Business Manager for the Jacksonville District and my director supervisor and manager.

3.       Plaintiff's stellar work ethic, credentials, and overall fortitude as a Takeda employee is highlighted in her 2019 performance review states in pertinent part:

> Shannon has made every effort to engage the team and foster a great team culture which includes building relationships with teammates and those across the district. Shannon fosters a supportive and inclusive team culture. Shannon continuously shows a respect for differing viewpoints within our team and values each person's unique identity, strengths and contribution.

4.       On or about August 9, 2019, Plaintiff began working with another new Takeda employee–a gentleman named Jordan Davis, whom Ms. Gayle-Garcia hired.

5.       At the time Mr. Davis was hired, he also worked as an assistant basketball coach under head coach Renaldo Garcia—Jodi's husband. Mr. Garcia was Jordan's high school basketball coach, as well.

6.       In March 2020, Takeda pulled its Salesforce[2] team from the field as coronavirus began to spread throughout the United States.

7.       Shortly thereafter, Takeda's Executive Leadership Team ("ELT") which, among other things, was tasked with selecting specific, high-performing employees from each of the company's respective territories to participate in conference calls as a means to maintain oversight and awareness of company activities and sales throughout the country.

---

[2] "Salesforce" is a multi-purpose term Takeda uses when referring to either (1) its sales management software database or (2) its field sales representatives as a collective group. For purposes of this pleading, which of the two meanings is applicable is made clear based upon the context in which the term is used.

8.    Plaintiff, based on her stellar employment record, was selected to speak on behalf of the Jacksonville, Florida District—however, Jodi Gayle-Garcia, never informed Plaintiff that she was chosen and as a result, Plaintiff merely participated in the calls without the knowledge as to the specific importance she played or the role for which she had been selected. Had Plaintiff had known she was expected to speak and represent the Jacksonville District, she would have participated substantively and in an active capacity as opposed to merely joining in as a passive listener. Ms. Gayle-Garcia had knowledge and knew at all times relevant that the ELT selected Plaintiff.

9.    It was not until approximately mid-March of 2020 that Plaintiff learned she had been selected to participate in the aforementioned two calls. In response, Plaintiff asked Ms. Gayle-Garcia why she had not been informed of her selection. In response, Ms. Gayle-Garcia advised that she herself had never even been told Plaintiff was selected for the conference calls. Upon information and belief, this was untrue. To the extent this is true, Plaintiff has a good faith belief that Ms. Gayle-Garcia intentionally failed to relay this information to Plaintiff because, as described in further detail below, Ms. Gayle-Garcia had a special relationship with Mr. Jordan Davis, a young, African-American man to whom Ms. Gayle-Garcia effectively gifted a position of employment with Takeda and had utilized to fulfill the obligations set forth in Takeda's "Diversity, Inclusion, & Equity" ("DEI") Policy.

10.    In June of 2020 and approximately one year after Takeda hired him, Mr. Davis was hired for a second position. In addition to working as a sales representative for Takeda, Mr. Jordan also began working as the Gaither High School's Men's Varsity Basketball Coach. This directly conflicted with Takeda's well-established policy that prohibits its employees from maintaining a second income outside the company.

11.     Plaintiff is particularly familiar with the prohibitions against second incomes because she, as white female over the age of 40, was vigorously investigated for merely obtaining a patent in 2015 when she worked as a "job share representative". At no time did she receive or earn any income or funds from her patent at any time relevant. Ironically, Plaintiff's created her patent solely for the purpose of pitching it to Takeda in response to the initiatives and recommendations of Takeda itself.[3]

12.     But this prohibition did not apply to Mr. Davis. Not only did Takeda know Mr. Davis was receiving a second income at all times relevant, but Takeda also intentionally, willfully, and purposefully turned a blind eye to Mr. Davis' second career in what would unfortunately be the first of many instances of disparate treatment on the basis of Plaintiff's age (48 years old), race (Caucasian), and gender (female) and the indisputable preferential treatment Takeda afforded Mr. Davis, who differs in terms of age (30 years old), race (African-American[4]), and gender (male).

13.     Ms. Gayle-Garcia even went so far as to make a district-wide announcement congratulating Jordan on being hired as a Head Coach. This left senior representatives including Plaintiff shocked and confused. Many senior representatives have friends and former colleagues who had been terminated for this exact policy violation.

14.     To illustrate the spectacular egregiousness of this cavalier deviation from Takeda's normal policy applicability and administration, it is notable that not only did Mr. Davis' coaching career violate the dual-income policy; coaching high school basketball also violated other company policies including Takeda's "Sales Workday Policy" and its "Outside

---

[3] The patent related issues are discussed below.
[4] Takeda itself has referred to Mr. Davis as "African-American", as evidenced in its own statements and text messages.

10

Employment Policy" — both of which Takeda has historically relied upon and enforced against older, Caucasian, female employees. And to further exacerbate the gravity of this age, race, and gender-motivated exception, voluminous employees who have been terminated by Takeda for violations of the same policies had worked for the company for years and knew their jobs. Yet Mr. Davis, who had been with Takeda for less than two years and still growing and learning about his role, was given this unprecedented latitude while nobody else received the same opportunity, including Plaintiff.

15.    The next instance in which Plaintiff experienced disparate treatment took place just a few weeks later. In early June of 2020 and just days after the death of George Floyd, Plaintiff received a text message from Takeda's Senior Level Management, Gregory Crouch, instructing Plaintiff to "reach out to [Mr. Davis] to see how [he] is coping with the death of George Floyd." According to Mr. Crouch, he sent Plaintiff the aforesaid text message because "[she] ha[d] an African American counterpart."

16.    Mr. Davis is African American and Plaintiff's counterpart. There is no ambiguity as to whom Mr. Crouch's text message was intended to pertain.

17.    Of course, compassion for those who may be struggling or grieving should be fostered in the workplace, and Plaintiff does not take issue with consoling her co-workers. Rather, Plaintiff raises this instance in light of Takeda's abject silence following the tragic death of Plaintiff's own sister, who had just died the year prior as a direct and proximate result of depression—an illness to which Takeda takes greats pains to market itself as a formidable opponent based upon the billions of Trintellix[5] pills Takeda sells for billions of dollars in profits annually.

---

[5] Trintellix is a medication owned and manufactured by Takeda that is used for treating major depressive disorder.

18.     Approximately two weeks later, on June 26, 2020, Takeda directed its Salesforce employees to resume contacting client offices and proactively schedule virtual sales calls for the first time since the pandemic reached American soil. In issuing this directive, Takeda leadership and management officials stated, "All sales reps are on even playing field as no one had worked remotely." As such, Plaintiff's expectation was exactly that—all sales reps, including Mr. Davis, would be on "even playing field." But that was not the case.

19.     Four days later, on June 30, 2020, Ms. Gayle-Garcia and Plaintiff conducted a virtual field day meeting to review progress, sales, and other relevant updates. Ms. Gayle-Garcia and Plaintiff held another virtual field day meeting again on July 8, 2020 to discuss the aforesaid matters a second time.

20.     While the June 30, 2020 virtual field day meeting was more or less innocuous, the July 8, 2020 virtual field day meeting differed in stark contrast based on Ms. Gayle-Garcia's statements, implications, and gaslighting of Plaintiff.

21.     Specifically, during the July 8 virtual field day meeting, Ms. Gayle-Garcia told Plaintiff that "[She] needed to take more of a 'leadership role' with Mr. Davis if [she] want[ed] to achieve Territory Manager" — the next career milestone Plaintiff was diligently working towards.

22.     Plaintiff responded to Ms. Gayle-Garcia's audacious directive by informing her that Plaintiff had exhaustively tried to assist Mr. Davis but her efforts were to no avail. Plaintiff advised that she had assigned Mr. Davis various tasks on multiple occasions, but Mr. Davis would simply rebuff Plaintiff and refuse to complete any of the assignments with which he was tasked. And Ms. Gayle-Garcia is familiar with Mr. Davis' refusal to complete assigned work as

12

he would also ignore assignments Ms. Gayle-Garcia assigned him. Regrettably, Ms. Gayle-Garcia did not care.

23.     After stating with specificity various examples of assignments Mr. Davis refused to complete, Ms. Gayle-Garcia learned that it was Plaintiff—not Plaintiff *and* Mr. Davis—who had been completing 100% of the work that had been assigned to Plaintiff's Salesforce team in the months leading up to their conversation. Ms. Gayle-Garcia even asked Plaintiff "[So] you have been doing all the work?" to which Plaintiff responded, "Yes" and thereby placing Takeda on notice that Mr. Davis was not performing the duties of his employment, which in turn, caused Plaintiff's workload to drastically increase.

24.     It is notable here too, that Ms. Gayle-Garcia, in her managerial capacity, has access to Mr. Davis' day-to-day interactions, call records, expense reports, sampling activity, and other relevant metrics that, had she even looked into the work Mr. Davis was (or rather, was not) producing. Had Gayle-Garcia even looked at Mr. Davis' performance for a few brief minutes, the answer to Ms. Gayle-Garcia's question would have become abundantly clear.

25.     On August 21, 2020, Plaintiff, Mr. Jordan, and Ms. Gayle-Garcia participated in a "Footprint Collaboration Meeting" to discuss the execution and updates of the Salesforce team's newly adopted action plan. During the call, Mrs. Gayle-Garcia insisted that *both* Mr. Davis *and* Plaintiff:

a.     Committed to making changes to the execution and update of their action plans and making changes in the footprint plan in regard to virtual engagements.:

b.     Verified the accuracy their call logs which were being reviewed for work activity and apportionment of duties/balance of time spent and work performed;

13

c. Assured that they would use "suggestions" as a way to follow up with healthcare providers;

d. Committed to holding each other accountable concerning the use of email communications; and

e. Committed to looking at targeted healthcare providers moving forward and their return on investment with emails, coupon usage and virtual engagements. The action plan will be updated and shared via one drive to ensure communication is clear among the three of us. We will have another collaboration meeting next month. "

26. Ms. Gayle-Garcia held the Footprint Collaboration Meeting with the intent to group Plaintiff and Mr. Davis together to vitiate the unequivocal clarity that Mr. Davis, not Plaintiff, was performing far below expectations. Simply stated, Ms. Gayle-Garcia used Plaintiff as the scapegoat for Mr. Davis shortcomings and performance-related failures.

27. On September 19, 2020, Ms. Gayle-Garcia conducted another Virtual Field Day with Plaintiff. The meeting was unremarkable other than the fact that Ms. Gayle-Garcia failed to acknowledge or express her awareness or gratitude as to Plaintiff's continued work ethic and her continued performance satisfying the duties of not just her own duties, but the duties of Mr. Davis, as well.

28. On or about September 23, 2020, Mr. Crouch sent an email that included the data from August 1, 2020 through September 18, 2020, which revealed that St. Petersburg, Florida (Plaintiff's region) accounted for 2.46% of Mr. Crouch's regional engagements. And of that 2.46%, Plaintiff accounted for 2.25% while Mr. Davis merely accounted for 0.21% of the engagements in the exact same region.

14

29.     According to Mr. Crouch, the email was sent "[s]o everyone across the region [would] have the context needed to identify areas where you are strong and some areas where you want to increase your focus."

30.     The vast difference between Plaintiff's engagements and Mr. Davis' engagements is the equivalent of a statistical representation of the disparity between Plaintiff's work ethic and commitment to Takeda and the bare minimum effort Mr. Davis put into the company. Yet despite this, Ms. Gayle-Garcia ordered Plaintiff to give Mr. Davis some of the engagements she had scheduled so that Mr. Davis could increase his statistics and alleviate the disparity.

31.     Said differently, Ms. Gayle-Garcia directed Plaintiff to do Mr. Davis' job for him, then allow Mr. Davis to take credit for it. In doing so, not only does this epitomize the very notion of disparate treatment; this directive even impacted Plaintiff's ability to accurately reflect how hard she worked for Takeda and how effectively she carried out her role as a sales representative.

32.     About a month later, on October 13, 2020, Plaintiff received an email notice advising that a call had been scheduled with Susan Portilechio from Takeda's Office of Employee Relations and Perry O'Brien of Takeda's Office of Ethics and Compliance. According to the email, the purpose of the call was to discuss Plaintiff's alleged secondary income from "Fit Life Active Wear" – a brand name Plaintiff owned.

33.     As briefly mentioned above, Plaintiff had endured a voracious investigation into whether she received a secondary income, which she did not, while on the other hand, Takeda supervisors and staff publicly acknowledged Mr. Davis received a second income and even went so far as to publicly congratulate him within the company for doing so.

15

34.     As a note aside, on or about September 22, 2020, Plaintiff contacted Senior Manager of Multi-Channel marketing, Laura Berger, to discuss "an idea" she had after she was inspired by Takeda's USBU President, Ramona Sequira. After listening to Ms. Sequira speak to her entire salesforce of Takeda employees on a nationwide sales call, Plaintiff took Ms. Sequira's words to "Be bold, come forward, and share" any "ideas on specifically how Takeda can restore faith in society" to heart. The resulting product of that culminated in "Fit Life Active Wear."

35.     Inspired by this, Plaintiff ran with her idea on "how to restore faith in society" which involved relating to customers in a non-pharmaceutical capacity. But because Plaintiff is a Caucasian female over the age of 40 and not a younger, black man, Plaintiff's efforts to go above and beyond for Takeda resulted in numerous calls with Human Resources and dozens of hours she had to expend in "proving" to Takeda she did not receive a second income.

