# UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF FLORIDA
## TAMPA DIVISION

SHANNON OLSON,

      Plaintiff,

    v.

TAKEDA PHARMACEUTICALS
AMERICA, INC,

      Defendant.

CASE NO: 8:23-CV-00590-TPB-CPT

**JURY TRIAL DEMANDED**

## DEFENDANT TAKEDA PHARMACEUTICALS AMERICA, INC'S ANSWER TO PLAINTIFF'S THIRD AMENDED COMPLAINT

Defendant Takeda Pharmaceuticals America, Inc., pursuant to Rule 8 of the Federal Rules of Civil Procedure, submits the following answer and affirmative defenses.

## AS TO THE PRELIMINARY STATEMENT

Takeda states that Olson's "preliminary statement" is not a factual allegation to which any response is required. To the extent a response is required, Takeda admits that it employs Olson as a Senior Sales Representative and that it formerly employed Jordan Davis as a Sales Representative. Takeda denies the remaining content of Olson's preliminary statement.

## THE PARTIES

### COMPLAINT ¶ 1:

Plaintiff Shannon Olson ("Plaintiff") is a Christian female over the age of forty (40), and a resident of Pinellas County, Florida. At all times relevant, Plaintiff has maintained an employer-employee relationship with Takeda insofar as Takeda employs Plaintiff as a pharmaceutical sales representative. In this role,

307780376v.3

Plaintiff serves Takeda's neuroscience division and its clients located within the Jacksonville District——one of the six geographic territories to which Takeda assigns its Florida-based sales representatives.

**ANSWER:**

Takeda admits that Olson is a female over the age of 40 and a resident of Pinellas County, Florida. Takeda also admits that Olson is a Takeda employee who serves Takeda's neuroscience division and its clients located within the Jacksonville District. Takeda admits that the Jacksonville District is one of the six geographic territories to which Takeda assigns Florida-based Sales Representatives. Takeda denies the remaining allegations in Paragraph No. 1.

**COMPLAINT ¶ 2:**

Defendant Takeda Pharmaceuticals America, Inc. is a Japanese global, research and development-driven pharmaceutical company that maintains its principal place of business in the United States in Middlesex County, Massachusetts. Takeda conducts substantial business nationwide, including inter alia in the State of Florida, and more specifically, in Pinellas County.[1] At all times relevant, Takeda is Plaintiff's employer as intended by Title VII, the ADA, and the FCHRA, in that Takeda has employed and currently employs more than fifty (50) persons, including Plaintiff.

**ANSWER:**

Takeda admits that it is a Japanese global biopharmaceutical company that maintains its principal place of business in the United States in Middlesex County, Massachusetts. Takeda admits that it conducts business nationwide, including Pinellas County in the State of Florida. Takeda admits that Pinellas County is within the jurisdiction of the Middle District of Florida, Tampa Division. Takeda admits that it employs Olson. Takeda admits that Takeda

---

[1] Pinellas County Florida is within the jurisdiction of the Middle District of Florida's Tampa Division.

307780376v.3

currently employs more than fifty (50) persons, including Olson. Takeda denies

any remaining allegations in Paragraph No. 2.

## JURISDICTION AND VENUE

**COMPLAINT ¶ 3:**

Jurisdiction of this Court is invoked pursuant to 28 U.S.C. §§ 451, 1331, 1337, 1343 and 1345. This action is authorized and instituted pursuant to Section 706(f)(1) and (3) of Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e-5(f)(1) and (3) ("Title VII"), 42 U.S.C. § 12117 ("ADA"), and Section 102 of the Civil Rights Act of 1991, 42 U.S.C. § 1981a.

**ANSWER:**

Takeda admits that jurisdiction is proper in this Court under 28 U.S.C. §

1331 and 1367. Takeda denies the remaining allegations in Paragraph No. 3.

**COMPLAINT ¶ 4:**

This Court has supplemental jurisdiction pursuant to 28 U.S.C. § 1367 over Plaintiff's FCHRA claims brought pursuant to Fl. Stat. §§ 760.01, et seq., in that Plaintiff has satisfied all conditions precedent to maintaining her FCHRA claims and because her FCHRA claims are so closely related to Plaintiff's federal claims underlying this Court's original jurisdiction, the "same case or controversy requirement" prescribed by Article III of the United States Constitution is satisfied.

**ANSWER:**

Takeda admits that the Court has supplemental jurisdiction under 28

U.S.C. § 1367 for Olson's claim under the Florida Civil Rights Act. Takeda denies

the remaining allegations in Paragraph No. 4.

**COMPLAINT ¶ 5:**

Venue is proper in this District pursuant to 28 U.S.C. §§ 1391(b)(2) and 1391(c), in that the unlawful employment practices alleged herein were committed within the Middle District of Florida's Tampa Division. Plaintiff resides within this Division, Plaintiff works for Takeda from her home office located within this Division, and Takeda employs more than fifty (50) other

3

307780376v.3

persons who reside within this Division, including Plaintiff and upon information and belief, each of the Takeda employees mentioned[2] by name in this SAC.

**ANSWER:**

Takeda admits that venue is proper in this Court. Takeda denies the

remaining allegations in Paragraph No. 5.

**ADMINISTRATIVE PROCEDURES**

**COMPLAINT ¶ 6:**

On or about December 22, 2021, Plaintiff filed a Charge of Discrimination ("Charge") with the Equal Employment Opportunity Commission ("EEOC") on the basis that Takeda discriminated against her on the basis of her race, sex, religion, age, disability, and retaliation in satisfaction 42 U.S.C. § 2000e5(e)(b) and (e) and 42 U.S.C. § 12117(a).

**ANSWER:**

Takeda admits that Olson filed a Charge of Discrimination with the Equal

Employment Opportunity Commission ("EEOC"), Charge No 523-2022-00202

("Charge") on December 22, 2021. Takeda denies the remaining allegations in

Paragraph No. 6.

**COMPLAINT ¶ 7:**

Based on the work-sharing agreement entered into between the EEOC and the Florida Commission on Human Relations ("FCHR") and the cross-filing designation Plaintiff included on her EEOC Charge, Plaintiff is deemed to have timely filed her FCHR charge regarding her FCHRA claims asserted herein.

**ANSWER:**

Takeda denies the allegations in Paragraph No. 7.

---

[2] Plaintiff mentions multiple Takeda employees in her SAC, including those previously named as Defendants in this action. However, in accordance with the Court's November 29, 2023 order dismissing Plaintiff's claims against all individual defendants, these individuals are omitted as parties to this action and Plaintiff only mentions their names for clarity and to provide sufficient specificity as to satisfy the Twombly/Iqbal pleading standard.

4

**COMPLAINT ¶ 8:**

On or about December 15, 2022, the EEOC concluded its investigation and issued Plaintiff a Notice of Right to Sue ("right-to-sue letter"), which inter alia provided Plaintiff ninety (90) days to commence this action in federal court. Upon receiving her right-to-sue letter, Plaintiff is deemed to have fully satisfied the FCHR exhaustion requirement concerning her FCHRA claims.

**ANSWER:**

Takeda admits that the EEOC issued a Notice of Right to Sue dated December 15, 2022. Takeda denies the remaining allegations in Paragraph No. 8.

**COMPLAINT ¶ 9:**

On March 15, 2023, which is less than ninety (90) days from the date on which Plaintiff received her right-to-sue letter, Plaintiff commenced this action. (ECF No. 1)[3]

**ANSWER:**

Takeda admits that Olson filed her original complaint on March 15, 2023. Takeda lacks knowledge or information sufficient to form a belief about the truth of the remaining allegations in Paragraph No. 9.

**COMPLAINT ¶ 10:**

Accordingly, Plaintiff has exhausted all administrative remedies and she has fully satisfied all conditions precedent to maintaining this action, in that Plaintiff filed formal Charges of Discrimination with the EEOC and FCHR within 180 days of the last date of discrimination complained of herein, Plaintiff received her right-to-sue letter prior to initiating this action, and Plaintiff filed her Complaint within ninety (90) days of December 15, 2023––the date on which Plaintiff received the EEOC's Dismissal and Notice of Right to Sue.

**ANSWER:**

Takeda denies the allegations in Paragraph No. 10.

---

[3] Plaintiff filed her First Amended Complaint ("FAC") on August 24, 2023 (ECF No. 35), and on November 29, 2023, the Court dismissed Plaintiff's FAC with leave to refile a Second Amended Complaint ("SAC") on or before December 14, 2023. (ECF No. 54).

5

**STATEMENT OF FACTS**

**COMPLAINT ¶ 1:**<sic>

Plaintiff is a pharmaceutical sales representative employed by Takeda. In this role, Plaintiff serves Takeda's neuroscience division and its clients located within the Jacksonville District––one of the six geographic territories to which Takeda assigns its Florida-based sales representatives.

**ANSWER:**

Takeda admits that Olson serves Takeda's neuroscience division and its

clients located within the Jacksonville District. Takeda admits that it assigns its

Florida-based employees to the Jacksonville District and five other territories.

Takeda denies the remaining allegations in Paragraph No. 1.

**COMPLAINT ¶ 2:**

In April 2019, Takeda restructured its Salesforce.[4] As part of this restructuring effort, Takeda named Jodi Gayle-Garcia as its Business Manager for the Jacksonville District.

**ANSWER:**

Takeda admits the allegations in Paragraph No. 2.

**COMPLAINT ¶ 3:**

As the Jacksonville District's Business Manager, Ms. Gayle-Garcia was responsible for the managerial and supervisory roles of Takeda employees who worked within the Jacksonville District, including inter alia Plaintiff–– a Christian, Caucasian female over the age of 40––and Plaintiff's colleague, Mr. Jordan Davis ("Mr. Davis")––a black male under the age of 40.

---

[4] "Salesforce" is a multi-purpose term Takeda uses when referring to either (1) its sales management software database or (2) its field sales representatives as a collective group. For purposes of this pleading, which of the two meanings is applicable is made clear based upon the context in which the term is used.

6

307780376v.3

**ANSWER:**

Takeda admits that Olson is a Caucasian female over the age of 40 and that Jordan Davis is a black male under the age of 40. Takeda denies the remaining allegations in Paragraph No. 3.

**COMPLAINT ¶ 4:**

Like Plaintiff, Mr. Davis also served Takeda as a pharmaceutical sales representative.

**ANSWER:**

Takeda denies the allegations in Paragraph No. 4.

**COMPLAINT ¶ 5:**

Like Plaintiff, Mr. Davis also worked within Takeda's neuroscience division.

**ANSWER:**

Takeda admits the allegations in Paragraph No. 5.

**COMPLAINT ¶ 6:**

Like Plaintiff, Mr. Davis was assigned to perform his duties and serve Takeda's clients within the Jacksonville District territory.

**ANSWER:**

Takeda denies the allegations in Paragraph No. 6.

**COMPLAINT ¶ 7:**

Plaintiff and Mr. Davis held the same positions of employment, worked within the same Takeda division, and worked with the same Takeda clients and within the same geographic territory.

**ANSWER:**

Takeda denies the allegations in Paragraph No. 7.

7

307780376v.3

**COMPLAINT ¶ 8:**

The essential functions and duties of Plaintiff's job as a pharmaceutical sales representative were identical to the essential functions and duties of Mr. Davis' job, as a pharmaceutical representative.

**ANSWER:**

Takeda denies the allegations in Paragraph No. 8.

**COMPLAINT ¶ 9:**

At all times relevant and in Takeda's own words, "All sales reps are on even playing field", which calcified the notion that Plaintiff––a sales rep––and Mr. Davis––also a sales rep–– were identically situated.

**ANSWER:**

Takeda denies the allegations in Paragraph No. 9.

**COMPLAINT ¶ 10:**

At all times relevant, Plaintiff performed the essential functions and duties of her job at or in excess of Takeda's reasonable expectations, as evidenced by Plaintiff's performance-based awards and recognitions, her performance reviews and evaluations, and the statistical data showing Plaintiff was one of the top performers amongst Takeda's pharmaceutical sales representatives.

**ANSWER:**

Takeda denies the allegations in Paragraph No. 10.

**I.  Plaintiff's Outstanding Performance as a Pharmaceutical Sales Representative**

**COMPLAINT ¶ 11:**

Plaintiff has received awards and recognition on numerous occasions to commemorate her exceptional performance.

