# EXHIBIT A

Page 1

UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION
Case No. 8:23-CV-00590-TPB-CPT

SHANNON OLSON,

     Plaintiff,

v.

TAKEDA PHARMACEUTICALS
AMERICA, INC.,
     Defendant.

_____/

VIDEOTAPED
DEPOSITION OF:    SHANNON OLSON

DATE:             August 15, 2024

TIME:             9:23 a.m. to 5:20 p.m.

PLACE:           Gray Robinson, P.A.
                 101 East Kennedy Blvd., Suite 4000
                 Tampa, FL 33602

PURSUANT TO:     Notice by counsel for Defendant
                 for purposes of discovery, use at
                 trial or such other purposes as are
                 permitted under the Federal Rules
                 of Civil Procedure

REPORTED BY:     ANN S. BEILSTEIN, RPR
                 Notary Public
                 State of Florida at Large

Pages 1 - 298

APPEARANCES:

    Michael A. Yoder, Esquire

    (Remote appearance)

    Yoder LaVeglia LLP

    2001 L St. NW, Suite 500

    Washington, DC 20036

    myoder@yoderlaveglia.com

        Attorney for Plaintiff

    Andrew M. McKinley, Esquire

    Seyfarth Shaw LLP

    1075 Peachtree Street, N.E., Suite 2500

    Atlanta, GA 30309

    amckinley@seyfarth.com

        Attorney for Defendant

ALSO PRESENT:

    Shannon Cherney, Esquire, for Plaintiff (Remote)

    Sonali Das, Esquire, for Defendant (Remote)

    Craig Black, Videographer

I N D E X

                                        PAGE

DIRECT EXAMINATION BY MR. McKINLEY.................. 6

CERTIFICATE OF OATH................................ 295

CERTIFICATE OF REPORTER............................ 296

ERRATA SHEET....................................... 297

READ AND SIGN LETTER............................... 298

E X H I B I T S

DESCRIPTION

FOR THE DEFENDANT:                                      PAGE

Exhibit 1 - Job Description........................  73

Exhibit 2 - 2019 Year End Performance Review........  96

Exhibit 3 - Articles of Organization...............  102

Exhibit 4 - Articles of Amendment..................  103

Exhibit 5 - 2015 Florida Limited Liability Company
            Annual Report..........................  104

Exhibit 6 - Emails 0000077-422.....................  105

Exhibit 7 - Emails 0000406-423.....................  109

Exhibit 8 - Emails 0000035-36......................  114

Exhibit 9 - Email 0000099..........................  114

Exhibit 10 - Fit Life Aug. 2020 Plan...............  116

Exhibit 11 - 2019 HR & Compliance Policies and Proc.  48

Exhibit 12 - Emails 0000502-519....................  125

Exhibit 13 - Email - Outside Activities Intake
             Request Form 0000318-320..............  132

Exhibit 14 - Email - Outside Activities Intake
             Request Form 0000333-336..............  135

Exhibit 15 - Emails 0000337-341....................  141

Exhibit 16 - Email Re Secondary Employment 0000342..  148

Exhibit 17 - Emails - Template 0000343-345.........  150

Exhibit 18 - Emails - Template 0000347-349.........  152

Exhibit 19 - Email - ADA Medical Eval 0000425-431...  162

Exhibit 20 - Emails - Accommodation 0000437-439.....  174

E X H I B I T S

DESCRIPTION

FOR THE DEFENDANT: PAGE

Exhibit 21 - Emails - Accommodation Request 0000460 178

Exhibit 22 - Emails - Accommodation Update
0000480-487............................ 182

Exhibit 28 - Email - Suspension of COVID-19
Policies and Procedures 0000542........ 190

Exhibit 30 - Pay stubs.............................. 214

Exhibit 32 - Short-Term Disability File............ 209

Exhibit 33 - Letter to Shannon Olson from Melissa
Moynahan 0000576-579.................. 212

Exhibit 34 - Letter to Shannon Olson from Shana Cote
0000568................................ 214

Exhibit 35 - Text messages - 10 pages.............. 228

Exhibit 36 not identified

Exhibit 37 not identified

Exhibit 38 not identified

Exhibit 39 - Memo to Jordan David from Matt Hand
0000401-405............................ 239

Exhibit 40 - 2020 Year End Performance Review
0000493-496............................ 258

Exhibit 41 - Charge of Discrimination 0000490-492... 288

Exhibit 42 not identified

Exhibit 43 - Plaintiff's Responses to Defendant's
Requests for Production of Documents... 41

Shannon Olson                    August 15, 2024
Olson, Shannon v. Takeda Pharmaceuticals America, Inc.

Page 5

P R O C E E D I N G S

THE VIDEOGRAPHER:  Good morning.  We are going on the record at 9:23 a.m. on August 15th, 2024.  Please note that the microphones are sensitive and may pick up whispering and private conversations and please mute your phones at this time.  Audio and video recording will continue to take place unless all parties agree to go off the record.

This is media unit one of the video-recorded deposition of Shannon Olson taken by counsel for Defendant in the matter of Shannon Olson versus Takeda Pharmaceuticals America, Incorporated, filed in the U.S. District Court, Middle District of Florida, Tampa Division, Case Number 8:23-CV-00590-TPB-CPT.  The location of the deposition is 101 East Kennedy Boulevard, Suite 4000, Tampa, Florida.  My name is Chris Black representing Veritext Legal Solutions and I am the videographer.  The court reporter is Annie Beilstein from the firm Veritext Legal Solutions.  I am not related to any party in this action nor am I financially interested in the outcome.  If there are any objections to proceeding, please state them at the time of your appearance.

Will counsel now please state their

appearances and affiliations for the record beginning with the noticing attorney, and then the court reporter can swear in the witness and we may proceed.

MR. McKINLEY:  Andrew McKinley with Takeda Pharmaceuticals America, Inc.  I also have with me two individuals who aren't counsel of record, but Sonali Das who is in-house counsel for Takeda and Shannon Cherney who is an associate from my office.

MR. YODER:  And Michael Yoder on behalf of the plaintiff, Shannon Olson.

COURT REPORTER:  If you would raise your right hand, please?

Do you swear or affirm the testimony you are about to give will be the truth, the whole truth, and nothing but the truth?

THE WITNESS:  Yes.

SHANNON OLSON,

the witness herein, being first duly sworn on oath, was examined and deposed as follows:

DIRECT EXAMINATION

BY MR. McKINLEY:

Q    All right.  Ms. Olson, thank you for coming today.

A    Um-hum.

Shannon Olson                    August 15, 2024
Olson, Shannon v. Takeda Pharmaceuticals America, Inc.

Page 7

Q    I am -- like I said a minute ago, I'm Andrew McKinley.  I am one -- the attorney for Takeda in this case and, you know, today is going to be your deposition.

Could you please state your full name for the record?

A    Shannon Olson.

Q    Okay.  Do you have a middle name?

A    Marion.

Q    Okay.  How do you spell that?

A    M -- M-A-R-I-O-N.

Q    Okay.  Have you ever been known by any other names?

A    Kerr, K-E-R-R.

Q    Okay.  As your last name?

A    Yes.

Q    Okay.  Any others?

A    Uh-uh.

Q    Okay.  Have you been married before?

A    Yes.

Q    Okay.  Are you married now?

A    No.

Q    Okay.  How long were you married for?

A    I was married 11 years.

Q    Okay.  And to whom?

A     Michael Olson.

Q     Okay.  And what -- you said 11 years.  From when to when?

A     I was married -- we divorced in 2014, so --

Q     Okay.

A     -- in November of 2014.

Q     Okay.  Do you have children?

A     Yes.

Q     How old are they?

A     I have three.  My oldest is 18, my daughter is 17, and my youngest is 15.

Q     Okay.  Have you ever been deposed before?

A     Yes.

Q     Okay.  For what?

A     I -- child support modification with my children's father.

Q     Okay.  And when was that deposition?

A     Was it -- I believe 2020.

Q     Okay.  Do you remember how long it lasted?

A     It might have been 2019.

Q     Do you remember how long it lasted?  Was it like an hour, a full day?

A     I think just the morning.

Q     It was the morning.  What do you remember about it?  Positive?  Negative?  Hated every second of

it?

    A    No.  I mean, what I remember of it, that there wasn't really any need for it.

    Q    Okay.  And was it you were trying to get child support modification?

    A    I had filed a child support modification.

    Q    Okay.  So since you've been deposed before, some of this might be familiar to you, but I'm going to kind of run through sort of what I'll call background rules, but just some -- some things that let us kind of set the expectations for each other, keep -- keep me honest and --

    A    Yeah.

    Q    -- keep you honest too.

    So to start, I can -- this is going to be a long day and I can guarantee you that at some point today, my brain is going to stop working --

    A    Um-hum.

    Q    -- fully and I'm going to ask questions that I thought made sense but really didn't make sense when they came out of my mouth.

    A    Okay.

    Q    So if at any point I ask a question that doesn't make sense to you, it's rambling, it's -- I skipped a word, I do something that just doesn't make

sense, please let me know.  Is that fair?

A    Yeah, or just ask a clarifying --

Q    Yeah.

A    -- question?

Q    Right.

A    Okay.

Q    And if I ask a question and you don't tell me that you don't understand it, I'm going to assume that you do.  Is that fair?

A    Okay.  So then is it best if it's a generalized question to ask a specific question?  Oh, there's no interpretation on something that --

Q    I think what I would say is if I ask a question, I would want you to ask it as answer -- or ask -- answer it as asked.

A    Okay.

Q    However, if you aren't clear on what I'm asking, I'd ask you to please --

A    Okay.

Q    -- ask me to rephrase it or --

A    Um-hum.

Q    -- ask it again.  Is that fair?

A    Sure.

Q    Okay.  Also, there is a court reporter here. Her job is to write down everything both of us say.

Shannon Olson                    August 15, 2024
Olson, Shannon v. Takeda Pharmaceuticals America, Inc.

Page 11

A     Um-hum.

Q     And so I know that when two people are talking, often, you know, we do an um-hum like you just you did --

A     Yes.

Q     -- or nod our heads, and that can sometimes be hard for the court reporter to keep down.  So please --

A     Apologies.

Q     -- do the best you can.  Try to say yes, no --

A     Yes.

Q     -- instead of uh-huh or nodding or anything like that.  And if you don't do that, I'll try to catch it.  I'm sure the court reporter will try to catch it too.

A     Yes.

Q     But let's both try to make sure that we do that.

Also, again, in conversation you're -- everybody probably knows what the other person is going to ask two-thirds of the way through their sentence, and so often when we're talking, I might be getting to the end of a question and then you already know what you want to say in response.  Please make sure that you let me finish the question so the court reporter can get it down and then -- and then you answer it.  And I also

will try to make sure that I don't interrupt you when you're answering.

A    Um-hum.

Q    If your answer does start going off course a little bit, then I might kind of jump in to get us back on course, but generally, I'm going to try to not interrupt you and I'd ask that you also try not to interrupt the question.  Is that fair?

A    Yes.

Q    Okay.  As a mentioned ago -- a minute ago, this -- it's going to be a pretty long day.  And so if you need a break for any reason, you need water, you need to go to the bathroom, there's going to be a few sensitive topics we get into today, so if you need a break just to clear your mind a little bit --

A    Okay.

Q    -- please let me know.  I will -- I will make sure that we do that.  What I'll say is if I'm in the middle of a line of questioning, I may ask you to just finish that and then we'll get to the break.

A    Okay.

Q    But otherwise, I will try to make sure that we take a break within a few minutes of you asking.  Is that fair?

A    Sure, yes.

Q   All right.  Are you aware of any reason why you can't answer the questions that I ask completely accurately or truthfully?

A   Am I aware -- repeat.

Q   Is there any reason that you don't -- that you couldn't be truthful today?

A   No.

Q   Okay.  And is there any -- any medication that you normally take that you aren't taking today?

A   No.

Q   Okay.  Is there any medication that you are taking today that you don't normally take?

A   Yes.  I took a propanolol.

Q   Okay.  Do you think that the propanolol. will have any impact on your ability to answer any questions that I ask today?

A   I don't believe so.

Q   Okay.  What is propanolol for?

A   For -- to keep my heart rate from beating out of my chest and --

Q   Okay.  And hopefully, as we go along, that will subside a little bit.

So when were you born?

A   July 13th, 1974.

Q   Okay.  Where were you born?

A    New Haven, Connecticut.

Q    Okay.  Where do you currently live?

A    St. Pete Beach, Florida.

Q    What's the street address?

A    102 28th Avenue.

Q    And how long have you lived there?

A    About -- in that house a year, about approximately a year.

Q    Okay.  Where were you before that?

A    Fourteen blocks away.

Q    Okay.  What was that address?

A    1405 Gulf Way.

Q    How long were you there?

A    Approximately four years.

Q    Okay.  So that's back to about what, 2016, 2017?

A    No.

Q    Maybe not quite.

A    We were there 2019 -- I'm sorry, not 2019. 2000 -- I think it was like 2001, so three years.

Q    Okay.  And how long have you lived in the Tampa-St. Pete area?

A    I've lived in Tampa-St. Pete area for I guess about -- approximately 23, 24 years.

Q    Okay.  How did you come down here -- or why

did you come down here from New Haven?

A    I didn't come through New Haven.

Q    Okay.

A    I arrived in Florida via Hawaii.

Q    Okay.  Why -- how did -- how did you end up from New Haven to Hawaii to here?

A    I went to school in South Carolina.

Q    Okay.

A    And then moved to Hawaii.  Stayed in South Carolina a year after graduation.  Saved money.  Moved to Hawaii and then lived there and then moved to Florida.

Q    Okay.  You said school in South Carolina?

A    Um-hum.

Q    What school?

A    I did school in Connecticut and in South Carolina.

Q    Okay.

A    South Carolina, University of South Carolina.

Q    Columbia or --

A    Yes, um-hum.

Q    Okay.  My parents went there.

A    Ah.

Q    Yeah.  My grandma lives in Richmond County right next to Williamsburg.

A     Where were you raised?

Q     So I was born in Charleston, but --

A     Really?

Q     Yeah.  But moved -- moved down here -- yeah, we got dis -- or yeah, dislocated by Hugo.

A     Oh.

Q     So, but it's all right.

A     I do love College of Charleston.

Q     Do you?  Oh, yeah?  It's nice.  My -- my cousin lives in the city right now.

A     Yes.

Q     It's a great city.

A     Um-hum.

Q     Okay.  So you went to South Carolina.  You said also school in --

A     Yeah.

Q     -- Connecticut.  Where?

A     In Waterbury, Connecticut.  It was called Teikyo Post University.  Now it goes by Post University.

Q     Okay.  And what -- what time frame were you at Post University?

A     After high school graduation through I believe it was '95.

Q     Okay.

A     So was it, like, 1993 through 1995.

Q    Okay.  And you were at South Carolina for --
or University of South Carolina from what?

A    I believe 1995 through 1997.

Q    Okay.  And did you graduate from --

A    Yes.

Q    -- South Carolina?

A    And dates -- just I'm horrible with dates.

Q    Yeah.  One other thing I should say as a
ground rule.  I am not -- all the questions I ask today,
I do not want you to guess.  Please don't.  If you don't
know the answer, please, please say that.  You're under
oath and so you should --

A    Yes.  I mean, I graduated from high school in
1993, two years in Connecticut, two years -- I believe
it was 1997.  I just --

Q    Okay.

A    -- haven't --

Q    Yeah.

A    -- had to answer that question in quite some
time.

Q    Okay.  What degree did you graduate with?

A    A liberal arts degree.

Q    Okay.  And do you have any professional
licenses?

A    No.

Q    Okay.  Have you received any sort of additional schooling or vocational training after graduating from South Carolina?

A    No.

Q    Okay.

A    Back in -- I guess it was when Takeda -- there was an organization called TAP.  They had a program. They had paid -- it's not -- I don't believe it's used anymore, but it was a certified representative.  So you just took -- you know, you paid for it and then -- I believe then they paid for it, but then they gave you money to complete it.

Q    Okay.  And is that -- is that training provided by Takeda or was it something where they would facilitate it but somebody else was providing it?

A    No.  It was offered through a company called TAP.

Q    Okay.

A    Takeda-Abbott, but that would have been back in -- '99 -- like 2001 or something.

Q    Okay.  And explain again what exactly that training was for?

A    It just gave you -- companies now do it on their own, but it gave you -- and you can actually get -- do most of the research on your own now, but that

was before everything was available to you online.  So it was an easy way to gain knowledge in the industry in various components.

Q    Okay.  Do you have -- do you have any social media?

A    I do.

Q    Okay.  What do you have?

A    I have Facebook, Instagram.  Because I just subscribed to a couple of others.  I wasn't big into it. But Facebook, Instagram, LinkedIn, TikTok, I guess X. Is that considered social media?  Threads.  And is Truth Social a social media?

Q    Yeah.

A    Or is it -- okay.

Q    Any others?

A    I said LinkedIn?

Q    Yes.

A    Is Pinterest a social media?

Q    Maybe technically, but that's different, I think.

A    Okay.  And is Telegram considered a social media?

Q    It's a messenger app.  Do you use, like, Snapchat or --

A    No.

Q    How about Kick or anything like that?

A    No.

Q    Okay.  Have -- have you ever posted about, like, Takeda or this case on any of that social media?

A    No.

Q    Okay.  I know we talked about your -- you were requesting modification of your child support payment a minute ago.

A    Um-hum.

Q    I imagine there was, you know, a filing for the divorce before that, right?  Or you guys filed a case for the divorce or, you know, filed something to get the divorce approved by a court, right?

A    Correct.

Q    Have you ever had any other cases where you've sued or been sued by anybody?

A    No.

Q    Okay.

A    My -- when I was married.  I don't know if my name's on that, though.

Q    Oh.  Do you know what it was for?

A    A neighbor had sprayed a pesticide or something over the fence and my kids' dad, my husband at the time, you know, the kids filed -- I don't even know what it was against them.  I don't know if my name is on

that or not, though.

Q    Okay.  Do you remember how that resolved?

A    No.  I think it was just, like, a warning type thing to --

Q    Do you know if it was a lawsuit or a police report?

A    No.  I can -- do you want me to see what it is?

Q    If you have it readily available.

A    I mean, I can Google it, I guess.

Q    Okay.

A    Again, I don't even know if -- I'm trying to -- I think that it was just Mike's name on it, to be quite honest with you.

Q    Okay.  But you're not aware of any settlement or anything like that from it?

A    No, there was not.

Q    Okay.  Okay.  Apart from --

A    To the best of my knowledge, there was not.  I didn't take care of that.

Q    Okay.  Apart from this matter that you have against Takeda, have you ever filed any other complaint or charge with a state or federal agency like the EEOC?

A    No.

Q    Okay.  And when did you first consider suing

Takeda?

A     When did I first consider?

Q     Yeah.

A     I guess in -- is it 2020?

Q     Okay.  Do you remember when in 2020?  Like the first half, second half?

A     I remember 2020.

Q     And I will -- just -- so for the deposition, please -- please don't bring any documents.

A     I just have wrote just so the -- I'm trying to be accurate with dates.  I'm horrible with dates, like I said.

Q     Right.  I understand.  But the purpose of the deposition --

A     It would have been 2021.  I'm sorry.

Q     2021.  Okay.

A     2020.  2020 to 2021.

Q     Okay.  Do you -- do you remember what it was that caused you to start?

A     It was a combination of multiple blatantly obvious instances and things, events.

Q     Well, I guess my question is was there -- was there one event?

A     No.

Q     And maybe there was -- there was not.  Okay.

Was there -- do you remember -- okay. What did you -- what have you done to make sure that any emails that you have about any of these cases against Takeda have been preserved?

MR. YODER: I'm going to object just to the characterization of multiple cases.

Shannon, you can go ahead and answer.

BY MR. McKINLEY:

Q   Okay. If I said multiple cases, what -- just my question is what have you done to make sure that your emails about Takeda have been preserved?

A   My emails?

Q   Yeah.

A   With Takeda emails?

Q   So --

A   Use -- I guess my question -- I'm sorry.

Q   I'll clarify it. You have -- you have claims against Takeda right now, correct?

A   Correct.

Q   And you understand what those claims are, right?

A   Correct.

Q   What have you done to make sure that any email that may have ever existed about -- that relates to those claims has been preserved so that it's not

deleted?

A    I have, I mean, a Takeda laptop.

Q    Um-hum.

A    That's Takeda's property.

Q    Okay.  Have you ever emailed on your personal email to anybody about Takeda?

A    Well, my -- yes.  My attorney.

Q    Okay.  Have you --

A    The EEOC.

Q    Okay.  And any of the emails on your personal email, what have you done to make sure that those are preserved?

A    Filed them, printed what I've deemed relevant to --

Q    Okay.  I guess ultimately my question is is any email that you have had about Takeda still in your gmail?  Or I assume it's a gmail.  Is your personal email a gmail?

A    Um-hum.

Q    Okay.  Have you saved --

A    Yes.  Sorry.

Q    Have you saved every email that you have related to Takeda that was to or from your gmail in your gmail?

A    To the best of my knowledge, yes.  However, I

do know there are -- can be issues with email in that sometimes things aren't always saved.  I just learned there was a 50-email limit.  But yeah, I mean, I have not intentionally gone and -- I don't have anything to --

Q    Okay.

A    I'm not hiding anything.

Q    Okay.  Are you -- sitting here today, are you aware of any emails that you had at some point but you don't have today relating to Takeda?

A    Any emails that I had at some point that I no longer have?

Q    I'll rephrase it.  Are you aware of any Takeda emails getting deleted at some point from your gmail?

A    Well, in my Takeda email, after a certain period of time, there aren't emails.  I can check a 2020 file and there's nothing in it.

Q    Okay.

A    I can check a Takeda 2019 file and there's nothing in it.

Q    Um-hum.  I want to the focus on your gmail, your personal account.

A    Okay.

Q    Are you aware of any emails that have been deleted from your personal email?

A    No.

Q    Okay.  How about text messages?  What have you done to preserve any text messages you have relating to Takeda?

A    I -- I have text messages.

Q    Okay.  Sitting here today, do you still have all of the text messages that you had with Jodi Gayle-Garcia?

A    On a different phone.

Q    Okay.  Do you know where that phone is?

A    Yeah.  At my house.

Q    Okay.  Sitting here today, do you have all of your text messages with Greg Crouch?

A    I have printouts of both and on another phone.

Q    Okay.  And are all -- is the full text history on that phone?

A    It should be.

Q    Okay.  And why do you have printouts?

A    In case if something happened to the text messages.

Q    Okay.

A    I mean --

Q    Is -- is there any reason you haven't produced any of those -- those text messages in this case?

A    No.  I mean, I -- I have produced what I --

what I was asked to produce.

Q    Okay.  Are you aware that Takeda did ask you to produce all your text messages?

A    And I gave them whatever I have.

Q    Are you sure you gave --

A    Of Takeda?

Q    Takeda.

A    I had given production on what I was asked to produce.

Q    Did you give it to your attorney?

A    Um-hum.

Q    Do you know if it --

A    Yes.

Q    -- went to Takeda?

A    I -- I don't know.

Q    Okay.  We'll get into this a little more later, but I'm going to note that we might have to hold the deposition open on that point because no messages have been produced to Takeda.

How about with Matt Hand?  Do you have -- do you have -- do you still have all your texts with Matt Hand?

A    I -- and with all of them, I can't say every single text is there, every single communication.

Q    Um-hum.

A    But yeah, if it's -- I've changed phones a couple of times and with that comes things that aren't -- a phone number that once was there that no longer is there.

Q    Okay.

A    And I have used texts as a to-do list in the past.  When I've completed the task, the text gets erased.

Q    So you have --

A    I can't say I've done that specifically with a Takeda person.  I can say I've done that with -- in general.

Q    Okay.  So it's possible -- you're saying it's possible that you --

A    Yes.

Q    -- might have deleted texts in a chain on your phone?

A    Sure.

Q    Okay.

A    Anything's possible.  It's like I plugged in my old phone and I don't have access to it.

Q    Okay.  Well, I understand that anything is possible.  Let me ask this.  Do you have any reason to believe that you have deleted any text messages you might have with Jodi Gayle-Garcia?

A    I could have possibly.

Q    Okay.  Do you have any reason to believe that you deleted any text messages with Greg Crouch?

A    I could have.

Q    Okay.  Do you have any reason to believe that you have deleted any text messages with Matt Hand?

A    I -- I could have.

Q    Okay.  Okay.  What have you done to prepare for your deposition today?

A    Prayed a lot.

Q    Okay.

A    Tried to sleep.

Q    And I'm going to preface this with something. At no point today should you tell me anything that you spoke with your attorney about.  I do not want you to tell me the content of any communication you've ever had with him.  Please do not do that.  But I will ask some questions that are related, but again, not asking for the content of your conversation.

Did you -- did you meet with your attorney about the deposition today either virtually or in person?

A    Yes.

Q    Okay.  When did that happen?

A    Yesterday.

Q    Okay.

A    It was maybe five minutes.

Q    Okay.  Did you -- have you reviewed any documents to prepare for the deposition today?

A    Yeah.  I reviewed performance evaluations.  I reviewed just various policies.

Q    Okay.  Do you remember what the policies were?

A    Outside employment.

Q    Okay.  Any others?

A    What is it called?  Conflict of interest.

Q    Any others?

A    Policies on data, what Takeda does with various data.

Q    What is -- what -- could you explain that more, what data?

A    What they do with workday data.

Q    What kind of workday data?

A    Your pronouns, your identity, et cetera.

Q    Okay.  Are you saying that you reviewed a policy or that you reviewed an email, or what exactly were you looking at?

A    Corporate disclosures on our company, I guess, intranet.

Q    On the intranet.  Okay.

Any other documents you remember reviewing to

prepare for the deposition today?

A    I just went through old -- like I said, I was going through files, and in my Takeda email in my 2020, there's nothing there.  So I was looking back at sent emails.

Q    Okay.  Do you remember any particular emails that you looked at?

A    Yeah.  One involving a -- you know, the working remote in 2020.  An email that I was slated for expense report training.

Q    Okay.  Any others you remember?

A    Just how people were working virtually.

Q    Okay.  Do -- do you know what your current claims in this case are?

A    Um-hum.

Q    What are they to your understanding?

A    The claims that -- yeah, I mean, it's discrimination with disability.  And I know that the Judge had put specific things, retaliation in a comparator.

Q    Okay.  So I'm clear, is your understanding that your current claims are disability discrimination?

A    Um-hum.

Q    And did you say retaliation?

A    Yeah, the adverse event, adverse event,

adverse employment action.

Q    Okay.  Do you know -- do you know whether that's -- the adverse employment action is part of your disability claim or are you claiming disability and retaliation separately?

A    In all honesty, I read through our Third Amended, the Judge Order, and halfway through Takeda's response.

Q    Okay.  You understand your religious claims are dismissed at this point, right?

A    Um-hum.

Q    Okay.  Have you discussed the -- your claims in this case with anyone other than your attorney?

A    Yes.

Q    Who?

A    My children.

Q    Anyone else?

A    The guy that I'm dating, my parents.

Q    Anyone else?

A    My best friend.

Q    Anyone else?

A    Some Takeda employees who were fired from Takeda.

Q    Anyone else?

A    An old Takeda employee.

Q    Anyone else?

A    My friends, like my circle of friends.  Who specifically?  I mean, are you wanting specific inside people who are currently working for Takeda?  I mean --

Q    I want the full roster.

A    Okay.

Q    So I'm going to run through those and then we'll make sure we covered everybody.

A    Um-hum.

Q    You said --

A    My sister.

Q    Okay.  You said the guy you're dating.  What's his name?

A    J.T.

Q    What's his last name?

A    Vikari, V-I-K-A-R-I.

Q    What does J.T. stand for?

A    Jeffrey Todd.

Q    Okay.  What have you specifically said to J.T.?

A    Exactly what had happened.

Q    Okay.  Are you able to -- I mean, you said exactly what happened, but are you able to remember specific statements you made to him?

A    Just general, generalized statements.

Q    Okay.  You mentioned your parents.  What have you said to your parents?

A    My parents, I mean, they've been a part of -- from everything that's been going on, so --

Q    So is it like with J.T.?  Have you talked to them generally about it?  Do you remember specific things you said to them?

A    I would - I don't -- not specifics-specifics. I would get an opinion, especially from my father, because sometimes you -- things can occur and it's like, is that actually -- did that -- is that -- is that fact, is that -- you know, is this really going on here?  And at the time too with some --

And when you're saying specifics about the case, like, this has been --

Q    Yeah, I'm not --

A    -- four -- like, four years, so --

Q    Yeah, when I'm talking about the case.  I mean do you remember talking about them -- with them either about the litigation or kind of the things that you're talking about in the litigation?

A    Say that one more time.  I'm sorry.

Q    Do you remember speaking with them about the litigation itself or the subject matter of the litigation?

A    The subject matter.

Q    Okay.  And do you remember any of the specific parts of the subject matter that you spoke with your dad about?

A    Everything.

Q    Okay.

A    I spoke with my teammates too.

Q    Okay.  You said your best friend.  What's your best friend's name?

A    Jen Lexell.

Q    How do you spell the last name?

A    L-E-X-E-L-L.  She actually goes by Bredal now.  She got married.  B-R-E-D-A-L.

Q    Okay.  Did you talk with Jen about anything different than what you talked with your parents about?

A    No, and it was a -- coming from a -- seeking advice mainly.

Q    Okay.

A    And a -- it was, like, repeated patterns, is this seriously occurring, and then, you know, sometimes people can see things that you're not seeing.

Q    Um-hum.  You mentioned that you spoke with Takeda employees who had been fired.  Who were those individuals?

A    Alicia Ramsey.  Well, I had already mentioned

Scott Comerinsky.  Alan Fitz -- Fritz.  Oh, gosh, what is her name?  Hang on.  I can't -- her name is drawing a blank to me.  Tammy Friedman.

Q     Any others?

A     Melissa Kelly.

Q     Anyone else?

A     Yeah.  I just looked.  Britt Singleton and Tracy Sweeney.

Q     Okay.  Do you -- do you -- let me ask this.  When you spoke with each of them, was it about the vaccination policy specifically or was it about issues beyond that?

A     Issues beyond.

Q     Okay.  And what issues beyond that did you speak with any of them about?

A     My specific issues that were going on, that had gone on, were currently going on, in addition to the common commonality we all had which was the vaccination policy.

Q     Who was -- well, you mentioned an old Takeda employee.  Who was that?  In your list, you --

A     They're all old Takeda employees.  None of them work for Takeda anymore.

Q     Well, in the list you gave me a minute ago, you said that there were Takeda employees who were fired

and then you identified somebody who, I guess, wasn't in that group but you identified as an old Takeda employee. Do you remember who that was?

A    Oh, no.  I mean, Scott.  I don't -- they're all -- people either got fired or they got laid off.

Q    Okay.  You mentioned speaking with your friends.  Which -- which of your friends did you speak to about it other than the best friend we just talked about?

A    My circle of friends.

Q    What are their names?

A    Natalia Rutherford.  Some old Takeda employees, Mindow Scream -- Screams (phonetic).  I'm saying her last name wrong, pronouncing it wrong. Debbie Owen, Mary Beth Kemp, Christian Natu, and Karen Tellebschur.

Q    How do you spell that last name?

A    T-E-L-L-E-B -- I think it's S-C-H-U-R.

Q    Okay.

A    Do you want me to get the exact spelling?

Q    You said -- did that person work for Takeda?

A    Back in the day.

Q    Okay.  Yeah, if you have -- I mean, if you have it readily available?

A    Are you -- go ahead.

Q    No, go ahead.  What was the --

A    None of those individuals work at Takeda.

Q    None of them work?

A    None of them on that list --

Q    Okay.

A    -- work at Takeda.

Q    Okay.  You said -- you say work at Takeda. Did they work at -- some of them work at Takeda at some point in the time?

A    Um-hum.

Q    Okay.

A    Yes.  Sorry.

Q    Which ones worked there at some point in the past?

A    All of them minus Natalia Rutherford.

Q    Okay.

A    And past could have been ten years, you know.

Q    Okay.  Have you given -- we talked about the texts before, but let's set aside the texts for a minute.  Apart from that, have you provided every document in your possession to your attorney that relates to Takeda?

A    I've provided --

THE WITNESS:  Mike, have I?

BY MR. McKINLEY:

Q    I don't know that he can answer that for you.

A    Oh, I don't know.  I was given --

MR. YODER:  Could you rephrase the question, whether you're asking generalized or specifically to the discovery requests?

MR. McKINLEY:  Yes.

BY MR. McKINLEY:

Q    Did -- have you -- let me break it down a little bit.  You filed several Complaints in this case, right?

A    Um-hum.

Q    Have you provided your attorney every document that you based any allegation in that Complaint on?

A    I have provided to my attorney every document he has asked -- he or an associate has asked me for.

Q    Do you have documents that you based your Complaint on that you haven't provided to your attorney?

A    I'm not totally sure as -- I have a box.  I've provided what he's asked.

Q    Okay.  And so sitting here today, you don't -- you don't know if you've yet provided your attorney every document that relates to this case.  Is that fair?

A    Every needed document?  Yeah, I've provided everything thus far requested.

Shannon Olson                    August 15, 2024
Olson, Shannon v. Takeda Pharmaceuticals America, Inc.

Page 40

Q    And when you say requested, you mean by your attorney, correct?

A    Correct.

Q    Okay.  And my -- I need -- I understand why you're saying it that way, but I need to make sure that the question I'm asking is answered.

Sitting here today, do you know if you have documents that relate to this case that haven't been requested by your attorney but that you have?

A    I don't remember every document he asked for.

Q    Okay.  So sitting here today, is it fair to say that you don't know if you have provided your attorney every document you have related to your claims against Takeda?

MR. YODER:  I'm going to object to relevance if documents weren't requested with discovery and also objection to the attorney-client privilege and work product doctrine.

You can go ahead and answer, Shannon.

A    Actually, I had remembered this morning that -- because I hadn't thought about it, I didn't think it relevant before, but the -- having a special expense report training, I do not believe I provided the emails and such to Mike regarding that.  Hindsight, I -- I thought it was a non-issue, but looking back, it is a

big issue actually.

Q    I'm going to -- I'm going to do this way out of order, but I'm going to show you -- and I will share my screen with Mike.  Just give me one second.

A    Um-hum.

MR. YODER:  I know you mentioned that you premarked exhibits.  Are we just going to revise that to note as, like, Defense Exhibit 1?

MR. McKINLEY:  I'm actually going to do them out of order.  I find that renumbering them gets confusing.  So I'm just going to stick with the originals -- original numbering and it will -- it will all be attached to the deposition.  It will just read out of order, I suppose.  It's just easier to do it this way.

MR. YODER:  That's fine.  I prefer that.  So that works.

(Defendant's Exhibit 43 was marked for identification.)

BY MR. McKINLEY:

Q    All right.  So Ms. Olson, I am going to show you what I will mark as Exhibit 43.  Take a minute to look at it if you need.  My question ultimately is have you ever seen this document?

A    I haven't seen this actual document.  I have

gone through these questions, though.

Q    And do you -- do you understand what you have been asked to produce in this case by Takeda?

A    What I have been asked to produce by Takeda? No.

Q    Okay.  Do you understand that this document consists of all the things that Takeda has asked you to produce and --

A    Okay.

Q    -- as your response is agreeing to produce those things?

A    Okay.

Q    Do you understand that?

A    I'm just seeing this.  So, I mean, I have, as stated, had verbal conversations.

Q    And don't -- don't describe those conversations to me.

A    Okay.

Q    Those are privileged, but -- so I'll --

A    If there's something that is -- like I said, I had just this morning tied in that expense training which is pretty big.  At Takeda you can't -- the thing, expenses and sampling are large, and when an upper management has you go through a training, I didn't put it together until this morning.  So I can get that

information to you guys --

Q    Okay.

A    -- through Mike.

Q    Yeah, and I -- I want to focus on Exhibit 43 specifically.

A    Is that in here?

Q    The entire thing is Exhibit 43.

A    Okay.

Q    Can you look at request number 6, for example?

A    Um-hum.

Q    Do you understand that you were asked to produce any documents regarding any patent held by you?

A    Um-hum.

Q    Including any attempt in monetization of the patent or business activity with the patent during your employment with Takeda?

A    Yes, I did.  I have not done anything with this patent.  I -- let me see.  Ten years ago I job-shared my job, meaning I worked part-time for the organization.  When I went full-time for the organization, I didn't do anything with the organization -- with my trademark except have a website.

Q    Okay.  So I want to make sure we focus on the exact question.  I guarantee you we're going to talk about that issue a lot later.  What I want to focus on

is you understand this request -- I mean, you see your response under it, right?  All responsive documents attached to Plaintiff or within her possession -- sorry -- available to Plaintiff or within her possession are attached hereto?

A    Sure.

Q    You understand you have not produced that -- or any patent documentation to Takeda, right?

A    No, I'm not aware.

Q    Okay.  You have not provided any documentation about the organization or corporate filings that you had for your company Fit Life, correct?

A    Okay.

Q    Are you aware of that?

A    I've -- again, through a conversation with an associate with my attorneys, I was asked questions and gave answers to questions and provided what I was asked to provide.  It was a while back.  I'm not aware of what requests Takeda has and what requests Takeda does not have, what Takeda doesn't need, you know.

Q    Okay.  Sitting here today --

A    Okay.

Q    -- is it fair to say that you do not know if you have -- if you have provided everything that you committed to provide in Exhibit 43, correct?

A     Say that one more time.

Q     Sitting here today --

A     Um-hum.

Q     -- you don't know that you have actually produced to Takeda everything that you committed to producing in Exhibit 43, right?

A     I have given what -- to my attorney what was asked of me through communication with him and his associate.

Q     My question is different.

A     I can't answer that because I don't know what has been given to Takeda and what has not been given to Takeda.

Q     Well, my question is different than that, right?  I understand that you don't know what your attorney gave to Takeda.

A     Um-hum.

Q     My question is -- and I think we're almost saying the same thing, but I want to make sure that you answer the question I'm asking.

A     I don't really know what the heck you're asking because I'm not the one providing the --

Q     Well, what I'm asking is sitting here today, you don't know if you have provided to Takeda -- you or your attorney have provided to Takeda every document

that you committed to producing in this Exhibit 43,

right?

A     So going back to request number 6 --

Q     Yep.

A     -- yes, that documentation has been provided

to Takeda.  It's in Takeda's HR -- my HR file with

Takeda, and Takeda Ethics and Compliance even has the

information.

Q     So two things.  First of all, my question is

about this litigation.

A     Right.

Q     Litigation and employment are different

things.

A     Okay.

Q     You have not produced -- you do not know if

anything related to the organization of Fit Life has

been produced to Takeda, correct?

A     I do not know -- I -- there's no way for me to

know --

Q     Yeah.

A     -- what information I have been -- I have

provided has been provided to Takeda.  That's between

you and my attorney, not --

Q     Well, let me ask it differently.  You have not

provided your attorney the patents, have you?

A    I have provided -- whatever has been asked of me I have provided.

Q    I've --

A    I can't -- I don't remember -- I actually found it.  It was tucked under the list of everything that was asked.

Q    Well, so that's fine, but I do need you to say yes, no, or I don't know to this.

A    I don't know.

Q    Okay.

A    I would assume he had asked for it.  I don't know if he definitely did or definitely did not ask for it.

Q    Okay.  Do you have any reason to dispute that Takeda didn't receive any of your corporate filings for Fit Life?

A    Do I have any reason to dispute --

Q    That Takeda did not receive any corporate filings from you about Fit Life?

A    I just would not know what Takeda did and did not receive.  I have no way of knowing that.  You're asking me basically about information I don't have.  I'm not the one that's sending the stuff.  That would be something for you and my attorney to discuss.  There's no way for me to know.

Q    Okay.  I'm going to make a representation to you.  Takeda has never received any corporate filing from your company.

A    Okay.

Q    Do you -- do you --

A    But do you need what -- if Takeda has some stuff that they need, ask me for it.  I will gladly provide it.

(Defendant's Exhibit 10 was marked for identification.)

BY MR. McKINLEY:

Q    Well, for clarity, if you look at the last page of Exhibit 10, Takeda asked for all this on January 16th, 2020.  Or actually, you provided your response on January 16th, 2024 saying you would provide all this stuff.

A    Okay.

Q    Do you know -- I mean, so a request has been made.

A    Okay.

Q    Do you know why it hasn't been complied with?

A    I'm not -- again --

Q    Okay.

A    Perhaps that's a communication --

Q    I think it probably is.  I mean, request

number 7, you were asked to provide all text messages --

A    Um-hum.

Q    -- regarding your complaints about Jordan Davis, any alleged unfair treatment, your efforts to obtain any accommodation --

A    Uh-huh.

Q    -- Takeda's response, your alleged damages, communications with Jordan Davis, communications with any individual defendants --

A    Um-hum.

Q    -- and your communications regarding your religious beliefs or preferences.

A    Okay.

Q    Have you texted with Jordan Davis?

A    When?

Q    Ever.

A    Of course.

Q    Okay.  Do you know why you haven't produced a single text?

A    I don't know if I have texts from him.

Q    Okay.

A    I can go back and look.

Q    Okay.  Do you know why you haven't produced a single text with Greg Crouch?

A    I -- no, I don't.  I have -- again, what I

have been asked to submit I have submitted.

Q    Okay.  Again, by your attorney is what were you're saying?

A    Correct.

Q    Okay.  And do you know why -- and again, just you personally.  I'm not -- I want to be clear.  I'm not asking you to answer for your attorney.

A    Um-hum.

Q    Do you know why Takeda hasn't been given any texts between you and Jodi Gayle-Garcia?

A    No, I don't.

Q    Okay.  And do you personally know why Takeda --

A    Unless if there weren't any, meaning I had said to you I changed phones, and at that time, if I had deleted something, it wasn't able to be recovered.  So I don't -- I don't -- I can't recall specifics as to what was asked for me to produce because it was a while back.

Q    Okay.  Sitting here today, do you have any memory of going through your phone to look for texts with Jodi Gayle-Garcia?

A    My current phone.

Q    Okay.  Do you remember ever looking through your old phone?

A    One, I can't.  It's locked.  I don't know if I

changed the passcode.

Q    Okay.  Have you gone -- is it an iPhone?

A    Um-hum.

Q    Have you gone through Apple to get them to unlock it for you?

A    No.

Q    Okay.  Is there any reason you haven't?

A    I have three children.  I'm a mom.  This -- it's just taking the time to go do it.  It's like getting a car washed.

Q    Okay.

A    You know?

Q    And so is it -- is it fair to say that sitting here, I mean, that there may be texts on that old phone, you just don't know right now?

A    Sure, yes.

MR. McKINLEY:  Okay.  We're -- I'm going to hold this -- I'm going to put this on the record. There's probably a discussion between counsel to be had about the sufficiency of the actual document production in light of what's been said here.  I'll just put on the record that we'll hold the deposition open for that to be addressed and we'll move on from that for now.

BY MR. McKINLEY:

Q    Have you gone through your voicemails to see if you have anything related to your texts in this case in your voicemails?

A    I went through them the other week.  I don't believe there's anything in there.

Q    You listened to all your voicemails?

A    I don't believe there's anything in there.

Q    You don't believe or don't know or don't believe or know there isn't?

A    To the best of my knowledge, currently there is nothing in my voicemail that would pertain to this case.  I normally just delete them.

Q    Okay.  Is there any possibility there's a voicemail you're just not aware of sitting here today?

A    Again, there's always a possibility.  So I did not and have not in the past -- no one ever thinks you're going to be where you currently are.  So if something was deleted, lost, deleted, I -- it's not -- I at the time, like I said, deemed it either irrelevant or -- I don't even have Jordan's phone number anymore.  Is it I don't have it because it didn't transfer when I got a new cell phone?  Do I -- you know, I don't know.  It's -- he -- I haven't -- he's not been with the company for a while.

Q    Okay.  Have you looked -- we went through a long list of people that you've talked about -- you said you've talked to about this case.

A    Um-hum.

Q    Have you looked through your texts to see if you have any texts with any of them where you're talking about the case or Takeda?

A    No.  Normally it's just on, if anything, a phone call conversation.

Q    Okay.  Do you know for sure that -- that there are no texts with any of them ever?

A    No.

Q    Okay.  Ms. Olson, are you aware that you were required to provide what's called initial disclosures in this case?

A    Okay.  Consisting of?

Q    Things that the Court requires you to say at the outset of a case?

A    I have -- I have given whatever has been asked of me.

Q    Okay.  And that's fair.  I guess --

A    If I don't know that there's a request, I can't fulfill the request.

Q    Okay.  And maybe that answers these next questions.  Are you aware that even though you're

required to provide initial disclosures, you didn't?

A    I provided what was asked of me.

Q    Okay.  Is it fair to say that you don't know why Takeda never received initial disclosures from you through your attorney?

A    I think it's fair to say I did not -- I provided what I was asked.  I have done what I have been asked to do.

Q    By your attorney, correct?

A    Correct.

Q    Okay.  And I think what I am telling you is that there was a requirement to fulfill.

A    Um-hum.

Q    It wasn't and you don't know why.  Is that -- is that fair?

A    There's a requirement to fulfill and I don't know why?

Q    You don't know why it wasn't?

A    A requirement to fulfill?  I mean, if there's a requirement to fulfill, Takeda is not having information that they need, let me know and --

MR. YODER:  I'd just --

THE WITNESS:  Um-hum.

MR. YODER:  -- like to put on the record that we provided initial disclosures on January 13th.  I

don't know if it was anything due to the changing of counsel or whatever, but we did provide initial disclosures in this.

MR. McKINLEY:  Okay.  I guess we'll talk about that offline.  I will say that I spoke to former counsel and that's different from my understanding, but we can address that off record --

MR. YODER:  Okay.

MR. McKINLEY:  -- after the deposition.

All right.  We have been going for about an hour and 15 minutes.  I'm fine.  I will keep going straight, but do you want to take a break?  Do you --

THE WITNESS:  No.  Go ahead.

MR. McKINLEY:  Okay.

THE VIDEOGRAPHER:  We do need to take a break at about an hour and 20 minutes, so --

MR. McKINLEY:  Okay.

THE VIDEOGRAPHER:  -- for the video record.

BY MR. McKINLEY:

Q    All right.  So Ms. Olson, you began working at Takeda on December 13, 1999, correct?

A    Correct.  At that time it was TAP.

Q    TAP.  Okay.

A    I was hired for TAP.

Q    Okay.  Where did you start?

A    Lakeland, Florida was my named territory.

Q    And in what role?

A    Sales rep.

Q    All right.  Could you go through every position that you have held with TAP, Takeda --

A    Um-hum.

Q    -- and the time frames that you held each role?

A    No.  I should have brought -- nothing.  I've worked for the organization.  When I was hired, I was hired and worked with a direct counterpart, Lori Hernandez.  I think I was with her for 18 months maybe and then transferred to a Brandon-Bradenton territory.  My work partner was Jason Kelly.

So in TAP/Takeda, you have direct counterparts, direct, and you -- you know, it's a direct counterpart.  You work and can't get from point A to point B without each other, your bonus the same, et cetera.

And let me see.  After Jason, I think that was like -- Jason Kelly did I say was my --

Q    Yes.

A    -- work partner's name?

Q    Do you remember -- and I don't expect exact

dates, but do you remember, like, the rough time frame of when you were working with Jason?

A    It was -- so if 1999 -- so that would be 2000, 2001.  Halfway through, like, probably 2001, I transferred to Brandon-Bradenton and I was there for about -- I want to say about 18 months, and then I lived in St. Petersburg and a spot came open there.

Q    Okay.  And that was when, 2002 or 2003?

A    Roughly 2003.

Q    Okay.  Have you been there since or have you --

A    Um-hum.

Q    -- had anything different in the interim?

A    Yeah, but then different.  In 2005, September of 2005, my son was born and I went after leave to work in January of 2006 and then job shared my job.

Q    Starting in 2006 or after?

A    I'm trying -- 2006.  It was in 2006.

Q    Okay.  And that was from 2006 until when?

A    Until approximately 2015, 2016.

Q    Okay.  You mentioned -- you used the phrase "job shared."  What does that mean?

A    Basically sharing a full-time job, so -- but with -- Takeda would allow two people to make up one week.  So they hired Jennifer Lexell.

Q    Okay.  So --

A    So she would work two days, I would work two days, and we'd either alternate the fifth day to make up a week or we would do two days one week, three days the next.

Q    Okay.  And then after 2016, the job sharing ended and you returned -- did you -- at some point, you became a senior sales associate, right, or I'm sorry, senior rep, yeah, senior sales rep?

A    Right.  That was during I think job share days.  I don't remember exactly when that happened.

Q    Okay.  And then you were -- after job sharing, what happened?

A    Jen -- I had gotten divorced.  Then Jen had gotten divorced and she -- both of us needed to supplement our income.  So, you know, she just said, I'm sorry, I have to get a full -- I have to go and do full-time.  Takeda didn't have anything for her to transfer into, so she had a position outside of Takeda. And then Takeda gave me the option, we'll do -- do you want still job share or full-time?  And as a single mom, I went full-time.

Q    Got it.  All right.  So kind of towards the start of that, you mentioned that you have a counterpart.

A    Um-hum.

Q    Is -- is the situation at the district?  Is it a district or team level?  How do you describe that -- that twosome?  What is --

A    Territory.

Q    Territory.  Okay.

A    Um-hum.

Q    At the territory level, has it always been, essentially, two roles that are counterparts with each other?  I guess, yeah, the job sharing is a complication, so --

A    But then we had a full-time partner.  So it was always a two-person pod up until the last restructuring Takeda did.  However, I was without a counterpart, a direct counterpart from the middle of 2021, yeah.

Q    Okay.  So until -- until when?

A    Takeda's last restructuring was -- I think it was January of 2022 or something, and then they did away with the, quote-unquote, primary care sales force and everyone became a neuroscience sales rep and titled, et cetera.

Q    Yes.  Just so I'm clear, from what date to what date did you not have a counterpart?

A    From, I want to say, July of 2021 and then

Takeda did a restructuring.  It could have been -- it could have been -- they only do it right -- right at the end of their fiscal year which is the end of March, but then sometimes they've done it in January too.  So it was either January or March-ish of 2022.

Q   Okay.  All right.  Lori Hernandez, was she a -- was she a -- was her title sales rep or senior sales rep?

A   I have no idea.

Q   Okay.  How about Jason Kelly?  Do you know if he was a sales rep or a senior sales rep?

A   I have no idea.

Q   Okay.  I want to -- and for the time frame prior to your job sharing, I want to be clear.  You -- so it was a two-person pod, right?  It was always you and somebody else?

A   Correct.

Q   And then during timesharing, there -- it was kind of a three-person pod because there was someone else, but then you and Jennifer were one person?

A   Correct.

Q   Okay.  While you were in St. Petersburg before the job sharing, who were the counterparts that you had had and when were they your counterparts?

A   When I was in St. Petersburg before job share?

I don't know if I was a sales rep.  Oh, Steven Green, I think.  Jennifer Potter.  Was Steven even my partner?  I can't guarantee it.  Yeah, I think he was.  You're asking from a long time ago.

Q    I know.  Do you remember anyone else?

A    As a counterpart?

Q    Yeah.

A    Uh-uh, no.

Q    Okay.

A    I can't -- let me just go back to make sure.

Q    Okay.

A    Because at some time, Takeda or TAP did have a three -- three-person pod too, but that was short lived.

Q    Okay.  Do -- what is the -- in your words, what is the dynamic between the counterparts?  Like, what is -- how are they supposed to work together?  Let's put it that way.

A    We have the same territory.

Q    Um-hum.

A    Same geographical space, the same accounts, the same products, the same manager.

Q    Okay.  Are --

A    And with all of those, I can't say for -- there might have been two different managers a while back, but typically, it's been the same manager, the

same region.

Q   Okay.  Is -- is the expectation that you and the counterpart are supposed to work collaboratively?

A   Um-hum.

Q   And ultimately, are you and the counterpart and your territory responsible for the entire territory?

A   Yes.

Q   Okay.

A   And that can differ based on management.

Q   Has there ever been a time where you weren't supposed to work collaboratively with your counterpart?

A   That you're not supposed to work collaboratively with your counterpart?  Oh, Karen Tellebschur was a counterpart too.  It just depended if -- I think Jen and I were given Actos at one point and I think -- I do not believe our counterpart had Actos.  So that was when we were job sharing.  So we wouldn't need to collaborate about a product that she didn't have.

Q   I guess my question is more has there ever been a time that a manager has told you don't work together to be as successful as you can be?

A   Don't work together?

Q   Yeah, don't collaborate.  Has any -- and I'll rephrase the question.  Has any manager ever told you that they didn't expect you to collaborate with your

counterpart?

A    Not to the best of my knowledge.

Q    Okay.  Ultimately, are you and your counterpart responsible -- or, you know, do you both get the benefit when the territory is managed well by both of you?

A    Yes.

Q    Okay.  And do you both, I guess, get the detriments when the territory is not handled well by both of you?

A    Yes.

Q    Okay.  Is it your understanding that there's an expectation that when one of the counterparts isn't able to do something for whatever reason, the other counterpart will assist if they can?

A    Sure.

Q    Okay.  And is that --

A    Yes.

Q    Is that because ultimately the goal is to get as much business for Takeda as you possibly can together?

A    The theory is two people doing the same job calling on the same customer, thus an increase in voice.  Thus, a territory would do well.

Q    Okay.  And when you are working with a

counterpart -- with your counterpart, there are times where you are both touching the same customers, right, meaning you're both reaching out to the same customers --

A    Um-hum.

Q    -- sometimes?

A    Yes.

Q    Okay.  And when you started as a sales rep, was there any training you were given?

A    As like everyone, initial sales training.

Q    Okay.  What does that consist of?

A    Learning the product and the landscape, the marketplace.

Q    Okay.  Is that a formal training or is it --

A    Yes.

Q    -- informal too?  Is there any -- are there any informal aspects of that training?

A    When I went through training, yes, the home study can be informal.  It's on your own.

Q    Okay.  The formal training that you had, how long did that last?

A    My formal training, I believe a week and a half, perhaps two weeks.

Q    Okay.  And I've noticed --

A    I think.  I mean, it could have been a week.

Two weeks of at-home study and then one week of -- a week to two weeks. I can't -- I mean --

Q Okay. I've noticed a few times that you've made a point of saying my formal training. Is that -- is that because the --

A Because TAP -- it's Takeda now. So Takeda Abbott was a different organization than Takeda. So what I went through in TAP, I don't know what Takeda currently has people going through.

Q Okay. So you don't have any knowledge at all of what the training is for new sales reps?

A I don't know how long they're there.

Q Okay. Do you know if they get shadowed or, you know, they go through shadowing or anything like that?

A I believe so.

Q Okay. Have you ever been shadowed by another associate?

A Um-hum, yes.

Q Do you remember how long that shadowing lasted?

A Just he -- the morning. He came to a procedure.

Q Okay. Who was that?

A P.J. Burdis (phonetic).

Q    Okay.  Do you know if the shadowing that he did was limited to you or if he was shadowing other people as well?

A    I don't recall.

Q    Okay.  All right.  And you -- you said you became a senior sales rep sometime during the job sharing, right?

A    I think it was during job share.

Q    Yeah.  Explain your job to me.  What is it?

A    Analyzing data and educating offices and providers on the solution to the problem, whatever the condition is.

Q    I guess I'll put it this way.  I'm going to ask you to dumb it down for me.

A    My current role?  My current role, depression.  The problem is depression, solution, Trintellix.

Q    Okay.  And just to describe it as a very -- at a very high level, you're trying to sell something, right?

A    Yeah.  I just -- I mean, in medicine I don't -- the term "sales" is just so -- because -- but yes.

Q    Okay.  And you're --

A    You're selling for a specific unmet need.

Q    Okay.  And so am I -- you said analyze data.

Are you talking about looking at -- you know, essentially analyzing data about what the market is and where needs are or are you analyzing something else?

A    No.  Analyzing the data Takeda provides.

Q    Okay.  And what is that data?

A    It's called Eye Insights.  It just tells you who is writing your product, who has written in the market.

Q    Okay.  So the data you're looking at is who's actually -- who is actually prescribing the things you're selling?

A    Correct.

Q    Okay.

A    And who is not.

Q    And who is not.

A    It's a snapshot of your territory.

Q    Okay.  And when you're analyzing that, are you saying to yourself, go for the people who are prescribing it, or are you saying -- are you looking for the people who aren't because there's opportunity there, or is it something in between?

A    Yeah, I mean, something in between.

Q    Okay.

A    You know, it's changed over -- the drug's a decade-plus years old.  So it's changed, you know, where

you're going from a launch product to an aged product.
You're, you know, changing where you're gaining your
business from, how you're looking at the data, I should
say.

Q    Got it.  And apart from looking at kind of
the, say -- I'll call them sales numbers, but the --

A    Um-hum.

Q    -- prescription numbers, what other types of
things are you looking at to kind of assess who to
target?

A    Aside of looking at their sales numbers?

Q    Yeah.  And I'll -- I mean, I'll give an
example that hopefully will make the question --

A    Um-hum.

Q    -- a little clearer.  So I could see, for
example, how COVID probably created a lot of uncertainty
in the market and maybe impacted things from --

A    Um-hum.

Q    -- how they were previously.

Like, what kind of factors beyond just numbers
of prior prescriptions are you looking at when you
figure which clients you're going to -- or which
potential clients you're going to go to?

A    It's mainly who is driving your business.

Q    Okay.  Okay.  You mentioned depression.  Just

to be clear, for at least since, like, 2018 on, you've been primarily selling you said depression-related drugs?

A    Um-hum, Trintellix.

Q    Trintellix.  I've also seen the name, is it Vyvanse?

A    Uh-huh.

Q    Is that -- what is that.

A    Attention deficit.

Q    Okay.  Have you been selling that too?

A    I did.

Q    You did.  When did you sell it?

A    Jordan and I both had Trintellix and the Vyvanse.

Q    Okay.

A    Vyvanse stopped I think with this latest reorganization.

Q    Okay.  So, like, 2022-ish?

A    I'm guessing at that one.

Q    Okay.

A    I can't remember the exact date we stopped with Vyvanse.

Q    Okay.  Vyvanse and Trintellix are the two names I've seen.  Have there been other things you've been responsible for the selling in the last --

A    Mydais.

Q    How do you spell that?

A    M-Y-D-A -- D-AI-S.

Q    Okay.  And what is that for?

A    Attention deficit.

Q    Okay.  Do you remember when you started or stopped?

A    The same with -- I want to say that went before Vyvanse.

Q    Okay.  Do you know if that was before Jordan or --

A    That was during Jordan.

Q    Okay.

A    Jordan and I had the same products, the exact same products.

Q    Got it.  Got it.

THE VIDEOGRAPHER:  When you get a chance --

MR. McKINLEY:  Now.  Yeah.  All right.

THE WITNESS:  You want a break?

MR. McKINLEY:  Yeah, we'll take a break.  I guess -- let's go off the record for a second.

THE VIDEOGRAPHER:  The time is 10:54 a.m. and we are now off the record.  This is the end of media unit one.

(Recess from 10:54 a.m. to 11:04 a.m.)

THE VIDEOGRAPHER: This is the start of media unit number two. The time is 11:04 a.m. and we are back on the record.

BY MR. McKINLEY:

Q All right. Ms. Olson, just as a reminder, I think -- I was told during the break that we were both talking over each other a little bit.

A Okay.

Q So if we could both focus on that and --

A Okay.

Q -- obviously, let us know if it's creating an issue. That would be -- that would be great.

All right. So we were talking about your role as a senior sales rep and, I mean, do you -- do you agree with me that you were made a senior sales rep because of the experience that you received over a number of years with TAP and Takeda?

A And it was -- the sales reps don't have a -- yes, a clear -- that was, like, the career path for the sales rep.

Q Okay. And is it fair to say that the sales rep job is hard? Is that fair?

A I think life's hard.

Q Well, sure, but, I mean, do you think that -- do you think that it's normal for -- or in your

experience, has it been normal for a sales rep to come in and be, like, a top performer at the job from day one?

A    The -- I believe the number one sales rep in my -- in the neuroscience division is a new rep.

Q    Okay.  Do you know if they did --

A    Currently.

Q    Do you know if they did sales somewhere else first?

A    I don't know who -- I don't know who it is.

Q    Okay.  Did you think when you started as a sales rep, were you -- were you perfect from day one?

A    No one's per every day.

Q    Okay.  Do you -- when do you think -- how long do you think it took you as a sales rep to finally feel like you were comfortable with, you know, with what you were doing and the performance you were giving?

A    I'd say a couple of months is the typical.

Q    Okay.  Was it a couple of months for you or --

A    (Nods head.)

Q    Okay.  Is that a yes?

A    Sorry.  Yes.  The technology, though, has changed a lot.  So it's -- in the beginning, we had to create a lot of stuff.  Present day, a lot of tools are created so you don't have to go searching for it.

Q    Um-hum.  Okay.  Do you think that as a senior sales rep, you have knowledge and experience that most new sales reps don't?

A    Sure.

Q    Okay.  I'm going to show you what I will mark --

A    Not necessarily as a -- I mean, I'm not even a senior sales rep anymore.  They did away with titles.  As someone who -- I like -- I research a lot, so research a lot especially about conditions, et cetera.

Q    All right.  Well, I'll word the -- the question a little differently.  Do you think that you have knowledge and experience to offer sales reps that they may not have coming in?

A    Sure.

Q    Okay.  All right.  I'm going to show you what I will mark as Exhibit 1.  We went from 43 to 1.

This -- take a minute to look at it if you need, but my question is going to be this is a true and correct copy of the senior sales representative job description, right?

A    I'm going to take your word for it because I haven't seen this in quite some time.

(Defendant's Exhibit 1 was marked for identification.)

BY MR. McKINLEY:

Q   Okay.  Do you -- I mean, do you have any reason -- do you have any reason to doubt that this is --

A   No.

Q   Okay.  And I'm sorry.  I'll finish the question.  Do you have any reason to doubt this is a true copy of the job description for senior sales rep?

A   No.

Q   Okay.  I am going to -- I want you to look at the bottom of the first page.  Do you see where it says Accountabilities?

A   Um-hum.

Q   Okay.  And do you agree with me that the bullet points under Accountabilities on page 1 going into page 2 of Exhibit 1 accurately reflect your job duties as a -- you know, as a sales -- or senior sales representative?

A   It's not -- well, aside from, I guess it's page two, the job description --

Q   Yes.

A   -- the only -- the difference in what the job description for a sales rep, and again, a senior rep doesn't exist anymore, is providing the district manager and assisting the district manager.

Q    What do you mean providing?

A    In additional duties to be assigned because the job description for a sales rep says the same thing as page 1.  They're responsible for the exact same stuff.

Q    I want to make sure that you're answering the question that I asked.  The question that I asked is just when you were a senior sales rep.

A    Um-hum.

Q    I mean, do you agree that -- do you agree that the bullet points under Accountabilities accurately reflects what you were responsible for as senior sales representative?

A    Yeah.

Q    Okay.

A    Yes.  I apologize.

Q    And you said that there was -- I think you were saying there was a difference on a few of the bullet points from senior sales rep to sales rep.  Are you saying -- I think you were saying that there is a -- that the bullet point that says, "Assist district manager to address district needs and provide training, mentoring of new sales representatives," is a senior sales rep bullet, but is not one that would be on a sales rep job description; is that right?

A     Correct.

Q     Okay.  Are there any others that you think would not be a sales -- a regular sales rep responsibility?  I think maybe you mentioned additional duties may be assigned?

A     Correct, correct.

Q     Okay.  Any others?

A     Not that I'm --

Q     Okay.  Are --

A     -- seeing.

Q     Okay.  Are sales -- do you know if sales reps are responsible for assisting the district manager with facilitating district meetings and modeling appropriate behavior?

A     That's -- I had said that earlier, aside from the district manager stuff, that --

Q     Okay.

A     -- it's the same.

Q     So are -- so was your testimony before that any of these bullet points that talk about the interactions with district manager, the district manager is a senior sales rep responsibility?

A     That would -- that was one of the, I guess, differences between a sales rep and was just the interaction with the district manager.

Q   Okay.  So, I mean, let's -- I'll run through them with you.  I see active -- the first bullet point on page 2, actively monitors local market conditions and, you know, the one that starts there.  And then at the end, it says, Models business techniques to peers and maximize sales opportunities across the district.

Do you agree with me that the modeling business technique aspect of this is a senior requirement, but not a regular sales requirement?

A   No.  It would be a regular, anyone.  You have to -- I mean, your market conditions, if you've got a managed care change, if you have a -- market conditions are like a hospital system that implements a new policy.

Q   I'm sorry if my question wasn't clear.  I didn't want to -- I know I referenced the first sentence just to orient you.  My question is actually about the second sentence on that first bullet.

The sentence that says models business techniques to peers to -- that maximize sales opportunities across the business, that's about -- that's a senior sales representative responsibility, not a sales representative responsibility, right?

A   I'm -- honestly, I'm not sure.  Models business techniques to peers that maximize sales opportunities across the district?

Q     Um-hum.

A     That would be, I mean, for a sales representative in general.

Q     Okay.  Let me ask it this way.  Are -- well, do you know if that shows up -- do you have any personal knowledge of whether that's in the sales representative job description?

A     The current sales job?

Q     The one that -- the one that would have been in effect from 2019 through 2021.

A     I have no idea.

Q     Okay.  The bullet point that starts, "Provide feedback to district manager on marketplace trends," is that one you're saying is a senior responsibility or is that senior and regular sales rep responsibility?

A     It would -- I mean, it would be both.  You would want to inform regardless.

Q     Okay.

A     Some territories, you know, if you've got one person in the territory --

Q     Um-hum.

A     -- you're doing all of these things whether there's that senior attached to your name or not.

Q     Sure.  Are you -- are there any specific duties that you can think of a senior sales rep having

that you don't think are adequately reflected in this job description?

A    No.

Q    Okay.  Ms. Olson, in your role as -- well, in your various roles with Takeda, is it fair to say that you've never been personally responsible for enforcing Takeda's HR and compliance policies?

A    Correct.

Q    Okay.  And is it fair to say that in your roles, you've never had any responsibility for interpreting Takeda's HR and compliance policies?

A    I'm not -- I'm not sure what you mean.

Q    Yeah.  So I'm saying that it's never been your job to decide whether a Takeda policy is being complied with or isn't, right?

A    It's my job to know if I am complying.

Q    Well, it's -- let me put it this way.  We can agree that policies are written and then sometimes there are gray areas, right?

A    I'm sorry.

Q    Policies are written, but they can't -- they can't always account for every possible scenario out there, right?

A    I suppose.

Q    Yeah.  So, I mean, I guess my question is you

have never had the responsibility for deciding for Takeda that this conduct does comply with the policy or this conduct does not, right?

A     No.

Q     No, you didn't have that responsibility?

A     No, I did not have the responsibility.

Q     Okay.  And I might do that a few times today too, right?  I just want to make sure that the answer is clear.

A     That would be a manager's --

Q     Okay.  And do you agree with me that a major part of being a successful sales representative for Takeda is building relationships with health care providers that you're marketing the Takeda -- or the products to?

A     Sure.

Q     Okay.  I'm sorry.  I'm just trying to take this off the screen.

A     Yeah.

Q     And do you agree with me that it, I mean, typically takes long periods of time to build those relationships?

A     It can.

Q     It can.  Have you had relationships that took you years to develop?

A    I mean, the reality in COVID, I had people I had never -- offices I had never met before --

Q    Um-hum.

A    -- and had to develop virtual relationships. So it's a matter -- I think if you're consistent and persistent is one.

Q    Yeah.  And I guess my question is just and, you know, even in being persistent, sometimes it can take years for -- for a client to find -- or a potential client to finally agree to give you business, right?

A    It can.

Q    And sometimes you can work on a client for years or a potential client for years and they don't give you anything, right?

A    Sure.

Q    And do you agree that it takes time for a sales representative to understand the dynamics of the territory they're working?

A    Yes, it can.

Q    Okay.  And do you agree that it takes time to figure out how to manage that territory?

A    It can.  But again, a lot now, it's been provided.  So with, you know, partners, you can go ahead and each work on a routing together, so that way, then, you know, you're basically following each other.

Q    Um-hum.

A    Takes the workload off of one person to put to two.  So it's not the -- you're not building a customer base from scratch.  It's already given to you.

Q    Sure.  But you're always trying to build on that customer base, right?

A    Meaning?

Q    Add new clients on top of it?  Add more business from existing clients?

A    It's the same customers.

Q    You never have any new customers?

A    There can be a new customer that does pop up in the data and then you just investigate and see what's going on with that person.  It could be a brand-new medical provider.  But both -- at Takeda, you both have access.  At that time, both have access to that data.

Q    Sure, and -- I mean, but it still takes some time to, I guess, look at that data and figure out the best way to manage and grow those relationships, right?

A    Yeah.  I mean, I think -- no.

Q    No?

A    Everything -- so we put -- I mean, you create what's called a routing.

Q    Um-hum.

A    And you have a route.  And so you have a route

and you've got two or four weeks to, you know, that --
high customers and then some additional ones in there.
You're calling on the same people over and over and over
again.

Q    Sure, but you're -- and I understand that
there are certain aspects of your job that are
databased, but there are also personal aspects that take
time to manage and develop and figure out the best way
for you to reach out to them, when to reach out to them,
how frequently, that type of thing, right?

A    Yeah, and a lot of that data is put in -- it's
called Veeva, so you can already see in there, like, the
days that they are not in there, time, et cetera.

Q    And I mean --

A    How they prefer to be, like, if they're
virtual or what have you.

Q    Right.  And ultimately, there is an aspect of
your job where you're -- like, you're relied upon for
your judgment to figure out how to reach out to people,
when to reach out to, the best way to grow things,
right?

A    Yeah, everyone's going to have their unique
style.

Q    Okay.  Do you think that you had your style
immediately or did it take you some time to develop?

A    I think I've -- I think it took a minute for, like, confidence, not necessarily style.  But when you're consistently seeing the same, they -- it's like they know you're coming, you know.  It's --

Q    Okay.  How long do you think it took you to learn or to learn about the products being sold?

A    I had a good foundation.  Lori was helpful.  She had experience.  So, like, routing, she would do our routing.

Q    Okay.

A    I could focus on expanding.  You know, I again did a lot on my own to understand and took advantage of what Takeda, TAP offered.

Q    Okay.  And Lori was one of your counterparts?

A    My original partner.

Q    Okay.  And, I mean, is it fair to say that you -- you've learned from her mentoring you?

A    She didn't really mentor.  I learned about routing and she was great with analyzing data.  At the time, the data was different than the current data.  The current data is pretty much black and white.  Here are who are your growers, here are who your decreasers, here's who -- you know, it's given.  Everything is laid out for you.  You don't have to come up with -- even, honestly, messaging, Takeda has it all mapped out.

Q    Got it.

A    It was a little bit more -- I think it was harder then than it is now because more is given to you. You have more tools given to you now.

Q    Okay.  All right.  At some point while you were a senior sales representative, you also took on the responsibility of being the district Trintellix lead, correct?

A    Jodi had asked me to do that.

Q    Do you know when she asked you?

A    In Jan -- I think January.

Q    Of?

A    2020.  She had -- we had a, like, field day and had discussed my representative past, like, the next step.  So the next step for me would have been territory manager.  I'm at the max I can do as a senior sales rep.

The organization wasn't designed for people to stay sales reps forever, however, people like being sales reps.  And so back then, because there wasn't -- they had area trainers, they had this and they did away with all of that and then came up with this senior sales rep territory manager.  And so then it's basically then no one -- you know, you're doing all this extra work and there's no added financial gain for it, so then -- but then they changed the scope of territory manager and

yeah.  But that -- it's encouraged and kind of pushed that you -- you know, you have to have a game plan.

Q    Um-hum.  Did -- do you know why Jodi -- I mean, I understand -- well, let me take a step back.

It sounds to me like you're saying that you had expressed an opportunity in growing and that Jodi thought that -- or Jodi had told you that being a Trintellix lead would help with that.  Is that accurate?

A    I -- we were discussing a career path.

Q    Okay.

A    So I am a -- any of the career paths in Takeda, and I remember this, I'm like, I can't travel. I'm a mom.  Like, I have to -- I'm a single mom.  I can travel Thursday night and every other weekend.  A job doesn't -- and she had said, Look into rare disease. And I can't travel.  I'm not going to present that I can travel if I can't travel and I'm not going to make that look like something that it's not.  So then in a sales representative role, the next thing would be territory manager, and she said, you know, I need a Trintellix lead and that can help with that.  I'm like, Sure, why not.

Q    Okay.  And was the idea -- I mean, was it your understanding that she had suggested a Trintellix lead because that would give you some leadership role to make

you more appealing as a territory manager candidate?

A    Yes.

Q    Okay.  Do you know why she offered or -- and don't -- I'm not asking to look into her mind, but were you told why you were offered that opportunity over anybody else?

A    No.

Q    Okay.  And, I mean, do you -- do you -- do you agree that the Trintellix lead role was at least something to add to your resume to make you more appealing for roles, whether it did or didn't?

A    It should have.

Q    Okay.  What does the -- or what did the Trintellix lead role involve?

A    I remember during -- when we were working remote and she had asked, she said, Can -- we have a call and you basically get them passionate and have a -- we were able to contact offices, like, have a sense of urgency.  You're talking about depression.  And so, you know, I'm like, it's not blood pressure.  Like, you don't know -- it's -- so we had a call and, you know, to try to get people to think differently, ask differently, approach differently, think a different way of navigating, so to speak.

Q    What sort of things did you start doing as a

Trintellix lead that you hadn't been doing as just a regular sales representative, senior sales representative I mean?

A    I guess -- oh, conference calls.  She would have me be one of the leads on, like, district and region -- regional conference call.

Q    Okay.  Was it ever communicated to you that, you know, as the lead, there was a higher expectation for you to be mentoring others in the district?

A    No.

Q    No?

A    No.

Q    Okay.  And never she told you that --

A    In fact, I had said to her my -- oh, Tracy Sweeney was one of my partners.  Tracy took a different -- prior to Jordan.  Tracy took a different position and I had come back from a leave.  Takeda had done a layoff.  I had a lot of change and I was very up front and said, I cannot take on anything else at this point right now, I've got enough going on.

Q    Um-hum.

A    And so it wasn't my job to train.  I would guide any time and I had always said if anyone has a question, needs anything, call me, but I wasn't -- it wasn't my role to train, so to speak.

Q    I think -- and maybe I used both words, but I thought I asked whether you had a -- well, let me take a step back.  Look back at Exhibit 1.  Bullet 4 says that senior sales representatives are responsible to, quote, provide training/mentoring of new sales representatives, right?

A    I don't -- mine says:  Utilize the sales tools resource and supporting analysis.  Are you --

Q    On the second page?

A    Okay.

Q    The fourth bullet point.

A    Assist district manager to address district needs.  Yeah.  And provide training mentoring, not -- the training that you're speaking -- well, what type of training are you speaking of?

Q    Any, any training at all.  It could be a synonym for mentoring.  It could -- I mean, I don't -- I'm not asking necessarily whether you were doing formal programs, but you were -- you were providing on-the-job training, ways to -- things to -- or ways to do things better, things like that, right?

A    Yeah.  Sharing best practices is what it is. Jordan had a sampling issue.  I spent a day with him going through, I mean, a serious sampling issue that it -- you know, you have to account for samples.  Going

through, I -- going through how to manage the samples.

Q   And that's -- and that's the kind of training that that job description is referencing, right, the --

A   Yeah.  And then, like I had said, she had reached out asking for -- on a call for -- to create passion amongst the district.

Q   Okay.  As a -- when you were a senior sales representative, who did -- who did you report to?

A   Jodi.

Q   Well, it was -- am I correct that it was Jodi, then it was Matt Hand, then it was -- is it David Diaz?

A   Um-hum, correct.

Q   It was Matt Sheridan?

A   Correct.

Q   Okay.

A   Well, Matt Sheridan, they did away -- I'm a neuroscience specialist.  So they did away with all the different levels of -- I think they have a new program coming out, but when I was partners with Jodi -- or with Jordan, Jordan and I both reported directly to Jodi.  Jodi reported directly to Greg Crouch.

Q   Okay.  Except that you and Jordan also, at some point during that, also reported to Matt Hand because Jodi was replaced by Matt Hand, right?

A   Jodi took a different position in the

organization, um-hum.  But actually, at that time, Matt Hand was -- we had a regional trainer.

Q    Um-hum.

A    And so as a regional trainer, that's the responsibility to train new sales reps.

Q    Okay.

A    You know, he was in charge of the whole region.

Q    Sure.

A    And so as a regional trainer, he then took a -- he became -- it was called an interim district manager.

Q    Okay.  What are -- what are Cresset rankings?

A    They've changed over the years.  So then was -- it's based on performance and had a -- I don't recall when they added it, a component where it would be your competencies, they rated them, would be evaluated in that.

Q    Okay.  And are the Cresset rankings meant to be company-wide?

A    Correct.

Q    And is that in the sales representative roles that -- or is it --

A    Correct.

Q    Does it encompass anything else beyond that?

A    Pardon?

Q    Does it encompass any roles beyond those sales representative roles?

A    Oh, district managers.

Q    Okay.  And so it's telling all of them where they rank with, you know, in relation to one another, right?

A    Correct.

Q    Okay.  Do you personally agree that -- or do you personally believe that the Cresset rankings are a necessarily fair and reliable way of assessing how an individual is performing their own?

A    Their own?

Q    On their own.

A    At that time, there was the component of numbers which would be you and your partner --

Q    Um-hum.

A    -- and a component of meeting your core competencies --

Q    Um-hum.

A    -- which was independent of your partner.

Q    Are you talking about in the performance review or --

A    No.

Q    -- are you just talking about in the

performance of the Cresset rankings?

    A    Cresset ranking.

    Q    Okay.

    A    And, I mean, that's part of your performance review which goes into the Cresset ratings.

    Q    I guess my question is do you think that you can just look at somebody's Cresset ranking and see that they're, you know, 50 of 300 or 300 of 300 and necessarily be able to say that alone really tells everything you need to know about the person's performance?

    A    No.  There's always outstanding variables.

    Q    And is it -- I mean, is it fair to say that you --

    A    But it's the only thing that Takeda cares about.  Not the only.  It's a very big -- it's part -- I mean, you can't move without it.

    Q    And is it fair to say that you've had quarters where your rankings have been pretty good and you've had quarters where your rankings have been on the lower end?

    A    Good or in that middle part.  I rarely have been -- I can't recall a lot of super low except maybe I think when I was on my own.

    Q    Right.  So that's I think what I was going to ask.  So, I mean, in Q2 of 2022, you were 224 of 252,

right?

A    2022, yeah.

Q    Okay.  And do you personally believe that two -- 224 of 252 is where you really ranked within the company?

A    It's where Takeda said I ranked.

Q    Do you think that's reflective of where -- from your performance for -- where for your performance from your perspective you felt like you really ranked?

A    It -- I don't know.  It's where -- it's -- it doesn't matter what I think.  It matters what the organization in all reality.  That's what we -- how we get paid.

Q    Well, I appreciate that.  It matters -- it matters to me for this deposition today --

A    Yeah.

Q    -- which we're doing.  So do you -- do you feel like for Q2 of 2022, that if somebody was just looking at your Cresset ranking and seeing 224 or 252, that that accurately reflected your performance for that quarter?

A    Um --

Q    Or at least that it told the whole picture of your performance for the whole quarter?

A    Honestly, I'm not sure.  Q2 of 2022 I was --

the environment was different.  It changed.  So I'm sure there are other elements as well.  I don't know. Rankings are not always, you know, as agreed before, the total picture, but it is exactly what Takeda looks for.

Q   Okay.  And is it fair to say that, you know, the territory a representative has might impact what their Cresset ranking potentially could be?

A   Meaning?

Q   Higher volume territories are going to get better rankings?

A   No.

Q   No?  That's not going to be higher sales numbers?

A   I have one of the highest volume --

Q   Well --

A   -- territories.

Q   -- just to be clear, my question is about the Cresset rankings generally across the board.

A   No, I don't -- no.

Q   Okay.  Are --

A   My goal -- if you have a high-volume territory, you've got higher goals.

Q   Okay.

A   If you have a low-volume territory, you have lower goals.

Q    Um-hum.  Fair to say that different -- or different territories have different promoted therapies? You were promoting Vyvanse and Trintellix.  Do you agree with me that other sales reps were promoting different drugs?

A    No.  We both -- the organization -- what time period are you speaking of specifically?

Q    Well, let's narrow it to 2019 to 2021.

A    Okay.  So where everyone's responsible for Trintellix and Vyvanse depending -- your product weight could be different.

Q    Okay.

A    However, Jodi put it that, like, I was 60 -- I want to say 60/40, 60 Trintellix, 40 Vyvanse.  Jordan 40 Trintellix, 60 Vyvanse.  She put us at 50/50.

Q    Sure.  And maybe -- maybe you're answering it, but my question is again about company wide.  Are you saying that every sales rep who was looked at in the Cresset rankings from 2019 to 2021 was also selling only Trintellix and Vyvanse?

A    Yes.  The Cresset rankings are for the business unit.  The different business units have their own Cresset rankings.

(Defendant's Exhibit 2 was marked for identification.)

BY MR. McKINLEY:

Q    Okay, okay.  All right.  I'm going to show you what I'll mark as Exhibit 2.  Take a minute if you need, but the question will be this is a true and correct copy of your 2019 Year End Performance Review, correct?

A    It appears so, yes.

Q    All right.  And the review covered by -- or the review covered the time frame from April 1st, 2019 to March 31st, 2020, correct?

A    Correct.

Q    All right.  And your review was completed by Jodi Gayle-Garcia, right?

A    Correct.

Q    Okay.  And do you agree with me that this was not a negative review?

A    Well, let me -- what was your --

Q    Yeah.  I mean, do you agree that this isn't a negative review.

A    Is not a negative review?

Q    Yes.

A    Yes.

Q    Okay.  Your Cresset rankings for April to June of 2019 was 162 of 449, correct?

A    Um-hum.

Q    Okay.  Is that a yes?

A    Yes.  I'm sorry.

Q    That's all right.  It's going to happen more and more as the day goes along.

Your Cresset ranking was 225 of 449 for July to September of 2019, correct?

A    Yes.

Q    And your Cresset ranking was 217 of 249 -- sorry -- of 449 to October to December of 2019, correct?

A    Correct.

Q    Okay.  And I don't -- I didn't see a Cresset ranking in the review for January to March of 2020.  Do you know why that was?

A    No, I don't.

Q    Okay.

A    Probably at the time, the numbers probably hadn't come out.

Q    Okay.  And if we go to the second page of Exhibit 2, Ms. Gayle-Garcia actually noted the fact that you stepped up to be the district Trintellix lead as a positive in your performance review, right?

A    Um-hum.

Q    Is that a yes?

A    Oh, sorry.  Yes.

Q    Okay.  And she also noted that -- she also noted the fact that you were mentoring and developing

your new partner who I believe was Jordan Davis at the time as -- as a positive in your performance review, right?

A    Correct.

Q    Okay.  And --

A    Well, it says a higher level of communication.

Q    Yeah.  So if you look under --

A    Yeah.

Q    -- Self-Awareness at the top and then it says engage others, it says:  Shannon continues --

A    Um-hum.

Q    -- to mentor and develop her new partner. That was a positive comment in the review, right?

A    Correct.

Q    She also noted that she saw some deficits in Jordan's performance, right?  She noted that Shannon will need to -- sorry -- that you guys discussed -- and this is at the very end of your Way Forward.  You discussed the need for a more balanced routing that reflects a 50/50 model for both reps, and then it cuts off, but she was telling you that she thought Jordan needs to be doing more, right?

A    Yeah, but that shouldn't have really -- your performance review is typically about you.  Jodi had hired actually three brand -- I think it was just three

brand-new reps.

Q    Yeah.  Well, I mean, you agree that Jordan doing more would have been about you, right?  It would have made it so that you both were succeeding together?

A    Yeah.  It's just -- what was your question?

Q    Yeah.  I'm just saying she was -- she was noting that she was hoping going into the next year that you and Jordan would work together to have Jordan do more than he had been doing, right?

A    This is from --

Q    This is from --

A    Jordan got hired in -- when did he get hired, in August of 2019?

Q    July, August, somewhere in there.

A    Okay.  And this went through March.  Yes.

Q    Okay.  And as -- I mean, as part of this performance review, Ms. Gayle-Garcia did tell you that she wanted you to keep working on taking on leadership responsibilities to help you with your career development plan, correct?

A    Yes.

Q    Okay.  And she let you know that her expectation was for you to help develop sales representatives rep -- representatives in the district, right?

A    Well, one of -- that was a goal, a personal goal I had.

Q    Okay.  So your goal was to work on developing sales reps --

A    Um-hum.

Q    -- in the district?

A    Well, yeah, streamlining the -- she had -- again, she had a lot of new reps.

Q    Okay.  And just to be clear, I mean, I think you're right.  You did write it in goals and priorities, but she also wrote it in way forward, right?

A    Um-hum.

Q    She wrote:  I look forward to seeing your development of these reps.  Right?

A    Um-hum.

Q    So you both -- you both -- and I'm sorry.  You're doing that uh-huh thing.

A    I'm so sorry.  Yes.

Q    Okay.  And so you both -- you both together wanted you to develop your -- your leadership of reps to help you move up, right?

A    I wanted to help them and move, not -- the different techniques and ways of doing things in our industry, things that are easier.

Q    And helping them --

A     And questions, you know.

Q     Helping them, I mean, it would ultimately help you too, right?

A     It -- achieve what I was -- yeah, and my goals.

Q     Yeah.  And -- all right.

Ms. Olson, we were talking about Fit Life a little bit earlier, but you created a company called Fit Life Sport, LLC on October 9th, 2014, correct?

A     It's one of the same.

Q     Understood.  You changed the name later, but you created the company on October 9th, 2014, correct?

A     Correct.

Q     Okay.  I'm going to show you -- I think we're about to get to a point where we go through documents a little more quickly.  So I'm going to show you what I'll mark as Exhibit 3.  All right.  I'm sorry.  This is the wrong one.  I was giving you my copy.  Here you go.

A     Thank you.

(Defendant's Exhibit 3 was marked for identification.)

BY MR. McKINLEY:

Q     All right.  And Exhibit 3 is a true and correct copy of the Articles of Organization that you filed for Fit Life Sport, LLC, correct?

A    Correct.

Q    All right.  And you agree that you had to pay -- you had to pay money to incorporate your company, right?

A    Correct.

(Defendant's Exhibit 4 was marked for identification.)

BY MR. McKINLEY:

Q    And we're going to go to Exhibit 4 now.  A long reach.  A long reach, short arms.

THE VIDEOGRAPHER:  What number is this?

MR. McKINLEY:  Exhibit 4.  I'm just trying to get it on my screen before I start asking about it.

BY MR. McKINLEY:

Q    All right.  You changed your company's name to Fit Life Active Wear, LLC on March 13th, 2020 -- I'm sorry -- 2015, correct?

A    Correct.

Q    Okay.  And Exhibit 4 is a true and correct copy of the filing you made with the Secretary -- the Florida Secretary of State to change your company's name, right?

A    Correct.

Q    Okay.  And to do that, you had to -- to file that name change, you had to pay a filing fee as well,

right?

A    Correct.

Q    And you have always been the sole managing member of Fit Life Sport, L -- or sorry -- Fit Life Sport, LLC, later renamed Fit Life Active Wear, LLC, right?

A    Originally I had a -- a partner.

Q    Okay.  But at least -- do you remember when the partner wasn't involved anymore?

A    When I changed -- I believe when I changed the name then.

Q    Okay.

A    So she was there for -- what's the date of that?  At the -- she was there at the very beginning maybe.

Q    Less than a year?

A    Yeah.

Q    Okay.

A    Yes.  Sorry.

Q    All right.  I'm going to give you in a second what I will mark as Exhibit 5.

         (Defendant's Exhibit 5 was marked for identification.)

BY MR. McKINLEY:

Q    Exhibit 5 is a compilation of all of the

annual reports that you filed with the Florida Secretary of State for Fit Life every year from 2015 through 2024, right?

A    Yes.

Q    Okay.  And each time you had to file an annual report, you had to pay a business expense to do that filing, right?

A    Correct.

Q    All right.  Lin Brinkley is a lawyer who provided legal services to Fit Life, correct?

A    Correct.

Q    And you paid Mr. Brinkley for him to provide legal services to Fit Life, right?

A    Yes.

(Defendant's Exhibit 6 was marked for identification.)

BY MR. McKINLEY:

Q    All right.  I will show you what I'm going to mark as Exhibit 6.  Exhibit 6 is a true and correct copy of emails between you and Mr. Brinkley about Fit Life, right?

A    Correct.

Q    And let's go to the last page of Exhibit 6, meaning the very first email.  Well, I guess it's not the last page.  Let's go to the oldest email here which

is I think from Mr. Brinkley to you on March 12th, 2018.
I think it actually starts on the first page --

A    Okay.

Q    -- and runs through the last page.

Mr. Brinkley's email outlines various trademark applications related to Fit Life, right?

A    Yes.

Q    Okay.  And when you made the applications for the trademarks, did you submit an affidavit to the U.S. Patent and Trademark Office on making any representations about, you know, the grounds for you requesting -- sorry -- requesting the trademark?

A    Say that one more time.

Q    Yeah.  So do you remember to get the trademarks or to apply for the trademarks, did you have to sign and submit an affidavit verifying information to prove you were entitled to the trademark?

A    Lin did that.  I had hired him when I was having a hard time navigating it.

Q    Okay.  Did he have you sign the document?

A    I would imagine.

Q    Okay.  And are you aware that in making those applications as this email reflects that you claimed a first use in commerce?

A    Yes.

Q     Okay.  And do you understand what -- do you know what commerce means?

A     Selling.

Q     Selling.  Okay.  And so you understand that to claim these trademarks, you had to represent that -- with a first use in commerce entitlement, you had to represent to the PTO -- the U.S. PTO that there were sales of goods, rights?

A     You're actively using the trademark.

Q     Right, for sales?

A     Actively using the trademark, yeah, that you have been actively using the trademark, I mean, through a website, yeah.

Q     Right.

A     Sales.

Q     Okay.  And in fact, I mean, you had -- I mean, had you gone to vendor markets and set up a tent and --

A     Correct.

Q     -- sold your shirts?

A     Yes.

Q     And you had actually sold some of the shirts at those markets, right?

A     Yes.

Q     Okay.  And you had a website set up?

A     Yes.

Shannon Olson                    August 15, 2024
Olson, Shannon v. Takeda Pharmaceuticals America, Inc.

Page 108

Q    And the website had the ability to -- for, you know, your products to be purchased, right?

A    Correct.

Q    Did you ever sell anything on that website?

A    A couple of things.

Q    Okay.  Did you do that before you submitted the trademark applications?

A    I did the website once the -- I was using the trademark on printed goods.  I believe I did the website post trademark approval.

Q    Okay.  Do you remember when your website first went up?

A    It would have been 20 -- 2015, I think, 2015 --

Q    Okay.  So I see --

A    -- at some point.

Q    You know, when you look at the Fit Life trademark here, it says first use in commerce 2015, 01/06, so January 6th, 2015.

A    Um-hum.

Q    Do you think that your website was before or after January 6th, 2015?

A    I don't know.

Q    Okay.  When do you think you had your first sale on your website?

A    I do not know.

Q    Do you think it was the first year it was up? Do you think it took --

A    2015.

(Defendant's Exhibit 7 was marked for identification.)

BY MR. McKINLEY:

Q    Okay.  I'm going to show you what I will mark as Exhibit 7.  And take a minute to read through it if you need, but the question will be Exhibit 7 is a true and correct copy of an email chain between you and a gentleman named Jacob Privette, correct?

A    Correct.

Q    Okay.  Who is Jacob Privette.

A    An Amazon growth builder.

Q    Okay.  And why did you reach out to Jacob Privette in September -- well, in August of 2020?

A    To grow Amazon business, I could hire his firm.

Q    Okay.  On top of the -- what you had done at the vendor shows and at -- you know, on your own website, you were also posting stuff for sale on Amazon, right?

A    Attempting.

Q    Attempting.  Did you ever sell anything on

Amazon?

A    No.

Q    Okay.  All right.  Well, let's go to the oldest email in Exhibit 7 which will be closer to the end here.  It starts on Takeda 0000422 if you look at the bottom right corner.

A    Um-hum.

Q    All right.  So your goal in putting your merchandise on Amazon was to sell it, right?

A    Correct.

Q    And you created inventory -- yeah, you created inventory that you were -- you were actively trying to sell, right?

A    I'm sorry?

Q    You created inventory that you were trying to sell, correct?

A    I had inventory, um-hum.

Q    Okay.  And you were -- in August of 2020 were actually interviewing people for positions with your company, right?

A    To do various social media.

Q    Okay.

A    Um-hum.

Q    But that's a -- that's a yes?

A    Yes.

Q    Okay.  Now I'm going to show you what I'll mark as Exhibit -- actually, give me one second.  Can you go to Takeda 0000418 on Exhibit 7?

A    Um-hum.

Q    You noted in your email to Mr. Privette on August 29th, 2020 at 8:36:25 a.m. that your margins were a little over 50 percent, right?

A    Which one are you on?

Q    If you look at --

A    419?

Q    418.

A    Okay.

Q    That's the email from Saturday, August 29th, 2020 at 8:36:25 a.m.

A    Okay.

Q    You wrote:  Margins a little over 50 percent.  Do you see that?

A    Correct.

Q    Do you know -- do you know what -- I mean, how did you get to that number?  How did you determine your margins were over 50 percent?

A    The shirt costs this.  It's being sold for this.

Q    Okay.  So were you basing that on actual sales that occurred in the past?

A    Yeah, yes.

Q    Okay.  What -- while -- while you had been working as a senior sales rep in 2020, even 2019, what -- did you have normal work hours?

A    Yes.  Fit Life, I got the trademark when I divorced because I was job sharing my job --

Q    Sure.

A    -- in a highly volatile industry that does layoffs.

Q    Sure.

A    Backup plan.  2020, reached out to do more digital stuff.  I hadn't done anything with it in years.  In 2020 I'm like everyone's digital now, so these guys are the experts.  I'm not doing anything.  They're doing it.  I'm just writing a check.

Q    Sure.  I think my question is probably more simple than that.  It's just that when you were a senior sales representative, did you have days you were supposed to work and hours you were supposed to work?  Like, was it Monday-Friday nine to five?  Was it -- you know, what were your hours?

A    So this is 2020 and the date is August.  We were all working remote in August.  So yeah, I worked every -- every day.

Q    Yeah.  I mean -- I mean, I think my question

is a little different, that while you were working remote in 2020 or --

A     Um-hum.

Q     -- was the expectation at Takeda that your work hours for Takeda were nine to five or was it something different?

A     We were told remote to take and do virtuals whenever the providers were available to do them.  I -- Jodi had called me one night and I'm working at nine because a doctor could get on the call then.

Q     Okay.

A     So it's -- you did whatever you needed to do to reach the account.

Q     Is it fair to say that between at least the hours of noon and three, you were supposed to be working for Takeda in 2020 on weekdays.

A     That's fair to say, yes.

Q     Okay.  Could you go to Takeda 0000413?

A     Um-hum.

Q     Okay.  Do you see the email from you to Mr. Privette on August 31st, 2020 at 2:54 p.m.?

A     Um-hum.

Q     Do you agree with me that you were sending emails to -- sending emails about Fit Life during time that you were supposed to be working at Takeda?

A    Yes.

(Defendant's Exhibit 8 was marked for identification.)

BY MR. McKINLEY:

Q    Okay.  All right.  Let's jump to Exhibit 8.

A    Okay.

Q    Again, I'm losing track of time, so when you're --

A    Okay.

Q    -- when anybody gets ready for a break, just let me know.

So Exhibit 8 is another email from you to -- a true and correct copy of an email from you to Lin Brinkley on August 16th, 2019, correct?

A    Correct.

Q    Okay.  And this image on Exhibit 8 is an image from your website, right?

A    Yes.

Q    Okay.  And the website is FitLifeActive.com; is that right?

A    Yes.

(Defendant's Exhibit 9 was marked for identification.)

BY MR. McKINLEY:

Q    Okay.  I'm going to show you now -- oh, I'm

going to show you now what I'll mark as Exhibit 9.  Let me share it.  It's like try to blow bubble gum and pat your head at the same time.  I'm not sure I'm always doing it.

So Exhibit 9 is a true and correct copy of an email that you drafted and sent to yourself, but it was a planned marketing email to Target, correct?

A     Yes.

Q     Did you ever actually send it --

A     I do not know.

Q     -- to Target?  Okay.

Do you agree with me that you were -- you were using your Takeda email to write emails about Fit Life Active for marketing purposes?

A     So yes.  I didn't have a personal email until 20 -- oh, God, I don't even know.  It was just one email that I -- that my -- that I used Takeda's.

Q     Okay.  And I want to make sure I'm reading this correctly.  I see in that first email, the oldest email in Exhibit 9 that you wrote:  Fit Life already has a huge social media presence, 31.6 million hash tags, and Fit Life is ranked number five in fitness lifestyles hash tags.

A     Yes.

Q     Does that mean -- are you saying there that

your company already had a social media following?

A    No.

Q    What are you saying?  Because --

A    Selling the sizzle to the name.  You know, it was one of the most hash tagged and you could go onto Instagram and see.

Q    Okay.  So it was just -- am I right that you're saying this is a phrase that is very popular on social media, but you're not necessarily saying that it's -- 31.6 million people know about your company, right?

A    Correct, yes.

    (Defendant's Exhibit 10 was marked for identification.)

BY MR. McKINLEY:

Q    Okay.  All right.  I'll show you what I will mark as Exhibit 10.  I'm guessing you're familiar with it, but take a minute if you need to and I'll share it.

    All right.  And the question is, in early August 2020 you were emailing yourself concerning a business plan for Fit Life through your Takeda email, right?

A    Yes.

Q    All right.  We may have touched on this a little bit earlier, but when is the last time that you

looked at Takeda's HR and compliance policies and procedures?

A    I -- I do not know.

Q    Okay.  Is it fair to say that you don't personally know off the top of your head every -- every nuance of those procedures?

A    Correct, yes.  I did email myself any and everything that was on my Takeda email to get it off of my -- like, to transfer it off of Takeda to personal anything that I had, you know.

Q    So you mean -- I just want to make sure I understand.  Are you saying that you did that for things related to Fit Life or you did that for all things --

A    Fit Life.

Q    Okay.  So any email that you have about Fit Life that was on Takeda's servers you still have?

A    I don't know if they're on Takeda servers.

Q    Well, I mean, I just mean that anything that you would have sent from -- you would have sent from a Takeda email you pulled at some point?

A    I emailed it to my -- to an email of -- at Fit Life.

Q    Okay.  Have you --

A    To not use company --

Q    Yeah.

A    -- company email, trying to --

Q    Yeah.  We talked about personal email before.
We didn't talk about the FitLifeActive.com email that's
shown on Exhibit 10.  Did you search through the emails
for that account to see if you had any documents that
would have been covered by those document requests we
looked at earlier?

A    That would have been covered by the
document --

Q    Exhibit 43, the very first document we looked
at?

A    I don't know.

Q    You don't know if you looked or you don't know
if there's anything there?

A    I don't know if there's -- I haven't even
looked.

Q    Okay.

A    I went through years ago --

Q    Yeah.

A    -- to email myself anything that I had to the
Fit Life.  I don't know what is -- as I stated, when I
checked folders, there's nothing in there.

Q    Okay.

A    So I don't know what's still on there.

Q    You mean you don't know if it's still on

Takeda or you don't know --

A    Correct.

Q    -- if it's still on the Fit Life email?

A    Takeda.

(Defendant's Exhibit 11 was marked for identification.)

BY MR. McKINLEY:

Q    Okay.  I'm going to now show you what I will mark as Exhibit 11.

A    Um-hum.

Q    All right.  Exhibit 11 is a true and correct copy of the 2019 version of the HR and compliance policies and procedure for Takeda, right?

A    Okay.

Q    Do you -- is that --

A    Yes, it looks -- it appears so, yes.

Q    Okay.  I want you to look at -- and you're going to have to look at the bottom right corner for this, but go to the page that says Takeda 000213.

A    Um-hum.

Q    And sorry.  Let me make sure I'm sharing it on my screen too.

All right.  Do you see -- do you see where it says that Takeda's policy -- well, let me take a step back.  Takeda's policy to permit employees to engage in

outside work subject to prior approval and other restrictions laid out in this policy on Takeda 000213 and 214, correct?

A    Correct.

Q    Okay.  And do you agree that Takeda's policy is to prohibit an employee's outside activities from competing with, conflicting with, or compromising Takeda's interests?

A    Yes.

Q    Okay.  And do you agree with me that to determine whether an outside activity presents a conflict, one would have to understand what the outside activity is?

A    Yes.

Q    Okay.  And Takeda's, you know, secondary outside employment policy requires that employees must request permission before engaging in any outside employment, right?

A    Yes.

Q    Okay.  And the policy states specifically what -- what must be included in the request, right?

A    Um-hum.

Q    Is that a yes?

A    Yes.

Q    All right.  And Ms. Olson, nowhere in this

secondary outside employment policy does the word "income" appear, does it?

A    I don't know.  I haven't read through the whole thing.

Q    You can take a minute to look at it.

A    I don't -- I agree.  I don't, yes.

Q    Okay.  And so do you agree with me that there is nothing in this policy that says it's relevant to whether an employee is complying with the policy whether they are drawing an income or not?

A    Say that one more time.  I'm sorry.

Q    Yeah, that was a bad question.

Do you agree with me that under the language of this policy, it -- there is no mention of whether an employee -- let me see if I -- let me take a step back.

Nothing in this policy says that it's relevant to determining whether it's complied with that an employee is actually drawing an income from whatever their outside activity is, right?

A    Okay.

Q    Do you -- are you agreeing with that or disagreeing with that?

A    So -- agree.

Q    Okay.  And do you agree that -- do you agree that -- okay.  Do you agree that the policy also

prohibits employees from soliciting or conducting any outside business during paid working time?

A    Yes.

Q    Okay.  Do you also agree that the policy prohibits employees from doing outside work while they take a leave of absence?  It's on the second page of the policy.

A    I see it now, yes.

Q    Okay.  Do you dispute that that's the policy?

A    That, I believe, is the current policy. There's a new policy.

Q    Well, do you dispute the policy --

A    Yeah, no.

Q    -- that that was the policy that was in effect --

A    Correct.

Q    -- in 20 --

A    Yes.

Q    And do you dispute that this 2019 handbook was what was in place in 2020 and 2021?

A    I -- I don't know.  I don't know.  I forget when they had actually changed it.

Q    Okay.

A    But then yeah.

Q    Do you agree with me that you were, in fact,

doing work-related to the Fit Life while were you were on your disability leaves?

A    I don't know if I was -- what the -- if sending -- I guess so.  I don't know.  I mean, it's an email, the merchandise, the product I had from years prior.

Q    Okay.

A    And it's not -- I'm not creating -- doing anything.  Just paying to have it done --

Q    Okay.

A    -- to maintain the trademark.

Q    Okay.  If you -- could you go back to Exhibit 5?

A    Um-hum.

Q    It's the annual filings.

A    Okay.  I'm on it.

Q    Can you go to the 2019 filing?

A    Um-hum.  Yes.

Q    Okay.  Do you agree with me that you submitted your 2019 annual filing on January 15, 2019?

A    Yes.

Q    And do you agree that you were on a leave of absence on that date for a disability leave?

A    Yes.

Q    Okay.  In -- I'm now going to show you what

I'll mark -- well, I'm going to go back to the handbook for a minute.

A     Um-hum.

Q     Could you take a look at Takeda 00000268 on Exhibit 11?

A     Um-hum.

Q     And do you agree with me that under Takeda's policies providing -- failing to provide accurate or thorough information during an internal or external investigation is cause for discipline up to termination?

A     Which one were you reading?

Q     The second bullet.

A     Okay.

Q     So the question is just do you agree that failing to provide accurate or thorough information during an investigation is a cause for termination including -- or sorry -- a cause for discipline up to and including termination?

A     Yes, it's one of the terms there.

Q     Okay.  And do you agree -- and this will be the fourth, sixth, eighth -- tenth bullet.  Do you agree that oral or written dishonesty or misrepresentation is also a cause for termination under Takeda's policies?

A     Yes.

Q     Okay.  And do you agree that -- this is the

eighth bullet point -- actions which give the appearance of being motivated by an employee's desire for inappropriate financial gain for themselves or others is also a cause for termination?

A    Yes, I --

Q    And also, if we go to the next page?

A    Um-hum.

Q    Do you agree that -- and this is the third -- if you go from the bottom, it's the second from the bottom and third from the bottom.  You agree that under Takeda's policy, violating any provision of this handbook that we're looking at as Exhibit 11 is cause for termination?

A    Yes.

        (Defendant's Exhibit 12 was marked for identification.)

BY MR. McKINLEY:

Q    Okay.  All right.  Now we'll go to Exhibit 12. Let's see.  Here you go.  Exhibit 12 is a true and correct copy of an email chain --

A    Um-hum.

Q    -- between -- well, that starts --

A    Yeah.

Q    Let me take a step back.  It is an email chain that started from an email from you from Laura --

A    Yeah.

Q    -- Berger, right?  Is that a yes.  Sorry.

A    Yes.

Q    I think we were talking over each other.

On September 21st, 2020, you reached out to the Trintellix marketing email at Takeda, right?

A    Yes.

Q    And that was because you wanted to market Fit Life to Takeda, right?

A    Yes.

Q    Okay.  And when you sent that email to Trintellix Marketing, Trintellix Marketing put you in touch with Laura Berger, right?

A    Yes.

Q    And Laura Berger is the Senior Manager of Multichannel Marketing for Takeda, right?

A    Yes.

Q    What -- at some point, you actually had a call with Ms. Berger, correct?

A    Yes.

Q    What do you remember about that call?

A    I remember a conference call, Ramona, who at the time was the president of Takeda, and had said if anyone has ideas on how to regain trust within society to come forward.  And I'm like, I have an excellent way

to regain trust within society in a non-pharma manner. And so yes, I called her and it was a very brief conversation and I'm like, okay, well, you know, I guess that's that.

I mean, it was very -- you know, I'm not trying to do anything, you know, a two-minute email, and I really -- you know, Ramona and Steve had done a great job in terms of the beginning on how they manage the organization that I truly, and I've been there forever, wanted them to do something great to restore the faith in society, a mistrust in society. So what better than having a non-pharma approach?

Q    Okay.

A    That -- and at the time, too, like I said, I was researching a lot. Lifestyle medicine was going to be a huge push. And as a pharma company, it should be -- you know, it just made common sense. How it would all fit together, I don't know. I just knew it seemed like a good thing.

Q    And you saw an opportunity for your company too, right?

A    And an opportunity for Takeda, um-hum.

Q    But I know just conversationally you were saying yes, but you were saying yes, an opportunity for your company and an opportunity for Takeda, right?

A    Yeah.  The reality, it's a great name for a brand.  I've had the mark.  I haven't done anything with it other than a site and when I could do stuff part-time, when I job shared.  So, you know, I thought it would be a great kind of connector.

Q    Okay.  If you go to the first page of Exhibit 12 --

A    Um-hum.

Q    -- do you see the email from Laura Berger from -- or to Pamela McDonald on October 9th, 2020?

A    Yes.

Q    Okay.  Do you see where Laura wrote that she didn't quite understand what you were proposing?

A    Yes.

Q    Do you have any reason to doubt that that's what -- that she really was confused about what you were proposing?

A    Well, in our conversation, she really didn't ask.  It was more of -- there wasn't a lot of asking questions.

Q    Okay.  But, I mean, so do you -- do you -- do you doubt that she didn't understand it yet?

A    Well, yeah, because there's nothing really asked.

Q    Okay.  And Laura was the first call that you

had about Fit Life with anyone at Takeda, right?

A    I had emailed to try to get -- I emailed numerous people.  I don't know off the top of my head who they were.

Q    Okay.  And -- but did you have calls with anyone else at --

A    No.

Q    Okay.  How long do you think that call with Laura Berger lasted?

A    Less than a minute.

Q    Okay.  All right.  And then so your call with Laura Berger is -- was it some -- somewhere between what, October 9th and October -- sorry.

A    I don't remember when exactly I had the call with her.

Q    It was late September, early October, right?

A    I don't know exactly when I did.

Q    It had to have been before October 9th, right?

A    Correct.

Q    And it looks like on September 23rd, Laura told you that 1:30 --

A    Um-hum.

Q    -- on Thursday would work for her, right?

A    Correct.

Q    So sometime between that Thursday and

October 9th?

A    Yes.

Q    All right.  Do you agree with me that as of --
as of the time you emailed Trintellix Marketing in that
September 21 email that starts this chain, you had not
submitted a formal request for outside work approval,
right?

A    Right, yes.

Q    Okay.  And so you also had not been --
received the pre-approval that we saw the policy
requires before sending this, right?

A    I'm sorry.

Q    We looked earlier at the outside work
policy --

A    Yes.

Q    -- and it said pre-approval is required,
right?

A    Yes.

Q    And you agree you had not received
pre-approval before you were -- before you were
marketing this to -- or before you sent this email to
Trintellix Marketing on September 21st, 2020, right?

A    Yes.  I wasn't deeming it as work per se.

Q    Okay.  Did anybody at -- I'll put it this way.
Before -- before September 21, 2020, did anybody at

Takeda tell you that they didn't consider it work?

A    Before -- I really didn't do anything with it after 2015, 2016.

Q    That's different than my question.  My question is, I mean, you filed annual reports, right?  You had a company.

A    Well, filing annual reports is submitting an email.  But in terms of actively promoting and doing stuff for the -- for Fit Life, I did not do anything with it.

Q    Okay.  My question really is did anybody at Takeda before you started -- before you sent this email on September 21, 2020 tell you that what you were doing did not qualify as outside work under their policy?

A    No.

Q    Okay.

A    I wasn't -- I didn't share it.

Q    Okay.

A    I mean --

Q    And I'm going to have you look at Exhibit 13.

THE VIDEOGRAPHER:  Andrew, whenever you get a good stopping point.

MR. McKINLEY:  Yeah, yeah, we can stop here.  That's fine.

THE VIDEOGRAPHER:  The time is 12:35 p.m. and

we are now off the record.  This is the end of media unit two.

(Discussion off the record.)

(Lunch recess from 12:35 p.m. to 1:05 p.m.)

THE VIDEOGRAPHER:  This is the start of media unit number three.  The time is 1:05 p.m. and we are back on the record.

(Defendant's Exhibit 13 was marked for identification.)

BY MR. McKINLEY:

Q    All right.  I am going to show you now what I will mark as Exhibit 13.  And so Exhibit 13 is a true and correct copy of an email from Susan Potilechio to you, correct?

A    Yes.

Q    And am I correct that you had a call with Ms. Potilechio on October 14th, 2020?

A    Yes.

Q    Is that the first call you had with Ms. Potilechio?

A    I believe so.

Q    Okay.  Was anybody else on that call?

A    Yes.

Q    Do you know who?

A    Compliance and Ethics.

Q    Is it Perry O'Brien?

A    Yes.

Q    Okay.  Anybody else?

A    Not to the best of my knowledge.

Q    What -- how long do you think that call with Ms. Potilechio and Mr. O'Brien last -- lasted?

A    With him, it wasn't very long, and with her, probably about an hour with her.

Q    Okay.  Was it two separate calls or was it --

A    No, one.

Q    -- just one talking and then the other talking?

A    She spoke, asked questions, and then Perry not too long into the call says "This has nothing to do with us" and got off the call.  He said that I didn't violate anything with his -- whatever he's responsible for.

Q    Did he use the words "didn't violate anything"?

A    I don't recall verbatim.  Didn't violate or didn't involve.

Q    Involve his team?

A    Yeah.

Q    Okay.

A    He asked me and I told him and that was it.

Q    Okay.  But Ms. Potilechio, she -- she still

had questions for you, correct?

A    Um-hum.

Q    Okay.

A    Yes.

Q    Do you remember what specifically her questions for you were?

A    No.

Q    Okay.  And do you remember how your discussion with Ms. Potilechio ended on October 14th, 2020?

A    To -- I believe she was sending me a form to fill out and then she would get back in contact with me.

Q    Okay.  And the form she sent you is the form that is on the second and third page of Exhibit 13, correct?

A    Yes.

Q    Okay.  And do you have any reason to dispute that this is outside -- the pre-approval form that is sent to everybody when they're doing outside work?

A    I don't know.  This appears to be the form that she had sent to me.  I just remember these boxes.

Q    Okay.  I think my question is just do you have -- do you have any reason to dispute that this is the same form anybody who is --

A    No.

Q    -- doing outside work has to complete?

A     No.

(Defendant's Exhibit 14 was marked for identification.)

BY MR. McKINLEY:

Q     Okay.  And on October -- sorry.  I'm going to have you look at Exhibit 14 which I will share now.

A     Um-hum.

Q     All right.  And so it looks like on October 27th, 2020, that is when you returned the form that Ms. Potilechio had sent you, correct?

A     There was a different -- another email in there because if she sent it to me on the 15th, I would have sent it immediately back to her.  I wouldn't have waited that long.

Q     Do you have that email?

A     I don't -- there's another email.

Q     Do you know if you have it?

A     Because I do recall that there was -- there was an email in between these two because I hadn't given her every single thing that -- there was something I didn't fill it out exactly as she needed it or something like that.

Q     Where --

A     Hmm?

Q     We're going to get into that.

A    Okay.

Q    So -- but for now the question is this is -- October 27th, 2020 is when you returned -- you returned a form, right?

A    Yes.

Q    Okay.  And Exhibit 14 is the email where you sent -- you sent -- I mean, it's a true and correct copy of the email where you returned the form to her, right?

A    Yes.

Q    Okay.  And in this -- in this form you filled out, right, this is only one, two -- five sentences, right?  Is it -- in the Describe in Detail section?

A    Yes.

Q    You only wrote five sentences in this one, right?

A    Yes.

Q    Okay.  And this actually was the first one you filled out.  You did a more descriptive one later, right?

A    Okay.  I don't know.

Q    Let me ask this.  You filled out the form twice, right?

A    Yes.

Q    Okay.  So if I -- and I am going to show you this in a minute.

A    Okay.

Q    If I show you a second one --

A    Yeah.

Q    -- that's later --

A    Yes.

Q    -- then this was your first -- your first email returning it, right?

A    I'm -- I'm -- I would -- I guess so, yes.

Q    Okay.  In this form, you wrote, "I have" -- do you see where it says, "Will you be paid?  If so, how much?"  It's two separate boxes, but do you see both of them?

A    Yes.

Q    Okay.  And where it says, "If so, how much," you wrote, "I have not made any profit today.  Currently monthly sales are zero."  Right?

A    Yes.

Q    But in fact, you had had sales in the past, right?

A    As a part-time employee, when I was able to, yes, as a part-time employee.

Q    Okay.  If you had to rewrite this, would you rewrite that sentence any differently?

A    I'm not sure.

Q    Okay.  And --

A    My role with the organization changed.  When I'm part-time, that's when I worked on this.  Full-time, I didn't do anything other than keep the trademark alive which is what I had explained to Perry, hence, the email to Lin and filling out a -- what's it called at the end of the year?

Q    Yeah.  You remember we looked at the --

A    Um-hum.

Q    -- outside work policy earlier?

A    (Nods head.)

Q    There was nothing in that policy that said that its applicability depended on whether you were full-time or part-time, right?

A    Yes.

Q    Okay.  And when you filled this form out, you wrote that your outside --

A    Actually, I don't think -- I'm sorry, but I don't think Takeda even has job share anymore.  So I don't even think that there's policies for job share anymore, and that would have been in 19 --

Q    I guess my question is you agree that that policy doesn't say anything about -- you know, it doesn't say it matters what position you have with the company, right?

A    Um-hum.

Q    It's just a policy that applies across the board?

A    Correct.

Q    Okay.  On Takeda 334, and again, in Exhibit 14, you wrote that your outside activity began in January 2016, right?

A    Yes.

Q    Okay.  And in fact, your company had begun in 2014, right?

A    No.

Q    Do you want to go back --

A    The trademark was 2014.  I didn't do -- officially do anything until 2015.

Q    Can you go back to Exhibit 3?

A    Okay.  Filing is 2014.  Okay.

Q    So you agree with me that when you wrote January 2016, that was incorrect and the right date would have been in 2014, right?

A    My interpretation of it is outside activity, outside activity, doing something outside of -- filing a -- for a trademark wasn't actively doing something. Going to a race and being a vendor is actively doing something.  That's how I interpreted it.

Q    Okay.  And has anybody at Takeda told you that organizing a company and doing filings for a company

does not qualify as work under the policy?

A    No, but they also didn't tell me that it does either.

Q    Okay.  Okay.  The -- Do you understand why this form raised questions for Takeda?

A    Raised questions today?

Q    No.  Raised questions at the time you submitted it.

A    This one?

Q    Yeah.

A    No, I -- no.  I forget what her -- her questions were, to be quite honest.

Q    Okay.  Do you -- do you think that it would be unreasonable for -- when Takeda's policy that pre-approval for outside work is required, that they would have questions when they see a form in 2020 saying a company had been operating since 2016?

A    Sure, yes.

Q    And do you think that there's anything inappropriate about asking questions to understand why -- why that was the case?

A    No.

Q    Okay.  I mean, how long do you think it took you to fill out this form on Exhibit 14?

A    Not long.

Q    Fifteen minutes?  Thirty minutes?  What would you estimate?

A    I don't know, to be honest.

Q    Do you think it would have taken more than an hour?

A    Yeah, because I would have -- I remember I called Jodi on this one too because I'm like, I didn't realize I was doing something wrong.

Q    Okay.  But how long do you think it took to actually fill in the five sentence and -- five sentences and describe in detail in the other information?

A    Probably an hour.

(Defendant's Exhibit 15 was marked for identification.)

BY MR. McKINLEY:

Q    Okay.  All right.  Let's look at Exhibit 15 which I'll show you in a second.

All right.  Exhibit 15 is a true and correct copy of an email chain between you and Ms. Potilechio, correct?

A    Correct.

Q    All right.  And on November 2nd, Ms. Potilechio emailed you with a few additional questions she had about your -- about what Fit Life involves, right?

A    Yes.

Q    And do you -- do you think that any of the questions she listed in that November 2nd email are unreasonable?

A    No.  I think they're repetitive, though.  It's what we had discussed, hence why Perry -- we had already discussed all of that in the conver -- in a conversation.

Q    Right.  But she told you to put it in the form and you didn't put that information in the form, right?

A    I don't recall what she told me to put into the form.  She asked me to fill out that form and then said -- I guess it wasn't thorough.  I'm like, okay.

Q    Right.  Well, she told you the form -- and the policy says that the form is needed for outside approval, right?

A    Okay.

Q    Do you disagree with that?

A    The form and then I believe it's a -- wasn't it a letter from your manager or something, an endorsement from your manager?

Q    Um-hum, right.  And I guess she's -- she is telling you in this email that the form she asked you to fill out didn't have the information reflected in the questions she listed here, right?

A    So she sent me this form and then this one's dated November 2nd, so it's not -- she didn't give me the questions that she needed answered into the form.

Q    Well, she -- the form says describe in detail the activities, right?

A    Yeah.

Q    And then in the November email, she's telling you these are the additional details that I need that weren't included, right?

A    What we had discussed on our call, yes.  So I filled it out as per this email that didn't list that she needed answers to all these questions.  I filled out exactly what I was -- the form given as I would fill it out and then sent this, so I filled it out again.

Q    Do you have any reason to believe that the questions that she asked you are any different than questions that she's asked to other people who have submitted outside approval forms?

A    I don't know.

Q    Okay.  And do you think -- did you tell her on the call with her -- I mean, you told me a minute ago that you didn't remember exactly what you discussed, but did you tell her on the call with her that you had sold your shirts at vendor markets previously?

A    Um-hum.

Q    Okay.  Did you --

A    I believe so.  I believe so.

Q    Do you know for sure?

A    Again, when I -- no, I don't, to be totally honest with you.  I don't remember every single aspect of the call.

Q    Okay.  Did you --

A    And when I did that, I worked part-time.  I was not a full-time sales rep with the organization.  I job shared the job.

Q    Okay.  Did you tell her -- had you told her on the call why there was a website where shirts could be sold if you weren't actually selling?

A    Yes.

Q    Okay.  And what did you say?

A    Just that, because I remember Perry, he's -- I remember, I'm like, it's like a stock, you know.  I said, but I have to keep -- and he's like, I get it, I get this.  It's a trademark, here's how you keep it legal, et cetera.  And she didn't -- she was, I guess, wrapping her hands around it.  It just took a little bit longer.

Q    I understand that you -- for a period of time, you weren't maybe actually selling stuff on your website, but there was an ability for people to buy

stuff on your site during that time, right?

A    Yep.  Yes.

Q    And if somebody had put a shirt in the cart and bought it, you would have fulfilled it, right?

A    Yes.  At the time, I wasn't doing anything to actively -- like social media wise or anything, hence why it was like I need to go ahead and start doing it.

Q    And she's telling you here, right, that part of the reason she needs all this information in writing and not just on your call with her is because eventually her managers are going to have -- or, you know, your managers are going to see it and when they approve it, right?

A    I didn't know that.  I, again, had called Jodi.  Jodi was aware and she said:  No one reached out to me and said that this investigation was going on.

Q    Okay.  Do you see at the bottom of the email where it says:  These are the type of questions that you need to clearly state the description box?

A    Um-hum.

Q    At the bottom, your managers are going to ask the same questions?

A    Yes.

Q    So you understand that she's telling you part of the reason for having these answers in writing is

because it's going to eventually be relayed to the managers, right?

A    Yes.

Q    And you hadn't told your managers all of the things that you told Susan on your call with her, right?

A    I don't know.

Q    Okay.  Do you think you had told Greg Crouch that you were selling shirts at a vendors market before your approval form was relayed to them?

A    I wasn't doing that.  I -- as a part-time job share rep is when I did that.  As a full-time rep with Takeda I did not.

Q    Is the answer to the question no, then?

A    What was the --

Q    The question is did you tell Greg Crouch before the request for approval was relayed to him that you had sold shirts as a vendor while employed by Takeda?

A    I don't know.

Q    Okay.  All right.  I'm going to have you -- well, staying on 15, this email is from November 3rd, 2020, right?

A    Yes.

Q    And so you see now Susan's request for more information was on November 2nd and then you responded

the next day with the updated form, correct?

A    Yes.

Q    Okay.  And in your email response to Susan, you said you do not generate income, but you hadn't said that you had generated income in the past, right?

A    I'm sorry.  Say that one more time.  I didn't hear it.

Q    You said in your email to Susan that you do not generate income, but you hadn't said in that email that you had generated income in the past in your company, right?

A    Correct.  I had a different job when I did generate income with the company.

Q    Okay.

A    I worked part-time for the company.

Q    I understand.

A    Um-hum.

Q    And you hadn't received approval to do any work before or while you were part-time, right?

A    I wasn't aware that I needed.

Q    Okay.  And the document starting on Takeda 0000339 through 341 is the updated form that you completed, correct?

A    Yes.

Q    And how long do you think it took you to fill

this out?

A    An hour.

(Defendant's Exhibit 16 was marked for identification.)

BY MR. McKINLEY:

Q    All right.  And then on -- I'm going to show you what I'll mark as Exhibit 16.

All right.  So on Exhibit 16, Ms. -- well, before this, Ms. Potilechio had set up a call to talk about it with you, right?

A    Yes.

Q    And then on November 5th, after she got your form, she said, We don't need to speak anymore, your -- your explanation is much better, right?

A    Yes.

Q    Okay.  And so am I right that you only had the one call with Ms. Potilechio that Perry O'Brien on for at least part of?

A    Yes.

Q    Okay.  And she told you that she would forward it to Staci Thompson who will get back about whether your outside activity was approved, right?

A    Yes.

Q    Okay.  Here's the question I have.  Did -- did anybody ever tell you that these communications with

Susan were an investigation or did they tell you that they were just putting you through the outside approval process?

A    When Ethics and Compliance and -- it's not the -- it's not a normal approval process, but I wouldn't know that.  I just inadvertently wasn't thinking I had done something wrong and when -- anyone would be concerned if Ethics and Compliance is on the conference call with you.

Q    I understand that and --

A    And then multiple times to fill out the same form, so --

Q    I understand that.  I think my question really is did anybody ever tell you that they -- did anybody ever use the word "investigation" with you?

A    No.  My manager stated she didn't even know about the call.  I was --

Q    Okay.

A    It was me.

Q    Okay.  And did anybody ever tell you that they were looking at discipline in connection with this?

A    No one was -- Susan was involved in the call. Perry was involved in the call.

Q    Right.  But did anybody tell -- did either of them or anybody else tell you that they were -- they

were looking at this issue to decide whether you'd be disciplined?

A    I don't know.

Q    Okay.  You don't -- but sitting here today, you don't have a distinct recollection of discipline ever coming up, right?

A    I think when you have Ethics and Compliance on your call, it's not -- it's cause to be very concerned.

Q    Okay.  Is it fair to say that you have never been involved in any outside approval process for any other individual?

A    Correct.

Q    Okay.  And so is it fair to say that you don't know whether Ethics and Compliance reached out to anybody when they have questions about their outside work the same way they did with you?

A    Yes.

(Defendant's Exhibit 17 was marked for identification.)

BY MR. McKINLEY:

Q    Okay.  And I'll show you what I'll mark as Exhibit 17.  Exhibit 17 is a true and correct copy of another email chain involving, I guess, two emails from Susan Potilechio to you, right?

A    Yes.

Q    All right.  And on November 7 -- or November 10th, 2020, Ms. Potilechio told you that you had been approved for your outside activity, correct?

A    Yes.

Q    All right.  There was never any discipline given to you for engaging in anything outside of the company, was there?

A    Discipline in what form?

Q    Any form.

A    Extra stress.

Q    But there were no --

A    No.

Q    Okay, no.  So you're saying there were no -- no write-ups, no -- you weren't terminated, anything like that for anything having to do with Fit Life?

A    Write-up -- I don't know.  I don't know what's in my HR file.

Q    So --

A    Termination, no.

Q    Okay.  No warning letter or anything like that was issued to you, right?

A    No.

Q    Okay.  And Susan told you that when your updated form or at least the information from your updated form was passed along to Jodi Gayle-Garcia and

Greg Crouch, that both Jodi and Greg were fine with you in the outside work, right?

A    Correct.

Q    Okay.  And -- and then she also -- she sent you the first email on November 10th, and then on November 16th she sent you a second email reminding you that you needed to return your outside approval acknowledgment or your approval agreement, right?

A    Yes.

Q    Okay.  And the second and third page of Exhibit 17 is that approval agreement you were asked to complete, right?

A    Yes.

(Defendant's Exhibit 18 was marked for identification.)

BY MR. McKINLEY:

Q    All right.  I will now show you what I'll mark as Exhibit 17 -- or sorry -- Exhibit 18.

All right.  Exhibit 18 is a true and correct copy of an email from you back to Susan Potilecho, correct?

A    Yes.

Q    And the document on the second and third page, Takeda 348 to Takeda 349, is the signed approval agreement that you completed with Takeda, right?

A    Yes.

Q    And after you -- after you completed this, you were allowed to do anything you wanted for Fit Life, right?

A    Yes.

Q    Okay.  And you have never been disciplined at any -- or you've never been given any discipline at any point for working for Fit Life, right?

A    Right.

Q    Okay.  So I want to -- we went through kind of a string of emails and other things.  I want to make sure that I understand the full history here.

The entirety of the outside approval process was you had a, one, a phone call with Susan Potilechio and Perry O'Brien that lasted about one hour.  You, two, were asked by Ms. Potilechio to complete the outside activities form.  Three, you were asked to -- by Ms. Potilechio to provide a better description of the outside activities form, and each time you filled it out, you think it took about an hour.  And then, four, Takeda approved your outside work, right?

A    Yes.

Q    Okay.  Anything in that process that I'm missing?

A    No.

Q    Okay.  And have you ever been personally involved in any conversations with anybody at Ethics and Compliance about the approval process for outside work for any other individual?

A    I don't believe so, no.

Q    Okay.  And do you agree with me that you personally don't know whether Jordan Davis submitted an outside approval request for outside work?

A    He did.

Q    Okay.  Are you basing that on your personal knowledge or something you've seen during this litigation?

A    A conference call that was held with Jodi.

Q    Okay.  And what did Jodi -- I want to be clear.  Did Jodi say she knew he was doing outside work or did Jodi say he went through the approval process?

A    She said Jordan is Gaither High School's -- let's congratulate Jordan, Gaither High School's varsity basketball coach.

Q    Okay.  Do you have any reason to dispute that Jordan Davis had to fill out the exact same paperwork that you filled out?

A    No.

Q    Okay.  And did you know that Jordan Davis submitted his outside paperwork before you submitted

yours?  Let me put it a different --

A    Yes.

Q    Okay.  Okay.  And do you agree that you do not personally know who evaluated his request for outside work?

A    No.

Q    You don't agree with that or you --

A    Oh, I -- no, I do not know who.

Q    Okay.  And do you agree that you don't know what happened during any process for him requesting outside work?

A    Correct.

Q    Okay.  And do you agree that you have no idea what the thought process was behind him being granted the ability to do outside work?

A    Yes.

Q    Okay.

A    Except that Jodi said on the call because everyone was stunned, and she would have had to have approved or written a letter of basically endorsing -- endorsement for him that, you know, Takeda doesn't inhibit you from, you know, doing things.

Q    Do you actually know that a letter of endorsement was completed?

A    It states in the policy.

Q    It states in the policy that she has to approve it.  It doesn't say she has to write a letter, does it?

A    Yes.

Q    It says she has to write it?

A    I believe so, yes.  Which one was it?

Q    It's Exhibit 11.

A    I believe -- I could be wrong.  I thought that I read that.  What page?

Q    It is --

A    I got it.

Q    -- Takeda 213.

A    Yeah.  "Upon receipt, the employee's immediate manager must forward the written request to the appropriate human resource representative with a recommendation."

Q    Right.  So all this policy says is that if a manager receives a written request, it's obligated to forward it and talk with Human Resources about whether it will be approved, right?

A    It says with a recommendation, so it's --

Q    Okay.  I mean, so Jodi had to also recommend that yours was approved, right?

A    I have no idea.

Q    Okay.  But then you also don't know what

happened with Jordan Davis's, right?

A    I -- it states, "Manager must forward the written request to the appropriate HR rep with a recommendation."  So you're stating, I recommend this person to do this position.  With mine, it was an investigation, not a -- filling out a form.  So there was no recommendation.

Q    Just to be -- to be clear, you're assuming there is a recommendation, right?  You haven't seen one, have you?

A    Well, I'm -- if I'm -- we just went through corporate -- if I'm following policy, it says with a recommendation.

Q    Okay.  My question is have you ever seen a recommendation?

A    I'm not -- no.

Q    Have you -- has anybody ever told that you Jodi sent a recommendation for Jordan Davis?

A    No.

Q    Okay.  Do you have any reason to think that Jodi did anything differently for the approval process for Jordan Davis than she did for the approval process for you?

A    I don't know.

Q    Do you have any reason to think she did?

A    I -- I don't know.

Q    Okay.  Do you agree with me that you have never had any role in evaluating accommodation requests at Takeda?

A    Correct.

Q    Okay.  And you have no personal knowledge about Takeda's typical policies and practices related to accommodation requests, right?

A    Say that one more time.  I'm so sorry.

Q    You have no personal knowledge of Takeda's personal policies and procedures for processing accommodation requests, correct?

A    Correct.

Q    Okay.  And you agree with me that starting around November 2nd, 2021, all employees at Takeda -- sorry, let me rephrase that.

Do you agree that starting November 2nd, 2021, all employees were required to be vaccinated to work at a Takeda site or to have face-to-face interactions with Takeda colleagues and customers?

A    No.  There -- you were able to have an accommodation.  You were able to apply for a religious accommodation or a medical accommodation.

Q    So I think maybe I need to re-ask the question.  Do you agree that Takeda's policy starting

around November 2021 was that to work at a -- to actually work at a physical Takeda site, you had to be vaccinated?

A    I don't know what the home office was.  It was different than field.  I can't -- I don't know.

Q    Okay.  Well, let me -- let me ask this, then. Do you agree that as of November 2021 -- or in November 2021, Takeda announced that anybody working in the same role you had was going to be required to be vaccinated if they wanted to work at a Takeda site or go out and see customers?

A    Minus an accommodation.

Q    Unless there was an accommodation?

A    Correct.

Q    Okay.  Are you aware of anybody being allowed to actually work in the field or at a Takeda site unvaccinated?

A    Takeda site is different.

Q    Okay.

A    The home office, all of that was under a different --

Q    In your role.  I'm asking about in your role. Are you aware of anybody in your role who was allowed to go to Takeda sites or see customers unvaccinated in 2021 through the termination of the vaccine policy?

Shannon Olson                    August 15, 2024
Olson, Shannon v. Takeda Pharmaceuticals America, Inc.

Page 160

A    Takeda sites, yes.  That was different than health care providers.

Q    Okay.

A    What do you mean by a Takeda site?

Q    Any -- any office for Takeda that you would have typically gone to.

A    So I'm -- I'm taking Takeda site to be like a home office.  They had their -- a very different policy than field sales.

Q    I'm only interested in the policy that applied to you.  Let me ask it differently.  Were you allowed to do any work other than virtual work if you were not vaccinated from the implementation of the vaccination policy in November of 2021 to its termination?

A    I -- Takeda did allow at some point interaction.  First, everything was 100 percent virtual. Then they allowed interaction with other Takeda employees.

Q    Okay.  Okay.  So at some point, the policy -- and at some point, the policy changed from no interaction with employees or customers if you're not vaccinated to just no employees with customers if you're not vaccinated.  Is that what you're saying?

A    Correct.

Q    Okay.

A    You could have interaction with Takeda, but I brought up if -- if a Takeda person is a customer, why that would, you know, violate a policy.

Q    Well, did anybody tell you that they weren't comfortable putting customers at risk of potentially transmitting COVID to them?

A    If there's a Takeda employee that sees, I mean, a doctor that -- one of their doctors, that's a -- I mean, they're -- you know what I'm saying?  It was a very sticky area.

Q    Um-hum.  Have you had COVID before?

A    No.

Q    All right.  Okay.  You understand that when you get COVID, there's a latency period, right?

A    Um-hum.

Q    And that you may not know you have it until some period of time later?  Would you disagree with that?

A    I've never had COVID.  My kids haven't.

Q    So you don't have any reason to agree or disagree with it?

A    I -- I -- I mean, I don't know.

Q    Okay.  Do you agree that you have no personal knowledge of why Takeda felt the vaccine policy was necessary?

A     I'm sorry.  Say that one more time.

Q     Yes.  Do you agree you have no personal knowledge of why Takeda thought that its vaccine policy was necessary?

A     I have no personal knowledge?

Q     Yes.

A     On why Takeda thought it was necessary?

Q     Yeah.

A     I mean, they had just said it was to stop the spread.

Q     Okay.  But you weren't -- I mean, we can both agree you weren't involved in any deliberations for, you know, people who decided that the policy would be implemented, right?

A     No.  I was involved like everyone else on global calls where we were able to ask questions.  I was involved in calls explaining the why behind it, supposed why behind it, but in terms of making their policy, no.

(Defendant's Exhibit 19 was marked for identification.)

BY MR. McKINLEY:

Q     Please look at what I'll mark as Exhibit 19.

Okay.  Exhibit 19 is a true and correct copy of an email chain ending with an email from Stephanie Anderson to you, correct?

A    Yes.

Q    And Stephanie Anderson was -- is she a nurse you were seeing, a --

A    A nurse practitioner, correct.

Q    Yeah.  And what -- what were you -- why were you seeing Stephanie Anderson?

A    She's my family medical provider.

Q    So just your -- your PCP?

A    Um-hum.

Q    Okay.

A    Yes.  Sorry.

Q    You haven't produced any medical records from Stephanie Anderson.  Have you tried to get your medical records from her?  And let me clarify that.  Obviously, we have the records that were submitted to Takeda, but setting aside the records that were submitted to Takeda -- to Takeda as part of the approval process, have you made any efforts to get your medical records from your regular treatment from Stephanie Anderson?

A    From which dates?

Q    Any dates including through present.

A    Yes.  I believe she sent -- she has sent or is sending.  What is your question?

Q    Did you ever personally ask her to pull -- to give you your medical records?  Did you ever ask her to

give you your medical records?

A    I asked for a copy of my medical records from the subpoena from you guys.

Q    So prior to Takeda subpoenaing, you had not asked, right?

A    No.

Q    No, you hadn't asked, or no, you --

A    I don't -- I don't believe so, no.

Q    Okay.  Prior to Takeda issuing subpoenas, had you requested your medical records from any provider you've seen over the last ten years?

A    I don't know.  That's a decade.

Q    Well, do you -- I mean, do you remember -- and I'm not asking you to --

A    I'm going to say yes because I've gotten mammograms.  I've gotten --

Q    Let me clarify.  Have you asked -- during this case, have you asked for any medical records from any medical provider on your own, not after the subpoena was issued?

A    No.

Q    Okay.  What -- what conversations have you -- I mean, I -- what conversations did you and Ms. Anderson have about the COVID vaccine?

A    Whether I was a candidate for it or not.

Q    Okay.  And what was the result of that conversation?

A    No.

Q    Why?

A    Due to uncertain outcomes.

Q    Okay.

A    She wanted additional data that wasn't currently available.

Q    Okay.  Do -- and what was the concern that she had?  Was it about the vaccine generally or was it about something else?

A    I'm not sure.

Q    Okay.  Was there anything unique to you that created some medical risk for COVID, for the COVID vaccine?

A    I'm not sure.  Hers was long-term data.

Q    Okay.  So is it your understanding that her concern was whether the COVID vaccine worked long term for anybody --

A    No.

Q    -- or had harmful effects long term for anybody?

A    Yes.

Q    Okay.  So her concern was the COVID vaccine generally, not the COVID vaccine for you specifically,

right?

A    No.  For me specifically.  She wanted more data.

Q    Okay.  Did you have any understanding of what -- why her opinion about you specifically would have been different from anybody else?

A    Just underlying -- my underlying conditions.

Q    Which is?

A    Epstein-Barr virus.

Q    Okay.

A    And anxiety, PTSD, depression.

Q    When were you diagnosed with Epstein-Barr?

A    I don't know.  Years ago.

Q    Was it by Ms. Anderson or was it by somebody else?

A    Either Stephanie or a different practice that she worked under.

Q    Okay.  Do you know why you were -- when you were first diagnosed with anxiety?

A    First diagnosed?

Q    Yep.

A    No.

Q    Okay.  Do you think it was over a decade ago?

A    I don't know.

Q    Do you think it was before or after your

divorce?

A   I think it was after.  Wait.  Hang on.  Nine years, ten years.  Probably -- I don't know.  I don't know the exact time that it was.

Q   Okay.  You had been seeing a therapist back to at least 2013 or so, 2012, right, maybe even before that?

A   Correct.

Q   Do you know when you started seeing a therapist?

A   A therapist?

Q   Yes, any therapist.

A   No.

Q   Okay.  Were you seeing a therapist because of depression, anxiety, both?

A   Yes.

Q   Both?  Both of them?

A   Um-hum.

Q   Okay.  On Exhibit 19, you agree that the specific accommodation that Ms. Anderson requested for you was weekly COVID testing, masks, and social distancing, right?

A   Yes.

Q   Okay.  And those were the only accommodations she submitted when she initially submitted this document

on October 22nd, 2021, correct?

A    What was the --

Q    Weekly COVID tests, masks, and social distancing?

A    Yes.

Q    So you're agreeing that those were the only accommodations she proposed at that time, right?

A    Accommodations in lieu of the vaccination.

Q    Correct.

A    Yes.

Q    And do you agree that -- we'll go to Takeda 431.  Do you agree that Ms. Anderson informed Takeda when you requested your accommodation that she could not say whether weekly COVID testing, masks, and social distancing would allow you to perform the essential functions of your senior sales representative role?

A    Yes.

Q    Okay.  And do you agree that Ms. Anderson told Takeda that she could not say whether allowing weekly COVID testing, masks, and social distancing would prevent you from being a direct threat to your own safety or the safety and health of others in the workplace?

A    I don't know specifics of what she said.  She had the conversation.  I know that this here --

Q    If you look at -- on 431, look at bullet two.

A    Um-hum.

Q    Do you -- do you have any reason to dispute that the only thing that Ms. -- do you have any personal knowledge to dispute that the only information Ms. Anderson provided on whether you would be a direct threat to yourself and others without the vaccine and without social distancing -- or sorry -- without social -- without the vaccine, and if you were allowed to get weekly COVID testing, masks, and social distancing, was that she could not say -- she could not say whether you would be a direct threat to yourself and others?

A    She said that, "I cannot provide a yes-or-no answer as I do not know how the current vaccines will interact with Shannon.  There is not enough information for me to make that decision."

Q    Right.  So she -- her representation to Takeda was that she could not say whether you would be a direct threat to yourself and others, right?

A    Direct threat to myself or others by not being vaccinated or being vaccinated?

Q    By not being vaccinated and you were accommodated with COVID testing, masks, and social distancing.

A    I -- I do not know.  I'm -- you're kind of getting me a little bit confused.  There were specific questions that she was -- hang on -- answering.

Q    Yeah, number two on 431, I just want you to look at number two.

A    Okay.

Q    My only question is do you see the question where she said, "Can Shannon perform the essential functions of her position without being a direct threat to his or her own health and/or safety of others in the workplace?"  Do you see that?

A    Um-hum.

Q    And Ms. Anderson's response was that she did not know, right?

A    Yeah, but I don't know if this is -- again, she's stating in here that she cannot give a yes or no because -- and it was -- this was more if -- I believe, if I'm reading it correctly, this was?  Can the employee perform the essential functions of her -- of his or her position without being a direct threat to his or her own safety and/or health and safety of others in the workplace without being vaccinated -- or with being vaccinated?  Without an accommodation.  I'm sorry.  So that would be with.  And she said that she does not know because she does not have enough information to make the

decision.

Q    Right.

A    Yes.

Q    Okay.  And you have no personal knowledge of her ever changing that answer, right?

A    Right.

Q    Okay.  And, I mean, it sounds like you believe that it remained her answer because she didn't know the long-term effects.  Is that fair?

A    I do not know.

Q    Okay.

A    I don't know.

Q    Okay.  Have you ever told anybody at Takeda that you have Epstein-Barr?

A    Yes.

Q    Who?

A    An old counterpart.

Q    Who?

A    Amber Stuckler (phonetic).

Q    She was a coworker.  Was she ever a supervisor?

A    No.  She's my direct counterpart.

Q    Okay.  Have you ever told Jodi Gayle-Garcia that you have Epstein-Barr?

A    I don't know.

Q    Okay.  Have -- have you ever told Greg Crouch that you have Epstein-Barr?

A    I don't know.

Q    Okay.  Have you ever told Matt Hand that you have Epstein-Barr?

A    I don't know.

Q    Have you ever told Greg Crouch that you have anxiety?

A    I don't know.

Q    Okay.  Have you ever told Matt Hand that you have anxiety?

A    I don't know.

Q    Have you ever told Jodi Gayle-Garcia that you have anxiety?

A    I don't know.

Q    Have you ever told Jodi Gayle-Garcia that you have depression?

A    I don't know.

Q    Have you ever told Greg Crouch that you have depression?

A    I -- you know, I can't say yes or no with anxiety, depression, PTSD with the three of them and all of that just because of Trintellix.  I don't know.  I honestly -- I don't know.  I can't say yes or no --

Q    Okay.

A    -- if I directly said something or not.

Q    And so -- and just to make sure I cover everything, you also -- you're saying you also can't say whether you told Matt Hand that you had depression, right?

A    Right.

Q    Is it fair to say -- I mean, would you have -- if Jodi Gayle-Garcia said that she did not know of any specific medical condition you had, would you have any reason to dispute that?

A    Yeah, because I took a leave of my -- I mean, I had taken a leave of absence when she was my manager.

Q    My question is a little different.  My question is if she told you -- I mean, I'm not disputing that she would have known you were on a leave.  I'm saying if she said that I -- I've never been told what Ms. Olson had, whether it was depression or, you know, arthritis, you know, would you have any reason to dispute that she didn't know what your specific medicals were?

A    Actually, I think I did tell her because I had -- I had to -- I took the leave of absence because I had crushed my car, my company car from being complete and totally functionally not there.

Q    Okay.  So what do you think you told her your

specific -- what is the specific medical condition you think you told her?

A    I have no idea.

Q    Okay.  Can you say with certainty that you told her you had a specific medical condition?

A    No.

Q    Okay.

A    Actually, I don't know.

Q    Okay.  Would you have any reason to dispute Greg Crouch if he said he didn't know any specific medical condition you had?

A    No.

Q    Would you have any reason to dispute Matt Hand if he said he didn't know of any specific medical condition you had?

A    I'm not sure.

(Defendant's Exhibit 20 was marked for identification.)

BY MR. McKINLEY:

Q    Okay.  I'm going to show you what I'll mark as Exhibit 20.  All right.  And Exhibit 20 is a true and correct copy of an email chain involving you and Heidi Miller, correct?

A    Yes.

Q    All right.  And Heidi Miller was a human

resource business partner, right?

A    Yes.

Q    Or sorry.  Well, I guess the technical title is Employee Relations Partner.  Is that the right --

A    Yes.

Q    Okay.

A    HR.

Q    HR.  So on October 23rd --

A    Um-hum.

Q    -- which what, is the -- so the day after Ms. Anderson sends her email that we just looked at --

A    Um-hum.

Q    -- Exhibit 19, Heidi Miller reached out to you to set up a call about your medical accommodation request, right?

A    It was -- yeah, it was on a Saturday she sent me that email.

Q    Right.  And so when you look at the bottom of Takeda 439, it looks like she originally sent a Teams invite on Saturday, October 23rd, 2021 at 6:40 p.m.  Is that right?

A    I don't know if it was a Team and -- it was an email.  I didn't get it until Monday.

Q    Okay.  And then -- okay.  And after she requested the call, you told her that you wanted her to

give you the questions in writing, right?

A    Correct.

Q    And that you would need to answer them in writing, right?

A    Correct.

Q    Okay.  And Ms. -- Ms. Miller then told you that there would need to be an actual verbal discussion, right?

A    Yes.

Q    And when you responded on October 26th, you responded that you did not want to -- basically, that you didn't want to have a verbal discussion with them, right?

A    I -- I trusted in the religious accommodation discussion and I was not putting myself through that again.

Q    Okay.

A    So they trust Stephanie to write Takeda products, but they don't trust a written documentation stating that her client -- her patient shouldn't take a certain product.

So again, I'd done the religious one in good faith believing that Takeda would want to have a discussion and it was nothing close to a discussion.  So I said everything in writing, which I think is

reasonable, and I'll respond in writing, and then she wouldn't do it and I'm -- I wasn't doing that again.

Q    Okay.  And so --

A    So Stephanie had a call with Takeda.

Q    Right.  So I think, getting back to the question, that you -- you would not have a call with Ms. Miller, but you directed Ms. Miller to Stephanie Anderson, correct?

A    No.  Ms. Miller directed -- said that an occupational nurse would have a call with me and I said no.

Q    Okay.  And then -- and then Ms. Miller proposed that the occupational nurse, which is what, Kristen Zablocki, would have a call with Stephanie Anderson, right?

A    Correct.  I don't know who the occupational nurse was.

Q    All right.  Are you -- have you ever heard of something called the interactive process under the ADA?

A    I have, but I can't recall it.

Q    Okay.  Do you understand that under the law, you're required when making an accommodation request to engage in an interactive process and provide information as -- you know, as requested by an employer --

A    Um-hum.

Q    -- to facilitate --

A    Sure.

Q    -- the determination of whether an accommodation exists?

A    Yes.

Q    Okay.  And do you -- do you agree that even though Takeda preferred to have a conversation with you, it was willing to let the conversation go through the occupational -- occupational nurse and Ms. Anderson?

A    Yes.

Q    And do you agree that you -- you weren't on any of the calls with -- between Ms. Zablocki and Ms. Anderson?

A    Correct.

Q    And you don't have any personal knowledge of what they discussed exactly, right?

A    Correct.

(Defendant's Exhibit 21 was marked for identification.)

BY MR. McKINLEY:

Q    Okay.  Please look at what I'm going to show you as Exhibit 21.

Just one other thing.  You mentioned a second ago that -- that Takeda wasn't -- at least your view was that Takeda wasn't comfortable with the paperwork that

Shannon Olson                    August 15, 2024
Olson, Shannon v. Takeda Pharmaceuticals America, Inc.

Page 179

Ms. Anderson had submitted, right, and you didn't understand why they were -- they wanted to ask more questions?

A    No.

Q    No, you don't?  I mean, do you think it was unreasonable for Takeda to want to ask more questions after the note that Ms. Anderson provided?

A    I think it's unreasonable -- I think it's reasonable for an employee who has already gone through one of the process and when a thing is labeled a discussion and you already know what that is, to have an alternative way of getting the same information.  I felt like I got morally raped when they did the religious accommodation.  I wasn't going to sit there and --

Q    I think I have a -- I think my question is different, though.  My question is did you -- like, looking back at Exhibit 19 and that note we were looking at from Stephanie Anderson, I mean, you understand that -- and the information she originally provided, Ms. Anderson didn't even say what medical condition was being accommodated.

A    Um-hum.

Q    And so do you -- like, do you agree with me that to evaluate an accommodation request, you need to at least know what the supposed disability is?

A    Yeah, but, I mean, HR also has records from before, so ask Lincoln Financial.

Q    Sure.  But without knowing they don't know if you have some -- they don't know what condition is being evaluated, right?

A    Um-hum.

Q    They don't know if it's something new, don't know if it's something old, don't know what it is, right?

A    Takeda?

Q    Yeah.

A    Okay.

Q    Would you disagree with that, that unless -- unless more information that was provided in this note, Takeda didn't even know what they were accommodating?

A    I don't know because Takeda didn't -- I don't know.  I don't know what Takeda was looking for with -- I don't know.  I don't know.

Q    Okay.  Well, similarly, because you don't know that, do you agree that you don't know whether any of the questions that Takeda asked -- asked Ms. Anderson were reasonable or unreasonable?

A    I don't know.

    (Defendant's Exhibit 21 was marked for identification.)

BY MR. McKINLEY:

Q   Okay.  All right.  I think we were jumping to Exhibit 21 which I will share.  All right.  So -- did I hand it to you already?  I've got one in front of me.  I just want to make sure.

A   Yes.  My apologies.

Q   All right.  So Exhibit 21 is a series of emails involving you, Heidi Miller, and Roberta Newcomb, right?

A   Yes.

Q   All right.  And this is a true and correct copy of that email chain, right?

A   Yeah.  Was this after -- I think after her dad died or something.

Q   Right.  So on November 1, 2021, Roberta Newcomb informed you that you would be allowed to work remotely until a decision on your medical accommodation requests was made, right?

A   Yes.

Q   Okay.  And Heidi Miller also had separately told you that you should only work virtually until your accommodation issues were resolved, right?

A   Yes.

Q   Okay.  And in fact, you did work remotely the entire time from when you requested -- or sorry -- from

when you were told to work remotely around November 1 through the time -- through the time your accommodation was -- you know, that the need for the accommodation ended, right?

A     Yes.

(Defendant's Exhibit 22 was marked for identification.)

BY MR. McKINLEY:

Q     Okay.  Let's look at Exhibit 22.  Exhibit 22 is a true and correct copy of an email chain involving you and Heidi Miller, correct?

A     Yes.

Q     Okay.  So originally on November 10th, 2021, when they were evaluating your request for social distancing, masks, and weekly testing, Heidi Miller sent you an email that said they were not going to be able to give you that as an accommodation, correct?

A     I don't know.  I don't know.

Q     Okay.  I mean, on November 10th, it says: Upon review of the information requested or provided, Takeda cannot approve your request, right?

A     Yes.  Yes.  This was, from what I believe I understand, what to do in lieu of not getting vaccinated which we were doing October 31st, social distancing, masking, and weekly testing.

Q    Right.  And they were -- we looked before. The form that had been filled out was for those things, and Ms. Miller said that wasn't going to happen and she told you at that time that you had until November 18th, 2021 to decide whether you would be vaccinated, right?

A    Right.

Q    And then the same day, you emailed Heidi and you said -- you asked what was denied?

A    Correct.

Q    And then you got a response from her, and then the next day, you said -- you asked Heidi if working remotely would be a possible accommodation, right?

A    Correct.

Q    Okay.  After you asked that, Heidi spoke with you on -- Heidi Miller spoke with you on November 16th, 2021, right?

A    Say -- what was the date again?

Q    November 16th, 2021.

A    Again, I'm still on the pages about Ramona and the remote positions that she had stated that were available.

Q    Yeah.  So if you go to --

A    So then what was your next --

Q    -- Takeda -- if you go to Takeda 44.  So on --

A    Yeah.

Q    -- on November 17th, 2021, you sent an email to Ms. Miller and you say -- you see the language where it says:  With regards to our conversation yesterday?

A    Yes.

Q    Okay.  And so on November 16th, 2021, you had a call with Heidi Miller, right?

A    I believe.

Q    And during that call, Ms. Miller informed you that Takeda was going to grant your accommodation of working remotely, right?

A    Okay.  Yes, I did -- I received all of a sudden, hours before, a calendar invite for a call.

Q    Okay.  And during that call, she told you that they were going to accommodate you by letting you work remotely, at least initially for a period of 90 days, right?

A    She told me that my disability had been approved, that Legal didn't know what to do with me.

Q    Did she literally --

A    I don't even -- that's what she said and because it was -- I had received two denial emails.  I asked for an appeals, work remote, anything, and then there were two denial emails, and then said that Legal approved it, but didn't know what to do with me.  And there would be a 90-day accommodation, hence do I need

to do anything with the vac system.  I don't want to not miss dotting an I or crossing a T if I have to report something.

  Q The two emails that you're talking about, are those the same -- the ones in this thread, the one from November 10th --

  A I don't know.  One is definitely -- I don't know.

  Q Okay.  Are you -- are you -- sitting here today, are you aware of any emails that -- that you're characterizing as denials other than the one on 486 that says -- that's from November 10th at 10:16 and the one from November 11th, 2021 at 11:59 --

  COURT REPORTER:  Eleven?

  MR. McKINLEY:  At 11:59 a.m.

  A They appear to be.

BY MR. McKINLEY:

  Q Okay.  You said -- you said that Ms. Miller said Legal didn't know what to do.  Is that you characterizing her or did she use those exact words?

  A Those words.

  Q Okay.  But she had told you that you were -- your accommodation was being granted for a period of 90 days, correct?

  A Correct.

Q    Okay.  And -- and that accommodation was that you were going to be allowed to work remotely and that you would be exempt from the requirement that you be vaccinated, right?

A    I don't recall.  I believe that then we had to have a follow-up call regarding what exactly the accommodation would look like and that HR and then management would outline various things.

Q    Okay.  I mean, but you agree with me that you were -- that as part of your accommodation, you were ultimately, one, allowed to work remotely, and two, you were not required to get the COVID vaccine, right?

A    Correct.

Q    Okay.

A    I still had to do twice-a-week testing.

Q    Okay.  And even though initially you were approved -- and you were never disciplined for not being vaccinated, right?

A    Meaning?

Q    You never -- there were various deadlines for complying with the vaccination policy and you were never disciplined for not being vaccinated at any point prior to your accommodation being granted, right?

A    Disciplined in what way, shape or form? Specifics.

Q    The exact way the discipline normally means, that you got a write-up given to you --

A    There was -- I did not get written up.

Q    Okay.  You did not -- you did not -- you weren't terminated, right?

A    Correct.

Q    Okay.  There was -- you're not aware of any document that was created that criticizes you in any way for not being vaccinated when the deadline for being vaccinated passed, right?

A    There was an email that got sent out of all the terminated employees that my name was on.  It was an email that accidentally got sent out the night before everyone was supposed to be fired.  And then all of a sudden, because I had a medical accommodation in the process, they had said to stay remote, to get to my medical accommodation.

Q    Who sent that email?

A    I have no idea.

Q    Okay.  Why haven't you produced it?

A    I believe it's been -- I produced.

Q    It hasn't.  I can tell you it hasn't.

A    Okay.  I can if it's there.

Q    Okay.  And do you have any reason to think that your name being on that list was anything other

than a mistake?

A    I don't know.

Q    You weren't fired, right?

A    It was hours before I was supposed to be fired, so no, I was not.

Q    Well, your accommodation was also granted within 48 hours of the deadline, right?

A    No.  I had -- this was different.

Q    Are you saying that the original deadline, not your -- not the second deadline they gave?

A    No.  They had extended mine because they were -- on November 1st Takeda was firing everyone.

Q    Okay.

A    So instead of -- they extended mine, hence Heidi stating work remote until we will get to your accommodation.

Q    Okay.  But ultimately, nothing about your employment status changed, right?

A    No.

Q    No, nothing changed or --

A    My employment status?

Q    Yeah.  Nothing -- nothing about your employment -- your status as an employee with Takeda changed because you were not vaccinated on November --

A    Correct.

Q    Okay.  And even though you were granted that initial 90-day exemption from the COVID vaccine requirement, that extension kept being extended further until you -- until the policy was no longer in place and you were no longer required to be vaccinated, right?

A    So every 90 days they would review.

Q    Um-hum.

A    So --

Q    And --

A    -- you don't know if you have a position or not a position every 90 days.  And it wasn't 90 days.  Sometimes it would be 110 days.  Sometimes they'd get busy and you'd be emailing.  It was pretty stressful, pretty stressful, and at least it -- HR's busy.  There were only two people in the neuroscience business unit that had -- on the sales force that had accommodations.

Q    That you're aware of, right?

A    I was told that me and someone in California.

Q    Are you talking about for the COVID requirement or --

A    Yes.

Q    You don't know what -- what accommodation requests HR is dealing with that are not COVID related, right?

A    I just know that there were two individuals

working remote, me and then someone in California in the whole neuroscience business unit.

Q    Sure.  But my question is you don't know -- you don't know what other accommodations --

A    Correct.

Q    -- for any condition might have been out there, right?

A    (Nods head.)

Q    Is that a yes?

A    Yes.  Oh, yes.

Q    And every time that 90 period -- 90-day period came up, you were approved, right, for a further extension?

A    Yes.

Q    Okay.  And you were never disciplined at any point during the time of your accommodation request for not being vaccinated, right?

A    Correct.

Q    Okay.  And ultimately -- well, please look at -- I'm going to jump ahead a few here.

A    Yeah.

        (Defendant's Exhibit 28 was marked for identification.)

BY MR. McKINLEY:

Q    I'll show you what I'll mark as Exhibit 28.

Exhibit 28 is a true and correct copy of an email from Heidi Miller to you, correct?

A    Yes.

Q    And on May 30th, 2023, Ms. Miller told you that Takeda's COVID vaccination requirements for field-based employees were being suspended, right?

A    Yes.

Q    And so at that point, you were cleared to return to face-to-face meetings with customers, correct?

A    Yes.

Q    Okay.  And so you agree once this was announced on May 30th, 2023, there was no longer any further need for you to be accommodated, right?

A    Yes.

Q    Okay.  You are still employed with Takeda today, right?

A    Yes.

Q    And as you're here today, you have not received the COVID vaccine, correct?

A    Correct.

Q    Okay.  And Takeda has never taken any action, you know, never issued you a discipline or terminated you for not receiving the COVID vaccine, right?

A    Correct.

Q    And -- okay.

Shannon Olson                    August 15, 2024
Olson, Shannon v. Takeda Pharmaceuticals America, Inc.

Page 192

MR. McKINLEY:  Do -- we're good?  Break?

THE VIDEOGRAPHER:  Now is a good time.

MR. McKINLEY:  Now is a good time.  We'll take a, what five, five-minute break?

THE VIDEOGRAPHER:  The time is 2:28 p.m. and this is the end of unit number three.

(Recess from 2:28 p.m. to 2:40 p.m.)

THE VIDEOGRAPHER:  This is the start of media unit number four.  The time is 2:40 p.m. and we are back on the record.

BY MR. McKINLEY:

Q    Okay.  Ms. Olson, we'll jump to something a little different now.  Do you agree with me that you don't -- you've never been responsible for, you know, handling or -- well, handling disability claims that come in for Takeda workers, right?

A    Right, yes.

Q    And do you agree that you don't have personal knowledge about Takeda's policies or procedures related to the short-term disability requests?

A    Don't have about their policies and procedures?

Q    About the way -- about the, you know, the way they process, to the extent they do at all, short-term disability requests?

A    I'm not sure of the question.  We're given a whole entire --

Q    My question just is have you ever had any personal -- I mean, apart from what the policy -- what -- let me step back.

A    Um-hum.

Q    Do you have any personal knowledge about how short-term disability claims are processed for Takeda?

A    No.

Q    Okay.  And do you -- do you understand that Takeda uses Lincoln to handle short-term disability requests?

A    Yes.

Q    Okay.  To your knowledge, are you aware of whether Takeda has any conversations with Lincoln about disability determinations?

A    I do not know.

Q    Okay.  And do you know whether -- do you know what Takeda's policies are when it comes to paying individuals who have made short-term disability claims?

A    What their policies are?

Q    Yeah.

A    Again, I can look them up.  They're in the -- I can't --

Q    Yeah.

A    -- say them offhand.

Q    Okay.  Do you have any reason to, just based on your personal knowledge, to dispute that when an employee has submitted a short-term disability claim, Takeda pays them until Lincoln Financial makes a determination on whether the disability is going to be approved or denied?

A    Yes.

Q    Okay.  You do have reason to dispute that or you agree that they --

A    No.  Yes, that's correct.

Q    Okay.  And do you agree or do you have any reason to dispute that if Lincoln Financial denies an employee's short-term disability claim, then it is Takeda's policy to stop making payment until -- unless and until an appeal is made and granted?

A    I didn't know, but I learned.

Q    Okay.  Okay.  And do you have any reason to dispute that that's the same policy that applies to --

A    No.  I --

Q    -- everybody across the company?

A    I don't know.

Q    Okay.

A    I don't know.

Q    All right.

A     And actually, no.

Q     You don't have any reason to dispute it?

A     I do have reason to dispute.

Q     What do you have to dispute?

A     Well, if you're -- never mind.  We'll go on with the -- the question.  I don't know.  I don't know if it's the same across the board.

Q     Okay.

THE VIDEOGRAPHER:  I'm sorry.  Can you fix your -- yeah, it's pushing into your shirt.

THE WITNESS:  Oh, sorry about that.

THE VIDEOGRAPHER:  It was just making a lot of side noise.

THE WITNESS:  Sorry about that.  Better?

THE VIDEOGRAPHER:  (Nods head.)

THE WITNESS:  Okay.

BY MR. McKINLEY:

Q     And do you -- do you agree that you don't have any reason to dispute that if Lincoln Financial has denied an STD claim, STD meaning short-term disability -- I guess I shouldn't use that acronym anymore probably, but if the employee appeals and wins the appeal, that it is Takeda's practice to retroactively pay all of the amounts that should have been paid or could have been paid during the term of the

denial in a lump sum payment?

A    I did not know that.

Q    Okay.  But do you -- do you know that now?

A    Yes.

Q    Okay.  And Ms. Olson, I -- you worked for the company a long time, but am I right that you've taken three short-term disability leaves or do you think it's been more?

A    In what period of time?

Q    Well, I guess my question initially is about your entire employment, so let's start there.  Do you think you've taken three or more?

A    More.

Q    Okay.  How many do you think you've taken?

A    Six.

Q    Okay.  And since 2019 you have taken three, right?

A    Correct.

Q    The first was from January 8th, 2019 through January 28th, 2019, right?

A    Correct.

Q    And Takeda allowed you to take that leave, right?

A    What do you mean allow?

Q    You filed for STD leave and it was -- I mean,

Lincoln approved it, right?

A    Eventually.

Q    Okay.

A    At -- um-hum.

Q    Well, what were you going to say?

A    Takeda also offers an extended -- what is it called when you -- I can't remember.

Q    FBLA?

A    Yes, that I had no idea about.  So that was my younger sister.  So at the 11th hour, you know, the last day, Lincoln approves it.  You just don't even know.  It's not a great process.

Q    Okay.

A    Because it's mental health and not a broken leg.

Q    Sure.  Do you have any reason to dispute that the amount of time that it takes Lincoln to approve or deny something is Lincoln's decision, not Takeda's?

A    No.

Q    And do you have any personal knowledge of Takeda doing anything to slow down the approval for any of your disability requests?

A    I don't know.

Q    I am aware that the questions I'm about to ask are I'm sure sensitive, so I'm going to try to navigate

that, but you took that January 2019 leave because your sister had died, correct?

A    Um-hum.

Q    And you were depressed about that, right?

A    Yeah.

Q    And is it -- is it fair to say --

A    It was two weeks I took.

Q    Two weeks.  Does that -- it was two weeks you took, but the -- the impact of your sister dying lasted well beyond the two weeks, right?

A    Oh, yeah.

Q    Does it still impact you today?

A    Not as much.

Q    Okay.

A    But yes.

Q    Okay.  You were paid the entire time you were on that short-term disability leave in January 2019, correct?

A    Correct.

Q    Okay.  The second time you took disability in that 2019-on period was from September 16, 2019 to October 7, 2019, correct?

A    I don't know the exact dates, but it sounds -- it sounds correct.

Q    Okay.  And that second leave was, again,

because of anxiety and depression related to your sister's death, right?

A    Anxiety and depression for sure, um-hum.  I just wasn't functioning, hence when I hit the car, so --

Q    Did you hit the car in that --

A    Takeda's -- in my company car.

Q    Well, my question is -- I want to make sure we're focusing on the right time period.

A    Yeah.

Q    Was it that September-October 2019 period --

A    Yes.

Q    -- where you crashed the car?

A    Um-hum.

Q    So that's a yes, just for --

A    Yes.  Apologies.  Um-hum.

Q    Okay.  And so when you crashed your car, I mean, you said anxiety and depression.  Are you saying that it wasn't related to your sister's --

A    No.  Yeah, I -- I don't know.  Yes, I'm positive it was.  You know, it's -- you just try to -- again, having a child and taking a leave is much easier than taking a leave because you're not functioning.

Q    Okay.  And, I mean, the not functioning, we mentioned the sister.  I mean --

A    Um-hum --

Q    -- was it -- was it partially because of what you -- you know, the situation with your ex?

A    He can compound some things.

Q    Okay.  Were there any other major stressors at the time, like, that was -- that were making it so that your depression and anxiety were such that you couldn't function?

A    I don't even know.

Q    Okay.  And again, when you took that leave from September to October 2019, you were -- you were paid for the entire time you were on that leave, right?

A    Yes.

Q    Okay.  Did you ever talk to anybody at Takeda, not Lincoln but Takeda about your sister's death?

A    I don't know.  Oh, meaning?

Q    Did you ever say to -- did you ever say to anybody at Takeda --

A    Yes.

Q    Well, let me -- let me -- that is a broad question, so let me ask it this way.  Did you ever have a discussion with Jodi Gayle-Garcia about your sister's death?

A    She wasn't my manager when my sister died.

Q    Did you ever have --

A    Yes.

Q    -- any conversation?

A    Yes.

Q    Did you ever have a conversation with Greg Crouch about your sister dying?

A    Yes.

Q    Okay.  Was Greg the -- were you under Greg when your sister died?

A    I believe so.

Q    Do you know for sure?

A    No.

Q    Okay.  Do you think you talked to Greg about it around the time it happened or do you think you talked to him much later?

A    I don't know.

Q    Okay.

A    I don't know.

Q    Did you ever talk to Matt Hand about your sister's death?

A    I'm sure.

Q    Okay.  And do you remember any specific conversation you had with Jodi Gayle-Garcia about your sister's death?

A    Uh-uh.

Q    Okay.  Do you remember any specific conversation you had with Matt Hand about your sister's

death?

A    No.

Q    Okay.  One of the things that I saw in the leave records that kind of outline your communications with -- with Lincoln is that they indicate you had -- you had suggested that talking about your sister's death was one of the things that made you very uncomfortable. Is that accurate?

A    No.

Q    No?  Talking about your -- or being asked about your sister's death --

A    No.

Q    -- did it contribute to your depression?

A    No.

Q    Okay.

A    No.

Q    Were you openly talking with your coworkers about her death when it happened?

A    I'm trying to remember who was on my team. Yes, I -- yeah, yes.

Q    Okay.  Would --

A    My district manager gave me two extra days of bereavement.

Q    Okay.  How -- how long after your sister's death do you think Jodi took over?

A    Colleen died in December.  That April, Jodi took over.

Q    Okay.

A    April or March.  April Jodi took over, um-hum.

Q    Did --

A    Hence, why I said when -- go ahead.  I'm sorry.

Q    No.  Go ahead.

A    No.  Go ahead.

Q    Did you -- your district manager gave you two extra days of bereavement.  Did your district manager say anything else to you about the situation?

A    I -- no.  I had emailed HR and I said, Can I have a copy of the bereavement policy?  And then I emailed Mark and I said, hey -- my family was in Connecticut, so there was travel involved, et cetera, and it didn't happen immediately, but -- so I said, you know, can I have additional bereavement?  And then there's actually additional bereavement at the -- your district manager can go and initiate.

Q    Um-hum.

A    So if you just transition your young sister, hey, Shannon, this is available to you, why would you not -- it -- I didn't know about that until I was researching things further, but no.  And then it's how

much time do you need?  Well, it has to be consecutive and I guess it was a Wednesday, so I'm like, I guess it's two days.

Q    Who was your district manager at the time?

A    Mark Tate.

Q    Okay.  Did Mark ever say anything like, I'm sorry for your loss, or anything like that?

A    He sent me a Takeda resource group type of thing, an 800 number to call.

Q    Okay.  Did -- did anyone else at the company say "Sorry for your loss" or anything along those lines?

A    I don't -- I don't remember.  I -- as soon as I came back, Takeda -- Takeda did a layoff, so yeah.  I mean, my friends, you know, that used to work for the organization, I'm trying to even remember who was in my district at that point, but it wasn't a, you know --

Q    Do you think -- do you think --

A    It's a documented email to Mark.  Like, we're not talking a -- while a 98-year-old grandmother, it's hard to lose.  A 35-year-old sister, you know?

Q    Right.  Do you think that it would have been appropriate or inappropriate to -- for your leaders, including your district manager, to be talking to your coworkers about your sister's death without you involved in that conversation?

A    I think -- have a conversation with the employee.  We want to support you.  How can we support you?

Q    Yeah, my question is a little different.  I'm saying do you think -- and I agree that would be appropriate.  My question is do you think that it would be appropriate or inappropriate for a manager to be talking to other -- to your coworkers about your sister's death?

A    I don't know.  That's a very -- a lot of variables go into that.

Q    Do you think one of them --

A    I can't say yes or no.  It depends upon the individual.

Q    Do you think it would be -- do you think it would have at least thrown you off if you found out that was happening without -- without him running it by you or without somebody running it by you first?

A    No, it wouldn't surprise me.  I mean --

Q    Or, you know -- okay.

A    I mean, I had a brother who committed suicide, so I'm pretty -- working in antidepressants, Takeda or Trintellix, you know, I mean.  So it's not like, Shannon, motivate the district to get them to care.  Okay.  But then, hey, we'll give you two days and then

have you keep calling in if your leave is going to be
approved.

Q   Let me put it this way.  Do you feel like --
do you feel like personal situations relating to your
family are your story to share or the story for somebody
else in the company to share?

A   I -- again, it depends.  I don't know.  I
think it just depends on the situation.

Q   Okay.  So we talked about two disability
leaves so far.  The third one was from April 9th, 2021
to July 1st, 2021, correct?

A   Um-hum.

Q   All right.  I'm going to -- or well --

A   And please keep in mind, this is in a 25-year
career.  I'm not a take-a-leave hop-in type of girl, you
know?

Q   I understand.

A   Okay.

Q   And that April 9th, 2021 leave --

THE VIDEOGRAPHER:  (Sneezed.)

THE WITNESS:  God bless.

THE VIDEOGRAPHER:  Thank you.

BY MR. McKINLEY:

Q   -- was still, at least in part, I mean, it was
from -- for depression still, right?

A    Um-hum, yes.

Q    And some of that was from your sister's death, right, still?

A    It -- no.  Well, yes and -- I'm sorry.  Continue.

Q    Well, you were saying and what else?

A    You were saying my sister's death and what?

Q    And am I right that your -- your -- you had -- your dad had terminal cancer?

A    Um-hum.

Q    Okay.  That was contributing to your depression --

A    Um-hum.

Q    -- right?  Is that a yes?

A    Yes.  Oh, sorry.  Yes.

Q    And you were also struggling with the fact that your daughter had anxiety, right?

A    Yes.

Q    Okay.  And also, general work stress was contributing to your depression, right?

A    Yes.

Q    Okay.  You have -- you don't know what, if anything, Takeda said to Lincoln about your April 2021 short-term disability request, right?

A    No, I don't, no.

Q    Okay.  And that's -- you're saying no, you don't know?

A    No, I do not know.

Q    Okay.  And is it fair to say that you don't personally know whether Takeda had any input into the initial denial of your short-term disability request in April of 2021?

A    I don't know.

Q    Okay.  And you -- you requested short-term disability leave because you at the time believed you had been mentally and physically unable to do your job for a few months, right?

A    Um-hum.  Oh, yes.

Q    And you agree that that had impacted your work capacity?

A    Yeah.  I don't know.  Yes.  Yes.

Q    Okay.  And do you -- do you agree that your depression had impacted your productivity?

A    Yes.

Q    Okay.  Do you agree that at the time, you were not -- at the time you requested your leave, you weren't able to problem solve?

A    I don't know.

Q    Okay.  I'm going to --

A    Yes, I guess.  I mean --

Q    Okay.

A    I did reach out numerous times and asked for help prior to that one and wasn't given and --

Q    And do you agree that when you went out on -- when you requested disability leave in April of 2021, you had not been able to have positive interactions for several months?

A    Positive interactions?

Q    Um-hum.

A    With?

Q    Anybody.  Work-related positive interactions?

A    No, I've had -- no.

Q    Okay.  I'm going to show you -- this will be marked as Exhibit 32.

A    Um-hum.

(Defendant's Exhibit 32 was marked for identification.)

BY MR. McKINLEY:

Q    I'll just open it to the page I want you to look at.  Okay.  If you can look at -- and let me get it on the screen too.

I will represent to you that Exhibit 32 --

A    Um-hum.

Q    -- is the short-term disability file for April of 2021 that was received from Lincoln.

A    Um-hum.

Q    I ask you to look at Exhibit -- or sorry -- at page -- or Takeda 564 and -- Takeda 564 or 0000564 through 565 is a letter that you wrote as your appeal of the denial of your short-term disability leave, right?

A    Correct.

Q    And in this letter, you wrote -- give me one second.  If you could look at Takeda 0000565?

A    Um-hum.

Q    When you submitted your appeal to Lincoln, you wrote:  I verbally sell my medications using clinical data and studies, answer questions, problem solve -- problem solve and positively interact and foster relationships.  Right now I am not able to do this.

So do you agree that you represented to Lincoln in your appeal that you were not able to positively interact?

A    Right.

Q    Okay.

A    Correct.

Q    Was that accurate when you wrote that?

A    Yes.

Q    Okay.  You also mentioned in your appeal that you were not able to foster relationships at work.  Was that -- was that accurate when you wrote that?

A    Yes.

Q    And you also wrote that you could not engage in clinical discussions at work.  Was that accurate when you wrote that?

A    Yes.

Q    And so how long before you submitted your short-term disability leave request on April 2021 had you struggled with things like positively interacting and fostering relationships at work?

A    I'm not sure.

Q    Okay.  Do you think it was, like, days or months?

A    I'm not sure.

Q    Okay.  You noted in this letter that you were making -- you make mistakes where mistakes cannot be made.  Was that accurate when you wrote that?

A    Yes.

Q    And what did that mean?

A    My -- I'm not sure.  I would assume samples or expense reports or -- I think there was a -- there was a call with Matt that I had and I didn't -- I didn't realize it was for -- he was certifying me in something and I didn't realize it was for that.  And so then he got really mad because he's like, you're unprepared, and I didn't -- I was like, oh, my gosh, I don't even know

that that -- I guess I had forgotten about it.  So it was just basic stuff that you can't --

Q    Okay.  You also wrote that you often miss deadlines and forget meetings.  Was that true when you wrote that?

A    Yes.

Q    Okay.  Do you remember how long you had been having issues with deadlines before you submitted your leave request?

A    I think that was with expense reports.  I'm not sure.

Q    Okay.  I'm going to show you now what I will mark as Exhibit 33.

A    Um-hum.

(Defendant's Exhibit 33 was marked for identification.)

BY MR. McKINLEY:

Q    All right.  Exhibit 33 is a true and correct copy of the letter that Lincoln Financial Group sent to you informing you of its initial determination that you would be denied for short-term disability leave --

A    Um-hum.

Q    -- I guess in May of 2021, correct?

A    Yes.

Q    Okay.  And in the letter, Lincoln outlined, at

least from its standpoint, the reasons for why it was denying your request, right?

A    Yes.

Q    And is it your understanding that they -- that their concern at least at this time was that they felt that there was a lack of abnormal objective findings to support a disability request?  At least that's what they wrote here, right?

A    Yes.

Q    Okay.  Do you know what -- do you know what lack of abnormal objective findings means?

A    I can gather.

Q    Okay.  I mean, do you know what they meant, though?

A    No.

Q    Okay.  And they also told you that -- that you had the ability to appeal, right?

A    Yes.

Q    Okay.  And you did appeal?

A    Um-hum.

Q    Correct?

A    Yes.

Q    All right.  And then I'm going to show you what I'll mark as Exhibit 34.  And let me take a step back.

Did anybody at Lincoln ever tell you that -- did they ever say they thought you were faking?

A    No.

Q    Okay.  And nobody's ever told you they thought you were faking, right?

A    Not that I remember.

(Defendant's Exhibit 34 was marked for identification.)

BY MR. McKINLEY:

Q    Okay.  So I'll show you Exhibit 34.  This is -- give me one second so I can share it.

Exhibit 34 is a true and correct copy of the letter that Lincoln Financial Group sent to you on June 4th, 2021 letting you know that after considering the appeal letter we looked at a few minutes ago, your -- it had determined that your benefits were payable, right?

A    Yes.

(Defendant's Exhibit 30 was marked for identification.)

BY MR. McKINLEY:

Q    Okay.  And now I'm going to show you what is going to be marked as Exhibit 30.

All right.  Exhibit 30 is a true and correct copy of a number of pay stubs for you, correct?

A     Yes.

Q     Okay.  And you -- if we look at the paystub starting at Takeda 0000792, you agree that you received your full pay for the week of 4/5/21 through -- well, I'll word that differently.

You -- you agree that you received your full pay for the week of April 5th, 2021 through -- or time period of April 5th, 2021 through April 18, 2021, correct?

A     Yes.

Q     Okay.  If we go to the --

A     No.

Q     No?

A     It says zero.

Q     You're looking at --

A     The check.  Well, they all do.  So probably just because it's direct deposited, then, okay, maybe, so --

Q     Do you see where it says Regular, 80 hours?

A     Yeah.  I'm looking down at the bottom.

Q     Yeah.

A     Okay.

Q     All right.  And then on the -- if we go to the next page, you -- you agree that you received the full 80 hours of pay for the pay period from April 19th, 2021

through May 2nd, 2021, right?

A    Yes.

Q    Okay.  And then we said before that your denial -- the denial you received from Lincoln was on May 4th, 2021, correct?

A    Yes.

Q    Okay.  And so the -- starting with the pay period -- the three pay periods after that pay period ending May 2nd, 2021, you were not initially paid during those weeks, right?

A    I don't have the exact dates, but yes.  I don't have the exact dates.

Q    Yeah.  So, I mean, we can go -- we can look at 794 on --

A    Um-hum.

Q    -- Exhibit 30 and we see the pay period from 5/3 to 5/16/2021 and, you know, under Earnings, you see gross pay zero, right?

A    Um-hum.

Q    And that's -- you weren't paid during that pay period, right?

A    Yes.

Q    Okay.  At least initially.

And then if we go to the next page, you see the pay period of May 17th, 2021 through May 30th, 2021,

correct?

A     Yes.

Q     And during that period, you also weren't initially paid, correct?

A     Yes.

Q     And then we go to the next page.  You see May 31st, 2021 through June 13th, 2021, and you were not initially paid during that pay period, right?

A     Yes.

Q     Okay.  And then -- I'm sorry.  I think I might have shown you the wrong paper.  797 is actually the right one.

Do you know what -- the one I just showed you -- let's take a step back.  I showed you one and it says -- it actually doesn't have your earnings.  It says something that -- it says Fleet Taxable.  Do you know what that is?

A     I think it's the vehicle.

Q     Okay.  So the one that actually was about your pay would have been --

A     794.

Q     794.  Okay.

A     Is that thunder?

Q     I think so.

A     Is your flight tonight?

Q    It's at eight.

A    I'm just kidding.

Q    But anyway, at the end of the day, you weren't paid for that -- at least to your knowledge, you weren't paid for the time period from 5/31 through 6/13/2021, correct, initially?

A    Five -- it would be five O -- 5/03/2021.

Q    Correct.

A    Basically, the month -- I see all of May from what I'm looking at right here.

Q    So it was three pay periods, right?

A    Um-hum.

Q    And then your -- we said your -- your disability leave was approved by Lincoln, right?

A    Yes.

Q    And on -- if we go to Takeda 0000799 --

A    Um-hum.

Q    -- on -- for the pay period of 6/14 to 7 -- or it says 6/14 to 7/12, they sent -- they paid two 40 hours to cover the periods that had been denied, right, initially?

A    Yes.

Q    Okay.  So even though there was a delay because of the denial, eventually you were paid all of the time that you were out, correct?

A    Yes.

Q    Okay.  And are you aware of any person whose pay was handled differently when they similarly got an initial denial from Lincoln of a --

A    I don't know.

Q    Okay.  What did you do while you were on that April 2021 leave?

A    Called Lincoln a lot about this leave. Stephanie had to call them too.

Q    Okay.  Anything else?

A    I had gone up north, I think.

Q    Okay.  Anything else you remember doing on that --

A    I don't know.

Q    Okay.  Is there anything that would jog your memory?

A    I don't know.

Q    Okay.  All right.  Ms. Olson, do you -- what does DEI stand for?

A    Diversity, equity and inclusion.

Q    Yes.  And what does DEI mean to you?

A    I don't -- I don't know.

Q    Okay.  Are you able to define it?

A    Yes.

Q    Okay.  And what is -- how would you define

DEI?

A    Honestly, I don't know.  It's not something I'm -- I mean --

Q    In your -- in your Amended Complaint, you use the -- you use the phrase DEI or the acronym DEI --

A    Um-hum.

Q    -- 27 times.

A    Okay.

Q    Are you saying you don't know what you were referring to when you put that in your Complaint?

A    No.

Q    Okay.  What were you referring to?

A    Takeda specific DEI policies.

Q    And -- but you're -- are you able to -- are you able to define what DEI means when you say DEI policies?

A    What DEI means to me is different in how it's represented in Takeda.

Q    What does DEI mean to you?

A    It just should be how it should be.  I mean --

Q    What does that mean?

A    Diversity, equity and inclusion, different people all equal together.

Q    Okay.  And are you -- you said that's somehow different than what Takeda represented.  How is that

different than what Takeda has represented?

A    It's very segregated.  And so it's not about solving, in my opinion.

Q    What has Takeda itself segregated, in your view?

A    The Takeda resource groups.

Q    Are you saying that Takeda has -- by resource groups, do you mean Affinity groups?

A    I'm not sure what that is.

Q    Do you mean -- well, you, for example, are in a group that -- is it Faith at Work?

A    Yes.

Q    Is that a resource group?

A    Yes.

Q    Okay.  So you think that -- do you think it's somehow problematic to allow employees to join groups that coordinate with what they self-identify as?

A    No.

Q    Okay.

A    No.

Q    Then I guess my question is why are you characterizing that as segregation?

A    Because I joined a lot of them and sat in on calls and have had, you know, pitched ideas for other resource groups that are not represented in there.

Q    What do you mean?  What's an example?

A    Moms.  So instead, it was labeled Caregivers which is already there.  But, you know, more moms than -- look at the percentage of sales reps.  There's a percentage of sales reps that are females, that are moms, that are single moms, et cetera.

Q    Okay.  Do you -- do you think there are aspects of who you are that would tic DEI -- you know, tic DEI boxes, if that's the right way to say it?

A    I don't know what you mean.

Q    Okay.  Do you agree with me that diversity, equity, inclusion includes things like gender?

A    Yeah.

Q    Okay.  Do you agree with me that it includes things like religion?

A    Yes.

Q    Do you agree with me that includes things like disability?

A    Yes.

Q    Okay.  Do you agree with me that it includes things like age?

A    Yes.

Q    Okay.  Are you aware of any -- have you ever seen in the policy manuals that we've looked at already or elsewhere a written DEI policy?

A    Yes.

Q    Where?

A    I just saw it the other day on the Takeda site and it states what they do with the information that was put in people's profiles on Workday.

Q    Have you produced that document?

A    I just found it the other day.

Q    Okay.  Where -- where did you see that?

A    I don't even remember where.  It was -- it's on the Takeda, the main that employees have access to.

Q    Okay.  Do you have any idea if that was there in 2021 or before?

A    I don't know.

Q    Okay.  What does the policy that you say you saw say about what's done with data put in Workday?

A    I haven't read -- I don't know.  I haven't read through the whole thing.

Q    Okay.  I mean, do you remember anything about what it says about what happens with the data?

A    No.

Q    Okay.  Do -- apart from that, whatever that is that we don't have in front of us, are you aware of any other written DEI policy at Takeda?

A    I don't know.

Q    Okay.  Are you aware of any other informal or

unwritten DEI policy at Takeda?

A    I don't know.

Q    And when you say "I don't know," are you saying "I don't know if there is one"?

A    I know that there's something I printed out that has the whole entire DEI philosophy, et cetera.  I just haven't gone through it all.  What time frame are you asking about?

Q    At any point, have you -- or have you been aware of an unwritten DEI policy at Takeda?

A    So in 25 years?

Q    Yeah.  I mean, are you aware of --

A    I don't know.

Q    Okay.  Are you -- are you aware of any in the last five years?

A    Unwritten?

Q    Unwritten.

A    I don't know.

Q    Meaning you don't know if there's one or --

A    I don't know.

Q    Yeah, I just need -- I need us to be clear on what you're answering.

Are you saying you don't know -- you don't know if you know or you don't know if there is a policy?

A    You said an unwritten?

Q    Yeah.

A    I do not know.

Q    You don't know that one exists?

A    An unwritten?

Q    Yeah.  So you're --

A    Correct.

Q    Okay.  Have you ever had any role in enforcing any DEI policy at Takeda in any way?

A    No.

Q    Have you ever had any role in assessing whether any DEI policy has ever been complied with at Takeda?

A    No.

Q    Okay.  Have you ever seen any sort of DEI-related statistics at Takeda?

A    Yes, on the website.

Q    What statistic did you see?

A    I do not remember.

Q    Okay.  Did -- and I want to be clear.  Are you saying that you saw a policy that said something about what happens with data or are you saying you have seen actual raw numbers?

A    A number of male versus female.

Q    Okay.  So you've seen -- you have seen --

A    It's on their site, yes.

Q    What -- I mean, let me -- you've seen the number, the breakdown of male versus female?

A    No.  In leadership.  It's right on their site.

Q    Okay.  Have you ever seen or heard from anybody at Takeda in a decision-making role that any DEI consideration has ever played a role in any hiring decision?

A    I don't know.

Q    You don't know if it did or you don't know if you heard it?

A    I -- I -- I don't know.

Q    Yeah, I need you to answer that question, though.  You don't know if you heard it or you don't know if it did happen?

A    What I have heard, I do not know if it's a -- to answer your question.  Jodi always -- you know, I've got the most diversity, equity inclusion, look at this team, look at -- you know.  And it's like, okay, okay.

Q    Did she ever say anything other than I've got a diverse team?  Did she -- let me take a step back.  Did Jodi ever tell you that she ever made a hiring decision based on somebody's race?

A    No.

Q    Did Jodi ever tell you that she made any disciplinary decision based on somebody's race?

A    No.

Q    Okay.  Has Jodi ever said anything to you that indicated that she's ever made any work-related decision on the basis of race?

A    I don't know how to answer that.  She had told me that she was told in the training department, and I can't remember when, to basically chill out, did she want her legacy to be that, and --

Q    Did she want her legacy to be what?

A    She was, I guess, very vocal in 2020, 20 -- you know, 2021, and hence, then she had -- you know, was moving onto a different organization.

Q    Who were you saying told that you?

A    Jodi told me that.

Q    And when did Jodi tell you that?

A    On a call.  I believe I congratulated her.  Or no.  It was prior to her leaving and we were talking -- we had talked about something, some question I had or something, and, you know, I mean, she had said someone in training had just told her to, like, simmer down, keep it down some because she was just getting out and did she want her -- did she want her legacy to be that.

Q    To be what?

A    I guess very outspoken about DEI and everything.

Q    Okay.  I guess, you know -- understood.  Apart from the fact that she was outspoken on DEI, had you heard her say anything that indicated to you that she was actually making decisions that were work-related on the basis of whether somebody was a particular race?

A    I don't know.

Q    Does that mean you don't know if she said it or -- I'm asking you right now sitting here --

A    I don't remember.

Q    Okay.

A    Aside from what I had just said, I -- I mean, I'd have to think.

Q    Okay.  Is that -- I mean, if I gave you a few minutes right now, would you be able to think of anything?

A    Keep going and then if it come -- comes in, I'll blurt it.

Q    Ms. Olson, I'm going to show you what I'll mark as Exhibit 35.

A    Um-hum.  Um-hum.

       (Defendant's Exhibit 35 was marked for identification.)

BY MR. McKINLEY:

Q    Ms. Olson, the text messages that are reflected in Exhibit 35 are a true and correct copy of

the full text history between you and Greg Crouch --

A     Um-hum.

Q     -- between January 24th, 2020 and March 30th, 2022, correct?

A     Okay.

Q     Is that you agreeing or --

A     Yes.

Q     Okay.  And do you -- just looking at this history, if we go to -- it's hard to read the numbers with the dark here, but I think if we go to -- if we go to the second page, do you see where you sent a message to Greg Crouch at January -- on January 25th, 2020 at 10:21 a.m.?

A     Yes.

Q     Okay.  Do you agree with me that -- I'm sorry. Let me -- I did that in reverse.  These texts are from Greg Crouch.  So on January 25th, 2022 at 10:21 a.m., Greg Crouch sent you a text, right?

A     Which one are you going with?  This one?

Q     Yeah.

A     Okay.

Q     Yeah, so the first -- on the second page --

A     Yes.  Yes.

Q     Okay.  And then do you agree with me that between January 25th, 2020 at 10:21 a.m. and

October 14th, 2021 at 11:43 p.m. -- or a.m., Greg Crouch did not send you any texts at all?

A    I don't know.  I do not know.

Q    Well, do you see any here between those dates?

A    I don't see any here.

Q    Okay.  Do you have any -- any documents in your possession that suggests there are any texts between January 25th, 2020 and October, October 14th, 2021 from Greg Crouch?

A    I don't know.

Q    Okay.  And -- and again, we talked about before, you haven't -- you haven't checked to see if you have those texts, have you?

A    Right, yes.

Q    Okay.  Do you know when George Floyd died?

A    2020 -- wasn't it 2021?  2020 and then I don't know the -- no, I don't know.

Q    Do you have any reason to dispute that he died on May 25th, 2020?

A    No.

Q    Okay.  And do you agree with me that there is no text message in this text history that's Exhibit 35 from Greg Crouch about George Floyd anywhere in 2020 or 2021?

A    In this text thread.

Q    Yes.  And this is the only text thread either of us have, right?

A    Correct.

Q    Okay.  Why have you claimed that Greg Crouch has sent you a text message about the death of George Floyd?

A    Because he did.

Q    Okay.  Do you have any proof of that?

A    Other people that he sent it to.

Q    Well, you and somebody else are different.

A    Okay.

Q    Do you have any proof that he sent it to you?

A    It was either in a text -- I believe a text. It could have even been a group text.

Q    Okay.  Do you -- do you -- who are the other people you're saying that he sent it to?

A    It would have been Scott Comerinksky.

Q    Anybody else?

A    I -- in my -- in the district at the time, that would have been one person and I don't know about the region.

Q    Okay.  You say -- so was it -- I mean, do you know -- do you know if anybody other than -- if it was a group text, do you know if anybody other than Scott Comerinksky and you would have received this?

A    Other people?

Q    Yes.

A    Yes.  I just don't know who.

Q    Okay.  Why do you think it's inappropriate -- if it happened, why do you think it's inappropriate for anybody to -- to text you to check in on whether a coworker is okay after a culturally significant event?

A    Say it again.

Q    Assuming you did receive a text message that neither of us have, why did you think that -- I mean, do you think it's inappropriate for somebody -- for a manager to reach out to you asking you to check in on a coworker after a culturally significant event?

A    I don't know.

Q    Did you ever reach out to Jordan Davis?

A    Yes.

Q    Okay.  What did you say to him?

A    Asked how he was.

Q    Okay.  Did you mention George Floyd or did you just ask how he was?

A    Asked how he was and had a conversation with him.

Q    Okay.  What did he say?

A    To try to understand because -- I don't recall.

Q    Okay.  Did you get -- did the name George Floyd come up in that conversation at all or was it --

A    I don't know.

Q    -- just more general?

A    I don't know.

Q    Okay.  Do you remember what he said to you?

A    No.

Q    Okay.  Do -- do you think that it would have been appropriate for a district manager to talk about your performance with other sales representatives?

A    Regarding?

Q    Whether you were meeting expectations?

A    I don't know.

Q    Okay.  Do -- I mean -- okay.  Do you think there's anything -- let me put it this way.  Has Jodi -- did Jodi Gayle-Garcia ever have any conversations with you about what showed up in other people's performance reviews?

A    I don't know.

Q    Okay.  Sitting here today, do you remember ever talking with Jodi Gayle-Garcia about Jordan Davis's quarterly feedback?

A    Quarterly?

Q    Quarterly feedback.

A    I don't remember.

Q    Okay.  Sitting here today, do you remember ever having any conversation with Jodi Gayle-Garcia about what appeared in any annual review for Jordan Davis?

A    I don't remember.

Q    Okay.  Sitting here today, do you remember ever having any conversation with Matt Hand about any quarterly feedback meeting that he had with Jordan Davis?

A    I do not remember.

Q    Okay.  Sitting here today, do you remember having any conversation with Matt Hand about any annual review that he completed for Jordan Davis?

A    I don't -- I don't remember.

Q    Okay.  Have you ever had a discussion with -- with Jodi Gayle-Garcia about any coaching or other feedback that she's given Jordan Davis directly?

A    Coaching she's given Jordan Davis directly?

Q    Yeah.

A    I don't know.  I don't know.

Q    Okay.  Have you ever had any conversation with Matt Hand about any coaching that she has given Jordan Davis -- or sorry -- that he has given Jordan Davis?

A    I -- I -- I do not know.

Q    Okay.  Have you had any conversation with Greg

Crouch about any feedback at all that he has given Jordan Davis?

A    I don't -- I don't remember.

Q    Okay.  And is it fair to say that if Jodi Garcia had any one-on-one conversations with Jordan Davis about his performance, you don't know what happened to those?

A    Say that one more time.

Q    Is it fair to say that if Jodi Garcia had any conversations with Jordan Davis about his performance in one-on-one settings, you don't know what happened in any of those, right?

A    Correct.

Q    And if -- you don't know what happened in any one-on-one meetings between Jordan Davis and Matt Hand about -- about Jordan's performance, right?

A    Correct.

Q    Okay.  And you don't know -- you know, you don't know what was said in any one-on-one meetings between Greg Crouch and Jordan Davis about Jordan's performance, right?

A    Yes.

Q    Okay.  I know we've talked about the name Jordan Davis a few times today.  Jordan Davis was a sales -- a sales representative on -- who was your --

what did we call him before?

A    Counterpart?

Q    Counterpart, right?

A    Correct.

Q    Right.  And he was hired by Takeda on July 19th, 2019, right?

A    Yes.

Q    Okay.  And he was fired by Takeda on July 6th, 2021?

A    Yes.

Q    So you agree his entire employment with the company lasted under two years?

A    Yes.

Q    Okay.  And in fact, he was the only employee or the only sales rep fired by Matt Hand, right?

A    I'm not sure.

Q    Okay.  Sitting here today, can you think of anybody other than Jordan Davis who was fired by -- or who was fired while on Matt Hand's team?

A    Matt then moved to a different team and was the manager for a different team.

Q    Sure.  So let me --

A    In our team?

Q    Yeah, on your team.

A    Correct.  Others left, but he didn't fire

them.

Q    Right.  But Jordan was the only one who was actually fired while Matt was over your team?

A    Yes.

Q    Okay.  And we talked before about how there are some slight differences between senior sales rep and sales rep, including that the senior sales rep trains while somebody like Jordan wasn't training their employees, right?

A    Yes.

Q    Okay.  And is it fair to say that you personally have no knowledge of whether Jordan received discipline for his performance over time, right?

A    I don't know.

Q    You don't -- you don't know if he got it or you don't know what you know?

A    Right, either/or.

Q    Okay.  Okay.  Were you -- do you have -- were you ever placed on a performance improvement plan while you worked with Jordan Davis?

A    No.

Q    Okay.  Did you ever receive any written discipline while you worked with Jordan Davis?

A    Yes.

Q    About?

Shannon Olson                    August 15, 2024
Olson, Shannon v. Takeda Pharmaceuticals America, Inc.

Page 238

A    The monthly field coaching logs with Jodi.

Q    Okay.  What happened with that?

A    It got -- I -- lumped together.

Q    What are you considering discipline in that context?  Are you saying you got feedback or you actually got a warning letter or write-up?

A    So those are what your performance review is based off of.  And so if those aren't -- it's just lumping Shannon and Jordan agreed to this, Shannon and Jordan committed to this, because I had to because I was already doing it, but in an effort to --

Q    So are you saying if we look at -- if we looked at your performance review, we'll see what you're talking about?

A    Monthly ones.

Q    Monthly?

A    It started in January of 2020.

Q    Has anybody -- has Jodi Gayle-Garcia ever told you that your monthly performance reviews are discipline?

A    Monthly performance reviews are what is used to do your year-end evaluation.  It's what Matt Hand told me he used to write my evaluation after he was my manager for less than three months.

Q    Uh-huh.

A    Stuff with Jodi, the stuff -- the monthly pushing logs from Jodi.

Q    So let's make sure that the question I ask is answered.  Did Jodi ever tell you that the monthly performance logs were discipline?

A    What is discipline?

Q    I mean a write-up, something, something that --

A    It's a document.  It's documentation, yes.

Q    Well, to be clear, like, a write-up says something like you have done -- you have violated this; if you do it again, you'll be terminated.  You know, it's not just any document that exists.

Have you been told that you have been -- like, has the word "discipline" ever been used with you in any conversation --

A    Yes.

Q    -- in connection with monthly logs?

A    I don't know.

(Defendant's Exhibit 39 was marked for identification.)

BY MR. McKINLEY:

Q    Okay.  I'm going to show you what I will mark as Exhibit 39.  Take a minute to look at it.  The question that I will ask first is have you ever seen

this document before?

A    No.

Q    Okay.  All right.  Do you have any reason to dispute that Jodi Gayle-Garcia had been noting performance issues for Jordan Davis since at least July of 2020?

A    Noting performance?

Q    Yes, that she had been discussing performance issues with him since at least July of 2020.  Do you have any reason to dispute that?

A    No.

Q    Okay.  Do you have any reason to dispute that -- that Matt Hand had had coaching discussions with Jordan Davis on January 15th, 2021, February 4th, 2021, February 9th, 2021, February 21st, 2021, February 25th, 2021, March 11th, 2021, March 19th, 2021, or April 21st, 2021?

A    No.

Q    Okay.  Do you have any reason to dispute that Jodi Gayle-Garcia and Matt Hand knew that Jordan had performance issues and were trying to address them?

A    Say the beginning part of that one more time.  Do I have a reason to dispute it?

Q    That they knew there were performance issues and that they had been having conversations with him to

address them?

A    What was the first part of your question?

Q    Do you have any reason to dispute?

A    Yes.  Why put the letter for -- endorse -- if he's having performance issues, why endorse him for a secondary income for the varsity basketball coach if there's performance issues?  That was the month of June, correct, of the same year and then July is when the thing occurred.  On a July phone call between the pair of us, I had a conversation with her about that too.

Q    Okay.  You're aware that he had only been approved -- whether he did it or not, he was only approved to do work not on work time, right?

A    I don't know.

Q    Okay.  Apart from the fact that he was -- he was doing outside work, do you have any reason to dispute that Jodi and Matt had repeated conversations with him about areas he needed to improve in?

A    I don't know.

Q    You don't know whether you dispute it or you don't --

A    I don't know about their conversations with him.

Q    Okay.  Do you have any reason to dispute that Jordan was told during quarterly conversations of

engagement expectations that he was -- that he needed to meet, and that when he failed to meet them, he was eventually put on a PIP?

A    I don't know.

Q    Okay.  You don't know if you have any reason to dispute it or you don't know what happened between them?

A    I don't know what happened.

Q    Do you -- I mean, given your impression of this PIP, do you think that this is anything short of thorough as to what Jordan's performance deficiencies were?

A    I don't know.  I haven't seen a performance plan before.

Q    Okay.  Well, my question just is, like, do you feel like this is a lengthy document?  Do you feel like this is a cursory description of what he's doing poorly or do you think that this is a document that is detailed and is putting Jordan on notice of what he needs to fix?

A    I don't know.  I'm not sure.

Q    Okay.  If you received a document like this, would you -- would you be on notice that you needed to fix a lot?

A    Yeah.

Q    Okay.  What -- apart -- I know you've raised

Jordan Davis in this case. Is your -- is your concern about him that they didn't fire him quick enough?

A No.

Q Okay. Do you think that -- I mean, if they were performance managing him in the way this plan reflects --

A This was Matt Hand. This wasn't Jodi Garcia.

Q Well, Q2 of 2020 was Jodi Garcia, correct?

A Um-hum.

Q Okay. And this plan covers what she coached him on in 2020?

A Q2 of 2020 would have been.

Q July to September of 2022 -- or 2020 I mean.

A Um-hum.

Q Okay. So this plan does address issues raised by Jodi Garcia, right? Do you see that first paragraph?

A Correct.

Q Okay. Do you think -- I mean, do you think there's anything inappropriate about performance managing somebody until you realize that the only option is terminating them?

A No.

Q Okay. Do you think that it was reasonable for Jodi and Matt to performance manage him to see if he could improve before they decided -- or before Matt

determined that he could not?

A    Yes.

Q    Okay.  What more do you know that Jodi or Matt didn't do with respect to Jordan that you think they needed to do?

A    Cover up, especially Jodi.  This is May 26, 2021.  January 20 -- January 2020, it -- I mean, the writing was on the wall from -- for a long time.

Q    So you did want to fire quicker?

A    No.  No.

Q    Then what --

A    That's not what I'm saying.

Q    What are you saying?  I mean --

A    It was her responsibility, her job as his manager to go ahead and to -- I mean, she has access to all of the reports.  She has access to expense reporting, call logs.  She has the same information. When Greg is sending out information that the whole region can see and consistently the kid is down, that's her job to step in and to -- it was her hire.

Q    Right.  And --

A    Instead, everything just kept getting spun and turned.  Shannon -- Shannon -- Shannon and Jordan agree to this.  Shannon and Jordan, you know.

Q    Again, this document says -- you said cover

up.   The quality conversations are documented, correct?

A    I -- yes.

Q    Okay.   And this document and the quality conversations show that Jodi had raised issues with him about strategic approach, results orientation, change management, administrative responsibilities, poor job expectations, and failure to follow through on way-forward expectations.

A    Um-hum.

Q    I mean, is there -- do you -- do you --

A    Quality conversations starting Q2, July through September, because in July, she had a conversation with me, a quality conversation with me that I had to take a more leadership role with Jordan and --

Q    Sure.   But my --

A    -- et cetera.

Q    My question is --

A    Is that the dates that you're getting at?

Q    I'm not really getting at any dates.   You just said that she was covering something up.   I'm saying how is it a coverup if she's documenting all these issues that are noted here?

A    What date are you stating?

Q    The quality conversation right there says that

it occurred on October 22nd, 2020 -- or sorry -- on October 22nd, 2020.

A    That they had that -- the -- okay.

Q    Is it a coverup if you're putting something on a -- on a quarterly quality conversation?

A    When it's been brought to your attention and it should have been on your radar because you're getting emails about performance.

Q    What role in the company have you ever had with performance management of employees?

A    I have not.

Q    Okay.  And is it fair to say that your -- your opinion that she should have been doing something sooner is your opinion, not necessarily one that is shared outside -- I mean not necessarily one that is consistent with what district managers have been told in terms of management of sales reps, right?

A    I'm not sure.

Q    Okay.  And do you disagree with me that for somebody who has worked for under two years, there has to be at least some period of time where you allow them to become acclimated with the role before you decide that serious performance management is warranted?

A    Yes.

Q    Okay.  And would you agree to me that it would

be judging somebody fully, including whether they need to be performance managed, to the point where you're discussing termination in year one is -- would be very unusual?

A   I'm not sure.

Q   Okay.

A   Because year one, he was given another position, able to do another position.  If you're not doing your full-time job, why are you given something else then if you're not handling the first?

Q   Well, you're talking about the basketball?

A   Yeah.  That had to have gotten approval.  And so if -- I mean, if you're managing someone for a year, you already know what they're doing.

Q   Sure.  But again, the basketball approval, he was only approved to do stuff while not working.

A   Right.

Q   He was not approved to take time away from Takeda, right?

A   Correct.

Q   Okay.  Have you ever been disciplined for something that you and Jordan did but Jordan was not treated the same way as you in terms of discipline?

A   I don't know.

Q   Okay.  Do you -- do you think that Jordan

Davis, who was the only employee to be terminated on your team during this period, was treated more favorably than you?

A    I don't know.

Q    Okay.  And do you know whether Jordan Davis and Jodi Gayle-Garcia had a personal relationship?

A    Define personal.

Q    Did they know each other outside of work or before he joined the company?

A    Yes.

Q    Okay.  What is your understanding of what their relationship was?

A    He was -- Jordan was Jodi's husband's player turned assistant coach.

Q    Okay.

A    And then he wanted to be a P.E. teacher.  Jodi reached out to him and said he had a position.  There was a position in Tampa.  I think at the time, he had a girlfriend.  They were all really close.

Q    Who told you all that?

A    Jordan.

Q    Okay.  You mentioned earlier that Jodi hired him.  Do you know whether it was Jodi who encouraged him to apply or whether it was Jodi as opposed to a hiring manager who actually made the decision to hire him?

A    Greg made the decision.  It was at a --
somebody's basketball game.  Jordan had said that the
interview was in a bar.

Q    Okay.

A    He said it was weird.

Q    Okay.

A    And yeah.

Q    Do you think that -- do you think that Jodi --
do you think that Jodi's personal relationship with him
maybe caused her to -- well, do you think she favored
Jordan in any way because she had a personal
relationship with him?

A    Yes.

Q    Okay.  Do you know -- when we talk about --
when we've been talking about his performance issues, do
you -- do you have any reason to think that her maybe --
maybe not addressing an issue earlier in 2020 was
because of that personal relationship or do you think it
was for some other reason?

A    I don't know.

Q    Okay.  When you are on a team -- when you're
on a team, a territory with, you know, you and a -- what
is the word again?  The counterpart and --

A    Write it down.

Q    I know.  I forget things as the day goes on

unfortunately.

A    Yes.

Q    When you're on a team and one counterpart is just bad at their job and performance management isn't working, is it fair to say that the only option at that point short of firing the person is -- is that the -- that you or -- or maybe even the territory manager have to fill the gaps?

A    I don't -- I don't -- I don't know.

Q    Yeah.  I mean, I guess what I'm getting at is, Jordan -- Jordan clearly struggled, right?  Would you agree with that?

A    Yes.

Q    Okay.  And short of firing Jordan, what other option was there when performance management wasn't working to make sure that the work the territory needed to get done was done?

A    I don't know.

Q    Okay.

A    I don't know.

Q    All right.  What is -- what is an executive leadership team?

A    The executive leadership team is the -- was the vice president of sales, the area directors.

Q    Okay.  How frequently do those -- do executive

leadership team calls happen?

A    It just depends.

Q    Okay.  Is it on a recurring basis or is it just whenever they feel like setting them?

A    When they feel like setting them.

Q    How long do they typically last?

A    It depends.

Q    Okay.  And it might be the same answer, but is there -- what happens during them typically, or at least a high level, what happens during them?

A    It depends.  It could involve the president of Takeda, the president of Takeda U.S., Neuroscience.  It could be -- it just depends upon what the --

Q    Okay.  Have you ever been asked to speak at any executive leadership team calls?

A    No.

Q    Okay.  My understanding based on the Complaint is that you have alleged that you were asked to speak on them, but somehow it wasn't relayed to you.  Is that inaccurate?

A    Yes.

Q    It is inaccurate?

A    In or a?

Q    Inaccurate.

A    Yes, it's -- that's -- it was not relayed to

me, correct.

Q    Okay.  Who -- to your understanding, who decided that you were going to speak on an executive leadership team call?

A    I do not know.

Q    Okay.  Who told you you had been --

A    And pardon.  It was the executive leadership team meeting with various representatives throughout the country to get a pulse.  So it was them and they had specific people.  I do not know.

Q    Okay.  You don't know who wanted -- who decided they would speak to you?

A    Correct.

Q    Okay.  Who told you that they decided that they were going to speak to you?

A    There was a -- there was a calendar update that had -- I randomly got on a call that was in my calendar and it said executive leadership team call or something like that.

Q    So you got a calendar invite --

A    Correct.

Q    -- for the call?

A    Correct.

Q    And did the invite tell you what the call was about?

A    Uh-uh.

Q    How far before did you get it?

A    I don't know.

Q    Okay.  Do you know that -- do you know if the way you were informed of the call was any different than the way anybody else who was --

A    I have no idea.

Q    Okay.  So as far as you know, everybody got the same invite as you and the same lack of information as you?

A    Typically, managers are informed.  I can't imagine they just picked my name out of the sky.

Q    Okay.  But again, as far as you're aware, you're not aware of anybody else receiving information related to that invite that you didn't get, right?  I'm just asking what you know personally.

A    I don't know.

Q    Okay.

A    I don't know.

Q    Okay.  And was it one call?

A    (Shakes head.)

Q    So two separate ones?  You got calendar invites for both?

A    (Nods head.)

Q    Okay.  Did you ever ask anybody after you got

the first one what it was about?

A    Jodi.

Q    Okay.  And what did she say to you?

A    I didn't -- I had no idea.  I didn't get any -- any information about that.

Q    Okay.  Do you have any reason or any personal knowledge that what she said to you wasn't true?

A    I don't know.

Q    Okay.  I mean, have you ever seen anything that -- that would have told you that she was informed and --

A    It's just typically how -- typically the chain of command, so to speak --

Q    Okay.

A    -- you say.  I mean, one, it would be -- I don't know, but it's not -- typically, managers are involved or at least know about that type of stuff.

Q    Is it fair to say that the only people who would know what, if anything, Jodi was told would be Jodi and whoever is responsible for relaying information on behalf of the ELT?

A    For -- yes.

Q    Okay.  After -- after the first invite you got and you spoke with Jodi, why did you then not know what the second one was about?

A    Because it didn't say anything.

Q    Okay.  But you had already -- was it about a different topic?  I guess I'm curious why --

A    I forget what the second one was about.  The first one was a pulse on the -- pretty much, like, what's going on in Florida, what's going on in, you know, people from different areas of the country.  I forget what the second one was about.

Q    Okay.  Did -- did you ever respond to the person who sent the invite and ask what it was about?

A    No.

Q    Did you ever join the call after getting -- calls after getting the invite?

A    Yes.

Q    Okay.  Did you say anything during them?

A    Yes.

Q    Okay.  So you --

A    I was very surprised it's me and a handful of people and the executive leadership team.

Q    Okay.

A    Not what I was thinking.

Q    Okay.  But you were able -- like, you showed up and you presented during those meetings, although maybe not with as much preparation as you would have liked?

A     I was completely caught off guard.

Q     Okay.  But you presented during it, right, as best you could?

A     Correct.  Yes.

Q     How long do you think you talked during each?

A     I don't know.

Q     Like, do you think it was more than five minutes, more than ten minutes?

A     I don't know.  It was multiple times.  I don't know.

Q     I'm sure you weren't talking for an hour, right?

A     No.

Q     Okay.  You think you were even --

A     The call was multiple people.

Q     Yeah.  How long do you think the total call lasted?  An hour, two hours?

A     Sure, yes.

Q     Do you think it was closer to an hour or two?

A     I don't know.  I don't know.

Q     How many people presented during it?

A     I do not know.

Q     More than ten?

A     I don't know.

Q     Okay.  Was Jordan Davis ever selected to speak

on any ELT calls for -- ELT means executive leadership team, right?

A     Yes.

Q     Okay.  Was Jordan Davis ever selected to speak on an ELT call as far as you know?

A     I do not know.

Q     Okay.  And do you believe that -- do you have any reason to believe that your race had anything to do with the miscommunication -- potential miscommunication of information related to those meetings?

A     I do not know.

Q     Do you have any reason to believe that any disability you might have had anything to do with the potential miscommunication for those meetings?

A     I do not know.

Q     Okay.  Has anyone ever told you that speaking or not speaking at an ELT meeting would have any impact on your employment with Takeda?

A     I've never been asked to be on a phone call with the executive leadership team.

Q     My question is has anybody ever told you that speaking or not speaking on those two calls was going to have any impact at all on your employment?

A     I don't remember.

THE VIDEOGRAPHER:  Is this a good time?

MR. McKINLEY:  Yeah, yeah, we can take a break.

THE VIDEOGRAPHER:  The time is 4:14 p.m. and this is the end of media unit -- we're off the record.  This is the end of media unit four.

(Discussion off the record.)

(Recess from 4:14 p.m. to 4:24 p.m.)

THE VIDEOGRAPHER:  This is the start of media unit number five.  The time is 4:24 p.m. and we are back on the record.

BY DEFENSE:

Q   All right.  Ms. Olson, I'm going to show you what I'll mark as Exhibit 40.

A   Okay.

(Defendant's Exhibit 40 was marked for identification.)

BY MR. McKINLEY:

Q   Exhibit 40 is a true and correct copy of your 2020 Year End Performance Review, correct?

A   Yes.

Q   Sorry.  Let me put it up on my screen.

All right.  And this Exhibit 40 that the review covered the time frame from April 1st, 2020 to March 31st, 2021, correct?

A   Yes.

Q    And your --

A    No.  It's the 2020 year end, right?

Q    Right.

A    Oh, yeah, sorry.  Yes, yes, you're correct.

Q    Okay.  It identifies Greg Crouch as your manager and says it was evaluated by Greg Crouch.  Was it Greg Crouch or Matt Hand?

A    Matt Hand.

Q    Okay.

A    So because he's a trainer, he doesn't have -- it had to be under Greg's name because he doesn't have certain privileges at the time to do certain things, I guess, so --

Q    Okay.  There -- I mean, this is -- this is a positive review, right?

A    This is my -- what I gave my -- this is all me.  This has nothing -- I wrote this.

Q    Well, you wrote the employee portion.  Let me put it this way.  There's nothing in the manager overall evaluation that's negative, is there?

A    Not that I'm seeing.

Q    Okay.  And you mentioned a little earlier how there was a monthly -- monthly -- monthly feedback and that, you know, the monthly feedback can contribute to the annual review.  But here, the monthly feedback you

were talking about earlier did not make its way into this annual review, right, where you said that Jordan Davis -- well, you and Jordan Davis were held accountable for the same thing?

A    Correct.  Yes.

Q    Okay.

A    This review does not mention Jordan's name.  I believe the last review you gave to me did mention his name.

Q    Yeah.

A    So --

Q    Understood.  Well, it may not say his name, but you -- you agree that -- you agree that while it may not have said Jordan's name, Matt Hand wrote positively about you helping guide your partner through the importance of database management and impact on ROI goal attainment, right?

A    Yes.

Q    Okay.  And so do you agree with me that in every annual review you had while you worked with Jordan Davis, the fact that you helped Jordan Davis was noted as a positive in your annual reviews?

A    Okay.

Q    Do you agree with that or disagree with that?

A    I -- I'm not sure.

Q    Okay.  I mean --

A    Because I can't -- I don't know who put what here, who wrote -- I can't state for a fact.  I mean, I could have back in 2020, but Matt was a manager for three months.  So I'm going to say I don't know.

Q    You don't -- you don't know if all of your reviews had noted as a positive that you had helped Jordan?

A    This review doesn't state his name.  It says "Help guiding partner."  What is your -- what is your main question?

Q    That that bullet point right there, "Took lead during prescriber maintenance period to clean up HCP universe."

A    Um-hum.

Q    "Helping guide partner through importance of database management and impact on ROI goal attainment." That clearly was meant as a positive about you, right?

A    Yes.

Q    And so all I'm saying is you agree that when -- you know, when you were helping Jordan in 2019, it helped your 2019 review, right, the one we looked at earlier?

A    Okay.  I wouldn't say it helped my review.

Q    It led to positive comments on your review,

right?

A    I'm -- I'm not sure.  That's not typically how -- a review is based on the individual, and yeah, you're -- but --

Q    I mean, these comments like the one in this 2020 that we said was positive, it is about you.  It's about how -- a positive about you as a leader, right?

A    Okay.

Q    Do you disagree with that?

A    No.

Q    Okay.  And Matt also wrote in this review that you -- that she wrote under Collaboration and Development Capabilities that during field engagement training, you were a resource to treat teammates in the district.

A    Um-hum.

Q    Right?

A    Yes.

Q    And that again was meant to be positive about you, right?

A    Yeah.

Q    Okay.  You weren't eligible for the Cresset rankings in 2020, correct?

A    I don't even remember.

Q    There was an issue -- there was an issue

about -- well, let me -- I'll just show it.

A    Oh, that's right.

Q    Yeah.  Just let me see.

A    No.  Wait a minute.  Maybe it's not that one. It is that '21.

Q    You're right.  It's 2021.

A    Um-hum.

Q    Do you know why Cresset rankings weren't listed in this review?

A    No, I don't.

Q    Okay.

A    Perhaps because they weren't released.

Q    Okay.  And this would have been -- was this right after -- was this a different situation because of COVID and changes were happening then?

A    What do you mean?

Q    Were there -- was there any sort of hold or at least questions about what would happen with the Cresset rankings at least immediately after COVID?

A    Honestly, I complete and totally forget with that.

Q    Okay.  Have you ever applied for a territory manager opening?

A    There isn't an application.

Q    Okay.  Have you been -- a territory manager is

over what?

A    It's basically the next step from senior sales rep, then it's territory manager.

Q    Okay.

A    Sales rep, senior sales rep, territory manager.

Q    So who would be the territory manager --

A    Jodi would have -- no one.  Jodi -- they -- there's a percentage.  They only allow a certain percentage of people to get -- at that time, senior sales rep, only a certain percentage of people to get territory manager.  So Jodi or my manager would have had to go to leadership and state, you know, Shannon --

Q    Okay.  Are you aware of any specific territory manager opening since 2019 that you could have filled?

A    It's not an opening.  It's not an opened role. It's not a -- it's not on Takeda's job site you're going to see territory manager.  Sales rep.  You'll see a job for a sales rep, okay?  And then the path for sales reps, because again, it's not designed for people to stay 25 years being a sales rep, right, is at the time, they had sales rep and then senior sales rep and then territory manager.

Q    Well, I mean --

A    Basically, in the end, it just is a -- you can

max out of what you make as a senior -- as a rep, senior sales rep, and then the next thing, if you want your merit increases, to actually be beneficial to go to territory manager.

Q    So you mentioned before that there's a certain number of territory managers that are allowed, right?

A    They have a percentage -- the organization has a percentage, yeah.

Q    Okay.  Are you aware of any time since 2019 where the number of territory managers dropped below that percentage threshold such that you could have filled an open -- a role?

A    I hate to say, it's just -- that's just not how it -- it does.  Each year they will do a -- like, 1 percent will be -- they'll promote 1 percent or something.  There's a number that they have, a specific -- it has to be brought from the manager to upper management.  Does that make sense?  It's not something that I say --

Q    Well, I'm not -- I don't think that's quite what I'm asking.  I think what I'm asking and I'll word it differently is are you aware of anybody who was promoted to territory manager over you from 2019 on?

A    It -- no.

Q    Okay.

A    But I'm not sure -- I don't know who got promoted and who didn't.

Q    Okay.

A    And then there was the layoff, so --

Q    And do you know of anybody in your district who -- under Jodi who was promoted to territory manager over you at any point and while Jodi was your supervisor?

A    No, but again, that's not how you -- it's not a promotion over someone.  It is something that you have to work for during the year.  At the end of the year, leadership management, your manager, it's like when they go and, you know, have to for a second -- for a second income go and write the -- you know, hey, I endorse this person, dah, dah, dah, I endorse Shannon Olson for territory manager, here's the why behind it.

Q    So --

A    Here's the impact.

Q    Yeah, I -- I mean, I'll ask the question differently because I don't know --

A    Okay.

Q    -- that I fully followed your characterization.

I think at some point, right, at some point, Jodi at the end of the year has to decide, I'm not -- I

am or I am not going to, you know, recommend that

somebody or somebodies be moved to a territory manager

role, right?

A    Yes.

Q    Okay.  And my question really is are you aware

of her recommending anybody from her team at a time

where she didn't recommend you?

A    No.

Q    Okay.  Are you aware of Matt Hand recommending

anybody from his team at a time he didn't recommend you?

A    Matt wasn't a manager, so he couldn't -- he

wasn't -- I don't -- I don't even know if he could have.

Q    Okay.  So Matt Hand might not --

A    He was an internal manager.

Q    So Matt Hand might not even have the ability

to recommend you?

A    Correct.

Q    Okay.  And does the recommendation have to

come from the district manager?  Is that what you're

saying?

A    Yes.

Q    Okay.  And so in -- when we looked at that

2019 review which ended March -- end of March 2020, Jodi

had set a goal for you to start taking on leadership

roles so hopefully you would eventually move to

territory manager, right?

A     Um-hum.   Um-hum.

Q     Okay.

A     Yes.   Sorry.   Sorry.   It's almost 5:00.

Q     And by the next performance cycle, by March of 2021 when 2020 was being reviewed, Jodi was no longer around --

A     Correct.

Q     -- to recommend you for anything, right?

A     Yeah, she was -- she left January of 2021.

Q     Okay.   So Jodi wasn't there to recommend you, and Matt, as far as you know, didn't have the ability to recommend you, right?

A     I don't know.

Q     Okay.

A     I don't know.

Q     Okay.   So it's possible -- based on what you're saying, it's at least possible that there was no recommendation that could have been made in March of 2021, right?

A     It's possible.   It's also possible a recommendation could have been made.

Q     By Matt, you're saying?

A     By Jodi.   Even -- she took a lateral position, but I don't know.   I don't know.   I'm not involved in

those decisions.  I don't -- I just know that it has to go through a manager.

Q    Okay.  And I guess since you're not involved in the decisions, we would probably have to talk to Jodi or Matt to figure out what the process was for that, right?  What they were able to do, when they were able to do it, those are things they have to answer, right?

A    Yes.

Q    Okay.  Do you -- is it fair to say that you don't personally know whether Jodi thought you were ready to be a territory manager 100 percent when she left her role on your team, right?

A    I don't know.

Q    And you -- is it fair to say that you don't know what Matt thought about whether you were fully ready to be a territory manager, right?

A    I don't know what Matt knew.

Q    Okay.  Or what Matt thought, right?

A    Yeah.

Q    Okay.  Is it fair to say that if we -- if we want to know what Jodi thought about your performance and what you were ready for from her perspective, we'd have to ask her, right?

A    Well, that was the problem with this is that this was done without me being present, her being there.

Q    Um-hum.  Sure.

A    So --

Q    But are you agreeing that if we want to know -- if we want to know if she thought you were ready, we'd have to ask her?

A    Yeah.  Yes.

Q    And if we want to know if Matt thought you were ready to be a territory manager at any point, we'd have to ask him, right?

A    Yes.

Q    Okay.  Have you -- and I don't want "apply" to be a word that trips us up here, but apart from territory manager, has there been any other role that you've hoped to get or applied at Takeda at any point since 2019?

A    Yes.

Q    And that --

A    I applied for a volunteer role, I think it was called Thrive or something, and did not get a volunteer role.  It was like a health and wellness role.  And then there was a couple of other roles I applied to too.  Spoke with, what the heck are they called?  Patient -- patient assistant managers more involved with, like, the getting the patient and resources for the patient and spoke with the manager.  I applied for a couple of

different things.  I can get you a list.  I can't remember everything off the top of my head.

Q    In your Complaint, you mention that -- you mention a promotion.  Was the promotion you were talking about in your Complaint the territory manager role?

A    Correct.

Q    Okay.  Not --

A    Yes.

Q    Not any other role that you were talking about in the Complaint, right?

A    Right.

Q    Okay.  Has anybody at Takeda said any -- made any comments to you that you thought were discriminatory towards you based on your race?

A    When?  What's the date?

Q    Ever.

A    In 25 years?

Q    Yep.

A    I don't remember.

Q    Okay.  Do you -- has Jodi Gayle-Garcia ever said anything to you that you thought was discriminatory towards you based on your race?

A    I don't remember.

Q    Okay.  Has Matt Hand ever said anything that you thought was discriminatory about your race?

A    I don't remember.

Q    Has Greg Crouch ever said anything that you thought was discriminatory about your race?

A    I don't remember.

Q    Okay.  Apart -- or has anybody at Takeda done anything to you that you believe is racially discriminatory?

A    I'm not sure.  I'm not sure.

Q    Okay.  Have you ever made any -- set aside this lawsuit and your EEOC filing.  Have you ever made any complaints about race discrimination to anybody at Takeda?

A    Yes.

Q    To who?

A    I believe Staci Thompson.

Q    What specifically did you say to her?

A    I said I was treated vastly different.  First I inquired about my performance review and then I said I just wanted to talk to you about something else, and, I mean, you know, that's a hard conversation.  You open that can of worms and it's just -- and she said, If you want to have that conversation, I have to have someone else have the conversation with you.

Q    Okay.

A    And then I talked to Irving Forester.

Q    Okay.  Did you say to her that you were treated vastly different or did you say that you were --

A    I said I was treated vastly different than my counterpart.

Q    Did you say that I was treated vastly different than my counterpart, period, or I was treated vastly different than my counterpart because of my race?

A    I was treated vastly different than my counterpart.

Q    So you did not say because of my race, right?

A    Nor did I say my sex.

Q    Okay.

A    Or my religion.

Q    Okay.  And so is it fair to say that you've never had any conversation with anybody at Takeda where you said in any way that you had been treated differently because of your race, focus on that, because of your race?

A    I don't know.

Q    Okay.  Has anyone at Takeda said anything to you that you believe was discriminatory about any disability you have?

A    I'm not sure.

Q    Okay.  Has Jodi Gayle-Garcia said anything to you that you think was discriminatory about any

disability you have?

A    I can't remember.

Q    Okay.  Has anybody at Takeda said anything about any disability you have -- sorry.  Has any -- has Matt Hand ever said anything about any disability you may have that you consider discriminatory?

A    I can't remember.

Q    Okay.  Has Greg Crouch ever said anything about any disability you may have that you believe was discriminatory?

A    I can't remember.

Q    Okay.  Do you think that a racial comment towards you, a derogatory racial comment towards you is something you would remember?

A    I mean, define it.

Q    I mean, do you -- do you think that you would remember if somebody said something that was negative about the fact that you're -- I'm going to assume you're white -- you're white?  I hate guessing, but I think that's --

A    Look, I honestly can't believe all of this has occurred how it's occurred.  And so am I remembering every single thing?  No, because really?

Q    Well, let me -- understood.  Do you think that anybody has ever said a racial slur to you about you

being white?

A    I don't know.

Q    Okay.  Has anybody at Takeda done anything to you that you believe was discriminatory towards you on the basis of any disability you have?

A    The whole stuff with Lincoln Financial.

Q    So --

A    I mean, the leave that's denied.  I mean, three different ones for depression, a baby.  There's no question having a baby, but for -- and I know Takeda has since changed policy or whatever with Lincoln Financial and Takeda has one designated Lincoln Financial rep to monitor all their leaves, but that's not okay.

Q    Okay.

A    I mean at all.

Q    So --

A    Especially when that's their area, Takeda's area of -- one of their areas of specialty, neuroscience.

Q    Okay.  Earlier you said that you don't know if Takeda had any -- any impact at all on Lincoln Financial's decision to deny your April 2021 disability claim, right?

A    Yes.

Q    Okay.  And so my question is are you aware of

Takeda doing anything -- anybody at Takeda doing anything that you believe was discriminatory on the basis of your disability?

A    Well, Takeda hires Lincoln Financial.  I mean, that's -- and yeah, I think sending on the -- the -- oh, my God, I can't even think anymore -- the accommodation, the denial, I mean --

Q    Is --

A    And then, right, eventual approval.  But I mean, it's just -- it's a mind game.  It's a mind game. And you're messing with someone's head who's already got -- you know, I mean, it's just -- it's a mind game.

Q    Is -- are you --

A    But if it was something you could physically see, it means so much more, you know.

Q    Is it your belief that any time a short-term disability claim is denied, that that is discriminatory?

A    I've been with -- no.  I have been with the organization for 25 years, the same organization for 25 years.  They have my health records from having three kids.  They have a health record from after my sister passed.  They have everything.  So if you're looking at somebody -- and honestly, if they don't have the tools, then Takeda should have sat there and ensured they have tools to effectively deal with, care for their employees

dealing with a condition that they make a ton from and that, you know, their employees sell. It's --

I don't have concrete fact about what Takeda and Lincoln do. I'm positive it's reported every month how many people are on leave, et cetera, whatever.

Q Do you have any reason to dispute that the individual at Lincoln who reviewed your short-term disability claim genuinely believed that when you initially provided information, it did not have sufficient, in her view, abnormal objective findings? Do you have any reason to dispute she thought that?

A I -- I don't know.

Q Okay.

A I don't know. My doctor called them.

Q Okay.

A So when your medical doctor calls, not many -- not many medical doctors call.

Q Okay.

A And again, she had records from before too, so --

Q And do you have any -- are you able to identify a single person whose short-term disability claim was handled any differently than yours?

A I have no idea her name. Jodi would know. There was a girl that was notorious. She'd come back,

go out, come back, go out, go out and always -- I'm like, how do people -- what is that?  How do people do that?

Q    Well --

A    So I get it, but I just wasn't one of those, and you can't do that to -- you stop paying a single mom for a month who is out for depression, PTSD and anxiety. Seriously?

Q    But --

A    But, oh, yeah.

Q    -- the person whose name you can't remember, you don't know what information she submitted to Lincoln, right?

A    It would be my medical provider that submitted the information to Lincoln.

Q    I'm talking about the person you just said would come in and out.

A    And then someone else sits there on the other side and says yes or no and then you appeal it and it get kicks up to their superior.

Q    We're talking about two different things.  You just mentioned that there's an individual who came in and out of work, and my question is --

A    Oh, I -- I don't -- I've never met her.  I just -- she was talked about amongst Jodi and people.

Q    Okay.  So my question ultimately is you don't know what information she provided to Lincoln or how Lincoln reviewed it, right?

A    But I know from my past when I've had a child, when I've had a baby, and I've had three of them with Takeda, it's good, it's fine.  Other people who have had physical surgeries, physical whatever, but because it's something that you -- it's not seen, you know?  I mean -- but again, it's -- I mean, they -- Takeda should be at the forefront of that.  And again, they did make change.  There's one person from Lincoln now to manage and that Takeda people go to, but that's just -- you're the thought leader in the space and it's not okay.

Q    Okay.  Apart from your disability claim, is there anything that you believe anybody at Takeda has done to you that you thought was discriminatory on the basis of your disability or any disability you may have?

A    I don't know.

Q    Okay.  Are you aware of Takeda disclosing any disability you have to anybody who shouldn't -- or who didn't have a need to know it?

A    I'm not sure.

Q    Okay.  Have you ever made any complaints of disability discrimination where you said disability or whatever your medical condition is to anyone at Takeda?

A    I'm not sure.

Q    Okay.  Sitting here today, I just want to be clear.  You're -- you're -- and we kind of got at it at the start, but I want to make sure we're on the same page.  You're not currently asserting a retaliation claim in your Complaint, are you?

A    I thought he --

THE WITNESS:  Mike?

BY MR. McKINLEY:

Q    Well, let me -- let me take a step back.

A    Um-hum.

Q    I'll withdraw that.  Are you claiming that anybody at Takeda retaliated against you for making any kind of complaint where you mentioned racial or disability discrimination?

MR. YODER:  I'm just going to object to that, calling for a legal conclusion.

BY MR. McKINLEY:

Q    Okay.  Well, let me -- Ms. Olson, do you believe that anybody at Takeda has taken any action against you for filing or for making a complaint of disability discrimination?

A    I'm not sure.

Q    Okay.  Do you believe that anybody at Takeda has taken any action against you for making any

complaint of race discrimination?

A    I'm not sure.

Q    Okay.  Do you believe that anybody at Takeda has taken any action against you for requesting a disability accommodation?

A    I'm not sure.

Q    Okay.  Ms. Olson, there -- you mentioned layoffs a few times.

A    Um-hum.

Q    Am I correct that there have been multiple layoffs over the last, let's say, five years or so where you could have been laid off but Takeda did not lay you off?

A    Yes.

Q    Okay.  And do you agree with me that at least as far as you know, a lot of people were laid off as part of some of those layoffs?

A    I don't know.  People were laid off as a result of those layoffs.

Q    Okay.  Do you agree with me that if Takeda was -- if Takeda wanted to run you off the company, they could have laid you off at some point before now, right?

A    I'm not sure.  I don't know.

Q    Okay.  And today, you know, as far as you know, you're still employed by the company, right?

A    Who knows come Monday?  No, I'm just kidding.

Q    But yes, right?  You're still employed?

A    Yes.

Q    Okay.  And nobody has -- nobody has told you that there's any intention to fire you, have they?

A    I mean -- well, I received an email, was it last week, expense report the last week, the week prior, and it was sent to -- my manager copied me about outstanding expenses from a terminated or an employee who is no longer with the organization.  I'm like, okay, come on, you accidentally get that crap?

So look, I don't know.  I'm -- I'm very much -- I don't know what Takeda's plan is.  I don't know what the plan is.  I don't know -- I'm very much on my own.  It's like I've got the Scarlett Letter.  I mean --

Q    And this is -- this is just your thing.  What are you -- what are you trying to -- what do you think you're trying to get out of this lawsuit?

A    I just think it's the nonsense.  It's nonsense.

Q    Okay.  What money are you trying to get out of this lawsuit?

A    I don't know.

Q    Okay.  Do you have any idea what you think

your claims are worth?

A    No.

Q    Okay.  Do you have any -- do you have any idea what your claims are?  Do you have any idea how to come up with a number for what your claims are worth?

A    I haven't -- honestly, I really haven't thought about it.

Q    Okay.  Are there any things that you were able to do in 2018 that are you not able to do today?

A    In 2018?

Q    Um-hum.

A    That I'm not able to do today?

Q    Um-hum.

A    Specifically?

Q    Anything at all.  Like, is there any aspect of your life that in 2018 you could do, but now you're claiming you can't do because of something -- you can't do anymore because of Takeda?

A    I'm not sure.  That's a very general --

Q    Yeah, I guess -- I guess what I'm saying is are you claiming that Takeda has done anything that has required you to stop doing the things you enjoy in life?

A    Some.

Q    Such as?

A    It took a lot to get back to -- you know, I'm

just going to -- I'll say I don't know.  Let me get back
to it.

Q    Okay.  What do you mean, we'll get back to it?

A    I don't know.  I don't know.

Q    Okay.

A    I was prepping for this, not thinking anything
further.

Q    Well, I know.  I only want to know as of
today.  I don't want to know in the future.  I mean, is
there -- is there anything -- like, are you no longer
able to exercise?  Are you no longer to do, like,
hobbies you had before?

A    It's taken a minute.

Q    Okay.  But you are able to do them now?

A    Some.  It's -- I don't know.  I don't --
I'll -- I'm not sure.

Q    Okay.  Just to put a bow on it, are there any
specific things today that you can identify that you're
unable to do that in 2018 you were able to do?

A    I'm not sure.

Q    Okay.  What's your current salary?

A    Oh, God, I don't know.  I told you if I had my
thing, I can look it all up.  I don't know.

Q    Okay.  Do you -- apart from your base salary,
do you receive a bonus?

A    Um-hum.

Q    Is that quarterly?

A    Yes.

Q    Okay.  Do you receive any other comp on top of that?

A    Bonus, and I think it's, like, December they add to our 401(k).

Q    Okay.  Are you personally able to tell -- like, you still have stress from time to time, depression, anxiety?

A    Um-hum.

Q    Are you able to tell in any certainty -- with any certainty what part of that stress comes from Takeda and what part of that comes from your personal life, issues with your kids, issues with your ex?  Do you have any way of saying what comes from what?

A    Honestly, I think during that time, it was just very different working completely -- I don't know.

Q    I'll ask it in a slightly different way.  Is it fair to say that there's really no way for you to say this percentage of my depression is from this versus this, right?  There's no mathematical formula to it, right?

A    I'm not sure.

Q    Okay.  Have you ever -- we've talked about

sort of the depression and anxiety.  Have you ever had
any physical harm resulting from your work with Takeda?

A    What do you mean "physical harm"?

Q    Like, have you -- you've got a -- you've got a
little bit of paper.

A    Oh, geez.

Q    Other eye.

A    Thank you.

Q    Yep.  I mean, has it ever -- like, have you
ever thrown up or, you know, had a physical, like a --

A    Yeah.  A panic attack?

Q    Yeah, a panic attack as one.

A    Yeah.

Q    Okay.  And do you --

A    I hit a car.

Q    Sure.

A    I mean while driving.

Q    And --

A    Like.

Q    And that's -- that's an interesting point too.
The -- you mentioned the hitting the car and we talked
earlier about that, how that was before August 2019.

A    Um-hum.

Q    Jordan Davis started on July 2019.  So can --

A    Um-hum.

Q    Are you able to tell me what portion of your depression is from just the aspects of Takeda you don't like or you think could be done better and what portion are from the things you think are racially or, you know, disability discrimination?

A    I'm not sure.

Q    Okay.  Do you agree with me that at least some portion, maybe a significant portion of your stress is things that, you know, maybe aren't related to your race or disability but happen from work with Takeda?

A    Yes.

Q    Okay.  Why are you still working at Takeda?

A    I mean, I do love the medication and I launched it.  It loses exclusivity coming up.  I mean, I do love my job, believe it or not, and I like -- but I don't know because, I mean, I -- I'm kind of limited.

Q    Since 2019, have you applied to work at any other companies?

A    Nope.

Q    Okay.  Who do you think, if anybody, would have information, personal information supporting your claim that you were discriminated against on the basis of your race?

A    I'm not sure.

Q    Okay.  Are you aware -- are you -- do you know

if there's anybody who would have personal knowledge of any information that would prove or support that you have been discriminated against based on your disability or any disability you have?

A    I'm not sure.

(Defendant's Exhibit 41 was marked for identification.)

BY MR. McKINLEY:

Q    Okay.  I'm going to show you what I will mark as Exhibit 41.  Let me share it.

Exhibit 41 is a true and correct copy of the EEOC charge that you submitted before filing this case, right?

A    Yes.

Q    And is it -- am I correct that this Exhibit 41 reflects all of the issues that you have ever raised with the EEOC about your work with Takeda?

A    Yes.

Q    Okay.  Is there anything that you believe you have experienced at Takeda or is there anything that has happened at Takeda that you believe was racially discriminatory that we have not talked about during this deposition?

A    I'm not -- I don't know.

Q    Okay.  Is there anything that you have

experienced at Takeda that you believe was discriminatory on the basis of any disability you have that we haven't talked about during this deposition?

A    I do not know.

Q    Okay.

A    We've talked about a lot.

MR. McKINLEY:  Yeah.  Let -- let's go on maybe a five-minute break.  I think -- I think we're almost done.  I just want to check and make sure I've covered everything in my notes.

THE WITNESS:  Yeah, yeah.

MR. McKINLEY:  So we'll go off the record.

THE VIDEOGRAPHER:  The time is 5:08 p.m. and we are now off the record.

(Recess from 5:08 p.m. to 5:15 p.m.)

THE VIDEOGRAPHER:  The time is 5:15 p.m. and we are back on the record.

BY MR. McKINLEY:

Q    All right.  Ms. Olson, in your EEOC charge that we were just looking at a minute ago, you had originally claimed that you thought there might also be gender discrimination.  It's my understanding that in your current Complaint, you are not alleging gender discrimination anymore or at least you don't have a claim about gender discrimination; is that correct?

A    Yes.

Q    Okay.  The -- you brought up an issue a few times about something recent that happened with expenses; is that right?

A    Just an email that got sent and --

Q    Okay.  What was the email?

A    It just said a terminated employee or an employee who is no longer with the organization has outstanding expenses.

Q    Okay.  Was it just sent to you or was it sent to multiple people?

A    Supposedly multiple people.

Q    Was, like, the cc line blank or, you know --

A    I don't remember.

Q    Okay.  Was that the document you said earlier that on further reflection you maybe should have produced that but hadn't produced it?

A    That -- I think you're talking about the one -- the email that accidentally got sent out, leaked with all the people that were getting fired?

Q    No.  I'm talking about at the start of the deposition today when we were going over --

A    Oh, the expense report.

Q    Yeah.  Is this email that you just -- that you were just talking about, is that the --

A    No.

Q    It's a different email that you were talking about earlier that you said maybe you should have produced on reflection?

A    I didn't think about it when you had -- I had --

Q    Yeah.

A    -- per Greg express report training.  And I'm like, expense report training?  But it's -- you can then -- it's just documentation.  You know, hey, she had expense report training, so if something goes wrong, then she already got trained on that.

Q    Okay.  So the email, all it said was that what, you needed to take expense report training?

A    Yeah.  Like, we need to get -- it was this girl.  I forget her name.  I don't even know if she's still with the organization.

Q    Okay.

A    It was just me and her.

Q    Okay.  And it was asking for her to train you or you to train her?

A    Her to train me.

Q    Okay.  Did it say anything other than that they wanted you to take expense report training?

A    That it was requested that she reach out to me

and give me expense report training.

Q    Okay.  Was there anything else noteworthy to you about that email?

A    Just, I mean, you know, okay.

Q    Okay.

A    You're not going to object to it.  You've got to just do it.

Q    Okay.  I think we've -- we've talked about -- we talked about Jordan Davis already.  Is there any other non-white person at Takeda who you believe has been treated non -- or more favorably than you?

A    I don't know.

Q    Okay.  Is there any other nondisabled person at Takeda who you believe has been treated more favorably than you?

A    I don't know.

MR. McKINLEY:  I don't have any other questions.

THE WITNESS:  Okay.

MR. McKINLEY:  Let's see if your attorney does.

MR. YODER:  No, I have nothing else.

MR. McKINLEY:  Okay.

THE VIDEOGRAPHER:  Read us off the record, then?

MR. McKINLEY:  Well, we should put this on the -- on the record, I think.

Ms. Olson, you have an opportunity to read the transcript and sign if you want or you can waive that.  Would you like to read the transcript and note whether there are any errors or do you want to waive that right?

THE WITNESS:  I would assume read it, Mike?

MR. YODER:  If you want to read it, that's fine.  I typically waive, but if you want to read it, you're more than welcome to.  That's your right.

THE WITNESS:  Well, I mean --

MR. McKINLEY:  We can -- we can go off if you want.  You can have a call with each other and talk about it without us on the line or you can --

MR. YODER:  Yes, we -- I'll put that we're responding to any orders that we have if that's all right with the reporter.

MR. McKINLEY:  I think you broke up a little bit there.  Could you repeat that?

MR. YODER:  Oh, yeah.  I was saying that I'll just follow -- I'll talk to Shannon and if I can get the email for the court reporter or I can just send -- if you have the email, you can forward it

Shannon Olson     August 15, 2024
Olson, Shannon v. Takeda Pharmaceuticals America, Inc.

Page 294

to me.  I'll just follow up with whether we're going to waive or read and then our transcript order.

COURT REPORTER:  Sounds good.

Are you ordering at this time?

MR. McKINLEY:  Yes, we'll order.

THE VIDEOGRAPHER:  And the video too?

MR. McKINLEY:  I am pretty sure yes, but let me -- let me talk with my client.

THE VIDEOGRAPHER:  Okay.  Are we ready to go off the record?

MR. McKINLEY:  Yes.

THE VIDEOGRAPHER:  Okay.  We are off the record at 5:20 p.m. and this concludes today's testimony given by Shannon Olson.  The total number of media units used was five and will be retained by Veritext Legal Solutions.

(The deposition concluded at 5:20 p.m.)

CERTIFICATE OF OATH


STATE OF FLORIDA          )


COUNTY OF HILLSBOROUGH )




        I, the undersigned authority, certify that SHANNON OLSON personally appeared before me and was duly sworn.

        WITNESS my hand and official seal this 30th day of August, 2024.




ANN S. BEILSTEIN, RPR
Registered Professional Reporter
Notary Public
State of Florida
My Commission Expires 10/31/2024
Commission No. HH 036032


                Personally Known
        OR Produced Identification - X
        Type of Identification Produced - License

Page 296

CERTIFICATE OF REPORTER

STATE OF FLORIDA          )

COUNTY OF HILLSBOROUGH   )

I, Ann S. Beilstein, Registered Professional Reporter, certify that I was authorized to and did stenographically report the foregoing deposition; that a review of the transcript was reserved; and that the transcript is a true record of the testimony given by the witness.

I further certify that I am not a relative, employee, attorney, or counsel of any of the parties, nor am I a relative or employee of any of the parties' attorneys or counsel connected with the action, nor am I financially interested in the action.

Dated this 30th day of August, 2024.

Ann S. Beilstein, RPR

PLEASE ATTACH TO THE DEPOSITION OF SHANNON OLSON, TAKEN

ON AUGUST 15, 2024, IN THE CASE OF SHANNON OLSON v.

TEKADA PHARMACEUTICALS AMERICA, INC.

ERRATA FOR ASSIGNMENT #6853645

PAGE_____ LINE_____ CHANGE_____

_____

PAGE_____ LINE_____ CHANGE_____

_____

PAGE_____ LINE_____ CHANGE_____

_____

PAGE_____ LINE_____ CHANGE_____

_____

PAGE_____ LINE_____ CHANGE_____

_____

PAGE_____ LINE_____ CHANGE_____

_____

PAGE_____ LINE_____ CHANGE_____

_____

PAGE_____ LINE_____ CHANGE_____

_____

Under penalties of perjury, I declare that I have read

the foregoing document and that the facts stated in it

are true.

_____        _____

SHANNON OLSON                           DATE

August 30, 2024

Ms. Shannon Olson

102 28th Avenue

St. Petersburg, FL 33706

Re:  Shannon Olson v. Takeda Pharmaceuticals America
     Deposition taken on 8/15/24 - Job No. 6853645

Dear Ms. Olson:

        The above-referenced transcript is available for review.

        You should read the testimony to verify its accuracy.  If there are any changes, you should note those with the reason on the attached Errata Sheet.

        You should, please, date and sign the Errata Sheet and email to the deposing attorney as well as to Veritext at cs-southeast@veritext.com and copies will be emailed to all ordering parties.

     It is suggested that the completed errata be returned 30 days from receipt of testimony, as considered reasonable under Federal rules*, however, there is no Florida statute to this regard.

     If you fail to do so, the transcript may be used as if signed.

                                Yours,


                                Veritext Legal Solutions

cc:  Andrew M. McKinley, Esquire

*Federal Civil Procedure Rule 30(e)/Florida Civil Procedure Rule 1.310(e)c

**&**

**&** 3:14

**0**

**00000268** 124:4
**0000035-36**
   3:11
**0000077-422**
   3:9
**0000099** 3:12
**0000318-320**
   3:17
**0000333-336**
   3:18
**0000337-341**
   3:19
**0000339** 147:22
**0000342** 3:20
**0000343-345**
   3:21
**0000347-349**
   3:22
**0000401-405**
   4:17
**0000406-423**
   3:10
**0000413** 113:18
**0000418** 111:3
**0000422** 110:5
**0000425-431**
   3:23
**0000437-439**
   3:24
**0000460** 4:4
**0000480-487**
   4:5

**0000490-492**
   4:20
**0000493-496**
   4:19
**0000502-519**
   3:15
**0000542** 4:7
**0000564** 210:3
**0000565** 210:8
**0000568** 4:12
**0000576-579**
   4:10
**0000792** 215:3
**0000799** 218:16
**000213** 119:19
   120:2
**00590** 1:3 5:15
**01/06** 108:19
**036032** 295:18

**1**

**1** 1:24 3:4 41:8
   73:17,17,24
   74:15,16 75:4
   89:3 181:15
   182:1 265:15
   265:15
**1.310** 298:21
**10** 3:13 4:13
   48:9,13 116:13
   116:17 118:4
**10/31/2024**
   295:17
**100** 160:16
   269:11

**101** 1:15 5:16
**102** 3:6 14:5
   298:2
**103** 3:7
**104** 3:8
**105** 3:9
**1075** 2:7
**109** 3:10
**10:16** 185:12
**10:21** 229:13
   229:17,25
**10:54** 70:22,25
**10th** 151:2
   152:5 182:13
   182:19 185:6
   185:12
**11** 3:14 7:24
   8:2 119:5,9,11
   124:5 125:12
   156:7
**110** 189:12
**114** 3:11,12
**116** 3:13
**11:04** 70:25
   71:2
**11:43** 230:1
**11:59** 185:13
   185:15
**11th** 185:13
   197:10 240:16
**12** 3:15 125:15
   125:18,19
   128:7
**125** 3:15

**12:35** 131:25
   132:4
**12th** 106:1
**13** 3:16 55:22
   131:20 132:8
   132:12,12
   134:13
**132** 3:17
**135** 3:18
**13th** 13:24
   54:25 103:16
   217:7
**14** 3:18 135:2,6
   136:6 139:5
   140:24
**1405** 14:12
**141** 3:19
**148** 3:20
**14th** 132:17
   134:9 230:1,8
**15** 1:12 3:19
   8:11 55:11
   123:20 141:13
   141:16,18
   146:21 297:1
**150** 3:21
**152** 3:22
**15th** 5:3 135:12
   240:14
**16** 3:20 148:3,7
   148:8 198:21
**162** 3:23 97:23
**16th** 48:14,15
   114:14 152:6
   183:15,18

184:5
**17** 3:21 8:11
150:18,22,22
152:11,18
**174** 3:24
**178** 4:4
**17th** 184:1
216:25
**18** 3:22 8:10
56:13 57:6
152:14,18,19
215:8
**182** 4:5
**18th** 183:4
**19** 3:23 4:6
138:20 162:19
162:22,23
167:19 175:13
179:17
**190** 4:7
**1974** 13:24
**1993** 16:25
17:14
**1995** 16:25
17:3
**1997** 17:3,15
**1999** 55:22
57:3
**19th** 215:25
236:6 240:16
**1:05** 132:4,6
**1:30** 129:21
**1st** 97:8 188:12
206:11 258:23

---

**2**

**2** 3:5 74:16
77:3 96:24
97:3 98:18
**20** 3:24 55:17
108:13 115:16
122:17 174:17
174:21,21
227:10 244:7
**2000** 14:20
57:3
**2001** 2:3 14:20
18:20 57:4,4
**2002** 57:8
**2003** 57:8,9
**20036** 2:4
**2005** 57:14,15
**2006** 57:16,17
57:18,18,19
**2012** 167:6
**2013** 167:6
**2014** 8:4,6
102:9,12 139:9
139:12,15,18
**2015** 3:8 57:20
103:17 105:2
108:13,14,18
108:19,22
109:4 131:3
139:13
**2016** 14:15
57:20 58:6
131:3 139:6,17
140:17

---

**2017** 14:16
**2018** 69:1
106:1 283:9,10
283:16 284:19
**2019** 3:5,14
8:20 14:19,19
25:19 78:10
96:8,19 97:5,8
97:23 98:5,8
100:13 112:3
114:14 119:12
122:19 123:17
123:20,20
196:16,19,20
198:1,17,21,21
198:22 199:10
200:10 236:6
261:21,22
264:15 265:9
265:23 267:23
270:15 286:22
286:24 287:17
**2020** 3:13 4:18
8:18 22:4,5,7
22:17,17 25:16
31:3,9 48:14
85:13 97:9
98:11 103:16
109:17 110:18
111:6,14 112:3
112:11,13,22
113:2,16,21
116:20 122:20
126:5 128:10
130:22,25

---

131:13 132:17
134:9 135:9
136:3 140:16
146:22 151:2
227:10 229:3
229:12,25
230:8,16,16,19
230:23 238:17
240:6,9 243:8
243:11,12,13
244:7 246:1,2
249:17 258:19
258:23 259:2
261:4 262:6,23
267:23 268:6
**2021** 22:15,16
22:17 59:16,25
78:10 96:8,19
122:20 158:15
158:17 159:1,7
159:8,24
160:14 168:1
175:20 181:15
182:13 183:5
183:16,18
184:1,5 185:13
206:10,11,19
207:23 208:7
209:5,25 211:7
212:23 214:14
215:7,8,8,25
216:1,5,9,25,25
217:7,7 219:7
223:12 227:11
230:1,9,16,24

236:9 240:14
240:14,15,15
240:16,16,16
240:17 244:7
258:24 263:6
268:6,10,20
275:22
**2022** 59:19
60:5 69:18
93:25 94:2,18
94:25 229:4,17
243:13
**2023** 191:4,12
**2024** 1:12 5:3
48:15 105:2
295:10 296:16
297:1 298:1
**209** 4:9
**21** 4:4 130:5,25
131:13 178:18
178:22 180:24
181:3,7 263:5
**212** 4:10
**213** 156:12
**214** 4:8,12
120:3
**217** 98:7
**21st** 126:5
130:22 240:15
240:16
**22** 4:5 182:6,9
182:9
**224** 93:25 94:4
94:19

**225** 98:4
**228** 4:13
**22nd** 168:1
246:1,2
**23** 14:24
**239** 4:17
**23rd** 129:20
175:8,20
**24** 14:24
**249** 98:7
**24980** 295:15
296:20
**24th** 229:3
**25** 206:14
224:11 264:21
271:17 276:19
276:19
**2500** 2:7
**252** 93:25 94:4
94:19
**258** 4:19
**25th** 229:12,17
229:25 230:8
230:19 240:15
**26** 244:6
**26th** 176:10
**27** 220:7
**27th** 135:9
136:3
**28** 4:6 190:22
190:25 191:1
**288** 4:20
**28th** 14:5
196:20 298:2

**295** 2:15
**296** 2:16
**297** 2:16
**298** 1:24 2:17
**29th** 111:6,13
**2:28** 192:5,7
**2:40** 192:7,9
**2:54** 113:21
**2nd** 141:22
142:3 143:2
146:25 158:15
158:17 216:1,9

**3**

**3** 3:6 102:17,20
102:23 139:14
**30** 4:8 214:19
214:23,24
216:16 298:1
298:13,20
**300** 93:8,8,8
**30309** 2:7
**30th** 191:4,12
216:25 229:3
295:9 296:16
**31.6** 115:21
116:10
**31st** 97:9
113:21 182:24
217:7 258:24
**32** 4:9 209:14
209:16,22
**33** 4:10 212:13
212:15,18
**334** 139:4

**33602** 1:15
**33706** 298:3
**34** 4:11 213:24
214:7,10,12
**341** 147:22
**348** 152:24
**349** 152:24
**35** 4:13 204:20
228:19,21,25
230:22
**36** 4:14
**37** 4:15
**38** 4:16
**39** 4:17 239:20
239:24
**3rd** 146:21

**4**

**4** 3:7 89:3
103:6,9,12,19
**4/5/21** 215:4
**40** 4:18 96:14
96:14 218:19
258:13,15,18
258:22
**4000** 1:15 5:17
**401** 285:7
**41** 4:20,22
288:6,10,11,15
**418** 111:11
**419** 111:10
**42** 4:21
**43** 4:22 41:18
41:22 43:4,7
44:25 45:6
46:1 73:17

118:10
**431** 168:12
  169:1 170:4
**439** 175:19
**44** 183:24
**449** 97:23 98:4
  98:8
**48** 3:14 188:7
**486** 185:11
**4:14** 258:3,7
**4:24** 258:7,9
**4th** 214:14
  216:5 240:14

**5**

**5** 3:8 104:21,22
  104:25 123:13
**5/03/2021**
  218:7
**5/16/2021**
  216:17
**5/3** 216:17
**5/31** 218:5
**50** 25:3 93:8
  111:7,16,21
**50/50** 96:15
  99:20
**500** 2:3
**564** 210:3,3
**565** 210:4
**5:00** 268:4
**5:08** 289:13,15
**5:15** 289:15,16
**5:20** 1:13
  294:14,18

**5th** 148:12
  215:7,8

**6**

**6** 2:15 3:9 43:9
  46:3 105:15,19
  105:19,23
**6/13/2021**
  218:5
**6/14** 218:18,19
**60** 96:13,14,15
**60/40** 96:14
**6853645** 297:3
  298:4
**6:40** 175:20
**6th** 108:19,22
  236:8

**7**

**7** 3:10 49:1
  109:5,9,10
  110:4 111:3
  151:1 198:22
  218:18
**7/12** 218:19
**73** 3:4
**794** 216:14
  217:21,22
**797** 217:11

**8**

**8** 3:11 114:2,5
  114:12,16
**8/15/24** 298:4
**80** 215:19,25
**800** 204:9

**8:23** 1:3 5:15
**8:36:25** 111:6
  111:14
**8th** 196:19

**9**

**9** 3:12 114:22
  115:1,5,20
**90** 184:15,25
  185:23 189:2,6
  189:11,11
  190:11,11
**95** 16:23
**96** 3:5
**98** 204:19
**99** 18:20
**9:23** 1:13 5:3
**9th** 102:9,12
  128:10 129:13
  129:18 130:1
  206:10,19
  240:15

**a**

**a.m.** 1:13 5:3
  70:22,25,25
  71:2 111:6,14
  185:15 229:13
  229:17,25
  230:1
**abbott** 18:19
  65:7
**ability** 13:15
  108:1 144:25
  155:15 213:17
  267:15 268:12

**able** 33:22,23
  50:16 63:14
  87:18 93:9
  137:20 158:21
  158:22 162:16
  182:16 208:22
  209:6 210:14
  210:16,24
  219:23 220:14
  220:15 228:14
  247:8 255:22
  269:6,6 277:21
  283:8,9,12
  284:11,14,19
  285:8,12 287:1
**abnormal**
  213:6,11
  277:10
**above** 298:6
**absence** 122:6
  123:23 173:12
  173:22
**access** 28:21
  82:16,16
  223:10 244:15
  244:16
**accidentally**
  187:13 282:11
  290:19
**acclimated**
  246:22
**accommodate**
  184:14
**accommodated**
  169:24 179:21

191:13

**accommodati...** 180:15

**accommodati...** 3:24 4:4,5 49:5 158:3,8,12,22 158:23,23 159:12,13 167:20 168:13 170:23 175:14 176:14 177:22 178:4 179:14 179:24 181:17 181:22 182:2,3 182:17 183:12 184:9,25 185:23 186:1,7 186:10,23 187:15,17 188:6,16 189:22 190:16 276:6 281:5

**accommodati...** 167:24 168:7,8 189:16 190:4

**account** 25:22 79:22 89:25 113:13 118:5

**accountabiliti...** 74:12,15 75:11

**accountable** 260:4

**accounts** 61:20

**accuracy** 298:8

**accurate** 22:11 86:8 124:8,15 202:8 210:21 210:25 211:3 211:16

**accurately** 13:3 74:16 75:11 94:20

**achieve** 102:4

**acknowledg...** 152:8

**acronym** 195:21 220:5

**action** 5:21 32:1,3 191:21 280:20,25 281:4 296:14 296:15

**actions** 125:1

**active** 77:2 103:16 104:5 115:14

**actively** 77:3 107:9,11,12 110:12 131:8 139:21,22 145:6

**activities** 3:16 3:18 120:6 143:5 153:17 153:19

**activity** 43:15 120:11,13 121:19 139:5 139:19,20

148:22 151:3

**actos** 62:15,16

**actual** 41:25 51:20 111:24 176:7 225:22

**actually** 18:24 34:11 35:12 40:20 41:1,9 45:4 47:4 48:14 67:10,10 77:16 91:1 98:18 99:25 106:2 107:21 110:19 111:2 115:9 121:18 122:22 126:18 136:17 138:17 141:10 144:13 144:24 155:23 159:2,16 173:21 174:8 195:1 203:19 217:11,15,19 228:4 237:3 238:6 248:25 265:3

**ada** 3:23 177:19

**add** 82:8,8 87:10 285:7

**added** 85:24 91:16

**addition** 36:17

**additional** 18:2 75:2 76:4 83:2

141:23 143:8 165:7 203:18 203:19

**address** 14:4,11 55:7 75:22 89:12 240:21 241:1 243:15

**addressed** 51:23

**addressing** 249:17

**adequately** 79:1

**administrative** 245:6

**advantage** 84:12

**adverse** 31:25 31:25 32:1,3

**advice** 35:17

**affidavit** 106:9 106:16

**affiliations** 6:1

**affinity** 221:8

**affirm** 6:14

**age** 222:21

**aged** 68:1

**agency** 21:23

**ago** 7:1 12:10 12:10 20:8 36:24 43:18 61:4 118:18 143:21 166:13 166:23 178:24 214:15 289:20

**agree** 5:8 71:15
74:14 75:10,10
77:7 79:18
80:11,20 81:10
81:16,20 87:9
92:9 96:3
97:14,17 100:2
103:2 113:23
115:12 120:5
120:10 121:6,7
121:13,23,24
121:24,25
122:4,25
123:19,22
124:7,14,20,21
124:25 125:8
125:10 130:3
130:19 138:21
139:16 154:6
155:3,7,9,13
158:2,14,17,25
159:7 161:20
161:23 162:2
162:12 167:19
168:11,12,18
178:6,11
179:23 180:20
186:9 191:11
192:13,18
194:10,12
195:18 205:5
208:14,17,20
209:4 210:15
215:3,6,24
222:11,14,17

222:20 229:15
229:24 230:21
236:11 244:23
246:25 250:12
260:13,13,19
260:24 261:20
281:15,20
287:7
**agreed** 95:3
238:9
**agreeing** 42:10
121:21 168:6
229:6 270:3
**agreement**
152:8,11,25
**ah** 15:23
**ahead** 23:7
37:25 38:1
40:19 55:14
81:23 145:7
190:20 203:6,8
203:9 244:15
**ai** 70:3
**alan** 36:1
**alicia** 35:25
**alive** 138:3
**allegation**
39:14
**alleged** 49:4,7
251:18
**alleging** 289:23
**allow** 57:24
160:15 168:15
196:24 221:16
246:21 264:9

**allowed** 153:3
159:15,23
160:11,17
169:9 181:16
186:2,11
196:22 265:6
**allowing**
168:19
**alternate** 58:3
**alternative**
179:12
**amazon** 109:15
109:18,22
110:1,9
**amber** 171:19
**amckinley** 2:8
**amended** 32:7
220:4
**amendment** 3:7
**america** 1:8
5:12 6:6 297:2
298:4
**amount** 197:17
**amounts**
195:24
**analysis** 89:8
**analyze** 66:25
**analyzing**
66:10 67:2,3,4
67:17 84:19
**anderson**
162:25 163:2,6
163:13,19
164:23 166:14
167:20 168:12

168:18 169:6
175:11 177:8
177:15 178:9
178:13 179:1,7
179:18,20
180:21
**anderson's**
170:13
**andrew** 2:6 6:5
7:1 131:21
298:19
**ann** 1:19
295:15 296:5
296:21
**annie** 5:19
**announced**
159:8 191:12
**annual** 3:8
105:1,5 123:15
123:20 131:5,7
234:3,12
259:25 260:2
260:20,22
**answer** 10:14
10:15 11:25
12:4 13:2,15
17:11,19 23:7
39:2 40:19
45:11,20 50:7
80:8 146:13
169:15 171:5,8
176:3 210:12
226:12,16
227:5 251:8
269:7

**answered** 40:6 143:3 239:4

**answering** 12:2 75:6 96:16 170:3 224:22

**answers** 44:17 53:24 143:12 145:25

**antidepressants** 205:22

**anxiety** 166:11 166:19 167:15 172:8,11,14,22 199:1,3,17 200:6 207:17 278:7 285:10 286:1

**anybody** 20:16 24:6 87:6 114:10 130:24 130:25 131:11 132:22 133:3 134:23 139:24 148:25 149:14 149:14,20,24 149:25 150:15 154:2 157:17 159:8,15,23 161:4 165:19 165:22 166:6 171:13 200:13 200:17 209:11 214:1 226:5 231:18,23,24 232:6 236:18

238:18 253:6 253:14,25 257:21 265:22 266:5 267:6,10 271:12 272:5 272:11 273:15 274:3,25 275:3 276:1 279:15 279:20 280:13 280:20,24 281:3 287:20 288:1

**anymore** 18:9 36:23 52:21 73:8 74:24 104:9 138:18 138:20 148:13 195:22 276:6 283:18 289:24

**anything's** 28:20

**anyway** 218:3

**apart** 21:18,21 38:20 68:5 193:4 223:21 228:1 241:15 242:25 270:12 272:5 279:14 284:24

**apologies** 11:8 181:6 199:15

**apologize** 75:16

**app** 19:23

**appeal** 194:16 195:23 210:4

210:10,16,23 213:17,19 214:15 278:19

**appealing** 87:1 87:11

**appeals** 184:22 195:22

**appear** 121:2 185:16

**appearance** 2:2 5:24 125:1

**appearances** 2:1 6:1

**appeared** 234:3 295:7

**appears** 97:6 119:16 134:19

**apple** 51:4

**applicability** 138:12

**application** 263:24

**applications** 106:6,8,23 108:7

**applied** 160:10 263:22 270:14 270:18,21,25 287:17

**applies** 139:1 194:19

**apply** 106:15 158:22 248:24 270:11

**appreciate** 94:14

**approach** 87:23 127:12 245:5

**appropriate** 76:13 156:15 157:3 204:22 205:6,7 233:9

**approval** 108:10 120:1 130:6,10,16,20 134:17 140:15 142:16 143:18 146:9,16 147:18 149:2,5 150:10 152:7,8 152:11,24 153:13 154:3,8 154:16 157:21 157:22 163:17 197:21 247:12 247:15 276:9

**approve** 145:12 156:2 182:21 197:17

**approved** 20:13 148:22 151:3 153:21 155:20 156:20 156:23 184:18 184:24 186:17 190:12 194:7 197:1 206:2 218:14 241:12

241:13 247:16 247:18

**approves** 197:11

**approximately** 14:8,14,24 57:20

**april** 97:8,22 203:1,4,4 206:10,19 207:23 208:7 209:5,24 211:7 215:7,8,8,25 219:7 240:16 258:23 275:22

**area** 14:22,23 85:20 161:10 250:24 275:17 275:18

**areas** 79:19 241:18 255:7 275:18

**arms** 103:10

**arrived** 15:4

**arthritis** 173:18

**articles** 3:6,7 102:24

**arts** 17:22

**aside** 38:19 68:11 74:19 76:15 163:16 228:11 272:9

**asked** 10:15 27:1,8 39:16

39:16,20 40:10 42:3,4,7 43:11 44:16,17 45:8 47:1,6,11 48:13 49:1 50:1,18 53:19 54:2,7,8 75:7,7 85:9,10 87:16 89:2 128:24 133:13,24 142:12,23 143:16,17 152:11 153:16 153:17 164:2,5 164:7,17,18 180:21,21 183:8,11,14 184:22 202:10 209:2 232:18 232:21 251:14 251:18 257:19

**asking** 10:18 12:23 29:18 39:5 40:6 45:20,22,23 47:22 50:7 61:4 87:4 89:18 90:5 103:13 128:19 140:20 159:22 164:14 224:8 228:8 232:12 253:16 265:21 265:21 291:20

**aspect** 77:8 83:17 144:5 283:15

**aspects** 64:17 83:6,7 222:8 287:2

**asserting** 280:5

**assess** 68:9

**assessing** 92:11 225:10

**assigned** 75:2 76:5

**assignment** 297:3

**assist** 63:15 75:21 89:12

**assistant** 248:14 270:23

**assisting** 74:25 76:12

**associate** 6:9 39:16 44:16 45:9 58:8 65:18

**assume** 10:8 24:17 47:11 211:19 274:18 293:8

**assuming** 157:8 232:9

**atlanta** 2:7

**attach** 297:1

**attached** 41:13 44:3,5 78:23 298:9

**attack** 286:11 286:12

**attainment** 260:17 261:17

**attempt** 43:14

**attempting** 109:24,25

**attention** 69:9 70:5 246:6

**attorney** 2:5,8 6:2 7:2 24:7 27:10 29:15,20 32:13 38:21 39:13,15,18,22 40:2,9,13,17 45:7,16,25 46:23,25 47:24 50:2,7 54:5,9 292:20 296:12 298:10

**attorneys** 44:16 296:14

**audio** 5:6

**aug** 3:13

**august** 1:12 5:3 100:13,14 109:17 110:18 111:6,13 112:22,23 113:21 114:14 116:20 286:22 295:10 296:16 297:1 298:1

**authority** 295:6

Shannon Olson August 15, 2024
Olson, Shannon v. Takeda Pharmaceuticals America, Inc.

[authorized - believe] Page 9

**authorized** 296:6

**available** 19:1 21:9 37:24 44:4 113:8 165:8 183:21 203:23 298:6

**avenue** 14:5 298:2

**aware** 13:1,4 21:15 25:9,13 25:24 27:2 44:9,14,18 52:15 53:13,25 106:22 145:15 147:20 159:15 159:23 185:10 187:7 189:17 193:14 197:24 219:2 222:23 223:22,25 224:10,12,14 241:11 253:13 253:14 264:14 265:9,22 267:5 267:9 275:25 279:19 287:25

**awareness** 99:9

**b**

**b** 3:1 4:1 35:13 37:18 56:19

**baby** 275:9,10 279:5

**back** 12:5 14:15 18:6,19 31:4 37:22 40:25 44:18 46:3 49:22 50:18 61:10,25 71:3 85:19 86:4 88:17 89:3,3 119:25 121:15 123:12 124:1 125:24 132:7 134:11 135:13 139:11 139:14 148:21 152:20 167:5 177:5 179:17 192:10 193:5 204:13 213:25 217:14 226:20 258:10 261:4 277:25 278:1 280:10 283:25 284:1,3 289:17

**background** 9:9

**backup** 112:11

**bad** 121:12 250:4

**balanced** 99:19

**bar** 249:3

**barr** 166:9,12 171:14,24 172:2,5

**base** 82:4,6 284:24

**based** 39:14,17 62:9 91:15

191:6 194:2 226:22,25 238:8 251:17 262:3 268:17 271:14,22 288:3

**basic** 212:2

**basically** 47:22 57:23 81:25 85:22 87:17 155:20 176:11 218:9 227:7 264:2,25

**basing** 111:24 154:10

**basis** 227:4 228:5 251:3 275:5 276:3 279:17 287:22 289:2

**basketball** 154:19 241:6 247:11,15 249:2

**bathroom** 12:13

**beach** 14:3

**beating** 13:19

**began** 55:21 139:5

**beginning** 6:2 72:23 104:14 127:8 240:22

**begun** 139:8

**behalf** 6:10 254:21

**behavior** 76:14

**beilstein** 1:19 5:20 295:15 296:5,21

**belief** 276:16

**beliefs** 49:12

**believe** 8:18 13:17 16:22 17:3,14 18:8 18:11 28:24 29:2,5 40:23 52:6,8,9,10 62:16 64:22 65:16 72:4 92:10 94:3 99:1 104:10 108:9 122:10 132:21 134:10 142:19 143:15 144:2,2 154:5 156:6,8 163:22 164:8 170:17 171:7 182:22 184:7 186:5 187:21 201:8 227:16 231:13 257:7,8,12 260:8 272:6,15 273:21 274:9 274:21 275:4 276:2 279:15 280:20,24 281:3 287:15

288:19,21 289:1 292:10 292:14

**believed** 208:10 277:8

**believing** 176:23

**beneficial** 265:3

**benefit** 63:5

**benefits** 214:16

**bereavement** 202:23 203:11 203:14,18,19

**berger** 126:2 126:13,15,19 128:9 129:9,12

**best** 10:10 11:9 21:19 24:25 32:20 35:8,9 37:8 52:11 63:2 82:19 83:8,20 89:22 133:4 256:3

**beth** 37:15

**better** 89:21 95:10 127:11 148:14 153:18 195:14 287:3

**beyond** 36:12 36:13,14 68:20 91:25 92:2 198:10

**big** 19:9 41:1 42:22 93:16

**bit** 12:5,15 13:22 39:10 71:7 85:2 102:8 116:25 144:21 170:2 286:5 293:21

**black** 2:11 5:17 84:21

**blank** 36:3 290:13

**blatantly** 22:20

**bless** 206:21

**blocks** 14:10

**blood** 87:20

**blow** 115:2

**blurt** 228:17

**blvd** 1:15

**board** 95:18 139:2 195:7

**bonus** 56:19 284:25 285:6

**born** 13:23,25 16:2 57:15

**bottom** 74:11 110:6 119:18 125:9,10,10 145:17,21 175:18 215:20

**bought** 145:4

**boulevard** 5:16

**bow** 284:17

**box** 39:19 145:19

**boxes** 134:20 137:11 222:9

**bradenton** 56:14 57:5

**brain** 9:17

**brand** 82:14 99:25 100:1 128:2

**brandon** 56:14 57:5

**break** 12:12,15 12:20,23 39:9 55:12,16 70:19 70:20 71:6 114:10 192:1,4 258:2 289:8

**breakdown** 226:2

**bredal** 35:12

**brief** 127:2

**bring** 22:9

**brinkley** 105:9 105:12,20 106:1 114:14

**brinkley's** 106:5

**britt** 36:7

**broad** 200:19

**broke** 293:20

**broken** 197:14

**brother** 205:21

**brought** 56:10 161:2 246:6 265:17 290:2

**bubble** 115:2

**build** 80:21 82:5

**builder** 109:15

**building** 80:13 82:3

**bullet** 74:15 75:11,19,21,24 76:20 77:2,17 78:12 89:3,11 124:12,21 125:1 169:1 261:12

**burdis** 65:25

**business** 43:15 63:20 68:3,24 77:5,8,18,20,24 81:10 82:9 96:22,22 105:6 109:18 116:21 122:2 175:1 189:15 190:2

**busy** 189:13,14

**buy** 144:25

**c**

**c** 5:1 37:18 298:21

**calendar** 184:12 252:16 252:18,20 253:22

**california** 189:18 190:1

**call** 9:9 53:9 68:6 87:17,21 88:6,24 90:5 113:10 126:18 126:21,22

128:25 129:8 129:11,14 132:16,19,22 133:5,14,15 143:10,21,23 144:6,12 145:10 146:5 148:9,17 149:9 149:17,22,23 150:8 153:14 154:13 155:18 175:14,25 177:4,6,10,14 184:6,8,12,13 186:6 204:9 211:21 219:9 227:16 236:1 241:9 244:17 252:4,17,18,22 252:24 253:5 253:20 255:12 256:15,16 257:5,19 277:17 293:15

**called** 16:18 18:7,16 30:10 53:14 67:6 82:23 83:12 91:11 102:8 113:9 127:2 138:5 141:7 145:14 177:19 197:7 219:8 270:19,22 277:14

**calling** 63:23 83:3 206:1 280:17

**calls** 88:4 129:5 133:9 162:16 162:17 178:12 221:24 251:1 251:15 255:13 257:1,22 277:16

**cancer** 207:9

**candidate** 87:1 164:25

**capabilities** 262:13

**capacity** 208:15

**car** 51:10 173:23,23 199:4,5,6,12,16 286:15,21

**care** 21:20 59:20 77:12 80:13 160:2 205:24 276:25

**career** 71:19 86:9,11 100:19 206:15

**caregivers** 222:2

**cares** 93:15

**carolina** 15:7 15:10,13,17,19 15:19 16:14 17:1,2,6 18:3

**cart** 145:3

**case** 1:3 5:14 7:3 20:4,12 26:19,24 31:14 32:13 34:15,18 39:10,23 40:8 42:3 52:3,13 53:3,7,15,18 140:21 164:18 243:1 288:12 297:1

**cases** 20:15 23:3,6,9

**catch** 11:12,13

**caught** 256:1

**cause** 124:10 124:16,17,23 125:4,12 150:8

**caused** 22:19 249:10

**cc** 290:13 298:19

**cell** 52:23

**certain** 25:15 83:6 176:21 259:12,12 264:9,11 265:5

**certainty** 174:4 285:12,13

**certificate** 2:15 2:16 295:1 296:1

**certified** 18:9

**certify** 295:6 296:6,11

**certifying** 211:22

**cetera** 30:18 56:20 59:22 73:10 83:13 144:20 203:16 222:6 224:6 245:17 277:5

**chain** 28:16 109:11 125:20 125:24 130:5 141:19 150:23 162:24 174:22 181:12 182:10 254:12

**chance** 70:17

**change** 77:12 88:18 103:21 103:25 245:5 279:11 297:4,6 297:8,10,12,14 297:16,18

**changed** 28:1 50:15 51:1 67:24,25 72:23 85:25 91:14 95:1 102:11 103:15 104:10 104:10 122:22 138:1 160:20 188:18,20,24 275:11

**changes** 263:15 298:8

**changing** 55:1 68:2 171:5

**characterizati...** 23:6 266:23

**characterizing** 185:11,20 221:22

**charge** 4:20 21:23 91:7 288:12 289:19

**charleston** 16:2 16:8

**check** 25:16,19 112:15 215:16 232:6,12 289:9

**checked** 118:22 230:12

**cherney** 2:10 6:9

**chest** 13:20

**child** 8:15 9:4,6 20:7 199:21 279:4

**children** 8:7 32:16 51:8

**children's** 8:16

**chill** 227:7

**chris** 5:17

**christian** 37:15

**circle** 33:2 37:10

**city** 16:10,12

**civil** 1:18 298:20,20

**claim** 32:4 107:5 194:4,14 195:20 275:23 276:17 277:8 277:23 279:14 280:6 287:22 289:25

**claimed** 106:23 231:4 289:21

**claiming** 32:4 280:12 283:17 283:21

**claims** 23:17,20 23:25 31:14,17 31:22 32:9,12 40:13 192:15 193:8,20 283:1 283:4,5

**clarify** 23:17 163:14 164:17

**clarifying** 10:2

**clarity** 48:12

**clean** 261:13

**clear** 10:17 12:15 31:21 50:6 59:23 60:14 69:1 71:19 77:14 80:9 95:17 101:9 154:15 157:8 224:21 225:19 239:10 280:3

**cleared** 191:8

**clearer** 68:15

**clearly** 145:19 250:11 261:18

**client** 40:17 81:9,10,12,13 176:20 294:9

**clients** 68:22,23 82:8,9

**clinical** 210:11 211:3

**close** 176:24 248:19

**closer** 110:4 256:19

**coach** 154:19 241:6 248:14

**coached** 243:10

**coaching** 234:16,18,22 238:1 240:13

**collaborate** 62:18,23,25

**collaboration** 262:12

**collaboratively** 62:3,11,13

**colleagues** 158:20

**colleen** 203:1

**college** 16:8

**columbia** 15:20

**combination** 22:20

**come** 14:25 15:1,2 72:1

84:24 88:17 98:16 126:25 192:16 228:16 233:2 267:19 277:25 278:1 278:17 282:1 282:11 283:4

**comerinksky** 231:17,25

**comerinsky** 36:1

**comes** 28:2 193:19 228:16 285:13,14,16

**comfortable** 72:16 161:5 178:25

**coming** 6:23 35:16 73:14 84:4 90:19 150:6 287:14

**command** 254:13

**comment** 99:13 274:12,13

**comments** 261:25 262:5 271:13

**commerce** 106:24 107:2,6 108:18

**commission** 295:17,18

**committed** 44:25 45:5

46:1 205:21 238:10

**common** 36:18 127:17

**commonality** 36:18

**communicated** 88:7

**communication** 27:24 29:16 45:8 48:24 99:6

**communicati...** 49:8,8,11 148:25 202:4

**comp** 285:4

**companies** 18:23 287:18

**company** 3:8 18:16 30:22 44:12 48:3 52:25 91:20 94:5 96:17 102:8,12 103:3 110:20 116:1 116:10 117:24 118:1 127:16 127:20,25 131:6 138:24 139:8,25,25 140:17 147:11 147:13,15 151:7 173:23 194:21 196:6 199:6 204:10

206:6 236:12 246:9 248:9 281:21,25

**company's** 103:15,21

**comparator** 31:20

**competencies** 91:17 92:19

**competing** 120:7

**compilation** 104:25

**complaint** 21:22 39:14,18 220:4,10 251:17 271:3,5 271:10 280:6 280:14,21 281:1 289:23

**complaints** 39:10 49:3 272:11 279:23

**complete** 18:12 134:25 152:12 153:16 173:23 263:20

**completed** 28:7 97:11 147:23 152:25 153:2 155:24 234:13 298:12

**completely** 13:2 256:1 285:18

**compliance** 3:14 46:7 79:7 79:11 117:1 119:12 132:25 149:4,8 150:7 150:14 154:3

**complication** 59:11

**complied** 48:21 79:14 121:17 225:11

**comply** 80:2

**complying** 79:16 121:9 186:21

**component** 91:16 92:15,18

**components** 19:3

**compound** 200:3

**compromising** 120:7

**concern** 165:9 165:18,24 213:5 243:1

**concerned** 149:8 150:8

**concerning** 116:20

**concluded** 294:18

**concludes** 294:14

**conclusion** 280:17

**concrete** 277:3

**condition** 66:12 173:9 174:1,5 174:11,15 179:20 180:4 190:6 277:1 279:25

**conditions** 73:10 77:3,11 77:12 166:7

**conduct** 80:2,3

**conducting** 122:1

**conference** 88:4,6 126:22 149:9 154:13

**confidence** 84:2

**conflict** 30:10 120:12

**conflicting** 120:7

**confused** 128:16 170:2

**confusing** 41:11

**congratulate** 154:18

**congratulated** 227:16

**connected** 296:14

**connecticut**
14:1 15:16
16:17,18 17:14
203:16
**connection**
149:21 239:18
**connector**
128:5
**consecutive**
204:1
**consider** 21:25
22:2 131:1
274:6
**consideration**
226:6
**considered**
19:11,21
298:13
**considering**
214:14 238:4
**consist** 64:11
**consistent** 81:5
246:15
**consistently**
84:3 244:19
**consisting**
53:16
**consists** 42:7
**contact** 87:18
134:11
**content** 29:16
29:19
**context** 238:5
**continue** 5:7
207:5

**continues**
99:10
**contribute**
202:13 259:24
**contributing**
207:11,20
**conver** 142:7
**conversation**
11:18 29:19
44:15 53:9
127:3 128:18
142:8 165:2
168:25 178:7,8
184:3 201:1,3
201:21,25
204:25 205:1
232:21 233:2
234:2,7,12,21
234:25 239:16
241:10 245:13
245:13,25
246:5 272:20
272:22,23
273:15
**conversation...**
127:23
**conversations**
5:5 42:15,17
154:2 164:22
164:23 193:15
233:16 235:5
235:10 240:25
241:17,22,25
245:1,4,11

**coordinate**
221:17
**copied** 282:8
**copies** 298:11
**copy** 73:20
74:8 97:4
102:18,24
103:20 105:19
109:11 114:13
115:5 119:12
125:20 132:13
136:7 141:19
150:22 152:20
162:23 164:2
174:22 181:12
182:10 191:1
203:14 212:19
214:12,25
228:25 258:18
288:11
**core** 92:18
**corner** 110:6
119:18
**corporate**
30:22 44:11
47:15,18 48:2
157:12
**correct** 20:14
23:18,19,22
40:2,3 44:12
44:25 46:17
50:4 54:9,10
55:22,23 60:17
60:21 67:12
73:20 76:1,6,6

79:8 85:8
90:10,12,14
91:21,24 92:8
97:4,5,9,10,13
97:23 98:5,8,9
99:4,14 100:20
102:9,12,13,24
102:25 103:1,5
103:17,18,19
103:23 104:2
105:8,10,11,19
105:22 107:18
108:3 109:11
109:12,13
110:10,16
111:18 114:13
114:14,15
115:5,7 116:12
117:7 119:2,11
120:3,4 122:16
125:20 126:19
129:19,24
132:13,14,16
134:1,14
135:10 136:7
139:3 141:18
141:20,21
147:1,12,23
150:12,22
151:3 152:3,19
152:21 155:12
158:5,12,13
159:14 160:24
162:23,25
163:4 167:8

168:1,9 174:22 174:23 176:2,5 177:8,16 178:14,17 181:11 182:10 182:11,17 183:9,13 185:24,25 186:13 187:6 188:25 190:5 190:18 191:1,2 191:9,19,20,24 194:11 196:18 196:21 198:2 198:18,19,22 198:24 206:11 210:6,20 212:18,23 213:21 214:12 214:24,25 215:9 216:5 217:1,4 218:6 218:8,25 225:6 228:25 229:4 231:3 235:13 235:17 236:4 236:25 241:8 243:8,17 245:1 247:20 252:1 252:13,21,23 256:4 258:18 258:19,24 259:4 260:5 262:23 267:17 268:8 271:6

281:10 288:11 288:15 289:25
**correctly** 115:19 170:18
**costs** 111:22
**cote** 4:11
**counsel** 1:16 5:10,25 6:7,8 51:19 55:2,6 296:12,14
**counterpart** 56:12,18 58:25 59:15,15,24 61:6 62:3,5,11 62:13,14,16 63:1,4,15 64:1 64:1 171:17,22 236:2,3 249:23 250:3 273:4,6 273:7,9
**counterparts** 56:17 59:9 60:23,24 61:15 63:13 84:14
**country** 252:9 255:7
**county** 15:24 295:3 296:3
**couple** 19:9 28:2 72:18,19 108:5 270:21 270:25
**course** 12:4,6 49:17

**court** 1:1 5:13 5:19 6:3,12 10:24 11:7,13 11:24 20:13 53:17 185:14 293:24 294:4
**cousin** 16:10
**cover** 173:2 218:20 244:6 244:25
**covered** 33:8 97:7,8 118:6,8 258:23 289:10
**covering** 245:21
**covers** 243:10
**coverup** 245:22 246:4
**covid** 4:6 68:16 81:1 161:6,11 161:14,19 164:24 165:14 165:14,18,24 165:25 167:21 168:3,14,20 169:10,24 186:12 189:2 189:19,23 191:5,19,23 263:15,19
**coworker** 171:20 232:7 232:13
**coworkers** 202:17 204:24

205:8
**cpt** 1:3 5:15
**craig** 2:11
**crap** 282:11
**crashed** 199:12 199:16
**create** 72:24 82:22 90:5
**created** 68:16 72:25 102:8,12 110:11,11,15 165:14 187:8
**creating** 71:11 123:8
**cresset** 91:13 91:19 92:10 93:1,2,5,7 94:19 95:7,18 96:19,21,23 97:22 98:4,7 98:10 262:22 263:8,18
**criticizes** 187:8
**crossing** 185:2
**crouch** 26:13 29:3 49:24 90:21 146:7,15 152:1 172:1,7 172:19 174:10 201:4 229:1,12 229:17,18 230:1,9,23 231:4 235:1,20 259:5,6,7 272:2 274:8

**crushed** 173:23
**cs** 298:11
**culturally** 232:7,13
**curious** 255:3
**current** 31:13 31:22 50:22 66:15,15 78:8 84:20,21 122:10 169:15 284:21 289:23
**currently** 14:2 33:4 36:17 52:11,18 65:9 72:7 137:15 165:8 280:5
**cursory** 242:17
**customer** 63:23 82:3,6,12 161:2
**customers** 64:2 64:4 82:10,11 83:2 158:20 159:11,24 160:21,22 161:5 191:9
**cuts** 99:20
**cv** 1:3 5:15
**cycle** 268:5

**d**

**d** 2:13 5:1 35:13 70:3,3
**dad** 20:23 35:3 181:13 207:9

**dah** 266:15,15 266:15
**damages** 49:7
**dark** 229:10
**das** 2:11 6:8
**data** 30:12,13 30:15,16,17 66:10,25 67:2 67:4,5,9 68:3 82:13,16,18 83:11 84:19,20 84:20,21 165:7 165:16 166:3 210:12 223:15 223:19 225:21
**database** 260:16 261:17
**databased** 83:7
**date** 1:12 59:23 59:24 69:21 104:13 112:22 123:23 139:17 183:17 245:24 271:15 297:23 298:10
**dated** 143:2 296:16
**dates** 17:7,7 22:11,11 57:1 163:20,21 198:23 216:11 216:12 230:4 245:19,20
**dating** 32:18 33:12

**daughter** 8:10 207:17
**david** 4:17 90:11
**davis** 49:4,8,14 99:1 154:7,21 154:24 157:18 157:22 232:15 234:4,9,13,17 234:18,23,23 235:2,6,10,15 235:20,24,24 236:18 237:20 237:23 240:5 240:14 243:1 248:1,5 256:25 257:4 260:3,3 260:21,21 286:24 292:9
**davis's** 157:1 233:21
**day** 8:22 9:16 12:11 37:22 58:3 72:2,12 72:13,24 85:13 89:23 98:3 112:24 147:1 175:10 183:7 183:11 184:25 189:2 190:11 197:11 218:3 223:3,7 249:25 295:10 296:16
**days** 58:2,3,4,4 58:11 83:13

112:18 184:15 185:24 189:6 189:11,11,12 202:22 203:11 204:3 205:25 211:11 298:13
**dc** 2:4
**deadline** 187:9 188:7,9,10
**deadlines** 186:20 212:4,8
**deal** 276:25
**dealing** 189:23 277:1
**dear** 298:5
**death** 199:2 200:14,22 201:18,22 202:1,6,11,18 202:25 204:24 205:9 207:2,7 231:5
**debbie** 37:15
**decade** 67:25 164:12 166:23
**december** 55:22 98:8 203:1 285:6
**decide** 79:14 150:1 183:5 246:22 266:25
**decided** 162:13 243:25 252:3 252:12,14

**deciding** 80:1

**decision** 169:17
171:1 181:17
197:18 226:5,7
226:22,25
227:3 248:25
249:1 275:22

**decisions** 228:4
269:1,4

**declare** 297:19

**decreasers**
84:22

**deemed** 24:13
52:20

**deeming**
130:23

**defendant** 1:9
1:16 2:8,11 3:3
4:3 5:11

**defendant's**
4:22 41:18
48:9 73:24
96:24 102:20
103:6 104:22
105:15 109:5
114:2,22
116:13 119:5
125:15 132:8
135:2 141:13
148:3 150:18
152:14 162:19
174:17 178:18
180:24 182:6
190:22 209:16
212:15 214:7

214:19 228:21
239:20 258:15
288:6

**defendants**
49:9

**defense** 41:8
258:11

**deficiencies**
242:11

**deficit** 69:9
70:5

**deficits** 99:15

**define** 219:23
219:25 220:15
248:7 274:15

**definitely** 47:12
47:12 185:7

**degree** 17:21
17:22

**dei** 219:19,21
220:1,5,5,13,15
220:15,17,19
222:8,9,25
223:23 224:1,6
224:10 225:8
225:11,15
226:5 227:24
228:2

**delay** 218:23

**delete** 52:13

**deleted** 24:1
25:14,25 28:16
28:24 29:3,6
50:16 52:19,19

**deliberations**
162:12

**denial** 184:21
184:23 196:1
208:6 210:5
216:4,4 218:24
219:4 276:7

**denials** 185:11

**denied** 183:8
194:7 195:20
212:21 218:20
275:8 276:17

**denies** 194:13

**deny** 197:18
275:22

**denying** 213:2

**department**
227:6

**depended**
62:14 138:12

**depending**
96:10

**depends** 205:13
206:7,8 251:2
251:7,11,13

**deposed** 6:20
8:12 9:7

**deposing**
298:10

**deposited**
215:17

**deposition** 1:11
5:10,16 7:4
8:17 22:8,14
27:18 29:9,21

30:4 31:1
41:13 51:23
55:9 94:15
288:23 289:3
290:22 294:18
296:7 297:1
298:4

**depressed**
198:4

**depression**
66:15,16 68:25
69:2 87:19
166:11 167:15
172:17,20,22
173:4,17 199:1
199:3,17 200:6
202:13 206:25
207:12,20
208:18 275:9
278:7 285:10
285:21 286:1
287:2

**derogatory**
274:13

**describe** 42:16
59:3 66:17
136:12 141:11
143:4

**description** 3:2
3:4 4:2 73:21
74:8,20,23
75:3,25 78:7
79:2 90:3
145:19 153:18
242:17

**descriptive** 136:18

**designated** 275:12

**designed** 85:17 264:20

**desire** 125:2

**detail** 136:12 141:11 143:4

**detailed** 242:18

**details** 143:8

**determination** 178:3 194:6 212:20

**determinations** 193:16

**determine** 111:20 120:11

**determined** 214:16 244:1

**determining** 121:17

**detriments** 63:9

**develop** 80:25 81:4 83:8,25 99:12 100:23 101:20

**developing** 98:25 101:3

**development** 100:20 101:14 262:13

**diagnosed** 166:12,19,20

**diaz** 90:11

**died** 181:14 198:2 200:23 201:7 203:1 230:15,18

**differ** 62:9

**difference** 74:22 75:18

**differences** 76:24 237:6

**different** 19:19 26:9 35:15 45:10,14 46:12 55:6 57:13,14 61:24 65:7 84:20 87:23 88:16,16 90:18 90:25 95:1 96:1,2,2,4,11 96:22 101:23 113:1,6 131:4 135:11 143:16 147:12 155:1 159:5,18,21 160:1,8 166:6 166:16 173:13 179:16 188:8 192:13 205:4 220:17,22,25 221:1 227:12 231:10 236:20 236:21 253:5 255:3,7 263:14 271:1 272:17 273:2,3,6,7,8

275:9 278:21 285:18,19 291:2

**differently** 46:24 73:12 87:22,22,23 137:23 157:21 160:11 215:5 219:3 265:22 266:20 273:17 277:23

**digital** 112:12 112:13

**direct** 2:15 6:21 56:12,16,17,17 59:15 168:21 169:6,12,19,21 170:9,20 171:22 215:17

**directed** 177:7 177:9

**directly** 90:20 90:21 173:1 234:17,18

**directors** 250:24

**dis** 16:5

**disability** 4:9 31:18,22 32:4 32:4 123:2,23 179:25 184:17 192:15,20,25 193:8,11,16,20 194:4,6,14 195:21 196:7

197:22 198:17 198:20 206:9 207:24 208:6 208:10 209:5 209:24 210:5 211:7 212:21 213:7 218:14 222:18 257:13 273:22 274:1,4 274:5,9 275:5 275:22 276:3 276:17 277:8 277:22 279:14 279:17,17,20 279:24,24 280:15,22 281:5 287:5,10 288:3,4 289:2

**disagree** 142:18 161:17 161:21 180:13 246:19 260:24 262:9

**disagreeing** 121:22

**disciplinary** 226:25

**discipline** 124:10,17 149:21 150:5 151:5,8 153:7 187:1 191:22 237:13,23 238:4,20 239:5 239:6,15

247:23
**disciplined**
150:2 153:6
186:17,22,24
190:15 247:21
**disclosing**
279:19
**disclosures**
30:22 53:14
54:1,4,25 55:3
**discovery** 1:17
39:6 40:16
**discriminated**
287:22 288:3
**discrimination**
4:20 31:18,22
272:11 279:24
280:15,22
281:1 287:5
289:22,24,25
**discriminatory**
271:13,21,25
272:3,7 273:21
273:25 274:6
274:10 275:4
276:2,17
279:16 288:22
289:2
**discuss** 47:24
**discussed** 32:12
85:14 99:17,19
142:6,7 143:10
143:22 178:16
**discussing** 86:9
240:8 247:3

**discussion**
51:19 132:3
134:8 176:7,12
176:15,24,24
179:11 200:21
234:15 258:6
**discussions**
211:3 240:13
**disease** 86:15
**dishonesty**
124:22
**dislocated** 16:5
**dismissed**
32:10
**dispute** 47:14
47:17 122:9,12
122:19 134:16
134:22 154:20
169:3,5 173:10
173:19 174:9
174:13 194:3,9
194:13,19
195:2,3,4,19
197:16 230:18
240:4,10,12,19
240:23 241:3
241:17,20,24
242:6 277:6,11
**disputing**
173:14
**distancing**
167:22 168:4
168:15,20
169:8,11,25
182:15,24

**distinct** 150:5
**district** 1:1,1
5:13,13 59:2,3
74:24,25 75:21
75:22 76:12,13
76:16,21,21,25
77:6,25 78:13
85:7 88:5,9
89:12,12 90:6
91:11 92:4
98:19 100:24
101:6 202:22
203:10,11,20
204:4,16,23
205:24 231:19
233:9 246:16
262:15 266:5
267:19
**diverse** 226:20
**diversity**
219:20 220:22
222:11 226:17
**division** 1:2
5:14 72:5
**divorce** 20:11
20:12,13 167:1
**divorced** 8:4
58:14,15 112:6
**doctor** 113:10
161:8 277:14
277:16
**doctors** 161:8
277:17
**doctrine** 40:18

**document**
38:21 39:13,15
39:23,24 40:10
40:13 41:24,25
42:6 45:25
51:20 106:20
118:6,9,10
147:21 152:23
167:25 187:8
223:6 239:9,13
240:1 242:16
242:18,21
244:25 245:3
290:15 297:20
**documentation**
44:8,10 46:5
176:19 239:9
291:10
**documented**
204:18 245:1
**documenting**
245:22
**documents**
4:22 22:9 30:4
30:25 39:17
40:8,16 43:12
44:2 102:15
118:5 230:6
**doing** 63:22
72:17 78:22
85:23 87:25
88:1 89:18
94:17 99:22
100:3,9 101:17
101:23 112:14

112:14 115:4 122:5 123:1,8 131:8,13 134:18,25 139:20,21,22 139:25 141:8 145:5,7 146:10 154:15 155:22 177:2 182:24 197:21 219:12 238:11 241:16 242:17 246:13 247:9,14 276:1 276:1 283:22

**dotting** 185:2

**doubt** 74:3,7 128:15,22

**drafted** 115:6

**drawing** 36:2 121:10,18

**driving** 68:24 286:17

**dropped** 265:10

**drug's** 67:24

**drugs** 69:3 96:5

**due** 55:1 165:5

**duly** 6:19 295:8

**dumb** 66:14

**duties** 74:17 75:2 76:5 78:25

**dying** 198:9 201:4

**dynamic** 61:15

**dynamics** 81:17

e

**e** 2:13 3:1 4:1 5:1,1 7:14 35:12,12,13 37:18,18 298:20,21

**earlier** 76:15 102:8 116:25 118:7 130:13 138:9 248:22 249:17 259:22 260:1 261:23 275:20 286:22 290:15 291:3

**early** 116:19 129:16

**earnings** 216:17 217:15

**easier** 41:15 101:24 199:21

**east** 1:15 5:16

**easy** 19:2

**educating** 66:10

**eeoc** 21:23 24:9 272:10 288:12 288:17 289:19

**effect** 78:10 122:15

**effectively** 276:25

**effects** 165:21 171:9

**effort** 238:11

**efforts** 49:4 163:18

**eight** 218:1

**eighth** 124:21 125:1

**either** 29:21 34:19 37:5 52:20 58:3 60:5 140:3 149:24 166:16 231:1,13 237:17

**elements** 95:2

**eleven** 185:14

**eligible** 262:22

**elt** 254:21 257:1,1,5,17

**email** 3:12,16 3:18,20,23 4:6 23:23 24:6,11 24:16,18,22 25:1,3,15,25 30:20 31:3,9 105:24,25 106:5,23 109:11 110:4 111:5,13 113:20 114:12 114:13 115:6,7 115:13,15,16 115:19,20 116:21 117:7,8

117:15,20,21 118:1,2,3,20 119:3 123:5 125:20,24,25 126:6,11 127:6 128:9 130:5,21 131:8,12 132:13 135:11 135:15,16,19 136:6,8 137:7 138:4 141:19 142:3,23 143:7 143:11 145:17 146:21 147:3,8 147:9 150:23 152:5,6,20 162:24,24 174:22 175:11 175:17,23 181:12 182:10 182:16 184:1 187:11,13,18 191:1 204:18 282:6 290:5,6 290:19,24 291:2,13 292:3 293:24,25 298:10

**emailed** 24:5 117:21 129:2,2 130:4 141:23 183:7 203:13 203:15 298:11

**emailing** 116:20 189:13

**emails** 3:9,10
3:11,15,19,21
3:22,24 4:4,5
23:3,11,12,14
24:10 25:9,11
25:14,16,24
31:5,6 40:24
105:20 113:24
113:24 115:13
118:4 150:23
153:11 181:8
184:21,23
185:4,10 246:8

**employed**
146:17 191:15
281:25 282:2

**employee** 32:25
36:21 37:2
121:9,15,18
137:20,21
161:7 170:18
175:4 179:9
188:23 194:4
195:22 205:2
236:14 248:1
259:18 282:9
290:7,8 296:12
296:13

**employee's**
120:6 125:2
156:13 194:14

**employees**
32:22 35:23
36:22,25 37:13
119:25 120:16

122:1,5 158:15
158:18 160:18
160:21,22
187:12 191:6
221:16 223:10
237:9 246:10
276:25 277:2

**employer**
177:24

**employment**
3:20 30:8 32:1
32:3 43:16
46:12 120:16
120:18 121:1
188:18,21,23
196:11 236:11
257:18,23

**encompass**
91:25 92:2

**encouraged**
86:1 248:23

**ended** 58:7
134:9 182:4
267:23

**endorse** 241:4
241:5 266:14
266:15

**endorsement**
142:21 155:21
155:24

**endorsing**
155:20

**enforcing** 79:6
225:7

**engage** 99:10
119:25 177:23
211:2

**engagement**
242:1 262:13

**engaging**
120:17 151:6

**enjoy** 283:22

**ensured** 276:24

**entire** 43:7 62:6
181:25 193:2
196:11 198:16
200:11 224:6
236:11

**entirety** 153:13

**entitled** 106:17

**entitlement**
107:6

**environment**
95:1

**epstein** 166:9
166:12 171:14
171:24 172:2,5

**equal** 220:23

**equity** 219:20
220:22 222:12
226:17

**erased** 28:8

**errata** 2:16
297:3 298:9,10
298:12

**errors** 293:6

**especially** 34:9
73:10 244:6
275:17

**esquire** 2:2,6
2:10,11 298:19

**essential**
168:15 170:8
170:19

**essentially** 59:9
67:2

**estimate** 141:2

**et** 30:18 56:20
59:22 73:10
83:13 144:20
203:16 222:6
224:6 245:17
277:5

**ethics** 46:7
132:25 149:4,8
150:7,14 154:2

**eval** 3:23

**evaluate**
179:24

**evaluated**
91:17 155:4
180:5 259:6

**evaluating**
158:3 182:14

**evaluation**
238:22,23
259:20

**evaluations**
30:5

**event** 22:23
31:25,25 232:7
232:13

**events** 22:21

**eventual** 276:9
**eventually**
  145:10 146:1
  197:2 218:24
  242:3 267:25
**everybody**
  11:19 33:8
  134:18 194:21
  253:8
**everyone's**
  83:22 96:9
  112:13
**ex** 200:2 285:15
**exact** 37:20
  43:24 56:25
  69:21 70:14
  75:4 154:21
  167:4 185:20
  187:1 198:23
  216:11,12
**exactly** 18:21
  30:20 33:21,23
  58:11 95:4
  129:14,17
  135:21 143:13
  143:22 178:16
  186:6
**examination**
  2:15 6:21
**examined** 6:20
**example** 43:9
  68:13,16
  221:10 222:1
**excellent**
  126:25

**except** 43:22
  90:22 93:22
  155:18
**exclusivity**
  287:14
**executive**
  250:21,23,25
  251:15 252:3,7
  252:18 255:19
  257:1,20
**exempt** 186:3
**exemption**
  189:2
**exercise** 284:11
**exhibit** 3:4,5,6
  3:7,8,9,10,11
  3:12,13,14,15
  3:16,18,19,20
  3:21,22,23,24
  4:4,5,6,8,9,10
  4:11,13,14,15
  4:16,17,18,20
  4:21,22 41:8
  41:18,22 43:4
  43:7 44:25
  45:6 46:1 48:9
  48:13 73:17,24
  74:16 89:3
  96:24 97:3
  98:18 102:17
  102:20,23
  103:6,9,12,19
  104:21,22,25
  105:15,19,19
  105:23 109:5,9

  109:10 110:4
  111:2,3 114:2
  114:5,12,16,22
  115:1,5,20
  116:13,17
  118:4,10 119:5
  119:9,11
  123:13 124:5
  125:12,15,18
  125:19 128:7
  131:20 132:8
  132:12,12
  134:13 135:2,6
  136:6 139:4,14
  140:24 141:13
  141:16,18
  148:3,7,8
  150:18,22,22
  152:11,14,18
  152:18,19
  156:7 162:19
  162:22,23
  167:19 174:17
  174:21,21
  175:13 178:18
  178:22 179:17
  180:24 181:3,7
  182:6,9,9
  190:22,25
  191:1 209:14
  209:16,22
  210:2 212:13
  212:15,18
  213:24 214:7
  214:10,12,19

  214:23,24
  216:16 228:19
  228:21,25
  230:22 239:20
  239:24 258:13
  258:15,18,22
  288:6,10,11,15
**exhibits** 41:7
**exist** 74:24
**existed** 23:24
**existing** 82:9
**exists** 178:4
  225:3 239:13
**expanding**
  84:11
**expect** 56:25
  62:25
**expectation**
  62:2 63:13
  88:8 100:23
  113:4
**expectations**
  9:11 233:12
  242:1 245:7,8
**expense** 31:10
  40:23 42:21
  105:6 211:20
  212:10 244:16
  282:7 290:23
  291:9,11,14,24
  292:1
**expenses** 42:23
  282:9 290:4,9
**experience**
  71:16 72:1

73:2,13 84:8
**experienced**
  288:20 289:1
**experts** 112:14
**expires** 295:17
**explain** 18:21
  30:14 66:9
**explained**
  138:4
**explaining**
  162:17
**explanation**
  148:14
**express** 291:8
**expressed** 86:6
**extended**
  188:11,14
  189:3 197:6
**extension** 189:3
  190:13
**extent** 192:24
**external** 124:9
**extra** 85:23
  151:10 202:22
  203:11
**eye** 67:6 286:7

**f**

**face** 158:19,19
  191:9,9
**facebook** 19:8
  19:10
**facilitate** 18:15
  178:1
**facilitating**
  76:13

**fact** 34:11
  88:14 98:18,25
  107:16 122:25
  137:18 139:8
  181:24 207:16
  228:2 236:14
  241:15 260:21
  261:3 274:18
  277:3
**factors** 68:20
**facts** 297:20
**fail** 298:15
**failed** 242:2
**failing** 124:8,15
**failure** 245:7
**fair** 10:1,9,22
  12:8,24 39:23
  40:11 44:23
  51:13 53:21
  54:3,6,15
  71:21,22 79:5
  79:9 84:16
  92:11 93:13,18
  95:5 96:1
  113:14,17
  117:4 150:9,13
  171:9 173:7
  198:6 208:4
  235:4,9 237:11
  246:12 250:5
  254:18 269:9
  269:14,20
  273:14 285:20
**faith** 127:10
  176:23 221:11

**faking** 214:2,5
**familiar** 9:8
  116:17
**family** 163:7
  203:15 206:5
**far** 39:25
  206:10 253:2,8
  253:13 257:5
  268:12 281:16
  281:24
**father** 8:16
  34:9
**favorably**
  248:2 292:11
  292:15
**favored** 249:10
**fbla** 197:8
**february**
  240:14,15,15
  240:15
**federal** 1:18
  21:23 298:13
  298:20
**fee** 103:25
**feedback** 78:13
  233:22,24
  234:8,17 235:1
  238:5 259:23
  259:24,25
**feel** 72:15 94:18
  206:3,4 242:16
  242:16 251:4,5
**felt** 94:9 161:24
  179:12 213:5

**female** 225:23
  226:2
**females** 222:5
**fence** 20:23
**field** 85:13
  159:5,16 160:9
  191:6 238:1
  262:13
**fifteen** 141:1
**fifth** 58:3
**figure** 68:22
  81:21 82:18
  83:8,19 269:5
**file** 4:9 25:17
  25:19 46:6
  103:24 105:5
  151:17 209:24
**filed** 5:12 9:6
  20:11,12,24
  21:22 24:13
  39:10 102:25
  105:1 131:5
  196:25
**files** 31:3
**filing** 20:10
  48:2 103:20,25
  105:7 123:17
  123:20 131:7
  139:15,20
  272:10 280:21
  288:12
**filings** 44:11
  47:15,19
  123:15 139:25

**fill** 134:11 135:21 140:24 141:10 142:12 142:24 143:13 147:25 149:11 154:21 250:8

**filled** 136:10,18 136:21 138:15 143:11,12,14 153:19 154:22 183:2 264:15 265:12

**filling** 138:5 157:6

**finally** 72:15 81:10

**financial** 85:24 125:3 180:2 194:5,13 195:19 212:19 214:13 275:6 275:11,12 276:4

**financial's** 275:22

**financially** 5:22 296:15

**find** 41:10 81:9

**findings** 213:6 213:11 277:10

**fine** 41:16 47:7 55:11 131:24 152:1 279:6 293:10

**finish** 11:24 12:20 74:6

**fire** 236:25 243:2 244:9 282:5

**fired** 32:22 35:23 36:25 37:5 187:14 188:3,5 236:8 236:15,18,19 237:3 290:20

**firing** 188:12 250:6,14

**firm** 5:20 109:19

**first** 6:19 21:25 22:2,6 46:9 72:9 74:11 77:2,15,17 105:24 106:2 106:24 107:6 108:11,18,24 109:2 115:19 118:10 128:6 128:25 132:19 136:17 137:6,6 152:5 160:16 166:19,20 196:19 205:18 229:22 239:25 241:2 243:16 247:10 254:1 254:23 255:5 272:17

**fiscal** 60:3

**fit** 3:13 44:12 46:16 47:16,19 102:7,8,25 103:16 104:4,4 104:5 105:2,10 105:13,20 106:6 108:17 112:5 113:24 115:13,20,22 116:21 117:13 117:14,15,21 118:21 119:3 123:1 126:8 127:18 129:1 131:9 141:24 151:15 153:3,8

**fitlifeactive.c...** 114:19 118:3

**fitness** 115:22

**fitz** 36:1

**five** 30:2 112:20 113:5 115:22 136:11 136:14 141:10 141:10 192:4,4 218:7,7 224:15 256:7 258:9 281:11 289:8 294:16

**fix** 195:9 242:19,23

**fl** 1:15 298:3

**fleet** 217:16

**flight** 217:25

**florida** 1:1,20 3:8 5:14,17 14:3 15:4,12 56:2 103:21 105:1 255:6 295:2,17 296:2 298:14,20

**floyd** 230:15,23 231:6 232:19 233:2

**focus** 25:21 43:4,23,25 71:9 84:11 273:17

**focusing** 199:8

**folders** 118:22

**follow** 186:6 245:7 293:23 294:1

**followed** 266:22

**following** 81:25 116:1 157:12

**follows** 6:20

**force** 59:20 189:16

**forefront** 279:10

**foregoing** 296:7 297:20

**forester** 272:25

**forever** 85:18 127:9

Shannon Olson August 15, 2024
Olson, Shannon v. Takeda Pharmaceuticals America, Inc.

[forget - general] Page 25

**forget** 122:21 140:11 212:4 249:25 255:4,8 263:20 291:16
**forgotten** 212:1
**form** 3:17,18 134:10,12,12 134:17,19,23 135:9 136:4,8 136:10,21 137:9 138:15 140:5,16,24 142:9,10,12,12 142:14,15,19 142:23 143:1,3 143:4,13 146:9 147:1,22 148:13 149:12 151:8,9,24,25 153:17,19 157:6 183:2 186:24
**formal** 64:14 64:20,22 65:4 89:18 130:6
**former** 55:5
**forms** 143:18
**formula** 285:22
**forward** 99:18 101:11,13 126:25 148:20 156:14,19 157:2 245:8 293:25

**foster** 210:13 210:24
**fostering** 211:9
**found** 47:5 205:16 223:7
**foundation** 84:7
**four** 14:14 34:17,17 83:1 153:20 192:9 258:5
**fourteen** 14:10
**fourth** 89:11 124:21
**frame** 16:20 57:1 60:13 97:8 224:7 258:23
**frames** 56:8
**frequently** 83:10 250:25
**friday** 112:20
**friedman** 36:3
**friend** 32:20 35:8 37:8
**friend's** 35:9
**friends** 33:2,2 37:7,7,10 204:14
**fritz** 36:1
**front** 88:19 181:4 223:22
**fulfill** 53:23 54:12,16,19,20

**fulfilled** 145:4
**full** 7:5 8:22 26:15 33:5 43:20 57:23 58:17,18,21,22 59:12 138:2,13 144:9 146:11 153:12 215:4,6 215:24 229:1 247:9
**fully** 9:19 247:1 266:22 269:15
**function** 200:7
**functionally** 173:24
**functioning** 199:4,22,23
**functions** 168:16 170:9 170:19
**further** 189:3 190:12 191:13 203:25 284:7 290:16 296:11
**future** 284:9

**g**

**g** 5:1
**ga** 2:7
**gain** 19:2 85:24 125:3
**gaining** 68:2
**gaither** 154:17 154:18
**game** 86:2 249:2 276:10

276:10,12
**gaps** 250:8
**garcia** 26:8 28:25 50:10,21 97:12 98:18 100:17 151:25 171:23 172:13 172:16 173:8 200:21 201:21 233:16,21 234:2,16 235:5 235:9 238:18 240:4,20 243:7 243:8,16 248:6 271:20 273:24
**gather** 213:12
**gayle** 26:8 28:25 50:10,21 97:12 98:18 100:17 151:25 171:23 172:13 172:16 173:8 200:21 201:21 233:16,21 234:2,16 238:18 240:4 240:20 248:6 271:20 273:24
**geez** 286:6
**gender** 222:12 289:22,23,25
**general** 28:12 33:25 78:3 207:19 233:4 283:19

**generalized**
10:11 33:25
39:5
**generally** 12:6
34:6 95:18
165:10,25
**generate** 147:4
147:9,13
**generated**
147:5,10
**gentleman**
109:12
**genuinely**
277:8
**geographical**
61:20
**george** 230:15
230:23 231:5
232:19 233:1
**getting** 11:21
25:14 51:10
170:2 177:5
179:12 182:23
227:21 244:22
245:19,20
246:7 250:10
255:12,13
270:24 290:20
**girl** 206:15
277:25 291:16
**girlfriend**
248:19
**give** 6:15 27:10
41:4 68:12
81:10,14 86:25

104:20 111:2
125:1 143:2
163:25 164:1
170:16 176:1
182:17 205:25
210:7 214:11
292:1
**given** 27:8
38:18 39:3
45:7,12,12
50:9 53:19
62:15 64:9
82:4 84:23
85:3,4 135:19
143:13 151:6
153:7 187:2
193:1 209:3
234:17,18,22
234:23 235:1
242:9 247:7,9
294:15 296:9
**giving** 72:17
102:18
**gladly** 48:7
**global** 162:16
**gmail** 24:17,17
24:18,23,24
25:14,21
**go** 5:8 12:13
13:21 23:7
37:25 38:1
40:19 42:24
49:22 51:9
55:14 56:5
58:17 61:10

65:14 67:18
68:23 70:21
72:25 81:23
98:17 102:15
102:18 103:9
105:23,25
110:3 111:3
113:18 116:5
119:19 123:12
123:17 124:1
125:6,9,18,19
128:6 139:11
139:14 145:7
159:10,24
168:11 178:8
183:22,24
195:5 203:6,8
203:9,20
205:11 215:11
215:23 216:13
216:24 217:6
218:16 229:9
229:10,10
244:15 264:13
265:3 266:13
266:14 269:2
278:1,1,1
279:12 289:7
289:12 293:14
294:10
**goal** 63:19
95:21 101:1,2
101:3 110:8
260:16 261:17
267:24

**goals** 95:22,25
101:10 102:5
**god** 115:16
206:21 276:6
284:22
**goes** 16:19
35:12 93:5
98:3 249:25
291:11
**going** 5:2 7:3
9:8,15,17,19
10:8 11:19
12:4,6,11,13
23:5 27:17
29:13 31:3
33:7 34:4,12
36:16,17 40:15
41:2,2,3,7,9,11
41:21 43:24
46:3 48:1
50:20 51:17,18
52:18 55:10,11
65:9 66:13
68:1,22,23
73:5,16,19,22
74:10,15 82:14
83:22 86:16,17
88:20 89:24,25
90:1 93:24
95:9,12 97:2
98:2 100:7
102:14,16
103:9 104:20
105:18 109:8
111:1 114:25

115:1 119:8,18 123:25 124:1 127:15 131:20 132:11 135:5 135:25 136:24 139:22 145:11 145:12,16,21 146:1,20 148:6 159:9 164:15 174:20 178:21 179:14 182:16 183:3 184:9,14 186:2 190:20 194:6 197:5,25 206:1,13 208:24 209:13 212:12 213:23 214:22,23 228:16,18 229:19 239:23 252:3,15 255:6 255:6 257:22 258:12 261:5 264:17 267:1 274:18 280:16 284:1 288:9 290:22 292:6 294:2

**good** 5:2 84:7 93:19,21 127:19 131:22 176:22 192:1,2 192:3 257:25 279:6 294:4

**goods** 107:8 108:9

**google** 21:10

**gosh** 36:1 211:25

**gotten** 58:14,15 164:15,16 247:12

**graduate** 17:4 17:21

**graduated** 17:13

**graduating** 18:3

**graduation** 15:10 16:22

**grandma** 15:24

**grandmother** 204:19

**grant** 184:9

**granted** 155:14 185:23 186:23 188:6 189:1 194:16

**gray** 1:14 79:19

**great** 16:12 71:12 84:19 127:7,10 128:1 128:5 197:12

**green** 61:1

**greg** 26:13 29:3 49:24 90:21 146:7,15 152:1 152:1 172:1,7 172:19 174:10

201:3,6,6,11 229:1,12,17,18 230:1,9,23 231:4 234:25 235:20 244:18 249:1 259:5,6 259:7 272:2 274:8 291:8

**greg's** 259:11

**gross** 216:18

**ground** 17:9

**grounds** 106:11

**group** 37:2 204:8 212:19 214:13 221:11 221:13 231:14 231:24

**groups** 221:6,8 221:8,16,25

**grow** 82:19 83:20 109:18

**growers** 84:22

**growing** 86:6

**growth** 109:15

**guarantee** 9:16 43:24 61:3

**guard** 256:1

**guess** 14:23 17:10 18:6 19:10 21:10 22:4,22 23:16 24:15 30:22 37:1 53:21 55:4 59:10 62:19 63:8

66:13 70:21 74:19 76:23 79:25 81:7 82:18 88:4 93:6 105:24 123:4 127:3 137:8 138:21 142:13,22 144:20 150:23 175:3 195:21 196:10 204:2,2 208:25 212:1 212:23 221:21 227:10,24 228:1 250:10 255:3 259:13 269:3 283:20 283:20

**guessing** 69:19 116:17 274:19

**guide** 88:23 260:15 261:16

**guiding** 261:10

**gulf** 14:12

**gum** 115:2

**guy** 32:18 33:12

**guys** 20:11 43:1 99:17 112:13 164:3

**h**

**h** 3:1 4:1 37:18

**half** 22:6,6 64:23

**halfway** 32:7 57:4
**hand** 4:17 6:13 27:20,22 29:6 90:11,23,24 91:2 172:4,10 173:4 174:13 181:4 201:17 201:25 234:7 234:12,22 235:15 236:15 238:22 240:13 240:20 243:7 259:7,8 260:14 267:9,13,15 271:24 274:5 295:9
**hand's** 236:19
**handbook** 122:19 124:1 125:12
**handful** 255:18
**handle** 193:11
**handled** 63:9 219:3 277:23
**handling** 192:15,15 247:10
**hands** 144:21
**hang** 36:2 167:2 170:3
**happen** 29:24 98:2 183:3 203:17 226:14 251:1 263:18

287:10
**happened** 26:19 33:21,23 58:11,13 155:10 157:1 201:12 202:18 232:5 235:7,11 235:14 238:2 242:6,8 288:21 290:3
**happening** 205:17 263:15
**happens** 223:19 225:21 251:9,10
**hard** 11:7 71:22,23 106:19 204:20 229:9 272:20
**harder** 85:3
**harm** 286:2,3
**harmful** 165:21
**hash** 115:21,23 116:5
**hate** 265:13 274:19
**hated** 8:25
**haven** 14:1 15:1,2,6
**hawaii** 15:4,6,9 15:11
**hcp** 261:13
**head** 72:20 115:3 117:5 129:3 138:10

190:8 195:15 253:21,24 271:2 276:11
**heads** 11:6
**health** 80:13 160:2 168:22 170:10,21 197:14 270:20 276:20,21
**hear** 147:7
**heard** 177:18 226:4,10,13,15 228:3
**heart** 13:19
**heck** 45:21 270:22
**heidi** 174:22,25 175:13 181:8 181:20 182:11 182:15 183:7 183:11,14,15 184:6 188:15 191:2
**held** 43:12 56:6 56:8 154:13 260:3
**help** 86:8,21 100:19,23 101:21,22 102:2 209:3 261:10
**helped** 260:21 261:7,22,24
**helpful** 84:7

**helping** 101:25 102:2 260:15 261:16,21
**hereto** 44:5
**hernandez** 56:13 60:6
**hey** 203:15,23 205:25 266:14 291:10
**hh** 295:18
**hiding** 25:7
**high** 16:22 17:13 66:18 83:2 95:21 154:17,18 251:10
**higher** 88:8 95:9,12,22 99:6
**highest** 95:14
**highly** 112:8
**hillsborough** 295:3 296:3
**hindsight** 40:24
**hire** 109:18 244:20 248:25
**hired** 55:25 56:11,12 57:25 99:25 100:12 100:12 106:18 236:5 248:22
**hires** 276:4
**hiring** 226:6,21 248:24

**history** 26:15 153:12 229:1,9 230:22

**hit** 199:4,5 286:15

**hitting** 286:21

**hmm** 135:24

**hobbies** 284:12

**hold** 27:17 51:18,22 263:17

**home** 64:18 65:1 159:4,20 160:8

**honest** 9:12,14 21:14 140:12 141:3 144:5

**honestly** 77:23 84:25 94:25 172:24 220:2 263:20 274:21 276:23 283:6 285:17

**honesty** 32:6

**hop** 206:15

**hoped** 270:14

**hopefully** 13:21 68:13 267:25

**hoping** 100:7

**horrible** 17:7 22:11

**hospital** 77:13

**hour** 8:22 55:11,17 133:8 141:5,12 148:2

153:15,20 197:10 256:11 256:17,19

**hours** 112:4,19 112:21 113:5 113:15 184:12 188:4,7 215:19 215:25 218:20 256:17

**house** 6:8 14:7 26:11

**hr** 3:14 46:6,6 79:7,11 117:1 119:12 151:17 157:3 175:7,8 180:1 186:7 189:23 203:13

**hr's** 189:14

**huge** 115:21 127:16

**hugo** 16:5

**huh** 11:11 49:6 69:7 101:17 238:25

**hum** 6:25 9:18 10:21 11:1,3 12:3 15:14,21 16:13 20:9 24:3,19 25:21 27:11,25 31:15 31:23 32:11 33:9 35:22 38:10 39:12 41:5 43:10,13 45:3,17 49:2

49:10 50:8 51:3 53:4 54:13,23 56:7 57:12 59:1,7 61:19 62:4 64:5 65:19 68:7,14,18 69:4 73:1 74:13 75:9 78:1,21 81:3 82:1,24 86:3 88:21 90:12 91:1,3 92:17 92:20 96:1 97:24 98:21 99:11 101:5,12 101:15 108:20 110:7,17,23 111:4 113:3,19 113:22 119:10 119:20 120:22 123:14,18 124:3,6 125:7 125:21 127:22 128:8 129:22 134:2 135:7 138:8,25 142:22 143:25 145:20 147:17 161:11,15 163:9 167:18 169:2 170:12 175:9,12 177:25 179:22 180:6 189:7

193:6 197:4 198:3 199:3,13 199:15,25 203:4,21 206:12 207:1 207:10,13 208:13 209:9 209:15,23 210:1,9 212:14 212:22 213:20 216:15,19 218:12,17 220:6 228:20 228:20 229:2 243:9,14 245:9 261:15 262:16 263:7 268:2,2 270:1 280:11 281:9 283:11 283:13 285:1 285:11 286:23 286:25

**human** 156:15 156:19 174:25

**husband** 20:23

**husband's** 248:13

**i**

**idea** 60:9,12 78:11 86:23 155:13 156:24 174:3 187:19 197:9 223:11 253:7 254:4 277:24 282:25

283:3,4
**ideas** 126:24
221:24
**identification**
41:19 48:10
73:25 96:25
102:21 103:7
104:23 105:16
109:6 114:3,23
116:14 119:6
125:16 132:9
135:3 141:14
148:4 150:19
152:15 162:20
174:18 178:19
180:25 182:7
190:23 209:17
212:16 214:8
214:20 228:22
239:21 258:16
288:7 295:20
295:21
**identified** 4:14
4:15,16,21
37:1,2
**identifies** 259:5
**identify** 221:17
277:22 284:18
**identity** 30:18
**image** 114:16
114:16
**imagine** 20:10
106:21 253:12
**immediate**
156:13

**immediately**
83:25 135:13
203:17 263:19
**impact** 13:15
95:6 198:9,12
257:17,23
260:16 261:17
266:18 275:21
**impacted** 68:17
208:14,18
**implementati...**
160:13
**implemented**
162:14
**implements**
77:13
**importance**
260:16 261:16
**impression**
242:9
**improve**
241:18 243:25
**improvement**
237:19
**inaccurate**
251:20,22,24
**inadvertently**
149:6
**inappropriate**
125:3 140:20
204:22 205:7
232:4,5,11
243:19
**included**
120:21 143:9

**includes** 222:12
222:14,17,20
**including** 43:14
124:17,18
163:21 204:23
237:7 247:1
**inclusion**
219:20 220:22
222:12 226:17
**income** 58:16
121:2,10,18
147:4,5,9,10,13
241:6 266:14
**incorporate**
103:3
**incorporated**
5:12
**incorrect**
139:17
**increase** 63:23
**increases** 265:3
**independent**
92:21
**indicate** 202:5
**indicated** 227:3
228:3
**individual** 49:9
92:12 150:11
154:4 205:14
262:3 277:7
278:22
**individuals** 6:7
35:24 38:2
189:25 193:20

**industry** 19:2
101:24 112:8
**inform** 78:17
**informal** 64:16
64:17,19
223:25
**information**
43:1 46:8,21
47:22 54:21
106:16 124:9
124:15 141:11
142:10,24
145:9 146:25
151:24 169:5
169:16 170:25
177:23 179:12
179:19 180:14
182:20 223:4
244:17,18
253:9,14 254:5
254:20 257:10
277:9 278:12
278:15 279:2
287:21,21
288:2
**informed**
168:12 181:16
184:8 253:5,11
254:10
**informing**
212:20
**inhibit** 155:22
**initial** 53:14
54:1,4,25 55:2
64:10 189:2

Shannon Olson August 15, 2024
Olson, Shannon v. Takeda Pharmaceuticals America, Inc.

[initial - job] Page 31

208:6 212:20 219:4
**initially** 167:25 184:15 186:16 196:10 216:9 216:23 217:4,8 218:6,21 277:9
**initiate** 203:20
**input** 208:5
**inquired** 272:18
**inside** 33:3
**insights** 67:6
**instagram** 19:8 19:10 116:6
**instances** 22:21
**intake** 3:16,18
**intention** 282:5
**intentionally** 25:4
**interact** 169:16 210:13,17
**interacting** 211:8
**interaction** 76:25 160:16 160:17,21 161:1
**interactions** 76:21 158:19 209:6,8,11
**interactive** 177:19,23
**interest** 30:10

**interested** 5:22 160:10 296:15
**interesting** 286:20
**interests** 120:8
**interim** 57:13 91:11
**internal** 124:9 267:14
**interpretation** 10:12 139:19
**interpreted** 139:23
**interpreting** 79:11
**interrupt** 12:1 12:7,8
**interview** 249:3
**interviewing** 110:19
**intranet** 30:23 30:24
**inventory** 110:11,12,15 110:17
**investigate** 82:13
**investigation** 124:10,16 145:16 149:1 149:15 157:6
**invite** 175:20 184:12 252:20 252:24 253:9 253:15 254:23

255:10,13
**invites** 253:23
**involve** 87:14 133:20,21 251:11
**involved** 104:9 149:22,23 150:10 154:2 162:12,15,17 203:16 204:24 254:17 268:25 269:3 270:23
**involves** 141:25
**involving** 31:8 150:23 174:22 181:8 182:10
**iphone** 51:2
**irrelevant** 52:20
**irving** 272:25
**ish** 60:5 69:18
**issue** 40:25 41:1 43:25 71:12 89:23,24 150:1 249:17 262:25,25 290:2
**issued** 151:21 164:20 191:22
**issues** 25:1 36:11,13,14,16 181:22 212:8 240:5,9,21,24 241:5,7 243:15 245:4,22

249:15 285:15 285:15 288:16
**issuing** 164:9

**j**

**j.t.** 33:14,17,20 34:5
**jacob** 109:12 109:14,16
**jan** 85:11
**january** 48:14 48:15 54:25 57:16 59:19 60:4,5 85:11 98:11 108:19 108:22 123:20 139:6,17 196:19,20 198:1,17 229:3 229:12,12,17 229:25 230:8 238:17 240:14 244:7,7 268:10
**jason** 56:15,21 56:22 57:2 60:10
**jeffrey** 33:18
**jen** 35:10,14 58:14,14 62:15
**jennifer** 57:25 60:20 61:2
**job** 3:4 10:25 43:19,19 57:16 57:16,22,23 58:6,10,12,21 59:10 60:14,23

60:25 62:17
63:22 66:6,8,9
71:22 72:2
73:20 74:8,16
74:20,22 75:3
75:25 78:7,8
79:2,14,16
83:6,18 86:14
88:22 89:19
90:3 112:6,6
127:8 128:4
138:18,19
144:10,10
146:10 147:12
208:11 244:14
244:20 245:6
247:9 250:4
264:17,18
287:15 298:4
**jodi** 26:7 28:25
50:10,21 85:9
86:3,6,7 90:9
90:10,19,20,21
90:24,25 96:13
97:12 99:24
113:9 141:7
145:15,15
151:25 152:1
154:13,14,15
154:16 155:18
156:22 157:18
157:21 171:23
172:13,16
173:8 200:21
201:21 202:25

203:1,4 226:16
226:21,24
227:2,14,15
233:15,16,21
234:2,16 235:4
235:9 238:1,18
239:1,2,4
240:4,20
241:17 243:7,8
243:16,24
244:3,6 245:4
248:6,16,22,23
248:24 249:8
254:2,19,20,24
264:8,8,12
266:6,7,25
267:23 268:6
268:11,24
269:4,10,21
271:20 273:24
277:24 278:25
**jodi's** 248:13
249:9
**jog** 219:15
**join** 221:16
255:12
**joined** 221:23
248:9
**jordan** 4:17
49:3,8,14
69:13 70:10,12
70:14 88:16
89:23 90:20,20
90:22 96:14
99:1,21 100:2

100:8,8,12
154:7,17,18,21
154:24 157:1
157:18,22
232:15 233:21
234:3,8,13,17
234:18,22,23
235:2,5,10,15
235:20,24,24
236:18 237:2,8
237:12,20,23
238:9,10 240:5
240:14,20
241:25 242:19
243:1 244:4,23
244:24 245:14
247:22,22,25
248:5,13,21
249:2,11
250:11,11,14
256:25 257:4
260:2,3,20,21
261:8,21
286:24 292:9
**jordan's** 52:21
99:16 235:16
235:20 242:11
260:7,14
**judge** 31:19
32:7
**judging** 247:1
**judgment**
83:19
**july** 13:24
59:25 98:4

100:14 206:11
236:6,8 240:5
240:9 241:8,9
243:13 245:11
245:12 286:24
**jump** 12:5
114:5 190:20
192:12
**jumping** 181:2
**june** 97:22
214:14 217:7
241:7

**k**

**k** 7:14 33:16
285:7
**karen** 37:15
62:13
**keep** 9:11,11,14
11:7 13:19
55:11 100:18
138:3 144:18
144:19 206:1
206:14 227:21
228:16
**kelly** 36:5
56:15,22 60:10
**kemp** 37:15
**kennedy** 1:15
5:16
**kept** 189:3
244:22
**kerr** 7:14
**kick** 20:1
**kicks** 278:20

**kid** 244:19

**kidding** 218:2
  282:1

**kids** 20:23,24
  161:19 276:21
  285:15

**kind** 9:9,10
  12:5 30:17
  34:20 58:23
  60:19 68:5,9
  68:20 86:1
  90:2 128:5
  153:10 170:1
  202:4 280:3,14
  287:16

**knew** 127:18
  154:15 240:20
  240:24 269:17

**know** 7:3 10:1
  11:2,3,22
  12:17 17:11
  18:10 20:6,10
  20:12,19,21,24
  20:24,25 21:5
  21:12 25:1
  26:10 27:12,15
  31:8,13,18
  32:2,2 34:12
  35:20 38:17
  39:2,3,22 40:7
  40:12 41:6
  44:20,23 45:4
  45:11,15,21,24
  46:15,18,19
  47:8,9,12,20,25

48:18,21 49:18
49:20,23 50:5
50:9,12,25
51:12,15 52:9
52:10,23,23
53:10,22 54:3
54:14,17,18,21
55:1 56:17
58:16 60:10
61:1,5 63:4
65:8,12,13,14
66:1 67:1,24
67:25 68:2
70:10 71:11
72:6,8,10,10,16
74:17 76:11
77:4,15 78:5
78:19 79:16
81:8,23,25
83:1 84:4,4,11
84:23 85:10,23
86:2,3,20 87:3
87:20,21,21
88:8 89:25
91:7 92:6 93:8
93:10 94:10
95:2,3,5 98:12
100:22 102:1
106:11 107:2
108:2,17,23
109:1,21
111:19,19
112:21 114:11
115:10,16
116:4,10 117:3

117:5,10,17
118:12,13,13
118:15,21,24
118:25 119:1
120:15 121:3
122:21,21
123:3,4 127:3
127:5,6,7,17,18
127:23 128:4
129:3,17
132:24 134:19
135:17 136:20
138:22 141:3
143:19 144:3
144:17 145:11
145:14 146:6
146:19 149:6
149:16 150:3
150:14 151:16
151:16 154:7
154:24 155:4,8
155:9,21,22,23
156:25 157:24
158:1 159:4,5
161:3,9,16,22
162:13 164:12
166:13,18,24
167:3,4,9
168:24,25
169:15 170:1
170:14,15,24
171:8,10,12,25
172:3,6,9,12,15
172:18,21,23
172:24 173:8

173:17,18,19
174:8,10,14
175:22 177:16
177:24 179:11
179:25 180:3,4
180:7,8,8,15,16
180:17,17,18
180:18,19,20
180:23 182:3
182:18,18
184:18,24
185:7,8,19
188:2 189:10
189:22,25
190:3,4 191:22
192:14,23
193:17,18,18
194:17,22,24
195:6,6 196:2
196:3 197:10
197:11,23
198:23 199:19
199:20 200:2,8
200:15 201:9
201:14,16
203:18,24
204:14,16,20
205:10,20,23
206:7,16
207:22 208:2,3
208:5,8,16,23
211:25 213:10
213:10,13
214:14 216:17
217:13,16

219:5,14,17,22
220:2,9 221:24
222:3,8,10
223:13,16,24
224:2,3,4,5,13
224:18,19,20
224:23,24,24
224:24 225:2,3
226:8,9,9,11,13
226:14,15,16
226:18 227:5
227:11,11,19
228:1,6,7
230:3,3,10,15
230:17,17
231:20,23,23
231:24 232:3
232:14 233:3,5
233:13,19
234:20,20,24
235:6,11,14,18
235:18,19,23
237:14,15,16
237:16 239:12
239:19 241:14
241:19,20,22
242:4,5,6,8,13
242:20,25
244:3,24
247:14,24
248:4,5,8,23
249:14,20,22
249:25 250:9
250:18,20
252:5,10,11

253:3,4,4,8,16
253:17,19
254:8,16,17,19
254:24 255:7
256:6,9,10,20
256:20,22,24
257:5,6,11,15
259:24 261:2,5
261:6,21 263:8
264:13 266:1,5
266:13,14,20
267:1,12
268:12,14,16
268:25,25
269:1,10,13,15
269:17,21
270:4,4,7
272:20 273:19
275:2,10,20
276:12,15
277:2,12,14,24
278:12 279:2,4
279:8,18,21
281:16,18,23
281:24,25
282:12,13,14
282:14,24
283:25 284:1,4
284:4,8,8,9,15
284:22,23
285:18 286:10
287:4,9,16,25
288:24 289:4
290:13 291:10
291:16 292:4

292:12,16
**knowing** 47:21
180:3
**knowledge**
19:2 21:19
24:25 52:11
63:2 65:10
73:2,13 78:6
133:4 154:11
158:6,10
161:24 162:3,5
169:5 171:4
178:15 192:19
193:7,14 194:3
197:20 218:4
237:12 254:7
288:1
**known** 7:12
173:15 295:20
**knows** 11:19
282:1
**kristen** 177:14

**l**

**l** 2:3 35:12,12
35:12,13 37:18
37:18 104:4
**labeled** 179:10
222:2
**lack** 213:6,11
253:9
**laid** 37:5 84:23
120:2 281:12
281:16,18,22
**lakeland** 56:2

**landscape**
64:12
**language**
121:13 184:2
**laptop** 24:2
**large** 1:20
42:23
**lasted** 8:19,21
65:21 129:9
133:6 153:15
198:9 236:12
256:17
**late** 129:16
**latency** 161:14
**lateral** 268:24
**latest** 69:16
**launch** 68:1
**launched**
287:14
**laura** 125:25
126:13,15
128:9,12,25
129:9,12,20
**laveglia** 2:3
**law** 177:21
**lawsuit** 21:5
272:10 282:19
282:23
**lawyer** 105:9
**lay** 281:12
**layoff** 88:18
204:13 266:4
**layoffs** 112:9
281:8,11,17,19

**lead** 85:7 86:8 86:21,24 87:9 87:14 88:1,8 98:19 261:12

**leader** 262:7 279:13

**leaders** 204:22

**leadership** 86:25 100:18 101:20 226:3 245:14 250:22 250:23 251:1 251:15 252:4,7 252:18 255:19 257:1,20 264:13 266:12 267:24

**leads** 88:5

**leaked** 290:19

**learn** 84:6,6

**learned** 25:2 84:17,18 194:17

**learning** 64:12

**leave** 57:15 88:17 122:6 123:22,23 173:11,12,15 173:22 196:22 196:25 198:1 198:17,25 199:21,22 200:9,11 202:4 206:1,15,19 208:10,21

209:5 210:5 211:7 212:9,21 218:14 219:7,8 275:8 277:5

**leaves** 123:2 196:7 206:10 275:13

**leaving** 227:17

**led** 261:25

**left** 236:25 268:10 269:12

**leg** 197:15

**legacy** 227:8,9 227:22

**legal** 5:18,20 105:10,13 144:20 184:18 184:23 185:19 280:17 294:17 298:18

**lengthy** 242:16

**letter** 2:17 4:10 4:11 142:20 151:20 155:20 155:23 156:2 210:4,7 211:14 212:19,25 214:13,15 238:6 241:4 282:15

**letting** 184:14 214:14

**level** 59:3,8 66:18 99:6 251:10

**levels** 90:18

**lexell** 35:10 57:25

**liability** 3:8

**liberal** 17:22

**license** 295:21

**licenses** 17:24

**lieu** 168:8 182:23

**life** 3:13 44:12 46:16 47:16,19 102:7,9,25 103:16 104:4,4 104:5 105:2,10 105:13,20 106:6 108:17 112:5 113:24 115:13,20,22 116:21 117:13 117:14,16,22 118:21 119:3 123:1 126:9 129:1 131:9 141:24 151:15 153:3,8 283:16 283:22 285:14

**life's** 71:23

**lifestyle** 127:15

**lifestyles** 115:22

**light** 51:21

**liked** 255:25

**limit** 25:3

**limited** 3:8 66:2 287:16

**lin** 105:9 106:18 114:13 138:5

**lincoln** 180:2 193:11,15 194:5,13 195:19 197:1 197:11,17 200:14 202:5 207:23 209:25 210:10,16 212:19,25 214:1,13 216:4 218:14 219:4,8 275:6,11,12,21 276:4 277:4,7 278:13,15 279:2,3,11

**lincoln's** 197:18

**line** 12:19 290:13 293:16 297:4,6,8,10,12 297:14,16,18

**lines** 204:11

**linkedin** 19:10 19:16

**list** 28:6 36:21 36:24 38:4 47:5 53:2 143:11 187:25 271:1

**listed** 142:3,25 263:9

**listened** 52:7
**literally** 184:19
**litigation** 34:20
34:21,24,25
46:10,12
154:12
**little** 12:5,15
13:22 27:16
39:10 68:15
71:7 73:12
85:2 102:8,16
111:7,16 113:1
116:25 144:21
170:2 173:13
192:13 205:4
259:22 286:5
293:20
**live** 14:2
**lived** 14:6,21
14:23 15:11
57:6 61:13
**lives** 15:24
16:10
**llc** 102:9,25
103:16 104:5,5
**llp** 2:3,6
**local** 77:3
**location** 5:15
**locked** 50:25
**logs** 238:1
239:2,5,18
244:17
**long** 7:23 8:19
8:21 9:16
12:11 14:6,13

14:21 53:2
61:4 64:21
65:12,20 72:14
80:21 84:5
103:10,10
129:8 133:5,7
133:14 135:14
140:23,25
141:9 147:25
165:16,18,21
171:9 196:6
202:24 211:6
212:7 244:8
251:6 256:5,16
**longer** 25:12
28:4 144:22
189:4,5 191:12
268:6 282:10
284:10,11
290:8
**look** 41:23 43:9
48:12 49:22
50:20 73:18
74:10 82:18
86:15,18 87:4
89:3 93:7 99:7
101:13 108:17
110:5 111:9
119:17,18
121:5 124:4
131:20 135:6
141:16 162:22
169:1,1 170:5
175:18 178:21
182:9 186:7

190:19 193:23
209:20,20
210:2,8 215:2
216:13 222:4
226:17,18
238:12 239:24
274:21 282:12
284:23
**looked** 31:7
36:7 53:1,5
96:18 117:1
118:7,10,13,16
130:13 138:7
175:11 183:1
214:15 222:24
238:13 261:22
267:22
**looking** 30:21
31:4 40:25
50:23 67:1,9
67:19 68:3,5,9
68:11,21 94:19
125:12 149:21
150:1 179:17
179:17 180:17
215:15,20
218:10 229:8
276:22 289:20
**looks** 95:4
119:16 129:20
135:8 175:19
**lori** 56:12 60:6
84:7,14
**lose** 204:20

**loses** 287:14
**losing** 114:7
**loss** 204:7,11
**lost** 52:19
**lot** 29:10 43:25
68:16 72:23,24
72:24 73:9,10
81:22 83:11
84:12 88:18
93:22 101:8
127:15 128:19
195:12 205:10
219:8 221:23
242:23 281:16
283:25 289:6
**love** 16:8
287:13,15
**low** 93:22
95:24
**lower** 93:20
95:25
**lump** 196:1
**lumped** 238:3
**lumping** 238:9
**lunch** 132:4

**m**

**m** 2:6 7:11,11
70:3 298:19
**mad** 211:24
**made** 9:20
33:24 48:19
65:4 71:15
100:4 103:20
106:8 127:17
137:15 163:18

| | | | |
|---|---|---|---|
| 181:18 193:20 194:16 202:7 211:16 226:21 226:24 227:3 248:25 249:1 268:19,22 271:12 272:9 272:10 279:23 | 280:4 289:9 | 142:21 149:16 156:14,18 157:2 173:12 200:23 202:22 203:10,11,20 204:4,23 205:7 232:12 233:9 236:21 238:24 244:15 248:25 250:7 259:6,19 261:4 263:23 263:25 264:3,6 264:7,12,12,15 264:18,23 265:4,17,23 266:6,12,16 267:2,11,14,19 268:1 269:2,11 269:16 270:8 270:13,25 271:5 282:8 | **manuals** 222:24 |
| | **makes** 194:5 | | **mapped** 84:25 |
| | **making** 106:10 106:22 162:18 177:22 194:15 195:12 200:5 211:15 226:5 228:4 280:13 280:21,25 | | **march** 60:3,5 97:9 98:11 100:15 103:16 106:1 203:4 229:3 240:16 240:16 258:24 267:23,23 268:5,19 |
| **main** 223:10 261:11 | | | |
| | **male** 225:23 226:2 | | |
| **maintain** 123:11 | **mammograms** 164:16 | | **margins** 111:6 111:16,21 |
| **maintenance** 261:13 | **manage** 81:21 82:19 83:8 90:1 127:8 243:24 279:11 | | **marion** 7:9 |
| **major** 80:11 200:4 | | | **mark** 41:22 73:6,17 97:3 102:17 104:21 105:19 109:8 111:2 115:1 116:17 119:9 124:1 128:2 132:12 148:7 150:21 152:17 162:22 174:20 190:25 203:15 204:5,6,18 212:13 213:24 228:19 239:23 258:13 288:9 |
| **make** 9:20,24 9:25 11:16,23 12:1,17,22 23:2,10,23 24:11 33:8 40:5 43:23 45:19 48:1 57:24 58:3 61:10 68:13 75:6 80:8 86:17,25 87:10 115:18 117:11 119:21 153:11 169:17 170:25 173:2 181:5 199:7 211:15 239:3 250:16 260:1 265:1,18 277:1 279:10 | **managed** 63:5 77:12 247:2 | **manager's** 80:10 | |
| | **management** 42:24 62:9 186:8 245:6 246:10,17,23 250:4,15 260:16 261:17 265:18 266:12 | **managers** 61:24 92:4 145:11,12,21 146:2,4 246:16 253:11 254:16 265:6,10 270:23 | |
| | **manager** 61:21 61:25 62:20,24 74:24,25 75:22 76:12,16,21,21 76:25 78:13 85:16,22,25 86:20 87:1 89:12 91:12 126:15 142:20 | **managing** 104:3 243:5,20 247:13 | **marked** 41:18 48:9 73:24 96:24 102:20 103:6 104:22 105:15 109:5 114:2,22 |
| | | **manner** 127:1 | |

116:13 119:5
125:15 132:8
135:2 141:13
148:3 150:18
152:14 162:19
174:17 178:18
180:24 182:6
190:22 209:14
209:16 212:15
214:7,19,23
228:21 239:20
258:15 288:6
**market** 67:2,8
68:17 77:3,11
77:12 126:8
146:8
**marketing**
80:14 115:7,14
126:6,12,12,16
130:4,21,22
**marketplace**
64:13 78:13
**markets** 107:17
107:22 143:24
**married** 7:19
7:21,23,24 8:4
20:19 35:13
**mary** 37:15
**masking**
182:25
**masks** 167:21
168:3,14,20
169:10,24
182:15

**mathematical**
285:22
**matt** 4:17 27:20
27:21 29:6
90:11,13,16,23
90:24 91:1
172:4,10 173:4
174:13 201:17
201:25 211:21
234:7,12,22
235:15 236:15
236:19,20
237:3 238:22
240:13,20
241:17 243:7
243:24,25
244:3 259:7,8
260:14 261:4
262:11 267:9
267:11,13,15
268:12,23
269:5,15,17,18
270:7 271:24
274:5
**matter** 5:11
21:21 34:24
35:1,3 81:5
94:11
**matters** 94:11
94:14,15
138:23
**max** 85:16
265:1
**maximize** 77:6
77:19,24

**mcdonald**
128:10
**mckinley** 2:6
2:15 6:5,5,22
7:2 23:8 39:1,7
39:8 41:9,20
48:11 51:17
52:1 55:4,9,15
55:18,20 70:18
70:20 71:4
74:1 97:1
102:22 103:8
103:12,14
104:24 105:17
109:7 114:4,24
116:15 119:7
125:17 131:23
132:10 135:4
141:15 148:5
150:20 152:16
162:21 174:19
178:20 181:1
182:8 185:15
185:17 190:24
192:1,3,11
195:17 206:23
209:18 212:17
214:9,21
228:23 239:22
258:1,17 280:9
280:18 288:8
289:7,12,18
292:17,20,23
293:1,14,20
294:6,8,12

298:19
**mean** 9:2 17:13
21:10 24:2
25:3 26:22,25
31:17 33:3,4
33:22 34:3,18
37:4,23 40:1
42:14 44:1
48:18,25 51:14
54:19 57:22
64:25 65:2
66:20 67:22
68:12 71:14,24
73:7 74:2 75:1
75:10 77:1,11
78:2,16 79:12
79:25 80:20
81:1 82:17,20
82:22 83:14
84:16 86:4,23
87:8 88:3
89:17,24 93:4
93:13,17,25
97:17 100:2,16
101:9 102:2
107:12,16,16
111:19 112:25
112:25 115:25
117:11,18,18
118:25 123:4
127:5 128:21
131:5,19 136:7
140:23 143:21
156:22 160:4
161:8,9,22

162:9,11
164:13,23
171:7 173:7,11
173:14 179:5
179:18 180:1
182:19 186:9
193:4 196:24
196:25 199:17
199:23,24
204:14 205:19
205:21,23
206:24 208:25
211:18 213:13
216:13 219:21
220:3,19,20,21
221:8,10 222:1
222:10 223:18
224:12 226:1
227:19 228:7
228:11,13
231:22 232:10
233:14 239:7
242:9 243:4,13
243:18 244:7
244:13,15
245:10 246:15
247:13 250:10
254:9,15
259:14 261:1,3
262:5 263:16
264:24 266:19
272:20 274:15
274:16 275:8,8
275:15 276:4,7
276:10,12

279:9,9 282:6
282:16 284:3,9
286:3,9,17
287:13,14,16
292:4 293:13
**meaning** 43:19
50:14 64:3
82:7 95:8
105:24 186:19
195:20 200:15
224:19
**means** 107:2
187:1 213:11
220:15,17
257:1 276:15
**meant** 91:19
213:13 261:18
262:19
**media** 5:9 19:5
19:11,12,18,22
20:4 70:24
71:1 110:21
115:21 116:1,9
132:2,5 145:6
192:8 258:4,5
258:8 294:16
**medical** 3:23
82:15 158:23
163:7,12,13,18
163:25 164:1,2
164:10,18,19
165:14 173:9
174:1,5,11,14
175:14 179:20
181:17 187:15

187:17 277:16
277:17 278:14
279:25
**medicals**
173:19
**medication**
13:8,11 287:13
**medications**
210:11
**medicine** 66:20
127:15
**meet** 29:20
242:2,2
**meeting** 92:18
233:12 234:8
252:8 257:17
**meetings** 76:13
191:9 212:4
235:15,19
255:23 257:10
257:14
**melissa** 4:10
36:5
**member** 104:4
**memo** 4:17
**memory** 50:20
219:16
**mental** 197:14
**mentally**
208:11
**mention** 121:14
232:19 260:7,8
271:3,4
**mentioned**
12:10 34:1

35:22,25 36:20
37:6 41:6
57:21 58:24
68:25 76:4
178:23 199:24
210:23 248:22
259:22 265:5
278:22 280:14
281:7 286:21
**mentor** 84:18
99:12
**mentoring**
75:23 84:17
88:9 89:5,13
89:17 98:25
**merchandise**
110:9 123:5
**merit** 265:3
**message** 229:11
230:22 231:5
232:9
**messages** 4:13
26:2,3,5,7,13
26:20,24 27:3
27:18 28:24
29:3,6 49:1
228:24
**messaging**
84:25
**messenger**
19:23
**messing** 276:11
**met** 81:2
278:24

michael 2:2 6:10 8:1
microphones 5:4
middle 1:1 5:13 7:8 12:19 59:15 93:21
mike 38:24 40:24 41:4 43:3 280:8 293:8
mike's 21:13
miller 174:23 174:25 175:13 176:6 177:7,7 177:9,12 181:8 181:20 182:11 182:15 183:3 183:15 184:2,6 184:8 185:18 191:2,4
million 115:21 116:10
mind 12:15 87:4 195:5 206:14 276:10 276:10,12
mindow 37:13
mine 89:7 157:5 188:11 188:14
minus 38:15 159:12
minute 7:1 12:10 20:8

36:24 38:20 41:22 73:18 84:1 97:3 109:9 116:18 121:5 124:2 127:6 129:10 136:25 143:21 192:4 239:24 263:4 284:13 289:8,20
minutes 12:23 30:2 55:11,17 141:1,1 214:15 228:14 256:8,8
miscommuni... 257:9,9,14
misrepresent... 124:22
missing 153:24
mistake 188:1
mistakes 211:15,15
mistrust 127:11
model 99:20
modeling 76:13 77:7
models 77:5,18 77:23
modification 8:15 9:5,6 20:7
mom 51:8 58:21 86:13,13 278:6

moms 222:2,3,6 222:6
monday 112:20 175:23 282:1
monetization 43:14
money 15:10 18:12 103:3 282:22
monitor 275:13
monitors 77:3
month 218:9 241:7 277:4 278:7
monthly 137:16 238:1 238:15,16,19 238:21 239:1,4 239:18 259:23 259:23,23,24 259:25
months 56:13 57:6 72:18,19 208:12 209:7 211:12 238:24 261:5
morally 179:13
morning 5:2 8:23,24 40:20 42:21,25 65:22
motivate 205:24
motivated 125:2

mouth 9:21
move 51:24 93:17 101:21 101:22 267:25
moved 15:9,10 15:11 16:4,4 236:20 267:2
moving 227:12
moynahan 4:10
multichannel 126:16
multiple 22:20 23:6,9 149:11 256:9,15 281:10 290:11 290:12
mute 5:6
mydais 70:1
myoder 2:4

**n**

n 2:13 5:1 7:11
n.e. 2:7
name 5:17 7:5 7:8,15 20:25 21:13 33:13,15 35:9,11 36:2,2 37:14,17 56:24 69:5 78:23 102:11 103:15 103:22,25 104:11 116:4 128:1 187:12 187:25 233:1 235:23 253:12 259:11 260:7,9

260:12,14
261:9 277:24
278:11 291:16
**name's** 20:20
**named** 56:2
109:12
**names** 7:13
37:11 69:24
**narrow** 96:8
**natalia** 37:12
38:15
**natu** 37:15
**navigate**
197:25
**navigating**
87:24 106:19
**necessarily**
73:7 84:2
89:18 92:11
93:9 116:9
246:14,15
**necessary**
161:25 162:4,7
**need** 9:3 12:12
12:12,13,14
40:4,5 41:23
44:20 47:7
48:6,7 54:21
55:16 62:17
66:24 73:19
86:20 93:10
97:3 99:17,19
109:10 116:18
143:8 145:7,19
148:13 158:24

176:3,7 179:24
182:3 184:25
191:13 204:1
224:21,21
226:12 247:1
279:21 291:15
**needed** 39:24
58:15 113:12
135:21 142:15
143:3,12
147:20 152:7
241:18 242:1
242:22 244:5
250:16 291:14
**needs** 67:3
75:22 88:24
89:13 99:22
145:9 242:19
**negative** 8:25
97:15,18,19
259:20 274:17
**neighbor** 20:22
**neither** 232:10
**neuroscience**
59:21 72:5
90:17 189:15
190:2 251:12
275:19
**never** 48:2 54:4
79:6,10,13
80:1 81:2,2
82:11 88:13
150:9 151:5
153:6,7 158:3
161:19 173:16

186:17,20,21
190:15 191:21
191:22 192:14
195:5 257:19
273:15 278:24
**new** 14:1 15:1,2
15:6 52:23
65:11 72:5
73:3 75:23
77:13 82:8,11
82:12,14 89:5
90:18 91:5
99:1,12 100:1
101:8 122:11
180:7
**newcomb**
181:8,16
**nice** 16:9
**night** 86:14
113:9 187:13
**nine** 112:20
113:5,9 167:2
**nobody's** 214:4
**nod** 11:6
**nodding** 11:11
**nods** 72:20
138:10 190:8
195:15 253:24
**noise** 195:13
**non** 40:25
127:1,12
292:10,11
**nondisabled**
292:13

**nonsense**
282:20,21
**noon** 113:15
**nope** 287:19
**normal** 71:25
72:1 112:4
149:5
**normally** 13:9
13:12 52:13
53:8 187:1
**north** 219:11
**notary** 1:20
295:16
**note** 5:4 27:17
41:8 179:7,17
180:14 293:6
298:8
**noted** 98:18,24
98:25 99:15,16
111:5 211:14
245:23 260:21
261:7
**notes** 289:10
**noteworthy**
292:2
**notice** 1:16
242:19,22
**noticed** 64:24
65:3
**noticing** 6:2
**noting** 100:7
240:4,7
**notorious**
277:25

**november** 8:6 141:22 142:3 143:2,7 146:21 146:25 148:12 151:1,2 152:5 152:6 158:15 158:17 159:1,7 159:8 160:14 181:15 182:1 182:13,19 183:4,15,18 184:1,5 185:6 185:12,13 188:12,24

**nuance** 117:6

**number** 5:14 28:3 43:9 46:3 49:1 52:21 71:2,17 72:4 103:11 111:20 115:22 132:6 170:4,5 192:6 192:9 204:9 214:25 225:23 226:2 258:9 265:6,10,16 283:5 294:15

**numbering** 41:12

**numbers** 68:6,8 68:11,20 92:16 95:13 98:15 225:22 229:9

**numerous** 129:3 209:2

**nurse** 163:2,4 177:10,13,17 178:9

**nw** 2:3

**o**

**o** 5:1 7:11 218:7

**o'brien** 133:1,6 148:17 153:15

**oath** 2:15 6:19 17:12 295:1

**object** 23:5 40:15 280:16 292:6

**objection** 40:17

**objections** 5:23

**objective** 213:6 213:11 277:10

**obligated** 156:18

**obtain** 49:5

**obvious** 22:21

**obviously** 71:11 163:14

**occupational** 177:10,13,16 178:9,9

**occur** 34:10

**occurred** 111:25 241:9 246:1 274:22 274:22

**occurring** 35:20

**october** 98:8 102:9,12 128:10 129:13 129:13,16,18 130:1 132:17 134:9 135:5,9 136:3 168:1 175:8,20 176:10 182:24 198:22 199:10 200:10 230:1,8 230:8 246:1,2

**offer** 73:13

**offered** 18:16 84:13 87:3,5

**offers** 197:6

**offhand** 194:1

**office** 6:9 106:10 159:4 159:20 160:5,8

**offices** 66:10 81:2 87:18

**official** 295:9

**officially** 139:13

**offline** 55:5

**oh** 10:11 16:6,9 20:21 36:1 37:4 39:3 61:1 62:13 88:4,14 92:4 98:23 114:25 115:16 155:8 190:10 195:11 198:11 200:15 207:15

208:13 211:25 259:4 263:2 276:5 278:10 278:24 284:22 286:6 290:23 293:22

**okay** 7:8,10,12 7:15,17,19,21 7:23,25 8:2,5,7 8:12,14,17,19 9:4,7,22 10:6 10:10,16,19,24 12:10,16,21 13:8,11,14,18 13:21,25 14:2 14:9,11,15,21 14:25 15:3,5,8 15:13,18,22 16:14,20,24 17:1,4,16,21,23 18:1,5,13,18,21 19:4,7,14,21 20:3,6,18 21:2 21:11,15,18,18 21:21,25 22:5 22:16,18,25 23:1,9 24:5,8 24:10,15,20 25:6,8,18,23 26:2,6,10,12,15 26:18,21 27:2 27:16 28:5,13 28:19,22 29:2 29:5,8,8,11,24 30:1,3,7,9,19

| | | | |
|---|---|---|---|
| 30:24 31:6,11 | 68:25,25 69:10 | 111:1,12,15,24 | 143:20 144:1,7 |
| 31:13,21 32:2 | 69:15,18,20,23 | 112:2 113:11 | 144:11,15 |
| 32:9,12 33:6 | 70:4,6,10,13 | 113:18,20 | 145:17 146:7 |
| 33:12,19,22 | 71:8,10,21 | 114:5,6,9,16,19 | 146:20 147:3 |
| 34:1 35:2,6,8 | 72:6,11,14,19 | 114:25 115:11 | 147:14,21 |
| 35:14,18 36:9 | 72:21 73:1,5 | 115:18 116:7 | 148:16,20,24 |
| 36:14 37:6,19 | 73:16 74:2,6 | 116:16 117:4 | 149:18,20 |
| 37:23 38:5,7 | 74:10,14 75:15 | 117:15,23 | 150:4,9,13,21 |
| 38:11,16,18 | 76:2,7,9,11,17 | 118:17,23 | 151:13,20,23 |
| 39:21 40:4,11 | 77:1 78:4,12 | 119:8,14,17 | 152:4,10 153:6 |
| 42:6,9,12,18 | 78:18 79:4,9 | 120:5,10,15,20 | 153:10,23 |
| 43:2,8,23 | 80:7,11,17 | 121:7,20,24,25 | 154:1,6,10,14 |
| 44:10,13,21,22 | 81:20 83:24 | 122:4,9,23 | 154:20,24 |
| 46:14 47:10,14 | 84:5,10,14,16 | 123:7,10,12,16 | 155:3,3,9,13,17 |
| 48:1,4,17,20,23 | 85:5 86:10,23 | 123:19,25 | 156:22,25 |
| 49:13,18,21,23 | 87:3,8,13 88:7 | 124:13,20,25 | 157:14,20 |
| 50:2,5,12,19,23 | 88:13 89:10 | 125:18 126:11 | 158:2,6,14 |
| 51:2,7,11,17 | 90:7,15,22 | 127:3,13 128:6 | 159:6,15,19 |
| 52:14 53:1,10 | 91:6,13,19 | 128:12,21,25 | 160:3,19,19,25 |
| 53:13,16,21,24 | 92:5,9 93:3 | 129:5,8,11 | 161:13,23 |
| 54:3,11 55:4,8 | 94:3 95:5,20 | 130:9,24 | 162:11,23 |
| 55:15,18,24 | 95:23 96:9,12 | 131:11,16,18 | 163:10 164:9 |
| 56:1 57:8,10 | 97:2,2,14,22,25 | 132:22 133:3,9 | 164:22 165:1,6 |
| 57:19,21 58:1 | 98:10,14,17,24 | 133:23,25 | 165:9,13,17,24 |
| 58:6,12 59:6 | 99:5 100:15,16 | 134:3,8,12,16 | 166:4,10,18,23 |
| 59:17 60:6,10 | 100:22 101:3,9 | 134:21 135:5 | 167:5,14,19,24 |
| 60:13,22 61:9 | 101:19 102:14 | 136:1,6,10,17 | 168:18 170:6 |
| 61:11,14,22 | 103:19,24 | 136:20,24 | 171:4,7,11,13 |
| 62:2,8 63:3,8 | 104:8,12,18 | 137:1,9,14,22 | 171:23 172:1,4 |
| 63:12,17,25 | 105:5 106:3,8 | 137:25 138:15 | 172:10,25 |
| 64:8,11,14,20 | 106:20,22 | 139:4,8,15,15 | 173:25 174:4,7 |
| 64:24 65:3,10 | 107:1,4,16,24 | 139:24 140:4,4 | 174:9,20 175:6 |
| 65:13,17,24 | 108:6,11,15,24 | 140:13,23 | 175:24,24 |
| 66:1,5,17,23,25 | 109:8,14,16,20 | 141:9,16 | 176:6,17 177:3 |
| 67:5,9,13,17,23 | 110:3,18,22 | 142:13,17 | 177:12,21 |

| | | | |
|---|---|---|---|
| 178:6,21 | 211:11,14 | 239:23 240:3 | 271:12,20,24 |
| 180:12,19 | 212:3,7,12,25 | 240:12,19 | 272:5,9,24 |
| 181:2,20,24 | 213:10,13,16 | 241:11,15,24 | 273:1,12,14,20 |
| 182:9,13,19 | 213:19 214:4 | 242:5,15,21,25 | 273:24 274:3,8 |
| 183:14 184:5 | 214:10,22 | 243:4,10,15,18 | 274:12 275:3 |
| 184:11,13 | 215:2,11,17,22 | 243:23 244:3 | 275:13,14,20 |
| 185:9,18,22 | 216:3,7,23 | 245:3 246:3,12 | 275:25 277:13 |
| 186:1,9,14,16 | 217:10,19,22 | 246:19,25 | 277:15,18 |
| 187:4,7,20,23 | 218:23 219:2,6 | 247:6,21,25 | 279:1,13,14,19 |
| 187:24 188:13 | 219:10,12,15 | 248:5,11,15,22 | 279:23 280:2 |
| 188:17 189:1 | 219:18,23,25 | 249:4,6,14,21 | 280:19,24 |
| 190:15,19 | 220:8,12,24 | 250:14,19,25 | 281:3,7,15,20 |
| 191:11,15,21 | 221:15,19 | 251:3,8,14,17 | 281:24 282:4 |
| 191:25 192:12 | 222:7,11,14,20 | 252:2,6,11,14 | 282:10,22,25 |
| 193:10,14,18 | 222:23 223:8 | 253:4,8,13,18 | 283:3,8 284:3 |
| 194:2,9,12,18 | 223:11,14,18 | 253:20,25 | 284:5,14,17,21 |
| 194:18,23 | 223:21,25 | 254:3,6,9,14,23 | 284:24 285:4,8 |
| 195:8,16 196:3 | 224:14 225:7 | 255:2,9,15,17 | 285:25 286:14 |
| 196:5,14,16 | 225:14,19,24 | 255:20,22 | 287:7,12,20,25 |
| 197:3,13 | 226:4,18,18 | 256:2,14,25 | 288:9,19,25 |
| 198:14,16,20 | 227:2 228:1,10 | 257:4,7,16 | 289:5 290:2,6 |
| 198:25 199:16 | 228:13 229:5,8 | 258:14 259:5,9 | 290:10,15 |
| 199:23 200:4,9 | 229:15,21,24 | 259:14,22 | 291:13,18,20 |
| 200:13 201:6 | 230:6,11,15,21 | 260:6,19,23 | 291:23 292:2,4 |
| 201:11,15,20 | 231:4,8,11,15 | 261:1,24 262:8 | 292:5,8,13,19 |
| 201:24 202:3 | 231:22 232:4,7 | 262:11,22 | 292:23 294:10 |
| 202:15,21,24 | 232:17,19,23 | 263:11,13,22 | 294:13 |
| 203:3 204:6,10 | 233:1,6,8,14,14 | 263:25 264:4 | **old** 8:9 28:21 |
| 205:20,25 | 233:20 234:1,6 | 264:14,19 | 31:2 32:25 |
| 206:9,18 | 234:11,15,21 | 265:9,25 266:3 | 36:20,22 37:2 |
| 207:11,19,22 | 234:25 235:4 | 266:21 267:5,9 | 37:12 50:24 |
| 208:1,4,9,17,20 | 235:18,23 | 267:13,18,22 | 51:14 67:25 |
| 208:24 209:1 | 236:8,14,17 | 268:3,11,15,17 | 171:17 180:8 |
| 209:13,20 | 237:5,11,18,18 | 269:3,9,18,20 | 204:19,20 |
| 210:19,23 | 237:22 238:2 | 270:11 271:7 | |

**oldest** 8:10 105:25 110:4 115:19

**olson** 1:4,11 4:10,11 5:10 5:11 6:11,18 6:23 7:7 8:1 41:21 53:13 55:21 71:5 79:4 102:7 120:25 173:17 192:12 196:5 219:18 228:18 228:24 258:12 266:15 280:19 281:7 289:19 293:3 294:15 295:7 297:1,1 297:23 298:2,4 298:5

**once** 28:3 108:8 191:11

**one's** 72:13 143:1

**ones** 38:13 83:2 185:5 238:15 253:22 275:9

**online** 19:1

**open** 27:18 51:23 57:7 209:19 265:12 272:20

**opened** 264:16

**opening** 263:23 264:15,16

**openly** 202:17

**operating** 140:17

**opinion** 34:9 166:5 221:3 246:13,14

**opportunities** 77:6,20,25

**opportunity** 67:20 86:6 87:5 127:20,22 127:24,25 293:3

**opposed** 248:24

**option** 58:20 243:20 250:5 250:15

**oral** 124:22

**order** 32:7 41:3 41:10,14 294:3 294:6

**ordering** 294:5 298:11

**orders** 293:18

**organization** 3:6 18:7 43:20 43:21,22 44:11 46:16 56:11 65:7 85:17 91:1 94:12 96:6 102:24 127:9 138:1 144:9 204:15 227:12 265:7 276:19,19

282:10 290:8 291:17

**organizing** 139:25

**orient** 77:16

**orientation** 245:5

**original** 41:12 84:15 188:9

**originally** 104:7 175:19 179:19 182:13 289:21

**originals** 41:12

**outcome** 5:22

**outcomes** 165:5

**outline** 186:8 202:4

**outlined** 212:25

**outlines** 106:5

**outset** 53:18

**outside** 3:16,18 30:8 58:19 120:1,6,11,12 120:16,17 121:1,19 122:2 122:5 130:6,13 131:14 134:17 134:18,25 138:9,16 139:5 139:19,20,20 140:15 142:15 143:18 148:22 149:2 150:10 150:15 151:3,6

152:2,7 153:13 153:16,19,21 154:3,8,8,15,25 155:4,11,15 241:16 246:15 248:8

**outspoken** 227:24 228:2

**outstanding** 93:12 282:9 290:9

**overall** 259:19

**owen** 37:15

**own** 18:24,25 64:19 84:12 92:12,13,14 93:23 96:23 109:21 164:19 168:21 170:10 170:20 282:15

**p**

**p** 5:1

**p.a.** 1:14

**p.e.** 248:16

**p.j.** 65:25

**p.m.** 1:13 113:21 131:25 132:4,4,6 175:20 192:5,7 192:7,9 230:1 258:3,7,7,9 289:13,15,15 289:16 294:14 294:18

**page** 2:14 3:3 4:3 48:13 74:11,15,16,20 75:4 77:3 89:9 98:17 105:23 105:25 106:2,4 119:19 122:6 125:6 128:6 134:13 152:10 152:23 156:9 209:19 210:3 215:24 216:24 217:6 229:11 229:22 280:5 297:4,6,8,10,12 297:14,16,18

**pages** 1:24 4:13 183:19

**paid** 18:8,10,11 94:13 105:12 122:2 137:10 195:25,25 198:16 200:11 216:9,20 217:4 217:8 218:4,5 218:19,24

**pair** 241:9

**pamela** 128:10

**panic** 286:11 286:12

**paper** 217:11 286:5

**paperwork** 154:21,25 178:25

**paragraph** 243:16

**pardon** 92:1 252:7

**parents** 15:22 32:18 34:1,2,3 35:15

**part** 32:3 34:3 43:19 80:12 93:4,16,21 100:16 128:4 137:20,21 138:2,13 144:8 145:8,24 146:10 147:15 147:19 148:18 163:17 186:10 206:24 240:22 241:2 281:17 285:13,14

**partially** 200:1

**particular** 31:6 228:5

**parties** 5:8 296:12,13 298:11

**partner** 56:15 59:12 61:2 84:15 92:16,21 99:1,12 104:7 104:9 175:1,4 260:15 261:10 261:16

**partner's** 56:24

**partners** 81:23 88:15 90:19

**parts** 35:3

**party** 5:21

**passcode** 51:1

**passed** 151:25 187:10 276:22

**passion** 90:6

**passionate** 87:17

**past** 28:7 38:14 38:17 52:17 85:14 111:25 137:18 147:5 147:10 279:4

**pat** 115:2

**patent** 43:12,15 43:15,18 44:8 106:10

**patents** 46:25

**path** 71:19 86:9 264:19

**paths** 86:11

**patient** 176:20 270:22,23,24 270:24

**patterns** 35:19

**pay** 4:8 103:3,3 103:25 105:6 195:24 214:25 215:4,7,25,25 216:7,8,8,16,18 216:20,25 217:8,20 218:11,18

219:3

**payable** 214:17

**paying** 123:9 193:19 278:6

**payment** 20:7 194:15 196:1

**pays** 194:5

**paystub** 215:2

**pcp** 163:8

**peachtree** 2:7

**peers** 77:5,19 77:24

**penalties** 297:19

**people** 11:2 31:12 33:4 35:21 37:5 53:2 57:24 63:22 65:9 66:3 67:18,20 81:1 83:3,19 85:17,18 87:22 110:19 116:10 129:3 143:17 144:25 162:13 189:15 220:23 231:9,16 232:1 252:10 254:18 255:7,19 256:15,21 264:10,11,20 277:5 278:2,2 278:25 279:6 279:12 281:16 281:18 290:11

290:12,20

**people's** 223:5
233:17

**percent** 111:7
111:16,21
160:16 265:15
265:15 269:11

**percentage**
222:4,5 264:9
264:10,11
265:7,8,11
285:21

**perfect** 72:12

**perform** 168:15
170:8,19

**performance**
3:5 4:18 30:5
72:17 91:15
92:22 93:1,4
93:11 94:8,8
94:20,24 97:5
98:20 99:2,16
99:24 100:17
233:10,17
235:6,10,16,21
237:13,19
238:7,13,19,21
239:5 240:5,7
240:8,21,24
241:5,7 242:11
242:13 243:5
243:19,24
246:8,10,23
247:2 249:15
250:4,15

258:19 268:5
269:21 272:18

**performer** 72:2

**performing**
92:12

**period** 25:16
96:7 144:23
161:14,17
184:15 185:23
190:11,11
196:9 198:21
199:8,10 215:8
215:25 216:8,8
216:16,21,25
217:3,8 218:5
218:18 246:21
248:2 261:13
273:6

**periods** 80:21
216:8 218:11
218:20

**perjury** 297:19

**permission**
120:17

**permit** 119:25

**permitted** 1:18

**perry** 133:1,13
138:4 142:6
144:16 148:17
149:23 153:15

**persistent** 81:6
81:8

**person** 11:19
28:11 29:22
37:21 59:13

60:15,19,20
61:13 78:20
82:2,14 157:5
161:2 219:2
231:20 250:6
255:10 266:15
277:22 278:11
278:16 279:11
292:10,13

**person's** 93:10

**personal** 24:5
24:10,17 25:22
25:25 78:5
83:7 101:1
115:15 117:9
118:2 154:10
158:6,10,11
161:23 162:2,5
169:4 171:4
178:15 192:18
193:4,7 194:3
197:20 206:4
248:6,7 249:9
249:11,18
254:6 285:14
287:21 288:1

**personally** 50:6
50:12 79:6
92:9,10 94:3
117:5 154:1,7
155:4 163:24
208:5 237:12
253:16 269:10
285:8 295:7,20

**perspective**
94:9 269:22

**pertain** 52:12

**pesticide** 20:22

**pete** 14:3,22,23

**petersburg**
57:7 60:22,25
298:3

**pharma** 127:1
127:12,16

**pharmaceutic...**
1:7 5:12 6:6
297:2 298:4

**philosophy**
224:6

**phone** 26:9,10
26:14,16 28:3
28:17,21 50:20
50:22,24 51:14
52:21,23 53:9
153:14 241:9
257:19

**phones** 5:6
28:1 50:15

**phonetic** 37:13
65:25 171:19

**phrase** 57:21
116:8 220:5

**physical** 159:2
279:7,7 286:2
286:3,10

**physically**
208:11 276:14

**pick** 5:5

**picked** 253:12
**picture** 94:23
  95:4
**pinterest** 19:18
**pip** 242:3,10
**pitched** 221:24
**place** 1:14 5:7
  122:20 189:4
**placed** 237:19
**plaintiff** 1:5 2:5
  2:10 6:11 44:3
  44:4
**plaintiff's** 4:22
**plan** 3:13 86:2
  100:20 112:11
  116:21 237:19
  242:14 243:5
  243:10,15
  282:13,14
**planned** 115:7
**played** 226:6
**player** 248:13
**please** 5:4,6,23
  5:25 6:13 7:5
  10:1,18 11:7
  11:23 12:17
  17:10,11,11
  22:9,9 29:17
  162:22 178:21
  190:19 206:14
  297:1 298:10
**plugged** 28:20
**plus** 67:25
**pod** 59:13
  60:15,19 61:13

**point** 9:16,23
  25:9,11,14
  27:18 29:14
  32:10 38:9,13
  56:18,19 58:7
  62:15 65:4
  75:21 77:2
  78:12 85:5
  88:20 89:11
  90:23 102:15
  108:16 117:20
  125:1 126:18
  131:22 153:8
  160:15,19,20
  186:22 190:16
  191:8 204:16
  224:9 247:2
  250:6 261:12
  266:7,24,24
  270:8,14
  281:22 286:20
**points** 74:15
  75:11,19 76:20
**police** 21:5
**policies** 3:14
  4:7 30:6,7,12
  79:7,11,18,21
  117:1 119:13
  124:8,23
  138:19 158:7
  158:11 192:19
  192:21 193:19
  193:21 220:13
  220:16

**policy** 30:20
  36:11,19 77:13
  79:14 80:2
  119:24,25
  120:2,5,16,20
  121:1,8,9,14,16
  121:25 122:4,7
  122:9,10,11,12
  122:14 125:11
  130:10,14
  131:14 138:9
  138:11,22
  139:1 140:1,14
  142:15 155:25
  156:1,17
  157:12 158:25
  159:25 160:8
  160:10,14,19
  160:20 161:3
  161:24 162:3
  162:13,18
  186:21 189:4
  193:4 194:15
  194:19 203:14
  222:24,25
  223:14,23
  224:1,10,24
  225:8,11,20
  275:11
**poor** 245:6
**poorly** 242:17
**pop** 82:12
**popular** 116:8
**portion** 259:18
  287:1,3,8,8

**position** 56:6
  58:19 88:17
  90:25 138:23
  157:5 170:9,20
  189:10,11
  247:8,8 248:17
  248:18 268:24
**positions**
  110:19 183:20
**positive** 8:25
  98:20 99:2,13
  199:20 209:6,8
  209:11 259:15
  260:22 261:7
  261:18,25
  262:6,7,19
  277:4
**positively**
  210:13,17
  211:8 260:14
**possession**
  38:21 44:3,4
  230:7
**possibility**
  52:14,16
**possible** 28:13
  28:14,20,23
  79:22 183:12
  268:17,18,21
  268:21
**possibly** 29:1
  63:20
**post** 16:19,19
  16:21 108:10

posted 20:3
posting 109:22
potential 68:23
  81:9,13 257:9
  257:14
potentially
  95:7 161:5
potilechio
  132:13,17,20
  133:6,25 134:9
  135:10 141:19
  141:23 148:9
  148:17 150:24
  151:2 153:14
  153:16,18
potilecho
  152:20
potter 61:2
practice 166:16
  195:23
practices 89:22
  158:7
practitioner
  163:4
prayed 29:10
pre 130:10,16
  130:20 134:17
  140:15
preface 29:13
prefer 41:16
  83:15
preferences
  49:12
preferred
  178:7

premarked
  41:7
preparation
  255:24
prepare 29:8
  30:4 31:1
prepping 284:6
prescriber
  261:13
prescribing
  67:10,19
prescription
  68:8
prescriptions
  68:21
presence
  115:21
present 2:9
  72:24 86:16
  163:21 269:25
presented
  255:23 256:2
  256:21
presents
  120:11
preserve 26:3
preserved 23:4
  23:11,25 24:12
president
  126:23 250:24
  251:11,12
pressure 87:20
pretty 12:11
  42:22 84:21
  93:19 189:13

189:14 205:22
  255:5 294:8
prevent 168:21
previously
  68:19 143:24
primarily 69:2
primary 59:20
printed 24:13
  108:9 224:5
printouts 26:14
  26:18
prior 60:14
  68:21 88:16
  120:1 123:6
  164:4,9 186:22
  209:3 227:17
  282:7
priorities
  101:10
private 5:5
privette 109:12
  109:14,17
  111:5 113:21
privilege 40:17
privileged
  42:19
privileges
  259:12
probably 11:19
  48:25 51:19
  57:4 68:16
  98:15,15
  112:16 133:8
  141:12 167:3
  195:22 215:16

269:4
problem 66:11
  66:16 208:22
  210:12,13
  269:24
problematic
  221:16
proc 3:14
procedure 1:18
  65:23 119:13
  298:20,21
procedures 4:7
  117:2,6 158:11
  192:19,22
proceed 6:4
proceeding
  5:23
process 149:3,5
  150:10 153:13
  153:23 154:3
  154:16 155:10
  155:14 157:21
  157:22 163:17
  177:19,23
  179:10 187:16
  192:24 197:12
  269:5
processed
  193:8
processing
  158:11
produce 27:1,3
  27:9 42:3,4,8
  42:10 43:12
  50:18

**produced** 26:23,25 27:19 44:7 45:5 46:15,17 49:18 49:23 163:12 187:20,21 223:6 290:17 290:17 291:4 295:20,21

**producing** 45:6 46:1

**product** 40:18 62:18 64:12 67:7 68:1,1 96:10 123:5 176:21

**production** 4:22 27:8 51:21

**productivity** 208:18

**products** 61:21 70:14,15 80:15 84:6 108:2 176:19

**professional** 17:23 295:16 296:5

**profiles** 223:5

**profit** 137:15

**program** 18:7 90:18

**programs** 89:19

**prohibit** 120:6

**prohibits** 122:1 122:5

**promote** 265:15

**promoted** 96:2 265:23 266:2,6

**promoting** 96:3 96:4 131:8

**promotion** 266:10 271:4,4

**pronouncing** 37:14

**pronouns** 30:18

**proof** 231:8,12

**propanolol** 13:13,14,18

**property** 24:4

**proposed** 168:7 177:13

**proposing** 128:13,17

**prove** 106:17 288:2

**provide** 44:18 44:25 48:8,15 49:1 53:14 54:1 55:2 75:22 78:12 89:5,13 105:12 124:8,15 153:18 169:14 177:23

**provided** 18:14 38:20,23 39:13 39:15,18,20,22 39:24 40:12,23 44:10,17,24 45:24,25 46:5 46:22,22,25 47:1,2 48:14 54:2,7,25 81:23 105:10 169:6 179:7,19 180:14 182:20 277:9 279:2

**provider** 82:15 163:7 164:10 164:19 278:14

**providers** 66:11 80:14 113:8 160:2

**provides** 67:4

**providing** 18:15 45:22 74:24 75:1 89:19 124:8

**provision** 125:11

**pto** 107:7,7

**ptsd** 166:11 172:22 278:7

**public** 1:20 295:16

**pull** 163:24

**pulled** 117:20

**pulse** 252:9 255:5

**purchased** 108:2

**purpose** 22:13

**purposes** 1:17 1:17 115:14

**pursuant** 1:16

**push** 127:16

**pushed** 86:1

**pushing** 195:10 239:2

**put** 31:19 42:24 51:18,22 54:24 61:17 66:13 79:17 82:2,22 83:11 96:13,15 126:12 130:24 142:9,10,11 145:3 155:1 206:3 220:10 223:5,15 233:15 241:4 242:3 258:21 259:19 261:2 284:17 293:1 293:17

**putting** 110:8 149:2 161:5 176:15 242:19 246:4

**q**

**q2** 93:25 94:18 94:25 243:8,12 245:11

**qualify** 131:14 140:1

**quality** 245:1,3 245:11,13,25 246:5
**quarter** 94:21 94:24
**quarterly** 233:22,23,24 234:8 241:25 246:5 285:2
**quarters** 93:18 93:20
**question** 9:23 10:4,7,11,11,14 11:22,24 12:8 17:19 22:22 23:10,16 24:15 39:4 40:6 41:23 43:24 45:10,14,18,20 46:9 62:19,24 68:13 73:12,19 74:7 75:7,7 77:14,16 79:25 81:7 88:24 93:6 95:17 96:17 97:4 100:5 109:10 112:16,25 116:19 121:12 124:14 131:4,5 131:11 134:21 136:2 138:21 146:13,15 148:24 149:13 157:14 158:25

163:23 170:7,7 173:13,14 177:6 179:15 179:16 190:3 193:1,3 195:6 196:10 199:7 200:20 205:4,6 221:21 226:12 226:16 227:18 239:3,25 241:2 242:15 245:18 257:21 261:11 266:19 267:5 275:10,25 278:23 279:1
**questioning** 12:19
**questions** 9:19 13:2,15 17:9 29:18 42:1 44:16,17 53:25 102:1 128:20 133:13 134:1,6 140:5,6,7,12,16 140:20 141:24 142:3,25 143:3 143:12,16,17 145:18,22 150:15 162:16 170:3 176:1 179:3,6 180:21 197:24 210:12 263:18 292:18
**quick** 243:2

**quicker** 244:9
**quickly** 102:16
**quite** 14:18 17:19 21:14 73:23 128:13 140:12 265:20
**quote** 59:20 89:4

**r**

**r** 5:1 7:11,14,14 33:16 35:13 37:18
**race** 139:22 226:22,25 227:4 228:5 257:8 271:14 271:22,25 272:3,11 273:7 273:10,17,18 281:1 287:9,23
**racial** 274:12 274:13,25 280:14
**racially** 272:6 287:4 288:21
**radar** 246:7
**raise** 6:12
**raised** 16:1 140:5,6,7 242:25 243:15 245:4 288:16
**rambling** 9:24
**ramona** 126:22 127:7 183:19

**ramsey** 35:25
**randomly** 252:17
**rank** 92:6
**ranked** 94:4,6 94:9 115:22
**ranking** 93:2,7 94:19 95:7 98:4,7,11
**rankings** 91:13 91:19 92:10 93:1,19,20 95:3,10,18 96:19,21,23 97:22 262:23 263:8,19
**raped** 179:13
**rare** 86:15
**rarely** 93:21
**rate** 13:19
**rated** 91:17
**ratings** 93:5
**raw** 225:22
**reach** 83:9,9,19 83:20 103:10 103:10 109:16 113:13 209:2 232:12,15 291:25
**reached** 90:5 112:11 126:5 145:15 150:14 175:13 248:17
**reaching** 64:3

read 2:17 32:6 41:14 109:9 121:3 156:9 223:16,17 229:9 292:24 293:3,5,8,9,10 294:2 297:19 298:8

readily 21:9 37:24

reading 115:18 124:11 170:18

ready 114:10 269:11,16,22 270:5,8 294:10

reality 81:1 94:12 128:1

realize 141:8 211:22,23 243:20

really 9:3,20 16:3 34:12 45:21 84:18 93:9 94:4,9 99:23 127:7 128:16,18,23 131:2,11 149:13 211:24 245:20 248:19 267:5 274:23 283:6 285:20

reason 12:12 13:1,5 26:23 28:23 29:2,5 47:14,17 51:7

63:14 74:3,3,7 128:15 134:16 134:22 143:15 145:9,25 154:20 157:20 157:25 161:20 169:3 173:10 173:18 174:9 174:13 187:24 194:2,9,13,18 195:2,3,19 197:16 230:18 240:3,10,12,19 240:23 241:3 241:16,24 242:5 249:16 249:19 254:6 257:8,12 277:6 277:11 298:9

reasonable 177:1 179:9 180:22 243:23 298:13

reasons 213:1

recall 50:17 66:4 91:16 93:22 133:19 135:18 142:11 177:20 186:5 232:25

receipt 156:13 298:13

receive 47:15 47:18,21 232:9 237:22 284:25

285:4

received 18:1 48:2 54:4 71:16 130:10 130:19 147:18 184:11,21 191:19 209:25 215:3,6,24 216:4 231:25 237:12 242:21 282:6

receives 156:18

receiving 191:23 253:14

recent 290:3

recess 70:25 132:4 192:7 258:7 289:15

recollection 150:5

recommend 156:22 157:4 267:1,7,10,16 268:9,11,13

recommendat... 156:16,21 157:4,7,9,13,15 157:18 267:18 268:19,22

recommending 267:6,9

record 5:3,8 6:1,7 7:6 51:18 51:22 54:24 55:7,19 70:21

70:23 71:3 132:1,3,7 192:10 258:5,6 258:10 276:21 289:12,14,17 292:24 293:2 294:11,14 296:9

recorded 5:9

recording 5:7

records 163:12 163:14,15,16 163:18,25 164:1,2,10,18 180:1 202:4 276:20 277:19

recovered 50:16

recurring 251:3

referenced 77:15 298:6

referencing 90:3

referring 220:10,12

reflect 74:16

reflected 79:1 94:20 142:24 228:25

reflection 290:16 291:4

reflective 94:7

reflects 75:12 99:20 106:23

243:6 288:16
**regain** 126:24
  127:1
**regard** 298:14
**regarding**
  40:24 43:12
  49:3,11 186:6
  233:11
**regardless**
  78:17
**regards** 184:3
**region** 62:1
  88:6 91:8
  231:21 244:19
**regional** 88:6
  91:2,4,10
**registered**
  295:16 296:5
**regular** 76:3
  77:9,10 78:15
  88:2 163:19
  215:19
**relate** 40:8
**related** 5:21
  24:23 29:18
  40:13 46:16
  52:3 69:2
  106:6 117:13
  123:1 158:7
  189:23 192:19
  199:1,18
  209:11 225:15
  227:3 228:4
  253:15 257:10
  287:9

**relates** 23:24
  38:22 39:23
**relating** 25:10
  26:3 206:4
**relation** 92:6
**relations** 175:4
**relationship**
  248:6,12 249:9
  249:12,18
**relationships**
  80:13,22,24
  81:4 82:19
  210:14,24
  211:9
**relative** 296:11
  296:13
**relayed** 146:1,9
  146:16 251:19
  251:25
**relaying** 254:20
**released** 263:12
**relevance**
  40:15
**relevant** 24:13
  40:22 121:8,16
**reliable** 92:11
**relied** 83:18
**religion** 222:15
  273:13
**religious** 32:9
  49:12 158:22
  176:14,22
  179:13
**remained** 171:8

**remember** 8:19
  8:21,24 9:2
  21:2 22:5,7,18
  23:1 30:7,25
  31:6,11 33:23
  34:6,19,23
  35:2 37:3
  40:10 47:4
  50:23 56:25
  57:1 58:11
  61:5 65:20
  69:21 70:6
  86:12 87:15
  104:8 106:14
  108:11 126:21
  126:22 129:14
  134:5,8,20
  138:7 141:6
  143:22 144:5
  144:16,17
  164:13 197:7
  201:20,24
  202:19 204:12
  204:15 212:7
  214:6 219:12
  223:9,18
  225:18 227:7
  228:9 233:6,20
  233:25 234:1,5
  234:6,10,11,14
  235:3 257:24
  262:24 271:2
  271:19,23
  272:1,4 274:2
  274:7,11,14,17

278:11 290:14
**remembered**
  40:20
**remembering**
  274:22
**reminder** 71:5
**reminding**
  152:6
**remote** 2:2,10
  2:11 31:9
  87:16 112:23
  113:2,7 183:20
  184:22 187:16
  188:15 190:1
**remotely**
  181:17,24
  182:1 183:12
  184:10,15
  186:2,11
**renamed** 104:5
**renumbering**
  41:10
**reorganization**
  69:17
**rep** 56:4 58:9,9
  59:21 60:7,8
  60:11,11 61:1
  64:8 66:6
  71:14,15,20,22
  72:1,4,5,12,15
  73:2,8 74:8,23
  74:23 75:3,8
  75:19,19,24,25
  76:3,22,24
  78:15,25 85:16

85:22 96:18
100:24 112:3
144:9 146:11
146:11 157:3
236:15 237:6,7
237:7 264:3,5
264:5,11,18,19
264:21,22,22
265:1,2 275:12
**repeat** 13:4
293:21
**repeated** 35:19
241:17
**repetitive**
142:5
**rephrase** 10:20
25:13 39:4
62:24 158:16
**replaced** 90:24
**report** 3:8 21:6
31:10 40:23
90:8 105:6
185:2 282:7
290:23 291:8,9
291:11,14,24
292:1 296:7
**reported** 1:19
90:20,21,23
277:4
**reporter** 2:16
5:19 6:3,12
10:24 11:7,13
11:24 185:14
293:19,24
294:4 295:16

296:1,6
**reporting**
244:17
**reports** 105:1
131:5,7 211:20
212:10 244:16
**represent**
107:5,7 209:22
**representation**
48:1 169:18
**representations**
106:11
**representative**
18:9 73:20
74:18 75:13
77:21,22 78:3
78:6 80:12
81:17 85:6,14
86:19 88:2,3
90:8 91:22
92:3 95:6
112:18 156:15
168:16 235:25
**representatives**
75:23 89:4,5
100:24,24
233:10 252:8
**represented**
210:15 220:18
220:25 221:1
221:25
**representing**
5:18
**reps** 65:11
71:18 73:3,13

76:11 85:18,19
91:5 96:4
99:20 100:1
101:4,8,14,20
222:4,5 246:17
264:20
**request** 3:17,18
4:4 43:9 44:1
46:3 48:18,25
53:22,23
120:17,21
130:6 146:16
146:24 154:8
155:4 156:14
156:18 157:3
175:15 177:22
179:24 182:14
182:21 190:16
207:24 208:6
211:7 212:9
213:2,7
**requested**
39:25 40:1,9
40:16 164:10
167:20 168:13
175:25 177:24
181:25 182:20
208:9,21 209:5
291:25
**requesting** 20:7
106:12,12
155:10 281:4
**requests** 4:22
39:6 44:19,19
118:6 158:3,8

158:12 181:18
189:23 192:20
192:25 193:12
197:22
**required** 53:14
54:1 130:16
140:15 158:18
159:9 177:22
186:12 189:5
283:22
**requirement**
54:12,16,19,20
77:9,9 186:3
189:3,20
**requirements**
191:5
**requires** 53:17
120:16 130:11
**research** 18:25
73:9,10
**researching**
127:15 203:25
**reserved** 296:8
**resolved** 21:2
181:22
**resource** 89:8
156:15 175:1
204:8 221:6,7
221:13,25
262:14
**resources**
156:19 270:24
**respect** 244:4
**respond** 177:1
255:9

**responded**
146:25 176:10
176:11
**responding**
293:18
**response** 11:23
32:8 42:10
44:2 48:15
49:7 147:3
170:13 183:10
**responses** 4:22
**responsibilities**
100:19 245:6
**responsibility**
76:4,22 77:21
77:22 78:14,15
79:10 80:1,5,6
85:7 91:5
244:14
**responsible**
62:6 63:4
69:25 75:4,12
76:12 79:6
89:4 96:9
133:16 192:14
254:20
**responsive** 44:2
**restore** 127:10
**restrictions**
120:2
**restructuring**
59:14,18 60:1
**result** 165:1
281:19

**resulting** 286:2
**results** 245:5
**resume** 87:10
**retained**
294:16
**retaliated**
280:13
**retaliation**
31:19,24 32:5
280:5
**retroactively**
195:24
**return** 152:7
191:9
**returned** 58:7
135:9 136:3,3
136:8 298:13
**returning**
137:7
**reverse** 229:16
**review** 3:5 4:18
92:23 93:5
97:5,7,8,11,15
97:18,19 98:11
98:20 99:2,13
99:24 100:17
182:20 189:6
234:3,13 238:7
238:13 258:19
258:23 259:15
259:25 260:2,7
260:8,20 261:9
261:22,24,25
262:3,11 263:9
267:23 272:18

296:8 298:7
**reviewed** 30:3
30:5,6,19,20
268:6 277:7
279:3
**reviewing**
30:25
**reviews** 233:18
238:19,21
260:22 261:7
**revise** 41:7
**rewrite** 137:22
137:23
**richmond**
15:24
**right** 6:12,23
10:5 13:1
15:25 16:7,10
20:11,13 22:13
23:18,21 32:10
39:11 41:21
44:2,8 45:6,15
46:2,11 51:15
55:10,21 56:5
58:8,10,23
60:2,2,6,15
64:2 66:5,7,19
70:18 71:5,13
73:11,16,21
75:25 77:22
79:15,19,23
80:3,8 81:10
81:14 82:6,19
83:10,17,21
85:5 88:20

89:6,21 90:3
90:24 92:7
93:24 94:1
97:2,7,11,12
98:2,20 99:3
99:13,16,22
100:3,9,25
101:10,11,14
101:21 102:3,6
102:17,23
103:2,4,15,22
104:1,6,20
105:3,7,9,13,18
105:21 106:6
107:10,14,22
108:2 109:23
110:3,6,8,9,13
110:20 111:7
114:5,17,20
116:7,11,16,19
116:22,24
119:11,13,18
119:23 120:18
120:21,25
121:19 125:18
126:2,6,9,13,16
127:21,25
129:1,11,16,18
129:23 130:3,7
130:8,11,17,22
131:5 132:11
135:8 136:4,8
136:11,12,15
136:19,22
137:7,16,19

138:13,24
139:6,9,17,18
141:16,18,22
141:25 142:9
142:10,14,16
142:22,25
143:5,9 145:1
145:4,8,13
146:2,5,20,22
147:5,11,19
148:6,8,10,14
148:16,22
149:24 150:6
150:24 151:1,5
151:21 152:2,8
152:12,17,19
152:25 153:4,8
153:9,21
156:17,20,23
157:1,9 158:8
161:13,14
162:14 164:5
166:1 167:6,22
168:7 169:18
169:20 170:14
171:2,5,6
173:5,6 174:21
174:25 175:1,4
175:15,18,21
176:1,4,8,13
177:5,15,18
178:16 179:1
180:5,9 181:2
181:3,7,9,11,12
181:15,18,22

182:4,21 183:1
183:5,6,12,16
184:6,10,16
186:4,12,18,23
187:5,10 188:3
188:7,18 189:5
189:17,24
190:7,12,17
191:6,13,16,23
192:16,17
194:25 196:6
196:17,20,23
197:1 198:4,10
199:2,8 200:11
204:21 206:13
206:25 207:3,8
207:14,17,20
207:24 208:12
210:5,14,18
212:18 213:2,8
213:17,23
214:5,17,24
215:23 216:1
216:10,18,21
217:8,12
218:10,11,14
218:20 219:18
222:9 226:3
228:8,14
229:18 230:14
231:2 235:12
235:16,21
236:3,5,6,15
237:2,9,13,17
240:3 241:13

243:16 244:21
245:25 246:17
247:17,19
250:11,21
253:15 256:2
256:12 257:2
258:12,22
259:2,3,15
260:2,17
261:12,18,22
262:1,7,17,20
263:2,6,14
264:21 265:6
266:24 267:3
268:1,9,13,20
269:6,7,12,16
269:18,23
270:9 271:10
271:11 273:10
275:23 276:9
278:13 279:3
281:22,25
282:2 285:22
285:23 288:13
289:19 290:4
293:7,12,19
**rights** 107:8
**risk** 161:5
165:14
**roberta** 181:8
181:15
**robinson** 1:14
**roi** 260:16
261:17

**role** 56:3,9
66:15,15 71:13
79:4 86:19,25
87:9,14 88:25
138:1 158:3
159:9,22,22,23
168:16 225:7
225:10 226:5,6
245:14 246:9
246:22 264:16
265:12 267:3
269:12 270:13
270:18,20,20
271:5,9
**roles** 59:9 79:5
79:10 87:11
91:22 92:2,3
267:25 270:21
**roster** 33:5
**rough** 57:1
**roughly** 57:9
**route** 82:25,25
**routing** 81:24
82:23 84:8,9
84:19 99:19
**rpr** 1:19 295:15
296:21
**rule** 17:9
298:20,21
**rules** 1:18 9:10
298:13
**run** 9:9 33:7
77:1 281:21
**running** 205:17
205:18

**runs** 106:4

**rutherford** 37:12 38:15

**s**

**s** 1:19 3:1 4:1 5:1 37:18 70:3 295:15 296:5 296:21

**safety** 168:22 168:22 170:10 170:21,21

**salary** 284:21 284:24

**sale** 108:25 109:22

**sales** 56:4 58:8 58:9 59:20,21 60:7,8,11,11 61:1 64:8,10 65:11 66:6,21 68:6,11 71:14 71:15,18,20,21 72:1,4,8,12,15 73:2,3,8,13,20 74:8,17,17,23 75:3,8,12,19,19 75:23,24,25 76:3,3,11,11,22 76:24 77:6,9 77:19,21,22,24 78:2,6,8,15,25 80:12 81:17 85:6,16,18,19 85:21 86:18 88:2,2 89:4,5,7

90:7 91:5,22 92:2 95:12 96:4,18 100:23 101:4 107:8,10 107:15 111:24 112:3,18 137:16,18 144:9 160:9 168:16 189:16 222:4,5 233:10 235:25,25 236:15 237:6,7 237:7 246:17 250:24 264:2,5 264:5,11,18,19 264:19,21,22 264:22 265:2

**samples** 89:25 90:1 211:19

**sampling** 42:23 89:23,24

**sat** 221:23 276:24

**saturday** 111:13 175:16 175:20

**saved** 15:10 24:20,22 25:2

**saw** 99:15 127:20 130:10 202:3 223:3,15 225:20

**saying** 28:13 30:19 34:14 37:14 40:5

45:19 48:15 50:3 65:4 67:18,19 75:18 75:20,20 78:14 79:13 86:5 96:18 100:6 115:25 116:3,8 116:9 117:12 127:24,24 140:16 151:13 160:23 161:9 173:3,16 188:9 199:17 205:5 207:6,7 208:1 220:9 221:7 224:4,23 225:20,21 227:13 231:16 238:5,12 244:12,13 245:21 261:20 267:20 268:18 268:23 283:20 285:16 293:22

**says** 74:11 75:3 75:21 77:5,18 89:3,7 99:6,9 99:10 108:18 119:19,24 121:8,16 133:14 137:10 137:14 142:15 143:4 145:18 156:5,17,21 157:12 182:19

184:3 185:12 215:14,19 217:15,15,16 218:19 223:19 239:10 244:25 245:25 259:6 261:9 278:19

**scarlett** 282:15

**scenario** 79:22

**school** 15:7,13 15:15,16 16:15 16:22 17:13

**school's** 154:17 154:18

**schooling** 18:2

**scope** 85:25

**scott** 36:1 37:4 231:17,24

**scratch** 82:4

**scream** 37:13

**screams** 37:13

**screen** 41:4 80:18 103:13 119:22 209:21 258:21

**se** 130:23

**seal** 295:9

**search** 118:4

**searching** 72:25

**second** 8:25 22:6 41:4 70:21 77:17 89:9 98:17 104:20 111:2

122:6 124:12 125:9 134:13 137:2 141:17 152:6,10,23 178:23 188:10 198:20,25 210:8 214:11 229:11,22 254:25 255:4,8 266:13,13

**secondary** 3:20 120:15 121:1 241:6

**secretary** 103:20,21 105:1

**section** 136:12

**see** 21:7 35:21 43:18 44:1 52:2 53:5 56:21 68:15 74:11 77:2 82:13 83:12 93:7 98:10 108:15 111:17 113:20 115:19 116:6 118:5 119:23,23 121:15 122:8 125:19 128:9 128:12 137:10 137:11 140:16 145:12,17 146:24 159:11 159:24 170:7

170:11 184:2 215:19 216:16 216:17,24 217:6 218:9 223:8 225:17 229:11 230:4,5 230:12 238:13 243:16,24 244:19 263:3 264:18,18 276:15 292:20

**seeing** 35:21 42:14 76:10 84:3 94:19 101:13 163:3,6 167:5,9,14 259:21

**seeking** 35:16

**seemed** 127:18

**seen** 41:24,25 69:5,24 73:23 154:11 157:9 157:14 164:11 222:24 225:14 225:21,24,24 226:1,4 239:25 242:13 254:9 279:8

**sees** 161:7

**segregated** 221:2,4

**segregation** 221:22

**selected** 256:25 257:4

**self** 99:9 221:17

**sell** 66:18 69:12 108:4 109:25 110:9,13,16 210:11 277:2

**selling** 66:24 67:11 69:2,10 69:25 96:19 107:3,4 116:4 144:13,24 146:8

**send** 115:9 230:2 293:25

**sending** 47:23 113:23,24 123:4 130:11 134:10 163:23 244:18 276:5

**sends** 175:11

**senior** 58:8,9,9 60:7,11 66:6 71:14,15 73:1 73:8,20 74:8 74:17,23 75:8 75:12,19,23 76:22 77:8,21 78:14,15,23,25 85:6,16,21 88:2 89:4 90:7 112:3,17 126:15 168:16 237:6,7 264:2 264:5,10,22 265:1,1

**sense** 9:20,20 9:24 10:1 87:18 127:17 265:18

**sensitive** 5:4 12:14 197:25

**sent** 31:4 115:6 117:19,19 126:11 130:21 131:12 134:12 134:18,20 135:10,12,13 136:7,7 143:1 143:14 152:4,6 157:18 163:22 163:22 175:16 175:19 182:15 184:1 187:11 187:13,18 204:8 212:19 214:13 218:19 229:11,18 231:5,9,12,16 255:10 282:8 290:5,10,10,19

**sentence** 11:20 77:15,17,18 137:23 141:10

**sentences** 136:11,14 141:10

**separate** 133:9 137:11 253:22

**separately** 32:5 181:20

**september**
57:14 98:5
109:17 126:5
129:16,20
130:5,22,25
131:13 198:21
199:10 200:10
243:13 245:12

**series** 181:7

**serious** 89:24
246:23

**seriously** 35:20
278:8

**servers** 117:16
117:17

**services** 105:10
105:13

**set** 9:11 38:19
107:17,24
148:9 175:14
267:24 272:9

**setting** 163:16
251:4,5

**settings** 235:11

**settlement**
21:15

**several** 39:10
209:7

**sex** 273:11

**seyfarth** 2:6

**seyfarth.com**
2:8

**shadowed**
65:13,17

**shadowing**
65:14,20 66:1
66:2

**shakes** 253:21

**shana** 4:11

**shannon** 1:4,11
2:10 4:10,11
5:10,11 6:9,11
6:18 7:7 23:7
40:19 99:10,16
169:16 170:8
203:23 205:24
238:9,9 244:23
244:23,23,24
264:13 266:15
293:23 294:15
295:7 297:1,1
297:23 298:2,4

**shape** 186:24

**share** 41:3
58:10,21 60:25
66:8 115:2
116:18 131:17
135:6 138:18
138:19 146:11
181:3 206:5,6
214:11 288:10

**shared** 43:19
57:16,22 128:4
144:10 246:14

**sharing** 57:23
58:6,12 59:10
60:14,23 62:17
66:7 89:22
112:6 119:21

**shaw** 2:6

**she'd** 277:25

**sheet** 2:16
298:9,10

**sheridan** 90:13
90:16

**shirt** 111:22
145:3 195:10

**shirts** 107:19
107:21 143:24
144:12 146:8
146:17

**short** 4:9 61:13
103:10 192:20
192:24 193:8
193:11,20
194:4,14
195:20 196:7
198:17 207:24
208:6,9 209:24
210:5 211:7
212:21 242:10
250:6,14
276:16 277:7
277:22

**show** 41:3,21
73:5,16 97:2
102:14,16
105:18 109:8
111:1 114:25
115:1 116:16
119:8 123:25
132:11 136:24
137:2 141:17
148:6 150:21

152:17 174:20
178:21 190:25
209:13 212:12
213:23 214:10
214:22 228:18
239:23 245:4
258:12 263:1
288:9

**showed** 217:13
217:14 233:17
255:22

**shown** 118:4
217:11

**shows** 78:5
109:21

**side** 195:13
278:19

**sign** 2:17
106:16,20
293:4 298:10

**signature**
295:15 296:20

**signed** 152:24
298:15

**significant**
232:7,13 287:8

**similarly**
180:19 219:3

**simmer** 227:20

**simple** 112:17

**single** 27:24,24
49:19,24 58:21
86:13 135:20
144:5 222:6
274:23 277:22

| | | | |
|---|---|---|---|
| 278:6 | 206:8 263:14 | **solutions** 5:18 | 99:17 101:16 |
| **singleton** 36:7 | **situations** | 5:20 294:17 | 101:18 102:17 |
| **sister** 33:11 | 206:4 | 298:18 | 103:17 104:4 |
| 197:10 198:2,9 | **six** 196:15 | **solve** 208:22 | 104:19 106:12 |
| 199:24 200:23 | **sixth** 124:21 | 210:12,13 | 110:14 119:21 |
| 201:4,7 203:22 | **sizzle** 116:4 | **solving** 221:3 | 121:11 124:17 |
| 204:20 276:21 | **skipped** 9:25 | **somebodies** | 126:2 129:13 |
| **sister's** 199:2 | **sky** 253:12 | 267:2 | 130:12 135:5 |
| 199:18 200:14 | **slated** 31:9 | **somebody** | 138:17 147:6 |
| 200:21 201:18 | **sleep** 29:12 | 18:15 37:1 | 152:18 158:9 |
| 201:22,25 | **slight** 237:6 | 60:16 94:18 | 158:16 162:1 |
| 202:6,11,24 | **slightly** 285:19 | 145:3 166:14 | 163:11 169:8 |
| 204:24 205:9 | **slow** 197:21 | 205:18 206:5 | 170:23 175:3 |
| 207:2,7 | **slur** 274:25 | 228:5 231:10 | 181:25 195:9 |
| **sit** 179:14 | **snapchat** 19:24 | 232:11 237:8 | 195:11,14 |
| **site** 128:3 145:1 | **snapshot** 67:16 | 243:20 246:20 | 203:7 204:7,11 |
| 158:19 159:2 | **sneezed** 206:20 | 247:1 267:2 | 207:4,15 210:2 |
| 159:10,16,18 | **social** 19:4,11 | 274:17 276:23 | 217:10 229:15 |
| 160:4,7 223:3 | 19:12,12,18,21 | **somebody's** | 234:23 246:1 |
| 225:25 226:3 | 20:4 110:21 | 93:7 226:22,25 | 258:21 259:4 |
| 264:17 | 115:21 116:1,9 | 249:2 | 268:4,4 274:4 |
| **sites** 159:24 | 145:6 167:21 | **someone's** | **sort** 9:9 18:1 |
| 160:1 | 168:3,14,20 | 276:11 | 87:25 225:14 |
| **sits** 278:18 | 169:8,9,10,24 | **son** 57:15 | 263:17 286:1 |
| **sitting** 25:8 | 182:14,24 | **sonali** 2:11 6:8 | **sounds** 86:5 |
| 26:6,12 39:21 | **society** 126:24 | **soon** 204:12 | 171:7 198:23 |
| 40:7,11 44:21 | 127:1,11,11 | **sooner** 246:13 | 198:24 294:4 |
| 45:2,23 50:19 | **sold** 84:6 | **sorry** 14:19 | **south** 15:7,9,13 |
| 51:13 52:15 | 107:19,21 | 22:15 23:16 | 15:16,19,19 |
| 150:4 185:9 | 111:22 143:23 | 24:21 34:22 | 16:14 17:1,2,6 |
| 228:8 233:20 | 144:13 146:17 | 38:12 44:4 | 18:3 |
| 234:1,6,11 | **sole** 104:3 | 58:8,17 72:22 | **southeast** |
| 236:17 280:2 | **soliciting** 122:1 | 74:6 77:14 | 298:11 |
| **situation** 59:2 | **solution** 66:11 | 79:20 80:17 | **space** 61:20 |
| 200:2 203:12 | 66:16 | 98:1,8,23 | 279:13 |

**speak** 36:15
37:7 87:24
88:25 148:13
251:14,18
252:3,12,15
254:13 256:25
257:4
**speaking** 34:23
37:6 89:14,15
96:7 257:16,17
257:22,22
**special** 40:22
**specialist** 90:17
**specialty**
275:18
**specific** 10:11
31:19 33:3,24
34:6 35:2
36:16 66:24
78:24 167:20
170:2 173:9,19
174:1,1,5,10,14
201:20,24
220:13 252:10
264:14 265:17
284:18
**specifically**
28:10 33:3,19
36:11 39:5
43:5 96:7
120:20 134:5
165:25 166:2,5
272:16 283:14
**specifics** 34:8,8
34:14 50:17

168:24 186:25
**spell** 7:10 35:11
37:17 70:2
**spelling** 37:20
**spent** 89:23
**spoke** 29:15
35:3,7,22
36:10 55:5
133:13 183:14
183:15 254:24
270:22,25
**sport** 102:9,25
104:4,5
**spot** 57:7
**sprayed** 20:22
**spread** 162:10
**spun** 244:22
**st** 2:3 14:3,22
14:23 57:7
60:22,25 298:3
**staci** 148:21
272:15
**stand** 33:17
219:19
**standpoint**
213:1
**start** 9:15 12:4
22:19 56:1
58:24 71:1
87:25 103:13
132:5 145:7
192:8 196:11
258:8 267:24
280:4 290:21

**started** 64:8
70:6 72:11
125:25 131:12
167:9 238:17
286:24
**starting** 57:17
147:21 158:14
158:17,25
215:3 216:7
245:11
**starts** 77:4
78:12 106:2
110:5 125:22
130:5
**state** 1:20 5:23
5:25 7:5 21:23
103:21 105:2
145:19 261:3,9
264:13 295:2
295:17 296:2
**stated** 42:15
118:21 149:16
183:20 297:20
**statements**
33:24,25
**states** 1:1
120:20 155:25
156:1 157:2
223:4
**stating** 157:4
170:16 176:20
188:15 245:24
**statistic** 225:17
**statistics**
225:15

**status** 188:18
188:21,23
**statute** 298:14
**stay** 85:18
187:16 264:21
**stayed** 15:9
**staying** 146:21
**std** 195:20,20
196:25
**stenographic...**
296:7
**step** 85:15,15
86:4 89:3
119:24 121:15
125:24 193:5
213:24 217:14
226:20 244:20
264:2 280:10
**stephanie**
162:24 163:2,6
163:13,19
166:16 176:18
177:4,7,14
179:18 219:9
**stepped** 98:19
**steve** 127:7
**steven** 61:1,2
**stick** 41:11
**sticky** 161:10
**stock** 144:17
**stop** 9:17
131:23 162:9
194:15 278:6
283:22

**stopped** 69:16 69:21 70:7

**stopping** 131:22

**story** 206:5,5

**straight** 55:12

**strategic** 245:5

**streamlining** 101:7

**street** 2:7 14:4

**stress** 151:10 207:19 285:9 285:13 287:8

**stressful** 189:13,14

**stressors** 200:4

**string** 153:11

**struggled** 211:8 250:11

**struggling** 207:16

**stubs** 4:8 214:25

**stuckler** 171:19

**studies** 210:12

**study** 64:19 65:1

**stuff** 47:23 48:7 48:16 72:24 75:5 76:16 109:22 112:12 128:3 131:9 144:24 145:1 212:2 239:1,1 247:16 254:17

275:6

**stunned** 155:19

**style** 83:23,24 84:2

**subject** 34:24 35:1,3 120:1

**submit** 50:1 106:9,16

**submitted** 50:1 108:6 123:19 130:6 140:8 143:18 154:7 154:25,25 163:15,16 167:25,25 179:1 194:4 210:10 211:6 212:8 278:12 278:14 288:12

**submitting** 131:7

**subpoena** 164:3,19

**subpoenaing** 164:4

**subpoenas** 164:9

**subscribed** 19:9

**subside** 13:22

**succeeding** 100:4

**successful** 62:21 80:12

**sudden** 184:12 187:15

**sued** 20:16,16

**sufficiency** 51:20

**sufficient** 277:10

**suggested** 86:24 202:6 298:12

**suggests** 230:7

**suicide** 205:21

**suing** 21:25

**suite** 1:15 2:3,7 5:16

**sum** 196:1

**super** 93:22

**superior** 278:20

**supervisor** 171:21 266:8

**supplement** 58:16

**support** 8:15 9:5,6 20:7 205:2,2 213:7 288:2

**supporting** 89:8 287:21

**suppose** 41:14 79:24

**supposed** 61:16 62:3,11,12 112:19,19 113:15,25

162:17 179:25 187:14 188:4

**supposedly** 290:12

**sure** 10:23 11:13,16,23 12:1,18,22,25 23:2,10,23 24:11 27:5 28:18 33:8 39:19 40:5 43:23 44:6 45:19 51:16 53:10 61:10 63:16 71:24 73:4,15 75:6 77:23 78:24 79:12 80:8,16 81:15 82:5,17 83:5 86:21 91:9 94:25 95:1 96:16 112:7,10,16 115:3,18 117:11 119:21 137:24 140:18 144:3 153:12 165:12,16 173:2 174:16 178:2 180:3 181:5 190:3 193:1 197:16 197:25 199:3,7 201:9,19 211:10,13,19

212:11 221:9 236:16,22 239:3 242:20 245:16 246:18 247:5,15 250:16 256:11 256:18 260:25 262:2 266:1 270:1 272:8,8 273:23 279:22 280:1,4,23 281:2,6,23 283:19 284:16 284:20 285:24 286:16 287:6 287:24 288:5 289:9 294:8

**surgeries** 279:7

**surprise** 205:19

**surprised** 255:18

**susan** 132:13 146:5 147:3,8 149:1,22 150:24 151:23 152:20 153:14

**susan's** 146:24

**suspended** 191:6

**suspension** 4:6

**swear** 6:3,14

**sweeney** 36:8 88:15

**sworn** 6:19 295:8

**synonym** 89:17

**system** 77:13 185:1

**t**

**t** 3:1 4:1 37:18 185:2

**tagged** 116:5

**tags** 115:21,23

**take** 5:7 12:23 13:9,12 21:20 41:22 55:12,16 70:20 73:18,22 80:17 81:9 83:7,25 86:4 88:19 89:2 97:3 109:9 113:7 116:18 119:24 121:5 121:15 122:6 124:4 125:24 176:20 192:3 196:22 206:15 213:24 217:14 226:20 239:24 245:14 247:18 258:1 280:10 291:14,24

**takeda** 1:7 5:12 6:5,8 7:2 18:6 18:14,19 20:4 21:22 22:1 23:4,11,14,18 24:2,6,16,23 25:10,13,15,19 26:4 27:2,6,7

27:14,19 28:11 30:12 31:3 32:22,23,25 33:4 35:23 36:20,22,23,25 37:2,12,21 38:2,6,7,8,22 40:14 42:3,4,7 42:22 43:16 44:8,19,19,20 45:5,12,13,16 45:24,25 46:6 46:7,7,17,22 47:15,18,20 48:2,6,13 50:9 50:13 53:7 54:4,20 55:22 56:6,16 57:24 58:18,19,20 59:14 60:1 61:12 63:20 65:6,6,7,8 67:4 71:17 79:5,14 80:2,13,14 82:15 84:13,25 86:12 88:17 93:15 94:6 95:4 110:5 111:3 113:4,5 113:16,18,25 115:13 116:21 117:8,9,17,20 119:1,4,13,19 120:2 124:4 126:6,9,16,23

127:22,25 129:1 131:1,12 138:18 139:4 139:24 140:5 146:12,18 147:21 152:24 152:24,25 153:21 155:21 156:12 158:4 158:15,19,20 159:2,8,10,16 159:18,24 160:1,4,5,7,15 160:17 161:1,2 161:7,24 162:3 162:7 163:15 163:17,17 164:4,9 168:11 168:12,19 169:18 171:13 175:19 176:18 176:23 177:4 178:7,24,25 179:6 180:10 180:15,16,17 180:21 182:21 183:24,24 184:9 188:12 188:23 191:15 191:21 192:16 193:8,11,15 194:5 196:22 197:6,21 200:13,14,17 204:8,13,13

205:22 207:23 208:5 210:3,3 210:8 215:3 218:16 220:13 220:18,25 221:1,4,6,7 223:3,10,23 224:1,10 225:8 225:12,15 226:5 236:5,8 247:19 251:12 251:12 257:18 270:14 271:12 272:5,12 273:15,20 274:3 275:3,10 275:12,21 276:1,1,4,24 277:3 279:6,9 279:12,15,19 279:25 280:13 280:20,24 281:3,12,20,21 283:18,21 285:13 286:2 287:2,10,12 288:17,20,21 289:1 292:10 292:14 298:4

**takeda's** 24:4 32:7 46:6 49:7 59:18 79:7,11 115:17 117:1 117:16 119:24 119:25 120:5,8

120:15 124:7 124:23 125:11 140:14 158:7 158:10,25 191:5 192:19 193:19 194:15 195:23 197:18 199:6 264:17 275:17 282:13

**taken** 5:10 141:4 173:12 191:21 196:6 196:12,14,16 280:20,25 281:4 284:13 297:1 298:4

**takes** 80:21 81:16,20 82:2 82:17 197:17

**talk** 35:14 43:24 55:4 76:20 118:3 148:9 156:19 200:13 201:17 233:9 249:14 269:4 272:19 293:15,23 294:9

**talked** 20:6 34:5 35:15 37:8 38:18 53:2,3 118:2 201:11,13 206:9 227:18 230:11 235:23

237:5 256:5 272:25 278:25 285:25 286:21 288:22 289:3,6 292:8,9

**talking** 11:3,21 34:18,19,21 53:6 67:1 71:7 71:13 87:19 92:22,25 102:7 126:4 133:11 133:12 185:4 189:19 202:6 202:10,17 204:19,23 205:8 227:17 233:21 238:14 247:11 249:15 256:11 260:1 271:4,9 278:16 278:21 290:18 290:21,25 291:2

**tammy** 36:3

**tampa** 1:2,15 5:14,17 14:22 14:23 248:18

**tap** 18:7,17 55:23,24,25 56:6,16 61:12 65:6,8 71:17 84:13

**target** 68:10 115:7,11

**task** 28:7

**tate** 204:5

**taxable** 217:16

**teacher** 248:16

**team** 59:3 133:21 175:22 202:19 226:18 226:20 236:19 236:20,21,23 236:24 237:3 248:2 249:21 249:22 250:3 250:22,23 251:1,15 252:4 252:8,18 255:19 257:2 257:20 267:6 267:10 269:12

**teammates** 35:7 262:14

**teams** 175:19

**technical** 175:3

**technically** 19:19

**technique** 77:8

**techniques** 77:5,19,24 101:23

**technology** 72:22

**teikyo** 16:19

**tekada** 297:2

**telegram** 19:21

**tell** 10:7 29:14 29:16 100:17

131:1,13 140:2 143:20,23 144:11 146:15 148:25 149:1 149:14,20,24 149:25 161:4 173:21 187:22 214:1 226:21 226:24 227:15 239:4 252:24 285:8,12 287:1

**tellebschur** 37:16 62:14

**telling** 54:11 92:5 99:21 142:23 143:7 145:8,24

**tells** 67:6 93:9

**template** 3:21 3:22

**ten** 38:17 43:18 164:11 167:3 256:8,23

**tent** 107:17

**tenth** 124:21

**term** 4:9 66:21 165:16,18,21 171:9 192:20 192:24 193:8 193:11,20 194:4,14 195:20,25 196:7 198:17 207:24 208:6,9 209:24 210:5

211:7 212:21 276:16 277:7 277:22

**terminal** 207:9

**terminated** 151:14 187:5 187:12 191:22 239:12 248:1 282:9 290:7

**terminating** 243:21

**termination** 124:10,16,18 124:23 125:4 125:13 151:19 159:25 160:14 247:3

**terms** 124:19 127:8 131:8 162:18 246:16 247:23

**territories** 78:19 95:9,16 96:2

**territory** 56:2 56:14 59:5,6,8 61:18 62:6,6 63:5,9,24 67:16 78:20 81:18,21 85:15 85:22,25 86:19 87:1 95:6,22 95:24 249:22 250:7,16 263:22,25

264:3,5,7,12,14 264:18,23 265:4,6,10,23 266:6,16 267:2 268:1 269:11 269:16 270:8 270:13 271:5

**testimony** 6:14 76:19 294:15 296:9 298:8,13

**testing** 167:21 168:14,20 169:10,24 182:15,25 186:15

**tests** 168:3

**text** 4:13 26:2,3 26:5,7,13,15,19 26:24 27:3,24 28:7,24 29:3,6 49:1,19,24 228:24 229:1 229:18 230:22 230:22,25 231:1,5,13,13 231:14,24 232:6,9

**texted** 49:14

**texts** 27:21 28:6,16 38:19 38:19 49:20 50:10,20 51:14 52:3 53:5,6,11 229:16 230:2,7 230:13

**thank** 6:23 102:19 206:22 286:8

**theory** 63:22

**therapies** 96:2

**therapist** 167:5 167:10,11,12 167:14

**thing** 17:8 21:4 42:22 43:7 45:19 75:3 83:10 86:19 93:15 101:17 121:4 127:19 135:20 169:4 178:23 179:10 204:9 223:17 241:9 260:4 265:2 274:23 282:17 284:23

**things** 9:10 22:21 25:2 28:2 31:19 34:7,10,20 35:21 42:7,11 46:9,13 53:17 67:10 68:9,17 69:24 78:22 83:20 87:25 89:20,20,21 101:23,24 108:5 117:12 117:13 146:5 153:11 155:22 183:2 186:8

200:3 202:3,7
203:25 211:8
222:12,15,17
222:21 249:25
259:12 269:7
271:1 278:21
283:8,22
284:18 287:4,9
**think** 8:23
10:13 13:14
14:20 19:20
21:3,13 37:18
40:22 45:18
48:25 54:6,11
56:13,21 58:10
59:18 61:2,3
62:15,16 64:25
66:8 69:16
71:6,23,24,25
72:11,14,15
73:1,12 75:17
75:20 76:2,4
78:25 79:1
81:5 82:20
83:24 84:1,1,5
85:2,11 87:22
87:23 89:1
90:18 93:6,23
93:24 94:7,11
99:25 101:9
102:14 106:1,2
108:13,21,24
109:2,3 112:16
112:25 126:4
129:8 133:5

134:21 138:17
138:18,19
140:13,19,23
141:4,9 142:2
142:5 143:20
146:7 147:25
149:13 150:7
153:20 157:20
157:25 158:24
166:23,25
167:2 173:21
173:25 174:2
176:25 177:5
179:5,8,8,15,15
181:2,13
187:24 196:7
196:12,14
201:11,12
202:25 204:17
204:17,21
205:1,5,6,12,15
205:15 206:8
211:11,20
212:10 217:10
217:18,24
219:11 221:15
221:15 222:7
228:12,14
229:10 232:4,5
232:10,11
233:8,14
236:17 242:10
242:18 243:4
243:18,18,23
244:4 247:25

248:18 249:8,8
249:9,10,16,18
256:5,7,14,16
256:19 265:20
265:21 266:24
270:18 273:25
274:12,16,19
274:24 276:5,6
282:18,20,25
285:6,17 287:3
287:4,20 289:8
289:8 290:18
291:5 292:8
293:2,20
**thinking** 149:7
255:21 284:6
**thinks** 52:17
**third** 32:6
125:8,10
134:13 152:10
152:23 206:10
**thirds** 11:20
**thirty** 141:1
**thompson**
148:21 272:15
**thorough** 124:9
124:15 142:13
242:11
**thought** 9:20
40:21,25 86:7
89:2 99:21
128:4 155:14
156:8 162:3,7
214:2,4 269:10
269:15,18,21

270:4,7 271:13
271:21,25
272:3 277:11
279:13,16
280:7 283:7
289:21
**thread** 185:5
230:25 231:1
**threads** 19:11
**threat** 168:21
169:7,12,20,21
170:9,20
**three** 8:10
14:20 51:8
58:4 60:19
61:13,13 99:25
99:25 113:15
132:6 153:17
172:22 192:6
196:7,12,16
216:8 218:11
238:24 261:5
275:9 276:20
279:5
**threshold**
265:11
**thrive** 270:19
**thrown** 205:16
286:10
**thunder** 217:23
**thursday** 86:14
129:23,25
**tic** 222:8,9
**tied** 42:21

**tiktok** 19:10

**time** 1:13 5:6
5:24 16:20
17:20 20:24
25:16 34:13,22
38:9 43:19,20
45:1 50:15
51:9 52:20
55:23 56:8
57:1,23 58:18
58:21,22 59:12
60:13 61:4,12
62:10,20 70:22
71:2 73:23
80:21 81:16,20
82:16,18 83:8
83:13,25 84:20
88:23 91:1
92:15 96:6
97:8 98:15
99:2 105:5
106:13,19
113:24 114:7
115:3 116:25
121:11 122:2
126:23 127:14
128:4 130:4
131:25 132:6
137:20,21
138:2,2,13,13
140:7 144:8,9
144:23 145:1,5
146:10,11
147:6,15,19
153:19 158:9
161:17 162:1
167:4 168:7
181:25 182:2,2
183:4 190:11
190:16 192:2,3
192:5,9 196:6
196:9 197:17
198:16,20
199:8 200:5,11
201:12 204:1,4
208:10,20,21
213:5 215:7
218:5,25 224:7
231:19 235:8
237:13 240:22
241:13 244:8
246:21 247:9
247:18 248:18
257:25 258:3,9
258:23 259:12
264:10,21
265:9 267:6,10
276:16 285:9,9
285:17 289:13
289:16 294:5

**times** 28:2 64:1
65:3 80:7
149:11 209:2
220:7 235:24
256:9 281:8
290:3

**timesharing**
60:18

**title** 60:7 175:3

**titled** 59:21

**titles** 73:8

**today** 6:24 7:3
9:17 12:14
13:6,9,12,16
17:9 25:8,10
26:6,12 29:9
29:14,21 30:4
31:1 39:21
40:7,11 44:21
45:2,23 50:19
52:15 80:7
94:15 137:15
140:6 150:4
185:10 191:16
191:18 198:12
233:20 234:1,6
234:11 235:24
236:17 280:2
281:24 283:9
283:12 284:9
284:18 290:22

**today's** 294:14

**todd** 33:18

**together** 42:25
61:16 62:21,22
63:21 81:24
100:4,8 101:19
127:18 220:23
238:3

**told** 62:20,24
71:6 86:7 87:5
88:13 94:23
113:7 129:21
133:24 139:24

142:9,11,14
143:21 144:11
146:4,5,7
148:20 151:2
151:23 157:17
168:18 171:13
171:23 172:1,4
172:7,10,13,16
172:19 173:4
173:14,16,25
174:2,5 175:25
176:6 181:21
182:1 183:4
184:13,17
185:22 189:18
191:4 213:16
214:4 227:5,6
227:13,14,20
238:18,23
239:14 241:25
246:16 248:20
252:6,14
254:10,19
257:16,21
282:4 284:22

**ton** 277:1

**tonight** 217:25

**took** 13:13
18:10 72:15
80:24 84:1,5
84:12 85:6
88:15,16 90:25
91:10 109:3
140:23 141:9
144:21 147:25

153:20 173:11 173:22 198:1,7 198:9,20 200:9 202:25 203:2,4 261:12 268:24 283:25

**tools** 72:24 85:4 89:7 276:23,25

**top** 72:2 82:8 99:9 109:20 117:5 129:3 271:2 285:4

**topic** 255:3

**topics** 12:14

**total** 95:4 256:16 294:15

**totally** 39:19 144:4 173:24 263:20

**touch** 126:13

**touched** 116:24

**touching** 64:2

**towards** 58:23 271:14,22 274:13,13 275:4

**tpb** 1:3 5:15

**track** 114:7

**tracy** 36:8 88:14,15,16

**trademark** 43:22 106:6,10 106:12,17 107:9,11,12

108:7,9,10,18 112:5 123:11 138:3 139:12 139:21 144:19

**trademarks** 106:9,15,15 107:5

**train** 88:22,25 91:5 291:20,21 291:22

**trained** 291:12

**trainer** 91:2,4 91:10 259:10

**trainers** 85:20

**training** 18:2 18:13,22 31:10 40:23 42:21,24 64:9,10,14,17 64:18,20,22 65:4,11 75:22 89:5,13,14,15 89:16,20 90:2 227:6,20 237:8 262:14 291:8,9 291:11,14,24 292:1

**trains** 237:7

**transcript** 293:4,5 294:2 296:8,9 298:6 298:15

**transfer** 52:22 58:19 117:9

**transferred** 56:14 57:5

**transition** 203:22

**transmitting** 161:6

**travel** 86:12,14 86:16,17,17 203:16

**treat** 262:14

**treated** 247:23 248:2 272:17 273:2,3,5,6,8 273:16 292:11 292:14

**treatment** 49:4 163:19

**trends** 78:13

**trial** 1:17

**tried** 29:12 163:13

**trintellix** 66:16 69:4,5,13,23 85:7 86:8,20 86:24 87:9,14 88:1 96:3,10 96:14,15,20 98:19 126:6,12 126:12 130:4 130:22 172:23 205:23

**trips** 270:12

**true** 73:19 74:8 97:4 102:23 103:19 105:19 109:10 114:13 115:5 119:11

125:19 132:12 136:7 141:18 150:22 152:19 162:23 174:21 181:11 182:10 191:1 212:4,18 214:12,24 228:25 254:7 258:18 288:11 296:9 297:20

**truly** 127:9

**trust** 126:24 127:1 176:18 176:19

**trusted** 176:14

**truth** 6:15,15 6:16 19:11

**truthful** 13:6

**truthfully** 13:3

**try** 11:9,12,13 11:16 12:1,6,7 12:22 87:22 115:2 129:2 197:25 199:20 232:24

**trying** 9:4 21:12 22:10 57:18 66:18 80:17 82:5 103:12 110:12 110:15 118:1 127:6 202:19 204:15 240:21 282:18,19,22

**tucked** 47:5
**turned** 244:23
  248:14
**twice** 136:22
  186:15
**two** 6:7 11:2,20
  17:14,14 46:9
  57:24 58:2,2,4
  59:9,13 60:15
  61:24 63:22
  64:23 65:1,2
  69:23 71:2
  74:20 82:3
  83:1 94:4
  127:6 132:2
  133:9 135:19
  136:11 137:11
  150:23 153:15
  169:1 170:4,5
  184:21,23
  185:4 186:11
  189:15,25
  198:7,8,8,10
  202:22 203:10
  204:3 205:25
  206:9 218:19
  236:12 246:20
  253:22 256:17
  256:19 257:22
  278:21
**twosome** 59:4
**type** 21:3 83:10
  89:14 145:18
  204:8 206:15
  254:17 295:21

**types** 68:8
**typical** 72:18
  158:7
**typically** 61:25
  80:21 99:24
  160:6 251:6,9
  253:11 254:12
  254:12,16
  262:2 293:10

**u**

**u** 37:18
**u.s.** 5:13 106:9
  107:7 251:12
**uh** 7:18,18
  11:11 49:6
  61:8,8 69:7
  101:17 201:23
  201:23 238:25
  253:1,1
**ultimately**
  24:15 41:23
  62:5 63:3,19
  83:17 102:2
  186:11 188:17
  190:19 279:1
**um** 6:25 9:18
  10:21 11:1,3
  12:3 15:14,21
  16:13 20:9
  24:3,19 25:21
  27:11,25 31:15
  31:23 32:11
  33:9 35:22
  38:10 39:12
  41:5 43:10,13

45:3,17 49:2
49:10 50:8
51:3 53:4
54:13,23 56:7
57:12 59:1,7
61:19 62:4
64:5 65:19
68:7,14,18
69:4 73:1
74:13 75:9
78:1,21 81:3
82:1,24 86:3
88:21 90:12
91:1,3 92:17
92:20 94:22
96:1 97:24
98:21 99:11
101:5,12,15
108:20 110:7
110:17,23
111:4 113:3,19
113:22 119:10
119:20 120:22
123:14,18
124:3,6 125:7
125:21 127:22
128:8 129:22
134:2 135:7
138:8,25
142:22 143:25
145:20 147:17
161:11,15
163:9 167:18
169:2 170:12
175:9,12

177:25 179:22
180:6 189:7
193:6 197:4
198:3 199:3,13
199:15,25
203:4,21
206:12 207:1
207:10,13
208:13 209:9
209:15,23
210:1,9 212:14
212:22 213:20
216:15,19
218:12,17
220:6 228:20
228:20 229:2
243:9,14 245:9
261:15 262:16
263:7 268:2,2
270:1 280:11
281:9 283:11
283:13 285:1
285:11 286:23
286:25
**unable** 208:11
  284:19
**uncertain**
  165:5
**uncertainty**
  68:16
**uncomfortable**
  202:7
**under** 1:18
  17:11 44:2
  47:5 74:15

75:11 99:7
121:13 124:7
124:23 125:10
131:14 140:1
159:20 166:17
177:19,21
201:6 216:17
236:12 246:20
259:11 262:12
266:6 297:19
298:13
**underlying**
166:7,7
**undersigned**
295:6
**understand**
10:8 22:13
23:20 28:22
32:9 40:4 42:2
42:6,13 43:11
44:1,7 45:15
81:17 83:5
84:12 86:4
107:1,4 117:12
120:12 128:13
128:22 140:4
140:20 144:23
145:24 147:16
149:10,13
153:12 161:13
177:21 179:2
179:18 182:23
193:10 206:17
232:24

**understanding**
31:16,21 55:6
63:12 86:24
165:17 166:4
213:4 248:11
251:17 252:2
289:22
**understood**
102:11 228:1
260:12 274:24
**unfair** 49:4
**unfortunately**
250:1
**unique** 83:22
165:13
**unit** 5:9 70:24
71:2 96:22
132:2,6 189:15
190:2 192:6,9
258:4,5,9
**united** 1:1
**units** 96:22
294:16
**universe**
261:14
**university**
15:19 16:19,19
16:21 17:2
**unlock** 51:5
**unmet** 66:24
**unprepared**
211:24
**unquote** 59:20
**unreasonable**
140:14 142:4

179:6,8 180:22
**unusual** 247:4
**unvaccinated**
159:17,24
**unwritten**
224:1,10,16,17
224:25 225:4
**update** 4:5
252:16
**updated** 147:1
147:22 151:24
151:25
**upper** 42:23
265:18
**ups** 151:14
**urgency** 87:19
**use** 1:17 19:23
23:16 106:24
107:6 108:18
117:24 133:17
149:15 185:20
195:21 220:4,5
**used** 18:8 28:6
57:21 89:1
115:17 204:14
238:21,23
239:15 294:16
298:15
**uses** 193:11
**using** 107:9,11
107:12 108:8
115:13 210:11
**utilize** 89:7

**v**

**v** 1:6 33:16
297:1 298:4
**vac** 185:1
**vaccinated**
158:18 159:3
159:10 160:13
160:22,23
169:22,22,23
170:22,23
182:23 183:5
186:4,18,22
187:9,10
188:24 189:5
190:17
**vaccination**
36:11,18
160:13 168:8
186:21 191:5
**vaccine** 159:25
161:24 162:3
164:24 165:10
165:15,18,24
165:25 169:7,9
186:12 189:2
191:19,23
**vaccines**
169:15
**variables** 93:12
205:11
**various** 19:3
30:6,13 79:5
106:5 110:21
186:8,20 252:8

**varsity** 154:18 241:6
**vastly** 272:17 273:2,3,5,7,8
**veeva** 83:12
**vehicle** 217:18
**vendor** 107:17 109:21 139:22 143:24 146:17
**vendors** 146:8
**verbal** 42:15 176:7,12
**verbally** 210:11
**verbatim** 133:19
**verify** 298:8
**verifying** 106:16
**veritext** 5:18,20 294:17 298:11 298:18
**veritext.com** 298:11
**version** 119:12
**versus** 5:11 225:23 226:2 285:21
**vice** 250:24
**video** 5:7,9 55:19 294:7
**videographer** 2:11 5:2,19 55:16,19 70:17 70:22 71:1 103:11 131:21

131:25 132:5 192:2,5,8 195:9,12,15 206:20,22 257:25 258:3,8 289:13,16 292:24 294:7 294:10,13
**videotaped** 1:11
**view** 178:24 221:5 277:10
**vikari** 33:16
**violate** 133:15 133:17,19 161:3
**violated** 239:11
**violating** 125:11
**virtual** 81:4 83:16 160:12 160:16
**virtually** 29:21 31:12 181:21
**virtuals** 113:7
**virus** 166:9
**vocal** 227:10
**vocational** 18:2
**voice** 63:23
**voicemail** 52:12,15
**voicemails** 52:2 52:4,7
**volatile** 112:8

**volume** 95:9,14 95:21,24
**volunteer** 270:18,19
**vyvanse** 69:6 69:14,16,22,23 70:9 96:3,10 96:14,15,20

**w**

**wait** 167:2 263:4
**waited** 135:14
**waive** 293:4,7 293:10 294:2
**wall** 244:8
**want** 10:14 11:23 17:10 21:7 25:21 29:15 33:5 37:20 43:4,23 43:25 45:19 50:6 55:12 57:6 58:21 59:25 60:13,14 70:8,19 74:10 75:6 77:15 78:17 80:8 96:14 115:18 117:11 119:17 139:11 153:10 153:11 154:14 170:4 176:11 176:12,23 179:6 181:5 185:1 199:7

205:2 209:19 225:19 227:8,9 227:22,22 244:9 265:2 269:21 270:3,4 270:7,11 272:22 280:2,4 284:8,9 289:9 293:4,6,9,10,15
**wanted** 100:18 101:20,22 126:8 127:10 153:3 159:10 165:7 166:2 175:25 179:2 248:16 252:11 272:19 281:21 291:24
**wanting** 33:3
**warning** 21:3 151:20 238:6
**warranted** 246:23
**washed** 51:10
**washington** 2:4
**water** 12:12
**waterbury** 16:18
**way** 11:20 14:12 19:2 40:5 41:2,15 46:18 47:21,25 61:17 66:13 78:4 79:17 81:24 82:19

83:8,20 87:23
92:11 99:18
101:11 126:25
130:24 150:16
179:12 186:24
187:1,8 192:23
192:23 200:20
206:3 222:9
225:8 233:15
243:5 245:8
247:23 249:11
253:5,6 259:19
260:1 273:16
285:16,19,20
**ways** 89:20,20
101:23
**we've** 222:24
235:23 249:15
285:25 289:6
292:8,8
**wear** 103:16
104:5
**website** 43:22
107:13,24
108:1,4,8,9,11
108:21,25
109:22 114:17
114:19 144:12
144:25 225:16
**wednesday**
204:2
**week** 52:5
57:25 58:4,4
64:22,25 65:1
65:2 186:15

215:4,7 282:7
282:7,7
**weekdays**
113:16
**weekend** 86:14
**weekly** 167:21
168:3,14,19
169:10 182:15
182:25
**weeks** 64:23
65:1,2 83:1
198:7,8,8,10
216:10
**weight** 96:10
**weird** 249:5
**welcome**
293:11
**wellness** 270:20
**went** 15:7,22
16:14 27:14
31:2 43:20
52:5 53:1
57:15 58:22
64:18 65:8
70:8 73:17
100:15 108:12
118:18 153:10
154:16 157:11
209:4
**whispering** 5:5
**white** 84:21
274:19,19
275:1 292:10
**wide** 91:20
96:17

**williamsburg**
15:25
**willing** 178:8
**wins** 195:22
**wise** 145:6
**withdraw**
280:12
**witness** 6:3,17
6:19 38:24
54:23 55:14
70:19 195:11
195:14,16
206:21 280:8
289:11 292:19
293:8,13 295:9
296:10
**word** 9:25
73:11,22 121:1
149:15 215:5
239:15 249:23
265:21 270:12
**words** 61:14
89:1 133:17
185:20,21
**work** 36:23
37:21 38:2,3,6
38:7,8,8 40:18
56:15,18,24
57:15 58:2,2
61:16 62:3,11
62:12,20,22
81:12,24 85:23
100:8 101:3
112:4,19,19
113:5 120:1

122:5 123:1
129:23 130:6
130:13,23
131:1,14
134:18,25
138:9 140:1,15
147:19 150:16
152:2 153:21
154:3,8,15
155:5,11,15
158:18 159:1,2
159:10,16
160:12,12
181:16,21,24
182:1 184:14
184:22 186:2
186:11 188:15
204:14 207:19
208:14 209:11
210:24 211:3,9
221:11 227:3
228:4 241:13
241:13,16
248:8 250:16
266:11 278:23
286:2 287:10
287:17 288:17
**workday** 30:16
30:17 223:5,15
**worked** 38:13
43:19 56:11,12
112:23 138:2
144:8 147:15
165:18 166:17
196:5 237:20

237:23 246:20 260:20

**workers** 192:16

**working** 9:17 31:9,12 33:4 55:21 57:2 63:25 81:18 87:15 100:18 112:3,23 113:1 113:9,15,25 122:2 153:8 159:8 183:11 184:10 190:1 205:22 247:16 250:5,16 285:18 287:12

**workload** 82:2

**workplace** 168:23 170:11 170:22

**works** 41:17

**worms** 272:21

**worth** 283:1,5

**wrapping** 144:21

**write** 10:25 101:10 115:13 151:14,16 156:2,5 176:18 187:2 238:6,23 239:7,10 249:24 266:14

**writing** 67:7 112:15 145:9 145:25 176:1,4

176:25 177:1 244:8

**written** 67:7 79:18,21 124:22 155:20 156:14,18 157:3 176:19 187:3 222:25 223:23 237:22

**wrong** 37:14,14 102:18 141:8 149:7 156:8 217:11 291:11

**wrote** 22:10 101:11,13 111:16 115:20 128:12 136:14 137:9,15 138:16 139:5 139:16 210:4,7 210:11,21,25 211:2,4,16 212:3,5 213:8 259:17,18 260:14 261:3 262:11,12

**x**

**x** 2:13 3:1 4:1 19:10 35:12 295:20

**y**

**y** 70:3

**yeah** 9:13 10:2 10:3 15:24

16:4,4,5,9,16 17:8,18 19:13 22:3 23:13 25:3 26:11 28:1 30:5 31:8 31:17,25 34:16 34:18 36:7 37:23 39:24 43:4 46:20 57:14 58:9 59:10,16 61:3 61:7 62:23 66:9,20 67:22 68:12 70:18,20 75:14 79:13,25 80:19 81:7 82:20 83:11,22 86:1 89:13,22 90:4 94:2,16 97:17 99:7,8 99:23 100:2,5 100:6 101:7 102:4,6 104:17 106:14 107:11 107:13 110:11 112:1,23,25 117:25 118:2 118:19 121:12 122:13,24 125:23 126:1 128:1,23 131:23,23 133:22 137:3 138:7 140:10 141:6 143:6

156:13 162:8 163:5 170:4,15 173:11 175:16 180:1,11 181:13 183:22 183:25 188:22 190:21 193:22 193:25 195:10 198:5,11 199:9 199:19 202:20 204:13 205:4 208:16 215:20 215:21 216:13 222:13 224:12 224:21 225:1,5 226:12 229:20 229:22 234:19 236:24 242:24 247:12 249:7 250:10 256:16 258:1,1 259:4 260:10 262:3 262:21 263:3 265:8 266:19 268:10 269:19 270:6 276:5 278:10 283:20 286:11,12,13 289:7,11,11 290:24 291:7 291:15 293:22

**year** 3:5 4:18 14:7,8 15:10 60:3 97:5 100:7 104:16

105:2 109:2
138:6 204:19
204:20 206:14
238:22 241:8
247:3,7,13
258:19 259:2
265:14 266:11
266:11,25
**years** 7:24 8:2
14:14,20,24
17:14,14 34:17
38:17 43:18
67:25 71:17
80:25 81:9,13
81:13 91:14
112:12 118:18
123:5 164:11
166:13 167:3,3
224:11,15
236:12 246:20
264:21 271:17
276:19,20
281:11
**yep** 46:4 145:2
166:21 271:18
286:9
**yesterday**
29:25 184:3
**yoder** 2:2,3
6:10,10 23:5
39:4 40:15
41:6,16 54:22
54:24 55:8
280:16 292:22
293:9,17,22

**yoderlaveglia...**
2:4
**young** 203:22
**younger** 197:10
**youngest** 8:11

**z**

**zablocki**
177:14 178:12
**zero** 137:16
215:14 216:18

Federal Rules of Civil Procedure

Rule 30

(e) Review By the Witness; Changes.

(1) Review; Statement of Changes. On request by the deponent or a party before the deposition is completed, the deponent must be allowed 30 days after being notified by the officer that the transcript or recording is available in which:

(A) to review the transcript or recording; and

(B) if there are changes in form or substance, to sign a statement listing the changes and the reasons for making them.

(2) Changes Indicated in the Officer's Certificate. The officer must note in the certificate prescribed by Rule 30(f)(1) whether a review was requested and, if so, must attach any changes the deponent makes during the 30-day period.

DISCLAIMER: THE FOREGOING FEDERAL PROCEDURE RULES ARE PROVIDED FOR INFORMATIONAL PURPOSES ONLY. THE ABOVE RULES ARE CURRENT AS OF APRIL 1, 2019. PLEASE REFER TO THE APPLICABLE FEDERAL RULES OF CIVIL PROCEDURE FOR UP-TO-DATE INFORMATION.

VERITEXT LEGAL SOLUTIONS

COMPANY CERTIFICATE AND DISCLOSURE STATEMENT

Veritext Legal Solutions represents that the foregoing transcript is a true, correct and complete transcript of the colloquies, questions and answers as submitted by the court reporter. Veritext Legal Solutions further represents that the attached exhibits, if any, are true, correct and complete documents as submitted by the court reporter and/or attorneys in relation to this deposition and that the documents were processed in accordance with our litigation support and production standards.

Veritext Legal Solutions is committed to maintaining the confidentiality of client and witness information, in accordance with the regulations promulgated under the Health Insurance Portability and Accountability Act (HIPAA), as amended with respect to protected health information and the Gramm-Leach-Bliley Act, as amended, with respect to Personally Identifiable Information (PII). Physical transcripts and exhibits are managed under strict facility and personnel access controls. Electronic files of documents are stored in encrypted form and are transmitted in an encrypted

fashion to authenticated parties who are permitted to access the material. Our data is hosted in a Tier 4 SSAE 16 certified facility.

Veritext Legal Solutions complies with all federal and State regulations with respect to the provision of court reporting services, and maintains its neutrality and independence regardless of relationship or the financial outcome of any litigation. Veritext requires adherence to the foregoing professional and ethical standards from all of its subcontractors in their independent contractor agreements.

Inquiries about Veritext Legal Solutions' confidentiality and security policies and practices should be directed to Veritext's Client Services Associates indicated on the cover of this document or at www.veritext.com.



# Olson, Shannon M

Sr Sales Rep

Manager: Jodi Gayle-Garcia
Evaluated By: Jodi Gayle-Garcia

# 2019 Year End Performance Review

Organization: Jacksonville, FL (Greg Crouch (Inherited))
Location: USA - MA - Lexington - Sales Virtual
04/01/2019 - 03/31/2020

## Overall Ratings and Comments

### Manager Overall Evaluation

**Rating:** No Ratings - Not Rated

**Comment:** FY Q1 (April- June)
Sales Performance-
Cresset Rank: June 162
MIC Goal Attainment: Trintellix 105.01% Vyvanse 98.90
PCP Rank 162/449 (36%)
Competencies:
Impact on others and district: with the acquisition in April Shannon has made every effort to engage the team and foster a great team culture which includes building relationships with teammate and those across the district.

FY Q2 (July-September)
Sales Performance-
Cresset Rank- 225/449 (50%)
MIC Goal Attainment (AUG) Trintellix- 100.68% Vyvanse- 100.52% Mydayis- 128.26

Competencies: Shannon was on leave most of September.
Collaboration: (Strength)
Builds relationships: actively reaches out to teammates for guidance and collaboration on territory needs. Shannon fosters a supportive and inclusive team culture.
Self-Awareness:
openness to feedback and is always willing to make changes that impact the territory and district in a positive way. When Shannon was alone in territory due to promotion of her partner, she proactively reached out to me to develop a plan that supported the needs of her territory for both Vyvanse and Trintellix. In addition, Shannon collaborated with other representatives to increase her knowledge of Vyvanse to gain confidence in ped offices.
Engage others:
Shannon has a new partner and we have 2 new reps starting in 2020. She has increased communication with partner and new reps to ensure they are up to speed.
FY Q3 (October-December)
Sales Performance-
Cresset Rank- 217/449
MIC Goal Attainment  Trintellix- 99.92% Vyvanse- 102.65% Mydayis 100%

Competencies:

Collaboration: (Strength)
Shannon continuously shows a respect for differing viewpoints within our team and values each person's unique identity, strengths and contribution (eg: willingness to change her routing based on business need and strategy change to be 50/50 and increase her time in the pediatric space). As a tenured rep Shannon continues to show the ability to

> EXHIBIT
> 2

Self-Awareness:
Shannon continuously demonstrates a willingness to admit her mistakes and modify approach to ensure a positive outcome (eg: Shannon's ability to pivot when asked by DBM to focus on the 94% of her business and to identify new opportunities using the SOT). As a tenured rep, Shannon models professional maturity and demeanor and solicits feedback and guidance from teammates and DBM on ways to identify and improve areas of development and implements accordingly (eg: business plan development).
Engage others: Shannon continues to mentor and develop her new partner, Shannon will need to work on including her partner in strategic territory management and allow him to have input in identifying key targets and assist with business planning, routing.

Development:
Leadership: Shannon and I discussed the need to take a leadership role. She has stepped up to be the District Trintellix Lead as a means of exerting her leadership capabilities and help to develop and foster growth among the reps in our district. Self- awareness: Shannon has identified that she needs to take a leadership role on the team with developing new representatives in the district.

Career Path: Flex role in 2020. This is a one-year commitment that allows for you to gain training experience and networking across the Bus.
**YOU OWN YOUR DEVELOPMENT:** you are encouraged to seek development opportunities

**NETWORKING:** Shannon has identified that she needs to take a leadership role on the team, specifically by reaching out to reps in the district to identify needs and providing resources.

**DEMONSTRATING & SUPPORTING:** Takeda Values, PTRB, and the 3C's.

Way Forward:
IDP: Utilizing the career path document, create a development plan that outlines your professional development for 2020. We have identified you are no longer interested at this time to apply for FLEX , but will continue developing in her roles as the Trintellix Lead. In addition, Shannon has identified a way to help upskill our new B to B reps on the Rep Basics. I look forward to seeing your development of these reps. Collaboration: Through our discussions, Shannon identified the need to have a higher level of communication with her partner Jordan including developing and maintaining a routing that impacts both Vyvanse and Trintellix and maximizes FTF time for both teammates with top HCPs for both products. We discussed the need for a more balanced routing that reflects the 50/50 model for both reps and continue to identify

## Employee Overall Evaluation

Comment:

## Goals and Priorities

**Rep Life:  An initiative I started to help with the development and success of new and existing district mates**

Newbies: Help and guide new hires.  Conduct conference calls to answer any questions and/or concerns.  Go through each part of a reps life: samples, expense reports, product knowledge, messaging, tips for success etc

Seasoned Reps: Continue to provide "ways to improve"
- Share work I have done for personal development

Due Date:   12/31/2020      Status:   On Track        Completion Date:

Takeda_0000435

Supports:

## Trintellix Lead

My goal in taking the role of Trintellix Lead is to continue to develop teammates knowledge and selling skills with depression and Trintellix.

Due Date: 12/31/2020    Status: On Track    Completion Date:

Supports:

--- Section Summary ---

**Manager Evaluation**

Comment:

**Employee Evaluation**

Comment:

## Areas for Development

### Continue to Research Positions within Takeda that would fit me and allow advancement

Status: In Progress

Start Date: Mar 1, 2018    Completion Date: Feb 28, 2019

--- Section Summary ---

**Manager Evaluation**

Comment:

**Employee Evaluation**

Comment:

## Global Core Competencies / Leadership Behaviors

### Please provide an overall evaluation of your Leadership Behaviors.

Manager Evaluation

Response:

Employee Evaluation

Response: Leadership Behaviors: Trintellix Lead and Rep Life Initative

Takeda_0000436

# Electronic Articles of Organization
## For
# Florida Limited Liability Company

L14000158028
FILED 8:00 AM
October 09, 2014
Sec. Of State
tbrown

## Article I

The name of the Limited Liability Company is:

FIT LIFE SPORT, LLC

## Article II

The street address of the principal office of the Limited Liability Company is:

4401 38TH WAY S.
ST. PETERSBURG, FL. 33711

The mailing address of the Limited Liability Company is:

4401 38TH WAY S.
ST. PETERSBURG, FL. 33711

## Article III

The name and Florida street address of the registered agent is:

SHANNON OLSON
4401 38TH WAY S.
ST. PETERSBURG, FL. 33711

Having been named as registered agent and to accept service of process for the above stated limited liability company at the place designated in this certificate, I hereby accept the appointment as registered agent and agree to act in this capacity. I further agree to comply with the provisions of all statutes relating to the proper and complete performance of my duties, and I am familiar with and accept the obligations of my position as registered agent.

Registered Agent Signature: SHANNON OLSON

EXHIBIT

3

## Article IV

The name and address of person(s) authorized to manage LLC:

L14000158028
FILED 8:00 AM
October 09, 2014
Sec. Of State
tbrown

Title: MGR
SHANNON OLSON
4401 38TH WAY S
ST. PETERSBURG, FL. 33711

Title: MGR
CARYN JOHNSON
2079 MASSACHUSETTS AVE NE
ST. PETERSBURG, FL. 33703

## Article V

The effective date for this Limited Liability Company shall be:

10/08/2014

Signature of member or an authorized representative

Electronic Signature: CARYN JOHNSON

I am the member or authorized representative submitting these Articles of Organization and affirm that the facts stated herein are true. I am aware that false information submitted in a document to the Department of State constitutes a third degree felony as provided for in s.817.155, F.S. I understand the requirement to file an annual report between January 1st and May 1st in the calendar year following formation of the LLC and every year thereafter to maintain "active" status.



# Takeda U.S.
# HR & Compliance Policies and Procedures

## 2019 Version 13.0

EXHIBIT

11

**Confidential:** The contents of this Manual are confidential and must not be distributed outside of Takeda

**TABLE OF CONTENTS**

I.  STATEMENT OF PURPOSE & DISCLAIMERS

II.  EMPLOYMENT POLICIES
   a.  EEO Policy/Affirmative Action/Non-Discrimination
   b.  Prohibition Against Harassment & Unprofessional/Disrespectful Conduct
   c.  Employment and Accommodation of Persons with Disabilities
   d.  Employment and Accommodation of Pregnant Applicants and Employees
   e.  Religious Accommodation
   f.  Employment of Relatives/Close Relationships
   g.  Job Postings/Internal Transfers
   h.  Personnel Records
   i.  Consultant & Contingent Labor Policy
   j.  Access to Employee Health Insurance Information
   k.  Confidential and/or Proprietary Information
   l.  Secondary Employment

III.  COMPENSATION POLICIES
   a.  Employment Classifications/Hours of Work
   b.  Flexible Work Arrangements
   c.  Non-Exempt Employees
   d.  Discretionary Bonuses

IV.  TIME OFF BENEFITS
   a.  Holidays
   b.  Paid Vacation
   c.  Paid Sick Leave
   d.  Disability or Worker's Compensation Leaves
   e.  FMLA Policy
   f.  Bonding Leave
   g.  Bereavement Leave
   h.  Jury and Witness Duty
   i.  Time off to Volunteer
   j.  Domestic Violence/Victims of Crime Leave
   k.  Military Leave
   l.  Personal Leave

V.  OTHER BENEFITS
   a.  Immigration and Work Authorization
   b.  Adoption Assistance Program
   c.  Employee Assistance Program
   d.  Service Credit for Rehired Employees
   e.  Tuition Reimbursement
   f.  Safe Ride Home Program

**Confidential:** The contents of this Manual are confidential and must not be distributed outside of Takeda

VI.      WORKPLACE POLICIES
   a. Inclement Weather
   b. Security Inspections
   c. Safety and Accident Reporting
   d. Solicitation and Distribution
   e. Electronic Communications

VII.     EMPLOYEE CONDUCT
   a. Code of Conduct
   b. Standards of Conduct and Work Rules
   c. Absences or Tardiness
   d. Personal Appearance
   e. Drug and Alcohol-Free Workplace
   f. Workplace Violence
   g. Social Media Activities

VIII.    TERMINATION OF EMPLOYMENT
   a. Resignations
   b. Providing References
   c. Return of Company Property

IX.      STATE NOTICES/POLICIES
   a. Statement on Poster Guard Notices
   b. Massachusetts Pregnant Workers Fairness Act
   c. Minnesota Drug Testing Policy
   d. New York Sexual Harassment Policy

X.       U.S. COMPLIANCE POLICIES/GUIDELINES
   a. Supplier Diversity
   b. Antitrust and Competition
   c. US Boycott Law
   d. Obligation to Protect Confidential Information
        i. Copyrighted Material
   e. Conflicts of Interest
        i. Personal Relationships
        ii. Boards, Panels and Consulting Arrangements
        iii. Insider Trading & Securities
   f. Giving and Receiving Gifts and Entertainment
   g. Political Activity and Contributions
   h. International Trade

**Confidential:** The contents of this Manual are confidential and must not be distributed outside of Takeda



## STATEMENT OF PURPOSE AND DISCLAIMERS

This Policy Manual (the "Manual") is intended to provide employees with information about Takeda's policies and practices that are in force at the time of printing or posting. Takeda may have different and/or additional policies or practices that apply to its employees at a local site level that are not included in this Manual. It is the responsibility of every employee to familiarize themselves with any such policies and to abide by them accordingly. In the event of confusion, please consult with local Human Resources onsite immediately.

As Takeda operates in multiple states, we cannot list every situation where state and local laws and regulations may differ from those listed in this Manual. Additionally, such laws and regulations are constantly changing. While Takeda makes every effort to keep this Manual up to date to ensure compliance with changes in the law, there may be times when a discrepancy exists between what is stated in this Manual and applicable law. Of course, in such instances, applicable law will always govern and supersede this Manual. In addition, to the extent that applicable federal, state or local laws or benefit plans provide more generous rights or benefits than what is included in the Manual, the applicable law or benefits plan will govern.

**This Manual is not an employment contract. Nothing contained in the Manual should be construed as creating a contract between Takeda and any employee or a guarantee of employment for any specific duration. While it is hoped that Takeda's employment relationships with our employees will be long-term, either the employee or Takeda may terminate the employment relationship at any time, for any lawful reason, with or without cause or notice. No employee or representative of Takeda, other than the Senior Vice President of Human Resources and Administration or, in the event of a conflict, the President of the Takeda entity or his/her designee, has the authority to enter any contract or agreement for employment for any specified period. Further, no such agreement shall be enforceable unless it is in writing and signed by the employee or the employee's authorized representative, and the duly authorized Takeda representative as noted herein.**

**Nothing in this Manual is intended to interfere with the rights of any employee to engage in activity protected under the National Labor Relations Act.**

Takeda reserves the right, in its sole discretion and at any time, to change, suspend, interpret and/or cancel, in whole or in part, Takeda's Policies, Practices, Procedures, Guidelines and/or other Rules, whether published or unpublished (including but not limited to those included in this Manual).

**Employees are encouraged to contact** the Employee Resource Center at erc@takeda.com or by calling 224-554-6800 **with any questions concerning any policy set forth in this Manual.**

**Confidential:** The contents of this Manual are confidential and must not be distributed outside of Takeda



**EEO POLICY/NON-DISCRIMINATION/AFFIRMATIVE ACTION**

It is the policy of Takeda to provide equal employment opportunities to all employees and applicants for employment without regard to race, color, religion, sex, sexual orientation, gender identity, gender expression, national origin, age, disability, citizenship status, genetic information or characteristics, marital status, status as a Vietnam era, special disabled, or other protected veteran in accordance with applicable federal and state laws, and any other characteristic protected by law (collectively "protected categories").

In addition, Takeda strictly prohibits discrimination.  Discrimination is defined as treating a person or group differently based on a protected category in any aspect of employment. This includes decisions with respect to recruiting/hiring, compensation, assignments, transfers, promotions, discipline, terminations, training programs, benefits, or any other term and condition of employment.

***Violations of this policy will result in disciplinary action up to and including termination of employment. This is true whether or not the behavior was intended or is perceived to be discriminatory.***

**Affirmative Action**

Takeda has established written affirmative action plans (AAPs) prepared in conformity with Executive Order 11246, the Rehabilitation Act of 1973, and the Vietnam Era Veteran's Readjustment Assistance Act of 1974, and the implementing regulations of the Office of Federal Contract Compliance Programs (OFCCP).  These AAPs are designed to provide guidance to management with respect to Takeda's commitment to full implementation of its EEO/Affirmative Action Policy.  Takeda's official EEO policy statement, signed by the appropriate business leader, can be found on the MyTakeda portal here and on bulletin boards in common areas of your respective facility.

**Confidential:** The contents of this Manual are confidential and must not be distributed outside of Takeda



## PROHIBITION AGAINST HARASSMENT & UNPROFESSIONAL/DISRESPECTFUL CONDUCT

Harassment is a type of discrimination defined as unwelcome conduct based on any protected category where: 1) enduring the offensive conduct becomes a condition of continued employment; or 2) the conduct is severe or pervasive, it creates a work environment that a reasonable person would consider intimidating, hostile, or abusive.

Takeda prohibits not only unlawful discrimination and harassment, but all forms of unprofessional and discourteous behavior. Indeed, Takeda prides itself as a professional and congenial place to work. To that end, Takeda employees are required to treat each other and all of those with whom they come in contact in the performance of their job duties with courtesy, consideration and professionalism always. Insulting, disrespectful, derogatory or otherwise inappropriate remarks, jokes or other comments are violations of this policy and will not be tolerated. Employees must exercise good judgment to avoid engaging in conduct that may be perceived by others as disrespectful or otherwise inappropriate. All employees are responsible for promptly reporting any conduct of which they are aware that may violate this policy, in accordance with the reporting procedures outlined below.

While the below list is not exhaustive, it provides examples of harassment and other behaviors that violate this policy:

- Verbal: sexual innuendoes, racial or sexual epithets, insulting or derogatory slurs, inappropriate or insensitive jokes, sexual propositions, threats, suggestive or insulting sounds;

- Visual/Non-Verbal: insulting or derogatory statements, posters, cartoons, graffiti or drawings, suggestive objects or pictures, graphic commentaries, leering, obscene gestures;

- Physical: unwanted physical contact including touching, interference with any individual's normal work movement, or assault; and/or

- Retaliation: making or threatening reprisals because of an individual's negative response to harassment, report of harassment, or participation in a harassment investigation.

This policy applies to the actions of all Takeda employees regardless of title. It also applies to clients, vendors, contractors, visitors and others who encounter Takeda employees performing job duties.

Takeda recognizes that sometimes it can be difficult to know what behavior rises to the level of harassment. Comments, jokes or personal advances that an employee may perceive as innocent or funny may be offensive to a co-worker. Even innocent intentions do not excuse actions that are unwanted and that are reasonably perceived as threatening or offensive. Therefore, employees are expected always to act professionally, treating others with respect, and avoiding conduct that could be perceived by others as inappropriate.

**Confidential:** The contents of this Manual are confidential and must not be distributed outside of Takeda



**Sexual Harassment**

Sexual harassment is a specific type of unlawful workplace harassment that is prohibited by this policy irrespective of any or all parties' gender.  As it relates to sexual harassment specifically, Takeda prohibits:

- Unwelcome sexual advances
- Requests for sexual favors
- All other verbal or physical conduct of a sexual or otherwise offensive nature where:
    - Submission to such conduct is made either explicitly or implicitly a term or condition of employment;
    - Submission to or rejection of such conduct by an individual is used as the basis for employment decisions affecting such individual; and or
    - Such conduct has the purpose or effect of unreasonably creating an intimidating, hostile or offensive working environment.

**Complaint Reporting and Investigation Procedures**

It is the responsibility of each member of management to create an atmosphere free of discrimination and harassment, sexual or otherwise.  In addition, it is the responsibility of each employee to respect the rights of co-workers, contractors, consultants, temporary workers, clients and customers or other visitors to our facilities.

If, through an employee's own observation or otherwise, he/she believes that he/she or any other individual is being or has been subjected to workplace discrimination, harassment or other behaviors in violation of Takeda policy by a fellow employee or third party, the employee must report it immediately to either a manager or to human resources.  If an employee prefers to report the behavior to a third party outside of Takeda, he/she may report it via the Ethics Line electronically at www.Takeda.ethicspoint.com or telephonically by calling 888-TAKEDA-0 (888-825-3320) Do not allow an inappropriate situation to continue by not reporting it, regardless of who is creating that situation.

No Takeda employee is exempt from this policy. Failure to report a violation of this policy may result in disciplinary action, up to and including termination of employment.

Takeda will take prompt investigative action and implement appropriate corrective and preventative measures in response to inappropriate behavior that comes to its attention. Takeda will endeavor to maintain the confidentiality of any complaint and investigation to the extent it is feasible. However, Takeda retains the right to inform persons it deems to have a need to know and to utilize information obtained during the investigation for legitimate business purposes.

As soon as practical after the investigation concludes, Takeda will determine whether this policy has been violated. An employee who engages in objectionable or other conduct in violation of this policy will be subject to disciplinary action up to and including termination of employment.

**Confidential:** The contents of this Manual are confidential and must not be distributed outside of Takeda

**Non-Retaliation**

Takeda wants employees to report potential violations of this policy without fear of retribution. Any retaliation against any employee or individual for the good-faith reporting of discrimination or harassment, or for participating in any investigation, will not be tolerated and should be reported immediately using the reporting procedure described above. Any employee who engages in any form of retaliation because of a complaint made or participation in an investigation under this policy will be subject to appropriate disciplinary action up to and including termination of employment.

**Your Responsibilities**
- ✓ Consider your actions. Are you doing or saying things that are or could be considered a violation of this policy? If so, cease the behavior immediately.
- ✓ If you are a witness to or have been subjected to behavior that you believe violates this policy, firmly and promptly notify the offender that his/her behavior is inappropriate and unwelcome, and politely request that the behavior immediately cease. Takeda recognizes that it may be difficult to initiate such a confrontation. If informal, direct communication is either ineffective or overly difficult, then report the incident immediately in accordance with the procedure outlined in this policy.
- ✓ Learn what harassment is and recognize its seriousness.
- ✓ Recognize and support Takeda's commitment to create and maintain an environment free of discrimination, harassment and other unprofessional and inappropriate conduct.
- ✓ Report all violations of this policy, whether directed at you or at another individual, in accordance with the procedure outlined in this policy. Do not retaliate against individuals who report violations of this policy or who participate in an investigation into alleged violations. Such retaliation is also a violation of this policy and will result in disciplinary action up to and including termination of employment. Report retaliation in accordance with the procedures outlined in this policy.

**Confidential:** The contents of this Manual are confidential and must not be distributed outside of Takeda



**EMPLOYMENT AND ACCOMMODATION OF PERSONS WITH DISABILITIES**

Takeda provides equal employment opportunities for qualified persons with disabilities, as defined by and in compliance with the Americans with Disabilities Act, the Rehabilitation Act and all other applicable federal, state and local laws. Takeda will attempt to make reasonable accommodations to employees and applicants with a qualified disability to enable them to apply for and to perform the essential functions of the jobs for which they are otherwise qualified.

An applicant who believes he/she may require an accommodation to perform the essential functions of a job must direct his/her accommodation request to the assigned Takeda recruiter. Employees requiring an accommodation should contact the Employee Resource Center for review and approval. Managers should not engage directly with an employee to discuss an accommodation request. Takeda will engage in a timely, interactive process with any applicant or employee to determine if there are effective, reasonable accommodations available, which would not result in an undue hardship to Takeda.

As permitted by law, Takeda may request specific medical documentation from an applicant or employee to substantiate that he/she is an otherwise qualified individual with a disability, as well as the need for an accommodation. All accommodations requests and any supporting documentation will be kept as confidential as possible, and will be evaluated on a case-by-case and an ongoing basis, in accordance with applicable federal, state and local laws.

When planning offsite meetings, business related social functions, and/or other business-related events, managers should avoid locations where barriers to accessibility exist.  Such barriers could include things such as:

- Lack of accessible/available parking, hotel shuttles, and public transportation;
- Lack of accessible entrances, interior doorways (i.e., adequate width, ramps, automatic door openers, etc.), corridors, aisles, etc.;
- Lack of accessible bathrooms, elevators, meeting rooms;
- Limited dining facilities and catering (including the ability to provide for dietary restrictions);
- Lack of quiet and private space for people who may require specific accommodations;
- Inability for qualified employees to use assistance animals.

**Confidential:** The contents of this Manual are confidential and must not be distributed outside of Takeda



**EMPLOYMENT AND ACCOMMODATION OF PREGNANT OR NURSING EMPLOYEES AND APPLICANTS**

Takeda provides equal employment opportunities for qualified pregnant workers, as defined by and in compliance with federal and state laws. As such, when legally required and not prohibitively expensive or disruptive, Takeda will provide reasonable accommodations to employees and job applicants for any medical or common condition related to pregnancy, childbirth, or medical or common conditions related to pregnancy or childbirth, in an effort to enable them to apply for and to perform the essential functions of the jobs for which they are otherwise qualified.

Any applicants who believe they require an accommodation as part of the application process and/or to perform the essential functions of a job must direct any accommodation request to their assigned Takeda recruiter.

Employees requiring an accommodation should contact the Employee Resource Center for review and approval. Managers should not engage directly with an employee to discuss an accommodation request. Takeda will engage in a timely, interactive process with any applicant or employee to determine if there are effective, reasonable accommodations available, which would not result in an undue hardship to Takeda.

Reasonable accommodations can include a variety of options including but not limited to modifications or adjustments to the job application process, work environment, or circumstances under which a position is customarily performed. When appropriate, such accommodations could include:

- More frequent or longer bathroom or water breaks
- Breaks for periodic rest
- Seating accommodations
- Assistance with manual labor
- Light duty (if applicable)
- Temporary transfer to a less strenuous or non-hazardous position
- Acquisition or modification of equipment
- Job restructuring
- Part-time or flexible work schedule
- Assignment to a vacant position
- Leave of absence

It is unlawful and violates Takeda policy for anyone to interfere with, restrain, or deny the exercise of any request by a pregnant employee or applicant for accommodation. It is also unlawful for Takeda to discharge or discriminate against any individual for opposing any practice or because of any involvement in any proceeding related to pregnancy accommodation laws. Individuals who believe their rights have been violated should immediately contact Human Resources to report their concerns. All reports will be investigated and retaliation for any good-faith reporting will not be tolerated.

**Nursing Mothers**
An Employee who is breastfeeding her child will be provided paid reasonable break times to express milk throughout the day, each time the employee has a need to express milk. If possible, break times

**Confidential:** The contents of this Manual are confidential and must not be distributed outside of Takeda



may be taken during regularly scheduled meal and rest breaks.  Regardless, Managers will work with nursing mothers to ensure appropriately flexibility.

Takeda will also provide appropriate private areas, other than bathrooms, for this purpose.  The area provided, if not dedicated to the nursing mother's use, will be made available when needed by the employee.  The area provided will be shielded from view and free from any intrusion from co-workers and the public. Designated rooms will vary depending on worksite location.  Please consult with the Employee Resource Center or your local Human Resources department for more information about designated nursing rooms.

**Confidential:** The contents of this Manual are confidential and must not be distributed outside of Takeda



**RELIGIOUS ACCOMMODATION**

Takeda respects the religious beliefs and practices of all employees and applicants. An employee whose religious beliefs or practices conflicts with his/her job, work schedule, or with Takeda's policy or practice on dress and appearance, or with other aspects of employment and who seeks a religious accommodation must submit a written request for the accommodation to his/her manager and the Employee Resource Center for review and approval. Similarly, applicants should direct any accommodation requests to their assigned Takeda recruiter for review.

Takeda will evaluate the request, considering whether a work conflict exists due to a sincerely held religious belief or practice and whether an accommodation that is reasonable and would not create an undue hardship on Takeda's business exists. All accommodations requests will be kept as confidential as possible, and will be evaluated by an employee's manager and the Employee Resource Center on a case-by-case and ongoing basis, in accordance with applicable federal, state and local laws.

Time off for religious observances that are not scheduled as legal or Company holidays may be taken only if approved by the Employee Resources Center and the employee's manager after the employee gives both his/her manager and the Employee Resources Center (erc@takeda.com) at least two weeks' advance written notice.

At the employee's option only, unused vacation or a "Your Choice" holiday, if available, may be applied for an employee to be paid for an approved religious holiday absence. Otherwise, that time off will be unpaid.

**Confidential:** The contents of this Manual are confidential and must not be distributed outside of Takeda



**EMPLOYMENT OF RELATIVES/CLOSE PERSONAL RELATIONSHIPS**

Takeda seeks to avoid the appearance of favoritism or conflicts of interest among employees. As such, current employees will not be promoted or transferred into a department that audits or controls a department where a relative or someone with a close personal relationship is employed. Also, employment may not be offered to relatives of employees or those with a close personal relationship with the employee where such employment would create a supervisor/subordinate relationship with an employee, where one employee would have access to confidential information about the applicant (such as wages and salaries, employee benefits, personnel records, medical records, etc.), or where one or the other employee would be in a position to influence or appear to influence employment or personnel decisions on behalf of the other.

For this policy, a relative is defined as: spouses, children, parents, grandparents, siblings (and all their respective step- and -in-law counterparts), aunts, uncles, cousins.

A close personal relationship is defined as: a domestic partner, cohabitant, significant other, or any individual with whom an employee shares a romantic or sexual relationship.

An audit or control function is defined as: a position where an employee has real or perceived conflict of interest because he or she could exercise or appear to have influence over the other's compensation, performance appraisal, or employment.

Employees must disclose to their Human Resources Representative any prohibited employment relationship immediately upon learning of the issue or as soon as a prohibited employment relationship develops. If a supervisor/subordinate relationship is created due to the hiring, promotion, or transfer of one or more employees, or if a prohibited relationship develops between a supervisor and subordinate, it is the responsibility of the supervisor employee to report the creation of the prohibited employment relationship. Failure to report a prohibited employment relationship may result in disciplinary action, up to and including termination of employment.

If a prohibited employment relationships exists, Takeda may require that one of the affected employees transfer to a suitable position within Takeda or require that the affected employees determine which of them will voluntarily resign their employment with Takeda.

**Confidential:** The contents of this Manual are confidential and must not be distributed outside of Takeda



**JOB POSTING AND INTERNAL TRANSFER POLICY**

**Job Posting**
Takeda posts certain open positions to provide employees with notice of potential opportunities for growth and development through a job transfer. Takeda will determine whether to post a position, for how long, and the specific eligibility requirements associated with a position in its sole discretion and in compliance with applicable federal, state, and local laws.

Takeda's determinations regarding job postings and/or internal transfers may be based on:

- Type of position and/or level of responsibility;
- Career path or other promotions within the work unit;
- Reorganization of work unit(s);
- Placement of an employee due to disability accommodation;
- Placement of an employee due to leave of absence;
- A development or succession planning program; or
- Other legitimate business needs as determined by Takeda.

**Internal Transfers**
To be eligible for a transfer, an employee, other than a field employee, must have been in his/her current position for a minimum of six (6) months.  A field employee is eligible to transfer if he/she has been in his/her current territory for a minimum of twenty-four (24) months, unless he or she meets the exception outlined below.

Employees are not eligible to transfer if they have received any corrective performance or other disciplinary action within the six (6) months, including, but not limited to written warnings, counseling plans and/or a performance improvement plan. It is the responsibility of the hiring manager to confirm the employee has not received such discipline or coaching by reaching out to the employee's current manager.

To view Takeda's full job posting and internal transfer policy, including requirements specific to field sales employees, click here.

Takeda reserves the right to make exceptions to these policies and procedures in its sole discretion without providing notice to employees.

**Confidential:** The contents of this Manual are confidential and must not be distributed outside of Takeda



## PERSONNEL RECORDS

Employee personnel records are considered confidential and access to them is strictly regulated. Takeda collects information pertinent to any employee's employment with Takeda. That information is generally contained within an employee's confidential Company personnel file, which can be in both electronic and hard-copy form.

Contents of personnel files may include, but are not limited to:
- Offer letter
- Employment application
- Résumé
- Internal administration forms
- Performance reviews
- Employee disciplinary documentation
- Any other employee signed agreement/acknowledgements
- Salary history and other financial records

Personnel files do not include records relating to the employee's health, investigations of misconduct, letters of reference, ratings, reports, or other records obtained prior to an employee's employment.

The Human Resources Department maintains employee personnel files. At any time while employed by Takeda, an employee may generally request a photocopy of all the information contained within his/her personnel file. Such requests must be in writing and submitted to the Employee Resource Center via email at erc@takeda.com. An employee can designate a representative to conduct the inspection of, or to receive a copy of, the employee's personnel file. The representative must be authorized in writing by the employee and Takeda reserves the right to verify that person's identity if necessary. Takeda will respond to any requests to inspect or to produce a copy of personnel records as promptly as possible but certainly within any legally required timeframes.

Takeda will not provide a personnel file or specific contents therein to an employee who separates from Takeda for any reason, unless required by law. Please note that personnel records may also be released pursuant to subpoena or applicable legal request without an employee's authorization or notification.

**Confidential:** The contents of this Manual are confidential and must not be distributed outside of Takeda



**CONSULTANT AND CONTINGENT LABOR POLICY**

Takeda along with all its subsidiaries and affiliates are subject to one Global Consultant and Contingent Labor Policy, the purpose of which is to ensure that a consistent approach to managing Consultants and Contingent Labor costs is taken across Takeda globally. To view a copy of the global policy, please click here.

Specific to the U.S., Takeda recognizes that from time to time, due to departmental workloads, special projects, for vacation or for other temporary needs, contingent workers may be needed to supplement the regular workforce. Contingent workers (i.e., workers provided by temporary employment or leasing agencies, contract firms or vendors, or independent contractors) are different from regular employees in their expectations, roles, commitments, and legal status. This means that Managers need to manage contingent workers differently from employees.

There are generally two types of contingent workers used by Takeda: (1) workers employed by a third-party vendor, such as a staffing agency, with whom Takeda has contracted for services; and (2) independent contractors who contract directly with Takeda. In the majority of cases, contingent workers will fall within the first category, and will be procured from one of the third-party vendors that has an existing contractual relationship with Takeda. In very limited situations, where a worker cannot be obtained through an existing relationship with an approved vendor, an independent contractor may be retained to perform the services. Managers are not permitted to contract with independent contractors or consultants directly. In the unusual circumstance where an independent contractor is needed for an assignment, a manager must obtain HR approval. This specific policy applies to third-party vendor workers.

The contractual relationships Takeda has with approved vendors ensure the protection of proprietary and confidential company information as well as compliance with our legal obligations. Contractors obtained through third-party vendors are employees of those vendors. The vendor not only performs the administration of payroll, benefits and other human resources activities but also is the employer of the workers. The vendor is responsible for recruiting, screening, hiring and training its employees. In addition, the vendor withholds taxes and social security and provides worker's compensation coverage. Takeda is NOT the employer of the contract employee. It is the manager's role to successfully manage the contingent worker relationship to reduce exposure to joint-employment liabilities. This can be accomplished in part by following the guidelines set forth in the Contractor Management Guidelines for all US Takeda sites, which can be accessed here.

**Confidential:** The contents of this Manual are confidential and must not be distributed outside of Takeda



## ACCESS TO EMPLOYEE HEALTH INSURANCE INFORMATION

Takeda sponsors group health insurance plans for eligible employees (the "group health plans"). The plans may be self-insured (meaning that Takeda pays for employee coverage and a third-party administrator undertakes a portion of the work to administer the plans for Takeda) or wholly insured (meaning that independent insurance companies insure the benefits that are provided under the health plans and the insurers and other third parties undertake most of the work to administer the health plans for Takeda).

As the sponsor of the group health plans, Takeda receives and can review summary health information, which does not identify individual employees, for obtaining premium bids for health insurance and modifying, terminating or amending the group health plans. As the sponsor of the group health plans, Takeda also has access to enrollment and dis-enrollment information regarding individual employees.

Authorized employees and contractors who are designated by Takeda to administer the group health plans are the only individuals with authorized access to any other employee health information generated by or for the group health plans. It is Takeda's policy to ensure that the group health plans it sponsors comply with all applicable laws regarding the privacy and confidentiality of employee health information generated by or for the group health plans including the Privacy Regulation and Security Regulation of the Health Insurance Portability and Accountability Act of 1996 ("HIPAA"). It is also Takeda's policy to ensure that Takeda itself, as sponsor of the group health plans, complies with such laws and principles with respect to any employee health information to which it has access, and to take reasonable steps to maintain the privacy and confidentiality of any employee health information that has been generated by or for the group health plans. Other files or documents unrelated to the group health plans sponsored by Takeda, such as workers' compensation files, short-term and long-term disability files and/or life insurance information may also contain information relating to an employee's health or medical condition. Takeda will take reasonable steps, to the extent required by law, to maintain the privacy and confidentiality of any employee health information that is not generated by or for the group health plans.

As the sponsor of the group health plans, and solely for purposes of administering the plans and meeting its fiduciary obligations, Takeda reserves the right to review all employee health information to the extent allowed or required by applicable law. To the best of its reasonable ability, Takeda will request that the group health plans' insurers and third-party administrators disclose only employee health information that is reasonably necessary to administer the group health plans or meet legal requirements when disclosing information to Takeda for these purposes. Takeda expressly and strictly prohibits all uses or disclosures of employee health information generated by or for the group health plans, except as set forth herein or as established in any additional Company policies, notices or other documents or official communications issued by Takeda regarding this topic.

In addition, it is Takeda's policy to require that any employee requesting assistance from Takeda with respect to certain issues relating to an employee's participation in the group health plans make the request in writing to the erc@takeda.com.

All issues with respect to this or other Company policies, notices or other documents or official communications relating to the privacy and confidentiality of employee health information should be directed to Takeda's HIPAA Privacy Official or HIPAA Compliance Contact. For a copy of Takeda's Notice of Privacy Practices, please click here.

**Confidential:** The contents of this Manual are confidential and must not be distributed outside of Takeda

**CONFIDENTIAL AND/OR PROPRIETARY INFORMATION**

While employed by Takeda, employees may be given access to, become familiar with, or acquire confidential and/or proprietary information. Inappropriate disclosure or use by an employee of such confidential and/or proprietary information could be greatly detrimental to Takeda and cause Takeda irreparable injury.

Accordingly, neither while employed by Takeda nor at any time thereafter may an employee directly or indirectly disclose, reveal, or use for him/herself or others any confidential and/or proprietary information of Takeda without prior written permission of Takeda, other than in the performance of an employee's authorized duties for Takeda. Additionally, depending on their position and job responsibilities, employees may be required to sign a non-disclosure/confidentiality agreement as a condition of their employment. Takeda reserves the right to seek and obtain all appropriate relief, including injunctive relief, for violations of this policy or applicable agreements and/or procedures, in its sole discretion.

"Confidential and/or proprietary information" means any information that relates to the business of Takeda that is not generally known to persons outside Takeda and/or which gives Takeda an economic advantage including, but not limited to, actual and prospective: client lists, pricing information, business plans, programs, strategies, research and development information (including without limitation information relating to the formulation, testing, registration, use, safety, efficacy and/or effects of marketed products or compounds under development), techniques, data, formulae, specifications, methods, devices, financial data, personnel information, confidential and/or proprietary information of third parties provided to Takeda subject to confidentiality and non-use restrictions, and other such information. Other examples of confidential and/or proprietary information include, but are not limited to, the following: trade secrets; preferred files; customer identities, lists and the names, job titles and telephone numbers of the principal contact(s) of each customer; customer documents, routes, books, files, cards, purchases and accounts; call list of any sales employee; pricing, margins, sales allowances, discounts and pricing policies; invoices; marketing information; computer records; product information; sales by sales representative or product or customer or territory; sales and delivery schedules; credit terms; policies and information; payment records; promotional programs; financial information of Takeda or its customers; the terms and formats of Takeda's contracts and agreements with customers, vendors and other business contacts; information pertaining to Takeda's methods of operation, processes, strategies and techniques; and personally, identifiable information of employees, consultants, contractors, customers, consumers, clinical investigators, clinical research study subjects, vendors and other third-party business partners.

Violations of this policy are extremely serious and may result in disciplinary action up to and including, termination of employment.

## Confidentiality Guidelines
The following are guidelines on how employees can help maintain information security in and outside of the work place.
- When discussing confidential and/or proprietary information with appropriate individuals at their desk, on the phone, at lunch or out of the building, employees should refrain from speaking louder than necessary. This also includes discussing business matters with colleagues

**Confidential:** The contents of this Manual are confidential and must not be distributed outside of Takeda



on airplanes and in elevators, and in other public places where employees may not know who might overhear.

- Employees must be careful not to leave confidential and/or proprietary information on their desk. Such information should be locked in employees' desks while away from their desks, including at the end of the day.
- Employees must be careful not to disclose any documents and/or information that could be considered confidential and/or proprietary on any social media during and/or after their employment. Please also refer to the Social Media policy set forth in this Manual.
- Employees should not remove any confidential and/or proprietary information from the office. Only those with specific authorization may take restricted papers and related material out of the building.
- Employees must follow policies and procedures applicable to the security and confidentiality of company confidential and/or proprietary information.

### Trade Secrets Notice of Immunity

Notwithstanding anything herein to the contrary, under the Federal *Defend Trade Secrets Act of 2016*, an individual may not be held criminally or civilly liable under any Federal or State trade secret law for the disclosure of a trade secret that (A) is made (i) in confidence to a Federal, State, or local government official, either directly or indirectly, or to an attorney; and (ii) solely for the purpose of reporting or investigating a suspected violation of law; or (B) is made in a complaint or other document filed in a lawsuit or other proceeding, if such filing is made under seal.  An individual who files a lawsuit for retaliation by an employer for reporting a suspected violation of law may disclose the trade secret to the attorney of the individual and use the trade secret information in the court proceeding if the individual files any document containing the trade secret under seal and does not disclose the trade secret except pursuant to court order.  Nothing herein is intended, or should be construed, to affect the immunities created by the *Defend Trade Secrets Act of 2016*.

**Confidential:** The contents of this Manual are confidential and must not be distributed outside of Takeda



## SECONDARY/OUTSIDE EMPLOYMENT

It is the policy of Takeda to allow its employees to engage in outside work, subject to prior Company approval and certain restrictions as outlined below.

Takeda requires that an employee's activities away from the job must not compete, conflict with, or compromise its interests or adversely affect the employee's job performance and his/her ability to fulfill all responsibilities to Takeda. This restriction, for example, prohibits an employee from performing any services on non-working time that are normally performed by Takeda. This prohibition also extends to the unauthorized use of any Company tools or equipment and the unauthorized use or application of any confidential trade information or techniques. In addition, employees must not solicit or conduct any outside business during paid working time.

Employees are encouraged to carefully consider the demands that any additional work activity will create before requesting permission to seek or accept outside employment. Outside employment will not be considered an excuse for poor job performance, absenteeism, tardiness, leaving early, refusal to travel, or refusal to work overtime or different hours. If outside work activity causes and/or contributes to job-related problems, it must be immediately discontinued and may result in disciplinary action, up to and including termination of employment.

Employees must request permission before engaging in any outside employment, including self-employment. Requests must be submitted in writing (via email is acceptable) to an employee's immediate manager. The written request should include pertinent information about the outside employer, including but not limited to the nature of the outside work activity, the expected hours of employment for that job, and any information about whether the outside company does any work with Takeda.

Upon receipt, the employee's immediate manager must forward the written request to the appropriate Human Resources Representative with a recommendation. The manager and Human Resources will review the request and notify the employee in writing of Takeda's final decision. In evaluating requests for outside work, immediate managers and the Human Resources Department will consider whether the proposed employment:

a) May or appear to compete or conflict with or compromise Takeda's interests or adversely affect the employee's job performance and his/her ability to fulfill all responsibilities to Takeda;
b) Involves working for an organization that is a competitor of Takeda or that does a significant amount of business with Takeda, such as major contractors, suppliers, and customers;
c) Violates any other Company policy or agreement between the employee and Takeda; or
d) May adversely affect Takeda's reputation.

Executives and certain designated managers, professionals and technical experts are expected to devote all their working energies to the performance of their duties at Takeda and, therefore, may not be permitted to accept any secondary employment.

**Confidential:** The contents of this Manual are confidential and must not be distributed outside of Takeda



Employees may not use paid or unpaid time off to work on any outside work. Employees are also prohibited from performing secondary/outside work while on an approved leave of absence, except for approved civic duty and/or military leaves.

Fraudulent use of paid sick, vacation, or leaves of absence will result in disciplinary action, up to and including termination of Takeda employment.

**Confidential:** The contents of this Manual are confidential and must not be distributed outside of Takeda



## EMPLOYMENT CLASSIFICATIONS

It is Takeda's policy to ensure that all employees are classified appropriately for the purposes of determining uniform standards for benefits eligibility, conditions of employment and compliance with applicable wage and hour laws. All determinations regarding whether an employee is exempt or non-exempt is made in accordance with applicable federal, state and/or local laws.

<u>Exempt Regular Full-Time Employees</u>
Exempt regular full-time employees are those employees scheduled to work the established normal workweek\* on a regular basis but whose salary represents payment for all hours that may be required to work in any given workweek, including those over 40. Exempt employees are excluded from the overtime pay provisions of applicable wage and hour laws.  In general, exempt regular full-time employees are eligible for all Takeda benefits set forth in this Manual and in applicable benefits' plan documents.

<u>Exempt Regular Part-Time Employees</u>
Exempt regular part-time employees are those employees scheduled to work at least 20 hours per week, but less than 40, on a regular basis. Exempt employees are excluded from the overtime pay provisions of applicable wage and hour laws.  Exempt regular part-time employees are eligible for some but not all Takeda benefits available to regular full-time employees, as explained in applicable plan documents.

<u>Non-exempt Regular Full-Time Employees</u>
Non-exempt regular full-time employees are those employees scheduled to work the established normal workweek\* on a regular basis and who are eligible for overtime pay in accordance with the overtime provisions of applicable wage and hour laws. In general, non-exempt regular full-time employees are eligible for all Takeda benefits set forth in this Manual and in applicable benefits' plan documents. Specific policies, procedures and rules applicable to non-exempt employees can be found in this Policy Manual <u>here</u>

<u>Non-exempt Regular Part-Time Employees</u>
Non-exempt regular part-time employees are those employees scheduled to work at least 20 hours per week, but less than 40, on a regular basis.  Non-exempt regular part-time employees are eligible for overtime pay in accordance with the overtime provisions of applicable wage and hour laws.  Non-exempt regular part-time employees are eligible for some but not all Takeda benefits available to regular full-time employees, as explained in applicable plan documents. Specific policies, procedures and rules applicable to non-exempt employees can be found in this Policy Manual <u>here.</u>

<u>Converting:</u>
An employee who converts from regular part-time to full-time status will not begin accruing increased paid vacation, personal and sick time benefits until one-month anniversary of the date when he/she was reclassified.

*\*The normal workweek varies as it is site and job-specific. Please consult with your local HRBP.*

**Confidential:** The contents of this Manual are confidential and must not be distributed outside of Takeda



**FLEXIBLE WORK ARRANGEMENTS**

While Takeda maintains a typical workweek, it also recognizes flexibility in scheduling may improve effectiveness at work and at home for some employees.  Flex work is acceptable so long as employees continue to meet performance expectations including, by, among other things, ensuring deadlines and business objectives are met.  For example, in some Deerfield departments for which Friday afternoon coverage is critical to meeting business needs, managers will provide additional direction and may require that employees work a full day instead of a partial schedule.

Employees who wish to work a flexible work arrangement should submit their request directly to their manager. For more information, non-sales employees can view the Flexible Work Paths section here and field sales employees can view the applicable Flexible Work Paths section here.  Non-exempt employees may not work alternative schedules unless and until approved by their respective managers and HR.

Employees may be required to work hours in excess of their normal schedule when business needs so dictate. Non-exempt employees will be paid overtime in accordance with applicable law. Exempt employees will NOT be paid overtime; they receive a salary for managing the responsibilities of their position, regardless of the time required.

**Confidential:** The contents of this Manual are confidential and must not be distributed outside of Takeda

## NON-EXEMPT EMPLOYEES

Certain of Takeda's rules and procedures, as described below, are applicable only to Takeda employees who are non-exempt. Non-exempt status means they are entitled to overtime compensation, among other things, in accordance with applicable law.

### Work Schedules

A regular full-time work schedule for non-exempt employees at Takeda is 40 work hours per workweek, excluding meal periods. Daily and weekly work schedules may be changed from time to time to meet business needs; however, Takeda will make every effort to announce changes to employee work schedules with as much notice as possible under the circumstances. Any employee requests for changes to pre-approved daily and/or weekly work schedules must be approved in advance by the employee's manager.

Employees are required to have at least one day (24 consecutive hours) of rest in each workweek. If situations arise that require an employee to work without a day of rest during a given workweek, a manager must first consult with Human Resources.

### Work Hours

In accordance with applicable law, Takeda considers all hours spent under the direction and control of the Company as compensable "work hours." Ordinarily, this includes all time that an employee is required to be on Takeda premises or at any assigned work place. Any work performed away from Takeda premises (e.g., at home) or after a shift has concluded must also be reported on any Takeda timesheet as "work hours" and will be properly compensated.

Employees must report all time worked, regardless if approved and regardless of when or where performed, on their Takeda timesheets. It is a manager's responsibility to exercise appropriate supervision as to when work is performed by employees. Employees who perform work during unauthorized times will be subject to disciplinary action, up to and including termination. Nevertheless, all work time will be compensated.

- **Use of Wireless Devices and Laptops:** Time spent using wireless devices and laptops at your manager's discretion to respond to electronic messages and conduct work will be counted as hours worked in the computation of overtime pay. Non-exempt employees must receive authorized permission before using these devices to work beyond scheduled hours.

### Meal and Rest Periods

Meal and rest periods are intended to promote the well-being and efficiency of an employee and may also be required by applicable law.

Takeda requires that all non-exempt employees take an uninterrupted and unpaid meal period of at least 30 minutes no later than 5 hours after the start of the workday. With manager approval, Takeda permits up to an additional 30 minutes (for a total of one (1) hour) unpaid meal period for employees who are scheduled to work eight (8) continuous hours in a workday. If, however, an employee works no more than 6 hours in one day, then the employee may waive his or her meal period by mutual written consent of both the employee and his or her manager, unless prohibited by law.

**Confidential:** The contents of this Manual are confidential and must not be distributed outside of Takeda



Takeda allows two paid ten-minute breaks for employees who are scheduled to work 8 continuous hours in a workday. Unless prohibited by local law, managers have the discretion to allow a break or not, based on the type of work, for employees who are scheduled to work less than 8 continuous hours in a workday.

Employees may elect to take authorized breaks all at once, if preferred. However, meal and rest periods may not be scheduled at the start or at the end of any workday under any circumstance. Unauthorized extensions of meal or rest periods are prohibited and will subject an employee to disciplinary action, up to and including termination of his/her employment. During any unpaid meal or rest period, an employee must be completely relieved from performing any work-related tasks (i.e., no checking email, voicemail, etc.).

Employees must coordinate all break periods, whether paid or not, with their managers. At the same time, managers must ensure compliance with any applicable laws and/or regulations regarding meal and rest periods. Thus, managers should not permit employees to work without the meal and/or rest periods mandated by applicable law.

### Vacation and Sick Time
Vacation and/or sick time must be taken by non-exempt employees in increments of no less than half an hour. Employees and their managers are responsible for accurately tracking and recording paid vacation and/or sick time. If Takeda determines that an employee has reported vacation and/or sick time more than the amount to which the employee was entitled to under applicable Company policies, the employee and his/her manager will be contacted to discuss. Disciplinary action up to and including termination of employment may also be taken.

### Paid Time Off
Non-exempt employees approved paid time off (including paid leaves of absences) pay will be calculated by multiplying the number of hours the employee is normally scheduled to work during the applicable workday or workweek that the employee did not work, by the employee's regular straight time gross hourly rate (or, in the case of a salaried, non-exempt employee his/her gross hourly equivalent rate) as of the date of the paid time off.

### Timekeeping
Takeda's non-exempt employee timesheet reporting procedures are intended to comply with applicable federal, state, and local laws and/or regulations. This policy is also intended to provide fair and consistent processes to ensure accurate time records and to assist employees when completing their timesheets.

All employees must accurately and properly prepare and submit timesheets. Improper time reporting is subject to discipline, up to and including termination on the first offense. Attendance records, time and attendance trackers, and/or timekeeping records are important Company records. As such, the falsification of any such record and/or the failure to comply with any Company policies or procedures associated with such records may result in disciplinary action up to and including termination of employment.

**Confidential:** The contents of this Manual are confidential and must not be distributed outside of Takeda



Managers are responsible for reviewing, timely approving employee timesheets and otherwise enforcing compliance with this policy. In reviewing employee time, managers must ensure that the recorded time is accurate and complete. Employees and their managers will follow all procedures defined in the Time Automation System.

## Travel Time

The principles that determine whether time spent in travel is compensable time depends upon the kind of travel involved and when it is undertaken. In general, time spent by an employee in travel as part of their principal business activity, such as travel from job site to job site during the employee's normal workday, is work time and must be recorded as work hours on an employee's time sheet. Please refer to Takeda's Non-Exempt Time Reporting Policy here for more specific travel time circumstances, including several hypotheticals.

## Overtime Pay

It is Takeda's general policy that all work by non-exempt employees shall be completed, insofar as possible, during the regular work day. However, conditions may arise from time to time that will necessitate overtime by being worked by such employees. In such instances, overtime will be paid as outlined in this policy, and in accordance with all federal and state laws regarding overtime payments.

Non-exempt employees receive their regular hourly rate up to 40 hours in a workweek and one and a half times their regular hourly rate for hours worked more than 40 hours, unless otherwise required by state or local law. Hours worked will also include all paid time off benefits (e.g. holidays, sick days, vacation days, and approved volunteer time off. It does not include any days during which an employee receives disability or workers' compensation benefits.)

Employees who are eligible for overtime must complete appropriate timesheets approved by their managers that indicate the number of overtime hours worked. Failure to provide such documentation will subject an employee to discipline and could result in the employee's pay being delayed.

If an employee works in a state that requires greater overtime benefits or opportunities, the law(s) of such state shall apply.

A non-exempt employee must obtain his/her manager's approval before working overtime. Any unauthorized use of overtime subjects an employee to disciplinary action, up to and including termination of employment. It is the non-exempt employee's responsibility to timely and accurately report all overtime worked.

**Confidential:** The contents of this Manual are confidential and must not be distributed outside of Takeda



## DISCRETIONARY BONUSES

Takeda values performance and aligns its highly competitive rewards strategies to attract, retain, differentiate and reward our best talent. Our compensation programs strive to be competitive, consistent and fair, flexible and fiscally responsible. In addition to base salary, Takeda's compensation package consists of these components:

- **Takeda Short-Term Incentive Plan (TSTIP) or other annual incentives:** Takeda's Short-Term Incentive Plan (TSTIP) takes into consideration individual performance, as well as Corporate and Division (or Sub-Division) performance.  The Plan encourages a pay-for performance philosophy and unites individual success with the greater success of the Company.  TSTIP is an important part of total compensation and is designed to align an employee's actions and achievements with common business objectives. All active U.S. employees are eligible to receive TSTIP, which is a cash bonus equal to a specified percentage of base salary.  To view TSTIP guidelines and rules, click here.  In some organizations (e.g. sales) other incentives are awarded in lieu of TSTIP.

- **Global Long-Term Incentive Plan (GLTIP):** Takeda's Global Long-Term Incentive Plan (GLTIP) program is designed to align participating employees' interests with the interests of Takeda Pharmaceutical Company Limited (TPC) shareholders. GLTIP awards are based on the company's long-term growth and performance, along with the individual's performance. Awards are delivered as restricted stock units (RSUs), which are linked to Takeda's stock price. Employees may be eligible to participate in the GLTIP program based on Role level.  To view the GLTIP guidelines and rules, click here.

**Confidential:** The contents of this Manual are confidential and must not be distributed outside of Takeda

**HOLIDAYS**

To be eligible for paid time off for a Company holiday, an employee must either be a full-time employee or a part-time employee regularly scheduled to work 20 hours per week and must be employed by Takeda on the Company-recognized holiday. If an employee works part-time or less than 5 days per week, the holiday must fall on the employee's scheduled workday for the employee to receive holiday pay. In other words, part-time employees do not receive holiday pay if they are not normally scheduled to work on the recognized holiday. Employees on an unpaid leave of any kind are not entitled to holiday pay.

Eligibility is not affected by any approved paid time-off such as vacation, sick, or Your Choice holiday on the scheduled workday immediately before or after the holiday. However, eligibility may be affected by unpaid time off on the scheduled workday immediately before or after the holiday. Without limitation by example, employees on unpaid leave of any kind are not entitled to holiday pay. If an employee is collecting short-term or long-term disability benefits at the time of the holiday, he/she will receive those benefits instead of holiday pay. In addition, the holiday counts toward applicable maximum disability periods (e.g., the 180-day maximum short-term disability period).

**Holidays Observed**
Takeda will determine the paid holidays in its sole discretion and will publish those holidays in advance of each calendar year here. Paid holidays will generally include:

New Year's Day
Memorial Day
Independence Day
Labor Day
Thanksgiving
Day after Thanksgiving
Christmas Day
Year-end shutdown period which is observed between Christmas and New Year's Eve

Takeda may also provide several Company "floating" holidays in addition to those listed above. Those dates will vary, depending on calendar year and business needs and will be published in advance. Please consult myTakeda for more information.

In addition, Takeda will comply with any state or local laws (including the laws of the Commonwealth of Puerto Rico) that require additional observed holidays or holiday pay.

**Your Choice Holiday**
All employees regardless of hire date during a calendar year are entitled to one or more paid Your Choice Holidays, depending on that particular location's holiday schedule. Please click here to determine what that schedule will be at your location. Employees are required to obtain manager approval before scheduling such days but employees must use that time off before the conclusion of any calendar year, or they risk losing it, unless prohibited by law.

**Confidential:** The contents of this Manual are confidential and must not be distributed outside of Takeda



A Your Choice Holiday must be taken in full workday increments. It may not be taken in partial day or hour increments. Your Choice Holiday(s) may be taken immediately upon hire and on any day of the calendar year. Part-time employees must schedule their Your Choice Holiday(s) on a normally scheduled workday to receive pay for it. They will receive pay equal to the pay they would have received had they worked the scheduled workday. For example, part-time non-exempt employees normally scheduled to work 9-hour workdays will receive 9 hours of Your Choice Holiday pay; part-time non-exempt employees normally scheduled to work 4-hour workdays will receive 4 hours of Your Choice Holiday pay. Exempt employees will receive Your Choice Holiday pay equal to their pay for one workday; Your Choice Holidays may not be taken in increments.

**Confidential:** The contents of this Manual are confidential and must not be distributed outside of Takeda

**PAID VACATION**

Takeda provides paid vacation time to regular full-time and regular part-time employees based on years of service with Takeda and other factors as explained below. This vacation time is intended to provide eligible employees with a relaxing period each year free of job responsibilities.

Vacation time for all Takeda employees is earned monthly on the first (1st) day of each calendar month (e.g., an employee who is eligible to receive fifteen (15) days of vacation time in a calendar year earns 1.25 days of vacation time (15 days divided by 12 months) on the first (1st) day of each calendar month). Nonetheless, subject to the terms and conditions of this policy, employees are normally permitted to schedule their vacation time prior to earning it if they do so during the calendar year during which it is earned.

### Vacation Requests and Tracking

To request vacation time, an employee must submit a request in writing (email is sufficient) to his/her manager for approval as far in advance as possible to accommodate business needs. Two (2) weeks' notice is normally considered adequate; however, a manager may require more or less notice based on specific business needs.

Takeda may set aside certain periods of the year when vacation will not be granted due to business reasons. In addition, Takeda may require an employee to take any amount of vacation time by and/or during a certain timeframe to meet business needs. In general, however, efforts will be made to accommodate individual preferences. Takeda reserves the right to deny any request for vacation at its sole discretion.

Eligible exempt employees must take vacation time in increments of not less than four (4) hours, regardless of whether they participate in a flexible work arrangement. Similarly, non-exempt employees must take vacation in increments of not less than thirty minutes.

All employees are required to track their paid vacation (including applicable carryover) via approved Company required time tracking methods. When tracking vacation, all employees must track their **actual time off** in hours (not days) and should record the hours taken based on their individual work schedule. The same recording should also apply for any carryover vacation. Please see the examples below for how to properly record vacation:

1. Employee A works a modified workweek consisting of nine-hours each day on Monday through Thursday and four hours on Friday. Employee takes Thursday and Friday off as vacation. The employee should record 9 hours of vacation for Thursday and 4 hours of vacation for Friday.

2. Employee B works a part-time schedule of 3 eight-hour days (Monday, Tuesday, Thursday). The employee requests vacation for Monday. The employee should record 8 hours of vacation for that Monday.

3. Employee C did not use 10 days of vacation last year. When recording that time for carryover purposes, the employee should record 80 hours, not 10 days (i.e., each vacation day is worth 8 hours, 10x8=80 hours)

### Vacation Carryover

Employees are encouraged to take all their vacation time in the same calendar year it is earned;

**Confidential:** The contents of this Manual are confidential and must not be distributed outside of Takeda

however, Takeda recognizes that is not always possible. As such, employees will be allowed to carryover a maximum of 80 hours of unused accrued paid vacation earned that calendar year into the following calendar year. Any carryover vacation time must be used by December 31st of the following calendar year after it was earned. If it is not used by that deadline, it will be forfeited and will not be paid out, unless state law requires otherwise.

### Vacation Benefits During Leaves of Absence

Employees must apply unused paid vacation during unpaid periods of a Personal Leave in accordance with the Personal Leave of Absence Policy. Additionally, employees are not required, but have the option, to apply any unused accrued paid vacation time during any unpaid portion of an FMLA, Military Leave of Absence, or other leave permitted by law.

Employees who take leave of absences of any kind for longer than three (3) consecutive calendar months will not earn vacation for any calendar month during the remainder of the leave.

### Vacation Schedules

The vacation schedules set forth below are based upon a regular full-time employee schedule. The number of paid vacation hours/days that an employee is entitled to will be prorated based upon his/her regularly scheduled workday/workweek.

### New Hire Vacation Schedule

In the first calendar year of service, newly hired employees will earn paid vacation based upon the month in which they were hired, as detailed in the New Hire Vacation Schedule described below:

| Month of Hire: | Hours of Prorated Paid Vacation: |
|---|---|
| January | 120 |
| February | 110 |
| March | 100 |
| April | 90 |
| May | 80 |
| June | 70 |
| July | 60 |
| August | 50 |
| September | 40 |
| October | 30 |
| November | 20 |
| December | 10 |

### Full-Year Vacation Schedule

Employees accrue 8 additional hours (1 day) of paid vacation per additional year of service after their first year of employment. Employees earn this additional day on their service anniversary date. The annual increase in vacation days will continue until an employee reaches his/her 15-yearservice anniversary. At that point, the employee becomes eligible for the maximum of 240 hours (30 days) of paid vacation and will be capped at that amount for the remainder of his/her employment.

**Confidential:** The contents of this Manual are confidential and must not be distributed outside of Takeda



The table following illustrates how the vacation schedule will apply:

| Length of Service | Days of Paid Vacation/Hours |
|---|---|
| New Employees | 15/120 |
| 1 year | 16/128 |
| 2 years | 17/136 |
| 3 years | 18/144 |
| 4 years | 19/152 |
| 5 years | 20/160 |
| 6 years | 21/168 |
| 7 years | 22/176 |
| 8 years | 23/184 |
| 9 years | 24/192 |
| 10 years | 25/200 |
| 11 years | 26/208 |
| 12 years | 27/216 |
| 13 years | 28/224 |
| 14 years | 29/232 |
| 15 years | 30/240 |

## Vacation Purchase Program

Regular full-time employees may purchase up to five additional vacation days per calendar year, which will be paid for by way of payroll deductions over the course of the year. Part-time employees are entitled to purchase prorated vacation days based upon his/her regularly scheduled workday/workweek.  Employees may elect to purchase additional vacation days during the benefit's annual enrolment period in the fall.  Takeda will not reimburse you for any unused purchased vacation, unless you leave Takeda or as required by law.

## International Transfers

International Transfers (Permanent Relocations): vacation does not transfer to/from entities.

> Prior to transfer to the U.S.: local/home country policies apply on how the unused vacation or paid time off balance is settled (i.e., pays out, employee exhausts all balance, etc.).

> Upon transfer to the U.S.: vacation eligibility is based on the employee's transfer/start date for the first year.  Employee's service date will be used for calculation of vacation eligibility in subsequent years.

Permanent transfers to the U.S. follow U.S. credit rules, policy and system/time tracking method. International Assignments (IA) both short-term (6 months to 1 year) and long-term (greater than 1 year): employee continues to utilize, accrue and track vacation time on "home" country credit, policy and system/time tracking method.

## Vacation Benefits Upon Separation of Employment

Employees who separate from Takeda's employment (regardless of reason) will be paid for:

**Confidential:** The contents of this Manual are confidential and must not be distributed outside of Takeda



1. Any unused earned vacation time (i.e., unused vacation days earned on the 1st day of the months in the calendar year of their separation);

2. Any unused carryover vacation days; and

3. Any unused purchased vacation day(s) (please note that Takeda will pay for any unused vacation day already purchased and deducted from an employee's past pay check; vacation days not yet deducted from a future pay check will not be refunded).

For the purposes of calculating vacation payouts upon separation, any used vacation time will first be deducted from the purchased vacation balance, second from the carryover vacation balance, and finally from the earned vacation balance. Such vacation pay outs will be included on an employee's final pay check.

**Confidential:** The contents of this Manual are confidential and must not be distributed outside of Takeda

**PAID SICK TIME**

All regular employees are eligible for paid sick time per full calendar year of employment immediately upon hire to provide compensation for when they are unable to perform their job due to their own illness or injury or due to the illness or injury of their child, parent, spouse, domestic partner, the child or parent of their spouse or domestic partner, or for any other reason provided for by state or local law. For details about state or local specific benefits to which you may be entitled to above what is provided for in this policy, please review paid sick leave notices, which are emailed directly to remote employees and/or posted in common areas of each Takeda US facility, where applicable.

Regular full-time exempt and non-exempt employees are eligible for a maximum of eighty hours (10 days) of paid sick time per full calendar year of employment. The paid sick time a part-time employee may receive per full calendar year of employment is prorated based on his/her regularly scheduled work hours.

Absences due to work-related illness or injury that qualify for workers' compensation coverage but, due to applicable waiting periods, are not compensable under state workers' compensation law, are also eligible for paid sick time under this policy; however, under these circumstances, paid sick time may be withheld at Takeda's discretion until a final determination has been made that the waiting period is compensable under state workers' compensation law. Absences for which an employee receives short-term or long-term disability benefits will not be eligible for paid sick time under this policy.

Unless otherwise required by law, in the first calendar year of service, newly hired employees will receive a portion of paid sick time based upon the month in which they were hired.  Please refer to the New Hire Sick Time Schedule below.

| New Hire Sick Time Schedule for First Calendar Year for Exempt and Non-Exempt Employees | | |
| --- | --- | --- |
| **Employees Hired In** | **Days of Paid Sick Time** | **Hours of Paid Sick Time** |
| January – March | 10 | 80 |
| April – June | 7 | 56 |
| July – September | 4 | 32 |
| October – December | 2 | 16 |

In their second and following calendar years of service, exempt and non-exempt employees are eligible for eighty hours (10 days) of paid sick time.

Non-exempt employees' sick time pay will be calculated by multiplying the number of scheduled hours of work the employee missed, by the employee's regular hourly rate. Exempt employees' weekly salary will not be reduced because of any unscheduled absence for which they receive paid sick time.

All employees are required to track their used sick time via approved Company required time tracking methods. When tracking sick time, employees must track their **actual time off** in hours (not days) and should record the hours taken based on their individual work schedule. For example, if an employee typically works nine hours during a workday instead of the normal eight hours, they should record nine hours of sick time.  Similarly, if the employee works only four hours on Friday and he/she is ill, the employee should record 4 hours of sick time.

**Confidential:** The contents of this Manual are confidential and must not be distributed outside of Takeda



Unless prohibited by law, eligible exempt employees must take available sick time in increments of no less than four hours and eligible non-exempt employees must take sick time in increments of no less than thirty-minutes. Paid sick time may not be used for any other purpose other than those identified in this policy, or those required by law. Violation or abuse of Takeda's paid sick time benefits or attendance policies may subject an employee to disciplinary action up to and including termination of employment. Unused sick time will not be paid out at termination and cannot be carried over from year to year, except when mandated by state or local law.

Employees who are absent but ineligible for paid sick time because they have used all their available paid sick time will be required to use available unused vacation time or a Your Choice holiday, unless approved for an FMLA or ADA leave, in which case the employee has the option of using such time. If such paid time off is unavailable, and the employee is not otherwise eligible for a medical or other legally protected leave, the employee will be required to take unpaid time off and may be subject to disciplinary action per applicable attendance policies.

In all cases, persistent absences, regardless of circumstances, will be addressed as a performance issue. Unless prohibited by law, Human Resources may request medical verification for any absence, especially when there are frequent short-term absences and a decision whether to approve sick pay for such absences may be conditioned on a review of such medical documentation.

If an employee is absent for three (3) or more consecutive workdays for a non-work-related illness or injury, the employee **must** notify the Employee Resource Center of his/her absence and may need to apply for an FMLA and/or Short-Term Disability. The employee may also be required to provide medical documentation substantiating his/her absences and ability to return to work.

## Other Paid or Unpaid Time Off Due to Illness or Caretaking

Employees who suffer work-related injuries or illnesses may be eligible for workers' compensation benefits under applicable state law, including temporary total disability benefits after satisfying any applicable waiting period(s). Please consult the Work-Related Accidents and Injuries section of this Employee Policy Manual for more information.

Employees working in jurisdictions with specific sick pay laws will earn and may use paid sick time in accordance with those state and local laws. In some jurisdictions, employees may be able to carryover some sick time. All sick time, including carry over sick time, must be tracked via approved Company required systems. For more information about those jurisdictions and their paid sick time laws, please consult the specific state or local postings in the common areas of your facility or, if you're a remote worker, the notices emailed to you by Poster Guard.

Other forms of paid and/or unpaid time off may be available to applicable employees residing in certain states and/or cities.

In all cases, retaliation against anyone who requests and/or is approved to take leave described within this policy is unacceptable and will not be tolerated. Employees are encouraged to report such incidents in the manner described in the Professional Conduct and Prohibition Against Discrimination and Harassment Policy.

**Confidential:** The contents of this Manual are confidential and must not be distributed outside of Takeda



**DISABILITY OR WORKER'S COMPENSATION LEAVES**

Short-term and long-term disability benefits (STD/LTD) are provided by Takeda to regular employees who are unable to work due to an illness, including pregnancy or a non-work-related injury. Employees suffering from a work-related injury may receive worker's compensation benefits in accordance with applicable law and Takeda policy.

If an employee is unable to work due to his/her own medical condition and/or injury and the employee is approved to receive STD/LTD or workers' compensation benefits under the terms and conditions of those policies, the employee will normally be placed on a Short and/or Long-Term Disability Leave (STD/LTD Leave) or Workers' Compensation Leave (Workers' Comp Leave) for the duration of the benefits' coverage period, subject to the maximum period described below. STD/LTD and/or workers' compensation benefits will only be paid if the employee's request is approved by Takeda's third-party administrators and carriers.

Takeda will normally approve STD/LTD or Workers' Comp Leaves to eligible employees for the same time Takeda's administrator approves the employee for benefits, subject to the maximum period described below unless an extension is requested and approved as a reasonable accommodation. STD/LTD or Workers' Comp Leave may or may not be job-protected. For example, leave required for a short-term disability will run concurrently with any qualifying leave under Takeda's Family and Medical Leave of Absence (FMLA) policy, and will provide an employee job protection solely for the duration of any FMLA only. However, if an employee is not eligible for FMLA but is approved to receive disability benefits for a period, that time will generally not be job-protected.

An employee who is on any leave of absence is prohibited from performing any work for Takeda or any other employer (including self-employment) during the leave. An employee's failure to comply with the terms governing a leave or an employee's misrepresentation regarding a leave may result in denial of the leave request and/or disciplinary action up to and including termination of employment.

### Application, Notice and Medical Documentation

To request and receive benefits under this policy, an employee must timely and sufficiently complete any paperwork and otherwise respond to any requests for information required by Takeda's third-party administrator.

An employee's failure to timely complete and submit any paperwork requested by Takeda's third-party disability administrator in association with a claim for disability or workers' compensation benefits may result in the denial of his/her request for leave and/or termination of his/her employment for being absent without approved leave.

An employee should provide thirty (30) days' notice to his/her manager, the ERC and Takeda's third-party disability administrator for foreseeable events that will require a leave of absence under this policy. In the event the need for leave is unforeseeable, the employee must notify his/her manager and the ERC as soon as practically feasible.

**Confidential:** The contents of this Manual are confidential and must not be distributed outside of Takeda



**Pay and Benefits**
Subject to applicable legal restrictions and plan requirements, any insurance benefits (e.g., medical, dental, vision, prescriptions, FSA (health care and dependent care), life insurance, AD&D) for which the employee is eligible and enrolled will be continued during any STD/LTD/Worker's Comp leave, provided the employee continues payment of his/her portion of the premium contribution during that same time.

If an employee is eligible to receive a pay increase scheduled to occur while he/she is on an approved STD or Workers' Comp leave, the pay increase will be paid during the normal merit cycle effective date. Employees who are on LTD leave are not eligible for pay increases.

Employees will continue to accrue vacation during an FMLA leave only, even if they are receiving disability benefits during that time. However, if an employee takes a combination of leaves of any kind for longer than three (3) consecutive calendar months, then the employee will not earn vacation for any calendar month in excess during the remainder of the same leave.

Employees who do not return to work within four (4) months of commencing any leave of absence (or any consecutive combination of leaves) must promptly (i.e., within five (5) business days) return all Takeda property, including but not limited to Company vehicles and laptops, unless otherwise approved by their manager and Human Resources. Takeda reserves the right to require employees to return Company property earlier than the timeframe described above if business needs dictate.

**Confidential:** The contents of this Manual are confidential and must not be distributed outside of Takeda

**FAMILY AND MEDICAL LEAVES OF ABSENCE (FMLA)**

Takeda grants leaves of absence to eligible employees in accordance with the terms of this policy, the federal Family and Medical Leave Act ("FMLA") and any applicable state or other federal law (i.e., the Americans with Disabilities Act). In some cases, this policy is broader than the law. Any leave of absence, including FMLA, will require Company approval as described in this policy. Employees may be terminated for being absent without approved leave. To the extent that applicable state law provides an employee with more generous leave rights than this policy, that state law will govern. Approved FMLA (whether paid or unpaid) is job-protected leave, which means that, absent certain enumerated circumstances, employees who return to work at or prior to the end of their FMLA will normally be returned to the same or equivalent position that they held at the time they commenced the FMLA.

## FMLA Qualifying Events

An eligible employee may take up to twelve (12) weeks of FMLA in a rolling 12-month period for the following reasons:

a)  He/she is unable to work due to his/her own Serious Health Condition (as defined in the section below);

b)  To care for a family member (defined as the employee's spouse or certified domestic partner, the employee's son or daughter, and the employee's parents) with a Serious Health Condition;

c)  To care for a son or daughter (defined as the employee's biological, adopted, foster child, stepchild, legal ward, or child to whom the employee is standing in loco parentis, who is either under the age of 18, or 18 or older and incapable of self-care because of a mental or physical disability) within 12 months of the child's birth, adoption, or foster placement with the employee; **or**

d)  Because of any qualifying exigency arising out of the fact that a spouse or certified domestic partner, son, daughter, or parent of the employee is a covered military member on active duty, has been notified of an impending call or order to active duty status in support of a contingency operation, or is being deployed to or returning from a foreign country due to service with the Armed Forces.

An eligible employee may take up to twenty-six (26) weeks of FMLA during a single 12-month period to care for a covered service member who is recovering from a serious illness or injury. A "covered service member" is defined as a current member of the Armed Forces (including a member of the National Guard or Reserves, or a member of the Armed Forces, or the National Guard or Reserves on the temporary disability retired lists) or a veteran who is receiving applicable medical treatment within five (5) years of the date he/she left the Armed Services. A "serious illness or injury" includes serious illnesses or injuries sustained in the line of duty while on active duty, conditions which existed before the beginning of the member's active duty which were aggravated by active duty service in the Armed Forces, or injuries or illnesses incurred by veterans in the line of duty (or whose condition was aggravated by active duty service) regardless of when the condition manifested itself. An employee is eligible for this benefit if he/she is the is the spouse or certified domestic partner, son, daughter, parent, or next of kin of the covered service member, as defined in this policy. The total amount of FMLA that may be taken for this purpose and for any of the reasons described in (a) – (d) above in that single 12-month period is limited to twenty-six (26) weeks.

FMLA may be taken intermittently or on a reduced schedule when medically necessary for an employee's own Serious Health Condition, the Serious Health Condition of a child, spouse, parent or

**Confidential:** The contents of this Manual are confidential and must not be distributed outside of Takeda



domestic partner, or the serious illness or injury sustained by a covered service member while on active duty. Leave also may be taken intermittently or on a reduced schedule basis because of any qualifying exigency as described in section (d) above. Intermittent FMLA is leave taken in separate blocks of time due to a single qualifying reason. Reduced schedule FMLA is leave that reduces an employee's usual number of working hours per workweek or workday for a period of time. Unless otherwise required by applicable state law or approved by an employee's manager and Human Resources, FMLA taken after the birth or placement of a child for adoption or foster care may not be taken intermittently or on a reduced schedule. If intermittent or reduced schedule FMLA is necessary, Takeda reserves the right to transfer the employee temporarily to an alternative position with equivalent pay and benefits that better accommodates the leave schedule.

Additionally, if spouses or certified domestic partners both work for Takeda, then they are limited to twelve (12) weeks of leave between both due to the birth, adoption, or foster placement of a child or due to any qualifying exigency as described in section (d) above, and twenty-six (26) weeks of leave between both to care for a covered service member who sustained a serious illness or injury while on active duty.

### Serious Health Condition

As used in this policy, a Serious Health Condition is as defined by the FMLA or a similar qualifying medical condition as defined by applicable state law. Generally, a Serious Health Condition is an illness, injury or other medical condition involving one of the following:

a) Inpatient care (i.e., an overnight stay in a hospital);
b) A period of incapacity of more than three calendar days plus continuing treatment by a health care provider;
c) Prenatal care visits or incapacity due to pregnancy;
d) A chronic condition requiring at least two visits a year to a health care provider that may result in occasional periods of incapacity (e.g., diabetes, epilepsy); or
e) Permanent or long-term incapacity under supervision of a health care provider (e.g., Alzheimer's, a severe stroke, or the terminal stages of a disease).

Minor illnesses such as colds, flu, headaches (other than migraines), ear aches, minor ulcers, and periodontal disease are normally not considered Serious Health Conditions and do not entitle an employee to FMLA protections. For purposes of subsection (b) above, the employee or qualifying family member must make an in-person treatment visit with a healthcare provider within seven (7) calendar days of the first day of incapacity. Further, a visit to a doctor which results in the doctor telling the employee to get plenty of rest, drink extra fluids, and take some form of over-the-counter medication does not by itself constitute "continued treatment by a health care provider" and does not entitle an employee to FMLA even if the illness results in a period of incapacity of more than three days.

### Eligibility

All employees are eligible for FMLA, provided they:

a) Have been employed by Takeda for at least twelve (12) months at the time the leave commences (not necessarily consecutively, but service prior to a break in service of more than seven (7) years for reasons other than military service is disregarded); and



b)   Have worked for Takeda for at least 1,250 hours during the previous 12-month period.

Service as a contract worker will count toward satisfying these requirements. If applicable state law has less restrictive eligibility requirements, that law will be applied in determining if any employee is eligible for that state leave. If an employee who is not eligible for FMLA needs a leave of absence because he or she is unable to work for an extended period (i.e., more than three (3) days due to a Serious Health Condition or other reason), Takeda will consider the extent to which a leave of absence could be a reasonable accommodation, so long as it does not create an undue hardship.

An employee's eligibility for short-term or long-term disability benefits, workers' compensation benefits, or Company paid leave benefits does not impact an employee's eligibility for FMLA. Likewise, an employee's eligibility for any of those benefits will not affect his/her eligibility for FMLA leave as required by law.

### Application for FMLA
To apply for FMLA, an employee must contact the Employee Resource Center and Takeda's third-party leave administrator to receive instructions on how to apply for a leave. The employee must also complete all leave of absence paperwork supplied by Takeda's third-party administrator. This paperwork must be filled out regardless of whether the employee expects to receive any of the following forms of payment during all or any portion of the absence: short-term or long-term disability benefits, workers' compensation benefits, sick pay, vacation pay, or Your Choice holiday. The leave of absence paperwork does not replace any paperwork that may be necessary to apply for any of those other benefits. An employee's failure to timely complete any leave of absence paperwork may result in the denial of the request for leave or the request that the leave be classified as FMLA, or termination of the employee's employment for being absent without approved leave. However, Takeda reserves the right to classify leave as FMLA in its discretion in appropriate circumstances.

Takeda requires at least thirty (30) days' notice to the employee's manager and the Employee Resource Center for foreseeable events that will require a leave of absence. In the event the need for leave is unforeseeable, the manager and the Employee Resource Center must be notified as soon as practicable after the employee learns of the need for the leave, ordinarily no later than the same or next working day after he/she learns of the need for the leave.

### Certifications
Any leave of absence due to a Serious Health Condition of an employee, qualifying family member, or covered service member will require medical certification from the treating healthcare provider, which must be provided to Takeda's third-party administrator within fifteen (15) calendar days of Takeda's request. A request for FMLA may be denied if medical certification is not received by Takeda within fifteen (15) days. Human Resources and/or Takeda's leave administrator may contact the employee's healthcare provider for purposes of verifying that the certification provided is authentic and has not been altered and/or clarification of the handwriting or the responses provided. In addition, Takeda may require that the employee or family member be examined by a physician or other healthcare provider selected by Takeda at Takeda's expense for purposes of obtaining a second opinion. If the employee's health care provider and the healthcare provider rendering the second opinion do not agree, Takeda may require a third – and final – opinion, also at Takeda's expense. That third opinion shall be binding on both the employee and Takeda.

**Confidential:** The contents of this Manual are confidential and must not be distributed outside of Takeda



Additionally, any leave of absence taken because of a qualifying exigency arising out of the active duty or call to active duty status of a covered military member will require the following documentation, as applicable:

- A copy of the covered military member's active duty orders or other documentation issued by the military which indicates that the covered military member is on active duty or call to active duty status in support of a contingency operation and the dates of the covered military member's active duty service; **and**

- A complete and sufficient certification to support a request for FMLA leave due to a qualifying exigency which includes any available written documentation which supports the need for leave (e.g., copy of a meeting announcement for informational briefings sponsored by the military, a document confirming an appointment with a counsellor or school official, a copy of a bill for services for the handling of legal or financial affairs).

If the qualifying exigency involves meeting with a third party, Takeda reserves the right to contact the individual or entity with whom the employee is meeting, without the employee's permission, for the purposes of verifying the meeting's purpose and occurrence only. Takeda also reserves the right to contact an appropriate unit of the Department of Defense to request verification that a covered military member is on active duty or call to active duty status.

**Effect on Pay and Benefits**
FMLA may be paid or unpaid. It will run concurrently with any approved leave (including but not limited any applicable federal, state, local and/or any other Company leave that an employee may be eligible for) and any approved Company benefits such as short-term or long-term disability or workers' compensation, or any paid leave benefit, as described in the Paid Leave for Birth or Placement of a Child for Adoption/Foster Care Policy, included within this Employee Policy Manual. Further, at the employee's request only, vacation, Your Choice holiday, or sick time (when applicable) may be applied to any period of otherwise unpaid FMLA.

Employees will continue to accrue vacation during FMLA only. If an employee takes a combination of leaves of any kind for longer than three (3) consecutive calendar months, the employee will not earn vacation for any calendar month during the remainder of the same leave.

If an employee is eligible to receive a pay increase scheduled to occur while that employee is on FMLA, the pay increase will be paid during the normal merit cycle effective date.

Subject to applicable legal restrictions, any insurance benefits (e.g., medical, dental, vision, prescriptions, FSA (health care and dependent care), life insurance, AD&D) for which the employee is eligible and enrolled will be continued during any paid FMLA, with employee contributions made by payroll deduction. If the FMLA is unpaid, coverage will be continued during the FMLA period. When the employee returns to work or separates, Takeda will recover those missed employee contributions through payroll deductions (if legally permissible) or through personal payment from the employee.

**Confidential:** The contents of this Manual are confidential and must not be distributed outside of Takeda



**Return to Work**

Employees must confirm with the Employee Resource Center and their manager of their intention to return to work after their approved FMLA. An employee may be returned to the position the employee held when his/her FMLA began or to an equivalent position if:

a)  The employee returns to work on or before the expiration date of his/her FMLA;
b)  The employee provides a return to work certification from the employee's treating healthcare provider if the FMLA was for the employee's own Serious Health Condition;
c)  The employee remains in full compliance with FMLA requirements; <u>and</u>
d)  There are no other independent causes which would otherwise result in the employee's separation from employment (e.g., reduction in force or discovery of prior misconduct warranting termination).

If an employee does not return to work immediately after the expiration of his/her FMLA, the employee is no longer entitled to FMLA job protection and Takeda may post the job and begin actively recruiting to fill the employee's position or eliminate the position, as business needs dictate. However, if the position the employee held at the time leave commenced is still available on the date that he/she returns to work, the employee may, at Takeda's sole discretion, be reinstated to that position. If the employee is not reinstated to his/her former position, the employee will be placed on a thirty (30) day unpaid leave of absence during which time he/she may apply for any open positions within Takeda for which he/she is qualified for in terms of skill, performance, experience, training and education. If after that thirty (30) day leave, another job within Takeda has not been secured, the employee will be separated from Takeda with full eligibility for rehire.

Additionally, employees who do not return to work immediately after the expiration of their FMLA may be required to return all Takeda property, including but not limited to Company vehicles and laptops, within five (5) days of the expiration of their FMLA, unless otherwise approved by their manager and the Employee Resource Center. During FMLA, an employee is expected to refrain from performing any Takeda job duties or work for any other employer (including self-employment). Failure to comply with that prohibition may result in the denial of a leave request and/or disciplinary action up to and including termination of employment. Employees who fail to complete FMLA or other required leave of absence paperwork, do not return to work following expiration of their approved leave, fail to keep Takeda appropriately informed of their status, or violates this policy in any way will be subject to disciplinary action up to and including termination of employment.

Takeda reserves the right to make reasonable exceptions to this policy to accommodate an employee's disability in accordance with applicable federal and/or state laws.

**Coordination with Other Benefits**

The birth, adoption, or foster placement of child with an employee is considered a "qualifying" life event permitting an employee to make limited changes to his/her benefits coverage and beneficiary information. Employees must report a qualifying life event change **within 31 days** after the eligible event to obtain applicable benefits coverage and/or make beneficiary changes. To report, go to www.myTakedabenefits.com. Employees who do not report a qualifying life event within the timeframe allowed **will not be able to make changes to their benefits until the next annual enrollment period.**

**Confidential:** The contents of this Manual are confidential and must not be distributed outside of Takeda

**BONDING LEAVE**

Upon the birth of a child of an employee, or the placement of a child with an employee for adoption or foster care, eligible employees are entitled to six (6) weeks of pay ("paid leave benefit"). Those six (6) weeks will also be job-protected only if an employee at the time of exercising this paid leave benefit is concurrently eligible for leave under the Family and Medical Leave of Absence Policy ("FMLA Policy")[1]. See the FMLA Policy in this Employee Policy Manual for eligibility details and further information.

The paid leave benefit does not place any additional and/or replace any eligibility requirements for any leave (including FMLA) or disability and/or workers' compensation benefits.

This paid leave benefit will run concurrently with any unpaid leave under the FMLA Policy, for which the employee qualifies. For example, an employee who is eligible for FMLA will receive up to twelve (12) weeks of job-protected leave. During that period, the employee may receive pay for a portion of that leave through short-term disability benefits (if that employee qualifies). When those benefits conclude, or if the employee is ineligible for those benefits, the employee will receive six (6) weeks of pay under this policy during what would otherwise be unpaid leave.

**Terms and Conditions**
- All regular full-time and part-time employees who are scheduled to work twenty (20) or more hours weekly are eligible for the paid leave benefit beginning on their date of hire.
- This paid leave benefit must be taken within twelve (12) months after the birth of the employee's child or the placement of a child with an employee through adoption or foster care. Please note that the qualifying event (i.e., the birth of the child or the placement of the child for adoption or foster care) must occur during an employee's employment with Takeda.
- Only one paid leave benefit is available for multiple births (e.g., twins).
- If the parents of the child are both active employees of Takeda, both will be eligible to receive this paid benefit and both may elect to take it at the same time, if desired.
- The paid leave benefit is not available for adoptions involving the child of an employee's spouse or domestic partner.
- Only one paid leave benefit is available for the simultaneous placement or adoption of children (e.g., siblings).
- This paid leave benefit will be applied after the application of any available short-term disability benefits. If short-term disability benefits are not available to an employee, the paid leave benefit will be applied before the application of any vacation and/or Your Choice holiday applied to otherwise unpaid portions of a leave.
- No duplication of benefits is permitted. In other words, the paid leave benefit will not be paid while an employee also is receiving disability or workers' compensation benefits. Nor may any vacation or other paid time off be applied simultaneously to the period when the paid leave benefit is being paid.
- Please note that this Company benefit may impact any state disability/leave payments that qualifying employees receive in some states (e.g., California, Washington, New Jersey). Check with the appropriate state agency to determine what effect, if any, this Company benefit may have on such payments.

**Confidential:** The contents of this Manual are confidential and must not be distributed outside of Takeda



- This paid leave benefit must be applied in whole during any leave taken in connection with the child's birth or the placement of a child for adoption or foster care.
- Employees must apply to Takeda's third-party administrator for this paid leave benefit at least thirty (30) days prior to the start of any leave. The employee is responsible for completing all paperwork assigned about this paid leave benefit.
- Proof of the child's birth, adoption, or foster care placement with the employee may be required to support the leave request and/or any paid leave benefit request.

---

1 *The only exception to this policy will be a situation when both parents work for Takeda and one parent has used all 12 weeks of FMLA leave for the birth of and bonding with a child. In that situation, the other parent will be permitted to obtain 6 weeks of paid, job-protected leave for the sole purpose of bonding with the child, regardless of that parent's applicable FMLA eligibility.*

**Confidential:** The contents of this Manual are confidential and must not be distributed outside of Takeda



**BEREAVEMENT LEAVE**

An employee may be granted up to 5 days/40 hours for the death of his/her immediate family member:

• Spouse
• Child
• Parent
• Brother or sister
• Domestic partner
• Legal guardian
• In-law, half and step equivalents of the same

An employee may be granted up to 3 days/24 hours for the death of his/her extended family member:

• Grandparent or grandchild
• Aunt, uncle, niece or nephew
• In-law, half and step equivalents

Employees will not be eligible for paid bereavement leave after 3 weeks in a calendar year. However, Takeda may in its sole discretion approve additional paid or unpaid bereavement leave in extraordinary circumstances, with the approval of the employee's manager and Human Resources Representative.

**Confidential:** The contents of this Manual are confidential and must not be distributed outside of Takeda



**CIVIC DUTY LEAVE**

Takeda encourages employees to perform their civic responsibilities. As such, Takeda will grant a leave of absence to employees who serve on a jury or testify as a witness in a legal proceeding, for the duration required by the court and/or local jurisdiction. Upon receipt of any court order, an employee must email a copy to the Employee Resource Center at erc@takeda.com and notify his/her manager of any required time off.

Approved Civic Duty Leave is job-protected leave which means that employees who return to work at or prior to the end of the Civic Duty Leave will normally be returned to the position they left vacant at the time they commenced the leave. However, absent extenuating circumstances, employees are required to return to work immediately upon the conclusion of their civic responsibilities.

Additionally, at Takeda's sole discretion, all eligible exempt and non-exempt employees will be paid for the entire duration of Takeda-approved Civic Duty Leave, regardless of whether they receive compensation from the court and/or local jurisdiction.

To the extent that applicable state or local law provides employees with more generous leave rights for these or other civic purposes, that law will govern.

Takeda also encourages employees to fulfill their civic responsibilities by participating in elections. Generally, employees can find time to vote either before or after their regular work schedule. If an employee is in a state which permits them to take paid time off during the workday to vote, Takeda will abide by those regulations; however, the employee must provide the required notice and proof of voting.

Employees may take unpaid time off to serve as an election official on election day. Any request for time off to serve as an election office must have the prior approval of the employee's manager and Human Resources. Employees may use available vacation time to receive pay for any such time off. They may not apply volunteer time off to such activities.

**Confidential:** The contents of this Manual are confidential and must not be distributed outside of Takeda



**VOLUNTEER TIME OFF**

Takeda believes its responsibility as a good corporate citizen is to help strengthen the communities in which its employees live and work. As such, eligible Takeda employees may take up to two days (16 hours) of paid time-off from work per calendar year to volunteer with eligible 501(c)(3) organizations. Part-time employees who work 20 hours or more are eligible for a pro-rated time-off benefit based on their total work hours during a week. All employees are eligible for this paid benefit from their date of hire, per manager approval. This paid time-off is in addition to any Companywide community service day (i.e., Takeda Cares Day, etc.).

Employees do not need to use their paid volunteer time-off all at once. Exempt employees must take volunteer time-off in increments of no less than half days; non-exempt employees must take time-off under this policy in increments of no less than four hours. Employees may not carryover any volunteer time off from calendar year to year and will not be paid out for any unused volunteer time-off at separation.

To be eligible for time off under this policy, an employee must:

- Work at Takeda for at least twenty (20) hours per week; **and**
    - Part-time employees must schedule their volunteer time on a normally scheduled work day and will be paid for their normally scheduled work hours on that day.

- Comply with all procedures articulated within this policy.

Not all volunteer activities qualify for paid time off under this policy. For an activity to be considered "volunteering" under this policy, it needs to meet all the following criteria:

- **Serve the public good.** The activity should serve a charitable cause for the public at large, such as a non-profit organization that works to alleviate poverty, improve reading in underprivileged children or clean up public waterways.
- **Be voluntary and non-remunerated.** The activity must be conducted by choice, without monetary reward (except regular Takeda pay, if conducted under this policy). Additionally, volunteer activities performed after work or on weekends are not eligible as paid time off from work and cannot be exchanged for time off under this policy. Volunteer time off also cannot be part of a department team-building or any Takeda-sponsored volunteer activity.
- **Constitute a direct service to the eligible organization or those it serves.** The actual activity performed by the employee needs to be value added to the non-profit organization. For example, mentoring, serving meals or picking up trash. Examples of activities that are not, in themselves, direct value added to the organization and therefore do not qualify as "volunteering activities" under this policy include:
    - Traveling to and from the volunteering
    - Attending a fundraising banquet (unless one helps organize or manage the actual banquet festivities)

Additionally, to qualify for paid time-off under this policy, employees must volunteer with an organization that is recognized as tax-exempt per an IRS 501(c)(3) designation. If Takeda is unable to

**Confidential:** The contents of this Manual are confidential and must not be distributed outside of Takeda



confirm an organization's 501(c)(3) status, employees will be required to provide a letter (originated from The Department of Treasury) to the Employee Resource Center with that information.

Religious organizations, defined as an organization that is denominational in nature and/or espouses or seeks to endorse a religion or faith, are not eligible unless the volunteer activity is done for a 501(c)(3) organization linked to that religious organization and benefits the broader community in a non-religious way. Political organizations are not eligible for paid time off under this policy. Additionally, requests to help an individual on a volunteer basis (e.g., assist a neighbor who lost a home after a fire or individually tutor a child outside of a program associated with a non-profit organization) are also not eligible under this policy. Employees may search for appropriate volunteer efforts to join by zip code, by organization type or by keyword by accessing a link available on myTakeda here.

All employees must complete the Takeda Volunteer Time-Off Request Form, available on myTakeda here, and have their manager approve it in advance of each volunteer activity. Employees must submit their requests for paid time off to their manager at least two weeks in advance. Takeda reserves the right to deny any requests for paid time-off if business needs require. An employee's manager may deny requests for paid time off for volunteer activities if important departmental deadlines and/or the employee's performance will suffer due to participation during business hours. Additionally, incidental costs associated with volunteering (i.e., travel costs, supplies, etc.) are not compensable by Takeda through this policy under any circumstances.

Non-exempt employees approved to take paid volunteer time off should record that time in Takeda's timekeeping systems in accordance with the procedures articulated by Takeda Payroll Department.

While engaged in activities benefiting the 501(c)(3) organization under this paid time off policy, employees are representing Takeda in the community and, thus, Takeda expects that they will perform in a professional, business-like and respectful manner always. Failure to abide by that expectation may result in denial of an employee's paid time off request and/or disciplinary action, if appropriate.

**Confidential:** The contents of this Manual are confidential and must not be distributed outside of Takeda



## DOMESTIC VIOLENCE AND VICTIMS OF CRIME LEAVE

### Domestic Violence

Eligible employees may be entitled to take unpaid time off during any rolling 12-month period if the employee or a covered family member is a victim of domestic violence, stalking, sexual assault and kidnapping. It may also include bullying, depending on the circumstances and applicable law.

Any employee seeking leave under this Policy may take any accrued vacation leave, Your Choice Holiday, and/or sick leave available to be compensated during all or a portion of the domestic violence leave. Additionally, when permissible by law, any domestic violence leave taken will run concurrent or be in addition to available FMLA or other applicable state leaves.

Covered family members include (i) persons who are married to one another; (ii) persons in a dating or engagement relationship and who reside together; (iii) persons having a child in common regardless of whether they have ever married or resided together; (iv) a parent, step-parent, child, step-child, sibling, grandparent or grandchild, domestic partner; and (v) persons in a guardianship relationship.

Employees may use the leave from work to: seek or obtain medical attention, counselling, victim services or legal assistance; secure housing; obtain a protective order from a court; appear in court or before a grand jury; meet with an attorney or other law enforcement official; or attend child custody proceedings or address other issues directly related to the abusive behavior against the employee or the covered family member of the employee, or any other reason permitted by applicable state or local law. An employee is ineligible for leave if the employee is the perpetrator of the abusive behavior against such employee's family member.

When leave is foreseeable (*e.g.*, due to a scheduled court date), the employee must provide at least 30 days' notice prior to the anticipated leave date, or as much notice as is practicable under the circumstances. If leave is unforeseeable, including if there is a threat of imminent danger to the health or safety of an employee or the employee's family member, the employee shall not be required to provide advanced notice of leave; provided, however, that the employee shall notify Takeda within 3 workdays that leave was taken or is being taken under this Policy.

Takeda may require an employee to provide documentation evidencing that the employee or a family member has been a victim of abusive behavior and that the leave taken is consistent with this policy, when permissible under law. Such documentation may include items such as police reports, subpoenas, court orders, documentation from medical professionals, counsellors, advocates, and/or social workers. The employee shall provide such documentation within a reasonable period after a request from Takeda.

All information related to the employee's leave or request for leave under this policy shall be kept confidential and shall not be disclosed, except to the extent that disclosure is: (i) requested or consented to, in writing, by the employee; (ii) ordered to be released by a court of competent jurisdiction; (iii) otherwise required by applicable federal or state law; (iv) required in the course of an investigation authorized by law enforcement, including, but not limited to, an investigation by the attorney general; or (v) necessary to protect the safety of the employee or others employed at the workplace. If

**Confidential:** The contents of this Manual are confidential and must not be distributed outside of Takeda



information is shared within the workplace for legitimate reasons, disclosure will be limited to a "needs to know" group.

## Victims of Crime

An employee who is a victim or who is the family member of a victim of a violent felony or serious felony may be entitled to time off from work based on applicable state law and specific circumstances.

Please consult with your Human Resources representative to learn more about specific options available.

In all cases, retaliation against anyone who requests and/or is approved to take leave described within this policy is unacceptable and will not be tolerated. Employees are encouraged to report such incidents in the manner described in the Professional Conduct and Prohibition Against Discrimination and Harassment Policy.

**Confidential:** The contents of this Manual are confidential and must not be distributed outside of Takeda



**MILITARY LEAVES OF ABSENCE**

Immediately upon hire, Takeda will grant a leave of absence to enable any employee to serve in the uniformed services of the United States for a cumulative period of up to five years (not including certain involuntary extensions of service). Employees who perform and return from service in the Armed Forces, the Military Reserves, the National Guard, or certain Public Health Service positions will retain certain rights regarding reinstatement, compensation, seniority, and benefits as provided by the Uniformed Services Employment and Reemployment Rights Act (USERRA) and all other applicable federal, state, or local law(s).

Employees on a leave of absence under this policy will continue to accrue service with Takeda for eligibility, vesting and benefit accrual (including vacation accrual milestone) purposes.

Employees who serve up to five years of uniformed military service under this policy will be reemployed, provided:
1. The employee is qualified to perform the duties of the position offered at reinstatement (with or without accommodation);
2. Application for reinstatement has been given to Takeda by the employee within the time required (see below);
3. The employee has satisfactorily completed the period of uniformed service;
4. The total length of the absence and all previous military absences does not exceed five (5) years (not including certain involuntary extensions of service or other reasons enumerated by law); and
5. Circumstances have not changed to the extent that it would be impossible or unreasonable to provide employment.

With some exceptions, employees returning from military leave must apply for reemployment within specified time limits. More specifically:
- If the Military Leave of Absence is less than 31 days, the employee must return to work by the beginning of the first full regularly-scheduled workday following the completion of the military service, return travel time, and the expiration of eight hours;
- If the Military Leave of Absence is between 31 and 180 days, the employee must apply to the employer within 14 days following the completion of the military service; and
- If the Military Leave of Absence is more than 180 days, the employee must apply for reemployment within 90 days following completion of the military service.

The above return/re-application periods may be extended for up to two years following the completion of service for individuals hospitalized or convalescing from an illness or injury incurred in, or aggravated, during the performance of military service. Additional time may be granted to accommodate a circumstance beyond an individual's control that would make reporting within the two-year period impossible or unreasonable.

Returning employees may be required to provide appropriate documentation that the return or reapplication is within the timelines established under applicable law. As with other leaves of absence, failure to return to work or to reapply within applicable time limits may result in termination of employment.

Employees who take a Military Leave of Absence of 90 days or less will be returned to their former position or, if different, the position they would have held had they not taken the Military Leave of

**Confidential:** The contents of this Manual are confidential and must not be distributed outside of Takeda


Absence. Employees who take a Military Leave of absence of greater than 90 days may also be placed in a position of like role, status and pay, if qualified. If an employee, on return from military service, is physically unable to perform the duties of the position offered at reinstatement even with a reasonable accommodation, Takeda will attempt to place the employee in a position of similar status and pay that is compatible with the employee's physical and other abilities and qualifications.

Employees on Military Leave of Absence have the option, but are not required, to use unused paid vacation and/or Your Choice Holidays during any unpaid portion of Military Leave. As with other leaves of absence, employees who take a Military Leave of Absence for longer than three (3) consecutive calendar months, will not earn vacation for any calendar month during the remainder of the same leave. Employees who do not return to work within four (4) months of commencing a leave of absence (or any consecutive combination of leaves) must promptly (i.e., within five (5) business days) return all Takeda property, including but not limited to Company vehicles and laptops, unless otherwise approved by their manager and Human Resources. Takeda reserves the right to require employees to return Company property earlier than the timeframe described above if business needs dictate.

Takeda will not terminate the employment of an employee who returns to work from a Military Leave of Absence, except for cause, within one year after reinstatement if the Military Leave of Absence was more than 180 days or within 180 days of reinstatement if the Military Leave of Absence was between 30 and 180 days.

In addition to the requirements of the USERRA, Takeda also provides the following benefits:
- An employee on a qualifying Military Leave for less than twenty (20) consecutive work days (i.e., days that the employee would regularly be working) will be paid the difference between his/her military pay and base wage or salary for up to a maximum of fifteen (15) work days per calendar year. An employee may apply unused accrued vacation time and or a "Your Choice" holiday to any unpaid Military Leave.
- An employee on a qualifying Military Leave for more than twenty (20) consecutive work days will be paid the difference between his/her military pay and base wage or salary for up to a maximum of twenty-six (26) pay periods. For more information regarding paid time off, please refer to the "Paid Time Off" section of this Manual.
- All employees on a Military Leave of Absence will be entitled to all bonus payments and incentive payments for which they are otherwise eligible; however, such payments may be prorated per the terms of the applicable plans.
- The health and welfare benefits of employees on a Military Leave of Absence will not be affected for the duration of the Military Leave, if they forward payment of their employee contribution throughout the Military Leave of Absence.
- Employees are eligible to participate in the Takeda Savings and Retirement 401(k) Plan, (including applicable Company matching contributions) per its terms and conditions throughout the term of any Military Leave of Absence.

When state or local law provides greater rights than those set forth in this policy, that law will control.

**Confidential:** The contents of this Manual are confidential and must not be distributed outside of Takeda



## PERSONAL LEAVES OF ABSENCE

All regular employees are eligible to apply for an unpaid Personal Leave of Absence (Personal Leave) of a maximum of sixty (60) calendar days. Personal Leave is granted in Takeda's sole discretion to employees who are not eligible for leave under any other Company leave policy.

Employees must request a Personal Leave at least two weeks in advance of the anticipated start date by contacting the Employee Resource Center and their manager in writing. Documentation may be required about any request for a Personal Leave, depending on the circumstances.

There is no guarantee that a request for Personal Leave will be granted. Personal Leave may be denied based upon an employee's performance and discipline record as well as other relevant business considerations. In general, Takeda will consider the employee's standing at the time of the request, relevant business needs, workload, impact to other members of the team, and other relevant factors when reviewing any request.

Personal Leave is not job-protected leave, which means that Takeda reserves the right to fill the employee's position during the leave and that the employee has no reinstatement rights upon return from such leave. However, the employee's service credit status will be preserved during an approved Personal Leave.

Employees will be required to exhaust all accrued unused vacation, Your Choice Holiday, and sick time (if applicable) prior to taking a Personal Leave. Additionally, employees on a Personal Leave will not accrue additional vacation time during the leave and any bonuses and/or other incentives that they may be eligible for may also be impacted. Employees should consult with Human Resources to determine what impact, if any, Personal Leaves may have on their overall compensation.

Subject to applicable legal restrictions and plan requirements, any insurance benefits (e.g., medical, dental, vision, prescriptions, FSA (health care and dependent care), life insurance, AD&D) for which the employee is eligible and enrolled will be continued during any Personal Leave, provided the employee continues payment of his/her portion of the premium contribution during the Personal Leave. If the Personal Leave is unpaid, coverage will be continued; however, when the employee returns to work or separates, Takeda will recover those missed employee contributions through payroll deductions (if legally permissible) or through personal payment from the employee in a way we specify.

**Confidential:** The contents of this Manual are confidential and must not be distributed outside of Takeda



## IMMIGRATION AND WORK AUTHORIZATION

This policy affects those affects those employees who request sponsorship for their Permanent Residence (Green Card) after April 1, 2017.

Consistent with our intention to attract the best qualified candidates for all positions, Takeda will provide immigration assistance as follows:

### Temporary Work Authorization

When Takeda determines that the best qualified candidate for a highly-specialized position is not a citizen or permanent resident of the United States, Takeda will provide legal assistance through its Legal Department to obtain temporary employment authorization for the candidate. The Human Resources and Legal departments and immigration Legal Counsel will determine the viability of each case and make the ultimate decision whether a candidate is eligible for work authorization sponsorship. This policy does not impact that situation.

The expenses of maintaining work authorization will be shared by Takeda's Legal Department and the hiring department. Takeda's Legal Department will cover the legal fees. The hiring department will cover all filing costs (i.e. subsequent visa renewals, premium processing, etc.) the employee may incur.

### Permanent Residence

Takeda will sponsor eligible employees who are in good standing for permanent residence after six (6) months of employment with Takeda. If the employee remains at Takeda, Takeda will provide legal support and expertise, prepare and file the applications, and provide ongoing legal support as necessary. The six-month waiting period may be waived only if the immigration status of the employees requires immediate processing, especially in cases where loss of work authorization is imminent, and if approved by the supervisor and HR. The expenses of this sponsorship will be shared by Takeda and the employee. Specifically, Takeda's Legal Department will cover the legal fees. The hiring department will cover the filing costs for the first step (PERM application) and the second step (I-140). For the final step of the application, Takeda's Legal Department will cover the legal fees and the employee will be responsible for paying the filing costs for themselves and their family members. Employees will be responsible for signing a sponsorship agreement to specify cost responsibilities.

Once approved, Takeda will not, under any circumstances, cover any costs related to any renewals of an employee's Permanent Residence (Green Card). This is solely the employee's responsibility even if Takeda originally sponsored the employee in the past.

### Eligibility for Permanent Residence Sponsorship

Takeda will expend reasonable efforts in obtaining immigration benefits for qualified employees as determined in the sole discretion of Takeda. Takeda cannot guarantee the success of any immigration case since all cases require government approval. In addition, Takeda reserves the right to determine the type of immigration category it will pursue as well as all immigration law procedures it will undertake on behalf of any qualified employee.

Takeda reserves the right to change and/or update this policy at any time.

**Confidential:** The contents of this Manual are confidential and must not be distributed outside of Takeda



**E-Verify**

Pursuant to federal law, Takeda will only hire individuals who may legally work in the United States (U.S.). To comply with the law, Takeda must verify the identity and employment authorization of each person hired, complete and retain a Form I-9 for each employee, and refrain from discriminating against individuals based on national origin or citizenship.

An electronic Form I-9 (Employment Eligibility Verification Form) must be completed per the timelines provided in the Form I-9 Handbook for Employers (M-274) for every Takeda employee. All paid Takeda employees, including current and future hired employees, completing a Form I-9 must receive confirmation of their employment eligibility through the E-Verify system operated by the Department of Homeland Security (DHS), U.S. Citizenship and Immigration Services (USCIS). That system checks information contained within the Form I-9 against records contained in DHS and Social Security Administration (SSA) databases.

**Confidential:** The contents of this Manual are confidential and must not be distributed outside of Takeda

**ADOPTION ASSISTANCE PROGRAM**

Takeda offers eligible employees certain adoption benefits. These benefits include financial assistance, leave for adoption, and resource and referral services.

**Eligibility**
All regular full-time and part-time employees who are scheduled to work twenty (20) or more hours weekly are eligible for adoption benefits beginning on their date of hire.

If an employee and the other adoptive parent are Takeda employees, only one of them can utilize the monetary benefit articulated below (i.e., maximum $10,000 reimbursement). Adopted children must be under the age of 18 and may not be the son or daughter of the employee's spouse or domestic partner. Employees who adopt children through state agencies may be eligible for a $1,000 reimbursement for expenses related to the adoption of a child.

**Adoption Benefits**
Eligible adoption-related expenses will be reimbursed to a maximum of $10,000 per child, including:
- Agency and placement fees;
- Legal fees and court costs;
- Medical expenses of the child prior to adoption;
- Temporary foster care costs incurred prior to placement of the child in foster care;
- Foreign adoption charges; and
- Travel expenses directly related to the adoption.

Expenses are only eligible for reimbursement if they were:
- Incurred by the employee while employed at Takeda; and
- Not reimbursed by any insurance and/or other public or private financial assistance program.

Takeda will provide any additional adoption benefits required by state or local law. To the extent that state or local government provides tax incentives and/or other benefits about an adoption and/or foster care placement, those benefits must be applied first before an employee can receive any assistance from Takeda. Additionally, Takeda will abide by all tax rules associated with any approved benefits.

**Procedure for Reimbursement**
An employee must complete the Adoption Assistance Form which may be obtained on myTakeda here. Itemized receipts showing incurred eligible expenses must be attached to the completed form for reimbursement. Claims for reimbursement must be submitted as soon as reasonably practicable and sent to erc@takeda.com. Only an active employee may receive any reimbursements; no reimbursements will be made to an employee after termination of his/her employment.

Employees may wish to consult with a tax advisor to determine any tax obligations related to any reimbursement received under this policy. Takeda will not provide any such information to any employee.

**Employee Assistance Program (EAP)**
Adoption information, support and referral information on locating and selecting licensed adoption agencies and organizations is available through the EAP Program, available 24 hours a day by calling toll-free at 1-800-327-5071.

**Confidential:** The contents of this Manual are confidential and must not be distributed outside of Takeda



## EMPLOYEE ASSISTANCE PROGRAM (WORKPLACE SOLUTIONS)

The Takeda Employee Assistance Program (EAP), administered by Workplace Solutions, offers confidential counseling services* at no cost to you or your eligible family and/or household members. The EAP's team of caring professionals will help you clarify the nature of your concern(s), and present the best options available to meet your needs. This may include consultation, short-term counseling and referrals.

Common concerns include:

- Personal and professional stress
- Relationship difficulties
- Lifestyle or health changes
- Addictive behaviors
- Emotional concerns such as depression and anxiety
- Grief and loss
- Parenting and other family matters
- Any other concerns that may be causing you stress

Many of these situations can be resolved with short-term, solution-focused counseling. If your concern requires more in-depth counseling, you may be referred to a professional counselor on your medical plan for continued help. If this occurs, your expenses would be congruent with your Takeda medical coverage or otherwise elected carrier.

**For more information, contact Workplace Solutions 24/7 at 800-327-5071 or visit: www.wseap.com.**

- **To access the work-life and legal-financial portal enter username: Takeda**

- **To access the LifeSpeak On Demand Portal enter access code: lifespeak**

*Participation is voluntary and confidential. Your confidentiality is protected according to rules established by federal and state law, as well as professional ethical standards. EAP records cannot be shared with anyone, and disclosure of information is prohibited without prior written consent, or as otherwise required by law.*

**Confidential:** The contents of this Manual are confidential and must not be distributed outside of Takeda



**SERVICE CREDIT FOR RE-HIRES**

Regular employees who were initially employed with Takeda for 12 months or longer and who separate their employment with Takeda and are re-hired as regular employees within 24 months of their termination date will be credited with an adjusted service date for the purposes of vacation and other service-based benefits (including severance benefits, if applicable). However, employees returning that have a break in service of more than 24 months will not receive any credit for past service.

Adjusted service date is based on actual time worked. For example, an employee who was hired on 4/1/2015 voluntarily resigns after 5 years of service. The employee is then rehired 18 months later, on 10/1/2021. The employee's original hire date is adjusted forward 18 months, to account for the time the employee was not employed by Takeda.

Original Hire Date: 4/1/2015
Termination Date: 4/1/2020
Rehire Date: 10/1/2021
Adjusted Service Date: 10/1/2016

Regular employees who, as part of a Company-approved move of employment between Takeda and an approved affiliate, join or separate and re-join employment with Takeda with no break(s) in service will be credited with all their service at Takeda and the approved affiliate(s) for the purposes of this benefit. Companies that are wholly owned by Takeda Pharmaceutical Company Limited or one of its wholly owned subsidiaries will normally be deemed approved affiliates for this policy.

No past service will be recognized in the case of a former employee who leaves Takeda and subsequently works for another company that becomes acquired by or merges with Takeda.

The number of vacation days to which re-hired regular employees are entitled to in the calendar year they return will be prorated in the same way that that Company prorates vacation days for new-hires with any partial days being credited to the employees' advantage. However, employees who return in the same calendar year during which they left will not be granted a total number of vacation days more than that to which they would have been entitled had they been employed by Takeda for the entire calendar year.

The service crediting rules for Takeda's Savings and Retirement Plan and other benefit plans may differ and will be governed by those respective plan documents.

**Confidential:** The contents of this Manual are confidential and must not be distributed outside of Takeda

**TUITION REIMBURSEMENT PROGRAM**

Takeda's Tuition Reimbursement Program (the "Program") provides financial assistance to eligible employees who choose to pursue professional development opportunities beneficial to their Takeda careers.

**Eligibility**
To be eligible to enroll and receive reimbursement in the Program, an employee must:

- Be a regular full-time employee who is not on a leave of absence of any kind at the time the employee seeks approval;
- Have an overall performance level that fully meets Company expectations and have no corrective performance or other disciplinary action (including but not limited to Warnings, Counselling Plans (for performance) and/or Performance Improvement Plans) documented in the six (6) months prior to the date the employee requests or receives approval from their manager to participate in a Degree Program or any individual Degree or Non-Degree course[1];
- Pay for the eligible expenses directly themselves; **and**
- Not receive reimbursement for the submitted expenses from any other source.

To be covered under this Program, courses must be:

- Part of an undergraduate or graduate degree program that is job-supportive as determined by the employee's manager in his/her sole discretion; **and**
- Taken at an accredited post-secondary institution listed in the Database of Accredited Programs and Institutions on the U.S. Department of Education's website www.ed.gov or in the Database of Institutions Accredited By Recognized U.S. Accrediting Organizations on the Council for Higher Education Accreditation's website www.chea.org (institutions outside the U.S. which are not listed in either of the above databases may also be approved by an employee's Function Head, in his/her sole discretion)

However, the Program **does not** cover:

- Courses taken for a sport, game or hobby that are not related to a degree program;
- Unaccredited correspondence courses;
- Entrance exams;
- Exam preparatory courses;
- Executive MBA programs;
- Short-term seminars;
- Professional certification programs;
- Training courses; or
- Classes that started prior to the employee's hire date.

**Takeda may pay for seminars and/or training classes, if necessary for an employee's skill development as determined by his/her manager in his/her sole discretion, through a department's training budget. Expenses involved in workshops, seminars, conferences, institutes, courses for which continuing education units (CEUs) are awarded and courses at non-degree-granting institutions, which are**

**Confidential:** The contents of this Manual are confidential and must not be distributed outside of Takeda



**required or approved by management as necessary and/or appropriate for the performance of an employee's job are considered a department expense and are not covered by this Program.**

Eligibility to participate in the Program is conditioned upon an employee's signed agreement to the terms and conditions of Takeda's written repayment agreement.

### Reimbursement
The maximum amount eligible for reimbursement under the Program is $10,000 per calendar year for approved undergraduate and graduate programs.

The Program reimburses 100% for approved courses that are completed with a grade of "C" or better for undergraduate courses and "B" or better for graduate courses. If the course is graded as pass/fail or complete/incomplete, a grade of "pass" or "complete" is required to receive reimbursement.

In addition, to be eligible, courses must not otherwise interfere with an employee's regular work schedule or responsibilities, as determined by Takeda.

**Reimbursement must be requested within ninety (90) days upon completion of each eligible course.**

| Eligible Expenses for Reimbursement | Ineligible Expenses for Reimbursement |
| --- | --- |
| Eligible course tuition | Non-mandatory fees |
| Fees that are mandatory and/or directly related to an eligible course (i.e., registration fees) | Supplies (other than textbooks) retained after <br> Course completion (e.g., calculators, blank disks, computers) |
| Textbooks | Meals, lodging, transportation and parking |
| Lab fees | Late fees, penalties and interest charges |
| Shipping costs related to textbooks/supplies | |

If an employee voluntarily resigns from Takeda or if his/her employment is involuntarily terminated by Takeda (e.g., because of poor performance or policy violation(s)), the employee will not receive reimbursement for any eligible expenses that were not reimbursed prior to the date of the resignation or termination, including preapproved expenses. However, if an employee's employment with Takeda is separated due to the position being eliminated, the employee will remain eligible for reimbursement of pre-approved expenses only.

Employees are required to report amounts paid or otherwise reimbursed to them for scholarships, grants, or other awards or payments for approved courses or related expenses. Such amounts will be deducted from reimbursable expenses. Failure to report such information may result in disciplinary action, up to and including termination of employment.

### Work Schedule Limitations
Participation in this Program should not in any way interfere with an employee's ability to perform his/her job. As such, approved employees may not take a course during scheduled work hours, unless

**Confidential:** The contents of this Manual are confidential and must not be distributed outside of Takeda



approved by the employee's manager and Human Resources. Further, such employees are not eligible for overtime for any time spent attending any course scheduled to take place during working hours and, in their manager's discretion, may not be permitted to work overtime hours as a result of course attendance during scheduled work hours.

## Tax Implications

At the time of this writing, reimbursement for Program expenses is federal income tax-exempt to a maximum of $5,250 per calendar year per the Internal Revenue Code. Federal, state and local tax laws and regulations may differ and are subject to change. Takeda will not provide any tax relief related to an employee's receipt of reimbursement for Program expenses more than the applicable tax-exemptions under any circumstances. Employees should consult with their tax advisor regarding the tax implications of any amounts reimbursed under the Program or to determine any tax obligations related to any reimbursement they receive under this policy.

## Repayment Clause

If an employee voluntarily resigns his/her employment with Takeda within twelve (12) months of receiving a reimbursement under the Program, the employee is obligated to repay Takeda all amounts, paid under the Program (whether paid to the employee or on his/her behalf) within the twelve (12) month period, **prior** to the termination date of the employee's employment. Eligibility to participate in the Program is conditioned upon an employee's signed agreement to the terms and conditions of Takeda's written repayment agreement.

Takeda reserves the right, in its sole discretion and at any time, to supplement, change, suspend, interpret and/or cancel this Program, in whole or in part. Takeda reserves the right in its sole discretion to revoke its approval of any pre-approved expense in response to a change in the employee's or the applicable expense's eligibility hereunder.

---

[1] *If an employee does not have six (6) months of Takeda employment history with Takeda at the time of the request, the employee's manager and Human Resources must review the request and determine whether an exception will be made to this requirement.*

**Confidential:** The contents of this Manual are confidential and must not be distributed outside of Takeda



**SAFE RIDE HOME PROGRAM**

If any employee is unable to drive home safely at any time for any reason, Takeda offers the Safe Ride Home Program. This Program provides reimbursement for transportation if an employee encounters unexpected car problems and/or other emergencies and needs a ride home. Through this Program, Takeda will reimburse the employee for his/her taxi fare or ride sharing service to home only.

This Program is intended to aid in emergency situations when alternate transportation is not available; it is not intended to serve as a planned form of transportation. Scheduling a taxi ride in advance, for example, would be considered an inappropriate use of the Safe Ride Home Program. Abuse of this Program may result in the suspension of an employee's use of the Program.

**Requesting Reimbursement**
To receive reimbursement, employees must submit a detailed receipt including their name, date and time of the ride, total fare amount, and approximate location of the pick-up and drop-off to erc@takeda.com

Appropriate use of the Program will not be disclosed by Human Resources to an employee's manager.

**Confidential:** The contents of this Manual are confidential and must not be distributed outside of Takeda


**INCLEMENT WEATHER POLICY**

Takeda's offices are always open, except in the event of a natural disaster.

All Takeda office based employees will receive timely recommendations via email regarding late arrival, early dismissal or work-at-home options due to hazardous weather conditions.  Takeda consults the recommendations of local emergency management organizations regarding such weather advisories.

All Takeda employees regardless of their work location should always take special precaution when driving to work on any day that the weather is hazardous.  Our policy is that employees should use their good judgment about leaving early or coming to work during inclement weather.  Employees should not risk their safety, and should take personal considerations (such as using public transportation instead of a car, distance where one lives, etc.) into account when making decisions about whether to work remotely or come into the office when hazardous weather conditions exist.

All office based Takeda employees must talk with their managers about any scheduling changes or, if more appropriate, working from home if severe weather conditions warrant such an arrangement. Additionally, if schools are closed, office based employees should also discuss alternative work arrangements available with their managers.

For the field sales organization, managers will provide additional direction and employees are responsible for consulting with their managers first before deviating from their normal schedules.

**Confidential:** The contents of this Manual are confidential and must not be distributed outside of Takeda



**COMPANY SECURITY INSPECTIONS**

The safety and security of property and premises owned, leased or used by Takeda is very important. To that end, Takeda reserves the right to inspect and search all areas owned, leased or used at any time by Takeda without notice, and to question individuals on Company premises in Takeda's sole discretion.

Company-authorized personnel may, from time to time, conduct searches, of areas, including but not limited to, offices and other workspaces, meeting rooms, telephones, files, file cabinets, desks, production areas, warehouses, closets, lockers, storage areas, restrooms, and all other areas of facilities, premises and vehicles as well as the person, vehicles, purses, packages, parcels and other containers, and devices of individuals entering, leaving or located on Company premises. Consequently, employees should have no expectation that any of these areas, objects or personal property brought onto Company premises will be private. Cooperation with Company security inspections, including of an employee's personal property, is required as a condition of continued employment. In limited circumstances, these inspections and searches may include use of live, photographic and/or video surveillance, conducted in accordance with applicable law. Takeda may conduct these investigations, inspections, searches and surveillance to detect illegal or unauthorized drugs and drug paraphernalia, alcohol, weapons, removal of Company property, or for other reasons in Takeda's sole discretion. For these reasons, Takeda keeps duplicates of all keys issued to its employees.

Additionally, employees should have no expectation that any electronic communications or transmissions (i.e., email, Internet usage, text messages, postings, photographs, instant messages, mobile phone records) conducted on Company issued or managed devices will be private. Any electronic communications or transmissions sent or received by an employee on a Company issued or managed device is subject to Company review at any time, regardless of who pays the expenses for such device.

**By accepting use of Takeda issued or managed device, you consent to the review and monitoring of such use and the release of your records related to the device to Takeda by any third-party service provider.**

Please leave valuable items at home. Takeda is not responsible for the loss, theft or damage of any property brought on the premises, left in Company vehicles, lost while engaged in Company related travel, and/or lost while attending Company-sponsored events. Additionally, employees should report any suspicious activity observed to their manager or to Takeda Security at 1-877-TAKEDA-0 (1-877-825-3320).

**Confidential:** The contents of this Manual are confidential and must not be distributed outside of Takeda



**WORKPLACE SAFETY & ACCIDENT REPORTING**

Takeda is committed to providing employees with a work environment that is conducive to safe, effective, and productive job performance. The health and safety of employees is a priority. All employees must follow safe working practices and instruct others to work safely. Failure to comply with Takeda's safety measures will not be tolerated under any circumstances.

Employee safety is and will remain an integral part of our operation. The administration of the program is assigned to Takeda's Managers. Managers have full responsibility to enforce the safe job procedures developed for each job function and to develop additional measures and training, as needed, depending on the type of work being performed and potential safety issues implicated. Prevention of injuries in our operation is only possible through a team effort doing everything possible to provide a safe working environment. As such, all employees are expected to do everything possible to avoid creating conditions that can result in injury.

Employees are expected to follow all applicable safety procedures and when uncertain of the safe way to do the job, ask for help. Employees should inform their Managers of any perceived hazards immediately. Each employee is also expected to comply with Takeda's safety program outlined below. Some Takeda locations will have specific departments and/or committees which are focused on local lab or manufacturing safety issues. Those groups may also monitor, train, and/or provide recommendations relating to the site's compliance with Company standards and applicable laws. Employees are expected to abide by all local rules/requirements set forth by those groups and to the extent that the instructions described below differ in any manner, local rules should be followed.

<u>Safety</u>
By using good judgment, following proper safety procedures when lifting and carrying heavy objects, and operating equipment properly, employees will help Takeda meet its objective of preventing personal injury and property damage. The following are a few of the safety guidelines employees must follow:
- Report any unsafe or hazardous condition immediately to Human Resources or Security. Reports and concerns about a workplace health and safety issue or the existence of a hazardous condition or practice in the workplace may be made anonymously by contacting the Ethics line electronically at www.takeda.ethicspoint.com or via phone at 1-888-TAKEDA-0 (1-888-825-3320). Takeda will not retaliate against any employee who makes a good-faith report of safety or health concerns either internally or externally.
- Comply with Takeda's safety rules always.
- Do not operate defective equipment, and report all equipment defects to a Human Resources Representative immediately. Under no circumstance should any repairs be attempted by anyone other than authorized maintenance personnel. It is the employee's responsibility not to operate defective equipment.
- Notify Security of any emergency.
- Avoid awkward positions when bending, stooping, or turning.
- Request assistance when lifting, pushing, or carrying heavy objects.
- Be cautious in the use of extension cords and multi-unit plugs.
- Do not leave any obstructions on the floor. General housekeeping is each employee's responsibility.
- Do not block any exit doors or electrical panels.

**Confidential:** The contents of this Manual are confidential and must not be distributed outside of Takeda



- Know the location, contents, and use of first aid, fire equipment, and other safety equipment.

Employees who violate health and safety standards, who cause hazardous situations, who fail to participate in required training and/or abide by instructions, or who fail to report or, when appropriate, remedy such situations may be subject to disciplinary action, up to and including termination of employment.

## On the Job Accidents/Reporting Procedures

- All accidents involving Company-provided vehicles, regardless of fault or degree of damage, must be reported to the police immediately. A police report must be obtained unless the accident occurs on private property and local law enforcement does not make private property reports. In that situation, the employee is required to report to a local police station to complete a "counter" or "incident report" prior to the end of his/her workday. Please note that incidents involving minimal property damage (i.e., driving over someone's lawn) may not necessarily require a police report.

- All incidents and/or accidents occurring during work time (including all vehicle accidents), illnesses and injuries, regardless of type or severity, must be immediately reported to an employee's manager and to Takeda's third-party administer, CorVel at 877-764-3574, available twenty-four hours a day/7 days a week.

- As part of any accident investigation, all employees involved in the industrial injury may be required to submit to a post-accident drug test if Takeda reasonably suspects that an employee's impairment from drugs or alcohol may have been a factor in the injury.

- Managers will be required to make a written report of the on-the-job injury/illness on the required forms. These forms must be completed immediately and submitted to Risk Management. Additional paperwork may be required depending on local site rules.
- Takeda maintains all required logs and reports, posts appropriate notices on the bulletin boards, and ensures that notices are current and adequate. Takeda also prepares required annual reports to federal and state agencies regarding workplace accidents and/or injuries.

## Medical Emergencies, First Aid

An employee should contact 911 for any life threatening medical condition during or after work hours. Local sites may also have additional instructions for injury response assistance. Managers who are made aware of an emergency medical situation should also notify Security and Human Resources. First aid kits are located within Takeda facilities.

## Ergonomics

Takeda believes that reduction of ergonomic risk is instrumental in maintaining an environment of personal safety and well-being, and is essential to our business. We desire to create a risk-free environment. Questions regarding ergonomics should be directed to the Employee Resource Center and will be accommodated to the extent possible.

## Emergency Action

Employees are required to know the location of all emergency exits in their work area and the routes to these exits.

**Confidential:** The contents of this Manual are confidential and must not be distributed outside of Takeda



Employees are also to know the location of all alarms and fire extinguishers and become familiar with the proper use of emergency equipment should the need ever arise.  Employees are also to review and become familiar with Takeda's emergency evacuation plan and to clarify any unclear aspect of Takeda's emergency procedures with their Manager, a Human Resources Representative, Facilities and/or Safety (depending on worksite location).

## Emergency Closing

At times, emergencies such as severe weather, fires, power failures, earthquakes, or planned/unplanned civil disturbances can disrupt Company operations.  In extreme cases, these circumstances may require the temporary closing of Takeda.

When the decision to close is made, employees will receive official notification, and time worked by non-exempt employees will be paid (non-exempt employees pay will not be reduced for time not worked during these circumstances, unless permitted by applicable law).

## Reporting Unsafe Conditions

If, through an employee's own observation or otherwise, he/she believes that anyone is acting in violation of this policy and/or that Company premises may be in an unsafe condition, the employee must report it immediately to his/her Manager, Human Resources Representative or to Takeda's US Compliance Officer. If an employee prefers to report the behavior to a third party outside of Takeda, he/she may call the Ethics Line at 1-888-825-3320.

Do not allow an inappropriate situation to continue by not reporting it, regardless of who is creating that situation. No Takeda employee is exempt from this policy. Failure to report a violation of this policy may result in disciplinary action, up to and including termination of employment.

## Investigation of Complaints

Takeda will take prompt investigative action and implement appropriate corrective and preventative measures in response to inappropriate behavior that comes to its attention. Takeda will endeavor to maintain the confidentiality of any complaint and investigation to the extent it is feasible. However, Takeda retains the right to inform persons it deems to have a need to know and to utilize information obtained during the investigation for legitimate business purposes.

As soon as practical after the investigation concludes, Takeda will determine whether this policy has been violated. An employee who engages in objectionable or other conduct in violation of this policy will be subject to disciplinary action up to and including termination of employment.

## Non-Retaliation

Takeda wants employees to report potential violations of this policy without fear of retribution. Any retaliation against any employee or individual for the good-faith reporting of unsafe working conditions, or for participating in any investigation, will not be tolerated and should be reported immediately using the reporting procedure described above. Any employee who engages in any form of retaliation because of a complaint made or participation in an investigation under this policy will be subject to appropriate disciplinary action up to and including termination of employment.

**Confidential:** The contents of this Manual are confidential and must not be distributed outside of Takeda

**DISTRIBUTION AND SOLICITATION**

To avoid work disruptions and possible discord between employees, Takeda prohibits employees from soliciting other employees or distributing literature about unauthorized, non-work-related causes, commercial pursuits, groups, or interests in working areas during work time. Solicitation, distribution of literature, or trespassing by non-employees, including contractors and vendors, is prohibited always on Company property, including parking lots.

Nothing within this policy is intended to interfere with and/or impede employees in the exercise of their rights under applicable federal and/or state law, including their right to engage in protected concerted activity.

**Prohibited Solicitation and Distribution**

Prohibited solicitation includes, but is not limited to: asking employees for funds or contributions for unauthorized causes; offering goods for sale for commercial purposes; asking employees to sign a petition; requesting employees to join or become a member of a group; soliciting an employee's support for a political candidate; or otherwise requesting employees' support or commitment with respect to causes, groups, or interests in working areas and while on working time.

Distribution includes handing out or posting literature in the workplace. Distribution is prohibited in working areas always.

Here are a few examples of what's okay and what's not under the Policy:

**Okay**
- Placing a sign-up sheet in break rooms for a non-profit fundraiser (e.g. an order form for Girl Scout cookies)
- While on a lunch break in the lunch room or cafeteria, asking others on their lunch breaks if they would like to contribute to a charitable cause or purchase items for non-profit fundraisers – so long as such solicitations do not disrupt or interfere with the other employees' enjoyment of their break or meal
- Encouraging your immediate team or department to participate in a team-building charitable activity such as a book drive. These activities are limited to your immediate team or department and participation must be optional.
- Asking employees to join a Takeda-sponsored group or activity (e.g., membership drives or personal invitations to join an Employee Resource Group; letting employees know you're gathering a team for the Crohn's & Colitis Foundation or NAMI races and inviting them to participate)
- Asking employees to sponsor you as a participant in a Takeda-sponsored run, walk, or another event. Please be clear in your request that the event is Takeda-sponsored and be mindful not to ask repeatedly.

**Not Okay**
- Asking employees to contribute to or purchase anything, including any of the "okay" items listed above during working time or in working areas (regardless of if it is during working time).
- Interrupting another employee's working time, even if it is during your work break

**Confidential:** The contents of this Manual are confidential and must not be distributed outside of Takeda



- Asking employees to sign a petition or become a member of a group that is not Takeda-sponsored during working time or in working areas.
- Otherwise requesting employees' support or commitment to outside causes, groups, or interests in working areas and while on working time in working areas, unless excepted above.
- Initiating or advertising a supply drive or other charitable activity that involves the entire campus. Exceptions are made for select charitable programs and events that are managed or approved by Corporate Communications.
- Distributing or posting literature in the workplace during working time or in working areas.

## Working-Hour Restrictions

Employees are prohibited from unauthorized solicitation of other employees or distributing literature during working time (i.e., time when employees are performing Takeda duties). Employees can use their meal and/or break periods or time before or after work for personal purposes, including solicitation, but such activities must not disrupt or interfere with ongoing Takeda operations or other employees' enjoyment of their break or meal periods, or other employees' working time.

## Working Area Restriction

Distribution of literature or other propaganda is prohibited always in work areas, whether or not it is during working time. "Working areas" include all areas where employees are engaged in working tasks, excluding, for example, break and lunch areas.

## Use of Takeda Assets

Employees are strictly prohibited from using Takeda-provided assets about any unauthorized solicitation or literature distribution activities. This restriction applies regardless of whether employees are on or off-duty, whether the activities are conducted during working or non-working hours, or whether the activities are located on or off Takeda premises. For purposes of this restriction, Takeda-provided assets include, but are not limited to computers, telephones, e-mail, fax machines, interoffice mail, voice mail, blogs, websites, and photocopiers.

Notwithstanding this policy, in support of its efforts to give back to the communities in which our employees and patients live and work and its long-standing focus on good corporate citizenship, Takeda may sponsor a small number of beneficent acts in the workplace throughout the year. Further, this policy does not restrict Takeda from soliciting for Company-sponsored events and/or programs or from soliciting or distributing literature concerning a limited number of programs approved by Takeda.

Questions regarding these acts or information regarding the Takeda Matching Gift Program (through which Takeda provides financial support to qualifying non-profit organizations recognized by its employees), should be directed to Takeda's Corporate Communications Department.

**Confidential:** The contents of this Manual are confidential and must not be distributed outside of Takeda



## ELECTRONIC COMMUNICATIONS

Through its information technology and communications infrastructure, Takeda provides employees with many hardware, software, and information resources, including computers, copy machines, fax machines, e-mail, software applications, Internet access, telephones, and a telephone communications network including voice mail, mobile devices and other resources (collectively "IT resources"), with the purpose of assisting in and improving the ability to conduct Company business.

Takeda encourages the use of its IT resources to further Takeda's business goals. Incidental use of the IT resources for personal use is also acceptable if it does not impact productivity. In addition, text and instant messaging may be used for logistical purposes (i.e. confirming a meeting time or place). However, the use of text or instant messaging for substantive business content is strictly prohibited. **If an employee's use of text messaging results in content that is subject to a Company Legal Hold, such content must be retained and cannot be destroyed. Takeda retains the right to collect individual devices and image such content.**

In all cases, employees must use the IT resources responsibly and in compliance with this and other applicable Company policies. This policy applies to all employees, as well as any other individuals who use the IT resources at any time or place. Takeda may refuse or withdraw an employee's access to any and/or all IT resources at any time at the sole discretion of Takeda without notice.

All business and personal information sent, received, or retrieved through, or contained in Takeda's IT resources is the property of Takeda and is not private to any employee, to the extent permitted under applicable law. Employees should have no expectation that any use of any of Takeda's IT resources will be private. Accordingly, Takeda reserves complete discretion, in accordance with applicable laws and regulations, to monitor, track, intercept, retrieve, record, review and/or, disclose to third parties, the fact of or the details of employees' use of Takeda's IT resources (including but not limited to voice mail, e-mail, documents, Internet access, Internet site visits and other Internet access data, including files or messages which have been composed, sent, downloaded or received on the systems) without prior notice at any time and for any purpose, including, without limitation by example, to determine compliance with Company policies, respond to lawful subpoenas or court orders, investigate alleged or suspected misconduct, locate information, monitor a system, and/or monitor an employee's workflow or productivity.

Passwords are designed to maintain a level of confidentiality and integrity to the business-related information contained in Takeda's IT resources systems. Employees are expected to maintain their passwords as confidential and not to share them with anyone (i.e., if an IT staff person needs to access an employee's computer to resolve a technology support problem, the employee should enter his/her password for the staff person and/or change the password immediately after the staff person resolves the problem). However, passwords are not designed to provide privacy to employees regarding their personal or business use of any IT resources or their personal or business messages, data or documents stored on the IT resources. As such, Takeda reserves the right to require the disclosure of an employee's password on any IT resource, to the extent permissible by law. Further, Takeda reserves the right to override any such password on any IT resource at any time, and for any purpose, without notice to the employee.

**Confidential:** The contents of this Manual are confidential and must not be distributed outside of Takeda



Every employee must properly manage Takeda's paper and electronic records and non-records, including but not limited to all electronic communication records, in the ordinary course of business and in accordance with approved retention schedules, corporate Policies, legal holds and corporate standard/business operating procedures, including, without limitation by example, Takeda's Corporate Records Retention Schedules. Failure to comply with these important policies and procedures will result in disciplinary action up to and including termination of employment.

All use of Takeda's IT resources must also be consistent with Takeda's policies regarding workplace conduct. Without limitation by example, Takeda's IT resources shall not be used in violation of Takeda's Professional Conduct and Prohibition Against Discrimination and Harassment Policy and/or to transmit, receive or store information that is sexually explicit, vulgar, profane, insulting, offensive, discriminatory, defamatory or harassing in any way. The following actions are also prohibited by this policy:

- Attempting to modify or remove computer equipment, software, or peripherals without proper authorization;
- Accessing computers, software, information or networks without proper authorization;
- Taking actions, which interfere with another's access to information systems without proper authorization;
- Circumventing log on or other security measures without proper authorization;
- Using information systems for any illegal or unauthorized purpose;
- Using Takeda's IT resources to send a fraudulent communication, including, without limitation by example, intentionally sending a communication under a false, assumed or misleading identity;
- Violating any software license or copyright, including copying or redistributing copyrighted software, without the written authorization of the software owner;
- Using Takeda's IT resources to violate the property rights of any author or copyright owner;
- Using Takeda's IT resources in violation of Takeda's workplace violence policies;
- Using Takeda's IT resources to disclose Company proprietary information without proper authorization;
- Using Takeda's IT resources to violate Takeda's Social Media Activities policy;
- Violation of and/or failure to fully comply with Takeda's Corporate Records Retention Schedules and other policies and/or standard/business operating procedures relating to records retention;
- Accessing and/or reading another user's information or files without permission;
- Forging, fraudulently altering or falsifying, or otherwise misusing Company records (including, without limitation by example, computerized records, permits, identification cards, or other documents or property);
- Knowingly running or installing on any computer system or network, or giving to another user, a program intended solely for or negligently resulting in damaging or placing excessive load on a computer system or network, including but not limited to computer viruses, Trojan horses, worms, bots, flash programs or password cracking programs;
- Downloading, transporting, or posting illegal, proprietary or damaging material to a Company computer;
- Violating any state or federal law or regulation about the use of any of Takeda's IT resources.

Employees must use only those IT resources that have been approved by Takeda to conduct Company business. They should not use personal email accounts or messaging systems (e.g., Gmail, Yahoo, AOL, Hotmail, etc.) to conduct Company business except in extraordinary circumstances (e.g., when no

**Confidential:** The contents of this Manual are confidential and must not be distributed outside of Takeda



reasonable communications alternative is available) and only with prior Company approval. However, employees may use Company accounts on external email or messaging systems but only to conduct Company business and only when previously authorized by Takeda's IT department. Company information must not be sent over the Internet using an unsecured network connection and employees must use only Company-provided IT resources to access/store any Company confidential data. E-mail addresses used from Takeda's e-mail address list (e.g., Microsoft Outlook Global Address List) can be considered safe for secure e-mail.

Keep in mind that electronic communications such as emails have the potential to be forwarded to unintended recipients and may be retrieved long after they are received, sent, deleted or trashed. As such, all electronic communications such as emails and postings should be written with as much care and sensitivity as a hard copy written communication.

Employees must not use Takeda's IT resources to send or forward personal e-mail, voice or other messages that could adversely impact the prompt delivery of e-mail, voice or other messages on Takeda's IT resources system, such as messages to a very large number of recipients, or messages with large graphic files, pictures or programs attached. Employees may access streaming audio and/or video using the IT resources for business purposes only. Takeda reserves the right to deny and/or immediately disable access to streaming audio and/or video without notice. Additional prohibited uses of IT resources include, but are not limited to, sending or forwarding chain letters, advertising for personal enterprises, downloading executable files (e.g., files ending in ".exe") unrelated to a business purpose, wagers, soliciting for non-Company purposes, or communications that are illegal or related to any unlawful purpose.

Takeda reserves the right to limit and/or reduce the size of all employees' electronic mailboxes without notice. Thus, employees must monitor and limit the number and size of email messages saved in their various electronic mailboxes (e.g., "In Box" and "Sent" files). Takeda reserves the right in its sole discretion to delete stored email messages or prevent incoming messages without notice due to lack of storage space in either Takeda's or the employee's system or for any other reason.

To promote a safe and secure environment that encourages Takeda employees to engage in a free dialogue and exchange of ideas and information during Company business, it is also against Company policy for employees to record conversations or actions of any persons or areas by audiotape, videotape, photographic or other recording device without both the advance approval of a Manager at the Director Level or above and the express consent of all individuals who may be recorded. This policy does not prohibit Takeda's use of security surveillance systems or Takeda's open recording of Company events for promotional, historical or other legitimate business purposes as determined by Takeda and approved by a Manager at the Director Level or above.

Takeda may also filter and/or restrict Internet use, so that all or any number of employees will not have access to certain sites as determined by Takeda in its sole discretion. Should an employee be denied access to a website needed for business-related purposes, he/she should contact the IT Helpdesk. Employees must not under any circumstances access websites or telephone lines (whether or not filtered) that contain offensive materials or download offensive materials from or post or leave any types of messages or materials on these types of websites or telephone lines using Takeda's IT resources.

**Confidential:** The contents of this Manual are confidential and must not be distributed outside of Takeda



The value and portability of laptops, iPads, cell phones and other IT resources make them an attractive target for theft. Employees provided with IT resources are responsible for maintaining the resources securely both inside and outside the office. If an employee's laptop, or other IT resource, is misplaced, stolen or damaged, he/she must report it immediately. This includes personally owned devices used to store company information, such as e-mail. U.S. copyright laws make no distinction between duplicating software for sale or for free distribution. The law protects the exclusive rights of the copyright holder and does not give users the right to copy software. To ensure that all employees understand the importance of not using unauthorized copies of proprietary software, the following software policy will be enforced:

• Takeda licenses the use of computer software from a variety of outside companies. Takeda does not own this software or its related documentation and, unless authorized by the software developer, Takeda and its employees do not have the right to reproduce it.
• Regarding use on multiple machines, employees shall use the software only in accordance with the license agreement.
• Takeda prohibits the illegal duplication of software. Employees who make, acquire, or use unauthorized copies of computer software shall be subject to disciplinary action up to and including termination of employment.
• Employees who learn of any misuse of software or related documentation within Takeda must notify their Supervisor or Manager or Takeda's Vice President, Information Technology.
• Takeda may implement system policies that prevent installation and/or use of personally owned software / peripherals on Company-provided computing devices at will.
• Where permitted for incidental personal use, Employees may install legal software on Company-provided computing devices. Takeda will not provide employees with any support for such software.
• Takeda does not reimburse for and/or return personally owned software to employees. Employees are responsible for ensuring that they have a valid license to install and/or use the software they install.

Takeda reserves the right to inspect all its IT resources without notice at any time to ensure compliance with all applicable software licenses and with this policy. Any electronic communications or transmissions sent or received by an employee on a Company issued or managed IT resource is subject to Company review at any time, regardless of who pays the expenses for such resources. Violations of this policy will result in disciplinary action up to and including termination of employment. Any questions as to the appropriateness of any use of IT resources should be addressed to a Human Resources Representative.

**By accepting use of Takeda issued resources, employees consent to the review and monitoring of such use and the release of any records related to the resource to Takeda by any third-party service provider.**

**Confidential:** The contents of this Manual are confidential and must not be distributed outside of Takeda



**TAKEDA CODE OF CONDUCT**

The Takeda Global Code of Conduct (the "Code"), which is incorporated in the Human Resources Policies and Procedure Manual by this reference, is a statement of the policies and procedures of Takeda for conducting its business in accordance with applicable laws and the highest ethical standards.

It is every employee's obligation to read, understand and, always, fully comply with the Code. The Code may be updated from time-to-time and employees are responsible for keeping up with those updates.

To access the Code, please click here.

**Confidential:** The contents of this Manual are confidential and must not be distributed outside of Takeda



## COMPANY STANDARDS OF CONDUCT AND WORK RULES

While on duty, conducting Takeda business, at Takeda-sponsored events, and/or on Takeda premises, all employees must conduct themselves in a professional and business-like manner. An employee must also treat Takeda's employees, customers, vendors and other business contacts with courtesy and respect.

If an employee's performance, attendance, or conduct violates Takeda's standards and/or rules, disciplinary action may be taken, up to and including termination of employment.  Whether and/or how Takeda chooses to administer employee discipline in no way alters or limits the at-will employment relationship defined in this Manual.

Takeda has established several guidelines concerning standards of conduct and work rules for the benefit and protection of the rights and safety of all employees. While not exhaustive, examples of behaviors that may result in disciplinary action up to and including termination of employment (even for a single offense) are listed below.  Nothing in this list is meant to impede on an employee's ability to engaged in concerted activity protected under the National Labor Relations Act, or any other federal, state or local law.

- Insubordination, including behaving disrespectfully and/or disregarding a manager's instruction;
- Refusal to cooperate with or failing to provide accurate or thorough information during an internal or external investigation;
- Causing damage to Company or employee property, or physical injury to employees;
- Obscene, abusive, threatening or indecent behavior, language or gestures;
- Fighting, threatening, coercing or interfering with, or harassing fellow employees, visitors, customers, vendors, or other individuals while at work, on Company premises, or while performing approved Company business;
- Possession or concealment of a firearm or other weapon or incendiary material on Company premises, during working hours, or while performing approved Company business, or other violation of Takeda's Policy Against Workplace Violence;
- Theft, attempted theft, or unauthorized borrowing of property of Takeda, its customers, vendors, employees, or others;
- Actions which result in and/or give the appearance of being motivated by an employee's desire for inappropriate personal financial gain for themselves and/or others;
- Misappropriation or misuse of Company funds or other assets;
- Oral or written dishonesty or misrepresentation; including falsification of reports, including expense reports, records, including time records, or other Company documents or deliberate failure to accurately complete such records, reports and/or documents.
- Oral or written misrepresentation of work history, background or qualifications in the employment application process, including, but not limited to the employment application and/or resume (whether discovered prior to or after hiring);
- Falsification of illness or injuries, filing fraudulent or misleading reports or other documents, or any other misrepresentation about a claim for any insurance or other employee benefit including, but not limited to medical or dental insurance, workers' compensation claims, short-term or long-term disability benefits, and/or leaves of absence;
- Soliciting or accepting gratuities from customers, vendors, or clients;

**Confidential:** The contents of this Manual are confidential and must not be distributed outside of Takeda



- Unauthorized disclosure of confidential and/or proprietary information, including but not limited to price lists, client lists, order guides, and employee information;
- Gambling on Company premises;
- Reporting to work (including participating in business related travel and/or meetings) in an unsafe condition, which may include but is not limited to, being under the influence of alcoholic beverages or drugs;
- Sale, possession or use of illegal drugs while at work or other violations of Takeda's Drug- and Alcohol-Free Workplace Policy;
- Action that damages or has the potential to damage Takeda's business, reputation or good standing regardless of whether such actions occurred during working hours (unless prohibited by applicable law);
- Violation of Takeda's anti-harassment and anti-discrimination policies or retaliation against an employee who has in good faith complained about discrimination or harassment;
- Excessive and unexcused tardiness or absenteeism and/or failure to report absences in accordance with Company policies and procedures;
- Failure to return from an authorized leave of absence on the first workday following the end of the leave unless otherwise approved;
- Smoking in unauthorized locations;
- Sleeping while on duty;
- Failure to perform duties required by an employee's job description or job assignment;
- Failure to maintain work quality and/or productivity or otherwise meet Takeda's performance standards;
- Failure to behave in a professional manner at any time during Company-related business;
- Rude or discourteous behavior toward Takeda's employees, customers, vendors or other business contacts;
- Operating Company equipment and/or vehicles in an unsafe, negligent, or destructive manner or other unauthorized use of a Company vehicle;
- Failure to report an accident of any kind or severity as promptly as is possible under the circumstances and/or in accordance with applicable Company policies and procedures;
- Deliberate or careless conduct endangering the safety of self or others;
- Violation of safety policies and procedures;
- Smoking in an undesignated area;
- Unauthorized use of Takeda's telephone, computer, text, e-mail, voicemail, internet, website, blogs, social media, or other violation of Takeda's Electronic Communications Policy;
- Working unauthorized overtime;
- Violation of Takeda's Global Social Media policy and local applicable guidance;
- Violation of Takeda's Global Code of Conduct;
- Violation of Takeda's Compliance Policies, if applicable;
- Violation of any other Company policy even if not specifically articulated in this list; and/or
- Commission of any similar or comparable act or offense.

Without limitation by example, as a rule, any conduct which represents a serious risk to the normal functioning of Takeda will result in a termination of employment the first time it occurs. This includes, but is not limited to, conduct which affects the security and safety of other persons; conduct which impedes the normal operation of Takeda business; and conduct which might pose a risk to Takeda if it waits to see whether the employee will again engage in the same conduct.

**Confidential:** The contents of this Manual are confidential and must not be distributed outside of Takeda



These rules are published for an employee's information and protection. Ignorance of any work rule and/or policy is not an acceptable excuse for violating them. It is every employee's responsibility to know the work rules and policies that apply to them and to fully comply with them.

Questions about any policy or procedure and/or its applicability should be discussed immediately with an employee's manager and/or Human Resources Representative.

**Confidential:** The contents of this Manual are confidential and must not be distributed outside of Takeda



**ABSENCES OR TARDINESS**

Excellent attendance and punctuality always is an essential part of any Takeda employee's job. Employees are responsible for behaving in accordance with that expectation.

If an employee will be late or absent on a scheduled workday, the employee must personally notify his/her manager with as much notice as possible (but no later than 9 a.m. on a scheduled workday), give the reason for the absence or tardiness, and provide an estimate as to when he/she expects to arrive or return to work.

Further, employees are required to call their manager every day that they do not report to work, except if they are on an approved leave of absence. Managers may impose additional reasonable notification requirements as necessary.

An employee's tardiness/absence may be paid or unpaid and may or may not be excused, depending on the circumstances and consistent with federal, state, and local laws.

Excessive tardiness and/or absenteeism, failure to provide sufficient notice of tardiness/absence, and/or failure to abide by any other Company policies regarding attendance/tardiness may result in disciplinary action up to and including termination of employment. Additionally, an employee's failure to report for work when specifically instructed and/or provide the required daily notice to his/her manager for three consecutive workdays will be deemed a resignation of employment, absent extenuating circumstances that would reasonably prevent the employee from meeting notification requirements.

If an absence is due to an employee's own or family member's illness or injury, Takeda may request appropriate medical documentation to support the need for the employee's absence. Depending on the length and circumstances of any absence due to an employee's own illness or injury, Takeda may also require a physician's written release before the employee may return to work. Failure to provide required medical documentation may result in a denial of any applicable benefits and/or disciplinary action up to and including termination of employment.

**Confidential:** The contents of this Manual are confidential and must not be distributed outside of Takeda



**PROFESSIONAL DRESS AND APPEARANCE**

At Takeda, we strive to provide a professional, comfortable and productive workplace. At all Takeda U.S. sites, the workday dress code is business appropriate, which means employees should use good judgment and dress in a way that best fits their location and schedule for the day. Jeans may be appropriate any day of the week.

A couple exceptions to the rule . . .
- Field employees who interact with customers are required to wear traditional business attire.
- Employees who work in the lab are required to follow the locally-defined protective clothing requirements for their work area always. Please refer to our Workplace Safety (OSHA) policy or contact your Local HR representatives if you have questions about those requirements.

Managers are responsible for supporting dress and appearance standards among their teams. This may include counselling employees as needed. For your reference, examples of inappropriate workplace attire include:
- Overly revealing items such as very low-cut necklines, revealing a bare midriff, excessively short shorts or skirts, halter tops, or spandex
- Wearing ragged or tattered items, or overly casual clothing such as sweatpants, sweatshirts, or other athletic gear

Employees who do not abide by these rules may be disciplined and asked to immediately change their clothing.

Note: Employees who may require an accommodation to these guidelines due to bona fide religious beliefs and/or a qualifying disability should contact the Employee Resource Center at erc@takeda.com

**Confidential:** The contents of this Manual are confidential and must not be distributed outside of Takeda



**DRUG- AND ALCOHOL-FREE WORKPLACE**

Takeda's Drug and Alcohol-Free Workplace Policy, which prohibits employees from working while under the influence of illegal drugs and/or alcohol, is designed to promote Takeda's goal of providing a safe, healthy and productive work environment.

Takeda's Fleet Policy contains additional related provisions applicable to employees who are granted Company vehicle driving privileges. Takeda's Fleet Policy is located on myTakeda here.

If state and/or local law conflicts with this policy or includes additional rights and/or obligations, the applicable state or local law will govern.

## Definitions

Illegal Drug: The term "illegal drug" includes all controlled substances illegal under federal law, including look-alike, synthetic and designer drugs, drug paraphernalia, and prescription medications which have not been prescribed for current use by an authorized medical practitioner and/or which are being used contrary to the prescribing physician's instructions.

Under the Influence: Whether an employee is "under the influence" will be determined by Takeda in its sole discretion by any number of means but will be presumed when there is evidence of:
• In the case of alcohol, a breath-alcohol concentration of 0.08 percent or more; and
• In the case of an illegal drug, the presence of the drug or its metabolites in the employee's urine.

## Rules

- Performing work (onsite or offsite) under the influence is prohibited.
- The actual or attempted possession, use, consumption, distribution, transfer, sale, purchase, manufacture or transportation of an illegal drug on Company premises, during working hours, or while on Company business is prohibited.
- The actual or attempted possession, use, consumption, distribution, transfer, sale, purchase, manufacture or transportation of alcohol on Company premises is prohibited; except that the limited, responsible consumption of alcohol served by Takeda on Company premises during a Company sponsored event that has been authorized in advance by a Function Head or above is permitted so long as it does not otherwise violate this policy.
- The limited, responsible consumption of alcohol off Company premises during business or social undertakings of Takeda is permitted so long as it does not otherwise violate this policy.
- Refusing to submit breath and/or urine specimens for testing when requested, to sign a chain of custody form, or to otherwise cooperate with testing or inspection procedures will be treated as insubordination and a positive result.

## Consequences of a Rule Violation

Violation of any of these rules will result in disciplinary action up to and including termination of employment. **Additionally, Takeda will notify appropriate governmental agencies, if legally required, of any behavior in the workplace which results in a criminal drug conviction of any kind.**

**Confidential:** The contents of this Manual are confidential and must not be distributed outside of Takeda



## Grounds for Testing

Takeda may require testing of an employee's or applicant's breath and/or urine samples for alcohol and drugs under any of the circumstances set forth below. In these cases, offers of employment and continued employment may be conditioned upon negative results. In the case of a negative dilute result, the test must be promptly retaken. A second negative dilute result will be treated as a positive result. State law restrictions on any of these types of testing may apply.

- Pre-Employment: Under some circumstances (depending on location and position), prior to and as a condition of employment, applicants are required to sign a statement that offers of employment are dependent on successfully completing a pre-employment drug test. An applicant may be required to take the test within 24 hours of notification as a condition of the offer.
- Reasonable Suspicion Testing: An employee may be required to submit breath and/or urine samples for testing if, while on Company premises, during working hours, during business travel, or during Company-sponsored events (a) a supervisor or other member of management (trained in reasonable suspicion where required by applicable law) observes abnormalities in the employee's physical, speech, behavioral, or performance indicators; or (b) the employee is suspected of having otherwise violated this policy.
- Post-Accident/Injury Testing: An employee may be required to submit breath and/or urine samples for testing following any accident on Company premises, during working hours, during business travel, during Company-sponsored events or involving Company property which results in (a) an illness or injury, or (b) damage to property or equipment.
- Return to Work Testing: An employee returning to work following participation in a substance abuse treatment program may be subject to periodic, unannounced testing during the first twelve months following his/her return to work or the maximum period allowed by law, if shorter.
- Random Testing: Takeda may implement a random testing program based on safety/security and business needs where state law permits. Employees covered by any random testing program will be notified of the program's adoption/implementation and specific guidelines.

In addition, if there is reasonable suspicion that an employee is in violation of this policy, the employee may be suspended pending further investigation or may be subject to other disciplinary action up to and including termination of employment, as Takeda deems appropriate.

To the extent legally permitted, Takeda may conduct a search of the employee's personal or other property (including but not limited to clothing, desks, packages, briefcases, purses, and/or employee-owned or used vehicles) that the employee has brought onto Company premises and/or used for a work-related purpose. Please review Takeda Security Inspections section of this Employee Policy Manual for additional information.

## Testing Procedures and Safeguards

The specimen collection and testing procedures described below are designed to ensure the reliability and accuracy of test results:

- Strict chain of custody procedures will be followed;
- Where required by law, only independent, certified laboratories will be used to conduct the testing; and

**Confidential:** The contents of this Manual are confidential and must not be distributed outside of Takeda


- Each employee shall be informed of the results of the drug or alcohol-screening test, and given an opportunity to explain the results.

Employees who are not deemed to have violated this policy after testing may nevertheless be subject to disciplinary action up to and including termination of employment if other violations of Company policies and/or rules of conduct exist. Takeda also reserves the right to impose disciplinary action up to and including termination of employment under this policy upon any employee who makes any false statement, deliberately conceals any fact, or destroys or interferes with the collection of any evidence concerning this policy or who assaults, threatens, intimidates or harasses any person concerning this policy.

## Rehabilitation Options

It is recognized that early treatment is the key to rehabilitation for substance abusers. Employees are encouraged to voluntarily request help for the treatment of drug and/or alcohol abuse, and to utilize the Employee Assistance Program (EAP). Please contact the Employee Resource Center at erc@takeda.com or by calling 224-554-6800 with any questions regarding the EAP.

Eligible employees may be granted paid or unpaid leave in accordance with Takeda's leave policies and procedures for rehabilitation. Please refer to the Leaves of Absence section of this Employee Policy Manual and the ERC for more information regarding leaves of absence.

**Confidential:** The contents of this Manual are confidential and must not be distributed outside of Takeda



## WORKPLACE VIOLENCE POLICY

Takeda is committed to maintaining a safe work environment free of all forms of violence, including verbal and physical threats, intimidation, abusive behavior, and harassment. To maintain the safety and security of our employees, our visitors, and those with whom we do business, Takeda has adopted this policy, which addresses intimidation, threats, harassment, potential and/or actual violence, and other disruptive and aggressive behaviors in the workplace and provides guidelines for the reporting of incidents. Individuals who engage in conduct prohibited by this policy may be subject to disciplinary action up to and including termination and may be reported to law enforcement authorities. When threats are made against people or property, they must be taken seriously. The ultimate success of any program aimed at preventing violence in the workplace requires employee support and participation. Please do not ignore any employee or other person who is making threats or is otherwise disruptive in the workplace.

### Prohibited Conduct

Takeda does not tolerate actions, statements or other behavior by anyone that is, or is intended to be, violent, threatening, intimidating, disruptive, aggressive or harassing, as determined by Takeda in its sole discretion. This policy applies to all employees, consultants, contractors, customers, vendors, visitors and all their employees and agents, and to all other individuals while on Takeda Premises, using Takeda electronic equipment or while participating in or otherwise affecting Takeda Business. For this policy, Takeda Premises includes Takeda offices, parking areas, vehicles, communications equipment and all other areas owned, leased or used by Takeda or for conducting Takeda Business; Takeda Business includes any activity conducted in furtherance of or related (directly or indirectly) to Takeda business (including travel); and Takeda electronic equipment includes, but is not limited to, a Company computer and/or mobile phone.

No Weapons of any type are allowed on Takeda Premises, except when permitted by law. For this policy, the term "Weapons" refers to any item or device designed, used or threatened to be used to inflict injury or cause property damage. This prohibition against Weapons applies whether the Weapon is on the individual's person, carried in a container or openly, or is in a vehicle used in connection with Takeda Business or is otherwise brought onto Takeda Premises, unless such prohibition is not permitted by law. Furthermore, while conducting Takeda Business, employees are prohibited from carrying or otherwise possessing or transporting Weapons at any time and at any place (including vehicles), unless such prohibition is not permitted by law.

Without limitation by example, examples of additional conduct that is prohibited by this policy include:
• Causing physical injury to another person;
• Fighting, hitting, biting, kicking, pushing, or shoving another person;
• Threatening, intimidating, bullying, or verbally abusing another person;
• Aggressive or hostile behavior that creates a reasonable fear of injury to another person;
• Intentionally damaging Takeda property or property of another;
• Committing acts in furtherance of domestic violence;
• Bothering someone outside the course of business by following them or with an excessive number of visits, calls, pages, faxes, e-mails, text messages, postings, blog entries, letters, or gifts;
• Lewd behavior or obscene calls, pages, faxes, e-mails, text messages, postings on social media, blog entries, letters, photographs, gifts, or graffiti;

**Confidential:** The contents of this Manual are confidential and must not be distributed outside of Takeda



• Using social media (on or off-site) in a manner that threatens the well-being of a Takeda employee, contractor and/or consultant, suggests retaliation or harm, and/or otherwise could be construed as an act or potential act of harm;
• Accessing or attempting to access unauthorized personal or confidential information; and/or
• Behavior otherwise in violation of Takeda policy, including but not limited to Takeda's Professional Conduct and Prohibition Against Harassment policy.

### Reporting Procedures

All employees are responsible for promptly notifying Security, their immediate manager, another member of management, or a Human Resources Representative, of any violation or potential violation of this policy, including any threats that they have witnessed or received or otherwise know about. Even without an express, verbal threat, employees should alert management to any suspicious behavior that they suspect might pose a danger to employees, to any other individuals, or to Takeda Premises or Takeda property. Takeda will strive to handle reports made under this policy with as much confidentiality as is reasonably practicable under the circumstances. Takeda also recognizes that threats to our work force could result from external parties such as former employees, spouses/partners or others with no immediate connection to Takeda. Employees who become aware of any situation involving a third-party that could result in that person causing potential harm to one of our Takeda employees are expected to follow the same reporting procedures noted above. Additionally, if an individual believes he/she is in immediate harm, immediately contact 911.

Finally, Takeda requires that managers who identify prohibited conduct and/or indicators of a troubling situation must also consult with Security or a Human Resources Representative for guidance before taking any further action.

### Restraining Orders

All individuals working on Takeda Premises or Takeda Business that apply for or obtain a temporary or permanent protective or restraining order must present copies of any petition or declaration seeking such orders, proof of service, and a signed court order to Security or Human Resources. Takeda will strive to keep the matter as confidential as is reasonably practicable under the circumstances.

### Arrests/Convictions

If an employee is arrested or convicted of a crime and the crime, arrest or conviction has the potential to impact the employee's ability to perform his/her job, threaten the safety of Takeda Premises or individuals participating in Takeda business, or undermine public confidence in Takeda, the employee must inform Security or his/her Human Resources Representative immediately. The decision as to whether an arrest or conviction will affect the employee's employment status with Takeda will depend on the circumstances, and such decision will be made in Takeda's sole discretion in accordance with applicable federal, state and local laws.

### Searches and Surveillance

Takeda reserves the right to search all the following: (1) all Takeda Premises and Takeda property; (2) the personal belongings (e.g., pocketbook, briefcase, desk, locker) of any individual conducting Takeda Business and/or present on Takeda Premises; and (3) any vehicle (and its contents) in a parking area owned or leased by Takeda, regardless of the identity of the owner of the vehicle, its contents or the item to be searched. In addition, Takeda reserves the right to implement any security measures deemed

**Confidential:** The contents of this Manual are confidential and must not be distributed outside of Takeda



necessary, including video surveillance, to enforce this policy. Takeda will take such actions in accordance with applicable federal, state and local laws. Please review Takeda Security Inspections section of this Employee Policy Manual for additional information.

## The Safety of Reporting Parties

Employee reports made pursuant to this policy will be dealt with discreetly, and the safety of the reporting party and others will be given the highest priority. All reports will be taken seriously and investigated. No retaliation will be tolerated against any person for reporting in good faith a violation of this policy or for filing, testifying, assisting or participating in any investigation, proceeding or hearing conducted by Takeda or by a federal or state enforcement agency or court. Employees who engage in retaliatory conduct against such employees will be subject to disciplinary action up to and including termination of their employment.

## Enforcement

Any person who possesses a weapon, engages in violent acts, makes or exhibits threats or behavior perceived by Takeda as threatening, or otherwise violates this policy may, in Takeda's sole discretion, be removed from Takeda Premises and Takeda Business activities, and barred from Takeda Premises until further notice from an authorized representative of Takeda. Takeda may require such individuals to participate in the EAP or similar program as a condition of continued employment and may request a "fitness for duty" certification from a health care professional before allowing an employee to return to work. Violations of this policy may, in Takeda's sole discretion, result in disciplinary action up to and including termination of employment. In addition, Takeda may contact the appropriate criminal authorities for arrest and/or prosecution, as appropriate. No other Takeda practice, policy or procedure should be interpreted to limit Takeda's ability to take prompt and appropriate action to prevent violence or other misconduct or to otherwise enforce this policy.

## Resources

Any employee who is personally experiencing violent or suicidal thoughts, fantasies, or urges, or who is the recipient of abusive behavior, regardless of work-relatedness, is encouraged to contact Takeda's EAP provider, Workplace Solutions, available 24-hours a day by calling toll free at 1-800-327-5071.

**Confidential:** The contents of this Manual are confidential and must not be distributed outside of Takeda

## SOCIAL MEDIA ACTIVITIES

Takeda has a Global Social Media Policy that articulates specific requirements regarding personal and business use of Social Media. This policy provides additional guidance at a local level regarding this topic. In the event of contradiction between the two policies, the terms of the Global Social Media Policy shall prevail.

Communications via the Internet, including but not limited to writing, posting or otherwise contributing to: blogs or microblogs (such as Twitter), personal websites or webpages; listservs or mailing lists; social networking or other similar sites (such as Facebook and LinkedIn); audio, photo or video sharing websites (such as YouTube, Google Video, Flickr and Picasa); virtual worlds (such as Second Life); or another user-generated electronic media, (collectively "social media activities") whether now in existence or invented in the future (collectively "Social Media" and "social media activities"), represent useful tools for businesses and individuals. Nevertheless, when social media activities – whether personal or business – impact Takeda, its business, workforce, vendors, and/or customers, all of Takeda's policies, including this Social Media Activities policy, apply. In other words, an employee's social media activities, whether business-related or personal, must comply with all Company policies and federal, state and local law always.

Because social media activities are public, permanent, and easily accessible by other employees, potential employers, vendors, customers, or competitors, employees must exercise discretion when engaging in any social medial activities.

Employees who participate in social media activities during working or non-working hours using personal or Company-issued equipment/systems must abide by the following guidelines:

• **Respect Takeda time and property.** Through its information technology and communications infrastructure, Takeda provides employees with electronic and communications equipment and resources with the purpose of assisting in and improving the ability to conduct Company business. (See Electronic Communications policy.) Incidental personal social media activities are acceptable during working hours and/or using Company-issued equipment if those activities do not interfere with Takeda business or an employee's productivity.

• **Identify views as personal.** If an employee engages in social media activities that refer to or relate to Takeda's business or products in any way, he/she must abide by the rules set forth in the Global Social Media Policy which requires, amongst other things, that employees undergo certification before posting business-related messaging. Employees publishing personal views must clearly state that they are personal opinions that are not endorsed by and do not represent the opinion or viewpoints of Takeda. As an example: *"This posting is my own opinion. It is not endorsed by Takeda nor does it constitute any official communication of Takeda."*

• **Abide by all Company policies.** Employees must ensure that their social media activities are not inconsistent with the image of Takeda, do not negatively impact the performance of their job duties in any way, and comply with all applicable Company policies including, but not limited to, the Global Social Media Policy, Takeda's Professional Conduct and Prohibition Against Discrimination and Harassment Policy, Company Standards and Work Rules, and the Takeda Code of Conduct. Further, employees may

**Confidential:** The contents of this Manual are confidential and must not be distributed outside of Takeda



not discuss Takeda, its management or workforce, customers, vendors, and/or competitors in a manner that is and/or may be perceived as defamatory under any circumstances. Employee must also refrain from responding to inquiries regarding Takeda's business and/or products and to refer them to Takeda's Corporate Communications Department immediately.  **Nothing in this section specifically, or in this policy generally, is intended to interfere with an employee's right to engage in protected concerted activity.**

• **Protect confidential and proprietary Company information.** Social media activities are public and accessible to third parties, including Takeda's competitors, vendors and customers. As such, employees must maintain the confidentiality of non-public Company information always. To that end, employees must not disclose any documents and/or information that could be considered proprietary, confidential, or intellectual property under any circumstances on any Social Media.

• **Respect the privacy of others.** Employees must not share personal and/or business contact or other information about any other Takeda employee, or any Takeda contractor, consultant, customer, vendor, or other business contact, without first obtaining that person's explicit consent. Similarly, employees should avoid posting and/or "tagging" photographs of any Takeda employees, contractors, consultants, customers, vendors, etc., without first obtaining their consent.

• **Do not use Takeda's name to endorse anything unless authorized.** Employees should only use the Takeda name, logo, graphic, trademark, trade name, corporate slogan and/or image on Social Media in a manner that is specifically compliant with the Global Social Media Policy.  Employees are prohibited from identifying their Company affiliation when promoting a political party, charity, or other organization, cause or opinion. This also includes making any professional recommendations for applicants, current employees, and/or past employees on Social Media (e.g., recommending someone on the website LinkedIn). Employees may make personal recommendations via social media but should clearly identify in writing that such references are personal and should not be interpreted as company-sponsored.

As an example:
*"This reference is my own personal opinion. It is not endorsed by Takeda nor does it constitute any official recommendation by Takeda."*

• **Respect Takeda's customers, suppliers, vendors and competitors.** Employees must not discuss Takeda's customers, suppliers, vendors or competitors on any Social Media without their prior written permission and Takeda's prior approval. Further, employees may not refer to competitors or make any comment about their products and/or services on any Social Media without prior approval from Corporate Communications and the Legal Department.

• **Abide by all copyright laws.** Employees must not distribute or incorporate material retrieved or copied from Social Media unless usage of such material meets the legal definition of "fair use." An employee who wishes to reproduce the contents of a posting or an electronic or print publication for job-related purposes must contact the Legal Department for prior approval.

• **Do not use a Takeda-provided email address when participating in personal social media activities.**

**Confidential:** The contents of this Manual are confidential and must not be distributed outside of Takeda



Company-provided email accounts are for appropriate business use only. They must not be used either to access or to identify any Company employee on any Social Media.

The above-referenced principles are meant to provide general guidance on the appropriate use of Social Media by Takeda employees; they are not all inclusive of every situation or circumstance. As such, employees' must demonstrate good judgment when participating in any social media activities and a failure to do so otherwise abide by these guidelines or any applicable Company policies may subject employees to disciplinary action by Takeda up to and including termination and, in some cases, may result in legal action.  If an employee is concerned that this policy is being violated, he/she should report that to Human Resources who will investigate accordingly.

Further, employees are reminded that they should not have any expectation of privacy at any time about their use of Company-provided equipment, systems or software. Please consult the Electronic Communications policy contained within this Manual for more information.

Additionally, to the extent permissible under applicable law, Takeda reserves the right to observe and react to employees' social media activities to ensure compliance with its policies and/or for other legitimate business reasons. Takeda also reserves the right to modify, adjust, or clarify its policies regarding Social Media at any time.

Questions about the policy and/or its application to content should be directed to Corporate Communications.

**Confidential:** The contents of this Manual are confidential and must not be distributed outside of Takeda



## RESIGNATION

Employees who wish to resign should notify their manager in writing at least two (2) weeks prior to the date of their departure.  When an employee resigns, he/she will be paid through the last day of his/her employment, as decided by Takeda in its sole discretion, including any holidays and overtime worked. Resigning employees will only be paid for any unused accrued vacation days, unless state or local law mandates otherwise.

### COBRA Coverage

Under the provisions of the federal Consolidated Omnibus Budget and Reconciliation Act (COBRA), Takeda is required to offer resigning employees and their covered spouse and dependent(s) the opportunity to extend employer-provided health insurance coverage at the employee's expense, depending on the qualified beneficiaries and the qualifying events.

Coverage may be offered for eighteen (18) months and in some instances, up to thirty-six (36) months from the date of separation, when an employee retires, resigns, is subject to job displacement, changes to a temporary employment classification, or is discharged for any reason other than misconduct.

In general, employees and any dependent(s) covered by Takeda's benefit plans can extend these benefits at the full group rate cost (employer and employee contribution) plus any administrative fees.

### Death of an Employee

If an employee dies, his/her family or beneficiary will receive:

- Any salary owed to the employee for time worked; and
- Payment for the employee's unused accrued vacation.

Upon notification of an employee's death, the Employee Resource Center will provide any necessary form(s) and information to the appropriate family member or beneficiary.

To update employee beneficiary information, please access the Takeda Benefits website at www.myTakedabenefits.com

### Other Payments

Payments for life insurance and other benefit plans such as the 401(k) or the Business Travel Accident Plans are subject to the provisions governing those benefit plans.

**Confidential:** The contents of this Manual are confidential and must not be distributed outside of Takeda



## PROVIDING REFERENCES

Employees are prohibited from disclosing any information regarding applicants, current and/or past employees to third parties seeking to obtain reference checks or employment verifications. Employees should respectfully decline to respond to such requests and instead, direct them to the Employee Resource Center. Takeda works with an outside vendor to respond to various reference checks and will normally release only limited general information (such as dates of employment and position held) and will do so only upon the written consent of the individual involved. When specifically requested to do so in writing by the employee at issue, payroll information may also be released.

Takeda may make exceptions to this policy to fully cooperate with legal, safety, and/or medical officials who need specific employee information. Additionally, Takeda will fully cooperate with legitimate third-party subpoenas that may request various personnel information related to a current or former employee's employment.

All employees are prohibited from making any professional recommendations (i.e., representing on behalf of Takeda) for applicants, current or past employees, contractors, interns, and/or consultants in writing and/or on any Social Media (e.g., recommending someone on the website LinkedIn) on behalf of Takeda. Should a current Takeda employee wish to serve as a reference for such individuals, he/she should send the written reference from their personal email account or on personal stationery. Such references should NOT be sent from a Takeda email account or provided on Takeda stationery and must make clear that the reference is personal and not endorsed by Takeda.

Such references should also include at the beginning of any reference, the following statement: *"I have been asked by _____ to serve as a personal reference, which I am happy to do. Please note that this is a personal reference and I am not speaking on behalf of Takeda."*

This statement should also be used on any social media site if a reference is being made.

Please refer to the Social Media Activities policy within this Manual for more information or consult with Human Resources.

**Confidential:** The contents of this Manual are confidential and must not be distributed outside of Takeda



**RETURN OF COMPANY PROPERTY**

All computer data, customer records, business reports, internal communications, and all other confidential or proprietary information is the exclusive property of Takeda regardless of the medium or device in which such information is stored. Upon termination of employment, employees must return to Takeda all property of Takeda, which they have in their possession, including but not limited to all laptop computers and other electronic devices, and all information and/or data contained therein, Company credit cards, mobile phone devices (only if purchased by Takeda), calling cards, keys, notebooks and other data relating to records, customer information, price lists, contacts, and other business records and non-records, this Manual, and all copies of such documents or information.

Takeda permits the incidental personal use of employee assigned Company equipment such as computers, mobile phones, and vehicles. However, employees may not borrow, take home, or otherwise use unassigned Company equipment and machinery, except in the regular performance of their duties, without first obtaining the written permission of their manager or a Human Resources Representative. The use, borrowing or taking of equipment without obtaining such approval, may result in disciplinary action up to and including termination of employment. In addition, employees may not conduct Company business or store Company information on any computer or electronic device that is not owned, leased or managed by Takeda.

If Takeda reasonably believes that Company business has been conducted using, or Company information is otherwise stored on, a non-Company issued or managed computer or electronic device, employees must surrender the computer or electronic device, upon request at any time, to Takeda for purposes of searching for and extracting or destroying any Company information contained on such computer or electronic device. Management approval to conduct Company business or store Company information on a non-Company computer or device will not supersede the requirements of any Company policy or provide any additional rights to the affected employee.

**Confidential:** The contents of this Manual are confidential and must not be distributed outside of Takeda

## STATE NOTICES/POLICIES

Depending on the state, city or county in which an employee works or resides, there may be specific employment laws that are inconsistent, complementary, or otherwise not covered in this Policy Manual. All state specific notices that summarize those laws are posted in each of Takeda's facilities. In addition, notices are emailed by PosterGuard, a vendor with which Takeda contracts, to all remote employees.

In addition to the notices provided by PosterGuard, Takeda incorporates the following state-required notices/policies.

### Massachusetts Pregnant Workers Fairness Act

The Pregnant Workers Fairness Act, effective April 1, 2018, amends Massachusetts' current law against discrimination in employment, G.L. c. 151B, §4, to expressly forbid discrimination against employees' due to pregnancy or conditions related to pregnancy. The Act also requires employers to provide "reasonable accommodations" to an employee who is pregnant or who has a condition related to pregnancy. The law is enforced by the Massachusetts Commission Against Discrimination (MCAD). Frequently Asked Questions (FAQs) are answered below.

### Q1. What does the Act do?
A1. Under the Act, employers:
- Cannot discriminate against employees' due to pregnancy or a condition related to pregnancy.
- Must grant an employee a "reasonable accommodation" for an employee's pregnancy or condition related to pregnancy, unless doing so would impose an "undue hardship" on the employer. For definitions of "condition related to pregnancy," "reasonable accommodation" and "undue hardship," please see Q&A 2, 3, and 4.
- Cannot deny an employment opportunity to, or take an adverse (negative) action against, an employee because of the employee's request for or use of a reasonable accommodation.
- Cannot make an employee accept a particular accommodation if another reasonable accommodation would allow the employee to perform the essential functions of the job, or require an employee to take a leave if another reasonable accommodation may be provided without undue hardship.
- Cannot refuse to hire a person who is pregnant because of the pregnancy or a pregnancy-related condition, if the person can perform the essential functions of the position with a reasonable accommodation.
- Must communicate with the employee in a timely, good faith, interactive process, once an employer is on notice of the need for an accommodation, in order to determine what accommodation may be needed.
- Must provide written notice to employees of their rights under the Act no later than April 1, 2018. The notice must be given to (1) new employees; and (2) an employee who notifies the employer of a pregnancy or a pregnancy-related condition, not more than 10 days after notification.

### Q2. What is a "condition related to pregnancy?"
A2. A condition related to pregnancy can be during or after pregnancy. Examples include, but are not limited to, morning sickness, lactation, or the need to express breast milk. For example, if a pregnant

**Confidential:** The contents of this Manual are confidential and must not be distributed outside of Takeda



employee needs to start her workday later than her usual start time due to morning sickness, the employee may be covered by the Act.

### Q3. What is a "reasonable accommodation"?
A3. A reasonable accommodation is a modification or adjustment that allows an employee to perform the "essential functions" of the employee's position. Some examples of reasonable accommodations are: (1) more frequent or longer breaks; (2) time off; (3) providing equipment or seating; (4) temporary transfer to a less strenuous or hazardous job; (5) job restructuring; (6) light duty; (7) private space for expressing breast milk; (8) assistance with manual labor; and (9) a modified work schedule. Employers are not required to discharge or transfer another employee with more seniority, or to promote an unqualified employee, as an accommodation.

### Q4. What is an "undue hardship"?
A4. An undue hardship is an action requiring significant difficulty or expense on the part of the employer. Some factors considered include (1) the nature and cost of the needed accommodation; (2) the employer's financial resources; (3) the overall size of the business; and (4) the effect on expenses and resources of the accommodation on the employer.

### Q5. How does an employee request a reasonable accommodation?
A5. An employee must notify the employer of a need for a reasonable accommodation due to pregnancy or a pregnancy-related condition. The statute does not require that the request be made in any particular fashion, i.e., orally vs. in writing. The employer must then engage in a timely, good faith, interactive "process" to determine what reasonable accommodation may be made, absent undue hardship. The process must include discussion(s) between the employee and the employer with respect to the requested accommodation.

### Q6. What kind of documentation is an employer allowed to ask for in response to a request for an accommodation?
A6. Employers can generally require documentation about the need for accommodation from a healthcare professional that explains what accommodation the employee needs, and from there, the employer and employee should discuss how the accommodation(s) relate to the essential functions of the employee's job. However, the employer cannot require documentation for an employee's need for the following: (1) more frequent restroom, food, or water breaks; (2) seating; (3) limits on lifting more than 20 pounds; and (4) private, non-bathroom space for expressing breast milk.

### Q7. How often can an employee take a break to breastfeed or express breast milk?
A7. The law does not specify or limit how often an employee can take a break to breastfeed or express breast milk. Employers should be aware that every employee has individualized needs, which may vary month to month or even day to day. Employers must allow employees to breastfeed or express milk as often as they need to do so, absent undue hardship.

### Q8. How long do employees' breaks to breastfeed or express breast milk need to last?
A8. As with the frequency of breaks, the law does not require breaks to be a specific length. However, breaks must allow the employee the time needed to breastfeed or express breast milk. Guidance from the U.S. Department of Health and Human Services, Office on Women's Health suggests that breaks may typically last approximately 15 to 20 minutes, plus additional time to get to and from the break room

**Confidential:** The contents of this Manual are confidential and must not be distributed outside of Takeda



and set up and break down equipment:
https://www.womenshealth.gov/files/documents/bcfb_employees-guide-to-breastfeeding-and-working.pdf

**Q9. Does an employer have to pay an employee for breaks to breastfeed or express breast milk?**
A9. Breaks may either be paid or unpaid under the law. However, if the employer does provide paid breaks to employees, the employer must allow the employee to use those paid breaks to breastfeed or express breast milk.

**Q10. What kind of space does the employer have to provide for an employee to breastfeed or express milk?**
A10. The employer must provide an employee a private, non-bathroom space to express breast milk or to breastfeed. Examples include, but are not limited to, a private room or office. The space should be free from intrusion by other employees, visitors, and the public. The space should be convenient enough for the employees that traveling to and from the space does not materially impact an employee's break time.

**Q11. What does the space have to contain?**
A11. Besides being a private, non-bathroom space, the space should allow employees to comfortably express breast milk and/or breastfeed. Examples of features that should be included in the space are sufficient electrical outlets for breast pumps, tables or other surfaces to hold breast pumps and other needed items, and seating.

**Q12. Can an employee be permitted to breastfeed or express milk in their personal workspace during the break, rather than taking additional unpaid time to travel to the designated private space?**
A12. Yes. If the employee's space is equivalent to a private, non-bathroom space, the employee may breastfeed or express breast milk at the workspace.

**Q13. Can an employee continue working while she breastfeeds or expresses breast milk, rather than taking an unpaid break?**
A13. Yes. If an employee has a private, non-bathroom space in which to work, and is able to work while breastfeeding or expressing breast milk, the employee may continue working while doing so.

**Q14. Is it an undue hardship for an employer if an employee requests that another employee cover the employee's job responsibilities while taking a break to breastfeed or express breast milk?**
A14. Whether it is an undue hardship depends on the facts of each individual case. For example, an employer may be able to have another employee cover an office's reception desk while the receptionist takes a break to breastfeed or express breast milk. Some jobs may not require another employee to cover them at all. Other jobs, such as a manufacturing line, may be more difficult for employers to accommodate. Employers and employees should attempt to resolve these issues during the interactive discussion phase of the process.

**Q15. Does an employer have to provide a space for expressing breast milk for employees, if none of its employees currently need to do so?**

**Confidential:** The contents of this Manual are confidential and must not be distributed outside of Takeda



A15. No. However, once the employer is on notice that an employee will need such a space, the employer should prepare the space promptly so that it is ready when needed. Additionally, employers are free to set up such a space in advance, even if none of its employees currently need one.

**Q16. If an employee works less than a normal day or shift because of her paid or unpaid breaks, can an employer reduce her pay or benefits?**
A16. Employers cannot take an "adverse" (negative) action against an employee because of her need to take a break permitted under the Act. For example, if an employer generally allows its employees to take breaks without loss of pay or benefits, but reduces the pay or benefits of an employee who takes breaks to express breast milk, the employer would likely be in violation of the Act.

**Q17. Are there any federal laws that cover pregnancy or pregnancy-related conditions?**
A17. Title VII prohibits discrimination on the basis of sex. The Pregnancy Discrimination Act bars employers from discriminating against employees on the basis of pregnancy. The Fair Labor Standards Act has requirements regarding break time for mothers who need to express breast milk. The Americans with Disabilities Act may cover certain pregnancy-related conditions. The Family and Medical Leave Act also has certain requirements regarding leave for an employee's serious health conditions. More information on those laws is available at www.eeoc.gov and www.dol.gov.

**Q18. How do federal and state laws interact?**
A18. If state law provides an employee more protections than federal law, the employer must comply with the greater protections provided by state law.

**Q19. What can I do if I believe I've been discriminated against?**
A19. If you believe you have been discriminated against, you can file a complaint with the Massachusetts Commission Against Discrimination within 300 days of the date the discriminatory act occurred. You do not have to have an attorney to file a claim (though you may hire an attorney). You can contact the Commission at the information below.

**Boston Headquarters:** One Ashburton Place, Room 601, Boston, MA 02108 | (617) 994-6000
**Springfield:** 436 Dwight Street, Room 220, Springfield, MA 01103 | (413) 739-2145
**Worcester:** 484 Main Street, Room 320, Worcester, MA 01608 | (508) 453-9630
**New Bedford:** 128 Union Street, Suite 206 New Bedford, MA 02740 | (774) 510-5801
**www.mass.gov/mcad/**

**Confidential:** The contents of this Manual are confidential and must not be distributed outside of Takeda



## MINNESOTA DRUG AND ALCOHOL TESTING POLICY

### Employees or Job Applicants Subject to Testing Under This Policy

Any Takeda employee who works or resides in Minnesota or job applicant seeking employment at Takeda's Brooklyn Park facility may be required to undergo drug and/or alcohol testing if that person meets one or more of the criteria for testing specified below. A person who is required to be tested must review and sign the Acknowledgment and Consent to Drug and/or Alcohol Testing form, a copy of which is attached as Addendum A to this policy. Testing will be conducted only by laboratories authorized to conduct such testing using processes in accordance with Minnesota law.

### Circumstances Under Which Testing May Be Required

Job Applicants. Takeda will require all job applicants seeking positions at its Brooklyn Park, Minnesota facility to undergo drug testing only after it makes a conditional offer of employment, which will be contingent upon the applicant's successful completion of the test.

Employees. Current employees may be required to undergo drug and/or alcohol testing under the following circumstances:

1. *Routine Physical Examination Testing.* Such testing will not be required more than once annually and, if such testing is required, then the employee will be given at least two weeks' written notice.

2. *Random Testing.* Employees who work in safety-sensitive positions are subject to random testing, which will occur at management's discretion.

3. *Reasonable Suspicion Testing.* An employee will be asked to submit to a test if a member of management reasonably suspects that the employee (1) is under the influence of drugs or alcohol; (2) has violated Takeda's policy prohibiting the use, possession or sale of drugs or alcohol; or (3) is involved in a work-related accident or injury.

4. *Treatment Program Testing.* If Takeda refers an employee to a chemical dependency treatment program, or if an employee is otherwise participating in such a program under an employee benefit plan, then that employee may be required to undergo drug or alcohol testing without prior notice during the treatment period and for a period of up to two years following completion of the program.

**Confidential:** The contents of this Manual are confidential and must not be distributed outside of Takeda

## Right to Refuse Test

Applicants and employees have a right to refuse testing under this policy.  Should an applicant refuse a test, however, then Takeda will withdraw its conditional offer of employment.  Likewise, an employee who refuses to test will be subjected to discipline, up to and including termination of employment.

Without limiting the generality of the foregoing, the following are examples of what shall be considered a refusal to submit to testing:

- failing to appear for testing within a reasonable time, as determined by Takeda, after being directed to do so;
- not remaining readily available to submit to testing after an accident;
- leaving the testing site before providing an adequate sample;
- failing to provide enough urine for testing, in the absence of a valid medical explanation;
- failing to provide a second sample when directed to do so by Takeda or the testing facility;
- failing to report immediately to management any work-related accident or injury that would have resulted in testing under this Policy;
- adulterating or substituting a urine sample;
- failing to cooperate with any part of the testing process or engaging in conduct that obstructs the testing process; or
- providing a urine specimen that is dilute (defined as a creatinine of less than 20 ng/dl and a specific gravity of less than 1.003) without providing a satisfactory medical explanation. If a sample is diluted or not testable, Takeda reserves the right to require that the employee or applicant submit a second sample to be tested. If the second sample is also diluted or not testable, Takeda will revoke a conditional job offer made to a job applicant and Takeda reserves the right to discipline an employee up to and including termination of employment

## Test Results

Takeda uses the services of testing laboratories that have been certified or accredited and ensures that the laboratories follow applicable chain-of-custody procedures and store samples that produced a positive result for at least six months.

If an employee or applicant's initial screening results in a positive test, then the testing laboratory will run a confirmatory test of the sample to verify the initial result before the results are reported to the employee or applicant.

Within three working days of receiving the final test results, Takeda will report the results in writing to the employee/applicant and will notify the employee/applicant that he/she has a right to request and obtain a copy of the report. (see Addendum B to this policy).

**Confidential:** The contents of this Manual are confidential and must not be distributed outside of Takeda



An employee who holds a safety-sensitive position and who tests positive will be suspended with pay pending the outcome of the confirmatory test and, if applicable, retest results.

## Positive Test Results and Disciplinary Action

Within five working days after receiving notice of a positive confirmatory test, the employee or applicant who tests positive shall have the right to explain the positive test result.  In addition, the affected employee or applicant has the right to a confirmatory retest, at his or her own expense.

If the positive confirmatory test result is the first such result for an employee, then the employee shall have the opportunity to participate in a rehabilitation program prior to discharge or discipline.  If the positive confirmatory test, and retest, if applicable, result is not the first such result for that employee, however, then the employee will be subject to disciplinary action up to and including termination of employment.   If the positive confirmatory test, and retest where applicable, is for a job applicant, then Takeda will withdraw the conditional job offer and will inform the applicant of the reason for its action.

## Confidentiality and Non-Retaliation

Takeda treats test result reports and other information acquired in the drug or alcohol testing process as private and confidential information that will not be disclosed to another employer, to a third-party individual or private organization, or any internal employee without a business need to know, without first obtaining the written consent of the employee or job applicant tested.  Such information, however, may be (1) used in an administrative hearing provided that information is relevant to the hearing or proceeding; (2) disclosed to any federal or state government agency as required under law; or (3) disclosed to a substance abuse treatment facility for the purpose of evaluation and treatment of the employee.

Takeda strictly prohibits retaliation against an employee for asserting rights and remedies provided under Minnesota's Drug and Alcohol Testing in the Workplace law.

**Confidential:** The contents of this Manual are confidential and must not be distributed outside of Takeda



**Addendum A**

**ACKNOWLEDGMENT AND CONSENT TO DRUG AND/OR ALCOHOL TESTING**

I hereby agree, upon a request made under Takeda's drug/alcohol testing policy, to submit to a drug or alcohol test and to furnish a sample of my urine, blood and/or other reasonable sample for analysis. I understand and agree that if I at any time refuse to submit to such a test, or if I otherwise fail to cooperate with the testing procedures, I will be subject to immediate termination (if a current employee) or my conditional offer will be revoked (if an applicant.) I further authorize and give full permission for the testing facility to release any and all documentation relating to any test I undergo to Takeda and/or to any governmental entity involved in a legal proceeding or investigation connected with the test. I also authorize Takeda to disclose any documentation or information relating to such test to any governmental entity involved in a legal proceeding or investigation connected with the test.

I will not sue or hold responsible Takeda or any testing laboratory for any alleged harm to me that might result from such testing, including loss of employment or any other kind of adverse job action that might arise as a result of the drug or alcohol test, even if I feel the Company or laboratory representative has made an error in the administration or analysis of the test or the reporting of the results.

**I have read Takeda's drug and alcohol testing policy and this consent form and I have been allowed to ask questions about the test, the policy or this form. By signing this form, I acknowledge that I understand both the policy and the nature of my consent.**

_____

Name

_____

Signature

Date: _____

**Confidential:** The contents of this Manual are confidential and must not be distributed outside of Takeda



**Addendum B**

## NOTICE OF DRUG AND/OR ALCOHOL TEST RESULT

This document is to notify you, _____, of the results of the recent drug and/or alcohol test you took pursuant to Takeda's Drug and Alcohol Testing Policy.

You are hereby notified of your:

_____   negative initial screening

_____   negative confirmatory test

_____   positive confirmatory test

You have a right to request and receive a copy of the test result report.  Please direct any such requests to Takeda security.

If you have tested positive on a confirmatory test, you also have the right to:

1.  Notify Takeda in writing within five working days of this notice of any information you consider relevant to explain the results of the test, including information related to any over-the-counter or prescription medication that you are currently taking or have recently taken and any other information relevant to the reliability or accuracy of the test;
2.  Notify Takeda in writing within five working days of this notice of your intent to obtain a confirmatory retest of the original sample at your own expense;
3.  Avoid discharge based on the test result if you are an employee and this was your first positive confirmatory test result under Takeda's policy; provided, however, that you must, at your expense, successfully complete a Company-designated drug or alcohol counseling or rehabilitation program.  A post-completion positive test result or early withdrawal from the program will be deemed an unsuccessful completion of the program and will result in discipline up to and including termination of employment.

**Confidential:** The contents of this Manual are confidential and must not be distributed outside of Takeda



## Sexual Harassment Policy for All Employers in New York State



### Introduction

Takeda is committed to maintaining a workplace free from sexual harassment. Sexual harassment is a form of workplace discrimination. All employees are required to work in a manner that prevents sexual harassment in the workplace. This Policy is one component of Takeda's commitment to a discrimination-free work environment. Sexual harassment is against the law[1] and all employees have a legal right to a workplace free from sexual harassment and employees are urged to report sexual harassment by filing a complaint internally with Takeda. Employees can also file a complaint with a government agency or in court under federal, state or local antidiscrimination laws.

### Policy:

1. Takeda's policy applies to all employees, applicants for employment, interns, whether paid or unpaid, contractors and persons conducting business, regardless of immigration status, with Takeda. In the remainder of this document, the term "employees" refers to this collective group.

2. Sexual harassment will not be tolerated. Any employee or individual covered by this policy who engages in sexual harassment or retaliation will be subject to remedial and/or disciplinary action (e.g., counselling, suspension, termination).

3. Retaliation Prohibition: No person covered by this Policy shall be subject to adverse action because the employee reports an incident of sexual harassment, provides information, or otherwise assists in any investigation of a sexual harassment complaint. Takeda will not tolerate such retaliation against anyone who, in good faith, reports or provides information about suspected sexual harassment. Any employee of Takeda who retaliates against anyone involved in a sexual harassment investigation will be subjected to disciplinary action, up to and including termination. All employees, paid or unpaid interns, or non-employees[2] working in the workplace who believe they have been subject to such retaliation should inform a supervisor, manager, human resources, or through the Ethics Line. All employees, paid or unpaid interns or non-employees who believe they have been a target of such retaliation may also seek relief in other available forums, as explained below in the section on Legal Protections.

4. Sexual harassment is offensive, is a violation of our policies, is unlawful, and may subject Takeda to liability for harm to targets of sexual harassment. Harassers may also be individually subject to liability. Employees of every level who engage in sexual harassment, including managers and supervisors who engage in sexual harassment or who allow such behavior to continue, will be penalized for such misconduct.

---

[1] While this policy specifically addresses sexual harassment, harassment because of and discrimination against persons of all protected classes is prohibited. In New York State, such classes includeage, race, creed, color, national origin, sexual orientation, military status, sex, disability, marital status, domestic violence victim status, gender identity and criminal history.

[2] A non-employee is someone who is (or is employed by) a contractor, subcontractor, vendor, consultant, or anyone providing services in the workplace. Protected non-employees include persons commonly referred to as independent contractors, "gig" workers and temporary workers. Also included are persons providing equipment repair, cleaning services or any other services provided pursuant to a contract with the employer.

**Confidential:** The contents of this Manual are confidential and must not be distributed outside of Takeda



5. Takeda will conduct a prompt and thorough investigation that ensures due process for all parties, whenever management receives a complaint about sexual harassment, or otherwise knows of possible sexual harassment occurring. Takeda will keep the investigation confidential to the extent possible. Effective corrective action will be taken whenever sexual harassment is found to have occurred. All employees, including managers and supervisors, are required to cooperate with any internal investigation of sexual harassment.

6. All employees are encouraged to report any harassment or behaviors that violate this policy. Takeda will provide all employees a complaint form for employees to report harassment and file complaints.

7. Managers and supervisors are **required** to report any complaint that they receive, or any harassment that they observe or become aware of, to their Human Resources Business Partner.

8. This policy applies to all employees, paid or unpaid interns, and non-employees and all must follow and uphold this policy. This policy must be provided to all employees and should be posted prominently in all work locations to the extent practicable (for example, in a main office, not an offsite work location) and be provided to employees upon hiring.

### What Is "Sexual Harassment"?

Sexual harassment is a form of sex discrimination and is unlawful under federal, state, and (where applicable) local law. Sexual harassment includes harassment on the basis of sex, sexual orientation, self-identified or perceived sex, gender expression, gender identity and the status of being transgender.

Sexual harassment includes unwelcome conduct which is either of a sexual nature, or which is directed at an individual because of that individual's sex when:

- Such conduct has the purpose or effect of unreasonably interfering with an individual's work performance or creating an intimidating, hostile or offensive work environment, even if the reporting individual is not the intended target of the sexual harassment;

- Such conduct is made either explicitly or implicitly a term or condition of employment; or

- Submission to or rejection of such conduct is used as the basis for employment decisions affecting an individual's employment.

A sexually harassing hostile work environment includes, but is not limited to, words, signs, jokes, pranks, intimidation or physical violence which are of a sexual nature, or which are directed at an individual because of that individual's sex. Sexual harassment also consists of any unwanted verbal or physical advances, sexually explicit derogatory statements or sexually discriminatory remarks made by someone which are offensive or objectionable to the recipient, which cause the recipient discomfort or humiliation, which interfere with the recipient's job performance.

Sexual harassment also occurs when a person in authority tries to trade job benefits for sexual favors. This can include hiring, promotion, continued employment or any other terms, conditions or privileges of employment. This is also called "quid pro quo" harassment.

Any employee who feels harassed should report so that any violation of this policy can be corrected promptly. Any harassing conduct, even a single incident, can be addressed under this policy.

**Confidential:** The contents of this Manual are confidential and must not be distributed outside of Takeda

## Examples of sexual harassment

The following describes some of the types of acts that may be unlawful sexual harassment and that are strictly prohibited:

- Physical acts of a sexual nature, such as:
    - Touching, pinching, patting, kissing, hugging, grabbing, brushing against another employee's body or poking another employee's body;
    - Rape, sexual battery, molestation or attempts to commit these assaults.

- Unwanted sexual advances or propositions, such as:
    - Requests for sexual favors accompanied by implied or overt threats concerning the target's job performance evaluation, a promotion or other job benefits or detriments;
    - Subtle or obvious pressure for unwelcome sexual activities.

- Sexually oriented gestures, noises, remarks or jokes, or comments about a person's sexuality or sexual experience, which create a hostile work environment.

- Sex stereotyping occurs when conduct or personality traits are considered inappropriate simply because they may not conform to other people's ideas or perceptions about how individuals of a particular sex should act or look.

- Sexual or discriminatory displays or publications anywhere in the workplace, such as:
    - Displaying pictures, posters, calendars, graffiti, objects, promotional material, reading materials or other materials that are sexually demeaning or pornographic. This includes such sexual displays on workplace computers or cell phones and sharing such displays while in the workplace.

- Hostile actions taken against an individual because of that individual's sex, sexual orientation, gender identity and the status of being transgender, such as:
    - Interfering with, destroying or damaging a person's workstation, tools or equipment, or otherwise interfering with the individual's ability to perform the job;
    - Sabotaging an individual's work;
    - Bullying, yelling, name-calling.

## Who can be a target of sexual harassment?

Sexual harassment can occur between any individuals, regardless of their sex or gender. New York Law protects employees, paid or unpaid interns, and non-employees, including independent contractors, and those employed by companies contracting to provide services in the workplace. Harassers can be a superior, a subordinate, a co-worker or anyone in the workplace including an independent contractor, contract worker, vendor, client, customer or visitor.

## Where can sexual harassment occur?

Unlawful sexual harassment is not limited to the physical workplace itself. It can occur while employees are traveling for business or at employer sponsored events or parties. Calls, texts, emails, and social media usage by employees can constitute unlawful workplace harassment, even if they occur away from the workplace premises, on personal devices or during non-work hours.

**Confidential:** The contents of this Manual are confidential and must not be distributed outside of Takeda

## Retaliation

Unlawful retaliation can be any action that could discourage a worker from coming forward to make or support a sexual harassment claim. Adverse action need not be job-related or occur in the workplace to constitute unlawful retaliation (e.g., threats of physical violence outside of work hours).

Such retaliation is unlawful under federal, state, and (where applicable) local law. The New York State Human Rights Law protects any individual who has engaged in "protected activity." Protected activity occurs when a person has:

- made a complaint of sexual harassment, either internally or with any anti-discrimination agency;

- testified or assisted in a proceeding involving sexual harassment under the Human Rights Law or other anti-discrimination law;

- opposed sexual harassment by making a verbal or informal complaint to management, or by simply informing a supervisor or manager of harassment;

- reported that another employee has been sexually harassed; or

- encouraged a fellow employee to report harassment.

Even if the alleged harassment does not turn out to rise to the level of a violation of law, the individual is protected from retaliation if the person had a good faith belief that the practices were unlawful. However, the retaliation provision is not intended to protect persons making intentionally false charges of harassment.

## Reporting Sexual Harassment

**Preventing sexual harassment is everyone's responsibility.** Takeda cannot prevent or remedy sexual harassment unless it knows about it. Any employee, paid or unpaid intern or non-employee who has been subjected to behavior that may constitute sexual harassment is encouraged to report such behavior to a supervisor, manager, human resources or through the Ethics Line. Anyone who witnesses or becomes aware of potential instances of sexual harassment should report such behavior to a supervisor, manager or their assig

Reports of sexual harassment may be made verbally or in writing. A form for submission of a written complaint is attached to this Policy, and all employees are encouraged to use this complaint form. Employees who are reporting sexual harassment on behalf of other employees should use the complaint form and note that it is on another employee's behalf.

Employees, paid or unpaid interns or non-employees who believe they have been a target of sexual harassment may also seek assistance in other available forums, as explained below in the section on Legal Protections.

## Supervisory Responsibilities

All supervisors and managers who receive a complaint or information about suspected sexual harassment, observe what may be sexually harassing behavior or for any reason suspect that sexual harassment is occurring, **are required** to report such suspected sexual harassment to their Human Resources Business Partner.

**Confidential:** The contents of this Manual are confidential and must not be distributed outside of Takeda



In addition to being subject to discipline if they engaged in sexually harassing conduct themselves, supervisors and managers will be subject to discipline for failing to report suspected sexual harassment or otherwise knowingly allowing sexual harassment to continue.

Supervisors and managers will also be subject to discipline for engaging in any retaliation.

## Complaint and Investigation of Sexual Harassment

*All* complaints or information about sexual harassment will be investigated, whether that information was reported in verbal or written form. Investigations will be conducted in a timely manner, and will be confidential to the extent possible.

An investigation of any complaint, information or knowledge of suspected sexual harassment will be prompt and thorough, commenced immediately and completed as soon as possible. The investigation will be kept confidential to the extent possible. All persons involved, including complainants, witnesses and alleged harassers will be accorded due process, as outlined below, to protect their rights to a fair and impartial investigation.

Any employee may be required to cooperate as needed in an investigation of suspected sexual harassment. Takeda will not tolerate retaliation against employees who file complaints, support another's complaint or participate in an investigation regarding a violation of this policy.

While the process may vary from case to case, investigations should be done in accordance with the following steps:

- Upon receipt of complaint, employee relations will conduct an immediate review of the allegations, and take any interim actions (e.g., instructing the respondent to refrain from communications with the complainant), as appropriate. If complaint is verbal, encourage the individual to complete the "Complaint Form" in writing. If he or she refuses, prepare a Complaint Form based on the verbal reporting.

- If documents, emails or phone records are relevant to the investigation, take steps to obtain and preserve them.

- Request and review all relevant documents, including all electronic communications.

- Interview all parties involved, including any relevant witnesses;

- Create a written documentation of the investigation (such as a letter, memo or email), which contains the following:
  - A list of all documents reviewed, along with a detailed summary of relevant documents;
  - A list of names of those interviewed, along with a detailed summary of their statements;
  - A timeline of events;
  - A summary of prior relevant incidents, reported or unreported; and
  - The basis for the decision and final resolution of the complaint, together with any corrective action(s).

- Keep the written documentation and associated documents in a secure and confidential location.

**Confidential:** The contents of this Manual are confidential and must not be distributed outside of Takeda



- Promptly notify the individual who reported and the individual(s) about whom the complaint was made of the final determination and implement any corrective actions identified in the written document.

- Inform the individual who reported of the right to file a complaint or charge externally as outlined in the next section.

## Legal Protections and External Remedies

Sexual harassment is not only prohibited by Takeda but is also prohibited by state, federal, and, where applicable, local law.

Aside from the internal process at Takeda, employees may also choose to pursue legal remedies with the following governmental entities. While a private attorney is not required to file a complaint with a governmental agency, you may seek the legal advice of an attorney.

In addition to those outlined below, employees in certain industries may have additional legal protections.

## State Human Rights Law (HRL)

The Human Rights Law (HRL), codified as N.Y. Executive Law, art. 15, § 290 et seq., applies to all employers in New York State with regard to sexual harassment, and protects employees, paid or unpaid interns and non-employees, regardless of immigration status. A complaint alleging violation of the Human Rights Law may be filed either with the Division of Human Rights (DHR) or in New York State Supreme Court.

Complaints with DHR may be filed any time **within one year** of the harassment. If an individual did not file at DHR, they can sue directly in state court under the HRL, **within three years** of the alleged sexual harassment. An individual may not file with DHR if they have already filed a HRL complaint in state court.

Complaining internally to Takeda does not extend your time to file with DHR or in court. The one year or three years is counted from date of the most recent incident of harassment.

You do not need an attorney to file a complaint with DHR, and there is no cost to file with DHR.

DHR will investigate your complaint and determine whether there is probable cause to believe that sexual harassment has occurred. Probable cause cases are forwarded to a public hearing before an administrative law judge. If sexual harassment is found after a hearing, DHR has the power to award relief, which varies but may include requiring your employer to take action to stop the harassment, or redress the damage caused, including paying of monetary damages, attorney's fees and civil fines.

DHR's main office contact information is: NYS Division of Human Rights, One Fordham Plaza, Fourth Floor, Bronx, New York 10458. You may call (718) 741-8400 or visit: www.dhr.ny.gov.

Contact DHR at (888) 392-3644 or visit dhr.ny.gov/complaint for more information about filing a complaint. The website has a complaint form that can be downloaded, filled out, notarized and mailed to DHR. The website also contains contact information for DHR's regional offices across New York State.

**Confidential:** The contents of this Manual are confidential and must not be distributed outside of Takeda



## Civil Rights Act of 1964

The United States Equal Employment Opportunity Commission (EEOC) enforces federal anti-discrimination laws, including Title VII of the 1964 federal Civil Rights Act (codified as 42 U.S.C. § 2000e et seq.). An individual can file a complaint with the EEOC anytime within 300 days from the harassment. There is no cost to file a complaint with the EEOC. The EEOC will investigate the complaint, and determine whether there is reasonable cause to believe that discrimination has occurred, at which point the EEOC will issue a Right to Sue letter permitting the individual to file a complaint in federal court.

The EEOC does not hold hearings or award relief, but may take other action including pursuing cases in federal court on behalf of complaining parties. Federal courts may award remedies if discrimination is found to have occurred. In general, private employers must have at least 15 employees to come within the jurisdiction of the EEOC.

An employee alleging discrimination at work can file a "Charge of Discrimination." The EEOC has district, area, and field offices where complaints can be filed. Contact the EEOC by calling 1-800-669-4000 (TTY: 1-800-669-6820), visiting their website at www.eeoc.gov or via email at info@eeoc.gov.

If an individual filed an administrative complaint with DHR, DHR will file the complaint with the EEOC to preserve the right to proceed in federal court.

## Local Protections

Many localities enforce laws protecting individuals from sexual harassment and discrimination. An individual should contact the county, city or town in which they live to find out if such a law exists. For example, employees who work in New York City may file complaints of sexual harassment with the New York City Commission on Human Rights. Contact their main office at Law Enforcement Bureau of the NYC Commission on Human Rights, 40 Rector Street, 10th Floor, New York, New York; call 311 or (212) 306-7450; or visit www.nyc.gov/html/cchr/html/home/home.shtml.

## Contact the Local Police Department

If the harassment involves unwanted physical touching, coerced physical confinement or coerced sex acts, the conduct may constitute a crime. Contact the local police department.

**Confidential:** The contents of this Manual are confidential and must not be distributed outside of Takeda

## U.S. COMPLIANCE GUIDELINES

### *Supplier Diversity*

Takeda strives to maintain and improve sound business processes throughout its operations, including through its commitment to supplier diversity. As a federal government contractor, Takeda is obligated under the Small Business Act to give small businesses maximum practicable opportunity to be engaged as subcontractors. As such, Takeda employees (TPUSA, TPA and TPR only) who are responsible for hiring vendors or soliciting vendors for products or services should ensure that procurement packages are structured to permit small, small disadvantaged, veteran-owned, service disabled veteran-owned, women-owned, and HUBZone businesses to participate to the maximum extent possible. Takeda employees who are unsure about whether a particular vendor or business falls into one of these categories should contact supplierdiversity@tpna.com.

### *Antitrust and Competition Laws*

Antitrust and competition laws are designed to promote a level playing field where we can all compete fairly. We refrain from any activity that violates the antitrust or competition laws of the United States or any country in which we do business.

Those laws generally make it illegal for competitors to agree on prices and price-related terms; to allocate markets, customers or sales among competitors; to engage in collusion with competitors on bids or proposals; or to reach any agreement that unreasonably restrains trade in any market.

These antitrust and competition laws also prohibit many forms of price discrimination. The rules governing price discrimination are complex. As a result, Takeda generally treats similarly situated customers alike. However, there are situations where differences in prices are pro-competitive and lawful. You should always consult with the Legal Department before applying different prices to similarly situated customers.

You should never discuss Takeda's prices, pricing policies, sales terms, inventory levels, business marketing plans or any other confidential matters concerning business, customers or competitive activities with employees or consultants of Takeda's competitors.

You also should not impose unlawful resale price restrictions on wholesalers, distributors, licensees, sales agencies or any other party.

Antitrust and competition laws are complex and jurisdiction-dependent, and their application in particular business settings may require detailed factual and legal analysis. You should consult with the Legal Department before engaging in any conduct that may appear to adversely affect competition in any market.

### *US Boycott Law*

The U.S. anti-boycott law prohibits Takeda and its affiliates from complying with any unsanctioned boycott, such as the Arab League boycott of Israel. The law prohibits the refusal to do business with Israel or any blacklisted firms, as well as furnishing boycott-related information. This law also requires that certain boycott-related requests be reported to the U.S. government.

**Confidential:** The contents of this Manual are confidential and must not be distributed outside of Takeda



**We Protect All Confidential Information**
Takeda's success relies in part on our collective efforts to create and maintain confidential information. The disclosure of confidential information regarding Takeda business or scientific operations, whether intentional or accidental, can adversely affect the financial stability and competitive position of Takeda and the job security of its employees. Simply stated, it takes years to build a formula and seconds to erase its value.

Confidential information encompasses the core information needed to conduct our business successfully. Takeda defines confidential information as all confidential and proprietary information, including, but not limited to:
- Non-public financial information.
- List of clients and potential clients.
- Pricing information.
- Business plans.
- Programs and tactics.
- Sales and marketing data.
- Research and development information (such as information about the formulation, testing, registration, use, safety, efficacy or effects of our compounds).
- Personal information of employees, healthcare providers, patients, research subjects and consumers.
- All third-party proprietary information that is subject to confidentiality or non-use restrictions.

These types of information must be protected according to (1) Takeda's information protection and other applicable policies and procedures; (2) the Confidentiality, Intellectual Property and Non-Competition Agreement, or other similar agreements, between you and Takeda; and (3) confidentiality agreements between Takeda and its business partners and other third parties. It is our responsibility to know which information is confidential and follow all policies to protect it. Therefore, you must not use, disclose or cause the use or disclosure of any confidential information except where it is (1) required to perform your responsibilities for Takeda; (2) to comply with the law or Takeda's policies or procedures; or (3) authorized in writing and in advance by Takeda.

Also, you may be required to access and use the confidential information of our customers, suppliers, vendors, contractors and others. Before you can accept or use any such confidential information, you need a Legal Department–approved confidential disclosure agreement. Once you have access to the confidential information of others, you must treat it just as you treat Takeda's confidential information.

Additionally, you are prohibited from answering press, financial analyst or investor inquiries regarding Takeda business, whether the information is confidential or not, unless you have the written consent of the Corporate Communications Department. If you are approached by the media or investors for Takeda information, document the inquiry and immediately notify Corporate Communications.

Promptly report to your manager or to the Takeda Ethics Line any attempt by anyone outside of Takeda to obtain confidential information, or any unauthorized use or disclosure of confidential information by other employees. Further, you should report any accidental loss of, or unauthorized access to, confidential information to your manager or via the Takeda Ethics Line.

**Confidential:** The contents of this Manual are confidential and must not be distributed outside of Takeda

*Copyrighted Material*
News, information and published research are important to a company built on scientific research. To support our work with the latest knowledge, Takeda pays for subscriptions to access many electronic and print resources such as journals, books, analyst and market reports and databases.

All published information for which we purchase access is covered by copyright or a license. Journals, newspapers and books are typically covered by Takeda's Multinational Copyright License. To find out with whom you can share articles and other options, check the "Copyright" link on the Takeda Knowledge Suite's help page (https://gci-takeda-tks.com/help/copyright).

In general, journal articles can be shared with Takeda employees worldwide and should be used for Takeda's internal business only. The "Copyright" link on the Takeda Knowledge Suite's help page will lead you to information about how and at what cost these materials can be shared with alliance or business partners, or anyone outside of Takeda.

Databases and analyst and market reports are covered by licenses specific to a Takeda site or, on occasion, apply to Takeda globally. In general, these licenses give you the right to use these materials for Takeda internal business purposes only at the licensed sites. These resources should never be shared outside of Takeda.

You are responsible for knowing the rights of use for each item and complying with all copyright laws. These laws and policies are complex, and they frequently change. If you have doubts or questions about using, sharing or distributing any copyrighted or proprietary material, refer to the Takeda Knowledge Suite "Copyright" link, consult with the subscribing department or contact a Takeda Knowledge Suite team member at TKS_info@takeda.co.jp.

In addition to copyright, it is Takeda's policy to respect all valid and legally-recognized intellectual property rights of third parties, such as patents, trademarks, and trade secret rights. If you have any questions or concerns about whether our activities may result in misappropriating or infringing the intellectual property rights of third parties, please contact the Legal or IP Department immediately.

*Full Disclosure*
If you make any public communication or provide reports or documents to the public or the government, you must make sure that all these communications and documents are accurate, complete and understandable, and that you provide them in a timely manner. You should contact Corporate Communications for review and guidance before releasing any reports or documents to the public. Any information released through a public statement by Takeda that involves work performed under a U.S. federal contract must be reviewed by the Legal Department to ensure that Takeda receives all necessary federal government approvals. Additionally, the Legal Department must be consulted before releasing any reports or documents to government entities.

## We Avoid All Conflicts of Interest
*Personal Relationships*
If you or a close relative has a personal relationship with a Takeda customer, competitor or any company that does or seeks to do business with Takeda, you are required to disclose it in writing to your local Ethics and Compliance office.

**Confidential:** The contents of this Manual are confidential and must not be distributed outside of Takeda



You should also select suppliers and customers based on fair and objective standards and without favor or preference based on any personal relationship.

*Boards, Panels and Consulting Arrangements*
We encourage our employees to be involved in their communities and to be active in groups and organizations, such as foundations, charities, or cultural or social services organizations that contribute to the well-being of their communities. In addition, Takeda employees may be asked to serve on boards or panels of healthcare businesses, write, edit, or advise on healthcare issues, or speak at professional or technical symposia on healthcare issues. Contributing your services to such organizations and causes can be a valuable service to society. However, depending on the nature of the organization and your specific involvement, these arrangements may interfere with your obligations to Takeda. Before engaging in any such activities, you should get written approval from your manager, local Ethics and Compliance office.

*Insider Trading and Securities Laws*
If you possess "Material Non-Public Information" (as defined below) concerning a company, U.S. securities laws generally make it illegal for you to trade in the securities of that company or to reveal the Material Non-Public Information to a third party who may subsequently trade the securities based upon such information. You risk incurring criminal and civil penalties for violations of those securities laws.

Specific examples of Material Non-Public Information may include:
- information about financial results, including changes in annual and quarterly earnings or revenue estimates, financial condition or dividend rates;
- significant acquisitions, mergers, divestitures or joint-venture transactions;
- proposed securities offerings, tender offers, stock splits or other changes in capitalization;
- senior management changes;
- significant litigation or regulatory proceedings or other developments;
- issues regarding asset quality or liquidity facilities;
- strategic partnerships;
- new products and expansion plans;
- major new contracts, licenses, orders or customers, or the loss thereof; or
- significant new discoveries, products or technological or other breakthroughs, including results of clinical research studies.

*You must comply with applicable securities laws. Any questions regarding compliance with this section of the Code should be directed to the Legal Department.*

If you are a director, officer, Takeda employee or employee of a third party (such as a contractor or consultant) who is in a confidential relationship with Takeda or any affiliated company of Takeda, you shall not trade in or recommend the purchase or sale of any securities of Takeda or any entity related to Takeda, while you are in possession of Material Non-Public Information regarding Takeda or such related entity.

You shall also refrain from trading in, or recommending the purchase or sale of, the securities of any other company about which you have obtained Material Non-Public Information because of your employment or assignment with Takeda. You also are prohibited from disclosing to a third party,

**Confidential:** The contents of this Manual are confidential and must not be distributed outside of Takeda



including, but not limited to, your friends and family members, any Material Non-Public Information regarding Takeda, any entity related to Takeda or any other entity about which you obtained such information due to your employment or assignment with Takeda. The only exceptions to this prohibition are disclosures required by law or made pursuant to the performance of your duties on behalf of Takeda, such as disclosures to the FDA, other regulatory authorities, or other third parties authorized by Takeda to receive such information. In any case, disclosures made pursuant to these exceptions must not contain any false or misleading information and must be reviewed in advance by the Chief Compliance Officer.

Members of your household or a close relative whose trading in securities could reasonably be attributed to you should not trade securities that would be improper for you to trade, except in certain limited circumstances approved in advance in writing by the Legal Department.

To prevent violations of the federal securities laws and to avoid even the appearance of impropriety, "blackout periods" may be imposed during which all or certain employees may not engage in any transactions involving the securities discussed in this policy. Affected employees will be notified of any such blackout period.

The above prohibitions regarding the trading of securities do not apply to the purchase or sale of securities in a "blind" trust, mutual fund, "wrap" account or similarly managed arrangement, if you do not discuss investments with the trustee, money manager or other third-party investment advisor who has discretion over the funds.

You must also comply with all applicable securities trading laws. Any questions regarding compliance with this section of the Code should be directed to the Legal Department.

## WHAT IS NON-PUBLIC INFORMATION?

"Non-Public Information" includes any information that has not been effectively communicated to the marketplace. Normally, information contained in a report filed with the U.S. Securities and Exchange Commission, securities commissions, stock exchanges or any other similar regulatory body is considered public. Information is also considered public if it is contained in a news release distributed by Takeda through a widely disseminated international news or wire service, provided enough time has elapsed after the news release has been distributed to permit the market to absorb the information, (i.e., normally within two days).

### *Takeda Phantom Stock Appreciation Rights Plan*
If you have been granted rights under the Takeda Phantom Stock Appreciation Rights Plan, or any similar plan, you shall not exercise those rights while you are in possession of Material Non-Public Information regarding Takeda or any entity related to Takeda. Takeda may also impose "blackout periods" during which you may not exercise rights granted under the Takeda Phantom Stock Appreciation Rights Plan or any similar plan.

### *Personal Investments or Transactions*

**Confidential:** The contents of this Manual are confidential and must not be distributed outside of Takeda



Takeda respects your right to manage your personal financial affairs. However, your personal financial decisions must not create situations that conflict or appear to conflict with your responsibilities to Takeda or harm Takeda.

You need to disclose in writing to the Chief Compliance Officer any material, financial interest or investment held by you, a member of your household or a close relative in any company that:

- Does business or seeks to do business with Takeda.
- Competes with Takeda.
- Gives the appearance of involvement by Takeda.
- Reflects unfavorably on Takeda.

## WHAT IS MATERIAL INFORMATION?

"Material" information generally is defined as information for which there is a substantial likelihood that a reasonable investor would consider it important in making his or her investment decisions. It also includes any information that is likely to have a substantial effect on the price of a company's securities, when disclosed. The materiality of information relating to possible future events depends upon the likelihood that the event will occur and the significance of the event if it does occur. Positive or adverse information may be "material".

### *Giving and Receiving Gifts and Entertainment*

As a general rule, receiving gifts and entertainment from people with whom we do business (e.g., customers, business partners, suppliers, etc.) is not acceptable because it may present a conflict of interest or imply an obligation on the part of Takeda. Business courtesies must never be used to influence business decisions nor even give the appearance of improper influence.

Tangible gifts from business partners, customers or suppliers may be kept if valued at less than $25 and they are neither intended nor likely to be perceived by others to improperly influence your business decisions. If you receive a tangible gift greater than $25, you may not keep it. You must disclose it to your manager, at which time only one of the following courses of action is appropriate: (1) perishable items (e.g., fruit baskets, pastries, etc.) may be shared with other employees; (2) non-perishable items should be returned to the sender, if possible, along with a note explaining Takeda's policy; or (3) if it is not possible to send the item back, you may donate the item to charity (in the name of the sender). If possible, send a note to the sender explaining the donation.

You may accept social entertainment, such as modest meals or event tickets, from business partners, customers and/or suppliers so long as it is occasional, reasonable, not overly lavish, permits business discussions, is pursuant to a bona fide business relationship, complies with all other Takeda policies and procedures and is disclosed to your manager.

You may never accept or give: bribes or kickbacks (i.e., anything where there is a "quid pro quo" arrangement); anything that is illegal; vacations; tangible items (e.g., cash or cash equivalents such as gift certificates, checks and vouchers); shares, options or participation in share offerings; services at rates other than those generally available to anyone; loans; special discounts (except those offered to employees of Takeda generally); or gifts that are offensive or entertainment that is provided at inappropriate venues.

**Confidential:** The contents of this Manual are confidential and must not be distributed outside of Takeda



For the provision of gifts, meals or entertainment to business partners, customers or suppliers, please refer to Policy-018 (Takeda Travel and Business Expense Policy) and the applicable Compliance Policies for Interactions with Healthcare Professionals and Clinical Research Participants. Takeda shall not provide business meals, entertainment or gifts, including educational items, to officials or employees of federal government agencies (e.g. the FDA, U.S. Department of Defense, U.S. Veterans Administration, U.S. Indian Health Services, Center for Medicare & Medicaid Services (CMS), National Institutes of Health, etc.). Likewise, for foreign government employees or officials, Takeda shall not provide business meals, entertainment or gifts, including educational items, unless specifically allowed under the applicable laws and regulations of the official or employee's country of origin. Consult the Global Ethics and Compliance website for country specific guidance.

You should never solicit gifts or entertainment, regardless of value, nor should you ask others to support a charity.

### *Political Activity and Political Contributions*

Takeda, through the office of Government and External Affairs (GEA), engages in political discussions about issues that affect Takeda and may make political contributions as well. In addition, Government and External Affairs may host political events from time to time and, in accordance with applicable laws, solicit voluntary contributions to TakPAC, Takeda's Political Action Committee, from eligible employees. All political activities on behalf of Takeda should be done so in consultation with GEA. As a general matter, U.S. federal government funds, received by Takeda through grants or contracts, may not be used for lobbying activities, including travel for the purpose of lobbying for federal government funds.

Many Takeda employees participate in the political process on a personal level. Any such participation is a private activity that you should conduct on personal time with personal resources. Any political activities you choose to undertake are on your behalf and you may not create the impression that you are speaking or acting on behalf of Takeda. You should clearly identify individual political activities to avoid the perception that your activities are on behalf of Takeda. You may not seek reimbursement from Takeda for personal political contributions. In addition, you may not contact other employees during work hours or while on Takeda premises to solicit political contributions or request political activity. If you have any question on what constitutes private political activities versus political activities on behalf of Takeda, please contact Government and External Affairs.

### *International Trade*

We will comply with all applicable laws and regulations related to cross border movements of products, materials, machinery, technology and any other items (i.e., imports and exports). Takeda's operations are global in scope and, as such, are subject to the Customs laws and international trade regulations of the many countries in which Takeda does business. Takeda is tasked with developing and maintaining a compliance program for its import and export activities. All Takeda employees globally are responsible for compliance with the policies and procedures implemented as part of this compliance program, and failure to comply may result in disciplinary action up to and including termination.

All Takeda employees, and particularly those responsible for managing or arranging for the importation and/or exportation of items for Takeda and those who request the importation or exportation of such items, directly or indirectly, will familiarize themselves with all applicable Takeda policies and

**Confidential:** The contents of this Manual are confidential and must not be distributed outside of Takeda



procedures relating to the international movements of goods and/or technology. In particular, all Takeda employees will adhere to the following:

   (i) We will exercise reasonable care in our goal to comply with all import and export laws and regulations;

   (ii) We will not misrepresent any material fact related to the importation or exportation of any item, including, but not limited to the valuation of the imported and/or exported product (e.g., we will not assign arbitrary, fictitious, nominal, or unsupported values), their classification, quantity, origin or other factors relevant to the cross-border movement of such items;

   (iii) We will not engage in any activity where there is evidence that it might result in the violation of any trade sanctions, restrictions, or embargoes implemented by countries in which we do business, including, but not limited to, embargoes against certain countries, entities or individuals, restrictions on payments, donations or gifts to government officials, or cooperation with unsanctioned boycotts;

   (iv) We will not make preferential claims under any special Customs programs, such as Free Trade Agreements, unless all qualifications and supporting documentation requirements necessary to qualify and comply with such program have been met.

   (v) We will ensure that all imports and exports are documented, and that all relevant records are retained, creating an appropriate audit trail for such activities and demonstrating support for all value, classification, origin and other declarations made to Customs authorities;

   (vi) We will obtain expert advice and opinions as necessary from internal or external subject matter experts when guidance is required; and

   (vii) We will ensure that all Takeda stakeholders are informed and empowered to ensure the best possible outcomes for Takeda with respect to the international movement of goods and technology.

Seek advice if you have any doubts or questions about a proposed transaction, and resolve them before proceeding, especially if you think someone is trying to cut corners or avoid a legal obligation

**Confidential:** The contents of this Manual are confidential and must not be distributed outside of Takeda

Message
_____

**From:** McDonald, Pamella [pamella.mcdonald@takeda.com]
**Sent:** 10/9/2020 3:11:21 PM
**To:** Thompson, Staci [staci.thompson@takeda.com]
**Subject:** FW: Trintellix/ CNS customer engagement idea Fit Life and Takeda
**Attachments:** FitLIfe and Takeda.docx; FitLifeActivewearWomenBrochure.pdf

**Flag:** Follow up

Hi Staci,

Per our conversation from a few weeks ago. Shannon sent over the information to Laura. It is still not clear what she is proposing to Takeda or Laura. It looks like she started a company called FitLife.

Once you review we can connect to see what, if any, steps need to be taken from an E&C and HR perspective.

Thanks!

***Best Regards,***

***Pam***

**Pamella C. McDonald**
USBU E&C Advisor, Neuroscience
Global Ethics & Compliance

**Takeda Pharmaceutical Company**
1200 Lakeside Drive
3E-100-4
Bannockburn, IL 60015
Office Phone: <u>1-224-940-3858</u>
Mobile: <u>1-847-414-7022</u>
E-mail: <u>pamella.mcdonald@takeda.com</u>
<u>www.takeda.us</u>

**Living Our Values Every Day (#LOVED)**

**From:** Berger, Laura <laura.berger@takeda.com>
**Sent:** Friday, October 9, 2020 9:47 AM
**To:** McDonald, Pamella <pamella.mcdonald@takeda.com>
**Subject:** FW: Trintellix/ CNS customer engagement idea Fit Life and Takeda

Good morning Pam! Shannon did follow up yesterday with some marketing materials. I still do not quite know what she is proposing, but I can certainly follow up with her with some of the questions we discussed. Let me know the best way to proceed.



**Better Health, Brighter Future**
**Laura M. Berger**
Senior Manager, Multi-Channel Marketing

EXHIBIT
**12**

Neuroscience Business Unit, US Marketing

**Takeda**
40 Landsdowne St,
Cambridge, MA 02139
Mobile: 774-300-2814

**From:** Olson, Shannon <shannon.olson@takeda.com>
**Sent:** Thursday, October 8, 2020 3:25 PM
**To:** Berger, Laura <laura.berger@takeda.com>
**Cc:** Olson, Shannon <shannon.olson@takeda.com>
**Subject:** RE: Trintellix/ CNS customer engagement idea Fit Life and Takeda

Hey there
I hope this email finds you and your husband healthy and well. I put a lot of time, thought and energy into your question to me regarding Fit Life and Takeda- Why Takeda?
Attached is my response and a sample of a marketing piece I put had made. With regards to the marketing piece, its not perfect nor is it my entire vision. It like Fit Life is a work in progress.

Laura, I am so excited for you to read my attachment. Please let me know your thoughts!! Thank you so much!!!

Best Always,


Shannon Olson
Senior Sales Representative
Neuroscience Business Unit
Takeda Pharmaceuticals
727-641-1676



**From:** Berger, Laura <laura.berger@takeda.com>
**Sent:** Wednesday, September 23, 2020 8:53 AM
**To:** Olson, Shannon <shannon.olson@takeda.com>
**Subject:** RE: Trintellix/ CNS customer engagement idea

1:30 will work for me as well. I'll send you a calendar invite.

**From:** Olson, Shannon <shannon.olson@takeda.com>
**Sent:** Tuesday, September 22, 2020 9:44 PM
**To:** Berger, Laura <laura.berger@takeda.com>
**Subject:** Re: Trintellix/ CNS customer engagement idea

Hi Laura!

Takeda_0000503

Great to meet you too! I hope you and yours have stayed safe and healthy. How does Thursday 1:30 pm EST work for you?

Warmest Regards
Shannon Olson

On Sep 22, 2020, at 3:13 PM, Berger, Laura <laura.berger@takeda.com> wrote:

So nice to meet you, Shannon! Would you be free Thursday afternoon? My calendar is flexible between 12 and 3.

<image001.png>

**Laura M. Berger**
Senior Manager, Multi-Channel Marketing
Neuroscience Business Unit, US Marketing

**Takeda**
40 Landsdowne St,
Cambridge, MA 02139
Mobile: 774-300-2814

**From:** Olson, Shannon <shannon.olson@takeda.com>
**Sent:** Tuesday, September 22, 2020 1:00 PM
**To:** Berger, Laura <laura.berger@takeda.com>
**Subject:** FW: Trintellix/ CNS customer engagement idea

Hi Laura
My name is Shannon Olson. I am a 20+ year veteran Takeda rep in FL. I have an idea I have been working on that I believe could be a great way to connect with patients. Can we set up a time to talk live?

Best Always,

Shannon Olson
Senior Sales Representative
Neuroscience Business Unit
Takeda Pharmaceuticals
727-641-1676
<image005.jpg>

**From:** Trintellix Marketing <TrintellixMarketing@takeda.com>
**Sent:** Tuesday, September 22, 2020 12:51 PM
**To:** Olson, Shannon <shannon.olson@takeda.com>
**Subject:** RE: Question

Hi Shannon,

Thanks for the additional information. You can reach out to Laura Berger on the Consumer MCM team. Here is her email address:

laura.berger@takeda.com

Thank You,

TRINTELLIX Marketing

<image006.png>

**Trintellix Marketing**
40 Landsdowne St.
Cambridge, MA 02139
Takeda Pharmaceuticals U.S.A.
TrintellixMarketing@takeda.com

**From:** Olson, Shannon <shannon.olson@takeda.com>
**Sent:** Tuesday, September 22, 2020 12:25 PM
**To:** Trintellix Marketing <TrintellixMarketing@takeda.com>
**Subject:** Re: Question

And for patients not healthcare providers

Warmest Regards
Shannon Olson

On Sep 22, 2020, at 11:51 AM, Olson, Shannon <shannon.olson@takeda.com> wrote:

HI there
It is a virtual platform- so multichannel marketing.  Thank you so much

Best Always,

Shannon Olson
Senior Sales Representative
Neuroscience Business Unit
Takeda Pharmaceuticals
727-641-1676
<image002.jpg>

**From:** Trintellix Marketing <TrintellixMarketing@takeda.com>
**Sent:** Tuesday, September 22, 2020 11:49 AM
**To:** Olson, Shannon <shannon.olson@takeda.com>
**Subject:** RE: Question

Hi Shannon,

Thanks for reaching out, we always appreciate ideas and insights from the field!

Takeda_0000505

Could you please share what your idea is regarding so we can put you in touch with the right person? Some marketing functions fall under our Multichannel Marketing team, and others fall under our brand team. Additionally, different individuals handle Consumer/Patient tactics vs. HCP tactics.

Thank You,

TRINTELLIX Marketing

<image003.png>

**Trintellix Marketing**
40 Landsdowne St.
Cambridge, MA 02139
Takeda Pharmaceuticals U.S.A.
TrintellixMarketing@takeda.com

---

**From:** Olson, Shannon <shannon.olson@takeda.com>
**Sent:** Monday, September 21, 2020 5:56 PM
**To:** Trintellix Marketing <TrintellixMarketing@takeda.com>
**Subject:** Question

Hi there
I have an idea I wanted to share with Trintellix marketing. Can you please provide a name of someone I can contact?
Thank you

Best Always,


Shannon Olson
Senior Sales Representative
Neuroscience Business Unit
Takeda Pharmaceuticals
727-641-1676

Takeda_0000506

People only know what they know. Likewise, people don't know what they don't know.

In the early 1990s, pharma companies relied heavily on direct to consumer marketing for prescription drugs. Overtime, DTC ads moved away from its original intent of education and focused more on lifestyle. Portraying the advertised drug as enabling healthy lifestyle activities that are achieved by taking the drug (i.e biking, yoga, going to the farmers market, spending time with family and friends). DTC allowed pharma to have a one-way conversation with the patient.

With the internet boom in the mid 90's, digital marketing emerged as the most far-reaching marketing tool. As a result, all major industries changed the way they market their products and services to customers. However, the pharmaceutical industry still delivers its marketing message via traditional channels 67% of the time and only 8% through emerging channels such as social media.

As of 2020, Facebook is the #1 Google search query in the USA. Why? What is the psychology of Facebook? Why do people like, share, comment and keep coming back? Like is a way to give positive feedback and to connect with things you care about on Facebook. Companies have taken note and have started to "brand' themselves to target the social media users, ultimately gaining new customers. The #1 reason for someone liking a brand on Facebook is to support the brand they connect with and like. To share interests, lifestyle and personal good experiences with others and that brand. Whereas our reasons for not liking a brand or company focus on privacy issues and quality of the social media experience.

Social media helps to reach out to a bigger audience. Almost 90% of marketers say their social marketing efforts have increased exposure for their business, and 75% say they've increased traffic. It is an ideal way to create brand awareness and stay in contact with your customers.

The biggest advantage of social media is that it offers a two-way conversation. Companies can communicate their message, but they can also socially listen to what consumers want through their feedback, personal stories and patient insights. This can help identify gaps which they can fulfill.

Studies have shown more than 74% of Internet users engage on social media, 80% are looking for health related information. With so many individuals and patients turning to social media for treatment suggestions and, especially emotional support, drug makers need and should want to be present and involved. Instead, less than 10% are. It is evident that social media holds tremendous potential as a marketing channel for the pharmaceutical industry.

As the world sits in front of millions of flat screens and maps the new reality by moving a cursor, the very definition of what constitutes reality may be undergoing a change to make the older reality fade away. This is guided by the fear in many that the physical world is not safe anymore and there is comfort in the virtual worth holding on to. Thus, more companies are realizing the value of virtual reality in terms of creating marketing campaigns. If pharma wants to sustain its growth, it will have to keep up with the digital age, especially in social media.

As, perception is reality. Business as usual is not a reality. Companies now need to meet their consumers where they currently are. They need to be like that person- and receptive to the person on the other end. Corporate values must align with those of their customers to create a sense of community and solidarity, and to positively impact and create a needed societal change.

Takeda_0000507

COVID-19 taught us that no one is immune; we are all suspectable and vulnerable. Consumers scrutinized how companies reacted during COVID and now how they are moving forward. Transparency, truth, and authenticity are center stage. Consumers are hungry for compassionate and factual messaging and will avoid companies they see placing profits ahead of people. We are in a time where solving, not selling is critical. The solutions your people, products and services can deliver for the individual and the betterment of society.

Since COVID, there has been a substantial increase in anxiety and depression, substance use and abuse, loneliness, domestic violence; and child abuse. Sedentary life due to the pandemic situation, added stress and binge eating are leading to lifestyle diseases in people as well as complicating their existing health issues. The Lifestyle After Covid has added issues like unnecessary weight gain, lack of physical activity, insomnia and not getting proper sleep because of working long hours, depression, anxiety, restlessness, and substance abuse like smoking and drinking. Health issues have manifested in the working professionals in the age group of 30 to 55. We entered a new pandemic of anxiety and helplessness. People will carry the scars of their COVID-19 experience for a long time.

The COVID-19 pandemic has left most thinking about ways and means to reduce the risk of contracting the virus. This situation has emphasized more than anything else in the past, the importance of individual health and lifestyle. People who have never thought of immunity, are now all talking about immunity and how to improve their immunity. However, most think of it as a quick fix, which they can get just by swallowing a pill, which will give them all the immunity they need. To improve one's immunity, one must eat healthily, exercise more, reduce stress, get proper sleep and control chronic diseases.

Lifestyle medicine, while not new, is now the most important, basic and life essential area healthcare and medical providers are now focusing on. Diet and exercise have always been part of the treatment plan however, just prescribing a diet or asking people to exercise in not enough. Patients and people need effective education that is simple in verbiage and explanations and speaks to them. Not filled with medical jargon, that is difficult to understand and is foreign to most. They need encouragement, mentorship and coaching that is empathetic to them instead of finding fault or making them feel guilty. They need the human emotion element that has been neglected and almost forgotten.

Many organizations are now capitalizing on this neglected essential life skill, that should be the foundation of patient care and converting this into a business and charging patients for a healthy lifestyle. Profit over People.

Unlike other industries, pharma has always had an intrinsic dedication to improving lives. However, it's negative reputation and image has plagued the industry. Societies general perception of pharma is, pharma creates just a win for their companies, not for society. The annual Gallup poll of American opinion in about 25 different industries last fall found pharma ranking last, its lowest score in the history of the poll. Americans were more than twice as likely to rate the pharma industry negatively (58%) than positively (27%).

The public never recognized pharma as compassionate and having a heart, until the industry demonstrated dedication to finding treatment and a vaccine for COVID. For the public, pharma had delivered hope. It was the first time since the pandemic started that people felt this emotion. And hope

Takeda_0000508

was felt worldwide, which has led to a more positive view of the pharmaceutical industry than before the pandemic.

While the future is uncertain, now is a pivotal time for every company, in every industry- especially pharma. The COVID -19 pandemic has turned the world upside down. Yet the virus has initiated perhaps the first stage of a good behavioral change. The virtual reality of the Post-COVID "New Normal." The virus has also provided a unique opportunity for all, to be a force for good.

New thinking must change old business models as this lifestyle shift is no passing trend. Companies must reevaluate their marketing plan, re-center their thinking and focus on what's next, with COVID-19 in mind. There is no playbook for this, as the pandemic is a health crisis like we've never seen before.

If a pharmaceutical company, whose sole mission and existence is to improve the health of people, ever dreamed of positively impacting millions, while socially being a force for good, NOW is the time to seize this moment to sustain positive changes made, while inspiring and empowering change to negative, self-destructive behaviors.

It's time to Boldly and Intentionally create and launch an Educational Breakthrough. To authentically put People over Profits. To Loudly be the human voice behind the Lifestyle pharma and the medical community should have been but weren't. Natures lifestyle medicine of whole food, movement and mind-health, which is the first line of defense you can take toward naturally keeping your mind, body, soul (and immune system) strong and healthy.

All change in your life comes when your mind collides with a new idea, and it only takes one idea.

Introducing Fit Life:

Fit Life™ is a symbol and trademarked lifestyle brand about wellness, healthy living and Finding Your Fit physically, mentally and spiritually! Fit Life is the branded, lifestyle medicine platform.

Fit Life's mission "To Inspire and Empower YOU to boldly choose to live a life well lived". We are a community of imperfect people helping to lift you up and support you on life's journey; as we are all in this together. Fit Life is your authentic lifestyle brand, a human brand, the voice for self-care strategies and a social movement to live as a coordinated whole- through the trinity of mind, body and spirit.

Fit Life is redefining the word FIT and what FIT means TODAY. Fit is NOT about physical perfection. Fit is about becoming whole, more authentically YOU- which is built on a coordinated foundation of your Mind, Body and Spirit. Mental, Physical, and Emotional Health are not just a New Year, New Me mantra, it's the foundation of Fit Life and a Lifestyle that is here to stay. Fit Life is the lifestyle brand that creates energy, inspires action and a will to change.

Fit Life's vision enforces the message that we were born to be real and strive for progress not perfection. Thus, dispelling the notion of perfection and eliminating the element of shame that happens when one falls but instead, we celebrate getting back up. Fit Life is a community where YOU belong, a place where YOU fit. An ethos, a platform to be authentic and share personal journeys without shame or judgement.

We believe living the Fit Life is not about being better than someone else. It is about being better than you were yesterday. Everyone starts from somewhere. Wherever you are in life, whatever your starting

Takeda_0000509

point, you CAN Find Your Fit. Take one step towards improving yourself and your health every single day and offer support to others trying to do the same. Fall in love with taking care of your whole self: mind, body and spirit. It's choosing to Find Your Fit. And Fit Life is about making the rest of your life the best, by living the Fit Life™. Don't be afraid to fail, believe that something different can and will happen.

In this digital age consumers are co-authoring the stories of a brand. Fit Life™ offers opportunity as EVERY BODY Has A Story and Your Story of Boldly Investing in Yourself to LIVE Your Best Life IS Important, and we WANT to HEAR and SHARE it! We want to build Fit Life together.

Fit Life™ is authentic, relatable and comes with built in value- the customer, they are the center of our brand. A BRAND THAT SPEAKS TO THEM AND UNDERSTANDS WHO THEY ARE! Fit Life™ speaks to YOU- we know you, we know where you are coming from, we know what you are up against, we were born to be real, we strive for progress not perfection, we are your tribe.

- o **#FitLife 35.3 million social media posts from existing IG customers hash-tagging the lifestyle they represent**
- o **#FitLife is ranked #5 in fitness hashtags**
- o **#FitLife averages 1.9K hashtag exposures per hour**
- o **#FitLife is rated as a "Hot Now" hashtag others use to get seen**
- o **#FitLife 13.9 thousand ticktock posts and 159.4 million overall ticktok views**

Consumers want organizations to lead with values. And organization's values are NOW more important to consumers in the US which can affect both sales and consumer loyalty. A recent study, reported that 78% of US consumers say organizations must positively affect society, not just make money- and nearly the same amount, 77% say they feel more emotionally connected to organizations driven by a purpose and values.

## WHY FIT LIFE AND TAKEDA

A 2018 survey conducted by Reputation Institute asked respondents to describe their feelings about 22 different drug makers. Takeda ranked at the bottom at the bottom, 18 out of 22.

Interesting to note, Respondents were of the "informed general public" and were "familiar" with the pharmaceutical industry. They were asked four key questions about each company. "Do they have a good feeling about the company? Do they admire the company? Do they trust the company? And do they find the company reputable? After these four questions, RI then drills down into more specific perceptions of each company.

People only know what they know. Likewise, people don't know what they don't know. What does the average, everyday American know about Takeda? How does the average, everyday person perceive Takeda? What is their main source of the information they know about Takeda? How does the 70% of Americans who are currently on a pharmaceutical medication…. those "at risk", essential workers, and others initially impacted most by COVID…. those 30-55-year-old working class individuals impacted the most in the Post Covid New Lifestyle perceive Takeda? What is their main source of the information they know about Takeda?

Again, what does everyone other than the "informed" general public know about Takeda? And do they know the independent corporation Takeda? Or do they only know the industry Pharma? And what does

Takeda_0000510

the term "informed" mean and how is that measured? What is their main source of the information they know about Takeda and pharma?

People only know what they know. Likewise, people don't know what they don't know. Takeda's company DNA is reflected in its values which has shaped its company culture. Takeda promotes living Lifestyle Medicine and is effective internally through creation of mind, body and spirit employer programs, such as Faith at Work, Thrive, and Be Well at Takeda. While supporting and inspiring social engagement and social responsibility, through internal employee groups like, STRIVE, BLC and Gender Parity Network. Global and community society initiatives such as World Mental Health Day and ADHD Awareness Month are some of the campaigns Takeda supports, as they are the medical conditions that Takeda has a medical solution for.

Takeda has created an internal corporate identity defined by the company's heartbeat; its mission, values and objectives. This nucleus which defines lifestyle medicine, should positively differentiate Takeda. However, it does not extend beyond its own internal walls.

People only know what they know. Likewise, people don't know what they don't know. The emotion of hope showed society that pharma has heart. An emotion, not a lifesaving drug, or a million-dollar donation was the POWERFUL FORCE that moved the needle of public perception. Takeda's dedication to the health and wellness of their patients and people must be seen through eyes outside of Takeda. And outside and independent of the pharma industry. After all, before someone is a Takeda patient, they are a person, who more than likely has never heard or had an interaction with Takeda.

COVID-19 has magnified the importance of living a healthy lifestyle. To be a COVID patient and/or survivor is determined by the individual lifestyle led. Lifestyle factors determine if you are at risk for contracting COVID and if you become infected with COVID how the virus will affect your body and your survival rate. Lifestyle is learned. Lifestyle is teachable. Lifestyle is a choice. Lifestyle is solvable.

Lifestyle medicine will be the new hot trend pushed by those seeking profit. For Takeda to regain trust in society, Takeda must do something that is both Socially Responsible and a Force for Good - OUTSIDE of the pharma umbrella. Takeda needs to be the engine and voice behind the Health-Related Lifestyle-Social Need they have an organic solution for, NOT have a drug for...Fit Life

Marketing in the conditions imposed on us by the coronavirus, must include transparency, truth, and authenticity. While providing compassionate and factual messaging, that positively impact people and society over profits. Companies must lean on community, brand building, and being a force for good. We must respond to the world as it is, as it changes- not the world we wish it was, or the world it used to be. Mental, physical and emotional health are not just a "New Year, New Me" mantra, it's a lifestyle here to stay.

Takeda_0000511



Takeda_0000512





## ABOUT FIT LIFE

**Fit Life is more than apparel.** Sporting a Fit Life shirt means being part of a community of individuals, each striving to be better today than they were yesterday. It's a lifestyle choice. It's choosing to take one step towards improving yourself and your health every single day, and offering support to others trying to do the same.

Takeda_0000514

# Our tribe

You never regret a workout. No matter what you have going on in your life, an hour spent pounding sidewalks or sweating it out at the gym can make anything you're facing feel conquerable. Whether it's a bike ride through tree-lined trails or a yoga class, the Fit Life tribe sees you. We see you showing up, we celebrate your accomplishments and we motivate you to keep putting one foot in front of the other.



## We've got grit

From the boardroom to bath and bedtime with the kids, we work hard. We believe mental strength is key to overcoming any challenge, and we channel that into our lifestyle goals.



## We are inclusive

There are a few things that bring the sense of peace that comes with finding your tribe. Finding like-minded individuals. People who get you. Ones that hold no judgments and no explanations are needed. We've "Got Your Back!"



## We strive for balance

We have full lives and long to-do lists. We also know that to get it all done, we have to take care of our mind, body, and spirit. While physical fitness is a priority, the goal is overall wellness.



## We are honest

We are authentic. We don't believe in perfection because we know there is no such thing. We believe in owning our shit. If we fall, it's because there is something down there we are supposed to find.

Takeda_0000515

# About Our Founder

Shannon Olson is a fearless single mother of three who rebuilt her life after a divorce. She understands firsthand what it's like to start from scratch with little more than a dream. When life dealt her lemons, she made margaritas. With aims of inspiring her children and everyone else around her, she started Fit Life as a natural extension of her passion for wellness and fitness.





### Kiddos

Logan, Chloe, and Liam are the engine behind everything she does. Being a single mom is never easy, but it has certainly given her the drive to always push forward, both for their sake and to provide them with a good example of what it is to be a good person and live a well-lived life.



### Taking control of her life

When she was broken and at a low point in life, she wanted her kids to see that no matter the circumstances, you are in charge of your own life. Mind, body, and spirit isn't just a mantra. She grabbed life's steering wheel and started a business from her two-bedroom apartment, to share the Fit Life mission.



### Giving back to the community

By lifting others up, we lift ourselves up. And when people feel good and are happy, they tend to pay it forward. This is why every month, she celebrates her success by donating at least 10% of Fit Life's sales to charity.

Takeda_0000516

# Our Products

All of our products are durable, functional, and fashionable. Moisture-wicking and odor resistant, they will take you from the training track to the finish line with ease and comfort.

From running errands after a quick workout to Boylston Street on Patriot's Day, Fit Life's got you covered.

   

   

   

Takeda_0000517

# I MAY not be there yet, BUT I'm closer than I was yesterday.

– Shannon Olson, Founder of FitLife®



Takeda_0000518





**FitLifeActive.com**

Shannon@fitlifeactive.com

727-641-1676

Takeda_0000519

Message
_____

**From:** Potilechio, Susan [susan.potilechio@takeda.com]
**Sent:** 10/15/2020 12:29:41 PM
**To:** Olson, Shannon [shannon.olson@takeda.com]
**CC:** Potilechio, Susan [susan.potilechio@takeda.com]
**Subject:** Outside Activities/ Secondary Employment Request Form
**Attachments:** Outside Activites Intake Request Form (Final).docx

Hi Shannon –

As we discussed yesterday, attached is the new form that Takeda is utilizing for outside activities for employees.  Fill it out and send back to me.  I will be responding via email and then we will put this into file that you have disclosed.

Thanks,

*Susan Potilechio, SPHR*
*(formerly Susan Wisehart)*
*Employee Relations Partner - USBU*
susan.potilechio@takeda.com

*Takeda Pharmaceuticals USA*
*Cell: (847) 561-9122*

**EXHIBIT**
**13**

Takeda_0000318



| Date: | | Name of Employee: | |
|---|---|---|---|
| Department and Function: | | Location: | |
| Job Title: | | Name of Manager: | |
| Name of HRBP: | | Name of Outside Employer/Outside Activity: | |
| Address: | | | |
| Telephone: | | Email of Supervisor or Responsible Point of Contact: | |
| Nature of Business: | | Dates outside activity begins and terminates: | |
| Estimated hours required per week for outside employment/activities and scheduled times: | | Will your activities be performed outside of Takeda work hours: | Yes/No |
| | | | If No, please explain: |
| Will you be paid?: | | If so, how much?: | |
| Have you been asked to sign any terms and conditions related to your requested outside employment/activities? If so, please provide a copy of any such materials in connection with this request for review. | | | |
| Does the outside employer or third-party have an existing business relationship with Takeda? If yes, please explain. | | | |

**Describe in Detail the activities you will perform for this employer or organization:**



Please check all statements that apply to your requested outside employment/activities. For any statement checked, please provide a detailed written explanation.

- ❑ The proposed outside organization has contracts with or otherwise receives financial assistance from Takeda now or will likely seek to do so in the future.
- ❑ The activity provides (or would it potentially seek to provide) goods or services to Takeda now or in the future.
- ❑ The activity currently competes with a Takeda marketed product or a product in some stage of development or will compete in one of Takeda's therapeutic areas.
- ❑ The activity requires work during the typical Takeda workday.
- ❑ The activity has the potential to create time demands on the employee that would adversely impact his/her Takeda work or will somehow require him to perform some work in support of it during the Takeda workday.
- ❑ The activity provides (or would it potentially seek to provide) goods or services to Takeda's competitors, vendors, partners, etc.
- ❑ Involvement in the activity could impact/influence the employee's judgment/decision-making in his/her Takeda role.
- ❑ Involvement in the activity has the potential to create reputational risk for Takeda because the employee could be externally identified as a Takeda employee.
- ❑ The activity conflicts (or potentially conflicts) in some way with Takeda's core principles.
- ❑ The employee either intentionally or unintentionally could leverage his/her reputation as a Takeda employee to the benefit of the outside activity.
- ❑ Involvement in the activity could potentially jeopardize Takeda's confidential/proprietary information and/or trade secrets as the employee have difficulty not drawing on his/her knowledge of such assets in the course of working on the activity

Could the proposed outside employment/activities benefit Takeda and if so how?

_____

I am requesting permission from Takeda to engage in outside employment/activities as truthfully described in this form. I understand that providing false or incomplete information about my potential or actual involvement in outside activities may result in disciplinary action, up to and including termination of my employment, if employed.

I have thoroughly reviewed Takeda's policies, procedures, agreements, and/or guidelines related to outside employment/activities, including but not limited to Takeda's Global Code of Conduct. I understand that I may not engage in such activities if it is incompatible with my duties as a Takeda employee and/or in conflict with Takeda's interests. I further understand that Takeda may reject my request to engage in outside employment/activities. If rejected, I will not engage in those prohibited activities. If I refuse, I understand that my employment with Takeda may be immediately terminated and/or my offer of employment may be revoked.

By my signature below, I certify that the information contained within this form is true and complete to the best of my knowledge and belief. I acknowledge that this form does not change the nature of my employment with Takeda which remains at-will.

_____          _____
Signature                          Date

Takeda_0000320

Message
_____

**From:**      Olson, Shannon [/O=EXCHANGELABS/OU=EXCHANGE ADMINISTRATIVE GROUP
              (FYDIBOHF23SPDLT)/CN=RECIPIENTS/CN=98981D2CF727408499AEE6194872895F-OLSON, SHAN]
**Sent:**      10/27/2020 11:09:33 AM
**To:**        Potilechio, Susan [susan.potilechio@takeda.com]
**Subject:**   Outside Activites Intake Request Form (Final)
**Attachments:** Outside Activites Intake Request Form (Final).docx

Hey there
I hope this email finds you and yours healthy and well. I hope I added the info you needed. Let me know
Thanks

EXHIBIT

**14**



| Date: | October 19, 2020 | Name of Employee: | Shannon Olson |
|---|---|---|---|
| Department and Function: | Field Sales, Senior Sales Representative | Location: | St Petersburg, FL |
| Job Title: | Senior Sales Representative | Name of Manager: | Jodi Gayle-Garcia |
| Name of HRBP: | | Name of Outside Employer/Outside Activity: | Fit Life Activewear/ Online apparel site |
| Address: | 1405 Gulf Way<br>St Pete Beach, FL 33706 | | |
| Telephone: | (727)641-1676 | Email of Supervisor or Responsible Point of Contact: | Shannon Olson, shannon@fitlifeactive.com |
| Nature of Business: | Online Lifestyle T-shirt/Tank company | Dates outside activity begins and terminates: | Jan 2016- present |
| Estimated hours required per week for outside employment/activities and scheduled times: | Weekend hours | Will your activities be performed outside of Takeda work hours: | Yes<br><br>If No, please explain: |
| Will you be paid?: | Ideally | If so, how much?: | I have not made any profit to date- currently monthly sales are $0.00 |
| Have you been asked to sign any terms and conditions related to your requested outside employment/activities? If so, please provide a copy of any such materials in connection with this request for review. | | No, I am the owner | |
| Does the outside employer or third-party have an existing business relationship with Takeda? If yes, please explain. | | I, Shannon Olson am a 21 year Takeda field sales representative and the owner of the online store. | |

**Describe in Detail the activities you will perform for this employer or organization:**

I own a trademark for the name Fit Life in apparel and a couple other categories. I received the trademark in 2015- just after I divorced and while I was a job share Representative with Takeda. As a single mother to 3 little kids, I needed to supplement my income. I could not work for another organization, so I needed to think outside the box. Fit Life is an online t-shirt, tank retail store, that requires me to maintain a website and social media.

Takeda_0000334



Please check all statements that apply to your requested outside employment/activities. For any statement checked, please provide a detailed written explanation.

- ❑ The proposed outside organization has contracts with or otherwise receives financial assistance from Takeda now or will likely seek to do so in the future.
- ❑ The activity provides (or would it potentially seek to provide) goods or services to Takeda now or in the future.
- ❑ The activity currently competes with a Takeda marketed product or a product in some stage of development or will compete in one of Takeda's therapeutic areas.
- ❑ The activity requires work during the typical Takeda workday.
- ❑ The activity has the potential to create time demands on the employee that would adversely impact his/her Takeda work or will somehow require him to perform some work in support of it during the Takeda workday.
- ❑ The activity provides (or would it potentially seek to provide) goods or services to Takeda's competitors, vendors, partners, etc.
- ❑ Involvement in the activity could impact/influence the employee's judgment/decision-making in his/her Takeda role.
- ❑ Involvement in the activity has the potential to create reputational risk for Takeda because the employee could be externally identified as a Takeda employee.
- ❑ The activity conflicts (or potentially conflicts) in some way with Takeda's core principles.
- ❑ The employee either intentionally or unintentionally could leverage his/her reputation as a Takeda employee to the benefit of the outside activity.
- ❑ Involvement in the activity could potentially jeopardize Takeda's confidential/proprietary information and/or trade secrets as the employee have difficulty not drawing on his/her knowledge of such assets in the course of working on the activity

Could the proposed outside employment/activities benefit Takeda and if so how?

Fit Life is a lifestyle brand- promoting health and wellness through mind, body and spirit. It is the lifestyle that is the 1st line of defense and should be heavily promoted in pharma and healthcare in general.

I am requesting permission from Takeda to engage in outside employment/activities as truthfully described in this form. I understand that providing false or incomplete information about my potential or actual involvement in outside activities may result in disciplinary action, up to and including termination of my employment, if employed.

I have thoroughly reviewed Takeda's policies, procedures, agreements, and/or guidelines related to outside employment/activities, including but not limited to Takeda's Global Code of Conduct. I understand that I may not engage in such activities if it is incompatible with my duties as a Takeda employee and/or in conflict with Takeda's interests. I further understand that Takeda may reject my request to engage in outside employment/activities. If rejected, I will not engage in those prohibited activities. If I refuse, I understand that my employment with Takeda may be immediately terminated and/or my offer of employment may be revoked.

By my signature below, I certify that the information contained within this form is true and complete to the best of my knowledge and belief. I acknowledge that this form does not change the nature of my employment with Takeda which remains at-will.

Shannon Olson

October 19, 2020

---
Signature

---
Date

[ PAGE \* MERGEFORMAT ]

Takeda_0000335

**From:** Olson, Shannon [/O=EXCHANGELABS/OU=EXCHANGE ADMINISTRATIVE GROUP (FYDIBOHF23SPDLT)/CN=RECIPIENTS/CN=98981D2CF727408499AEE6194872895F-OLSON, SHAN]
**Sent:** 11/3/2020 4:43:07 PM
**To:** Potilechio, Susan [susan.potilechio@takeda.com]
**Subject:** RE: Outside Activities Intake Request Form (Final)
**Attachments:** Outside Activites Intake Request Form (Final2).docx

Hey there
I hope this email finds you and yours well. I revised the form. Susan, the reality of my business is I own a trademark. In order for me to keep my trademark, I must prove proof of use. I prove of use by hiring a third party to maintain a website and social media. If I do not, I lose the rights to my trademark. My trademark is valuable as there is a large social media following to #FitLife. I do not own that hash tag. It is a # individuals use to # their Fit Life Lifestyle.
I do not generate income. My trademark is an investment and security for me and my kids. I have been approached from individuals and companies to purchase my trademark, but have not sold.
I hope this makes sense.
I can not make the call you scheduled tomorrow at 10. I have taken a couple days off as I have a family health issue I am managing. Can we reschedule the call for Thursday or Friday? Let me know, thanks

Best Always,


Shannon Olson
Senior Sales Representative
Neuroscience Business Unit
Takeda Pharmaceuticals
727-641-1676



**From:** Potilechio, Susan <susan.potilechio@takeda.com>
**Sent:** Monday, November 2, 2020 4:08 PM
**To:** Olson, Shannon <shannon.olson@takeda.com>
**Cc:** Potilechio, Susan <susan.potilechio@takeda.com>
**Subject:** FW: Outside Activities Intake Request Form (Final)

Shannon –

Sorry it has taken me a while to respond. I am going to schedule time with you on Wednesday to talk more about your application and the details about your business. Please take off the personal information in the bottom because we are looking for what this business actually entails which is not clearly written in your description. Is it an online t-shirt shop? Who is running it on a daily basis? Do you get the $ for the t-shirt sales or is it the company who produces the T-shirts and ships? If you make no money, then why is there a website and business? These are the types of questions that you need to clearly state in the description box since at the bottom your managers are going to ask that same questions. Try it again to detail what your business entails and we will talk on Wednesday.

**EXHIBIT**

**15**

Thanks,

*Susan Potilechio, SPHR*
*(formerly Susan Wisehart)*
*Employee Relations Partner - USBU*
susan.potilechio@takeda.com

*Takeda Pharmaceuticals USA*
*Cell: (847) 561-9122*

**From:** Olson, Shannon <shannon.olson@takeda.com>
**Sent:** Tuesday, October 27, 2020 5:10 AM
**To:** Potilechio, Susan <susan.potilechio@takeda.com>
**Subject:** Outside Activites Intake Request Form (Final)

Hey there
I hope this email finds you and yours healthy and well. I hope I added the info you needed. Let me know
Thanks

Takeda_0000338



| Date: | October 19, 2020 | Name of Employee: | Shannon Olson |
|---|---|---|---|
| Department and Function: | Field Sales, Senior Sales Representative | Location: | St Petersburg, FL |
| Job Title: | Senior Sales Representative | Name of Manager: | Jodi Gayle-Garcia |
| Name of HRBP: | | Name of Outside Employer/Outside Activity: | Fit Life Activewear/ Online apparel site |
| Address: | 1405 Gulf Way<br>St Pete Beach, FL 33706 | | |
| Telephone: | (727)641-1676 | Email of Supervisor or Responsible Point of Contact: | Shannon Olson, shannon@fitlifeactive.com |
| Nature of Business: | Online Lifestyle T-shirt/Tank company | Dates outside activity begins and terminates: | Jan 2016- present |
| Estimated hours required per week for outside employment/activities and scheduled times: | Weekend hours | Will your activities be performed outside of Takeda work hours: | Yes<br><br>If No, please explain: |
| Will you be paid?: | Ideally | If so, how much?: | I have not made any profit to date- currently monthly sales are $0.00 |
| Have you been asked to sign any terms and conditions related to your requested outside employment/activities? If so, please provide a copy of any such materials in connection with this request for review. | | | No, I am the owner |
| Does the outside employer or third-party have an existing business relationship with Takeda? If yes, please explain. | | | I, Shannon Olson am a 21 year Takeda field sales representative and the owner of the online store. |

### Describe in Detail the activities you will perform for this employer or organization:

I own a trademark for the name Fit Life in apparel and a couple other categories. I received the trademark in 2015- just after I divorced and while I was a job share Representative with Takeda. As a single mother to 3 little kids, I needed to supplement my income. Since I could not work for another organization, I needed to think outside the box, thus I trademarked the name Fit Life and created a small business. In 2015, I purchased bulk blank apparel and hired a local printer print my logo on them. The apparel on the site is the same original apparel.

Takeda_0000339



When I job shared my position, I worked my days and weekends off from Takeda to establish and market Fit Life. Instead of running races or competing in Tri's I set up a tent and became a vendor. Since going back full time (Oct 2017) I have not been actively marketing Fit Life. I do not have the time. I have since, hired a third party to maintain the website and social media and order fulfillment. BUT to keep my trademark, I must prove proof of use. Thus, Fit Life is an active LLC, with a website and minimal social media presence. I am not actively selling apparel outside of my website.

However, I have been approached by individuals and companies to sell my trademark to them. There is a large social media following for the #FitLife (the # is not owned by me- it a # individuals use to promote the Fit Life lifestyle they live). Thus, I came up with the idea to approach others and companies to purchase my trademark.

Fit Life has made $0.00 for the past 3 years). The trademark is my investment. The apparel, website and social media is how I am able to prove proof of use.

Please check all statements that apply to your requested outside employment/activities. For any statement checked, please provide a detailed written explanation.

- ❑ The proposed outside organization has contracts with or otherwise receives financial assistance from Takeda now or will likely seek to do so in the future.
- ❑ The activity provides (or would it potentially seek to provide) goods or services to Takeda now or in the future.
- ❑ The activity currently competes with a Takeda marketed product or a product in some stage of development or will compete in one of Takeda's therapeutic areas.
- ❑ The activity requires work during the typical Takeda workday.
- ❑ The activity has the potential to create time demands on the employee that would adversely impact his/her Takeda work or will somehow require him to perform some work in support of it during the Takeda workday.
- ❑ The activity provides (or would it potentially seek to provide) goods or services to Takeda's competitors, vendors, partners, etc.
- ❑ Involvement in the activity could impact/influence the employee's judgment/decision-making in his/her Takeda role.
- ❑ Involvement in the activity has the potential to create reputational risk for Takeda because the employee could be externally identified as a Takeda employee.
- ❑ The activity conflicts (or potentially conflicts) in some way with Takeda's core principles.
- ❑ The employee either intentionally or unintentionally could leverage his/her reputation as a Takeda employee to the benefit of the outside activity.
- ❑ Involvement in the activity could potentially jeopardize Takeda's confidential/proprietary information and/or trade secrets as the employee have difficulty not drawing on his/her knowledge of such assets in the course of working on the activity

Could the proposed outside employment/activities benefit Takeda and if so how?

I am requesting permission from Takeda to engage in outside employment/activities as truthfully described in this form. I understand that providing false or incomplete information about my potential or actual involvement in outside activities may result in disciplinary action, up to and including termination of my employment, if employed.

I have thoroughly reviewed Takeda's policies, procedures, agreements, and/or guidelines related to outside employment/activities, including but not limited to Takeda's Global Code of Conduct. I understand that I may not engage in such activities if it is incompatible with my duties as a Takeda employee and/or in conflict with Takeda's interests. I further understand that Takeda may reject my request to engage in outside employment/activities. If rejected, I will not engage in those prohibited activities. If I refuse, I understand that my employment with Takeda may be immediately terminated and/or my offer of employment may be revoked.

[ PAGE \* MERGEFORMAT ]

Takeda_0000340



By my signature below, I certify that the information contained within this form is true and complete to the best of my knowledge and belief. I acknowledge that this form does not change the nature of my employment with Takeda which remains at-will.

Shannon Olson                                    October 19, 2020
_____                      _____
Signature                                        Date

Takeda_0000341

Message
_____

**From:** Potilechio, Susan [susan.potilechio@takeda.com]
**Sent:** 11/16/2020 7:47:52 PM
**To:** Olson, Shannon [shannon.olson@takeda.com]
**CC:** Potilechio, Susan [susan.potilechio@takeda.com]
**Subject:** FW: Secondary Employment Approval
**Attachments:** Outside Activities Approval Agreement Template (Final) - Shannon Olson.docx

**Importance:** High

Shannon –

Can you please read and sign the attached form and then scan and send back for your file. This will be the final step and then your business/trademark will be approved.

Thanks,

*Susan Potilechio, SPHR*
*(formerly Susan Wisehart)*
*Employee Relations Partner - USBU*
susan.potilechio@takeda.com

*Takeda Pharmaceuticals USA*
*Cell: (847) 561-9122*

_____

**From:** Potilechio, Susan <susan.potilechio@takeda.com>
**Sent:** Tuesday, November 10, 2020 11:51 AM
**To:** Olson, Shannon <shannon.olson@takeda.com>
**Cc:** Potilechio, Susan <susan.potilechio@takeda.com>
**Subject:** Secondary Employment Approval

Hi Shannon –

Your secondary employment request has been approved. Greg and Jodi have been made aware and also agree it will not impede your role with Takeda. Please read and sign the approval form and I will insert into your file. Let me know if you have any questions.

Thanks,

*Susan Potilechio, SPHR*
*(formerly Susan Wisehart)*
*Employee Relations Partner - USBU*
susan.potilechio@takeda.com

*Takeda Pharmaceuticals USA*
*Cell: (847) 561-9122*

**EXHIBIT**
**17**

Takeda_0000343

## <u>APPROVAL AGREEMENT: OUTSIDE EMPLOYMENT/ACTIVITIES</u>

This Agreement applies to **Fit Life Activewear/ Online apparel site, Inc.** ("Takeda"), and its past, present, and future divisions, subsidiaries, parents, affiliates, joint ventures, and other related entities, and the respective predecessors, successors, and assigns of each of the foregoing entities (collectively "Takeda" or "Company") and the Employee specified below. In consideration for Takeda's approval of Employee's request for outside employment/activities, which are specifically **owning Fit Life trademark and selling of activewear through a 3rd party website** and the mutual promises and covenants set forth herein and for other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, Employee agrees by signing below to the following:

1. Employee will not engage in any outside employment/activities that are incompatible with Employee's official Takeda responsibilities. Specifically, Employee agrees that any approved outside employment/activities will not:

    a. bring disfavor or disrespect upon Employee and/or Takeda;
    b. impede or adversely affect Employee's performance and proper discharge of Employee's Takeda duties;
    c. make use of any Takeda resources and/or equipment;
    d. occur during time Employee is being paid in any way by Takeda or is conducting Takeda work; and/or
    e. conflict with any Takeda policies, procedures, and/or guidelines, including but not limited to Takeda's Global Code of Conduct.

2. Employee agrees not to participate in any activities that are relevant to and/or in conflict with Takeda's business including but not limited to activities related to actual or potential transactions with third parties.

3. Employee shall not perform outside employment/activities while receiving paid sick leave or disability benefits from Takeda. If Employee becomes injured, disabled, or ill as a result of any such activities, Employee understands and agrees that he/she shall not be given paid sick leave or disability benefits from Takeda.

4. Employee shall not violate any Takeda policies, procedures or other signed agreements between Employee and Takeda regarding the direct or indirect disclosure of any Takeda confidential or proprietary information when performing non-Takeda related activities. Employee acknowledges that he/she has reviewed Takeda's policies around confidential and/or proprietary information, has been given an opportunity to ask questions about those policies if necessary, understands them, and will fully comply with them when performing outside employment or activities.

5. Employee will not verbally agree to and/or sign any written terms and/or conditions related to Employee's outside employment/activities with a third-party unless expressly authorized by Takeda's Legal Department and Employee's manager.

6. Employee will immediately notify his/her manager and Human Resources Representative if the information contained in Employee's Request Form changes in any way after approval including but not limited to changes in length arrangement, specific duties, financial implications, potential reputational risks, etc.

7. Post approval, Employee agrees to fully cooperate in periodic reviews of his/her outside employment/activities at any time upon request. Employee agrees that this approval only includes the outside employment/activities specified above; it is not a blanket approval. All activities must be authorized separately and well in advance.

8. Employee understands that approval of Employee's request may be revoked at any time at the sole discretion of Takeda. Employee also agrees that he/she will immediately modify, limit or

Takeda_0000344

otherwise terminate his/her outside employment/activities upon request.

9. Employee understands that any failure to abide by the conditions within this agreement including but not limited to timely disclosing changes to his/her outside employment/activities arrangements, avoiding any activities which create an actual or potential conflict of interest arising from such employment, undertaking any actions that violate Takeda policies and/or procedures, and/or disobeying the instructions contained within this agreement are grounds for both immediate revocation of this approval and/or disciplinary action, up to and including termination of employment.

10. Employee acknowledges that his/her employment remains at-will and nothing in this agreement creates or evidences a contract for employment. Additionally, all other agreements between Employee and Takeda, including but not limited to the Confidentiality, Intellectual Property and Noncompetition Agreement ("Agreement"), remain in full force and effect.


_____         _____
Employee Printed Name and Signature              Date


CC:     Employee Personnel File
        Employee Manager

Takeda_0000345

| Message | |
|---|---|
| **From:** | stephanieanderson@gulfcoastfamilywellness.com [stephanieanderson@gulfcoastfamilywellness.com] |
| **Sent:** | 10/22/2021 4:13:44 PM |
| **To:** | Olson, Shannon [shannon.olson@takeda.com] |
| **Subject:** | Fwd: ADA Medical Evaluation |
| **Attachments:** | SO COVID.pdf |

Be advised that this email came from outside Takeda / お知らせ：社外から送信されたメールです

Begin forwarded message:

**From:** "stephanieanderson@gulfcoastfamilywellness.com"
<stephanieanderson@gulfcoastfamilywellness.com>
**Subject: ADA Medical Evaluation**
**Date:** October 22, 2021 at 11:46:55 AM EDT
**To:** US.Occ.Health.ADA@takeda.com
**Cc:** shannonolson3@gmail.com

Please see attached for the requested documentation.


Stephanie Anderson, APRN

The content of this email and of any files transmitted may contain confidential, proprietary or legally privileged information and is intended solely for the use of the person/s or entity/ies to whom it is addressed. If you have received this email in error you have no permission whatsoever to use, copy, disclose or forward all or any of its contents. Please immediately notify the sender and thereafter delete this email and any attachments.

<div style="border:1px solid black; display:inline-block; text-align:center;">

**EXHIBIT**

**19**

</div>

Takeda_0000425

**EMPLOYEE REQUEST FOR ACCOMMODATION BASED ON DISABILITY**

*Please complete this form and return it via email at US.Occ.Health.ADA@takeda.com Please do not submit this form to your manager. Please note this form will not be placed in your personnel file but will be kept in a separate and secure confidential file. Contents of this request are confidential and will not be shared except as needed to consider any reasonable accommodation request.*

**ALL QUESTIONS TO BE COMPLETED BY EMPLOYEE/APPLICANT ONLY:**

Date: October 15, 2021

Name: Shannon Olson

Employee ID#: 50010355

Please explain which aspects of your employment responsibilities/duties are impacted by your condition.




What specific accommodation are you requesting (e.g., time off, additional equipment, etc.)? (Please submit Form B, completed by your medical provider, in support of your response to this question)

Weekly Covid Testing, Masks, Social Distancing

What other accommodations may be responsive to your request?


How long do you anticipate the need for an accommodation? If requesting time off, please provide an estimated return to work date.


I understand that my request for accommodation must be supported by medical documentation. I agree to provide that information as requested per the deadline required. I agree to fully cooperate with Human Resources in responding to my request. I understand I may not be provided with the specific accommodation that I have requested; however, I understand that good faith efforts will be made to consider my request.

**Employee Signature:** *Shannon Olson* **Date:** October 15, 2021

Please note, the Genetic Information Nondiscrimination Act of 2008 (GINA) prohibits employers and other entities covered by GINA Title 11 from requesting or requiring genetic Information of an individual or family member of the individual, except as specifically allowed by this law. To comply with this law, we are asking that you not provide any genetic information when responding to this request for medical information. 'Genetic information' as defined by GINA, includes an individual's family medical history, the results of an individual's or family member's genetic tests, the fact that an individual or an individual's family member sought or received genetic services, and genetic information of a fetus carried by an individual or an individual's family member or an embryo lawfully held by an individual or family member receiving assistive reproductive services

Form A

Takeda_0000426



## HEALTH CARE PROVIDERS INFORMATION
## CONFIDENTIAL RECORDS STATEMENT
AUTHORIZATION TO RELEASE MEDICAL RECORDS

**INSTRUCTIONS FOR EMPLOYEE:** Complete health care provider information and sign authorization release below. Make additional copies of this form for each of your health care providers, if you have more than one provider.

Sign and date all forms and return to:
US.Occ.Health.ADA@takeda.com

## HEALTH CARE PROVIDER INFORMATION

Attending Health Care Provider's Name: Stephanie Anderson

Address: 7855 38th Ave N Ste 200

City: St Petersburg          State: FL          Zip: 33710

Phone Number: ( 727) 480-0387          Fax Number: (   )

## AUTHORIZATION TO RELEASE MEDICAL RECORDS

I have requested an accommodation from Takeda, my employer, under The Americans with Disabilities Act (ADA) of 1990.

**I hereby authorize the ADA Coordinator for Takeda and Takeda's Occupational Health Lead to communicate directly with the health care provider who completes this form, in order to obtain clarification of issues relating to the functional limitations for which I am seeking an accommodation.**

**A note about the Genetic Information Nondiscrimination Act of 2008 (GINA):**
**The Genetic Information Nondiscrimination Act of 2008 (GINA) prohibits employers and other entities covered by GINA Title II from requesting or requiring genetic information of an individual or family member of the individual, except as specifically allowed by this law. To comply with this law, we are asking that you not provide any genetic information when responding to this request for medical information. "Genetic information," as defined by GINA, includes an individual's family medical history, the results of an individual's or family member's genetic tests, the fact that an individual or an individual's family member sought or received genetic services, and genetic information of a fetus carried by an individual or an individual's family member or an embryo lawfully held by an individual or family member receiving assistive reproductive services.**

**This authorization will automatically end within one year from the date the employee signs this form.**

Takeda_0000427

Employee's Signature: _Shannon Olson_ (signature)    Date: October 15, 2021

CONFIDENTIALITY NOTICE: Medical-related information shall be kept confidential and maintained separate from other personnel records. However, supervisors and managers may be advised of information necessary to the determinations they are required to make in connection with a request for an accommodation. First aid and safety personnel may be informed, when appropriate, if the disability might require emergency treatment or if any specific procedures are needed in the case of fire or other evacuations. Government officials investigating compliance with the ADA may also be provided relevant information as requested.



# REQUEST FOR MEDICAL STATUS EVALUATION
# UNDER THE ADA AMENDMENTS ACT (the "ADAAA")

Employee Requesting Accommodation:

Position/Title: Senior Sales Representative    Department:  NSBU/ Sales

Work Location:  St Petersburg, FL        Work Phone number:   727-641-1676

Immediate Supervisor:   Greg Crouch

**The information below is treated confidentially, is not maintained in the employee's main personnel file, and will be used** only by authorized individuals with a direct need to know and/or evaluate the information.  Please return this form, once completed, to: US.Occ.Health.ADA@takeda.com.

**Supervisors and managers may be advised of information necessary to make the determinations they are required to make in connection with a request for an accommodation.**

## INSTRUCTIONS FOR EMPLOYEE

**Please provide this form to your healthcare provider along with your attached job description and your signed authorization form.  Takeda will consider your request for accommodation upon receipt of your completed Medical Status Evaluation Fom.  If you have any questions, please do not hesitate to call Occ Health or Employee Relations.  Thank you.**

······································································································································

## THIS SECTION TO BE COMPLETED BY HEALTH CARE PROVIDER:

Health Care Provider:  Stephanie Anderson

Office Address:  7855 38th Ave N Ste 200 St Petersburg FL 33710

Office Phone Number:  727-480-0387

1.   Based on the job description, can the employee perform the essential functions of the position without an accommodation?

   ☐ **Yes**        ☐ **No**

   *If no,* what essential job function(s) is the employee having trouble performing because of the impairment(s) (attach additional sheets of paper, if necessary)?
   See Attachment

2.   Can the employee perform the essential functions of his/her position without being a direct threat to his or her own health and safety and/or the health and safety of others in the workplace?

   ☐ **Yes**        ☐ **No**

Takeda_0000429



3. *If no*, please explain the basis for your response; including objective medical or other factual evidence (attach additional sheets of paper, if necessary)?

_____

_____

**Questions to help determine effective accommodation options.**

4. ***Is there a reasonable accommodation*** that would enable the employee to perform the essential functions of the job as described in the attached job description? (Please note that the employer retains the discretion to determine whether an accommodation is reasonable.)

☒ Yes      ☐ No

| **Accommodation Being Requested:** |
| --- |
| Weekly Covid Testing, Masks, Social Distancing |
| |
| |

5. How long do you estimate the accommodation(s) will be needed? Please comment on the estimated duration of the recommended accommodation and the frequency of accommodation if it entails time away from the employee's job:

_____

_____

6. If your proposed accommodation is a leave of absence, when will the employee be able to return to work?
Shannon is able to work, I just do not want Shannon to receive any of the current vaccinations

| Reason for Accommodation (functional limitation(s) for which you seek an accommodation): |
| --- |
| See Attached Sheet |
| |
| |
| |

7. Please provide any further information you feel would be useful to the Company in evaluating the employee's situation but do not identify the employee's specific medical condition and do not provide the details of your diagnosis of the employee.

_____

_____

_____

_____

**SIGNATURE OF HEALTHCARE PROVIDER**      **DATE** 10/22/2021
(Please do not use signature stamp or designee signature)



## GULF
## COAST
## FAMILY
## WELLNESS

Primary Care with a Personalized Touch

Response to Takeda's Request for Medical Status Evaluation Under the ADA Amendments Act (the "ADAAA") for Shannon Olson

1. Based on the job description, can Shannon perform the essential functions of the position without an accommodation?
   a. I cannot provide a yes or no answer as, I do not know how the current vaccines will interact with Shannon. There is not enough information for me to make that decision.

2. Can Shannon perform the essential functions of her position without being a direct threat to his or her own health and/or the safety of others in the workplace?
   a. I cannot provide a yes or no answer as, I do not know how the current vaccines will interact with Shannon. There is not enough information for me to make that decision.

3. If no, please explain the basis for your response, including objective medical or other factual evidence.
   a. Shannon Olson is not to receive any of the current COVID-19 vaccines. I am requesting Shannon Olson receive a medical exemption. As her medical provider, I state this for numerous reasons. Shannon has underlying autoimmune disease. When activated is detrimental to her health. She is also genetically predisposed to numerous other autoimmune diseases. As a child, she suffered with chronic ear infections. She was treated with antibiotics and had reactions including anaphylaxis reaction to amoxicillin.

4. Please provide any further information you feel would be useful to the Company in evaluating the employee's situation but do not identify the employees medical condition and do not provide the details of your diagnosis of the employee.

   a. As previously stated, as Shannon Olson's medical provider, at this time I do not want nor recommend Shannon Olson receive any of the current COVID-19 vaccines.

Stephanie Anderson, ARNP
727-460-0387

Takeda_0000431

Message
_____

**From:** Miller, Heidi [heidi.miller@takeda.com]
**Sent:** 5/30/2023 3:00:31 PM
**To:** Olson, Shannon [shannon.olson@takeda.com]
**CC:** Sheridan, Matt [matt.sheridan@takeda.com]; Urbanski, Lynn [lynn.urbanski@takeda.com]; Bell, Mike [mike.bell@takeda.com]; Smith, Eve [eve.smith@takeda.com]; Miller, Heidi [heidi.miller@takeda.com]
**Subject:** Suspension of COVID- 19 Policies and Protocols - Shannon Olson

**Importance:** High

Dear Shannon,

By now, you have likely read the message from Takeda's U.S. Crisis Management Committee informing the U.S. Region that Takeda is suspending COVID-19 policies and protocols, including the COVID-19 vaccination requirements for field-based employees.

I am pleased to confirm that, effective immediately, you are cleared to return to meeting face-to-face with your customers, which, as you know, is essential to optimizing our effectiveness. As a result, your current accommodation is closed. We expect that you work with your manager to discuss next steps for your timely return to work in the field. As always, we will continue to follow customer preference and customer requirements as we continue to serve our patients. If there are specific customer requirements that prohibit in-person meetings, please consult with your manager; if necessary, you may request a reasonable accommodation.

If you have any questions, please let your manager know or contact me. Thank you for your continued commitment to our patients.

Heidi



**Better Health, Brighter Future**

*Heidi Miller*
Employee Relations Partner, People Advisory Group (PAG)
Corporate Functions, Vaccines, Oncology
**Takeda Pharmaceutical Company Limited**
mobile +1-617-795-6384
heidi.miller@takeda.com
www.takeda.com

January 1: In the U.S., HRConnect & the ERC transform into the
**U.S. People Resource Hub**
takeda.info/peopleresourcehub
866-866-7893 or 224-554-6800
peopleresourcehub@takeda.com

EXHIBIT
**28**

Takeda_0000542

Takeda Pharma America, Inc.
One Takeda Parkway,
Deerfield, IL   60015

# Earnings Statement

Period Beginning:   01/05/2019
Period Ending:   01/18/2019
Pay Date:   01/18/2019

**SHANNON M OLSON**
**102 28TH AVE**
**ST PETE BEACH,   FL   33706**

Filing Status:   Single

Employee ID: 50010355

| Earnings | Rate | Hours | This Period | Year to Date |
|----------|------|-------|-------------|--------------|
| Regular | | 80.00 | 4,455.44 | |
| Fleet Taxable | | 0.00 | 53.00 | |
| **Gross Pay** | | | $ 4,508.44 | 9,016.88 |

**Important Notes**

| Deductions | Statutory | | |
|------------|-----------|---|---|
| | Federal Income Tax | 664.25 - | 1,328.50 - |
| | Social Security Tax | 262.64 - | 525.27 - |
| | Medicare Tax | 61.42 - | 122.84 - |
| | **Other** | | |
| | PS USAGE CHARGE | 120.00 - | |
| | CHECKING | 2,763.18 - | |
| | PRETAX DEN INS | 14.00 - | |
| | FLEET TXB | 53.00 - | |
| | HEALTH SAVINGS | 200.00 - | |
| | PRETAX MED INS | 71.00 - | |
| | ROTH 401K | 267.33 - | |
| | UNUM | 31.62 - | |
| | **Net Pay** | $ 0.00 | |

**Other Benefits and Information** | **This Period** | **Year to Date**

---

Takeda Pharma America, Inc.
One Takeda Parkway
Deerfield, IL   60015

**Payroll check Number:   0000031186**
Period Beginning:   01/05/2019
Period Ending:   01/18/2019
Pay Date:   01/18/2019
Employee ID:   50010355

Pay to the
order of      **SHANNON M OLSON**
This Amount:   **ZERO AND 00/100 DOLLARS**                         **$ 0.00**

THIS IS NOT A CHECK

**EXHIBIT**
**30**

## NON-NEGOTIABLE

Takeda_0000788

THIS IS NOT A CHECK

| CO. | FILE | DEPT. | CLOCK | CHK. NO. |
|-----|------|-------|-------|----------|
| GSE | 026177 | | | 0000051349 |

Takeda Pharma America, Inc.
One Takeda Parkway,
Deerfield, IL   60015

# Earnings Statement

Period Beginning:   01/19/2019
Period Ending:   02/01/2019
Pay Date:   02/01/2019

Filing Status:   Single

Employee ID: 50010355

**SHANNON M OLSON**
**102 28TH AVE**
**ST PETE BEACH,   FL   33706**

| Earnings | Rate | Hours | This Period | Year to Date |
|----------|------|-------|-------------|--------------|
| Regular | | 80.00 | 4,455.44 | |
| Fleet Taxable | | 0.00 | 53.00 | |
| **Gross Pay** | | | $    4,508.44 | 13,525.32 |

**Important Notes**

| Deductions | Statutory | | This Period | Year to Date |
|------------|-----------|--|-------------|--------------|
| | Federal Income Tax | | 664.25 - | 1,992.75 - |
| | Social Security Tax | | 262.63 - | 787.90 - |
| | Medicare Tax | | 61.43 - | 184.27 - |
| | **Other** | | | |
| | PS USAGE CHARGE | | 120.00 - | |
| | CHECKING | | 2,763.18 - | |
| | PRETAX DEN INS | | 14.00 - | |
| | FLEET TXB | | 53.00 - | |
| | HEALTH SAVINGS | | 200.00 - | |
| | PRETAX MED INS | | 71.00 - | |
| | ROTH 401K | | 267.33 - | |
| | UNUM | | 31.62 - | |
| | **Net Pay** | | $    0.00 | |

**Other Benefits and Information**

| | This Period | Year to Date |
|--|-------------|--------------|

Takeda Pharma America, Inc.
One Takeda Parkway
Deerfield, IL   60015

Payroll check Number:   0000051349
Period Beginning:   01/19/2019
Period Ending:   02/01/2019
Pay Date:   02/01/2019
Employee ID:   50010355

Pay to the
order of   **SHANNON M OLSON**

This Amount:   **ZERO AND 00/100 DOLLARS**                    **$ 0.00**

THIS IS NOT A CHECK

# NON-NEGOTIABLE

Takeda_0000789

| CO. | FILE | DEPT. | CLOCK | CHK. NO. |
|-----|------|-------|-------|----------|
| GSE | 026177 | | | 0000391008 |

Takeda Pharma America, Inc.
One Takeda Parkway,
Deerfield, IL   60015

# Earnings Statement

Period Beginning:   09/14/2019
Period Ending:      09/27/2019
Pay Date:           09/27/2019

Filing Status:   Single

**SHANNON M OLSON**
**102 28TH AVE**
**ST PETE BEACH,   FL   33706**

Employee ID: 50010355

| Earnings | Rate | Hours | This Period | Year to Date |
|----------|------|-------|-------------|--------------|
| Regular | | 80.00 | 4,566.82 | |
| Fleet Taxable | | 0.00 | 53.00 | |
| **Gross Pay** | | $ | 4,619.82 | 115,763.40 |

| Deductions | Statutory | This Period | Year to Date |
|------------|-----------|-------------|--------------|
| | Federal Income Tax | 690.98 - | 18,935.84 - |
| | Social Security Tax | 269.56 - | 6,839.70 - |
| | Medicare Tax | 63.04 - | 1,599.61 - |
| | **Other** | | |
| | PS USAGE CHARGE | 120.00 - | |
| | CHECKING | 2,832.61 - | |
| | PRETAX DEN INS | 14.00 - | |
| | FLEET TXB | 53.00 - | |
| | HEALTH SAVINGS | 200.00 - | |
| | PRETAX MED INS | 71.00 - | |
| | ROTH 401K | 274.01 - | |
| | UNUM | 31.62 - | |
| | **Net Pay** | $      0.00 | |

**Important Notes**

**Other Benefits and Information** | **This Period** | **Year to Date**

Takeda Pharma America, Inc.
One Takeda Parkway
Deerfield, IL   60015

**Payroll check Number:**   **0000391008**
Period Beginning:            09/14/2019
Period Ending:               09/27/2019
Pay Date:                    09/27/2019
Employee ID:                 50010355

Pay to the
order of     **SHANNON M OLSON**

This Amount:   **ZERO AND 00/100 DOLLARS**                                        **$ 0.00**

THIS IS NOT A CHECK

# NON-NEGOTIABLE

Takeda_0000790

| CO. | FILE | DEPT. | CLOCK | CHK. NO. |
|---|---|---|---|---|
| GSE | 026177 | | | 0000411014 |

# Earnings Statement

Takeda Pharma America, Inc.
One Takeda Parkway,
Deerfield, IL   60015

Period Beginning:   09/28/2019
Period Ending:      10/11/2019
Pay Date:           10/11/2019

Filing Status:   Single

**SHANNON M OLSON**
**102 28TH AVE**
**ST PETE BEACH,   FL   33706**

Employee ID: 50010355

**Important Notes**

| Earnings | Rate | Hours | This Period | Year to Date |
|---|---|---|---|---|
| Regular | | 80.00 | 4,566.82 | |
| Fleet Taxable | | 0.00 | 53.00 | |
| **Gross Pay** | | | $   4,619.82 | 120,383.22 |

| Deductions | Statutory | | |
|---|---|---|---|
| | Federal Income Tax | 690.98 - | 19,626.82 - |
| | Social Security Tax | 269.57 - | 7,109.27 - |
| | Medicare Tax | 63.04 - | 1,662.65 - |
| | **Other** | | |
| | PS USAGE CHARGE | 120.00 - | |
| | CHECKING | 2,832.60 - | |
| | PRETAX DEN INS | 14.00 - | |
| | FLEET TXB | 53.00 - | |
| | HEALTH SAVINGS | 200.00 - | |
| | PRETAX MED INS | 71.00 - | |
| | ROTH 401K | 274.01 - | |
| | UNUM | 31.62 - | |
| | **Net Pay** | $   0.00 | |

| Other Benefits and Information | This Period | Year to Date |
|---|---|---|

Takeda Pharma America, Inc.
One Takeda Parkway
Deerfield, IL   60015

**Payroll check Number:**   **0000411014**
Period Beginning:    09/28/2019
Period Ending:       10/11/2019
Pay Date:            10/11/2019
Employee ID:         50010355

Pay to the
order of      **SHANNON M OLSON**

This Amount:   **ZERO AND 00/100 DOLLARS**                            **$ 0.00**

THIS IS NOT A CHECK

# NON-NEGOTIABLE

Takeda_0000791

THIS IS NOT A CHECK

| CO. | FILE | DEPT. | CLOCK | CHK. NO. |
|-----|------|-------|-------|----------|
| GSE | 026177 | | X | 0000154269 |

Takeda Pharma America, Inc.
One Takeda Parkway,
Deerfield, IL  60015

# Earnings Statement

Period Beginning:  04/05/2021
Period Ending:  04/18/2021
Pay Date:  04/16/2021

Filing Status:  Single

**SHANNON M OLSON**
**102 28TH AVE**
**ST PETE BEACH,   FL   33706**

Employee ID: 50010355

| Earnings | Rate | Hours | This Period | Year to Date |
|----------|------|-------|-------------|--------------|
| Regular | | 80.00 | 4,681.00 | |
| Fleet Taxable | | 0.00 | 53.00 | |
| **Gross Pay** | | | $   4,734.00 | 46,764.16 |

**Important Notes**

| Deductions | Statutory | | |
|------------|-----------|--|--|
| | Federal Income Tax | 704.65 - | 7,593.49 - |
| | Social Security Tax | 275.48 - | 2,755.19 - |
| | Medicare Tax | 64.43 - | 644.36 - |
| | **Other** | | |
| | PS USAGE CHARGE | 120.00 - | |
| | CHECKING | 2,089.65 - | |
| | PRETAX DEN INS | 8.74 - | |
| | ESPP2 | 200.00 - | |
| | FLEET TXB | 53.00 - | |
| | HEALTH SAVINGS | 211.54 - | |
| | 401K LOAN | 416.96 - | |
| | PRETAX MED INS | 75.48 - | |
| | ROTH 401K | 468.10 - | |
| | UNUM | 37.64 - | |
| | PRETAX VIS INS | 8.33 - | |
| | **Net Pay** | $   0.00 | |

| Other Benefits and Information | This Period | Year to Date |
|-------------------------------|-------------|--------------|

Takeda Pharma America, Inc.
One Takeda Parkway
Deerfield, IL  60015

| Payroll check Number: | 0000154269 |
|-----------------------|------------|
| Period Beginning: | 04/05/2021 |
| Period Ending: | 04/18/2021 |
| Pay Date: | 04/16/2021 |
| Employee ID: | 50010355 |

Pay to the
order of    **SHANNON M OLSON**

This Amount:  **ZERO AND 00/100 DOLLARS**                          **$ 0.00**

THIS IS NOT A CHECK

# NON-NEGOTIABLE

Takeda_0000792

| CO. | FILE | DEPT. | CLOCK | CHK. NO. |
|---|---|---|---|---|
| GSE | 026177 | | X | 0000171717 |

Takeda Pharma America, Inc.
One Takeda Parkway,
Deerfield, IL  60015

# Earnings Statement

Period Beginning:    04/19/2021
Period Ending:       05/02/2021
Pay Date:            04/30/2021

**SHANNON M OLSON**
**102 28TH AVE**
**ST PETE BEACH,   FL   33706**

Filing Status:    Single

**Important Notes**

Employee ID: 50010355

| Earnings | Rate | Hours | This Period | Year to Date |
|---|---|---|---|---|
| Regular | | 80.00 | 4,681.00 | |
| Espp Maturity | | 0.00 | 598.60 | |
| Fleet Taxable | | 0.00 | 53.00 | |
| **Gross Pay** | | $ | 5,332.60 | 52,096.76 |

| Deductions | Statutory | | | |
|---|---|---|---|---|
| | Federal Income Tax | | 848.31 - | 8,441.80 - |
| | Social Security Tax | | 312.60 - | 3,067.79 - |
| | Medicare Tax | | 73.11 - | 717.47 - |
| | **Other** | | | |
| | PS USAGE CHARGE | | 120.00 - | |
| | CHECKING | | 2,141.79 - | |
| | PRETAX DEN INS | | 8.74 - | |
| | ESPP MATURITY | | 598.60 - | |
| | FLEET TXB | | 53.00 - | |
| | HEALTH SAVINGS | | 211.54 - | |
| | 401K LOAN | | 416.96 - | |
| | PRETAX MED INS | | 75.48 - | |
| | ROTH 401K | | 468.10 - | |
| | STK PUR REFUND | | -3.96 - | |
| | PRETAX VIS INS | | 8.33 - | |
| | **Net Pay** | | $ 0.00 | |

**Other Benefits and**
**Information**           **This Period**   **Year to Date**

Takeda Pharma America, Inc.
One Takeda Parkway
Deerfield, IL  60015

**Payroll check Number:**   **0000171717**
Period Beginning:           04/19/2021
Period Ending:              05/02/2021
Pay Date:                   04/30/2021
Employee ID:                50010355

Pay to the
order of    **SHANNON M OLSON**

This Amount:  **ZERO AND 00/100 DOLLARS**                    **$ 0.00**

THIS IS NOT A CHECK

## NON-NEGOTIABLE

Takeda_0000793

Takeda Pharma America, Inc.
One Takeda Parkway,
Deerfield, IL 60015

# Earnings Statement

Period Beginning: 05/03/2021
Period Ending: 05/16/2021
Pay Date: 05/14/2021

Filing Status:     Single

**SHANNON M OLSON**
**102 28TH AVE**
**ST PETE BEACH,  FL   33706**

Employee ID: 50010355

| Earnings | Rate | Hours | This Period | Year to Date |
|----------|------|-------|-------------|--------------|
| **Gross Pay** | | $ | 0.00 | 52,096.76 |
| **Deductions** | **Statutory** | | | |
| | Federal Income Tax | - | 8,441.80 | - |
| | Social Security Tax | - | 3,067.79 | - |
| | Medicare Tax | - | 717.47 | - |
| **Net Pay** | | $ | 0.00 | |

**Important Notes**

**Other Benefits and**
**Information**          **This Period**   **Year to Date**

---

Takeda Pharma America, Inc.
One Takeda Parkway
Deerfield, IL   60015

**Payroll check Number:   0000000000**
Period Beginning:          05/03/2021
Period Ending:             05/16/2021
Pay Date:                  05/14/2021
Employee ID:               50010355

Pay to the
order of      **SHANNON M OLSON**
This Amount:  **ZERO AND 00/100 DOLLARS**                                    **$ 0.00**

THIS IS NOT A CHECK

# NON-NEGOTIABLE

# Earnings Statement

Takeda Pharma America, Inc.
One Takeda Parkway,
Deerfield, IL   60015

Period Beginning:   05/17/2021
Period Ending:      05/30/2021
Pay Date:           05/28/2021

Filing Status:   Single

**SHANNON M OLSON**
**102 28TH AVE**
**ST PETE BEACH,   FL   33706**

Employee ID: 50010355

**Important Notes**

| Earnings | Rate | Hours | This Period | Year to Date |
|----------|------|-------|-------------|--------------|
| Gross Pay | | $ | 0.00 | 52,096.76 |

| Deductions | Statutory | | | |
|------------|-----------|---|---|---|
| | Federal Income Tax | | - | 8,441.80 - |
| | Social Security Tax | | - | 3,067.79 - |
| | Medicare Tax | | - | 717.47 - |
| | Net Pay | | $ | 0.00 |

| Other Benefits and Information | This Period | Year to Date |
|--------------------------------|-------------|--------------|

Takeda Pharma America, Inc.
One Takeda Parkway
Deerfield, IL   60015

| Payroll check Number: | 0000212330 |
|-----------------------|------------|
| Period Beginning: | 05/17/2021 |
| Period Ending: | 05/30/2021 |
| Pay Date: | 05/28/2021 |
| Employee ID: | 50010355 |

Pay to the
order of   **SHANNON M OLSON**

This Amount:   **ZERO AND 00/100 DOLLARS**                          **$ 0.00**

THIS IS NOT A CHECK

# NON-NEGOTIABLE

Takeda_0000795

| CO. | FILE | DEPT. | CLOCK | CHK. NO. |
|-----|------|-------|-------|----------|
| GSE | 026177 | | X | 0000232823 |

Takeda Pharma America, Inc.
One Takeda Parkway,
Deerfield, IL   60015

Filing Status:   Single

Employee ID: 50010355

# Earnings Statement

Period Beginning:   05/31/2021
Period Ending:   06/13/2021
Pay Date:   06/11/2021

**SHANNON M OLSON**
**102 28TH AVE**
**ST PETE BEACH,   FL   33706**

| Earnings | Rate | Hours | This Period | Year to Date |
|----------|------|-------|-------------|--------------|
| Fleet Taxable | | 0.00 | 106.00 | |
| **Gross Pay** | | $ | 106.00 | 61,246.76 |

| Deductions | **Statutory** | | | |
|------------|---------------|---|---|---|
| | Federal Income Tax | - | 10,297.68 | - |
| | Social Security Tax | - | 3,599.90 | - |
| | Medicare Tax | - | 841.91 | - |
| | **Other** | | | |
| | FLEET TXB | 106.00 | - | |
| | **Net Pay** | $ | 0.00 | |

**Important Notes**

**Other Benefits and
Information**          **This Period**   **Year to Date**

Takeda Pharma America, Inc.
One Takeda Parkway
Deerfield, IL   60015

Payroll check **Number:**   **0000232823**
Period Beginning:   05/31/2021
Period Ending:   06/13/2021
Pay Date:   06/11/2021
Employee ID:   50010355

Pay to the
order of      **SHANNON M OLSON**

This Amount:   **ZERO AND 00/100 DOLLARS**                    $ 0.00

THIS IS NOT A CHECK

# NON-NEGOTIABLE

Takeda_0000796

THIS IS NOT A CHECK

| CO. | FILE | DEPT. | CLOCK | CHK. NO. |
|-----|------|-------|-------|----------|
| GSE | 026177 | | X | 0000232824 |

Takeda Pharma America, Inc.
One Takeda Parkway,
Deerfield, IL   60015

# Earnings Statement

Period Beginning:  05/31/2021
Period Ending:  06/13/2021
Pay Date:  06/11/2021

**SHANNON M OLSON**
**102 28TH AVE**
**ST PETE BEACH,   FL   33706**

Filing Status:   Single

Employee ID: 50010355

**Important Notes**

| Earnings | Rate | Hours | This Period | Year to Date |
|----------|------|-------|-------------|--------------|
| Qtr Bonus | | 0.00 | 9,044.00 | |
| **Gross Pay** | | $ | 9,044.00 | 61,246.76 |

| Deductions | Statutory | | |
|------------|-----------|---|---|
| | Federal Income Tax | 1,855.88 - | 10,297.68 - |
| | Social Security Tax | 532.11 - | 3,599.90 - |
| | Medicare Tax | 124.44 - | 841.91 - |
| | **Other** | | |
| | PS USAGE CHARGE | 240.00 - | |
| | CHECKING | 4,991.15 - | |
| | PRETAX DEN INS | 17.48 - | |
| | ESPP2 | 200.00 - | |
| | HEALTH SAVINGS | 423.08 - | |
| | 401K LOAN | 416.96 - | |
| | PRETAX MED INS | 150.96 - | |
| | UNUM | 75.28 - | |
| | PRETAX VIS INS | 16.66 - | |
| | **Net Pay** | $       0.00 | |

**Other Benefits and
Information** | **This Period** | **Year to Date**

---

Takeda Pharma America, Inc.
One Takeda Parkway
Deerfield, IL   60015

**Payroll check Number:** 0000232824
Period Beginning:  05/31/2021
Period Ending:  06/13/2021
Pay Date:  06/11/2021
Employee ID:  50010355

Pay to the
order of   **SHANNON M OLSON**
This Amount:   **ZERO AND 00/100 DOLLARS**                     **$ 0.00**

THIS IS NOT A CHECK

# NON-NEGOTIABLE

THIS IS NOT A CHECK

| CO. | FILE | DEPT. | CLOCK | CHK. NO. |
|-----|------|-------|-------|----------|
| GSE | 026177 | | X | 0000251667 |

Takeda Pharma America, Inc.
One Takeda Parkway,
Deerfield, IL   60015

**Filing Status:** Single

Employee ID: 50010355

# Earnings Statement

Period Beginning:   06/14/2021
Period Ending:   06/27/2021
Pay Date:   06/25/2021

**SHANNON M OLSON**
**102 28TH AVE**
**ST PETE BEACH,   FL   33706**

**Important Notes**

| Earnings | Rate | Hours | This Period | Year to Date |
|----------|------|-------|-------------|--------------|
| Regular | | 80.00 | 4,798.02 | |
| Fleet Taxable | | 0.00 | 106.00 | |
| **Gross Pay** | | | $ 4,904.02 | 66,150.78 |

| Deductions | **Statutory** | | |
|------------|---------------|-------------|--------------|
| | Federal Income Tax | 659.75 - | 10,957.43 - |
| | Social Security Tax | 267.20 - | 3,867.10 - |
| | Medicare Tax | 62.49 - | 904.40 - |
| | **Other** | | |
| | PS USAGE CHARGE | 240.00 - | |
| | CHECKING | 1,788.36 - | |
| | PRETAX DEN INS | 17.48 - | |
| | ESPP2 | 200.00 - | |
| | FLEET TXB | 106.00 - | |
| | HEALTH SAVINGS | 423.08 - | |
| | 401K LOAN | 416.96 - | |
| | PRETAX MED INS | 150.96 - | |
| | ROTH 401K | 479.80 - | |
| | UNUM | 75.28 - | |
| | PRETAX VIS INS | 16.66 - | |
| | **Net Pay** | $ 0.00 | |

**Other Benefits and Information** | **This Period** | **Year to Date**

Takeda Pharma America, Inc.
One Takeda Parkway
Deerfield, IL   60015

| Payroll check **Number:** | **0000251667** |
|---|---|
| Period Beginning: | 06/14/2021 |
| Period Ending: | 06/27/2021 |
| Pay Date: | 06/25/2021 |
| Employee ID: | 50010355 |

Pay to the
order of   **SHANNON M OLSON**
This Amount:   **ZERO AND 00/100 DOLLARS**            **$ 0.00**

THIS IS NOT A CHECK

# NON-NEGOTIABLE

Takeda_0000798

THIS IS NOT A CHECK

| CO. | FILE | DEPT. | CLOCK | CHK. NO. |
|-----|------|-------|-------|----------|
| GSE | 026177 | | X | 0000500388 |

Takeda Pharma America, Inc.
One Takeda Parkway,
Deerfield, IL   60015

# Earnings Statement

Period Beginning:   06/14/2021
Period Ending:   07/12/2021
Pay Date:   06/30/2021

**SHANNON M OLSON**
**102 28TH AVE**
**ST PETE BEACH,   FL   33706**

Filing Status:   Single

**Important Notes**

Employee ID: 50010355

| Earnings | Rate | Hours | This Period | Year to Date |
|----------|------|-------|-------------|--------------|
| Regular | | 240.00 | 14,394.07 | |
| Fleet Taxable | | 0.00 | 53.00 | |
| **Gross Pay** | | | $ 14,447.07 | 80,597.85 |

| Deductions | Statutory | | |
|------------|-----------|--|--|
| | Federal Income Tax | 2,344.16 - | 13,301.59 - |
| | Social Security Tax | 877.72 - | 4,744.82 - |
| | Medicare Tax | 205.27 - | 1,109.67 - |
| | **Other** | | |
| | PS USAGE CHARGE | 120.00 - | |
| | CHECKING | 8,448.82 - | |
| | PRETAX DEN INS | 8.74 - | |
| | ESPP2 | 200.00 - | |
| | FLEET TXB | 53.00 - | |
| | HEALTH SAVINGS | 211.54 - | |
| | 401K LOAN | 416.96 - | |
| | PRETAX MED INS | 75.48 - | |
| | ROTH 401K | 1,439.41 - | |
| | UNUM | 37.64 - | |
| | PRETAX VIS INS | 8.33 - | |
| | **Net Pay** | $ 0.00 | |

| Other Benefits and Information | This Period | Year to Date |
|--------------------------------|-------------|--------------|

Takeda Pharma America, Inc.
One Takeda Parkway
Deerfield, IL   60015

| Payroll check Number: | 0000500388 |
|-----------------------|------------|
| Period Beginning: | 06/14/2021 |
| Period Ending: | 07/12/2021 |
| Pay Date: | 06/30/2021 |
| Employee ID: | 50010355 |

Pay to the
order of   **SHANNON M OLSON**
This Amount:   **ZERO AND 00/100 DOLLARS**

**$ 0.00**

THIS IS NOT A CHECK

# NON-NEGOTIABLE

Takeda_0000799

| CO. | FILE | DEPT. | CLOCK | CHK. NO. |
|---|---|---|---|---|
| GSE | 026177 | | X | 0000271899 |

Takeda Pharma America, Inc.
One Takeda Parkway,
Deerfield, IL 60015

# Earnings Statement

| | |
|---|---|
| Period Beginning: | 06/28/2021 |
| Period Ending: | 07/11/2021 |
| Pay Date: | 07/09/2021 |

Filing Status: Single

**SHANNON M OLSON**
**102 28TH AVE**
**ST PETE BEACH, FL 33706**

Employee ID: 50010355

| Earnings | Rate | Hours | This Period | Year to Date |
|---|---|---|---|---|
| Regular | | 80.00 | 4,798.02 | |
| Fleet Taxable | | 0.00 | 53.00 | |
| **Gross Pay** | | | $ 4,851.02 | 71,001.80 |

**Important Notes**

| Deductions | Statutory | | |
|---|---|---|---|
| | Federal Income Tax | 732.73 - | 11,690.16 - |
| | Social Security Tax | 282.76 - | 4,149.86 - |
| | Medicare Tax | 66.13 - | 970.53 - |
| | **Other** | | |
| | PS USAGE CHARGE | 120.00 - | |
| | CHECKING | 2,157.91 - | |
| | PRETAX DEN INS | 8.74 - | |
| | ESPP2 | 200.00 - | |
| | FLEET TXB | 53.00 - | |
| | HEALTH SAVINGS | 211.54 - | |
| | 401K LOAN | 416.96 - | |
| | PRETAX MED INS | 75.48 - | |
| | ROTH 401K | 479.80 - | |
| | UNUM | 37.64 - | |
| | PRETAX VIS INS | 8.33 - | |
| **Net Pay** | | $ 0.00 | |

**Other Benefits and Information** | **This Period** | **Year to Date**

Takeda Pharma America, Inc.
One Takeda Parkway
Deerfield, IL 60015

| **Payroll check Number:** | **0000271899** |
|---|---|
| Period Beginning: | 06/28/2021 |
| Period Ending: | 07/11/2021 |
| Pay Date: | 07/09/2021 |
| Employee ID: | 50010355 |

Pay to the
order of **SHANNON M OLSON**

This Amount: **ZERO AND 00/100 DOLLARS**

**$ 0.00**

THIS IS NOT A CHECK

# NON-NEGOTIABLE

Takeda_0000800



Lincoln Life Assurance Company of Boston
Disability and Life Claims
PO Box 2578
Omaha, NE 68172-9688
Phone No.: (844) 556-3266
Secure Fax No.: (603) 334-0401

May 4, 2021

Ms. Shannon Olson
1405 GULF WAY
ST PETE BEACH, FL 33706

RE: Short Term Disability (STD) Benefits
Takeda Pharmaceuticals USA, Inc.
Claim #: 11255216

Dear Ms. Shannon Olson:

Lincoln Life Assurance Company of Boston is responsible for managing claims for Short Term Disability (STD) benefits under Takeda Pharmaceuticals USA, Inc.'s Group Disability Plan. We are writing in reference to your claim for STD benefits under the Plan.

We have completed a thorough review of your eligibility for benefits and have determined that benefits are not payable. Takeda Pharmaceuticals USA, Inc.'s STD Plan requires that to be eligible for benefits you must meet the following definition of disability:

> *"Disability" or "Disabled" means the Covered Person, as a result of Injury or Sickness, is unable to perform the Material and Substantial Duties of his Own Job.*

In order to evaluate whether or not you have met the above definition of disability, we requested medical information from your physician(s).

You submitted a claim for depression and anxiety and your claim file contains the following medical documentation:

**Anderson NP:** April 9, 2021 office notes that you had increase stress at work, training new employees and an increase in work load. You're having stress at home. Has difficulty paying attention and makes careless mistakes. Trouble sustaining attention in reading and other tasks. You were to restart medication. A functional status evaluation form (FMSE) was completed.

In order to ensure a thorough review of your claim for Short Term Disability Benefits, we had your file reviewed by our Clinical Service Unit. The assessment concluded the medical documentation provided no evidence of functional impairment related to depression and anxiety to warrant any mental nervous restrictions and limitations. You ceased work on April 9, 2021 reporting depression and anxiety, care established same day with Stephanie Anderson NP. You reported stresses, largely

**EXHIBIT**

**33**

Takeda_0000576

occupational as wall as family stresses, requesting a leave of absence from work to deal with these stresses as well as mental health. Subjective reports were difficulty sustaining attention in reading and other tasks, mind wondering, difficulty organizing, often procrastinating when there are deadlines, frustrated by inability to focus, admitting to depression, denying thoughts of self-harm. There were no abnormal objective findings. Visit assessments were adult ADD and Depression with antidepressant Trintellix to be restarted as you had tolerated it well in the past, ADD medication refilled, you were to continue exercise and restart your routine, Stephanie Anderson NP noting FMLA forms would be completed for you to have a break to care for yourself and family during this tough time. Associated FMLA form notes leave from April 9, 2021 through July 15, 2021. FMSE does not document any deficits in appearance, alertness, memory, cognition, judgment or insight. Depressed mood and sad affect while discussing father and daughter were noted, Stephanie Anderson NP noting impaired focus and mood limits your ability to function in a work setting, with return to work when depressed mood and unfocused thoughts have resolved. Your next office visit is May 4, 2021.

Based on the records on file for review, with lack of abnormal objective findings, the presence of depression or anxiety with medication does not in and of itself support the need for sustained restrictions and limitations. You reported difficulty sustaining attention, focus, organizing, mind wandering and depression but note lacks documentation of objective findings that indicate impairment that would translate to the need for sustained restrictions and limitations related to a mental nervous condition (ie. psychomotor changes, altered speech, sadness, worthlessness, helplessness, impaired memory, cognition, thought processes) or other such signs of an intensity or frequency that would support the need for restrictions and limitations. The FMSE notes depressed mood and sad affect while discussing families medical concerns, which would not be unexpected given the context of conversation and while Stephanie Anderson NP indicates impaired focus and mood limit you in the work setting, there is no evidence that you are unable to perform daily tasks, care for yourself or family or unable to function in social settings that would indicate you to become functionally unable to continue tasks. Cumulatively, records on file do not substantiate the need for sustained restrictions and limitations for any duration.

While we understand that you may experience symptoms associated with your condition, there is insufficient medical evidence to establish that your condition was of a nature and severity that would prevent you from performing your job as a Senior Sales Representative. No information has been provided which documents how it restricts and limits your ability to perform your job. At this time we have not received medical documentation necessary to support your absence from work.

Based on the medical documentation received in relation to the requirements of your job, you do not meet the definition of disability outlined above. Thus no benefits are payable and we must deny your claim.

This claim determination reflects an evaluation of the claim facts and the Plan provisions. No internal rules, guidelines, protocols, standards or other similar criteria were relied upon in rendering the claim determination. We reserve the right to make a determination on any additional information that may be submitted.

Under the Employee Retirement Income Security Act of 1974 (ERISA), you may request a review of this denial by writing to the address below:

Takeda_0000577

Lincoln Life Assurance Company of Boston
Attn: Appeal Review Unit
Disability and Life Claims
PO Box 2578
Omaha, NE 68172-9688

The written request for review must be sent within 180 days from the receipt of this letter and state the reasons you feel your claim should not have been denied. In your request for review please include the following documentation:

Copies of all office treatment notes, diagnostic test results, prescription histories, treatment plans, physical therapy records, procedure or operative reports, and any hospital discharge summaries from April 9, 2021 through the present. This medical information is needed from Stephanie Anderson NP.; as well as all other treating providers, specialists or therapists, along with any additional information or specific restrictions and limitations established with the objective evidence to support disability.

You should also provide any additional information that you feel will support your claim.

You are entitled to receive, upon request and free of charge, copies of all claim file documents relevant to the claim determination. If Lincoln Financial Group does not receive your written request for review within 180 days from the receipt of this notice, our claim decision will be final, your file will remain closed, and no further review will be conducted.

Under normal circumstances, you will be notified of the final decision within 45 days from the date your request is received.

If you require language translation assistance, please contact Lincoln Financial Group to initiate a service provided free of charge to assist with understanding your claim and appeal rights.

如果您需要翻译方面的帮助，请联系我，我会免费为您服务以便了解您的要求和诉求。

Shá ata' hane'go shíká a'doowoł nínízingo saad hosíníłįį' dóó ná'ookąąh nííní'ąągo naaltsoos nííníłtsoozígíí hazho'ó bik'idi'deeshtįįł nínízingo doo bąąh ílínígóó níká a'doowoł éí biniiyé shił hodíílnih áko ákwe'égi níká adeeshwoł.

Si necesita traducción, contácteme para iniciar un servicio gratuito a fin de ayudarle a entender sus derechos de reclamo y apelación.

Kung nangangailangan ka ng tulong sa translation, mangyaring makipag-ugnayan sa akin upang gumamit ng serbisyong ibinigay nang walang bayad upang matulungan kang maunawaan ang iyong mga karapatan sa paghahabol at pag-aapela.

If special circumstances cause a delay in our decision, you will be notified of the final decision no

Takeda_0000578

later than 90 days from the date your request is received.

Nothing in this letter should be construed as a waiver of any rights and defenses under the above captioned Policy, and all of these rights and defenses are reserved by Lincoln Financial Group, whether or not they are specifically mentioned herein.

If you have any questions regarding this matter, please contact me.

Sincerely,

Melissa Moynahan
Senior Disability Case Manager
Phone No.: (844) 556-3266 Ext. 16236
Secure Fax No.: (603) 334-0401

Takeda_0000579



Lincoln Life Assurance Company of Boston
Disability and Life Claims
PO Box 2578
Omaha, NE 68172-9688
Phone No.: (888) 437-7611
Secure Fax No.: (603) 334-0419

June 4, 2021

Ms. Shannon Olson
1405 GULF WAY
ST PETE BEACH, FL 33706

RE:     Short Term Disability (STD) Benefits
        Takeda Pharmaceuticals USA, Inc.
        Claim #: 11255216

Dear Ms. Shannon Olson:

Lincoln Life Assurance Company of Boston is responsible for managing claims for Short Term
Disability (STD) benefits under Takeda Pharmaceuticals USA, Inc.'s Group Disability Plan.  We are
writing in reference to your claim for STD benefits under the Plan.

We have completed our review of your request for reconsideration for Short Term Disability (STD)
benefits and have determined that benefits are payable.  Any benefits that may be payable will be
sent under separate cover.

We will be requesting information periodically to evaluate your continued eligibility for benefits.

If you have any questions regarding this matter, please contact me.

Sincerely,

Shana Cote
Appeal Specialist
On Behalf Of: Melissa Moynahan
Phone No.: (888) 437-7611 Ext. 16236
Secure Fax No.: (603) 334-0419

**EXHIBIT**
**34**

Takeda_0000568



# Olson, Shannon M

Sr Sales Rep

Manager: Greg Crouch
Evaluated By: Greg Crouch

# 2020 Year End Performance Review

Organization: Jacksonville, FL (Greg Crouch (Inherited))
Location: USA - MA - Lexington - Sales Virtual
04/01/2020 - 03/31/2021

## Overall Ratings and Comments

### Manager Overall Evaluation

Rating: No Ratings - Not Rated

Comment:
**Roles/Impact:**
- District Trintellix Lead

**CORE COMPETENICES**

**Drive for Results/Strategic Approach**
- Proactively and consistently utilized available sales tools/reports to create a strategic plan to target key HCPs within the St. Pete territory.
  - Spearheaded footprints strategic approach, data analysis and messaging strategy.
- Took lead during Prescriber Maintenance period to clean-up HCP universe, helping guide partner through importance of database management and impact on ROI/goal attainment

**Lead Change**
- Leveraged promotion budget to set up virtual engagements with key HCPs. Lead district in Virtual Engagements for both Q3 and Q4.
  - For Jan and Feb, exceeded weekly strive goal of 15-20/wk, by averaging 4.3/day and 21.4/wk
- Successfully recruited 2 of the 3 attendees to the district's first Vyvanse – highlighting Shannon's ability to lead change and find ways to execute utilization of new resources and drive business results.
- In Q4, with additional emphasis/importance placed on using available resources Shannon led the district in mailings and emails. Sending over 100 more emails than the next closest on the team. Equally important was that Shannon sent led in DFTO and Trintellix Expert Exchange emails – two resources the organization, region and district placed even greater emphasis on.

**Collaboration/Develop Capabilities**
- As District Trintellix Lead, partnered/collaborated with other product leads in the region to spearhead a Trintellix Patient Descriptor discussion, geared specifically towards the evolving market landscape which was being impacted by COVID.
  - Shannon led the discussion around the middle aged female patient – helping share with the region effective ways to bring the patient to life considering how the marketplace has
- During field engagement training, Shannon was a resource to teammates and the district by sharing both clinical knowledge and industry knowing by providing clarity on studies as well as shared simplified competitor messaging.

**Opportunity/2021**
- Be at least in the "Top 50% of Cresset" – Strive to win Gold/Silver
- With focus continuing to be placed on driving Trintellix, continue to proactively look for opportunities to drive district discussions, as well as to proactively partner/collaborate with others across the district/region.
  - Ex: Constellation of Symptoms/Efficacy discussion

### Employee Overall Evaluation

Comment: I feel and know I did the best job I could do in 2020/Q4 2021. My last time in the field was with Dr ▌▌▌▌ as we had a lunchtime Vyvanse Program. When given the green light to go live in field I did. I left it all out on the field. I have no regrets nor do I feel there was any more I could do than what I did. I met each assigned office where they were, I pivoted, I went above and beyond for each of my assigned

Takeda_0000493

**EXHIBIT**

**40**

offices. I utilized every resource I could. I felt/feel such a sense of urgency to get patients our medications that I put patients, my offices, and my territory as a wholes needs above my own.

## Goals and Priorities

### Research Different non-sales areas of interest within Takeda (HR, Thrive, Consumer/Employee Engagement) with the goal to solidify career path

Ambassador Program, Mentorship Programs,

Due Date: 06/30/2021    Status: On Track    Completion Date:

Supports:

### Seek opportunities to contribute to building Takeda's Brand, while also building my own brand

Due Date:    Status: Not Started    Completion Date:

Supports:

### Territory Clean-Up/ Prescriber Maintenance

- Territory cleanup/ maintenance. Complete the Prescriber detail report maintenance
- I do feel and know going through prescriber detail report will result in positive cresset results
- Spend 1 hour each day hacking away at the report

Due Date: 03/31/2022    Status: Not Started    Completion Date:

Supports:

## Areas for Development

### Continue to Research Positions within Takeda that would fit me and allow advancement

Status: In Progress

Start Date: Mar 1, 2018    Completion Date: Feb 28, 2019

## Global Core Competencies / Leadership Behaviors

### Please provide an overall evaluation of your Leadership Behaviors.

| Manager Evaluation | Employee Evaluation |
|---|---|
| Response: | Response: **Business Acumen/Develop Cabilities:** |
|  | • Prescriber Maintenance |
|  | • Continued to evaluate/update routing on a quarterly basis based on strategy, |

Takeda_0000494

- Consistently met/meet customers "where they were/are at"
- Quarterbacked all top accounts throughout pandemic, assessing needs and delivering
- Used and continue to critically think about each account and best business options to build lost business due to pandemic and the fact that my territory is extremely message and promotionally sensitive
- Level 2 thinking and activity with messaging, resourcing
- Goals exceeded reality by thinking outside the box and effectively utilizing all options available to move forward to meet patient and customers needs

## Leadership/Self Awareness

- Trintellix Lead for district
- Led district product training, messaging, conference calls,
- Passion so strong for my role and sense of urgency that we get our customers what they need to help patients during pandemic that during one conf call I shared my "why" thus resulting in my children learning how my brother passed
- Tried new things by joining various groups within Takeda (Faith @ work, Gender Parity Group)
- On a call with Ramona she stated if we had any ideas pertaining to reaching patients and customers to be bold and reach out. I was bold and courageous. I kept a continued pulse on perception during pandemic, found an unmet need and way to connect and shared my idea. I ended up being reported to HR and Global Compliance as having "secondary income" (investigation resulted in truth of no secondary income)
- Was invited to take part in 2 conf calls with Executive Leadership pertaining to current selling environment and current territory and what was actually our new reality (couple months into pandemic)
- Was open and receptive to feedback on being a leader with my territory partner, implemented plan but was not successful as goals were not met

## Managing Change/Engage Others/

Takeda_0000495

- 6/26 Engagement with customers began, successfully pivoted from face to face to phone to virtual to hybrid
- Completed all new trainings Takeda initiates
- Continuously exceeded district, region and nation in engagements
- From Quarantine, Virtual School, Isolation, Back to School, to now Tsunami of Mental Health- namely anxiety and depression, managed accounts and messaging accordingly

## Strategic Approach/Collaboration/Drive For Results

- Goals exceeded reality by thinking outside the box and effectively utilizing all options available to move forward to meet patient and customers needs
- Had an office champion in each office that I utilized to gain access to providers in new "virtual world" as a patient advocate while also conducting mental health checks on my office staff (Lucy-let was out, Dr Eckstein gave her Trint- she did not realize how bad she was until she was back to "herself"
- Dr Amin: new MA, hours and hours spent educating her on Trint and Vyv, assisted getting pts successfully enrolled in Help at Hand
- Virtual Speaker Programs: I had invited and pulled through 2 of the 3 attendees at one program

Takeda_0000496