36.     For nearly a month, Takeda investigated Plaintiff and this alleged "second income." It was not until November 10, 2020, that she received a notification that her non-existent "second income" had "been approved." Specifically, upper management within Human Resources advised "Greg [Crouch]and Jodi [Gayle-Garcia] have been made aware and also agree it will not impede your role with Takeda." Six days later, on November 16, 2020, Takeda closed its investigation.

37.     Again, while Plaintiff endured the *entirety* of this investigation, Mr. Davis was earning a living, missing work assignments, and violating at least three different Takeda policies as he was a paid employee of Gaither High School serving as the Head Coach of its men's varsity basketball team.

38.     On or about October 16, 2020, Ms. Gayle-Garcia again acknowledged that Plaintiff was doing *literally* ten-times (10x) more work than Mr. Davis. In an email, Ms. Gayle-

16

Garcia wrote, "Please take a look at this. There is a disparity between teams on the number of VEs...how can we balance this?" Ms. Gayle-Garcia then listed that Plaintiff had conducted fifty-five (55) virtual engagements, while Mr. Davis had conducted just five (5) virtual engagements. Rather than commend Plaintiff for her work, Ms. Gayle-Garcia's only concern was rectifying Mr. Davis' poor performance and looped Plaintiff in as again, Ms. Gayle-Garcia expected Plaintiff to cure for Mr. Davis' failures.

39.     On or about October 21, 2020, Plaintiff and Ms. Gayle-Garcia engaged in a "Quarterly Quality Conversation Review" call to discuss performance for Q2 of 2020. During the call, Plaintiff and Ms. Gayle-Garcia discussed Plaintiff's review which notably, Ms. Gayle-Garcia even expressed her knowledge of Mr. Davis poor performance in writing, stating:

40.     It will be important that Shannon influences her partner to help "carry" the load in this new environment, ensuring that the entire footprint is growing and both her and her partner are succeeding in accessing the right HCPs. Shannon will need to ensure that Jordan is holding up his part of the territory they are both executing at the same pace and hold him accountable to similar performance in terms of customer engagements etc.

41.     Plaintiff is a Field Senior Sales Representative; she is not a Manger of any kind, nor does she have any authority over Mr. Davis. It is not her duty, role, or responsibility to "ensure [Mr. Davis] is holding up his part of the territory. It is not her duty to "ensure . . . both she and Mr. Davis are succeeding in accessing the right HCPs. It is not her duty to "hold [Mr. Davis] accountable" for his continued failure to meet performance standards. Yet nevertheless, Plaintiff again took on more responsibilities that she had no obligation to fulfill and began scheduling weekly meetings with Mr. Davis to review his performance and discuss the providers he was contacting and communicating with each week.

17

42. On November 19, 2020, Ms. Gayle-Garcia conducted yet another Virtual Field Day with Plaintiff. Again, the meeting was unremarkable other than the fact that, for the second month in a row, Ms. Gayle-Garcia failed to acknowledge or express her awareness or gratitude as to Plaintiff's continued work ethic and her continued performance satisfying the duties of not just her own duties, but the duties of Mr. Davis, as well and the additional duties she assumed despite no obligation to meet with Mr. Davis or shepherd him through the basics of his job.

43. Plaintiff's work environment did not change throughout the remainder of the 2020 year. The next notable event took place on or about January 8, 2021.

44. January 8, 2021, was Ms. Gayle-Garcia's last day as Plaintiff's Manager as she was promoted to a new role. On that day, Plaintiff was introduced to Matthew Hand for the first time as Mr. Hand would be stepping into Ms. Gayle-Garcia's role as Plaintiff's Interim Manager.

45. At the end of January, another Quarterly Quality Conversation Review was held to discuss performance during Q4 of 2020, which revealed the average engagements Plaintiff executed was more than double the averages for both, the Regional *and* National Salesforce teams. Plaintiff averaged eighty-five (85) meetings, while the regional average was 37.1 meetings, and the national average was just 35.2 meetings.

46. During the meeting, Plaintiff was advised that Mr. Crouch did not want discrepancies amongst counterpart engagements (i.e., the number of meetings executed by Plaintiff and her counterpart, Mr. Davis). After the meeting, Plaintiff explained to Mr. Hand that there would always be a disparity between her numbers and Mr. Davis' numbers because Mr. Davis had a second job and simply did not fulfill his duties at Takeda, nor did he meet Takeda's daily job expectations or requirements. The purpose of offering this explanation was not to

disparage Mr. Davis, but rather, to make Mr. Hand aware that the issue Mr. Crouch had with discrepancies, while idealistic, was pragmatically and factually unable to be resolved.

47.    On or about February 10, 2021, Plaintiff participated in her first virtual field day with her new interim manager, Mr. Hand. During the meeting, Plaintiff and Mr. Hand discussed, among other things, the current ranking within the company's Cresset Awards Rankings obtained: Plaintiff ranked 114, while Mr. Davis fell 140 spots below her, ranking 254 on the list.

48.    Upon seeing yet again, another month where Mr. Davis did not improve, Plaintiff ceased meeting with Mr. Davis on a weekly basis as doing so or expending effort into helping Mr. Davis was futile. Plaintiff had exhaustive all reasonable options and attempted to educate, encourage, and teach Mr. Davis how to do his job at a proficient level, but her efforts were to no avail. She had gone above and beyond her specific job duties without compensation and dedicated so much time and energy to assisting Mr. Davis that she began to struggle both mentally and physically. As a result, she began communicating with Mr. Davis purely via email or other electronic methods of communication.

49.    Once Plaintiff began communicating with Mr. Davis via email, she learned another tactic Mr. Davis had developed to avoid putting in work hours for Takeda despite nevertheless still receiving a salary.

50.    Being that Plaintiff and Mr. Davis are counterparts for sales in the same region, Plaintiff had access to Mr. Davis' calendar. When checking his calendar to avoid conflicting appointments or calls, Plaintiff discovered that Mr. Davis would routinely schedule meetings only to cancel the event on *his* end just prior to the meeting start time. As a result, it appeared to all others as though the meeting occurred as scheduled despite that not being the case. Then, after cancelling the meeting despite not reflecting the same on his schedule, Mr. Davis would

19

reschedule the meeting for a different time following week or shortly thereafter. In doing so, Mr. Davis made it appear to upper-level management that he was obtaining a significant number of meetings with a variety of clients; but in reality, all Mr. Davis was doing was moving currently scheduled clients into subsequent weeks. In other words, the meetings he scheduled were nothing more than duplicates—he was not earning Takeda any new business and in fact, the frequent rescheduling likely cost Takeda a significant amount of business even if Mr. Davis did eventually attend a meeting, albeit remotely.

51.     Upon this discovery, Plaintiff contacted Mr. Hand to voice her concerns as her frustrations continued to swell. She had been doing his job tirelessly in addition to her own and received no benefit from doing so, yet Plaintiff still continued to put Takeda first even after nearly a year of effectively doing Mr. Davis' entire job for him.

52.     The following day, on February 11, 2021, Mr. Davis added insult to injury when he posted on his public Instagram page that he needed help raising money for the Gaither High School basketball team. Specifically, Mr. Davis posted soliciting donations to the team's fundraiser, stating "We are raising Monty [*sic*] to help our team secure funds for travel, equipment, and more." In doing so, Mr. Davis confirmed that he was in fact still working for Gaither High School as evidenced by his use of the pronoun "we" despite the overwhelming majority of Takeda's upper -level management knowing Mr. Davis had a second income in violation of company policy.

53.     To make matters even worse, Plaintiff then learned that Takeda finally authorized its Salesforce team to return to the field and resume conducting in-person meetings under the condition that its sales representatives, such as Plaintiff and Mr. Davis abided by various COVID-19 mitigation protocols including without limitation, masking, weekly COVID-19

20

testing, and social distancing. Sales representatives were also required to complete a Daily Employee Self-Screening Form at the beginning of each workday.

54.    While the authorization to return to in-person meetings was great news to Plaintiff due to the fact that face-to-face meetings yield higher retention rates and sales results than remote meetings yield, the great news was short lived. As the allegations thus far already make it abundantly clear, Plaintiff prides herself on doing the best to her ability in all aspects of her work. Being able to resume in-person meetings enabled Plaintiff to perform again at an even higher capacity than she had for nearly a year while working remotely—which was still a capacity far in excess of virtually every other Salesforce team member. Differing in stark contrast with Plaintiff's excitement to better serve Takeda, Mr. Davis responded to the in-person meeting authorization by simply stating he was not going to return to the field as doing so made him "uncomfortable" which, upon information and belief, is based upon an alleged fear of contracting COVID-19.

55.    Different people have different risk tolerances concerning COVID-19 exposure; variables such as family history, pre-existing medical conditions, loss of family and/or friends, and other personal and intimate details play unique roles in shaping the risk a given individual perceives COVID-19 to pose. Of course, Mr. Davis' risk tolerance would be an irrelevant fact in this action, but for one additional fact: Mr. Davis was not "too uncomfortable" to continue coaching high school basketball, which involves physical contact, sweat, body-to-body contact, and a slew of other variables that make the likelihood of contraction and/or transmission of COVID-19 astronomically greater than the likelihood of engaging in a brief business meeting with one or two other persons while adhering to COVID-19 mitigation protocols. It is this logical fallacy and Mr. Davis' exhibited track record of valuing basketball—and seemingly everything

else—more than his career at Takeda that gives rise to reasonable and good faith doubt in the sincerity with which Mr. Davis allegedly was unable to participate in face-to-face meetings.

56.    Despite Mr. Davis dubious reasoning to avoid working, Plaintiff nevertheless resumed her in-person meeting schedule and adhered to all requirements and conditions Takeda and its potential customers implemented at all times relevant.

57.    On or about March 15, 2021, another Award Report Meeting was held, and the data revealed that Plaintiff was ranked 201 while Mr. Davis was 149 spots behind, ranking at 350 and in the bottom half of the company's performance statistics. During the meeting, Plaintiff also raised her concerns regarding the overburdensome workload she continued to bear while Mr. Davis was effectively given free reign to do anything (or as little) as he so desired. Mr. Hand acknowledged Plaintiff's concerns and likewise, became visibly frustrated with Mr. Davis' poor performance.

58.    On or about April 5, 2021, another Award Report meeting was held. Plaintiff ranked 142 while Mr. Davis was ranked at 303. It was after this meeting that Plaintiff reached her threshold as the burden and workload became far too great for her to bear due to the refusal to mitigate the workload, hold Mr. Davis accountable, and the unhealthy and hostile nature of the work environment.

59.    On April 9, 2021, and directly and proximately as a result of Takeda's continued disparate treatment of Plaintiff, she took Short Term Disability leave.

60.    Prior to being on leave, Takeda nevertheless continued to place demands on Plaintiff that were not placed upon or enforced against Mr. Davis. Despite countless requests for help and her repeated conversations raising her concerns, Plaintiff was ignored each time. Takeda's continuous mistreatment towards Plaintiff negatively affected her health, both mentally

and physically to the point Plaintiff needed to obtain medical attention—thus, the basis for which she took Short Term Disability Leave.

61.    Takeda's Short Term Disability Leave is managed by Lincoln Financial Group ("LFG"). Despite unquestionably qualifying for paid Short Term Disability leave, LFG denied Plaintiff's request and Takeda stopped paying Plaintiff on or about May 4, 2021.

62.    Because of this, Plaintiff was forced to spend her leave of absence fighting LFG to prove her disability made Plaintiff a qualified and entitled person for Short Term Disability Leave and she was unable to use the time on leave as intended—that is, to obtain much-needed treatment for the depression directly and proximately caused by the abusive, harassing, hostile, disparate, and discriminatory treatment and work environment Takeda subjected her to for months on end.

63.    At all times relevant, LFG acted on behalf of Takeda and as its agent.

64.    Takeda, by and through LFG, acted intentionally, purposefully, willfully, and recklessly in denying Plaintiff's Short-Term Disability Leave because all or nearly all of upper-level management know that:

a.    Plaintiff's brother committed suicide in 2005 due to depression;

b.    Plaintiff lost her sister in 2019 due to depression;

c.    Plaintiff hold very near and dear to her heart the pharmaceuticals Takeda manufactures, produces, sells, and distributes to help those struggling with depression;

d.    Plaintiff has generated tens of millions of dollars in revenue selling depression medication including *inter alia* Trintellix[6];

---

[6] Trintellix was formerly known as Brintellix, which was introduced to market in 2013. The name was thereafter changed to Trintellix.

23

e.    Plaintiff's medical records, which Takeda reviewed and knew about at all times relevant, revealed a family history of depression and suicide; and

f.    As a direct and proximate result of the manner in which Takeda discriminated against Plaintiff and disparately treated her, Plaintiff sought Short Term Disability Leave as she too was plagued with an onset of depression.

65.    Despite all the above, Takeda nevertheless denied her request for paid leave, which egregious enough on its own, is only exacerbated even further by the approximate ten (10) months she has fulfilled her duties *and* the duties assigned to Mr. Davis that he neglected or otherwise failed to perform.

66.    The resulting impact was devastating. Not only did Plaintiff forego any income from May 4, 2021 through June 4, 2021; but also, Plaintiff was not even able to obtain treatment and follow her physician's recommendations which included *inter alia* stepping away from work during her leave of absence because, Takeda, in blatant disregard of the fact that Plaintiff was on leave, disregarded Plaintiff's health and continued to pile work onto her plate, which she had to do if she wished to maintain her job after she returned to work on June 30, 2021.