**ANSWER:**

Takeda admits that Olson has received awards from Takeda during her employment. Takeda denies the remaining allegations in Paragraph No. 11.

**COMPLAINT ¶ 12:**

An example of Plaintiff's stellar work ethic, credentials, and overall fortitude as a Takeda employee is highlighted in her 2019 performance review, which states in pertinent part:

> Shannon has made every effort to engage the team and foster a great team culture which includes building relationships with teammates and those across the district. Shannon fosters a supportive and inclusive team culture. Shannon continuously shows a respect for differing viewpoints within our team and values each person's unique identity, strengths and contribution.

**ANSWER:**

Takeda admits that Olson's 2019 Year End Performance Review states that "… with the acquisition in April Shannon has made every effort to engage the team and foster a great team culture which includes building relationships with teammate <sic> and those across the district." Takeda also admits that Olson's 2019 Year End Performance Review states that "Shannon fosters a supportive and inclusive team culture." Takeda further admits that Olson's 2019 Year End Performance Review states that "Shannon continuously shows a respect for differing viewpoints within our team and values each person's unique identity, strengths and contribution…" Takeda denies the remaining allegations contained in Paragraph No. 12.

**COMPLAINT ¶ 13:**

Another example of Plaintiff's remarkable performance is evidenced by the decision Takeda's Executive Leadership Team ("ELT") made in selecting Plaintiff to represent and speak on behalf of the Jacksonville, Florida District during ELT nationwide conference calls.

9

307780376v.3

**ANSWER:**

Takeda denies the allegations contained in Paragraph No. 13.

**COMPLAINT ¶ 14:**

The ELT is comprised of a select few, high-performing employees from each Takeda territory across the nation, and the conference calls the ELT held was the means by which Takeda was able to maintain its oversight and awareness of company activities and sales throughout the country during the COVID-19 pandemic.

**ANSWER:**

Takeda denies the allegations contained in Paragraph No. 14.

**COMPLAINT ¶ 15:**

As to specific performance numbers, during Q4 of 2020, the average engagements[5] Plaintiff executed was more than double the averages for both, the Regional and National Salesforce teams during Q4 of 2020. Plaintiff averaged eighty-five (85) meetings, while the regional average was 37.1 meetings, and the national average was just 35.2 meetings.

**ANSWER:**

Takeda denies the allegations contained in Paragraph No. 15.

**COMPLAINT ¶ 16:**

It is without a doubt that Plaintiff is qualified for her position as a pharmaceutical sales representative.

**ANSWER:**

Takeda denies the allegations contained in Paragraph No. 16.

**COMPLAINT ¶ 17:**

To the contrary, however, is Mr. Davis––who without a doubt, has not demonstrated that he is qualified to be a pharmaceutical sales representative.

---

[5] The term "engagements" refers to client meetings, which are crucial for generating new business and maintaining current business.

307780376v.3

**ANSWER:**

Takeda denies the allegations contained in Paragraph No. 17.

## II.    Mr. Davis' Remarkably Poor Performance as a Pharmaceutical Sales Representative

**COMPLAINT ¶ 18:**

Objectively and statistically speaking, Mr. Davis is one of the worst pharmaceutical sales representatives Takeda employs nationwide.

**ANSWER:**

Takeda denies the allegations contained in Paragraph No. 18.

**COMPLAINT ¶ 19:**

One example of an objective metric showing Plaintiff's far superior performance is exhibited in the August-September 2020 regional sales data. This data shows that the Jacksonville District accounted for 2.46% of regional[6] engagements, and of that 2.46%, Plaintiff accounted for 2.25% while Mr. Davis merely accounted for 0.21% of the engagements in the exact same region.

**ANSWER:**

Takeda denies the allegations contained in Paragraph No. 19.

**COMPLAINT ¶ 20:**

Another example is the Cresset Awards rankings system. Cresset Asset Management is a significant Takeda shareholder that offers annual awards to Takeda Salesforce employees who excel in generating revenue for the company–– which of course, is the overall goal Takeda's Salesforce employees, such as Plaintiff and Mr. Davis.

**ANSWER:**

Takeda denies the allegations contained in Paragraph No. 20.

---

[6] The "regional" metric is comprised of dozens of districts (e.g., the Jacksonville District) located in multiple states. It is a far larger geographic territory and operates analogously with the comparison of U.S. Circuit Courts of Appeal and U.S. District Courts and divisions.

11

307780376v.3

**COMPLAINT ¶ 21:**

In February 2021, Plaintiff ranked 140 spots above Mr. Davis in Takeda's Cresset Awards rankings.

**ANSWER:**

Takeda admits that, according to the Cresset Award Report issued in February 2021, Olson's Year to Date National Rank was 114 and Davis' Year to Date National Rank was 254, resulting in a difference of 140 spots. Takeda denies any remaining allegations in Paragraph No. 21.

**COMPLAINT ¶ 22:**

In March 2021, Plaintiff ranked 149 spots above Mr. Davis in Takeda's Cresset Awards rankings.

**ANSWER:**

Takeda denies the allegations in Paragraph No. 22.

**COMPLAINT ¶ 23:**

In April 2021, Plaintiff ranked 161 spots above Mr. Davis in Takeda's Cresset Awards rankings.

**ANSWER:**

Takeda denies the allegations in Paragraph No. 23.

**COMPLAINT ¶ 24:**

And had Plaintiff not taken disability leave on April 9, 2021 (as explained in more detail below), Plaintiff would have kept rising in the rankings and the disparity between Plaintiff's performance and Mr. Davis' performance would have continued to increase month after month.

**ANSWER:**

Takeda lacks sufficient knowledge or information to form a belief about the truth of the allegations in Paragraph No. 24.

307780376v.3

### III.   Ms. Gayle-Garcia & Mr. Davis' Poor Performance

**COMPLAINT ¶ 25:**

As the Jacksonville District's Business Manager, Ms. Gayle-Garcia is tasked with supervising Takeda's sales representatives assigned to her district, including both Plaintiff and Mr. Davis. And as a supervisor, one of Ms. Gayle-Garcia's tasks involved reviewing performance-based information and data.

**ANSWER:**

Takeda admits that Gayle-Garcia's position involved reviewing performance-based information and data. Takeda denies the remaining allegations in Paragraph No. 25.

**COMPLAINT ¶ 26:**

In reviewing sales data and other materials relevant to evaluating performance, Ms. Gayle-Garcia learned that Mr. Davis was spectacularly incapable of performing the essential functions and duties of his job, and his inability to proficiently perform was only exacerbated by when compared to the data revealing Plaintiff's spectacular performance.

**ANSWER:**

Takeda denies the allegations in Paragraph No. 26.

**COMPLAINT ¶ 27:**

Upon learning this as Plaintiff and Mr. Davis' supervisor, Ms. Gayle-Garcia knew something had to be done in order for Mr. Davis to remain employed.

**ANSWER:**

Takeda denies the allegations in Paragraph No. 27.

**COMPLAINT ¶ 28:**

Of course, most people who work in a supervisory capacity wants to see their subordinates perform well. It not only is in the best interests of their employer, but a subordinate's performance directly reflects on any given supervisor's ability to do their job.

13

307780376v.3

**ANSWER:**

Takeda lacks sufficient knowledge or information to form a belief about the truth of the allegations in Paragraph No. 28.

**COMPLAINT ¶ 29:**

Here, Ms. Gayle-Garcia certainly cared about Mr. Davis' performance, but she cared about how he performed with a slight, yet significant, difference.

**ANSWER:**

Takeda denies the allegations in Paragraph No. 29.

**COMPLAINT ¶ 30:**

Ms. Gayle-Garcia cared about Mr. Davis' performance, but only to the extent that on paper, it appeared as though Mr. Davis was performing poorly. She did not care the difference here is that Ms. Gayle-Garcia did not particularly care if Mr. Davis performed well––rather, all she cared about was that it did not appear as though Mr. Davis was performing poorly.

**ANSWER:**

Takeda denies the allegations in Paragraph No. 30.

**COMPLAINT ¶ 31:**

It did not matter to Ms. Gayle-Garcia whether Mr. Davis actually performed well or not. Even if he was performing poorly, so long as it did not appear as though he was performing poorly, Ms. Gayle-Garcia was content.

**ANSWER:**

Takeda denies the allegations in Paragraph No. 31.

**COMPLAINT ¶ 32:**

Ms. Gayle-Garcia's concern about whether it appeared Mr. Davis was performing poorly is two-fold.

a.      First, Ms. Gayle-Garcia knew that Mr. Davis' awful performance was likely to lead to his termination unless he began to improve––or at least appear as though he had improved––and in the event Mr. Davis' poor performance led to his termination, Ms. Gayle-Garcia was fearful that she would face

consequences for the loss of a black subordinate employee, which would negatively impact Takeda's DEI requirements.[7]

b.      And second, Ms. Gayle-Garcia had a years-long relationship with Mr. Davis and she did not want to risk tarnishing it by trying to force Mr. Davis to actually do her job (which ironically, is Ms. Gayle-Garcia's job by definition).

**ANSWER:**

Takeda denies the allegations in Paragraph No. 32.

## IV.    Takeda's DEI Policy

**COMPLAINT ¶ 33:**

As mentioned above, Plaintiff is Caucasian and Mr. Davis is black.

**ANSWER:**

Takeda admits the allegations in Paragraph No. 33.

**COMPLAINT ¶ 34:**

While both fall skin colors fall within the protected category of race, Ms. Gayle-Garcia prioritized Mr. Davis because of his skin color and over Plaintiff because of Plaintiff's skin color. As a black employee, Mr. Davis benefits Takeda's DEI statistics, whereas Plaintiff, as a Caucasian employee does not benefit Takeda's DEI statistics in any way whatsoever.

**ANSWER:**

Takeda denies the allegations in Paragraph No. 34.

**COMPLAINT ¶ 35:**

As a supervisor, bolstering Takeda's DEI statistics reflects favorably upon Ms. Gayle-Garcia, and therefore, Mr. Davis' continued employment is important to her.

---

[7] "DEI requirements" are the requirements for "Diversity, Equity, and Inclusion" which is another way of saying Takeda makes employment and personnel decisions, at least in part, based on immutable characteristics such as skin color or gender. It also includes ensuring its workforce is representative of other allegedly marginalized groups, such as the LGBTQ community.

307780376v.3

**ANSWER:**

Takeda denies the allegations in Paragraph No. 35.

**COMPLAINT ¶ 36:**

So long as it does not appear as though Mr. Davis is underperforming, his job is safe and secure, and Ms. Gayle-Garcia is therefore not at risk of injuring the DEI statistics by failing to adequately do her job and ensure her subordinates perform at the minimum level of Takeda's reasonable expectations.

**ANSWER:**

Takeda denies the allegations in Paragraph No. 36.

## V. Ms. Gayle-Garcia's Relationship with Mr. Davis

**COMPLAINT ¶ 37:**

The second factor as to why Ms. Gayle-Garcia only cared about the appearance of Mr. Davis' performance and not whether he actually performed his job duties at the level reasonably expected is based on Ms. Gayle-Garcia's relationship with Mr. Davis.

**ANSWER:**

Takeda denies the allegations in Paragraph No. 37.

**COMPLAINT ¶ 38:**

And while forcing Mr. Davis to actually do his job and work at a proficient level may not impact Mr. Davis' employment (assuming he cared enough to actually improve), criticizing Mr. Davis' performance or otherwise requiring him to perform at a more proficient level did have an impact on the relationship Ms. Gayle-Garcia had with Mr. Davis.

**ANSWER:**

Takeda denies the allegations in Paragraph No. 38.

**COMPLAINT ¶ 39:**

As it turns out, Ms. Gayle-Garcia has had a relationship with Mr. Davis for more than a decade, dating all the way back to Mr. Davis' time in high school.

16

307780376v.3

**ANSWER:**

Takeda lacks sufficient knowledge or information to form a belief about the truth of the allegations in Paragraph No. 39.

**COMPLAINT ¶ 40:**

Mr. Davis was a star basketball player at Sickles High School where he was coached by Renaldo Garcia––Ms. Gayle-Garcia's husband.

**ANSWER:**

Takeda lacks sufficient knowledge or information to form a belief about the truth of the allegations in Paragraph No. 40.

**COMPLAINT ¶ 41:**

After high school, Mr. Davis went on to coach alongside Ms. Gayle-Garcia's husband, and the trio remained close throughout the years and at all times relevant.