67.    Internally and from a mental perspective, during her leave of absence, Plaintiff realized that everything she believed in so deeply for the last 23 years was an illusion. Since she began her career in 1999, Plaintiff worked for Takeda and is currently in its Neuroscience Division has sold tens of millions of dollars' worth of various medications including (since 2013) anti-depressant, ADD, and ADHD medications and had dedicated hundreds of hours of educating others on the drugs sold by the pharmaceutical giant. She has amplified Takeda's messaging in which she so strongly believed to tens of thousands of people over the course of her career only to now learn that, as an individual suffering from depression—induced by

24

Takeda itself—it's "commitment" to fighting against the disorder was nothing more than an utterance of words.

68.     Most shocking of all to Plaintiff was the fact that Takeda holds itself out as an "expert" in the field of neuroscience. Due to its stature in the medical community and the trust invested in the company by medical experts around the world, Takeda made over $516 million in 2020 and $694 million in sales from Trintellix in 2021 alone.

69.     Yet Takeda, who:

a.     Provides its Salesforce team with data demonstrating that depression is the No. 1 cause of workplace disabilities;

b.     Generated over $516 million in revenue from Trintellix sales in 2020 alone;

c.     Holds itself out as an expert in depression; and

d.     Saturates the market by depicting or stating that depression is a mental disorder; advised Plaintiff that her paid leave was denied because Takeda "does not recognize" depression as a disability in the workplace and that is the reason why Takeda denied Plaintiff's request for paid leave—which again, Plaintiff only requested as a direct

and proximate result of the discrimination, hostility, harassment, and disparate treatment Takeda exhibited against Plaintiff. And to make matters worse, even after withholding Plaintiff's pay while on leave and unjustifiably denying her request for paid leave, Takeda interfered with her ability to heal by disregarding her medical condition and continuing to pile work onto her plate just as Takeda had done for the twelve months prior.

70.     On April 11, 2021, Mr. Davis again publicly confirmed he was still employed at Gaither High School as he shared his continued efforts to solicit funds for the basketball team,

25

which he referred to as "*our* team." Ten days later, Mr. Davis updated his Instagram profile with a new "Coach" photograph consistent with his role as the Head Varsity Coach.

71.     On June 30, 2021, Plaintiff returned to work and her Short Term Disability *unpaid* leave concluded. To date, Plaintiff has not received the funds to which she is entitled for, at a minimum, six (6) weeks.

72.     Two weeks later, Takeda held a district-wide meeting anchored around the theme of "Ableism" and "Systemic Ableism" — a spectacularly tone-deaf topic in light of its treatment of disabled persons (e.g., Plaintiff) in the months leading up to the meeting. But Takeda did not care. Then in November 2021, Takeda again put its hypocrisy on display as it unveiled a new "Just Be You" internal rally cry calling to "build a world where mental health no longer limits the ability to 'Just Be You'." Indeed, Takeda's messaging is fundamentally antithetical to its actions, including the discrimination, hostility, harassment, and disparate treatment exhibited against even own employees.

73.     As soon as Plaintiff returned to work. Mr. Hand advised that Mr. Davis was no longer with the company.

74.     On July 20, 2021, Plaintiff had her first meeting since her return to work. She met with Mr. Hand and the two discussed Plaintiff's Performance Review, which stated *inter alia*:

75.     "Prior to LOA, [Plaintiff] effectively adapted to the changing sales environment by engaging her HCPs F2F, Virtually and by phone. [Plaintiff's] ability to embrace the changing landscape will continue to serve her well- helping to model for others in the district how to maximize customer engagement while working a territory solo."

76.     Naturally, Plaintiff was upset that her interim manager, who only observed Plaintiff during a three-month period, which also just happened to be the worst three months of

26

Plaintiff's career at Takeda, completed her Performance Review for the Fiscal Year April 1, 2020, through March 31, 2021. In response, Mr. Hand attempted to console and advised that he "based the review off of quality conversations with Jodi Gayle-Garcia." This disturbed Plaintiff as Ms. Gayle-Garcia, throughout the entirety of the subject review period, abjectly disregarded Plaintiff's rights to be free from discrimination, harassment, hostility, and disparate treatment in the workplace and above all else, Ms. Gayle-Garcia was the most culpable of all in promulgating the unlawful employment environment subject of this action.

77.     The meeting then concluded with Mr. Hand advising Plaintiff that despite her efforts, she was not selected for the Territory Manager promotion she unequivocally deserved.

78.     It is not subject to reasonable dispute that Plaintiff is nothing but collateral damage to Takeda's unlawful "Diversity, Equity, & Inclusion" ("DEI") initiative – which facially, is a commendable policy; but in reality, the manner in which Takeda implements and promulgates its DEI policy results in unjustified, severe, and unlawful discrimination, harassment, hostility, and disparate treatment of Takeda employees who belong to protected classes, just "not the correct" protected classes. And for the first time, Plaintiff expressed what everyone knew at Takeda: Plaintiff said, "Diversity, equity and inclusion, at my expense."

79.     The next notable interaction Plaintiff had occurred on July 20, 2021. On that day, Plaintiff copied Mr. Hand on an email concerning a COVOID-19 test she had ordered, which she had advised Mr. Hand she would do at the time she returned. As a woman of her word, Plaintiff took it upon herself to follow through and she copied Mr. Hand as a means of showing her good faith in doing so. Plaintiff further assured Mr. Hand that she would keep him apprised as to any developments in the testing process as well as inform him of her results.

27

80.     Over the course of the next month, Takeda held district-wide meetings, in-person; the only exception was that only vaccinated Takeda employees were permitted to attend. Those who were unvaccinated such as Plaintiff were not permitted to attend live irrespective as to the reason why a given employee was not vaccinated. As a result, Plaintiff attended the meetings virtually.

81.     On or about August 12, 2021, Plaintiff contacted Staci Thompson, her Regional Head of Human Resources, and requested to schedule a meeting. Four days later, Ms. Thompson responded and the two spoke via phone call on August 19, 2021.

82.     During Plaintiff's August 19, 2021, meeting with Ms. Thompson, Plaintiff voiced her concerns regarding her performance review being conducted while Plaintiff was on leave and in violation of Takeda protocol. Ms. Thompson confirmed that completing such review was, indeed, a violation. Plaintiff also voiced concerned about the events leading up to the time she was placed on administrative leave, to which Ms. Thompson advised she would escalate the matter to someone who would have the authority to provide meaningful relief. This scared Plaintiff as she was gravely afraid that she would be retaliated against, and justifiably so. Ms. Thompson assured Plaintiff she would not experience any retaliation, but unfortunately, her assurance carried no weight.

83.     The next day, on August 20, 2021, Plaintiff received a calendar invite for a one-on-one meeting with Mr. Hand. Plaintiff accepted and the two met via video call later that afternoon. To Plaintiff's surprise, Greg Crouch was on the call despite Mr. Hand leading Plaintiff to believe the call would be between just he and Plaintiff, leading Plaintiff to feel as though she was ambushed and causing her to be triggered as she feared retaliation. Plaintiff's fears were correct.

28

84.    During the call, Mr. Crouch and Mr. Hand advised Plaintiff that she had allegedly violated Takeda's Global Code of Conduct and USBU COVID Guidance Protocol as she did not test before meeting with Mr. Hand *over one month ago*.

85.    Plaintiff met with Mr. Hand after just returning from leave. As is customary in high-volume and high performing work environments, upon Plaintiff's return she was immediately met with thousands of unread emails, sample accountability reports, expense reports, training notice and other work-related communications and materials she had not received while out on leave.

86.    At no time did Mr. Hand mention to Plaintiff she needed to test for COVID-19 nor did he or even inquire as to whether Plaintiff had tested before he met with her. In fact, had Plaintiff not copied Mr. Hand on the email and followed through on her word, Mr. Hand would not have ever brought the testing up as at no point in time from July 20, 2021, through August 20, 2021 did Mr. Hand ever mention testing to Plaintiff or inquire about her test results.

87.    Despite the objective lack of concern Mr. Hand exhibited for an entire month, Mr. Crouch and Mr. Hand all of a sudden began treating Plaintiff as if she had committed attempted murder. Both Mr. Crouch and Mr. Hand spoke in a vicious tone and their anger was visible on their faces. Their demeanors appeared as if they were angry, scared, and almost as though they lacked control of their own emotions and words. Nevertheless, Plaintiff stood firm and asked both men why neither of them, and especially Mr. Hand who learned Plaintiff did not test the evening of July 20, 2021, never raise any concern or question until August 20, 2021—the day after Plaintiff reported her concerns regarding the hostility, harassment, and disparate treatment to which she was subjected in the workplace.

29

88.     Upon information and belief, following Plaintiff's meeting with Ms. Thompson, Ms. Thompson escalated the matter to Mr. Irving Forester. And, as mentioned above, once the matter is escalated, it no longer remains confidential. Weaponizing Plaintiff's follow through and adherence to her word after she voiced her concerns and otherwise engaged in protected activity by reporting workplace discrimination would soon become the first of many instances in which Mr. Hand, Mr. Crouch, and other Takeda upper management took retaliatory action against Plaintiff.

89.     After this incident, Plaintiff spoke with Mr. Forester regarding the same concerns she previously raised with Ms. Thompson. The only new addition was the instance in which Mr. Crouch and Mr. Hand retaliated against Plaintiff for doing so.

90.     In response, Mr. Forester advised Plaintiff that he remembered Mr. Davis and shared that Mr. Davis' coaching that provided him with a second income was earmarked as "community service" – hence, the basis for which Mr. Davis circumvented Takeda's second income probation policy.

91.     Mr. Forester further confirmed that Mr. Davis was coaching during business hours as evidenced by his participation in video calls while at the high school where Gaither High School athletes could be seen shooting in the background. It was also confirmed that not only most of upper-level management, *but all* of upper -level management knew that Mr. Davis "did not work" and further knew that Plaintiff was directed to complete Mr. Davis' work on his behalf.

92.     Plaintiff further shared her frustrations that Takeda never once held Mr. Davis accountable and to the contrary, rather than holding him accountable, Takeda veiled him with privileges and immunities no other Caucasian female had been afforded, let alone a Caucasian

30

female over the age of 40. Plaintiff then highlighted the instance in 2020 where she had to spend an entire month proving she did not have a second income simply because Takeda learned she owned a trademark to a brand name which taken in comparison with the leeway Takeda afforded Mr. Davis, exemplifies the very definition of what constitutes disparate treatment in the workplace.

93.     Plaintiff concluded her meeting by informing Mr. Foster that she felt management exploited her, her experience, and her tenure. Plaintiff felt as though she had been used as a scapegoat for Mr. Davis' failure to perform as well as for Ms. Gayle-Garcia, Mr. Hand, Mr. Crouch, and other upper level management failing to rectify the situation and otherwise ignoring Plaintiffs reasonable, legitimate, and evidenced-backed requests for Takeda to intervene, hold Mr. Davis accountable, and alleviate the pressures under which Plaintiff was forced to work for nearly a year. And after all of this, Plaintiff built up the courage to voice her concerns upon her return only to have her integrity backfire as Mr. Hand and Mr. Crouch retaliated after Plaintiff merely sought relief from a disparate, discriminatory, and harassing and work environment more hostile than most can even imagine.

94.     At the time she met with Mr. Forester, Plaintiff had felt mentally and emotionally abused and the abuse continued as it now metastasized into retaliation. On at least three separate occasions Plaintiff told Mr. Hand, "I am hanging on by a thread" and the only response she received from Mr. Hand was a demonstration of the lack of compassion and empathy he has, his utter disregard for Plaintiff and her concerns, and his intent to further exacerbate Plaintiff's ongoing troubles by increasing her workload.

31

95.    At its core, Plaintiff was subjected to the discrimination, harassment, hostility, disparate treatment, and retaliation because she is a Caucasian female over the age of 40[7] and not a young African-American male under the age of 35.[8] Indeed, had Plaintiff not belonged to any or all of the aforesaid protected classes and instead, belonged to protected classes that fall under the "DEI classes" umbrella, Plaintiff would have been treated immensely different and this action would not have been necessitated by Takeda's actions. Unfortunately, Takeda took a different course of conduct and thus, this action is compelled by Takeda's unlawful misconduct.

96.    Following Plaintiff's meeting with Mr. Forester, again nothing changed. Plaintiff received no apology, her workload never decreased, and Takeda couldn't be bothered to reduce Plaintiff's workload to literally 100% of the duties she was hired to do and within the scope of her employment. Rather, Takeda continued forging forward and assigning Plaintiff to complete anywhere from 110% to 200% of the work she was hired to complete. And of course, as of the date of this filing, Plaintiff has never received even a penny of additional compensation in addition to that which she is entitled despite effectively performing a second person's job for what is now, more than a year.

97.    Then, on September 10, 2021, Plaintiff was advised that she needed to become fully vaccinated against COVID-19 as a new condition of continued employment.

98.    At all times relevant, Plaintiff had never been required to become vaccinated against COVID-19 nor had Plaintiff been required or requested to do so despite the vaccines

---

[7] This allegation shall be construed both disjunctively and conjunctively and is plead in the alternative. That is, Plaintiff was subjected to the discrimination, harassment, hostility, disparate treatment, and retaliation because Plaintiff is (1) Caucasian; (2) female; **and** (3) over the age of 40, or pled in the alternative, because Plaintiff is (1) Caucasian; (2) female; **or** (3) over the age of 40. This applies to any combination of Plaintiff's membership in two of the three protected classes, as well.