**ANSWER:**

Takeda admits that Davis coached basketball after he completed high school. Takeda lacks sufficient knowledge or information to form a belief about the truth of the remaining allegations in Paragraph No. 41.

**COMPLAINT ¶ 42:**

Ms. Gayle-Garcia knew that Mr. Davis' poor performance not only put his employment with Takeda at risk, but also, Mr. Davis' inability to do his job proficiently also reflected poorly on her as his supervisor and manager.

**ANSWER:**

Takeda denies the allegations in Paragraph No. 42.

17

307780376v.3

**COMPLAINT ¶ 43:**

Moreover, Ms. Gayle-Garcia did not want to risk any harm to her relationship with Mr. Davis that could have potentially arose had Takeda terminated him.

**ANSWER:**

Takeda denies the allegations in Paragraph No. 43.

**COMPLAINT ¶ 44:**

Boiled down to its essence, Ms. Gayle-Garcia knew that Mr. Davis' performance had to either actually improve to a proficient level, or alternatively, Mr. Davis had to at least appear to be performing at a proficient level. And the only way to do this was through closing the gap between Plaintiff's performance and Mr. Davis' performance.

**ANSWER:**

Takeda denies the allegations in Paragraph No. 44.

**COMPLAINT ¶ 45:**

There is no doubt that the correct course of action to close the gap between the performance-related disparity would be to raise Mr. Davis' performance; but again, Ms. Gayle-Garcia did not want to run the risk of tainting her relationship with Mr. Davis.

**ANSWER:**

Takeda denies the allegations in Paragraph No. 45.

**COMPLAINT ¶ 46:**

As a result, the only way the gap could be closed and Mr. Davis' terrible performance could be passed off as proficient was a decrease in Plaintiff's overall performance, which in turn, lowered the expectations as to the sales figures a pharmaceutical sales representative assigned to the Jacksonville territory was capable of producing.

**ANSWER:**

Takeda denies the allegations in Paragraph No. 46.

18

307780376v.3

**COMPLAINT ¶ 47:**

Moreover, by decreasing Plaintiff's performance abilities, Ms. Gayle-Garcia was also able to avoid the adversarial nature associated with telling Mr. Davis he needed to start working and actually producing.

**ANSWER:**

Takeda denies the allegations in Paragraph No. 47.

**COMPLAINT ¶ 48:**

In sum, the only way for Ms. Gayle-Garcia to (1) protect her relationship with Mr. Davis; (2) minimize the negative impact that Mr. Davis' continued underperformance would have had on her own employment record due; and (3) mitigate the likelihood that Mr. Davis would be fired for not performing well—— which also consequentially be detrimental to Ms. Gayle-Garcia's employment in light of the impact his firing would have on Takeda's DEI statistics——Ms. Gayle-Garcia had to substantially alter the terms and conditions of Plaintiff's employment in a way that would significantly burden her ability to out-perform Mr. Davis on such a massive scale.

**ANSWER:**

Takeda denies the allegations in Paragraph No. 48.

## VI.   Examples of Takeda's Discrimination on the Basis of Plaintiff's Race

**COMPLAINT ¶ 49:**

The first discriminatory action Takeda[8] took against Plaintiff relates back to the ELT's decision to select Plaintiff to speak on behalf of the Jacksonville District during the company-wide oversight and update conference calls referenced in paragraphs 12-14.

**ANSWER:**

Takeda denies the allegations in Paragraph No. 49.

---

[8] As a Takeda employee, manager, and supervisor, the unlawful acts/omissions Ms. Gayle-Garcia committed within the scope of her employment are imputable against Takeda under the theory of respondeat superior.

19

307780376v.3

**COMPLAINT ¶ 50:**

Despite being selected, Ms. Gayle-Garcia never informed Plaintiff that she was chosen and as a result, Plaintiff was deprived of the opportunity to participate in the conference calls.

**ANSWER:**

Takeda denies the allegations in Paragraph No. 50.

**COMPLAINT ¶ 51:**

While the participation in the calls did not directly cause a detrimental impact on Plaintiff's sales figures directly, it did ensure that Plaintiff had no chance of benefitting in any way from being selected to speak during these calls.

**ANSWER:**

Takeda denies the allegations in Paragraph No. 51.

**COMPLAINT ¶ 52:**

Ms. Gayle-Garcia did not tell Plaintiff that she was selected as a participant for the calls because of Plaintiff's race. Had Plaintiff been black, Ms. Gayle-Garcia would have told Plaintiff that she was selected as doing so would further her interests in living up to Takeda's DEI policy requirements. But because Plaintiff was not black and because her high performance emphasized how poorly Mr. Davis truly was performing, it placed Mr. Davis' job at risk because she was responsible for managing Mr. Davis and ensuring he was performing his duties at a proficient level, and she failed to do so.

**ANSWER:**

Takeda denies the allegations in Paragraph No. 52.

**COMPLAINT ¶ 53:**

The second discriminatory action Takeda took against Plaintiff pertains to Takeda's selective enforcement of its policy prohibiting its employees from having secondary incomes.

**ANSWER:**

Takeda denies the allegations in Paragraph No. 53.

20

307780376v.3

**COMPLAINT ¶ 54:**

While still actively employed by Takeda, Mr. Davis obtained a second job where he was a compensated for serving as the Gaither High School's Men's Varsity Basketball Coach.

**ANSWER:**

Takeda admits that Davis received authorization to coach the varsity

basketball team at Gaither High School for 10-15 hours per week. Takeda denies

the remaining allegations in Paragraph No. 54.

**COMPLAINT ¶ 55:**

Mr. Davis' second income from his work as the Gaither High School's Men's Varsity Basketball Coach directly violated Takeda's well-established policy that prohibits its employees from maintaining a second income from any source outside of Takeda.

**ANSWER:**

Takeda denies the allegations in Paragraph No. 55.

**COMPLAINT ¶ 56:**

There is no doubt Takeda knew Mr. Davis was earning two incomes. This is evidenced by the fact that Ms. Gayle-Garcia made a district-wide announcement congratulating Jordan on being hired as a Head Coach. This left senior representatives shocked and confused, as many of Takeda's senior representatives have friends and former colleagues who had been terminated for violating the exact same policy that does not apply to Mr. Davis because of his skin color, his age, and his sex.

**ANSWER:**

Takeda denies the allegations in Paragraph No. 56.

**COMPLAINT ¶ 57:**

And this is not the only policy Mr. Davis violated by accepting the aforesaid coaching job. In addition to Takeda's dual-income policy; Mr. Davis' employment as a high school basketball coach also violated Takeda's "Sales Workday Policy"

21

307780376v.3

and its "Outside Employment Policy"––both of which Takeda has historically relied upon and enforced against older, Caucasian, female employees.

**ANSWER:**

Takeda denies the allegations in Paragraph No. 57.

**COMPLAINT ¶ 58:**

However, due to Mr. Davis' race, Takeda turned a blind eye to Mr. Davis' policy violations because terminating his employment would negatively impact Takeda's DEI policy requirements.

**ANSWER:**

Takeda denies the allegations in Paragraph No. 58.

**COMPLAINT ¶ 59:**

This is relevant as it pertains to Plaintiff because Mr. Davis was permitted to hold a second income due to his race as well as due to his gender and/or age, but Plaintiff, due to her race, as well as due to her gender and/or age, was prohibited from earning a second income––and even despite never earning a second income, or even attempting to earn a second income, Takeda still harassed her because she applied for a patent years ago.

**ANSWER:**

Takeda denies the allegations in Paragraph No. 59.

**COMPLAINT ¶ 60:**

Back in 2015, Plaintiff applied for and obtained through the United States Patent and Trade Office ("USPTO"). This is all that she did.

**ANSWER:**

Takeda denies the allegations in Paragraph No. 60.

**COMPLAINT ¶ 61:**

Plaintiff did not make a single penny from her patent, there was no additional job or employment, nor was there any sort of income generated from obtaining the patent. In fact, Plaintiff lost money as she herself paid the filing fees in obtaining the patent––which she sought for Takeda's benefit; it was not a patent Plaintiff ever intended on using for herself.

22

**ANSWER:**

Takeda lacks sufficient knowledge or information to form a belief about the truth of the allegations in Paragraph No. 61.

**COMPLAINT ¶ 62:**

Despite this, Takeda vigorously investigated her, and it ensured its investigation lingered for as long as conceivably possible as a means of hamstringing Plaintiff's ability to perform the essential functions and duties of her job at such a high level, which in turn, would mitigate how poorly Mr. Davis' performance appeared.

**ANSWER:**

Takeda admits that it conducted an investigation into Olson about potential outside business activities. Takeda denies the remaining allegations in Paragraph No. 62.

**COMPLAINT ¶ 63:**

After that, Takeda again investigated Plaintiff for allegedly violating the second income policy.

**ANSWER:**

Takeda denies the allegations in Paragraph No. 63.

**COMPLAINT ¶ 64:**

At the exact same time Mr. Davis was earning a second income, Takeda emailed Plaintiff and advised her that a call had been scheduled with Susan Portilechio from Takeda's Office of Employee Relations and Perry O'Brien of Takeda's Office of Ethics and Compliance. According to the email, the purpose of the call was to discuss Plaintiff's alleged secondary income from "Fit Life Active Wear" – a brand name Plaintiff owned.

23

307780376v.3

**ANSWER:**

Takeda admits that Susan Portilechio and Perry O'Brien corresponded with Olson regarding her secondary employment form. Takeda denies the remaining allegations in Paragraph No. 64.

**COMPLAINT ¶ 65:**

This call was prompted by Takeda's decision to capitalize on yet another opportunity to bring Plaintiff's performance down.

**ANSWER:**

Takeda denies the allegations in Paragraph No. 65.

**COMPLAINT ¶ 66:**

This opportunity to discriminate against Plaintiff arose a few weeks before the email was sent, at which time Plaintiff contacted Senior Manager of Multi-Channel marketing, Laura Berger, to discuss "an idea" she had after she was inspired by Takeda's USBU President, Ramona Sequira. After listening to Ms. Sequira speak to her entire salesforce of Takeda employees on a nationwide sales call, Plaintiff took Ms. Sequira's words to "Be bold, come forward, and share" any "ideas on specifically how Takeda can restore faith in society" to heart. The resulting product of that culminated in "Fit Life Active Wear."

**ANSWER:**

Takeda admits that Olson submitted a business proposal in or around October 2020. Takeda lacks sufficient knowledge or information to form a belief about the truth of the remaining allegations in Paragraph No. 66.

**COMPLAINT ¶ 67:**

Inspired by this, Plaintiff ran with her idea on "how to restore faith in society" which involved relating to customers in a non-pharmaceutical capacity. But because Plaintiff is Caucasian and not black, Plaintiff's efforts to go above and beyond for Takeda resulted in numerous calls with Human Resources and dozens of hours she had to expend in "proving" to Takeda she did not receive a second income.

24

**ANSWER:**

Takeda lacks sufficient knowledge or information to form a belief about

Olson's alleged inspiration. Takeda denies the remaining allegations in Paragraph

No. 67.

**COMPLAINT ¶ 68:**

And during the entire time Plaintiff was investigated, Mr. Davis was openly making two incomes and Takeda never said a word.

**ANSWER:**

Takeda denies the allegations in Paragraph No. 68.

**COMPLAINT ¶ 69:**

The third discriminatory action Takeda took against Plaintiff pertains to Takeda's actions following the death of George Floyd. At all times relevant, Takeda knew that Plaintiff was rattled by its aforementioned investigation, and in furtherance of its racially motivated decision to attack Plaintiff's emotional and mental well-being in hopes her performance would decrease (thereby making Mr. Davis' performance appear more acceptable), Takeda contacted Plaintiff and ordered her to "reach out to [Mr. Davis] to see how [he] is coping with the death of George Floyd" because Mr. Davis was Plaintiff's "African American counterpart."

**ANSWER:**

Takeda denies the allegations in Paragraph No. 69.

**COMPLAINT ¶ 70:**

Takeda emphasized its prioritization of its black employees' emotional well-being while entirely disregarding the emotional well-being of its Caucasian employees.

**ANSWER:**

Takeda denies the allegations in Paragraph No. 70.