[8] The same principle articulated above in footnote 7 applies as to Mr. Davis being (1) African-American; (2) male; **and** (3) under the age of 35, or pled in the alternative, because Mr. Davis is The same principle articulated above in footnote 7 applies as to Mr. Davis being (1) African-American; (2) male; **or** (3) under the age of 35; This applies to any combination of any two of the three protected classes, as well.

32

being readily available for more than 9 months as of September 10. Takeda provided Plaintiff until September 24, 2021, to begin the vaccination regimen and further provided that Plaintiff had until November 1, 2021 to become "fully vaccinated." Otherwise, Plaintiff's failure to do so would result in her termination.

99.    As a result, Plaintiff, who is a devout Christian and is prohibited from complying with Takeda's newly adopted mandatory COVID-19 vaccination policy, promptly submitted her request for a religious accommodation to Takeda on or about September 22, 2021, placing Takeda on notice of her sincerely held religious beliefs and the legitimate, non-secular reasons Plaintiff's religion compelled her to abstain from strictly complying with Takeda's mandatory COVID-19 vaccination policy.

100.    Specifically, in her request Plaintiff advised Takeda that, fundamental to her Christian faith is a teaching that requires her to refuse medical intervention, including a vaccination, if her informed conscience comes to this sure judgment. Plaintiff further expanded in explaining her religious beliefs and referenced authoritative Church teachings demonstrating the principled religious bases upon which Christians such as Plaintiff may determine whether she ought to refuse certain vaccines, such as the COVID-19 vaccine.

101.    Among others, Plaintiff expressed her sincerely held religious beliefs that:

a.    Vaccination is not morally obligatory in principle and so must be voluntary;

b.    There is a general moral duty to refuse the use of medical products, including certain vaccines, that are produced using human cells lines derived from direct abortions. It is permissible to use such vaccines only under certain case-specific conditions, based on a judgment of conscience;

33

c.    A person's informed judgments about the proportionality of medical interventions are to be respected unless they contradict authoritative Christian moral teachings;

d.    A person is morally required to obey his or her sure conscience; and

e.    Abortion is a sin and contrary to the teachings of the Christian Church. As a result, a Christian may invoke Church teaching to refuse a vaccine developed or produced using abortion-derived cell lines.

102.    At all times relevant, Takeda knew Plaintiff was a religious woman with sincerely held religious beliefs that prohibited her from complying with Takeda's COVID-19 vaccination policy.

103.    At all times relevant, Takeda knew Plaintiff's sincere beliefs were religious.

104.    At all times relevant, Takeda knew that Plaintiff's religious beliefs were sincerely held.

105.    At all times relevant, Takeda adopted and enforced the policies complained of herein intentionally, willfully, recklessly, and with abject disregard of Plaintiff's rights to which she is guaranteed pursuant to the United States Constitution, laws of the United States, and laws of the State of Florida.

106.    Six days after submitting her religious accommodation request, Takeda's Employee Relations Partner, Ms. Christine Mealey held a "Discussion" call with Plaintiff concerning her accommodation. At no point during the call did Ms. Mealey mention or express any objective basis giving rise to a *bona fide* doubt in the sincerity of Plaintiff's religious beliefs, nor did Ms. Mealey make any mention of any basis upon which the religious nature of Plaintiff's beliefs was subject to dispute. In fact, Ms. Mealey did not even articulate any basis upon which granting my accommodation request would have imposed upon Takeda an undue hardship;

34

rather, the basis for scheduling this "Discussion" call was to create a scenario in which Ms. Mealey would be able to ask Plaintiff questions with the intent that her questions trip Plaintiff into misspeaking or otherwise offering any information upon which Takeda could rely in denying her accommodation request.

107.    In reality, there was no "discussion" that took place. Rather, Plaintiff was disrespected, spoken down to, and interrogated to the point where she described it as feeling as though she was "morally raped." As a result of the repulsive treatment Mr. Crouch and Mr. Hand exhibited, Plaintiff contacted Human Resources and expressed her discontent with the manner in which she had so wrongfully been treated.

108.    Takeda valued vaccination above the constitutional and fundamental rights of its employees, including Plaintiff. This is evidenced by not only the attempts to trip Plaintiff up during her "Discussion" call by posing vaguely constructed, misleading questions concerning faith, including without limitation:

109.    Whether Plaintiff has ever taken Tylenol or other over-the-counter drugs before;

110.    Whether Plaintiff has ever been vaccinated before; and

111.    Whether Plaintiff attends church;

112.    Of course, Takeda did not have any basis to inquire and doing so is blatantly inconsistent with EEOC Guidance; but nevertheless, Plaintiff indulged Ms. Mealey and participated in the "Discussion" call as she feared even the slightest push back would yield a massive backlash laced with retaliation.

113.    The next day, on September 29, 2021, Plaintiff emailed Ms. Mealey and requested a copy of the transcript from their call the day prior, to which Ms. Mealey responded, "I don't

35

have a transcript but the notes taken are confidential and internal so I cannot share. If you have anything additional you would like to add to your accommodation request, please let me know."

114.    Then, on October 13, 2021, Ms. Mealey sent Plaintiff a letter advising that her request for an accommodation was denied. Ms. Mealey did not state any reasons as to why she denied Plaintiff's request. That is because no reason justifying the denial of Plaintiff's request existed.

115.    Five days later, Plaintiff spoke with Ms. Mealey concerning the basis of her denial. Ms. Mealey again declined to provide any bases upon which she relied in making her determination and instead, merely stated (albeit falsely) that granting Plaintiff's request imposed upon Takeda an "undue hardship."

116.    At the end of their call, Plaintiff asked Ms. Mealey, "If Takeda was not planning on approving any religious accommodations, why did they have us go through this process?" Ms. Mealey responded, "I don't know." In responding "I don't know" it is evident that Ms. Mealey intended for her response to address the latter half of Plaintiff's question as "I don't know" is unresponsive to the first portion of the question.

117.    Ms. Mealey had an opportunity to set the record as to whether Takeda intended on issuing blanket denials of accommodation requests, but she declined to do so and instead, ratified Plaintiff's understanding by stating she did not know why Plaintiff and others had to go through the accommodation request process and participate in a discussion call even though Takeda was going to blanket deny accommodation requests anyways. But, as a pharmaceutical company, Takeda knew or should have known that at all times relevant, each and every COVID-19 vaccine available in the United States is and always has been ineffective. Indeed, there is no corporation

36

better positioned to have knowledge of vaccine efficacy and safety than a pharmaceutical manufacturer with state –of –the –art technology and world-renowned scientists at its fingertips.

118.    There is no dispute that every COVID-19 vaccine that has ever been made available in the United States lacks the capability to prevent contraction and transmission of the virus. And, the veracity as to Ms. Mealey's statement that granting Plaintiff's accommodation request—which Ms. Mealey also implicitly confirmed was a pre-determined response made prior to even affording Plaintiff's request due consideration—imposed upon Takeda an "undue hardship" is not only a question of fact material to this case and for the jury to decide, but also, whether granting Plaintiff an accommodation imposed an undue hardship upon Takeda is not even subject to reasonable dispute as it is well-established that no COVID-19 vaccines achieve the ends sought to be effectuated by Takeda's vaccination policy in the first place.

119.    On or about October 22, 2021, plaintiff filed a medical accommodation request which initially, she was hesitant to submit due to the fact that last time she shared her medical condition with Takeda, it culminated in Takeda refusing to pay Plaintiff while still forcing her to work in lieu of affording her the time necessary to heal. But being that her religious accommodation was unjustifiably denied both on the basis of factually erroneous assertions and upon information and belief, and blanket denial policy promulgated by upper-level management[9], Plaintiff felt she had no other option than to again, disclose her medical information to Takeda in hopes of saving her career.

120.    Despite Plaintiff's treating physician communicating with Takeda and answering its questions concerning Plaintiff's need for an accommodation, Takeda nevertheless disregarded

---

[9] Takeda employs more than 18,000 persons, yet *just one* religious accommodation request was granted. Based on reasonable inference and statements made by colleagues, Plaintiff has a good faith basis to believe and assert that hundreds, if not thousands, of employees submitted accommodation requests; all of whom but one had their requests denied.

37

the medical advice Plaintiff's treating provider even took the time to participate in a phone call with Takeda and answered all of Takeda's questions concerning Plaintiff's need for a medical accommodation. Takeda was advised during the call that, to a reasonable degree of medical certainty, the risks outweighed any potential benefit conferred by the vaccines and such statement is consistent with the basis articulated in the medical documentation that accompanied Plaintiff's medical accommodation request at the time she submitted it to Takeda.

121.    On or about November 10, 2021, Takeda nevertheless ignored Plaintiff's treating physician and denied Plaintiff's request for a medical accommodation and in similar vein as its religious accommodation request denial, Takeda's decision to deny Plaintiff's accommodation request was devoid of any basis supporting its decision.

122.    The following day, on November 11, 2021, Plaintiff asked why her medical accommodation request had been denied. In response, Takeda advised Plaintiff that she had until November 18, 2021 (7 days) to become vaccinated or she would be terminated. Takeda never acknowledged Plaintiff's inquiry concerning the basis of her medical accommodation denial, let alone provide Plaintiff with a response to her question.

123.    On or about November 12, 2021, Plaintiff emailed Takeda's Employee Relations Partner, Heidi Miller, and asked if there were any other positions for religious or disabled persons within the company she could fulfill. Plaintiff knew such positions existed for religious and disabled persons as Takeda's President, Ramona Sequeira, had mentioned the positions during one of the company's recent nationwide teleconferences. Ms. Miller never responded to Plaintiff.

124.    Having a mere 48 hours left to save her job, Plaintiff was desperate. She did everything in her power to maintain her job and the career she loved to which she dedicated 23

38

years of her life. In a last -ditch effort, Plaintiff contacted Mr. Crouch and effectively pleaded with him to help save her career.

125. Plaintiff, a single mother of three who has poured her blood, sweat, and tears into Takeda, literally cried to Mr. Crouch asking for guidance and assistance.

126. At the end of the call, Mr. Crouch asked Plaintiff what she was going to do and whether she was going to get vaccinated and as a woman of faith, Plaintiff responded, "I can't." Mr. Crouch seemingly accepted her response and advised Plaintiff that "it would be a loss to him, the organization, and [Plaintiff's] territory" if she were to be terminated. Mr. Crouch then hung up.

127. Approximately two hours later, Mr. Crouch send Plaintiff a text message that said, "give me a buzz when you have a few." Plaintiff promptly telephoned Mr. Crouch and was informed that Takeda had begrudgingly agreed to grant Plaintiff a 90-day extension.

128. Shortly after speaking with Mr. Crouch, Plaintiff received a Microsoft Teams[10] calendar invite for a conference call with Takeda Employee Relations Partner, Heidi Miller. During their call, Ms. Miller advised Plaintiff that her disability had now miraculously "been approved" but Ms. Miller had not yet heard back as to what Plaintiff's accommodation would be. Ultimately, Takeda advised Plaintiff that her accommodation request would be re-reviewed as it refused to actually approve Plaintiff's accommodation request; instead, Takeda merely "extended" Plaintiff's time to apply and/or receive a response to her already-submitted medical accommodation request.

129. On December 22, 2021, and as a direct and proximate result of the discrimination, harassment, hostility, disparate treatment, and retaliation Plaintiff endured directly and proximate

---

[10] "Microsoft Teams" is a business software program with a calendar feature, among others, that is used to facilitate collaborative work and virtual meetings amongst remote employees or others unavailable to meet in-person.

39

because of her race, sex, religion, age, and disability, Plaintiff filed a formal Charge of Discrimination with the Equal Employment Opportunity Commission ("EEOC").

130.    On or about December 15, 2022, and after nearly an entire year of investigating Plaintiff's Charge of Discrimination, the EEOC concluded its investigation and issued Plaintiff a Notice of Right to Sue, which *inter alia* provided Plaintiff ninety (90) days to commence this action in federal court.

131.    On March 14, 2023, which is within the prescribed 90-day filing window, Plaintiff commenced this action.

132.    Accordingly, Plaintiff has exhausted all administrative remedies and she has fully satisfied all conditions precedent to maintaining this action, in that Plaintiff filed her formal complaint with the EEOC within 180 days of the last date of discrimination complained of herein and hereby initiates this action within ninety (90) days of receiving her Notice of Right to Sue Letter.

133.    And for her claims against Defendants Takeda Pharmaceuticals America, Inc., Takeda Pharmaceuticals USA, Inc. f/k/a Takeda Pharmaceuticals North America, Inc., Takeda Pharmaceuticals Company Limited, Takeda Pharmaceuticals Company Limited, N.A., Jodi Gayle-Garcia, Matthew Hand, Gregory Crouch, Christine Mealey, and Heidi Miller, Plaintiff asserts the following:

<u>**COUNT I – DISPARATE TREATMENT**</u>
**Violation of Title VI**
(*Against All Defendants*)

134.    Plaintiff re-alleges and incorporates by reference all preceding paragraphs as if fully set forth herein.

135.    Plaintiff is a Caucasian female and a member of at least one or more protected classes as intended by Title VII.

40

136.    Plaintiff is qualified for her position of employment, and she has fully performed all duties in full satisfaction or in excess of Defendant's reasonable expectations as evidenced by Plaintiff's twenty-three (23) year employment record working for Takeda, as well as Plaintiff's education, experience, stellar performance reviews, and the voluminous performance-based awards Plaintiff has earned throughout her career at Takeda.

137.    Despite being a qualified person and a member of a protected class, Defendants discriminated against Plaintiff and subjected her to disparate treatment due to her membership in one or more protected classes (race and/or gender) of persons protected by Title VII.