25

**COMPLAINT ¶ 71:**

Of course, compassion for those who may be struggling or grieving should be fostered in the workplace, and Plaintiff does not take issue with consoling her co-workers or Mr. Davis, who was at all times relevant, Plaintiff's comparator. Rather, Plaintiff raises this instance in light of Takeda's abject silence following the tragic death of Plaintiff's own sister, who had just died the year prior as a direct and proximate result of depression––an illness to which Takeda takes greats pains to market itself as a formidable opponent based upon the billions of Trintellix[9] pills Takeda sells for billions of dollars in profits annually.

**ANSWER:**

Takeda admits that compassion for those who may be struggling or grieving should be fostered in the workplace. Takeda denies the remaining allegations in Paragraph No. 71.

**COMPLAINT ¶ 72:**

The fourth racially motivated discriminatory action Takeda took against Plaintiff pertains to the substantial change in terms and conditions of Plaintiff's employment. This adverse employment action was again, motivated by Ms. Gayle-Garcia's intent to discriminate against Plaintiff on the basis of her race as Takeda prioritized the employment of its black employees and its DEI policy requirements over Plaintiff's protections against workplace discrimination on the basis of her race.

**ANSWER:**

Takeda denies the allegations in Paragraph No. 72.

**COMPLAINT ¶ 73:**

The specifics as to this discrimination pertain to the new tactic Ms. Gayle-Garcia adopted due to her racially motivated desire to close the gap between Plaintiff's high-level performance and Mr. Davis' terribly low performance. And being that the emotional attacks did not hold Plaintiff back from being a high performer, Ms. Gayle-Garcia elected to now impose Mr. Davis' duties on Plaintiff.

---

[9] Trintellix is a medication owned and manufactured by Takeda that is used for treating major depressive disorder.

26

**ANSWER:**

Takeda denies the allegations in Paragraph No. 73.

**COMPLAINT ¶ 74:**

This situation was a "win-win" in Ms. Gayle-Garcia's eyes: if Plaintiff continued performing at a high level and completed Mr. Davis' job duties for him, Mr. Davis would appear to be performing proficiently. And in the event Plaintiff did not perform well, Ms. Gayle-Garcia could show a minor disparity between Mr. Davis' performance and Plaintiff's performance, which in turn, bolsters the likelihood of Mr. Davis' continued employment, which furthered Takeda's DEI policy requirement interests.

**ANSWER:**

Takeda denies the allegations in Paragraph No. 74.

**COMPLAINT ¶ 75:**

The shifting of Mr. Davis' duties to Plaintiff began while Plaintiff, Ms. Gayle-Garcia, and upon information and belief, Mr. Davis, were attending a "virtual field day meeting." During this meeting, Ms. Gayle-Garcia told Plaintiff that "[She] needed to take more of a 'leadership role' with Mr. Davis if [she] want[ed] to achieve Territory Manager" –– a promotional position that Ms. Gayle-Garcia used as leverage.

**ANSWER:**

Takeda denies the allegations in Paragraph No. 75.

**COMPLAINT ¶ 76:**

Plaintiff informed Ms. Gayle-Garcia that she had already taken it upon herself to try and assist Mr. Davis, but her efforts were to no avail.

**ANSWER:**

Takeda denies the allegations in Paragraph No. 76.

**COMPLAINT ¶ 77:**

Plaintiff also advised Ms. Gayle-Garcia that she had assigned Mr. Davis various tasks on multiple occasions, but Mr. Davis would simply rebuff Plaintiff and refuse to complete any of the assignments Plaintiff had asked him to

307780376v.3

complete. And Ms. Gayle-Garcia is familiar with Mr. Davis' refusal to complete assigned work as he would also ignore assignments Ms. Gayle-Garcia assigned him. But Ms. Gayle-Garcia did not care, and she turned a blind eye to his refusal to work.

**ANSWER:**

Takeda denies the allegations in Paragraph No. 77.

**COMPLAINT ¶ 78:**

After stating with specificity various examples of assignments Mr. Davis refused to complete, Ms. Gayle-Garcia learned that it was Plaintiff––not Plaintiff and Mr. Davis––who had been completing 100% of the work that had been assigned to Plaintiff's Salesforce team in the months leading up to their conversation. Ms. Gayle-Garcia even asked Plaintiff "[So] you have been doing all the work?" to which Plaintiff responded, "Yes" and thereby placing Takeda on notice that Mr. Davis was not performing the duties of his employment, which in turn, caused Plaintiff's workload to drastically increase.

**ANSWER:**

Takeda denies the allegations in Paragraph No. 78.

**COMPLAINT ¶ 79:**

This was even more troublesome to Ms. Gayle-Garcia, because Mr. Davis' actual performance was even lower than she had thought due to Plaintiff––not Mr. Davis––doing the vast majority, if not all, of the work that had been attributed to Mr. Davis.

**ANSWER:**

Takeda denies the allegations in Paragraph No. 79.

**COMPLAINT ¶ 80:**

It is notable here too, that Ms. Gayle-Garcia, in her managerial capacity, has access to Mr. Davis' day-to-day interactions, call records, expense reports, sampling activity, and other relevant metrics that, had she even looked into the work Mr. Davis was (or rather, was not) producing. Had Gayle-Garcia even looked at Mr. Davis' performance for a few brief minutes, the answer to Ms. Gayle-Garcia's question would have become abundantly clear.

307780376v.3

**ANSWER:**

Takeda admits that Gayle-Garcia had access to certain information regarding Davis's employment activity. Takeda denies the remaining allegations in Paragraph No. 80.

**COMPLAINT ¶ 81:**

Because of Plaintiff's race (Caucasian, non-black), Takeda burdened her with the work of an underperforming black comparator, because the black comparator's continued employment furthered Takeda's DEI policy interests, and Plaintiff's continued employment harmed Takeda's DEI policy interests because she is Caucasian.

**ANSWER:**

Takeda denies the allegations in Paragraph No. 81.

**COMPLAINT ¶ 82:**

The fifth discriminatory action Takeda took Plaintiff arises out of Ms. Gayle-Garcia's response to feeling pressure from Takeda officials senior to her regarding Mr. Davis' poor performance––which is precisely the fears Ms. Gayle-Garcia has had all along.

**ANSWER:**

Takeda denies the allegations in Paragraph No. 82.

**COMPLAINT ¶ 83:**

Due to the fear that the questions being asked of her would lead to Mr. Davis' termination and Ms. Gayle-Garcia's subsequent reprimand for being an underperforming manager, Ms. Gayle-Garcia instructed Plaintiff and Mr. Davis to join her "Footprint Collaboration Meeting."

**ANSWER:**

Takeda denies the allegations in Paragraph No. 83.

307780376v.3

**COMPLAINT ¶ 84:**

During the Footprint Collaboration Meeting, Ms. Gayle-Garcia began taking steps that she believed come off to her supervisors as remedial action and good leadership——but in reality, Ms. Gayle-Garcia was attempting to muddy the disparity between Plaintiff's performance and Mr. Davis' performance by instructing Mr. Davis and Plaintiff that they must both:

a.      Commit to making changes to the execution and update of their action plans and making changes in the footprint plan in regard to virtual engagements;

b.      Verify the accuracy their call logs which were being reviewed for work activity and apportionment of duties/balance of time spent and work performed;

c.      Give the assurance that they would use "suggestions" as a way to follow up with healthcare providers;

d.      Commit to holding each other accountable concerning the use of email communications; and

e.      Commit to looking at targeted healthcare providers moving forward and their return on investment with emails, coupon usage and virtual engagements. The action plan will be updated and shared via one drive to ensure communication is clear among the three of us. We will have another collaboration meeting next month. "

**ANSWER:**

Takeda admits that Gayle-Garcia held meetings that included Olson and

Jordan Davis during which she discussed strategies to improve job performance.

Takeda denies the remaining allegations in Paragraph No. 84.

**COMPLAINT ¶ 85:**

Plaintiff never needed to make any of the assurances or commitments prior, and she was one of the highest performers throughout all of Takeda.

**ANSWER:**

Takeda denies the allegations in Paragraph No. 85.

30

**COMPLAINT ¶ 86:**

In short, Ms. Gayle-Garcia held the Footprint Collaboration Meeting with the intent to group Plaintiff and Mr. Davis together, which she hoped would vitiate the unequivocal clarity that Plaintiff was a high performing employee and Mr. Davis was a low performing employee. In other words, Ms. Gayle-Garcia used Plaintiff as the scapegoat for Mr. Davis shortcomings and tried to bring Plaintiff down to Mr. Davis' level, and she did so because Plaintiff's race ran contrary to Ms. Gayle-Garcia's own interests and Takeda's interests in upholding its DEI policy requirements.

**ANSWER:**

Takeda denies the allegations in Paragraph No. 86.

**COMPLAINT ¶ 87:**

The examples of Takeda's racially-motivated discrimination are so numerous that exhaustion of each would be futile. However, other notable examples of Takeda's discrimination against Plaintiff because she is Caucasian include:

a.      Requiring Plaintiff, not the District Manager, to train Mr. Davis, when Plaintiff holds the same position as Mr. Davis;

b.      Repeatedly and intentionally attributing Mr. Davis' failures to perform his duties as Plaintiff's failures;

c.      Assigning Mr. Davis' duties to Plaintiff, and when fulfilled, attributing credit to Mr. Davis without acknowledging that Plaintiff did the work, and doing so with the intent to harass or mentally break Plaintiff in hopes of decreasing her performance; and

d.      Ignoring known tactics Mr. Davis' employed to avoid having to do his work, including shifting his schedule around to make it appear as though he made engagement and client calls, and cancelling and re-scheduling meetings so it appeared he attended the meetings, while at the same time, demanding more and more of Plaintiff to compensate for the work Mr. Davis was not performing, and the work Takeda knew he was not completing;

**ANSWER:**

Takeda denies the allegations in Paragraph No. 87.

307780376v.3

### VII.  Examples of Takeda's Discrimination on the Basis of Plaintiff's Religion

**<u>COMPLAINT ¶ 88:</u>**

After already enduring these material changes in the terms, conditions, and/or privileges of her employment for no reason other than because Plaintiff is white and Mr. Davis is black, Takeda continued its discrimination against Plaintiff; only this time, it now did so on the basis of Plaintiff's religion.

**<u>ANSWER:</u>**

The Court dismissed this claim, and no response to this allegation is required. To the extent a response is required, Takeda denies the allegations in Paragraph No. 88.

**<u>COMPLAINT ¶ 89:</u>**

Following the COVID-19 pandemic, Takeda authorized its employees to return to working in the field, which Plaintiff appreciated as it enabled her to perform even better as in-person contact yields higher sales.

**<u>ANSWER:</u>**

The Court dismissed this claim, and no response to this allegation is required. To the extent a response is required, Takeda denies the allegations in Paragraph No. 89.

**<u>COMPLAINT ¶ 90:</u>**

To the contrary, Mr. Davis was anything but excited and despite coaching basketball at the time, in-person, Mr. Davis advised that he was allegedly "uncomfortable" going back to in-person meetings as he feared catching COVID-19——even though apparently he did not fear contracting COVID while playing a contact sport every day with his high school athletes.

307780376v.3

**ANSWER:**

The Court dismissed this claim, and no response to this allegation is required. To the extent a response is required, Takeda denies the allegations in Paragraph No. 90.

**COMPLAINT ¶ 91:**

Despite the logical and obvious inconsistency in his narrative, Takeda nevertheless did not ask any questions and granted Mr. Davis an accommodation and permitted him to continue working remotely.

**ANSWER:**

The Court dismissed this claim, and no response to this allegation is required. To the extent a response is required, Takeda denies the allegations in Paragraph No. 91.

**COMPLAINT ¶ 92:**

Plaintiff requested to work remotely as her religion and sincerely held religious beliefs prohibited her from complying with Takeda's mandatory COVID-19 vaccination policy.

**ANSWER:**

The Court dismissed this claim, and no response to this allegation is required. To the extent a response is required, Takeda denies the allegations in Paragraph No. 92.

**COMPLAINT ¶ 93:**

Despite granting Mr. Davis an accommodation and allowing him to work remotely– –and doing so when Mr. Davis did not even have a legally viable medical or religious reason that required Takeda to grant his request––Takeda denied Plaintiff's request, which was based on her sincerely held religious beliefs and even though federal law required Takeda to grant her request.

33

**ANSWER:**

The Court dismissed this claim, and no response to this allegation is required. To the extent a response is required, Takeda denies the allegations in Paragraph No. 93.