138.    Plaintiff is a Caucasian female over the age of 40.

139.    Mr. Davis is an African American male under the age of 40.

140.    Mr. Davis furthers Defendants' interest in having a DEI-compliant workforce.

141.    Plaintiff hampers Defendants' interest in having a DEI-compliant workforce.

142.    Specifically, Defendants purposefully, willfully, intentionally, or recklessly disparately treated Plaintiff by:

a.       taking discrete action against her such as: a. Creating, applying, following, enforcing, and otherwise adhering to one set of rules for Plaintiff, who is a Caucasian female over the age of 40, while creating, applying, following, enforcing, and otherwise adhering to a different, more lenient set of rules for Plaintiff's counterpart, Mr. Davis, who is an African American male under the age of 40;

b.       Allowing Mr. Davis to have a second income because Mr. Davis is an African American male under the age of 40 while not allowing Plaintiff to have a second income because Plaintiff is a Caucasian female over the age of 40;

41

c.      Vigorously investigating Plaintiff for approximately one month after having even just a suspicion she had a second income because Plaintiff is a Caucasian female over the age of 40 while congratulating Mr. Davis on obtaining a second job and income in company-wide correspondence and by other means because Mr. Davis is an African American male under the age of 40;

d.      Hiring and retaining Mr. Davis because he is an African American male under the age of 40 while conditioning Plaintiff's retention and continued employment on her performance because Plaintiff is a Caucasian female over the age of 40;

e.      Forcing Plaintiff to complete Mr. Davis' work and otherwise refusing to compel Mr. Davis to perform at similar or equal standards because Mr. Davis is an African American male under the age of 40 and Plaintiff is a Caucasian female over the age of 40;

f.      Refusing to hold Mr. Davis accountable for failing to perform because Mr. Davis is an African American male under the age of 40 while holding Plaintiff's performance to a much more stringent standard because Plaintiff is a Caucasian female over the age of 40;

g.      Ignoring Mr. Davis' repeated violations of at least three (3) different company policies because Mr. Davis is an African American male under the age of 40 while voraciously pursuing Plaintiff after a single instance in which Plaintiff allegedly violation a single company policy because Plaintiff is a Caucasian female over the age of 40;

h.      Forcing Plaintiff to perform Mr. Davis' work while not forcing Mr. Davis to perform at or near the same level because Plaintiff is a Caucasian female over the age of 40 and Mr. Davis is an African American male under the age of 40;

i.      Taking Mr. Davis' emotions into account and instructing Plaintiff to inquire about Mr. Davis' well-being after the death of George Floyd and otherwise caring about Mr. Davis'

42

emotional state because Mr. Davis is an African American male under the age of 40 while ignoring or otherwise not even acknowledging Plaintiff's emotional state following the death of her brother in 2005 or the death of her sister in 2009 because Plaintiff is a Caucasian female over 40;

j.      Turning a blind eye to Mr. Davis refusing to return to the field because he was "uncomfortable" because Mr. Davis is an African American male under the age of 40 while entirely ignoring Plaintiff's "comfortability" and need for a leave of absence due to depression because Plaintiff is a Caucasian female over 40;

k.      Refusing to commend Plaintiff for performing exceptionally well and significantly better than Mr. Davis based on objective statistics because Plaintiff is a Caucasian female over the age of 40 and Mr. Davis is an African American male under the age of 40;

l.      Establishing two different sets of performance standards for Plaintiff and Mr. Davis and applying a more stringent performance standard to Plaintiff because she is a Caucasian female over the age of 40 while applying a less stringent performance standard to Mr. Davis because he is an African American male under the age 40;

m.      Giving Mr. Davis a job he was not qualified for because he is an African American male under the age of 40;

n.      Retaining Mr. Davis because he is an African American male under the age of 40 while attempting to terminate Plaintiff or otherwise constructively oust Plaintiff because she is a Caucasian female over the age of 40;

o.      Refusing to hold Mr. Davis accountable because he is an African American male under the age of 40 despite knowing he was performing at an unsatisfactory level;

p.     Directing Plaintiff to supervise and hold Mr. Davis accountable for underperforming because Plaintiff is a Caucasian female over the age of 40;

q.     Denying Plaintiff's lawful entitlement to paid short term disability leave because she is a Caucasian female over the age of 40 while paying Mr. Davis a salary and bonus despite the fact that he was underperforming, despite his failure to complete the duties of his job, and despite working a second job during business hours in violation of company policy, and doing so because Mr. Davis is an African American male under the age of 40;

r.     Attempting to stifle Plainitiff's career growth because she is a Caucasian female over the age of 40 and in an attempt to mitigate the actual and legitimate disparity between her performance and Mr. Davis' performance because Mr. Davis is an African American male under the age of 40;

s.     Intentionally failing to inform Plaintiff that she had been selected based on merit for a district wide conference call to forcibly lower Plaintiff's performance because she is a high performing Caucasian female over the age of 40 who objectively excelled in her career based on merit and at a statistically higher rate than Mr. Davis, who is an African American male under the age of 40;

t.     Giving Mr. Davis preferential treatment over Plaintiff because Mr. Davis is an African American male under the age of 40 and Plaintiff is a Caucasian female over the age of 40; and

u.     Refusing to accommodate Plaintiff in regard to company policies because she is a Caucasian female over the age of 40 while accommodating Mr. Davis in regard to company policies because he is an African American male under the age of 40.

44

143. Each of the aforementioned acts or omissions constitutes adverse employment action.

144. Each of the aforementioned acts or omissions demonstrates that Defendants treated Mr. Davis, an African American male under the age of 40 more favorably than Defendants treated Plaintiff, a Caucasian female over the age of 40;

145. At all times relevant, Mr. Davis was identically situated as Plaintiff. Mr. Davis held the same title, position, received the same pay (or more pay than Plaintiff), had the same duties, performed the same tasks, and otherwise had the same responsibilities as Plaintiff at all times relevant.

146. Plaintiff was a member in one or more protected class(es) of persons (gender and race) as intended by Title VII.

1467. At all times relevant, Plaintiff was qualified for her position as a field sales representative.

1478. At all times relevant, Mr. Davis was a field sales representative employed by Takeda and an individual similarly situated to Plaintiff.

148. The adverse employment actions articulated above were partially, substantially, or entirely motivated by Plaintiff's membership in a protected class.

149. The adverse employment actions articulated above were partially, substantially, or entirely motivated by Plaintiff's membership in a protected class.

150. The adverse employment actions articulated above were partially, substantially, or entirely motivated by Plaintiff's membership in protected classes to which Mr. Davis, a similarly situated individual, was not a member.

45

15~~0~~1.   Plaintiff's membership in one or more protected classes that Mr. Davis is not a member of is the actual, but-for, direct, and proximate cause for which Defendants engaged in the above-articulated adverse employment actions.

151.   ~~The acts or omissions articulated above and incorporated by reference herein constitute disparate treatment on the basis of race in violation of Title VII.~~

152.   The acts or omissions articulated above and incorporated by reference herein constitute disparate treatment on the basis of race in violation of Title VII.

153.   The acts or omissions articulated above and incorporated by reference herein constitute disparate treatment on the basis of gender in violation of Title VII.

153.   ~~As a direct and proximate result of the aforesaid complained of conduct and disparate treatment with which Defendants treated Plaintiff in violation of Title VII, Plaintiff sustained pecuniary and non-economic injuries in an amount that~~ 154~~exceeds $75,000.00, including lost wages, benefits, retirement funds, the denial of promotional opportunity, humiliation, embarrassment, unnecessary pain and suffering, attorneys' fees, and costs associated with this action.~~

.   As a direct and proximate result of the aforesaid complained of conduct and disparate treatment with which Defendants treated Plaintiff in violation of Title VII, Plaintiff sustained pecuniary and non-economic injuries in an amount that exceeds $75,000.00, including lost wages, benefits, retirement funds, the denial of promotional opportunity, humiliation, embarrassment, unnecessary pain and suffering, attorneys' fees, and costs associated with this action.

## COUNT II – DISPARATE IMPACT
### Violation of Title VII
**(*Against ~~All Defendants~~Takeda*)**

15~~4~~5. Plaintiff re-alleges and incorporates by reference all preceding paragraphs as if fully set forth herein.

15~~5~~6. Defendants' policies and selective enforcement of Takeda policies deprived and tends to deprive Plaintiff of a workplace free from discrimination on the basis of race and gender in violation of Title VII's disparate impact prohibition. 42 U.S.C. §§ 2000e-2(a)(2) & (k).

15~~6~~7. Title VII makes it illegal for an employer to "limit, segregate, or classify his employees. . . in any way which would deprive or tend to deprive any individual of employment opportunities. . . because of such individual's . . . race or gender." 42 U.S.C. § 2000e-2(a)(2).

15~~7~~8. Defendants' employment practices complained of above and incorporated by reference herein caused a disparate impact on the basis of race and gender.

15~~8~~9. Defendants' employment policies and practices appear concerning employment standards, performance standards, qualifications, retention, compensation, sources of income, and secondary employment may appear or do appear to be neutral in their treatment of different groups but in fact, Defendants policies and practices are not neutral and fall more harshly on one or more groups (Caucasian and/or female) than one or more other groups (African American and male) and the disparity is not and cannot be justified by business necessity.

~~159. Each of Defendants' acts or omissions complained of above, individually or taken in any combination as a collective, are incorporated by reference herein.~~

160. Each of Defendants' acts or omissions complained of above, individually or taken in any combination as a collective, are incorporated by reference herein.

161. Each of Defendants' acts or omissions complained of above, individually or taken in any combination as a collective, constitute adverse employment actions.

47

161 2.   Defendants' "Diversity, Equity, and Inclusion Policy" is the actual, direct, but-for, and proximate cause and is otherwise causally related to the disparate impact Plaintiff sustained as a result of adverse employment actions motivated and/or directly and proximately caused as a result of Defendants' "Diversity, Equity, and Inclusion Policy."

162 3.   Defendants' "Diversity, Equity, and Inclusion Policy" results in a disparate impact in violation of Title VII.

163 4.   Defendants' "Secondary Income Policy" is the actual, direct, but-for, and proximate cause and is otherwise causally related to the disparate impact Plaintiff sustained as a result of adverse employment actions motivated and/or directly and proximately caused as a result of Defendants' "Secondary Income Policy."

164 5.   Defendants' "Secondary Income Policy" results in a disparate impact in violation of Title VII.

165 6.   Defendants' "Sales Workday Policy" is the actual, direct, but-for, and proximate cause and is otherwise causally related to the disparate impact Plaintiff sustained as a result of adverse employment actions motivated and/or directly and proximately caused as a result of Defendants' "Sales Workday Policy."

166 7.   Defendants' "Sales Workday Policy" results in a disparate impact in violation of Title VII.

167.   As a direct and proximate result of the aforesaid complained of conduct and disparate treatment with which Defendants treated Plaintiff in violation of Title VII, Plaintiff sustained pecuniary and non-economic injuries in an amount that exceeds $75,000.00, including lost wages, benefits, retirement funds, the denial of promotional opportunity, humiliation,

48

embarrassment, unnecessary pain and suffering, attorneys' fees, and costs associated with this action.

168.   As a direct and proximate result of the aforesaid complained of conduct and disparate treatment with which Defendants treated Plaintiff in violation of Title VII, Plaintiff sustained pecuniary and non-economic injuries in an amount that

exceeds $75,000.00, including lost wages, benefits, retirement funds, the denial of promotional opportunity, humiliation, embarrassment, unnecessary pain and suffering, attorneys' fees, and costs associated with this action.

**COUNT III – RELIGIOUS DISCRIMINATION**
**Violation of Title VII**
(*Against All DefendantsTakeda*)

1689.   Plaintiff re-alleges and incorporates by reference all preceding paragraphs as if fully set forth herein.

169170.   Plaintiff sincerely holds religious beliefs and is a member of a protected class based on her religion.

1701.   Plaintiff is an employee within the meaning of Title VII.

1712.   Takeda is an employer within the meaning of Title VII.

1723.   Title VII forbids Takeda from discriminating against Plaintiff because of her sincerely held religious beliefs or because of Plaintiff's need for a religious accommodation, absent proof that granting the accommodation would cause it undue hardship. 42 U.S.C. §§ 2000e(j), 2000e-2(a)(1); *E.E.O.C. v. Abercrombie & Fitch Stores, Inc.*, 575 U.S. 768, 774 (2015).

1734.   This extension of actionable religious discrimination to include a failure to accommodate derives from Title VII's definition of "religion" to include "all aspects of religious observance and practice, as well as belief, unless an employer demonstrates that he is unable to

49

reasonably accommodate to an employee's or prospective employee's religious observance or practice without undue hardship on the conduct of the employer's business." 42 U.S.C. § 2000e(j).

174~~4~~5. At all times relevant, Plaintiff held bona fide (sincere) religious beliefs that prohibited her from becoming vaccinated against COVID-19.

175~~5~~6. Plaintiff's sincere beliefs were religious in nature as her beliefs guided her conduct deviating from her sincere beliefs would impact her ability to ultimately go to Heaven.

176~~6~~7. Plaintiff sincerely believed that if she had gotten vaccinated in violation of her religious beliefs, such action would have impacted her ability to go to Heaven.

177~~7~~8. Plaintiff's sincerely held religious beliefs conflicted with Takeda's policy concerning mandatory vaccination.