**COMPLAINT ¶ 94:**

Plaintiff placed Takeda on notice that she is a devout Christian and her sincerely held religious beliefs prohibit her from complying with Takeda's mandatory COVID-19 vaccination policy.

**ANSWER:**

The Court dismissed this claim, and no response to this allegation is required. To the extent a response is required, Takeda denies the allegations in Paragraph No. 94.

**COMPLAINT ¶ 95:**

In her request, Plaintiff advised Takeda that, fundamental to her Christian faith is a teaching that requires her to refuse medical intervention, including a vaccination, if her informed conscience comes to this sure judgment. Plaintiff further expanded in explaining her religious beliefs and referenced authoritative Church teachings demonstrating the principled religious bases upon which Christians such as Plaintiff may determine whether she ought to refuse certain vaccines, such as the COVID-19 vaccine.

**ANSWER:**

The Court dismissed this claim, and no response to this allegation is required. To the extent a response is required, Takeda denies the allegations in Paragraph No. 95.

**COMPLAINT ¶ 96:**

Among others, Plaintiff expressed her sincerely held religious beliefs that:

34

307780376v.3

a.      Vaccination is not morally obligatory in principle and so must be voluntary;

b.      There is a general moral duty to refuse the use of medical products, including certain vaccines, that are produced using human cells lines derived from direct abortions. It is permissible to use such vaccines only under certain case-specific conditions, based on a judgment of conscience

c.      A person's informed judgments about the proportionality of medical interventions are to be respected unless they contradict authoritative Christian moral teachings;

d.      A person is morally required to obey his or her sure conscience; and

e.      Abortion is a sin and contrary to the teachings of the Christian Church. As a result, a Christian may invoke Church teaching to refuse a vaccine developed or produced using abortion-derived cell lines.

**ANSWER:**

The Court dismissed this claim, and no response to this allegation is required. To the extent a response is required, Takeda denies the allegations in Paragraph No. 96.

**COMPLAINT ¶ 97:**

Plaintiff promptly submitted her request for a religious accommodation upon learning of this newly adopted vaccination policy, and her sincerely held religious beliefs.

**ANSWER:**

The Court dismissed this claim, and no response to this allegation is required. To the extent a response is required, Takeda denies the allegations in Paragraph No. 97.

**COMPLAINT ¶ 98:**

Plaintiff's legitimate, non-secular basis for which she sought an accommodation compelled Takeda to accommodate her, which it was able to do absent undue hardship as evidenced by the ability to grant Mr. Davis——who

35

307780376v.3

holds the same job as Plaintiff––the exact same accommodation Plaintiff requested.

**ANSWER:**

The Court dismissed this claim, and no response to this allegation is required. To the extent a response is required, Takeda denies the allegations in Paragraph No. 98.

**COMPLAINT ¶ 99:**

At all times relevant, Takeda knew Plaintiff was a religious woman with sincerely held religious beliefs that prohibited her from complying with Takeda's COVID-19 vaccination policy.

**ANSWER:**

The Court dismissed this claim, and no response to this allegation is required. To the extent a response is required, Takeda denies the allegations in Paragraph No. 99.

**COMPLAINT ¶ 100:**

At all times relevant, Takeda knew Plaintiff's sincere beliefs were religious.

**ANSWER:**

The Court dismissed this claim, and no response to this allegation is required. To the extent a response is required, Takeda denies the allegations in Paragraph No. 100.

**COMPLAINT ¶ 101:**

At all times relevant, Takeda knew that Plaintiff's religious beliefs were sincerely held.

**ANSWER:**

The Court dismissed this claim, and no response to this allegation is required. To the extent a response is required, Takeda denies the allegations in Paragraph No. 101.

**COMPLAINT ¶ 102:**

Despite the obligation to accommodate her, Takeda refused to do so and instead, weaponized this new information against Plaintiff.

**ANSWER:**

The Court dismissed this claim, and no response to this allegation is required. To the extent a response is required, Takeda denies the allegations in Paragraph No. 102.

**COMPLAINT ¶ 103:**

Specifically, Takeda began interrogating Plaintiff based on her religious beliefs as a means to yet again, impact her mental state with the hope that doing so would cause her performance to decrease, which mitigated the egregiousness of Mr. Davis' poor performance, and thereby increase the likelihood that Mr. Davis would not be terminated––an essential goal of Takeda to maintain his employment because he was black and helped Takeda's DEI policy interests.

**ANSWER:**

The Court dismissed this claim, and no response to this allegation is required. To the extent a response is required, Takeda denies the allegations in Paragraph No. 103.

**COMPLAINT ¶ 104:**

More specifically, six days after submitting her religious accommodation request, Takeda's Employee Relations Partner, Ms. Christine Mealey held a "Discussion" call with Plaintiff concerning her accommodation. At no point during the call did Ms. Mealey mention or express any objective basis giving rise to a bona fide doubt in the sincerity of Plaintiff's religious beliefs, nor did Ms.

37

Mealey make any mention of any basis upon which the religious nature of Plaintiff's beliefs was subject to dispute. In fact, Ms. Mealey did not even articulate any basis upon which granting my accommodation request would have imposed upon Takeda an undue hardship; rather, the basis for scheduling this "Discussion" call was to create a scenario in which Ms. Mealey would be able to ask Plaintiff questions with the intent that her questions trip Plaintiff into misspeaking or otherwise offering any information upon which Takeda could rely in denying her accommodation request.

**ANSWER:**

The Court dismissed this claim, and no response to this allegation is required. To the extent a response is required, Takeda denies the allegations in Paragraph No. 104.

## VIII. Examples of Takeda's Discrimination on the Basis of Plaintiff's Disability

**COMPLAINT ¶ 105:**

Due to the ever-mounting discrimination Plaintiff faced, first on the basis of her race, which then was only compounded by the weaponization of Plaintiff's religious accommodation request to then also discriminate on the basis of her religion, Plaintiff's mental health began taking a toll.

**ANSWER:**

Takeda denies the allegations in Paragraph No. 105.

**COMPLAINT ¶ 106:**

Due to the strain and immense stress and pressure she was under, Plaintiff became disabled as she was diagnosed with PTSD and depression––the same disorder that claimed her sister's life and the condition for which she has sold Takeda's products and the condition that has generated Takeda millions of dollars.

**ANSWER:**

Takeda lacks sufficient knowledge or information to form a belief about the truth of the allegations in Paragraph No. 106.

307780376v.3

**COMPLAINT ¶ 107:**

Despite her overwhelming fear that her disability would now also be used to discriminate against her, Plaintiff could not continue working under the hostility and harassment she faced every day––all of which was motivated by discriminatory intent.

**ANSWER:**

Takeda denies the allegations in Paragraph No. 107.

**COMPLAINT ¶ 108:**

As a result, Plaintiff requested a disability accommodation and placed Takeda on notice that she suffered from PTSD and depression and as a result, needed to take Short-Term Leave.

**ANSWER:**

Takeda admits that Olson requested short-term leave. Takeda denies the

remaining allegations in Paragraph No. 108.

**COMPLAINT ¶ 109:**

Under Plaintiff's employment agreement, her contract, and as set forth in the terms and conditions applicable to Takeda employees such as Plaintiff, short-term disability leave is compensated for up to twelve (12) weeks.

**ANSWER:**

Takeda denies the allegations in Paragraph No. 109.

**COMPLAINT ¶ 110:**

Despite this, Takeda ensured Plaintiff did not get paid while on short-term disability leave, and the reason Takeda did so, whether directly or through indirectly influencing the third-party disability leave coordination entity, was for the purpose of continuing to harass Plaintiff and force her performance to decrease, all so Mr. Davis' risk of being fired was mitigated.

**ANSWER:**

Takeda denies the allegations in Paragraph No. 110.

307780376v.3

**IX:    Evidence of Takeda's Intentional Discrimination on the Basis of Plaintiff's Race**

**COMPLAINT ¶ 111:**

The easiest, most prudent, and lawful route Takeda should have taken if it wanted to maintain Mr. Davis' employment is unconscionably simple: Tell Mr. Davis he needed to improve, and have Takeda's managers assist him with improving, where needed. Otherwise, if he is poorly performing, he loses his job.

**ANSWER:**

Takeda denies the allegations in Paragraph No. 111.

**COMPLAINT ¶ 112:**

But Takeda, by and through Ms. Gayle-Garcia, did not care about the lawful course of action; she only cared about trying to make sure Mr. Davis did not get fired, which would have detrimental impacts on both her relationship with him and her job, as his poor performance is attributable to her since she was Mr. Davis' manager.

**ANSWER:**

Takeda denies the allegations in Paragraph No. 112.

**COMPLAINT ¶ 113:**

By prioritizing her interests and Takeda's interests in maintaining high DEI policy statistics, Takeda discriminated against Plaintiff on the basis of her race.

**ANSWER:**

Takeda denies the allegations in Paragraph No. 113.

**COMPLAINT ¶ 114:**

One example of the intent to discriminate against Plaintiff on the basis of her race is highlighted by Ms. Gayle-Garcia's acknowledgement that Plaintiff was doing literally eleven-times (11x) more work than Mr. Davis, and Ms. Gayle-Garcia expressed her desire to decrease Plaintiff's productivity.

**ANSWER:**

Takeda denies the allegations in Paragraph No. 114.

307780376v.3

**COMPLAINT ¶ 115:**

In an email, Ms. Gayle-Garcia wrote, "Please take a look at this. There is a disparity between teams on the number of VEs...how can we balance this?" Ms. Gayle-Garcia then listed that Plaintiff had conducted fifty-five (55) virtual engagements, while Mr. Davis had conducted just five (5) virtual engagements. Rather than commend Plaintiff for her work, Ms. Gayle-Garcia's only concern was bringing Plaintiff's performance down because she was white and the disparity placed Mr. Davis' job in jeopardy, which in turn, threatened Ms. Gayle-Garcia because she had to uphold Takeda's DEI policy interests.

**ANSWER:**

Takeda admits that, in an email, Gayle-Garcia wrote, "Please take a look at this. There is a disparity between teams on the number of VEs...how can we balance this?" Takeda also admits that Gayle-Garcia then listed that Olson had conducted fifty-five (55) virtual engagements, while Davis had conducted five (5) virtual engagements. Takeda denies the remaining allegations in Paragraph No. 115.

**COUNT I**
**DISPARATE TREATMENT (RACE)**
**Violation of Title VII**

**COMPLAINT ¶ 116:**

Plaintiff is a Caucasian female and a member of a protected class (e.g., race) as intended by Title VII.

**ANSWER:**

Takeda admits the allegations in Paragraph No. 116.

**COMPLAINT ¶ 117:**

Plaintiff is qualified for her position of employment, and she has fully performed all duties in full satisfaction or in excess of Takeda's reasonable expectations as evidenced by Plaintiff's employment record, her performance reviews, objective statistical data, and the recognition and selections she has received (e.g., ELT selection).

41

**ANSWER:**

Takeda admits that Olson is qualified for her position of employment.

Takeda denies the remaining allegations in Paragraph No. 117.

**COMPLAINT ¶ 118:**

Despite being a qualified person and a member of a protected class, Takeda discriminated against Plaintiff and took adverse employment action against her and subjected her to disparate treatment because she is Caucasian.

**ANSWER:**

Takeda denies the allegations in Paragraph No. 118.