178~~8~~9. Takeda purposefully, willfully, intentionally, or recklessly took adverse action against Plaintiff by:

a.      Harassing and ridiculing Plaintiff;

b.      Refusing to provide any information as to why it denied Plaintiff's accommodation request;

c.      Implementing, promulgating, and enforcing a mandatory vaccination policy without any intention of ever giving religious accommodation requests any meaningful review or consideration;

d.      Implementing, promulgating, and enforcing a mandatory vaccination policy without any intention of ever granting a religious accommodation to Plaintiff regardless of her lawful entitlement to a religious accommodation;

50

e.      Forcing Plaintiff to apply for a religious accommodation and participate in a "sham" accommodation request process where the decision to deny her request was pre-determined;

f.      Failing to give due consideration or review Plaintiff's accommodation request on a case-by-case basis;

g.      Screaming, demeaning, ridiculing, harassing, embarrassing, humiliating, condemning, threatening, and otherwise inflicting emotional distress upon Plaintiff because she requested an accommodation;

h.      Scheduling a "Discussion" meeting to facilitate an environment for Mr. Crouch and Mr. Hand to engage in the aforesaid action alleged in the above sub-paragraph;

i.      Lying to Plaintiff by claiming the vaccines effectuated the means sought to be effectuated by the COVID-19 vaccination policy;

j.      Concealing the efficacy and safety of the vaccines Takeda sought to coerce into Plaintiff's body;

k.      Lying to Plaintiff concerning the vaccines' ability to prevent contraction of COVID-19;

l.      Lying to Plaintiff concerning the vaccines' ability to prevent transmission of COVID-19;

m.      Lying to Plaintiff by telling her Takeda would endure an "undue hardship" if it maintained Plaintiff's employment if she remained unvaccinated;

n.      Assigning Plaintiff additional work outside the scope of her duties because she is religious;

51

o.      Failing to compensate Plaintiff for the additional work she performed at Takeda outside the scope of her duties because she is religious; and

p.      Refusing to accommodate Plaintiff despite her lawful entitlement to such an accommodation.

179180.      Plaintiff's sincerely held religious beliefs partially, substantially, or entirely motivated Takeda's decision to take the aforementioned adverse employment actions against her.

1801.   At all times relevant, Takeda knew of Plaintiff's sincerely held religious beliefs based upon emails, meetings, communications, and conversations regarding her inability to become vaccinated against COVID-19.

1812.   Takeda made no efforts at all to accommodate Plaintiff's sincerely held religious beliefs that compelled her to abstain from vaccination.

1823.   Takeda knew or should have known that accommodating Plaintiff would not have imposed upon it an undue hardship.

1834.   Takeda intentionally concealed its knowledge that no undue hardship existed because Takeda knew at all times relevant, the vaccines did not prevent transmission or contraction and therefore, Takeda's policy compelling vaccination did not satisfy the ends sought to be achieved by its vaccination policy.

1845.   Accommodating Plaintiff would not have imposed an undue hardship on Takeda, as evidenced by its ability to maintain Plaintiff's employment through the entirety of the COVID-19 pandemic and its use and implementation of alternative mitigation protocols such as masking, remote work, and social distancing.

185 6.    Other pharmaceutical companies and sales companies have not insisted on mandatory vaccination without allowing accommodations for religious objectors.

186 7.    As a direct and proximate result of the aforesaid complained of conduct and violation of Title VII, Plaintiff sustained pecuniary and non-economic injuries in an amount that exceeds $75,000.00, including lost wages, benefits, retirement funds, the denial of promotional opportunity, humiliation, embarrassment, unnecessary pain and suffering, attorneys' fees, and costs associated with this action.

## COUNT IV – RELIGIOUS DISCRIMINATION
### Violation of the FCRA
(*Against All Defendants Takeda*)

187 8.    Plaintiff re-alleges and incorporates by reference all preceding paragraphs as if fully set forth herein.

188 9.    Plaintiff sincerely holds religious beliefs and is a member of a protected class based on her religion.

189 0.    Plaintiff is an employee within the meaning of the FCRA.

190 1.    Takeda is an employer within the meaning of the FCRA.

191 2.    The FCRA forbids Takeda from discriminating against Plaintiff because of her sincerely held religious beliefs or because of Plaintiff's need for a religious accommodation, absent proof that granting the accommodation would cause it undue hardship.

192 3.    This extension of actionable religious discrimination to include a failure to accommodate derives from the FCRA's adoption and incorporation of Title VII's definition of "religion" to include "all aspects of religious observance and practice, as well as belief, unless an employer demonstrates that he is unable to reasonably accommodate to an employee's or prospective employee's religious observance or practice without undue hardship on the conduct of the employer's business."

53

194. At all times relevant, Plaintiff held bona fide (sincere) religious beliefs that prohibited her from becoming vaccinated against COVID-19.

195. Plaintiff's sincere beliefs were religious in nature.

196. Plaintiff sincerely believed that if she had gotten vaccinated in violation of her religious beliefs, such action would have impacted her ability to go to Heaven.

197. Plaintiff's sincerely held religious beliefs conflicted with Takeda's policy concerning mandatory vaccination.

198. Takeda purposefully, willfully, intentionally, or recklessly took adverse action against Plaintiff by engaging in the above-articulated conduct all of which is incorporated by reference herein.

199. Plaintiff's sincerely held religious beliefs partially, substantially, or entirely motivated Takeda's decision to take the aforementioned adverse employment actions against her.

200. At all times relevant, Takeda knew of Plaintiff's sincerely held religious beliefs.

201. Takeda made no efforts at all to accommodate Plaintiff's sincerely held religious beliefs.

202. Takeda knew or should have known that accommodating Plaintiff would not have imposed upon it an undue hardship.

203. Takeda intentionally concealed its knowledge that no undue hardship existed because Takeda knew at all times relevant, the vaccines did not prevent transmission or contraction and therefore, Takeda's policy compelling vaccination did not satisfy the ends sought to be achieved by its vaccination policy.

54

20~~3~~4.    Accommodating Plaintiff would not have imposed an undue hardship on Takeda, as evidenced by its ability to maintain Plaintiff's employment through the entirety of the COVID-19 pandemic and its use and implementation of alternative mitigation protocols such as masking, remote work, and social distancing.

20~~4~~5.    Other pharmaceutical companies and sales companies have not insisted on mandatory vaccination without allowing accommodations for religious objectors.

20~~5~~6.    As a direct and proximate result of the aforesaid complained of conduct and violation of the FCRA, Plaintiff sustained pecuniary and non-economic injuries in an amount that exceeds $75,000.00, including lost wages, benefits, retirement funds, the denial of promotional opportunity, humiliation, embarrassment, unnecessary pain and suffering, attorneys' fees, and costs associated with this action.

## COUNT V – Retaliation (Religion)
### VIOLATION OF TITLE VII
(*Against ~~All Defendants~~Takeda*)

20~~6~~7.    Plaintiff incorporates by reference all preceding and subsequent paragraphs hereto as if fully set forth herein.

20~~7~~8.    Defendants engaged in systemic retaliation against Plaintiff because she protested, opposed, and/or spoke out against Defendants' religious discrimination.

20~~8~~9.    Defendants' aforesaid retaliatory action was intentional, deliberate, willful, and conducted in callous disregard of Plaintiff's rights.

2~~10~~09.    In retaliation for engaging in protected activity, Defendant subjected Plaintiff to adverse employment action as alleged above and incorporated by reference herein.

21~~0~~1.    Defendants' retaliation against Plaintiff as a result of her opposition to the aforesaid religious-motivated discrimination and engagement in protected activity violates Title VII.

55

211~~1~~2.   As a direct and proximate result of Defendants' retaliation, Plaintiff sustained economic injuries in amount in excess of $75,000.00, including the denial of promotional opportunity, humiliation, embarrassment, unnecessary pain and suffering, and has incurred medical expenses, attorneys' fees, and costs associated with this action.

**COUNT VI – Retaliation (Religion)**
**VIOLATION OF THE FCRA**
(*Against ~~All Defendants~~Takeda*)

212~~2~~3.   Plaintiff incorporates by reference all preceding and subsequent paragraphs hereto as if fully set forth herein.

213~~3~~4.   Defendants engaged in systemic retaliation against Plaintiff because she protested, opposed, and/or spoke out against Defendants' religious discrimination.

214~~4~~5.   Defendants' aforesaid retaliatory action was intentional, deliberate, willful, and conducted in callous disregard of Plaintiff's rights.

215~~5~~6.   In retaliation for engaging in protected activity, Defendant subjected Plaintiff to adverse employment action as *as* alleged above and incorporated by reference herein.

216~~6~~7.   Defendants' retaliation against Plaintiff as a result of her opposition to the aforesaid religious-motivated discrimination and engagement in protected activity violates the FCRA.

217~~7~~8.   As a direct and proximate result of Defendants' retaliation, Plaintiff sustained economic injuries in amount in excess of $75,000.00, including the denial of promotional opportunity, humiliation, embarrassment, unnecessary pain and suffering, and has incurred medical expenses, attorneys' fees, and costs associated with this action.

## COUNT VII – DISABILITY DISCRIMINATION
**Violation of the ADA**
(*Against All Defendants Takeda*)

2189.    Plaintiff re-alleges and incorporates by reference all preceding paragraphs as if fully set forth herein.

219220.        Plaintiff is a disabled person within the meaning of 42 U.S.C. § 12102(1). Plaintiff suffers from PTSD, which is a physical or mental impairment that substantially limits one or more of Plaintiff's major life activities, such as caring for himself, performing manual tasks, eating, sleeping, breathing, learning, reading, concentrating, thinking, communicating, and working. Defendants also regard Plaintiff as having such an impairment as defined by 42 U.S.C. §§ 12102(1)(C), 3(A).

2201.    Plaintiff is a qualified individual within the meaning of 42 U.S.C. § 12111(8). Plaintiff, with or without a reasonable accommodation, can perform the essential functions of DCBOE/OCF Investigator based factors including but not limited to, his education, experience, performance reviews, and October 2018 return-to-work letter.

2212.    Plaintiff, at all times relevant to this action, was an employee within the meaning of 42 U.S.C. § 12111(4).

2223.    Takeda, at all times relevant to this action, was Plaintiff's employer within the meaning of 42 U.S.C. § 12111(5). Takeda engaged in an industry affecting commerce and has more than 25 employees for each working day in each of 20 or more calendar weeks in the current and preceding years.

2234.    At all times relevant, the Individual Defendants, singularly and/or collectively, were agents of Plaintiff's employer, Takeda, within the meaning of 42 U.S.C. § 12111(5).

2245.    Defendants had actual knowledge or constructive knowledge of Plaintiff's disability at all times relevant to this action, in that Takeda received notice that Plaintiff was

taking Short Term Disability Leave, Plaintiff discussed her disability with Defendants, Plaintiff discussed compensation while on leave for her disability with Defendants, and previously accommodated Plaintiff's disability; discussed Plaintiff's disability; Defendants examined, reviewed, or possessed medical evidence of Plaintiff's disability.

2256. Defendants purposefully, willfully, intentionally, or recklessly subjected Plaintiff to a hostile work environment by engaging in a series of actions, including:

a. Harassing and ridiculing Plaintiff because of her disability;

b. Threatening Plaintiff;

c. Refusing to compensate Plaintiff while she was entitled to compensation on Short Term Disability Leave;

d. Forcing Plaintiff to work while she was on Short Term Disability Leave;

e. Publicizing that Plaintiff was disabled to one or more persons;

f. Denying Plaintiff's request for a medical accommodation without any justification;

g. Refusing to inform Plaintiff why her medical accommodation request was denied;

h. Threatening to terminate Plaintiff because she is disabled;

i. Denying Plaintiff a promotion because she is disabled;

j. Assigning Plaintiff additional work outside the scope of her duties because she is disabled; and

k. Failing to compensate Plaintiff for the additional work she performed at Takeda outside the scope of her duties because she is disabled.

58

2267.    Defendants committed the aforesaid acts or omissions with the intent to humiliate, ridicule, insult, demean, coerce, and embarrass Plaintiff and with the intent to discriminate against her.

2278.    The aforesaid adverse employment actions occurred because Plaintiff is disabled.

2289.    The aforesaid adverse employment actions occurred because Plaintiff requested an accommodation and/or engaged in protected activity by taking a leave of absence because she is disabled.

229230.        All allegations set forth herein violate the ADA.

2301.    As a direct and proximate result of Defendants' actions or omissions complained of herein, Plaintiff sustained economic injuries in amount in excess of $75,000.00, including the denial of promotional opportunity, humiliation, embarrassment, unnecessary pain and suffering, and has incurred medical expenses, attorneys' fees, and costs associated with this action.

<u>**COUNT VIII – Failure to Accommodate (Disability)**</u>
**Violation of the ADA**
(*Against* ~~Defendants~~*Takeda*)

2312.    Plaintiff incorporates all preceding and subsequent paragraphs hereto as if fully set forth herein.

2323.    Plaintiff is a disabled person as intended by the ADA.

2334.    Plaintiff is qualified to perform the essential functions of his job if provided a reasonable accommodation by his employer.

2345.    Plaintiff is an employee and Defendants are Plaintiff's employer as intended by the ADA.

2356.    Defendants had notice of Plaintiff's disability through actual or constructive knowledge, in that Defendants previously accommodated Plaintiff's disability; discussed Plaintiff's disability; discussed Plaintiff's need for reasonable accommodation; examined,

reviewed, or possessed medical evidence of Plaintiff's disability, and received Plaintiff's numerous requests asking for such accommodation.