**COMPLAINT ¶ 119:**

Specifically, Takeda purposefully, willfully, intentionally, or recklessly:

a.      Depriving Plaintiff of an opportunity to speak on the ELT conference calls to ensure Plaintiff did not further impress Takeda or otherwise draw attention to her outstanding performance;

b.      Allowing Mr. Davis to openly share and discuss his second income and even congratulating him on doing so, while at the same time, vigorously investigating Plaintiff for allegedly having a second income, even though Plaintiff did not have a second income;

c.      Dragging Plaintiff's frivolous secondary income policy violation investigation out for as long as possible with the intent to hinder her ability to perform at such a high level in comparison to Mr. Davis' performance;

d.      Ordering Plaintiff to coddle Mr. Davis' emotional well-being because he was Plaintiff's "African American counterpart" while ignoring Plaintiff's emotional well-being at the time her sister died from depression––which is especially triggering as Plaintiff has dedicated her life to selling Takeda's drugs that treat the very disorder that claimed her sister's life;

e.      Requiring Plaintiff to complete Mr. Davis job duties in addition to her own, attributing credit to Mr. Davis for Plaintiff's work, and ignoring the fact that Mr. Davis was not performing his work at all or nearly at all;

f.      Requiring Plaintiff, not the District Manager, to train Mr. Davis, when Plaintiff holds the same position as Mr. Davis;

g.      Intentionally blurring the line between Plaintiff's failures and Mr. Davis' failures by intentionally including Plaintiff in conversations regarding insufficient performance and by directing remedial instructions that were issued solely because of Mr. Davis' poor performance, to both Mr. Davis and Plaintiff;

h.      Repeatedly and intentionally attributing Mr. Davis' failures to perform his duties as Plaintiff's failures;

i.      Assigning Mr. Davis' duties to Plaintiff, and when fulfilled, attributing credit to Mr. Davis without acknowledging that Plaintiff did the work, and doing so with the intent to harass or mentally break Plaintiff in hopes of decreasing her performance; and

j.      Ignoring known tactics Mr. Davis' employed to avoid having to do his work, including shifting his schedule around to make it appear as though he made engagement and client calls, and cancelling and re-scheduling meetings so it appeared he attended the meetings, while at the same time, demanding more and more of Plaintiff to compensate for the work Mr. Davis was not performing, and the work Takeda knew he was not completing;

**ANSWER:**

Takeda denies the allegations in Paragraph No. 119.

**COMPLAINT ¶ 120:**

Takeda engaged in the aforesaid discriminatory acts with the intent to discriminate against Plaintiff on the basis of her race.

**ANSWER:**

Takeda denies the allegations in Paragraph No. 120.

**COMPLAINT ¶ 121:**

Because Plaintiff is white, she is not a benefit to Takeda's DEI Policy requirements.

**ANSWER:**

Takeda denies the allegations in Paragraph No. 121.

**COMPLAINT ¶ 122:**

Because Mr. Davis is black, he benefits Takeda's DEI policy requirements.

43

307780376v.3

**ANSWER:**

Takeda denies the allegations in Paragraph No. 122.

**COMPLAINT ¶ 123:**

Plaintiff was an exceptionally high performer, and Mr. Davis was an exceptionally poor performer.

**ANSWER:**

Takeda denies the allegations in Paragraph No. 123.

**COMPLAINT ¶ 124:**

Due to the disparity between Plaintiff's performance and Mr. Davis performance, Plaintiff's high-level performing numbers evidenced the sales statistics that were possible to achieve at that time and within the Jacksonville District.

**ANSWER:**

Takeda denies the allegations in Paragraph No. 124.

**COMPLAINT ¶ 125:**

The standard of performance Plaintiff set shed light on how incredibly poor Mr. Davis' performance truly was.

**ANSWER:**

Takeda denies the allegations in Paragraph No. 125.

**COMPLAINT ¶ 126:**

Due to Mr. Davis' poor performance, his job was at risk.

**ANSWER:**

Takeda admits the allegations in Paragraph No. 126.

**COMPLAINT ¶ 127:**

Takeda prioritized satisfying its DEI policy interests above Plaintiff's rights to be free from race-based discrimination in the workplace by burdening Plaintiff, who was white and harmed its DEI policy interests, so that Mr. Davis,

44

who was black and helped Takeda's DEI policy interests, would not appear to be as poor of an employee as he actually was, which in turn, decreased the likelihood of Mr. Davis being terminated.

**ANSWER:**

Takeda denies the allegations in Paragraph No. 127.

**COMPLAINT ¶ 128:**

But-For Plaintiff's race, she would not have been subjected to the discriminatory actions complained of herein.

**ANSWER:**

Takeda denies the allegations in Paragraph No. 128.

**COMPLAINT ¶ 129:**

The aforesaid material change in the terms, conditions, and/or privileges of her employment was motivated and committed against Plaintiff because of her membership in a protected class (e.g., race) and because she is Caucasian.

**ANSWER:**

Takeda denies the allegations in Paragraph No. 129.

**COMPLAINT ¶ 130:**

The actions complained of herein constitute actionable adverse employment action because Takeda's actions, individually or collectively, constitute a material change in the terms, conditions, and/or privileges of Plaintiff's employment.

**ANSWER:**

Takeda denies the allegations in Paragraph No. 130.

**COMPLAINT ¶ 131:**

By materially changing the terms, conditions, and/or privileges of Plaintiff's employment because she is white, and not subjecting Mr. Davis to the same treatment or otherwise requiring him to be held to the same standards as Plaintiff because he is black, constitutes disparate treatment in violation of Title VII.

45

**ANSWER:**

Takeda denies the allegations in Paragraph No. 131.

**COMPLAINT ¶ 132:**

Plaintiff would not have endured the same treatment or experienced the material change in the terms, conditions, and/or privileges of her employment but-for her Caucasian race.

**ANSWER:**

Takeda denies the allegations in Paragraph No. 132.

**COMPLAINT ¶ 133:**

As a direct and proximate result of the adverse employment action taken against Plaintiff because of her race (Caucasian), Takeda violated Title VII's prohibition against racially motivated disparate treatment and Plaintiff sustained economic and non-pecuniary injuries, including humiliation, embarrassment, unnecessary pain and suffering, and she has incurred medical expenses, attorneys' fees, and costs associated with this action.

**ANSWER:**

Takeda denies the allegations in Paragraph No. 133.

**COUNT II**
**RELIGIOUS DISCRIMINATION**
**Violation of Title VII**

**COMPLAINT ¶ 134:**

Plaintiff sincerely holds religious beliefs and is a member of a protected class based on her religion.

**ANSWER:**

The Court dismissed this claim, and no response to this allegation is required. To the extent a response is required, Takeda denies the allegations in Paragraph No. 134.

46

**COMPLAINT ¶ 135:**

Plaintiff is an employee within the meaning of Title VII.

**ANSWER:**

The Court dismissed this claim, and no response to this allegation is required. To the extent a response is required, Takeda denies the allegations in Paragraph No. 135.

**COMPLAINT ¶ 136:**

Takeda is an employer within the meaning of Title VII.

**ANSWER:**

The Court dismissed this claim, and no response to this allegation is required. To the extent a response is required, Takeda denies the allegations in Paragraph No. 136.

**COMPLAINT ¶ 137:**

Title VII forbids Takeda from discriminating against Plaintiff because of her sincerely held religious beliefs or because of Plaintiff's need for a religious accommodation, absent proof that granting the accommodation would cause it undue hardship.

**ANSWER:**

The Court dismissed this claim, and no response to this allegation is required. To the extent a response is required, Takeda denies the allegations in Paragraph No. 137.

**COMPLAINT ¶ 138:**

This extension of actionable religious discrimination to include a failure to accommodate derives from Title VII's definition of "religion" to include "all aspects of religious observance and practice, as well as belief, unless an employer demonstrates that he is unable to reasonably accommodate to an employee's or

47

prospective employee's religious observance or practice without undue hardship on the conduct of the employer's business." 42 U.S.C. § 2000e(j).

**ANSWER:**

The Court dismissed this claim, and no response to this allegation is required. To the extent a response is required, Takeda denies the allegations in Paragraph No. 138.

**COMPLAINT ¶ 139:**

At all times relevant, Plaintiff held bona fide (sincere) religious beliefs that prohibited her from becoming vaccinated against COVID-19.

**ANSWER:**

The Court dismissed this claim, and no response to this allegation is required. To the extent a response is required, Takeda denies the allegations in Paragraph No. 139.

**COMPLAINT ¶ 140:**

Plaintiff's sincere beliefs were religious in nature as her beliefs guided her conduct deviating from her sincere beliefs would impact her ability to ultimately go to Heaven.

**ANSWER:**

The Court dismissed this claim, and no response to this allegation is required. To the extent a response is required, Takeda denies the allegations in Paragraph No. 140.

**COMPLAINT ¶ 141:**

Plaintiff sincerely believed that if she had gotten vaccinated in violation of her religious beliefs, such action would have impacted her ability to go to Heaven.

307780376v.3

**ANSWER:**

The Court dismissed this claim, and no response to this allegation is required. To the extent a response is required, Takeda denies the allegations in Paragraph No. 141.

**COMPLAINT ¶ 142:**

Plaintiff's sincerely held religious beliefs conflicted with Takeda's policy concerning mandatory vaccination.

**ANSWER:**

The Court dismissed this claim, and no response to this allegation is required. To the extent a response is required, Takeda denies the allegations in Paragraph No. 142.

**COMPLAINT ¶ 143:**

Takeda purposefully, willfully, intentionally, or recklessly took adverse action against Plaintiff by:

a.    Denying Plaintiff's accommodation request despite no undue hardship existing;

b.    Harassing and ridiculing Plaintiff upon learning of her religion;

c.    Weaponizing Plaintiff's religion by using it as a basis to interrogate her and cause her mental stress, anguish, and otherwise hinder Plaintiff's performance abilities;

d.    Refusing to provide any information as to why it denied Plaintiff's accommodation request;

e.    Telling Plaintiff she could request a religious accommodation without ever intending on granting it, irrespective as to what her accommodation request stated;

f.    Forcing Plaintiff to apply for a religious accommodation and participate in a "sham" accommodation request process where the decision to

49

deny her request was pre-determined under threat of termination for cause had she not submitted the request;

g.    Failing to give due consideration or review Plaintiff's accommodation request on a case-by-case basis;

h.    Screaming, demeaning, ridiculing, harassing, embarrassing, humiliating, condemning, threatening, and otherwise inflicting emotional distress upon Plaintiff because she requested an accommodation;

i.    Scheduling a "Discussion" meeting to facilitate an environment for Mr. Crouch and Mr. Hand to engage in the aforesaid action alleged in the above sub-paragraph;

j.    Lying to Plaintiff by claiming the vaccines effectuated the means sought to be effectuated by the COVID-19 vaccination policy;

k.    Concealing the efficacy and safety of the vaccines Takeda sought to coerce into Plaintiff's body;

l.    Lying to Plaintiff concerning the vaccines' ability to prevent contraction of COVID-19;

m.    Lying to Plaintiff concerning the vaccines' ability to prevent transmission of COVID-19;

n.    Lying to Plaintiff by telling her Takeda would endure an "undue hardship" if it maintained Plaintiff's employment if she remained unvaccinated;

o.    Assigning Plaintiff additional work outside the scope of her duties because she is religious;

p.    Failing to compensate Plaintiff for the additional work she performed at Takeda outside the scope of her duties because she is religious; and

q.    Refusing to accommodate Plaintiff despite her lawful entitlement to such an accommodation.

**ANSWER:**

The Court dismissed this claim, and no response to this allegation is

required. To the extent a response is required, Takeda denies the allegations in

Paragraph No. 143.

50

**COMPLAINT ¶ 144:**

Plaintiff's sincerely held religious beliefs partially, substantially, or entirely motivated Takeda's decision to take the aforementioned adverse employment actions against her.

**ANSWER:**

The Court dismissed this claim, and no response to this allegation is required. To the extent a response is required, Takeda denies the allegations in Paragraph No. 144.

**COMPLAINT ¶ 145:**

At all times relevant, Takeda knew of Plaintiff's sincerely held religious beliefs based upon emails, meetings, communications, and conversations regarding her inability to become vaccinated against COVID-19.

**ANSWER:**

The Court dismissed this claim, and no response to this allegation is required. To the extent a response is required, Takeda denies the allegations in Paragraph No. 145.

**COMPLAINT ¶ 146:**

Takeda made no efforts at all to accommodate Plaintiff's sincerely held religious beliefs that compelled her to abstain from vaccination.

**ANSWER:**

The Court dismissed this claim, and no response to this allegation is required. To the extent a response is required, Takeda denies the allegations in Paragraph No. 146.

**COMPLAINT ¶ 147:**

Takeda knew or should have known that accommodating Plaintiff would not have imposed upon it an undue hardship.

307780376v.3

**ANSWER:**

The Court dismissed this claim, and no response to this allegation is required. To the extent a response is required, Takeda denies the allegations in Paragraph No. 147.

**COMPLAINT ¶ 148:**

Takeda intentionally concealed its knowledge that no undue hardship existed because Takeda knew at all times relevant, the vaccines did not prevent transmission or contraction and therefore, Takeda's policy compelling vaccination did not satisfy the ends sought to be achieved by its vaccination policy.

**ANSWER:**

The Court dismissed this claim, and no response to this allegation is required. To the extent a response is required, Takeda denies the allegations in Paragraph No. 148.