236~~6~~7.   Defendants knowingly, intentionally, recklessly, negligently, or by gross negligence, discriminated against Plaintiff because of his disability by failing or refusing to provide Plaintiff a reasonable accommodation.

237~~7~~8.   Providing Plaintiff such accommodation would not cause Defendants to incur undue hardship, either financially or otherwise.

238~~8~~9.   All allegations set forth herein violate the ADA.

~~239~~240.        As a direct and proximate result of Defendants' actions or omissions, Plaintiff sustained economic injuries in amount in excess of $75,000.00, including the denial of promotional opportunity, humiliation, embarrassment, unnecessary pain and suffering, and has incurred medical expenses, attorneys' fees, and costs associated with this action.

### COUNT IX – Hostile Work Environment (Disability)
**Violation of the ADA**
(*Against ~~All Defendants~~Takeda*)

240~~0~~1.   Plaintiff incorporates all preceding and subsequent paragraphs hereto as if fully set forth herein.

241~~1~~2.   Plaintiff is a disabled person as intended by the ADA.

242~~2~~3.   Plaintiff is qualified to perform the essential functions of her job if provided a reasonable accommodation by his employer.

243~~3~~4.   Plaintiff is an employee and Defendants are Plaintiff's employer as intended by the ADA.

244~~4~~5.   Defendants had actual or constructive knowledge of Plaintiff's disability and was on notice of Plaintiff's disability at all times relevant.

60

2456. Defendants, with the intent to intimidate, ridicule, and insult Plaintiff, created a hostile and abusive work environment by committing the acts or omissions alleged in this Complaint and incorporated by reference herein.

2467. Defendants took the adverse employment actions alleged in this Complaint and incorporated by reference herein because Plaintiff requested an accommodation and engaged in protected activity in requesting an accommodation and reporting harassment and hostility in the workplace.

2478. All allegations set forth herein violate the ADA.

2489. As a direct and proximate result of Defendant's actions or omissions, Plaintiff sustained economic injuries in amount in excess of $75,000.00, including the denial of promotional opportunity, humiliation, embarrassment, unnecessary pain and suffering, and has incurred medical expenses, attorneys' fees, and costs associated with this action.

## COUNT X – Retaliation (Disability)
### Violation of the ADA
(*Against All DefendantsTakeda*)

249250. Plaintiff incorporates by reference all preceding and subsequent paragraphs hereto as if fully set forth herein.

2501. Plaintiff is a disabled person as intended by the ADA.

2512. Plaintiff is qualified to perform the essential functions of his job if provided a reasonable accommodation by his employer.

2523. Plaintiff is an employee and Defendants are Plaintiff's employer as intended by the ADA.

2534. Defendants had notice of Plaintiff's disability through actual or constructive knowledge, in that Defendants previously accommodated Plaintiff's disability; discussed Plaintiff's disability; discussed Plaintiff's need for reasonable accommodation; examined,

61

reviewed, or possessed medical evidence of Plaintiff's disability, and received Plaintiff's

numerous requests asking for such accommodation.

2545.    Plaintiff engaged in protected activity by requesting an accommodation for his

disability, and by protesting Defendant Coleman-Rollins' unlawful discriminatory and harassing

conduct.

2556.    Defendant Coleman-Rollins purposefully, willfully, intentionally, or recklessly

retaliated against Plaintiff by engaging in a series of adverse actions, including:

a.    Harassing and ridiculing Plaintiff because of her disability;

b.    Threatening Plaintiff;

c.    Refusing to compensate Plaintiff while she was entitled to compensation on Short

Term Disability Leave;

d.    Forcing Plaintiff to work while she was on Short Term Disability Leave;

e.    Publicizing that Plaintiff was disabled to one or more persons;

f.    Denying Plaintiff's request for a medical accommodation without any

justification;

g.    Refusing to inform Plaintiff why her medical accommodation request was denied;

h.    Threatening to terminate Plaintiff because she is disabled;

i.    Denying Plaintiff a promotion because she is disabled;

j.    Assigning Plaintiff additional work outside the scope of her duties because she is

disabled; and

k.    Failing to compensate Plaintiff for the additional work she performed at Takeda

outside the scope of her duties because she is disabled.

25~~6~~7.   Defendants committed the aforesaid acts or omissions with the intent to humiliate, ridicule, insult, demean, coerce, and embarrass Plaintiff and with the intent to retaliate against her.

25~~7~~8.   Defendants actions complained of herein violate the ADA.

25~~8~~9.   As a direct and proximate result of Defendants' retaliation, Plaintiff sustained economic injuries in amount in excess of $75,000.00, including the denial of promotional opportunity, humiliation, embarrassment, unnecessary pain and suffering, and has incurred medical expenses, attorneys' fees, and costs associated with this action.

## COUNT XI – DISABILITY DISCRIMINATION
### Violation of the FCRA
**(*Against ~~All Defendants~~Takeda*)**

~~259~~260.   Plaintiff re-alleges and incorporates by reference all preceding paragraphs as if fully set forth herein.

26~~0~~1.   Plaintiff is a disabled person within the meaning of the FCRA.

26~~1~~2.   Plaintiff suffers from depression, which is a physical or mental impairment that substantially limits one or more of Plaintiff's major life activities, such as caring for himself, performing manual tasks, eating, sleeping, breathing, learning, reading, concentrating, thinking, communicating, and working. Defendants also regard Plaintiff as having such an impairment as defined by the FCRA.

26~~2~~3.   Plaintiff is a qualified individual within the meaning of the FCRA. Plaintiff, with or without a reasonable accommodation, can perform the essential functions of her job-based factors including but not limited to, her education, experience, performance reviews, and voluminous performance-based awards earned throughout her career.

26~~3~~4.   Plaintiff, at all times relevant to this action, was an employee within the meaning of the FCRA.

2645. Takeda, at all times relevant to this action, was Plaintiff's employer within the meaning of the FCRA. Takeda engaged in an industry affecting commerce and has more than 25 employees for each working day in each of 20 or more calendar weeks in the current and preceding years.

2656. At all times relevant, the Individual Defendants, singularly and/or collectively, were agents of Plaintiff's employer, Takeda, within the meaning of the FCRA.

2667. Defendants had actual knowledge or constructive knowledge of Plaintiff's disability at all times relevant to this action, in that Takeda received notice that Plaintiff was taking Short Term Disability Leave, Plaintiff discussed her disability with Defendants, Plaintiff discussed compensation while on leave for her disability with Defendants, and previously accommodated Plaintiff's disability; discussed Plaintiff's disability; Defendants examined, reviewed, or possessed medical evidence of Plaintiff's disability.

2678. Defendants purposefully, willfully, intentionally, or recklessly subjected Plaintiff to a hostile work environment by engaging in a series of actions, including:

a.    Harassing and ridiculing Plaintiff because of her disability;

b.    Threatening Plaintiff;

c.    Refusing to compensate Plaintiff while she was entitled to compensation on Short Term Disability Leave;

d.    Forcing Plaintiff to work while she was on Short Term Disability Leave;

e.    Publicizing that Plaintiff was disabled to one or more persons;

f.    Denying Plaintiff's request for a medical accommodation without any justification;

g.    Refusing to inform Plaintiff why her medical accommodation request was denied;

64

h.      Threatening to terminate Plaintiff because she is disabled;

i.      Denying Plaintiff a promotion because she is disabled;

j.      Assigning Plaintiff additional work outside the scope of her duties because she is disabled; and

k.      Failing to compensate Plaintiff for the additional work she performed at Takeda outside the scope of her duties because she is disabled;

268~~8~~9. Defendants committed the aforesaid acts or omissions with the intent to humiliate, ridicule, insult, demean, coerce, and embarrass Plaintiff and with the intent to discriminate against her.

~~269~~270.      The aforesaid adverse employment actions occurred because Plaintiff is disabled;

270~~0~~1. The aforesaid adverse employment actions occurred because Plaintiff requested an accommodation and/or engaged in protected activity by taking a leave of absence because she is disabled;

271~~1~~2. All allegations set forth herein violate the ADA.

272~~2~~3. As a direct and proximate result of Defendants' actions or omissions complained of herein, Plaintiff sustained economic injuries in amount in excess of $75,000.00, including the denial of promotional opportunity, humiliation, embarrassment, unnecessary pain and suffering, and has incurred medical expenses, attorneys' fees, and costs associated with this action.

**COUNT XII – Failure to Accommodate (Disability)**
**Violation of the FCRA**
(*Against* ~~*Defendants*~~*Takeda*)

273~~3~~4. Plaintiff incorporates all preceding and subsequent paragraphs hereto as if fully set forth herein.

274~~4~~5. Plaintiff is a disabled person as intended by the FCRA.

65

275 6.    Plaintiff is qualified to perform the essential functions of her job if provided a reasonable accommodation by his employer.

276 7.    Plaintiff is an employee and Defendants are Plaintiff's employer as intended by the FCRA.

277 8.    Defendants had notice of Plaintiff's disability through actual or constructive knowledge.

278 9.    Defendants knowingly, intentionally, recklessly, negligently, or by gross negligence, discriminated against Plaintiff because of her disability by failing or refusing to provide Plaintiff a reasonable accommodation.

279 280.    Providing Plaintiff such accommodation would not cause Defendants to incur undue hardship, either financially or otherwise.

280 1.    All allegations set forth herein violate the FCRA.

281 2.    As a direct and proximate result of Defendants' actions or omissions, Plaintiff sustained economic injuries in amount in excess of $75,000.00, including the denial of promotional opportunity, humiliation, embarrassment, unnecessary pain and suffering, and has incurred medical expenses, attorneys' fees, and costs associated with this action.

**COUNT XIII – Hostile Work Environment (Disability)**
**Violation of the FCRA**
(*Against* ~~Defendants~~*Takeda*)

282 3.    Plaintiff incorporates all preceding and subsequent paragraphs hereto as if fully set forth herein.

283 4.    Plaintiff is a disabled person as intended by the FCRA.

284 5.    Plaintiff is qualified to perform the essential functions of her job if provided a reasonable accommodation by her employer.

66

285~~5~~6.   Plaintiff is an employee and Defendants are Plaintiff's employer as intended by the FCRA.

286~~6~~7.   Defendants had actual or constructive knowledge of Plaintiff's disability and was on notice of Plaintiff's disability at all times relevant.

287~~7~~8.   Defendants, with the intent to intimidate, ridicule, and insult Plaintiff, created a hostile and abusive work environment by committing the acts or omissions alleged in this Complaint and incorporated by reference herein.

288~~8~~9.   Defendants took the adverse employment actions alleged in this Complaint and incorporated by reference herein because Plaintiff requested an accommodation and engaged in protected activity in requesting an accommodation and reporting harassment and hostility in the workplace.

289~~9~~0.   All allegations set forth herein violate the FCRA.

290~~0~~1.   As a direct and proximate result of Defendant's actions or omissions, Plaintiff sustained economic injuries in amount in excess of $75,000.00, including the denial of promotional opportunity, humiliation, embarrassment, unnecessary pain and suffering, and has incurred medical expenses, attorneys' fees, and costs associated with this action.

**COUNT XIV – Retaliation (Disability)**
**Violation of the FCRA**
(*Against* ~~Defendants~~*Takeda*)

291~~1~~2.   Plaintiff incorporates by reference all preceding and subsequent paragraphs hereto as if fully set forth herein.

292~~2~~3.   Plaintiff is a disabled person as intended by the FCRA.

293~~3~~4.   Plaintiff is qualified to perform the essential functions of his job if provided a reasonable accommodation by his employer.

67

294~~5~~. Plaintiff is an employee and Defendants are Plaintiff's employer as intended by the FCRA.

295~~6~~. Defendants had notice of Plaintiff's disability through actual or constructive knowledge.

296~~7~~. Plaintiff engaged in protected activity by requesting an accommodation for his disability, and by protesting Defendants Gayle-Garcia, Hand, Crouch, Mealey, and Miller's unlawful discriminatory and harassing conduct.

297~~8~~. Takeda purposefully, willfully, intentionally, or recklessly retaliated against Plaintiff by engaging in a series of adverse actions as alleged above and incorporated herein by reference.

298~~9~~. Defendants Gayle-Garcia, Hand, Crouch, Mealey, and Miller purposefully, willfully, intentionally, or recklessly retaliated against Plaintiff by engaging in a series of adverse actions as alleged above and incorporated herein by reference.

~~299~~300. Defendants committed the aforesaid acts or omissions with the intent to humiliate, ridicule, insult, demean, coerce, and embarrass Plaintiff and with the intent to retaliate against her.

~~300. Defendants'~~301. Defendants actions complained of herein violate the FCRA.

30~~1~~2. As a direct and proximate result of Defendants' retaliation, Plaintiff sustained economic injuries in amount in excess of $75,000.00, including the denial of promotional opportunity, humiliation, embarrassment, unnecessary pain and suffering, and has incurred medical expenses, attorneys' fees, and costs associated with this action.

68

**COUNT XV – INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS**
**Violation of Florida Common Law**
(*Against Defendants Gayle-Garcia, Hand, Crouch, Mealey, and Miller*)

30~2~3.   Plaintiff incorporates by reference all preceding and subsequent paragraphs hereto as if fully set forth herein.