**COMPLAINT ¶ 149:**

Accommodating Plaintiff would not have imposed an undue hardship on Takeda, as evidenced by its ability to maintain Plaintiff's employment through the entirety of the COVID-19 pandemic and its use and implementation of alternative mitigation protocols such as masking, remote work, and social distancing.

**ANSWER:**

The Court dismissed this claim, and no response to this allegation is required. To the extent a response is required, Takeda denies the allegations in Paragraph No. 149.

**COMPLAINT ¶ 150:**

Other pharmaceutical companies and sales companies have not insisted on mandatory vaccination without allowing accommodations for religious objectors.

307780376v.3

**ANSWER:**

The Court dismissed this claim, and no response to this allegation is

required. To the extent a response is required, Takeda denies the allegations in

Paragraph No. 150.

**COMPLAINT ¶ 151:**

As a direct and proximate result of the aforesaid complained of conduct
and violation of Title VII, Plaintiff sustained pecuniary and non-economic
injuries in an amount that exceeds $75,000.00, including lost wages, benefits,
retirement funds, the denial of promotional opportunity, humiliation,
embarrassment, unnecessary pain and suffering, attorneys' fees, and costs
associated with this action.

**ANSWER:**

The Court dismissed this claim, and no response to this allegation is

required. To the extent a response is required, Takeda denies the allegations in

Paragraph No. 151.

**COUNT III**
**RELIGIOUS DISCRIMINATION**
**Violation of the FCHRA**

**COMPLAINT ¶ 152:**

Plaintiff sincerely holds religious beliefs and is a member of a protected
class based on her religion.

**ANSWER:**

The Court dismissed this claim, and no response to this allegation is

required. To the extent a response is required, Takeda denies the allegations in

Paragraph No. 152.

**COMPLAINT ¶ 153:**

Plaintiff is an employee within the meaning of the FCHRA.

307780376v.3

**ANSWER:**

The Court dismissed this claim, and no response to this allegation is required. To the extent a response is required, Takeda denies the allegations in Paragraph No. 153.

**COMPLAINT ¶ 154:**

Takeda is an employer within the meaning of the FCHRA.

**ANSWER:**

The Court dismissed this claim, and no response to this allegation is required. To the extent a response is required, Takeda denies the allegations in Paragraph No. 154.

**COMPLAINT ¶ 155:**

The FCHRA forbids Takeda from discriminating against Plaintiff because of her sincerely held religious beliefs or because of Plaintiff's need for a religious accommodation, absent proof that granting the accommodation would cause it undue hardship.

**ANSWER:**

The Court dismissed this claim, and no response to this allegation is required. To the extent a response is required, Takeda denies the allegations in Paragraph No. 155.

**COMPLAINT ¶ 156:**

This extension of actionable religious discrimination to include a failure to accommodate derives from the FCHRA's adoption and incorporation of Title VII's definition of "religion" to include "all aspects of religious observance and practice, as well as belief, unless an employer demonstrates that he is unable to reasonably accommodate to an employee's or prospective employee's religious observance or practice without undue hardship on the conduct of the employer's business."

54

**ANSWER:**

The Court dismissed this claim, and no response to this allegation is required. To the extent a response is required, Takeda denies the allegations in Paragraph No. 156.

**COMPLAINT ¶ 157:**

At all times relevant, Plaintiff held bona fide (sincere) religious beliefs that prohibited her from becoming vaccinated against COVID-19.

**ANSWER:**

The Court dismissed this claim, and no response to this allegation is required. To the extent a response is required, Takeda denies the allegations in Paragraph No. 157.

**COMPLAINT ¶ 158:**

Plaintiff's sincere beliefs were religious in nature.

**ANSWER:**

The Court dismissed this claim, and no response to this allegation is required. To the extent a response is required, Takeda denies the allegations in Paragraph No. 158.

**COMPLAINT ¶ 159:**

Plaintiff sincerely believed that if she had gotten vaccinated in violation of her religious beliefs, such action would have impacted her ability to go to Heaven.

**ANSWER:**

The Court dismissed this claim, and no response to this allegation is required. To the extent a response is required, Takeda denies the allegations in Paragraph No. 159.

307780376v.3

**COMPLAINT ¶ 160:**

Plaintiff's sincerely held religious beliefs conflicted with Takeda's policy concerning mandatory vaccination.

**ANSWER:**

The Court dismissed this claim, and no response to this allegation is required. To the extent a response is required, Takeda denies the allegations in Paragraph No. 160.

**COMPLAINT ¶ 161:**

Takeda purposefully, willfully, intentionally, or recklessly took adverse action against Plaintiff by:

a.      Denying Plaintiff's accommodation request despite no undue hardship existing;

b.      Harassing and ridiculing Plaintiff upon learning of her religion;

c.      Weaponizing Plaintiff's religion by using it as a basis to interrogate her and cause her mental stress, anguish, and otherwise hinder Plaintiff's performance abilities;

d.      Refusing to provide any information as to why it denied Plaintiff's accommodation request;

e.      Telling Plaintiff she could request a religious accommodation without ever intending on granting it, irrespective as to what her accommodation request stated;

f.      Forcing Plaintiff to apply for a religious accommodation and participate in a "sham" accommodation request process where the decision to deny her request was pre-determined under threat of termination for cause had she not submitted the request;

g.      Failing to give due consideration or review Plaintiff's accommodation request on a case-by-case basis;

h.      Screaming, demeaning, ridiculing, harassing, embarrassing, humiliating, condemning, threatening, and otherwise inflicting emotional distress upon Plaintiff because she requested an accommodation;

56

307780376v.3

i.      Scheduling a "Discussion" meeting to facilitate an environment for Mr. Crouch and Mr. Hand to engage in the aforesaid action alleged in the above sub-paragraph;

j.      Lying to Plaintiff by claiming the vaccines effectuated the means sought to be effectuated by the COVID-19 vaccination policy;

k.      Concealing the efficacy and safety of the vaccines Takeda sought to coerce into Plaintiff's body;

l.      Lying to Plaintiff concerning the vaccines' ability to prevent contraction of COVID-19;

m.      Lying to Plaintiff concerning the vaccines' ability to prevent transmission of COVID-19;

n.      Lying to Plaintiff by telling her Takeda would endure an "undue hardship" if it maintained Plaintiff's employment if she remained unvaccinated;

o.      Assigning Plaintiff additional work outside the scope of her duties because she is religious;

p.      Failing to compensate Plaintiff for the additional work she performed at Takeda outside the scope of her duties because she is religious; and

q.      Refusing to accommodate Plaintiff despite her lawful entitlement to such an accommodation.

## ANSWER:

The Court dismissed this claim, and no response to this allegation is required. To the extent a response is required, Takeda denies the allegations in Paragraph No. 161.

## COMPLAINT ¶ 162:

Plaintiff's sincerely held religious beliefs partially, substantially, or entirely motivated Takeda's decision to take the aforementioned adverse employment actions against her.

307780376v.3

**ANSWER:**

The Court dismissed this claim, and no response to this allegation is required. To the extent a response is required, Takeda denies the allegations in Paragraph No. 162.

**COMPLAINT ¶ 163:**

At all times relevant, Takeda knew of Plaintiff's sincerely held religious beliefs.

**ANSWER:**

The Court dismissed this claim, and no response to this allegation is required. To the extent a response is required, Takeda denies the allegations in Paragraph No. 163.

**COMPLAINT ¶ 164:**

Takeda made no efforts at all to accommodate Plaintiff's sincerely held religious beliefs.

**ANSWER:**

The Court dismissed this claim, and no response to this allegation is required. To the extent a response is required, Takeda denies the allegations in Paragraph No. 164.

**COMPLAINT ¶ 165:**

Takeda knew or should have known that accommodating Plaintiff would not have imposed upon it an undue hardship.

307780376v.3

**ANSWER:**

The Court dismissed this claim, and no response to this allegation is required. To the extent a response is required, Takeda denies the allegations in Paragraph No. 165.

**COMPLAINT ¶ 166:**

Takeda intentionally concealed its knowledge that no undue hardship existed because Takeda knew at all times relevant, the vaccines did not prevent transmission or contraction and therefore, Takeda's policy compelling vaccination did not satisfy the ends sought to be achieved by its vaccination policy.

**ANSWER:**

The Court dismissed this claim, and no response to this allegation is required. To the extent a response is required, Takeda denies the allegations in Paragraph No. 166.

**COMPLAINT ¶ 167:**

Accommodating Plaintiff would not have imposed an undue hardship on Takeda, as evidenced by its ability to maintain Plaintiff's employment through the entirety of the COVID-19 pandemic and its use and implementation of alternative mitigation protocols such as masking, remote work, and social distancing.

**ANSWER:**

The Court dismissed this claim, and no response to this allegation is required. To the extent a response is required, Takeda denies the allegations in Paragraph No. 167.

**COMPLAINT ¶ 168:**

Other pharmaceutical companies and sales companies have not insisted on mandatory vaccination without allowing accommodations for religious objectors.

307780376v.3

**ANSWER:**

The Court dismissed this claim, and no response to this allegation is required. To the extent a response is required, Takeda denies the allegations in Paragraph No. 168.

**COMPLAINT ¶ 169:**

As a direct and proximate result of the aforesaid complained of conduct and violation of the FCHRA, Plaintiff sustained pecuniary and non-economic injuries in an amount that exceeds $75,000.00, including lost wages, benefits, retirement funds, the denial of promotional opportunity, humiliation, embarrassment, unnecessary pain and suffering, attorneys' fees, and costs associated with this action.

**ANSWER:**

The Court dismissed this claim, and no response to this allegation is required. To the extent a response is required, Takeda denies the allegations in Paragraph No. 169.

**COUNT IV**
**DISABILITY DISCRIMINATION**
**Violation of the ADA**

**COMPLAINT ¶ 170:**

Plaintiff re-alleges and incorporates by reference all preceding paragraphs as if fully set forth herein.

**ANSWER:**

Takeda restates its answers to the preceding paragraphs as its answer to Paragraph No. 170.

**COMPLAINT ¶ 171:**

Plaintiff is a disabled person within the meaning of 42 U.S.C. § 12102(1). Plaintiff suffers from depression and PTSD, which is a physical or mental impairment that substantially limits one or more of Plaintiff's major life

60

307780376v.3

activities, such as caring for himself, performing manual tasks, eating, sleeping, breathing, learning, reading, concentrating, thinking, communicating, and working. Defendants also regard Plaintiff as having such an impairment as defined by 42 U.S.C. §§ 12102(1)(C), 3(A).

**ANSWER:**

Takeda denies the allegations in Paragraph No. 171.

**COMPLAINT ¶ 172:**

Plaintiff is a qualified individual within the meaning of 42 U.S.C. § 12111(8). Plaintiff, with or without a reasonable accommodation, can perform the essential functions of DCBOE/OCF Investigator based factors including but not limited to, his education, experience, performance reviews, and October 2018 return-to-work letter.

**ANSWER:**

Takeda denies the allegations in Paragraph No. 172.

**COMPLAINT ¶ 173:**

Plaintiff, at all times relevant to this action, was an employee within the meaning of 42 U.S.C. § 12111(4).

**ANSWER:**

Takeda admits the allegations in Paragraph No. 173.

**COMPLAINT ¶ 174:**

Takeda, at all times relevant to this action, was Plaintiff's employer within the meaning of 42 U.S.C. § 12111(5). Takeda engaged in an industry affecting commerce and has more than 25 employees for each working day in each of 20 or more calendar weeks in the current and preceding years.

**ANSWER:**

Takeda admits the allegations in Paragraph No. 174.

**COMPLAINT ¶ 175:**

At all times relevant, the Individual Defendants, singularly and/or collectively, were agents of Plaintiff's employer, Takeda, within the meaning of 42 U.S.C. § 12111(5).

61

307780376v.3

**ANSWER:**

Takeda denies the allegations in Paragraph No. 175.

**COMPLAINT ¶ 176:**

Defendants had actual knowledge or constructive knowledge of Plaintiff's disability at all times relevant to this action, in that Takeda received notice that Plaintiff was taking Short Term Disability Leave, Plaintiff discussed her disability with Defendants, Plaintiff discussed compensation while on leave for her disability with Defendants, and previously accommodated Plaintiff's disability; discussed Plaintiff's disability; Defendants examined, reviewed, or possessed medical evidence of Plaintiff's disability.