30~3~4.   At all times relevant, Defendants engaged in extreme and outrageous conduct by:

a.   Creating, applying, following, enforcing, and otherwise adhering to one set of rules for Plaintiff, who is a Caucasian female over the age of 40, while creating, applying, following, enforcing, and otherwise adhering to a different, more lenient set of rules for Plaintiff's counterpart, Mr. Davis, who is an African American male under the age of 40;

b.   Allowing Mr. Davis to have a second income because Mr. Davis is an African American male under the age of 40 while not allowing Plaintiff to have a second income because Plaintiff is a Caucasian female over the age of 40;

c.   Vigorously investigating Plaintiff for approximately one month after having even just a suspicion she had a second income because Plaintiff is a Caucasian female over the age of 40 while congratulating Mr. Davis on obtaining a second job and income in company-wide correspondence and by other means because Mr. Davis is an African American male under the age of 40;

d.   Hiring and retaining Mr. Davis because he is an African American male under the age of 40 while conditioning Plaintiff's retention and continued employment on her performance because Plaintiff is a Caucasian female over the age of 40;

e.   Forcing Plaintiff to complete Mr. Davis' work and otherwise refusing to compel Mr. Davis to perform at similar or equal standards because Mr. Davis is an African American male under the age of 40 and Plaintiff is a Caucasian female over the age of 40;

69

f.     Refusing to hold Mr. Davis accountable for failing to perform because Mr. Davis is an African American male under the age of 40 while holding Plaintiff's performance to a much more stringent standard because Plaintiff is a Caucasian female over the age of 40;

g.     Ignoring Mr. Davis' repeated violations of at least three (3) different company policies because Mr. Davis is an African American male under the age of 40 while voraciously pursuing Plaintiff after a single instance in which Plaintiff allegedly violation a single company policy because Plaintiff is a Caucasian female over the age of 40;

h.     Forcing Plaintiff to perform Mr. Davis' work while not forcing Mr. Davis to perform at or near the same level because Plaintiff is a Caucasian female over the age of 40 and Mr. Davis is an African American male under the age of 40;

i.     Taking Mr. Davis' emotions into account and instructing Plaintiff to inquire about Mr. Davis' well-being after the death of George Floyd and otherwise caring about Mr. Davis' emotional state because Mr. Davis is an African American male under the age of 40 while ignoring or otherwise not even acknowledging Plaintiff's emotional state following the death of her brother in 2005 or the death of her sister in 2009 because Plaintiff is a Caucasian female over 40;

j.     Turning a blind eye to Mr. Davis refusing to return to the field because he was "uncomfortable" because Mr. Davis is an African American male under the age of 40 while entirely ignoring Plaintiff's "comfortability" and need for a leave of absence due to depression because Plaintiff is a Caucasian female over 40;

k.     Refusing to commend Plaintiff for performing exceptionally well and significantly better than Mr. Davis based on objective statistics because Plaintiff is a Caucasian female over the age of 40 and Mr. Davis is an African American male under the age of 40;

70

l.      Establishing two different sets of performance standards for Plaintiff and Mr. Davis and applying a more stringent performance standard to Plaintiff because she is a Caucasian female over the age of 40 while applying a less stringent performance standard to Mr. Davis because he is an African American male under the age 40;

m.      Giving Mr. Davis a job he was not qualified for because he is an African American male under the age of 40;

n.      Retaining Mr. Davis because he is an African American male under the age of 40 while attempting to terminate Plaintiff or otherwise constructively oust Plaintiff because she is a Caucasian female over the age of 40;

o.      Refusing to hold Mr. Davis accountable because he is an African American male under the age of 40 despite knowing he was performing at an unsatisfactory level;

p.      Directing Plaintiff to supervise and hold Mr. Davis accountable for underperforming because Plaintiff is a Caucasian female over the age of 40;

q.      Denying Plaintiff's lawful entitlement to paid short term disability leave because she is a Caucasian female over the age of 40 while paying Mr. Davis a salary and bonus despite the fact that he was underperforming, despite his failure to complete the duties of his job, and despite working a second job during business hours in violation of company policy, and doing so because Mr. Davis is an African American male under the age of 40;

r.      Attempting to stifle Plainitiff's career growth because she is a Caucasian female over the age of 40 and in an attempt to mitigate the actual and legitimate disparity between her performance and Mr. Davis' performance because Mr. Davis is an African American male under the age of 40;

71

s.    Intentionally failing to inform Plaintiff that she had been selected based on merit for a district wide conference call to forcibly lower Plaintiff's performance because she is a high performing Caucasian female over the age of 40 who objectively excelled in her career based on merit and at a statistically higher rate than Mr. Davis, who is an African American male under the age of 40;

t.    Giving Mr. Davis preferential treatment over Plaintiff because Mr. Davis is an African American male under the age of 40 and Plaintiff is a Caucasian female over the age of 40;

u.    Refusing to accommodate Plaintiff in regard to company policies because she is a Caucasian female over the age of 40 while accommodating Mr. Davis in regard to company policies because he is an African American male under the age of 40;

v.    Harassing and ridiculing Plaintiff;

w.    Refusing to provide any information as to why it denied Plaintiff's accommodation request;

x.    Implementing, promulgating, and enforcing a mandatory vaccination policy without any intention of ever giving religious accommodation requests any meaningful review or consideration;

y.    Implementing, promulgating, and enforcing a mandatory vaccination policy without any intention of ever granting a religious accommodation to Plaintiff regardless of her lawful entitlement to a religious accommodation;

z.    Forcing Plaintiff to apply for a religious accommodation and participate in a "sham" accommodation request process where the decision to deny her request was pre-determined;

72

aa.     Failing to give due consideration or review Plaintiff's accommodation request on a case-by-case basis;

bb.     Screaming, demeaning, ridiculing, harassing, embarrassing, humiliating, condemning, threatening, and otherwise inflicting emotional distress upon Plaintiff because she requested an accommodation;

cc.     Scheduling a "Discussion" meeting to facilitate an environment for Mr. Crouch and Mr. Hand to engage in the aforesaid action alleged in the above sub-paragraph;

dd.     Lying to Plaintiff by claiming the vaccines effectuated the means sought to be effectuated by the COVID-19 vaccination policy;

ee.     Concealing the efficacy and safety of the vaccines Takeda sought to coerce into Plaintiff's body;

ff.     Lying to Plaintiff concerning the vaccines' ability to prevent contraction of COVID-19;

gg.     Lying to Plaintiff concerning the vaccines' ability to prevent transmission of COVID-19;

hh.     Lying to Plaintiff by telling her Takeda would endure an "undue hardship" if it maintained Plaintiff's employment if she remained unvaccinated;

ii.     Assigning Plaintiff additional work outside the scope of her duties because she is religious;

jj.     Failing to compensate Plaintiff for the additional work she performed at Takeda outside the scope of her duties because she is religious;

kk.     Refusing to accommodate Plaintiff despite her lawful entitlement to such an accommodation;

73

ll.   Harassing and ridiculing Plaintiff because of her disability;

mm.   Threatening Plaintiff;

nn.   Refusing to compensate Plaintiff while she was entitled to compensation on Short Term Disability Leave;

oo.   Forcing Plaintiff to work while she was on Short Term Disability Leave;

pp.   Publicizing that Plaintiff was disabled to one or more persons;

qq.   Denying Plaintiff's request for a medical accommodation without any justification;

rr.   Refusing to inform Plaintiff why her medical accommodation request was denied;

ss.   Threatening to terminate Plaintiff because she is disabled;

tt.   Denying Plaintiff a promotion because she is disabled;

uu.   Assigning Plaintiff additional work outside the scope of her duties because she is disabled; and

vv.   Failing to compensate Plaintiff for the additional work she performed at Takeda outside the scope of her duties because she is disabled.

3045.   As a direct and proximate result of Defendants' aforesaid intentional or reckless conduct, Plaintiff suffered extreme emotional distress resulting in physical manifestations of symptoms including but not limited to, loss of sleep, weight gain, upset stomach and related abdominal pain, and loss of appetite, sustained economic injuries in amount in excess of $75,000.00, including the denial of promotional opportunity, humiliation, embarrassment, unnecessary pain and suffering, and has incurred medical expenses, attorneys' fees, and costs associated with this action.

74

## **DAMAGES**

30<s>5</s>6.   Based on all foregoing paragraphs, and as a direct and proximate result of Defendants' conduct, Plaintiff has suffered the following injuries and incurred the following damages:

a.      Plaintiff was denied a promotion for which Defendants recommended and encouraged Plaintiff to apply and otherwise knew Plaintiff was the most qualified candidate for as a direct and proximate result of the conduct complained of herein, which ultimately resulted in lost wages, the denial of promotional opportunity, and otherwise deprivation of career advancement and other pay and benefits associated with the promotion;

b.      Plaintiff was forced to take a Short Term Leave of Absence due to the conduct complained of herein and such conduct is the direct and proximate result of the condition Plaintiff sustained requiring her to take leave and the direct and proximate cause as to why Plaintiff took leave, and Plaintiff was entitled to compensation while on leave. However, Defendants have not fully compensated Plaintiff and continue to refuse to fully compensate Plaintiff for the time she was on leave, and the conduct complained of herein directly and proximately has caused Plaintiff loss of wages and further directly and proximately caused Plaintiff to incur necessary and medically-related costs and expenses;

c.      Plaintiff suffered mental anguish, extreme emotional distress in the forms of depression, stress, anxiety attacks, anger, frustration, feelings of loneliness, dissociation, hopelessness, nightmares and daytime terrors, shortness of breath, hot flashes, loss of concentration, loss of sleep, low self-esteem, lack of ability to socialize with others, lack of enjoyment in previously-enjoyed recreational activities, upset stomach and related abdominal pain, indigestion, loss of appetite and other physical manifestations of symptoms as a direct and

75

proximate result of the conduct complained of herein and the actions giving rise to this Complaint.

D: Defendants, individually and collectively, engaged of the conduct complained of herein with actual knowledge of the wrongfulness of the conduct and the high probability that injury or damage to the claimant would result and, despite that knowledge, intentionally pursued that course of conduct, resulting in injury or damage. Defendants Gayle-Garcia, Hand, Crouch, Mealey, and Miller actively and knowingly participated and engaged in the conduct giving rise to this action and actively and knowingly committed the adverse employment actions complained of herein and Takeda's officers, directors, or managers knowingly condoned, ratified, or consented to such the conduct upon which this action is based. As a result, Plaintiff is further entitled to punitive damages in an amount to be determined at trial.

## **DECLARATORY RELIEF**

306. Plaintiffs allege and incorporate by reference the allegations in the preceding paragraphs.

307. A present and actual controversy exists between Plaintiff and Defendants concerning Plaintiff's rights and Defendants' respective duties. Plaintiff contends that Defendants violated his rights under Title VII of the Civil Rights Act of 1964, Title II of the ADA and the FCRA. Plaintiff is informed and believes, and thereon alleges, that Defendants deny these allegations. Declaratory relief is therefore necessary and appropriate.

308. Plaintiffs seek a judicial declaration of the rights and duties of the respective parties.

## **ATTORNEY'S FEES**

310. Plaintiff is entitled to an award of attorney's fees and reimbursement of the costs and expenses incurred in relation to prosecuting this action pursuant to Title VII, 42 U.S.C. §

2000e-5(k), the ADA, 42 U.S.C. § 12205, and the FCRA, FLA. STAT. § 760.11(5), and any other applicable statutory provision(s) under which this action is brought.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff respectfully prays that this Honorable Court enter judgment in Plaintiff's favor, and award Plaintiff such relief as to make Plaintiff whole and remedy the aforesaid violations; and hold Defendants' jointly and severely liable and in doing so, award all legal and equitable relief provided by law, including but not limited to:

A.      Declaratory relief finding Defendants' actions are unconstitutional;

B.      Permanently enjoin Defendants from engaging in the unlawful discrimination and retaliation complained of herein;

C.      Grant all injunctive relief necessary to bring Defendants into compliance with the ADA and Florida law;

D.      Grant declaratory relief pursuant to the statements above;

E.      Award compensatory damages for Plaintiffs' pecuniary losses as well as for non-economic losses including without limitation, emotional pain and suffering, in an amount to be proven at trial but in no amount less than $25,000,000.00;

F.      Award punitive damages in an amount to be determined at trial;

G.      Award statutory minimum damages;

H.      Order Defendants to pay Plaintiffs' reasonable attorneys' fees, reasonable expert witness fees, and other costs of this action;

I.      Award interest on damages, including pre- and post-judgment interest and an upward adjustment for inflation; and

J.      Grant such other and further relief as the court deems just and proper.

77

## JURY DEMAND

Plaintiff demands trial by jury of all claims and causes of action so triable.

Dated: ~~March 15~~August 23, 2023

Respectfully submitted,

SHANNON OLSON

By: /s/ MICHAEL A. YODER
Michael A. Yoder*
LAW OFFICE OF MICHAEL A. YODER, PLLC
2300 Wilson Blvd., Suite 700
Arlington, VA 22201
Tel: (571) 234-5594
michael@yoderesq.com
*admitted *pro hac vice*

By: /s/ MICHAEL A. MENDOZA
Michael A. Mendoza (FLB No. 1020250)
MENDOZA LAW, P.A.
618 E South Street, Suite 110
Orlando, FL 32801
Tel: (407) 720-7211
michael@mendozalawpa.com

~~By: /s/ MICHAEL A. YODER~~
~~Michael A. Yoder* (DC Bar: 1600519)~~
~~LAW OFFICE OF MICHAEL A. YODER, PLLC~~
~~2300 Wilson Blvd., Suite 700~~
~~Arlington, VA 22201~~
~~Tel: (571) 234-5594~~
~~michael@yoderesq.com~~
~~**pro hac vice* forthcoming~~

*Counsel for Plaintiff Shannon Olson*

78