**ANSWER:**

Takeda admits that Olson requested a disability accommodation and that

Takeda discussed Olson's accommodation request and leave with Olson. Takeda

denies the remaining allegations in Paragraph No. 176.

**COMPLAINT ¶ 177:**

Defendants purposefully, willfully, intentionally, or recklessly subjected Plaintiff to a hostile work environment by engaging in a series of actions, including:

    a.    Harassing and ridiculing Plaintiff because of her disability;

    b.    Threatening Plaintiff;

    c.    Refusing to compensate Plaintiff while she was entitled to compensation on Short Term Disability Leave;

    d.    Forcing Plaintiff to work while she was on Short Term Disability Leave;

    e.    Publicizing that Plaintiff was disabled to one or more persons;

    f.    Denying Plaintiff's request for a medical accommodation without any justification;

    g.    Refusing to inform Plaintiff why her medical accommodation request was denied;

h.   Threatening to terminate Plaintiff because she is disabled;

i.   Denying Plaintiff a promotion because she is disabled;

j.   Assigning Plaintiff additional work outside the scope of her duties because she is disabled; and

k.   Failing to compensate Plaintiff for the additional work she performed at Takeda outside the scope of her duties because she is disabled.

**ANSWER:**

Takeda denies the allegations in Paragraph No. 177.

**COMPLAINT ¶ 178:**

Defendants committed the aforesaid acts or omissions with the intent to humiliate, ridicule, insult, demean, coerce, and embarrass Plaintiff and with the intent to discriminate against her.

**ANSWER:**

Takeda denies the allegations in Paragraph No. 178.

**COMPLAINT ¶ 179:**

The aforesaid adverse employment actions occurred because Plaintiff is disabled.

**ANSWER:**

Takeda denies the allegations in Paragraph No. 179.

**COMPLAINT ¶ 180:**

The aforesaid adverse employment actions occurred because Plaintiff requested an accommodation and/or engaged in protected activity by taking a leave of absence because she is disabled.

**ANSWER:**

Takeda denies the allegations in Paragraph No. 180.

**COMPLAINT ¶ 181:**

All allegations set forth herein violate the ADA.

307780376v.3

**ANSWER:**

Takeda denies the allegations in Paragraph No. 181.

**COMPLAINT ¶ 182:**

As a direct and proximate result of Defendants' actions or omissions complained of herein, Plaintiff sustained economic injuries in amount in excess of $75,000.00, including the denial of promotional opportunity, humiliation, embarrassment, unnecessary pain and suffering, and has incurred medical expenses, attorneys' fees, and costs associated with this action.

**ANSWER:**

Takeda denies the allegations in Paragraph No. 182.

**COUNT V**
**DISABILITY DISCRIMINATION**
**Violation of the FCHRA**

**COMPLAINT ¶ 183:**

Plaintiff re-alleges and incorporates by reference all preceding paragraphs as if fully set forth herein.

**ANSWER:**

Takeda restates its answers to the preceding paragraphs as its answer to

Paragraph No. 183.

**COMPLAINT ¶ 184:**

Plaintiff is a disabled person within the meaning of the FCHRA.

**ANSWER:**

Takeda denies the allegations in Paragraph No. 184.

**COMPLAINT ¶ 185:**

Plaintiff suffers from depression, which is a physical or mental impairment that substantially limits one or more of Plaintiff's major life activities, such as caring for himself, performing manual tasks, eating, sleeping, breathing, learning, reading, concentrating, thinking, communicating, and working.

307780376v.3

Defendants also regard Plaintiff as having such an impairment as defined by the FCHRA.

**ANSWER:**

Takeda denies the allegations in Paragraph No. 185.

**COMPLAINT ¶ 186:**

Plaintiff is a qualified individual within the meaning of the FCHRA. Plaintiff, with or without a reasonable accommodation, can perform the essential functions of her job-based factors including but not limited to, her education, experience, performance reviews, and voluminous performance-based awards earned throughout her career.

**ANSWER:**

Takeda denies the allegations in Paragraph No. 186.

**COMPLAINT ¶ 187:**

Plaintiff, at all times relevant to this action, was an employee within the meaning of the FCHRA.

**ANSWER:**

Takeda denies the allegations in Paragraph No. 187.

**COMPLAINT ¶ 188:**

Takeda, at all times relevant to this action, was Plaintiff's employer within the meaning of the FCHRA. Takeda engaged in an industry affecting commerce and has more than 25 employees for each working day in each of 20 or more calendar weeks in the current and preceding years.

**ANSWER:**

Takeda admits that it employs Olson. Takeda admits that it engaged in an industry affecting commerce and has more than 25 employees for each working day in each of 20 or more calendar weeks in the current and preceding years. Takeda denies the remaining allegations in Paragraph No. 188.

65

**COMPLAINT ¶ 189:**

At all times relevant, the Individual Defendants, singularly and/or collectively, were agents of Plaintiff's employer, Takeda, within the meaning of the FCHRA.

**ANSWER:**

Takeda denies the allegations in Paragraph No. 189.

**COMPLAINT ¶ 190:**

Defendants had actual knowledge or constructive knowledge of Plaintiff's disability at all times relevant to this action, in that Takeda received notice that Plaintiff was taking Short Term Disability Leave, Plaintiff discussed her disability with Defendants, Plaintiff discussed compensation while on leave for her disability with Defendants, and previously accommodated Plaintiff's disability; discussed Plaintiff's disability; Defendants examined, reviewed, or possessed medical evidence of Plaintiff's disability.

**ANSWER:**

Takeda admits that Olson requested a disability accommodation and that

Takeda discussed Olson's accommodation request and leave with Olson. Takeda

also admits that it received notice that Olson was taking leave. Takeda denies the

remaining allegations in Paragraph No. 190.

**COMPLAINT ¶ 191:**

Defendants purposefully, willfully, intentionally, or recklessly subjected Plaintiff to a hostile work environment by engaging in a series of actions, including:

    a.    Harassing and ridiculing Plaintiff because of her disability;

    b.    Threatening Plaintiff;

    c.    Refusing to compensate Plaintiff while she was entitled to compensation on Short Term Disability Leave;

    d.    Forcing Plaintiff to work while she was on Short Term Disability Leave;

307780376v.3

e.      Publicizing that Plaintiff was disabled to one or more persons;

f.      Denying Plaintiff's request for a medical accommodation without any justification;

g.      Refusing to inform Plaintiff why her medical accommodation request was denied;

h.      Threatening to terminate Plaintiff because she is disabled;

i.      Denying Plaintiff a promotion because she is disabled;

j.      Assigning Plaintiff additional work outside the scope of her duties because she is disabled; and

k.      Failing to compensate Plaintiff for the additional work she performed at Takeda outside the scope of her duties because she is disabled;

**ANSWER:**

Takeda denies the allegations in Paragraph No. 191.

**COMPLAINT ¶ 192:**

Defendants committed the aforesaid acts or omissions with the intent to humiliate, ridicule, insult, demean, coerce, and embarrass Plaintiff and with the intent to discriminate against her.

**ANSWER:**

Takeda denies the allegations in Paragraph No. 192.

**COMPLAINT ¶ 193:**

The aforesaid adverse employment actions occurred because Plaintiff is disabled;

**ANSWER:**

Takeda denies the allegations in Paragraph No. 193.

**COMPLAINT ¶ 194:**

The aforesaid adverse employment actions occurred because Plaintiff requested an accommodation and/or engaged in protected activity by taking a leave of absence because she is disabled;

307780376v.3

**ANSWER:**

Takeda denies the allegations in Paragraph No. 194.

**COMPLAINT ¶ 195:**

All allegations set forth herein violate the ADA.

**ANSWER:**

Takeda denies the allegations in Paragraph No. 195.

**COMPLAINT ¶ 196:**

As a direct and proximate result of Defendants' actions or omissions complained of herein, Plaintiff sustained economic injuries in amount in excess of $75,000.00, including the denial of promotional opportunity, humiliation, embarrassment, unnecessary pain and suffering, and has incurred medical expenses, attorneys' fees, and costs associated with this action.

**ANSWER:**

Takeda denies the allegations in Paragraph No. 196.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiff respectfully prays that this Honorable Court enter judgment in Plaintiff's favor, and award Plaintiff such relief as to make Plaintiff whole and remedy the aforesaid violations; and hold Defendants' jointly and severely liable and in doing so, award all legal and equitable relief provided by law, including but not limited to:

A.   Declaratory relief finding Defendants' actions are unconstitutional;

B.   Permanently enjoin Defendants from engaging in the unlawful discrimination and retaliation complained of herein;

C.   Grant all injunctive relief necessary to bring Defendants into compliance with the ADA and California law;

D.   Grant declaratory relief

E.   Award compensatory damages for Plaintiffs' emotional pain and suffering, in an amount to be proven at trial;

F.   Award punitive damages in an amount to be determined at trial;

307780376v.3

G.      Award statutory minimum damages;

H.      Order Defendants to pay Plaintiffs' reasonable attorneys' fees, reasonable expert witness fees, and other costs of this action pursuant to 42 U.S.C. § 2000e-5(k), the ADA, 42 U.S.C. § 12205 and the FCHRA, FLA. STAT. § 760.11(5);

I.      Award interest on damages, including pre- and post-judgment interest and an upward adjustment for inflation; and

J.      Grant such other and further relief as the court deems just and proper.

**ANSWER:**

Takeda states that the preceding statement is not a factual allegation to which a response is required. To the extent that a response is required, Takeda denies that Olson is entitled to any relief whatsoever.

## **JURY DEMAND**

Plaintiff demands trial by jury of all claims and causes of action so triable.

**ANSWER:**

Takeda states that the Jury Demand is not a factual allegation to which a response is required.

## **AFFIRMATIVE DEFENSES**

## **FIRST AFFIRMATIVE DEFENSE**

Olson's claims are barred, in whole or in part, because she failed to exhaust her administrative remedies to the extent her claims are based on conduct outside the scope of what is identified in her charges.

69

307780376v.3

## SECOND AFFIRMATIVE DEFENSE

Olson's claims are barred, in whole or in part, by the applicable statute of limitations.

## THIRD AFFIRMATIVE DEFENSE

Olson's claims are barred by the doctrine of laches, waiver, and/or estoppel.

## FOURTH AFFIRMATIVE DEFENSE

To the extent that Olson has failed to mitigate her alleged damages, her recovery, if any, must be reduced accordingly.

## FIFTH AFFIRMATIVE DEFENSE

Olson cannot recover punitive damages because, among other reasons, Takeda made good faith efforts to comply with Title VII, the ADA, the Florida Civil Rights Act, and all other applicable anti-discrimination laws.

## SIXTH AFFIRMATIVE DEFENSE

Olson's claims are barred because Takeda made employment decisions concerning Olson's employment for reasons unrelated to any protected category.

## SEVENTH AFFIRMATIVE DEFENSE

Takeda affirmatively asserts that, even if Olson were to prove that Takeda took adverse employment action(s) against her as the product of discrimination, which Takeda denies, the same action(s) would have been taken in the absence of a discriminatory motivation.

307780376v.3

## **PRAYER FOR RELIEF**

Wherefore, Takeda respectfully requests that this Court enter judgement against Olson and award Takeda its reasonable costs.

DATED: February 6, 2024                    Respectfully submitted,


By: */s/ Alex Meier*

Alex Meier
ameier@seyfarth.com
Florida Bar No. 1011557
SEYFARTH SHAW LLP
1075 Peachtree Street, N.E.
Suite 2500
Atlanta, Georgia 30309-3958
Telephone: (404) 885-1500
Facsimile: (404) 892-7056

Attorney for Defendant Takeda
Pharmaceuticals America, Inc.

307780376v.3

## UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF FLORIDA
## TAMPA DIVISION

SHANNON OLSON,

        Plaintiff,

   v.

TAKEDA PHARMACEUTICALS
AMERICA, INC,

        Defendant.

CASE NO: 8:23-CV-00590-TPB-CPT

**JURY TRIAL DEMANDED**

## CERTIFICATE OF SERVICE

I hereby certify that on February 6, 2024, I electronically filed DEFENDANT TAKEDA PHARMACEUTICALS AMERICA, INC'S ANSWER TO PLAINTIFF'S THIRD AMENDED COMPLAINT using the CM/ECF system, which will automatically send e-mail notification of such filing to all counsel of record.

By: /s/ *Alex Meier*
     Alex Meier
     Attorney for Defendant

72

307780376v.3