# EXHIBIT P



**Footprint Planning**



Olson, Shannon

To: ○ Davis, Jordan;  Gayle-Garcia, Jodi <jod████████████          Thu 9/10/2020 7:43 PM

Hey Guys
Completed my part of Footprint Planning. I am 110% Positive I completed it correctly. I kept the reference guide
near by. I went through committed and non-committed targets. Thanks

Best Always,


Shannon Olson
Senior Sales Representative
Neuroscience Business Unit
Takeda Pharmaceuticals



← Reply      ← Reply all      → Forward

Outlook

**Fwd: FPP tool closing (action today)**

From Olson, Shannon <shannon███████████
Date Tue 9/22/2020 12:35 PM
To   Davis, Jordan <jordan███████████

Confirming -All your calls are 100% virtual

Best Always,


Shannon Olson
Senior Sales Representative
Neuroscience Business Unit
Takeda Pharmaceuticals
████████████




Begin forwarded message:

> **From:** "Gayle-Garcia, Jodi" <jodi███████████████
> **Date:** September 22, 2020 at 12:33:58 PM EDT
> **To:** "DL SALES Dist D0036 NSF Jacksonville, FL" <██████████████
> **Subject:** Fwd: FPP tool closing (action today)
>
> Team,
> Please go in and confirm ALL you calls are 100%virtual. I will be going into the tool at 3:00 today to ensure it had been done. My as is that YOU
> each ensure this has been done on all pages for all HCPs with calls assigned.
>
> Jodi Gayle-Garcia
> US BU-District Business Manager- Jacksonville, Fl
> US BU - Neuroscience
> **Takeda Pharmaceutical Company Limited**
> Mobile ████████████
> Email: Jodi █████████████
>
> Begin forwarded message:
>
> > **From:** "Crouch, Greg" <greg███████████
> > **Date:** September 22, 2020 at 12:29:05 PM EDT
> > **To:** "Clark, Chris" <chri█████████████ Dees, David" <davi████████, "Gayle-Garcia, Jodi"
> > <jod██████████████ Glover, Ryan" <ryan████████ "Graham, Jennifer" <jennife██████
> > "Hand, Matt" <matt█████████ "Koenig, Ann" <ann████████ "Sheridan, Matt" <matt.█████████
> > **Subject:** FPP tool closing (action today)
> >
> > TA,
> >
> > Please review the FPP data for every footprint to make sure we have 1005 of our current activity planned for virtual. Send me an e-mail when you
> > have had a chance to review the insight for your footprints. The following is the line we have to make sure is 100% for every HCP:



| Reviewed | Name / Address | City | State | ZIP | Specialty | TRI Tgt Dec | TRI Response Seg | VYV Tgt Dec | VYV Response Seg | MYD Tgt Dec |
|---|---|---|---|---|---|---|---|---|---|---|
| ● | | LAWRENCE VILLE | GA | 30043 | PC | 8 | M | 10 | M | 10 |
| ● | | AUBURN | GA | 30011 | PC | 8 | M | 10 | M | 8 |
| ● | | LAWRENCE VILLE | GA | 30043 | M-K | 10 | H | 1 | N | 1 |
| ● | | WATKINSVI LLE | GA | 30677 | IM1 | 10 | M | 9 | H | 9 |
| ● | | LAWRENCE VILLE | GA | 30045 | IM1 | 9 | L | 10 | M | |

Link to FPP:

Thanks for taking this extra step to make sure this is taken care of. If you have to correct any footprint I would like for you to share with me the specific footprint that were not able to pull this through.

Thanks!

Greg

Greg Crouch
Regional Business Director | Southeast
Takeda Pharmaceuticals U.S.A., Inc.



 Outlook

---

## Question

**From** Olson, Shannon <shannon█████████████

**Date** Tue 9/22/2020 2:58 PM

**To** suppor██████████:suppo████████

Hi there
I have a question regarding footprint planning. In a footprint with two sales reps, does each rep have access to each target? Meaning, does each representative have the ability to alter/ change the info or view the info on all targets within the footprint?

Best Always,


Shannon Olson
Senior Sales Representative
Neuroscience Business Unit
Takeda Pharmaceuticals



On Sep 22, 2020, at 4:21 PM, Takeda Suppor ██████████████ wrote:

Be advised that this email came from outside Takeda ████████████████████

Hi Shannon,

Hope you're having a great afternoon! Thanks for your question regarding footprint planning for two-rep footprints.

In footprints that are covered by two reps, both reps will have access to all the footprint's eligible HCPs in the FPP tool. For Q2'20, the suggested call plan was designed so that each HCP was originally only assigned calls from one of the footprint partners. However, there are no restrictions in the FPP system limiting which HCPs can be viewed by each footprint partner. Both reps have access to all of the eligible HCPs in their footprint and are expected to work together to design an optimal call plan that aligns with Takeda's latest footprint planning guidelines.

Please let us know if you have any other questions.

Thanks,
Footprint Planning Support Team

The content of this email and of any files transmitted may contain confidential, proprietary or legally privileged information and is intended solely for the use of the person/s or entity/ies to whom it is addressed. If you have received this email in error you have no permission whatsoever to use, copy, disclose or forward all or any of its contents. Please immediately notify the sender and thereafter delete this email and any attachments.

 Outlook

## RE: [Takeda Footprint Planning- Sep'20]- Response to support query

From  Takeda Support ████████████████████
Date  Tue 9/22/2020 8:46 PM
To  Olson, Shannon <shannon████████████████
Cc  Takeda Supp█████████████████████████

Be advised that this email came from outside Takeda ████████████████████████████

Hi Shannon,

Hope you're having a great evening! Happy to help!

The committed calls tab displays all of the HCPs that **you** have planned calls for during the FPP phase. For any HCP in your committed calls tab, the same HCP could be present in your partner's committed calls tab if they also have planned calls towards that HCP. If your partner doesn't have planned calls toward the HCP then the HCP would be present in your partner's non-committed calls tab.

You cannot plan calls for your footprint partner using the FPP tool, you can only add or drop calls based on **your own** planned activity. If there are HCPs that your partner should have planned activity towards, they would need to add calls to those HCPs using their own FPP tool. If you have committed calls planned towards HCPs that should be called on by your partner, you will need to remove your calls from the HCP and your partner will need to add their planned calls to the HCP.

Please let us know if you have any further questions.

Thanks,
Footprint Planning Support Team

**From:** Olson, Shannon <shannon█████████████████
**Sent:** Tuesday, September 22, 2020 7:08 PM
**To:** Takeda Support█████████████████████
**Subject:** Re: [Takeda Footprint Planning- Sep'20]- Response to support query

Thank you for your answer.

So would a provider appear in my committed calls and my partners non-committed calls?
I am asking as my partner and I split our targets based on geography. Some of my committee calls only have me calling on them but are in his geography. Am I able to add him for the calls?  We are trying to be as streamlined and honestly a  "well oiled machine". Lol

Warmest Regards
Shannon Olson

 Outlook

---

## Re: St Pete Plan

---

**From** Gayle-Garcia, Jodi <jodi.gaylegarcia@takeda.com>

**Date** Thu 1/7/2021 11:36 AM

**To**   Olson, Shannon <shannon.olson@takeda.com>

**Cc**   Davis, Jordan <jordan.davis@takeda.com>; Hand, Matt <matt.hand@takeda.com>

Nice way to plan ahead .. we will be discussing a lot of this tomorrow on the call. I appreciate your initiative and ability to pivot.

Jodi Garcia

> On Jan 7, 2021, at 11:23 AM, Olson, Shannon <shannon.olson@takeda.com> wrote:

Good Morning

Based on yesterday's call, I updated our Q4 2021 Business Book (still cannot rename it). The Goal is to keep it focused and simple while increasing the most TRx's possible.

**For Trintellix:**
- Focus on Top 90% using Greg's Nov 2020 SOT ( I used the base he provided in the SOT as the for these providers)
- I added the remaining providers in the SOT under the Focus/Others tab
  - I choose 7 providers to focus on (Most I chose based on who are writing NEW Rx's (1 week and 2 week iInsights) but are not in my 90% club, 1 based on potential and 1 based on a virtual call)
- I scrubbed iInsights and added those not in SOT based on
  - Trintellix TRx (1 week, 2 week, 4 week)
  - Trintellix NRx (1 week, 2 week, 4 week)
  - Trintellix filter on Commercial then hit TRx
  - Top Viibryd TRx and NRx
  - CVS Health added all
  - Baycare T2 NO STEP (largest hospital system in our area)
  - Anthen Part D

**Vyvanse:**
- Focus on top 90%

**Engagement Goal:**
- 3-4/ Day   (15-20/ Week)
- Coffee's, Smoothies, lunch, breakfast, snack
- In each office have "your person" and have their phone number (ex: Sarah)
  - you Facetime and they will take phone to providers

○ will set up virtual engagement
○ set up the actual virtual call for samples (they have app on their device)
• BayCare Providers and Employees email: Firstname.Lastname@baycare.org

Messaging: (weekly messaging piggy-backing on prior week message)
   Message with A SENSE OF URGENCY- ITS TIME TO BE BOLD!!!!

   ****Think that the patient you are talking about is your mom or dad and you have one shot at getting them to take a medication and it has to be Trintellix****

   • Message: I feel a massive sense of urgency to talk to you about Depression.
      • Would you agree, people are feeling pretty bad, a lot depressed? With those you are seeing are they currently taking an antidepressant or no?
      • Dr, would you agree, Even though most people are already taking an antidepressant, depressive symptoms still exist with those patients.
         ○ What are you doing different for these patients?
      • I have another doctor who started asking his pts currently on an antidepressant, "Is this how you want to feel for the rest of your life?"

   • Commitment:
      ○ For the patient that is currently on an antidepressant, my ask is that you do not do the same and give him/her the same another SSRI, BUT that you switch him/her to Trintellix- you can sign for samples and give the pt. 2 weeks, have them come back after the two weeks and then ask them again "Is this the way you want to feel for the rest of your life"

      ○ For patient that has never been on an antidepressant: Gain commitment for provider to Ask patients: Is there any reason Why You would not start that patient on Trintellix?

Our Commitment:
   • Every Wednesday 1:30 call to review iInsights and Messaging

Let me know if this makes sense. Call me if you have any questions.

Best Always,

Shannon Olson
Senior Sales Representative
Neuroscience Business Unit
Takeda Pharmaceuticals
727-641-1676
<image001.jpg>

<Copy of St Pete Q3 Routing 11_3.xlsx>

 Outlook

**RE: St Pete Plan**

From Hand, Matt <matt.hand@takeda.com>

Date Fri 1/8/2021 12:55 PM

To     Olson, Shannon <shannon.olson@takeda.com>; Davis, Jordan <jordan.davis@takeda.com>

Cc     Gayle-Garcia, Jodi <jodi.gaylegarcia@takeda.com>

Way to jump on the news/update and already start to plan how to pivot and adapt.

Look forward to discussing this in the coming days/weeks.

Have a great one.

All the best,

Matt Hand
Regional Sales Trainer – Southeast Region
Neuroscience Business Unit
Takeda Pharmaceuticals
917-658-9128



**From:** Olson, Shannon <shannon.olson@takeda.com>
**Sent:** Thursday, January 7, 2021 11:24 AM
**To:** Davis, Jordan <jordan.davis@takeda.com>
**Cc:** Gayle-Garcia, Jodi <jodi.gaylegarcia@takeda.com>; Hand, Matt <matt.hand@takeda.com>
**Subject:** St Pete Plan

Good Morning

Based on yesterday's call, I updated our Q4 2021 Business Book (still cannot rename it).  The Goal is to keep it focused and simple while increasing the most TRx's possible.

**For Trintellix:**
- Focus on Top 90% using Greg's Nov 2020 SOT ( I used the base he provided in the SOT as the for these providers)
- I added the remaining providers in the SOT under the Focus/Others tab
  - I choose 7 providers to focus on (Most I chose based on who are writing NEW Rx's (1 week and 2 week iInsights)  but are not in my 90% club, 1 based on potential and 1 based on a virtual call)
- I scrubbed iInsights and added those not in SOT based on
  - Trintellix TRx (1 week, 2 week, 4 week)
  - Trintellix NRx (1 week, 2 week, 4 week)
  - Trintellix filter on Commercial then hit TRx

# EXHIBIT Q

 Outlook

Re: St Pete Plan

**From** Gayle-Garcia, Jodi <jodi. ████████████
**Date** Thu 1/7/2021 11:36 AM
**To** Olson, Shannon <shannon. ████████████
**Cc** Davis, Jordan <jordan. ████████████ Hand, Matt <mat ████████████

Nice way to plan ahead .. we will be discussing a lot of this tomorrow on the call. I appreciate your initiative and ability to pivot.

Jodi Garcia


On Jan 7, 2021, at 11:23 AM, Olson, Shannon <shannon.olson@takeda.com> wrote:


Good Morning

Based on yesterday's call, I updated our Q4 2021 Business Book (still cannot rename it). The Goal is to keep it focused and simple while increasing the most TRx's possible.

**For Trintellix:**
- Focus on Top 90% using Greg's Nov 2020 SOT ( I used the base he provided in the SOT as the for these providers)
- I added the remaining providers in the SOT under the Focus/Others tab
  - I choose 7 providers to focus on (Most I chose based on who are writing NEW Rx's (1 week and 2 week iInsights)  but are not in my 90% club, 1 based on potential and 1 based on a virtual call)
- I scrubbed iInsights and added those not in SOT based on
  - Trintellix TRx (1 week, 2 week, 4 week)
  - Trintellix NRx (1 week, 2 week, 4 week)
  - Trintellix filter on Commercial then hit TRx
  - Top Viibryd TRx and NRx
  - CVS Health added all
  - Baycare T2 NO STEP (largest hospital system in our area)
  - Anthen Part D

**Vyvanse:**
- Focus on top 90%


**Engagement Goal:**
- 3-4/ Day  (15-20/ Week)
- Coffee's, Smoothies, lunch, breakfast, snack
- In each office have "your person" and have their phone number (ex: Sarah)
  - you FaceTime and they will take phone to providers

- will set up virtual engagement
- set up the actual virtual call for samples (they have app on their device)
    - BayCare Providers and Employees email:  Firstname.Lastname@baycare.org

<u>Messaging:</u> (weekly messaging piggy-backing on prior week message)
Message with A SENSE OF URGENCY- ITS TIME TO BE BOLD!!!!

****Think that the patient you are talking about is your mom or dad and you have one shot at getting them to take a medication and it has to be Trintellix****

- <u>Message:</u>  I feel a massive sense of urgency to talk to you about Depression.
    - Would you agree, people are feeling pretty bad, a lot depressed? With those you are seeing are they currently taking an antidepressant or no?
    - Dr, would you agree,  Even though most people are already taking an antidepressant, depressive symptoms still exist with those patients.
        - What are you doing different for these patients?
    - I have another doctor who started asking his pts currently on an antidepressant, "Is this how you want to feel for the rest of your life?"

- <u>Commitment:</u>
    - For the patient that is currently on an antidepressant, my ask is that you do not do the same and give him/her the same another SSRI, BUT that you switch him/her to Trintellix- you can sign for samples and give the pt. 2 weeks, have them come back after the two weeks and then ask them again "Is this the way you want to feel for the rest of your life"

    - For patient that has never been on an antidepressant: Gain commitment for provider to Ask patients:  Is there any reason Why You would not start that patient on Trintellix?

Our Commitment:
- Every Wednesday 1:30 call to review iInsights and Messaging

Let me know if this makes sense.  Call me if you have any questions.

Best Always,

Shannon Olson
Senior Sales Representative
Neuroscience Business Unit
Takeda Pharmaceuticals

<image001.jpg>

Q3 Routing 11_3.xlsx>

 Outlook

████████████████

From  Hand, Matt <mat████████████████
Date  Fri 1/8/2021 12:55 PM
To    Olson, Shannon <shannon██████████  Davis, Jordan <jordar████████████
Cc    Gayle-Garcia, Jodi <jod████████████████

Way to jump on the news/update and already start to plan how to pivot and adapt.

Look forward to discussing this in the coming days/weeks.

Have a great one.

All the best,

Matt Hand
Regional Sales Trainer – Southeast Region
Neuroscience Business Unit
Takeda Pharmaceuticals

████████████████



**From:** Olson, Shannon <shannon███████████████
**Sent:** Thursday, January 7, 2021 11:24 AM
**To:** Davis, Jordan <jordar████████████
**Cc:** Gayle-Garcia, Jodi <jod███████████  Hand, Matt <mat████████████████
**Subject:** ████████████

Good Morning

Based on yesterday's call, I updated our Q4 2021 Business Book (still cannot rename it). The Goal is to keep it focused and simple while increasing the most TRx's possible.

**For Trintellix:**

- Focus on Top 90% using Greg's Nov 2020 SOT ( I used the base he provided in the SOT as the for these providers)
- I added the remaining providers in the SOT under the Focus/Others tab
   - I choose 7 providers to focus on (Most I chose based on who are writing NEW Rx's (1 week and 2 week iInsights)  but are not in my 90% club, 1 based on potential and 1 based on a virtual call)
- I scrubbed iInsights and added those not in SOT based on
   - Trintellix TRx (1 week, 2 week, 4 week)
   - Trintellix NRx (1 week, 2 week, 4 week)
   - Trintellix filter on Commercial then hit TRx

# EXHIBIT R

 Outlook

**From** Gayle-Garcia, Jodi <jod█████████

**Date** Thu 1/7/2021 11:36 AM

**To** Olson, Shannon <shanno█████████

**Cc** Davis, Jordan <jorda█████████ Hand, Matt <matt█████████

Nice way to plan ahead .. we will be discussing a lot of this tomorrow on the call. I appreciate your initiative and ability to pivot.

Jodi Garcia

On Jan 7, 2021, at 11:23 AM, Olson, Shannon <shanno█████████ wrote:

Good Morning

Based on yesterday's call, I updated our Q4 2021 Business Book (still cannot rename it). The Goal is to keep it focused and simple while increasing the most TRx's possible.

**For Trintellix:**
- Focus on Top 90% using Greg's Nov 2020 SOT ( I used the base he provided in the SOT as the for these providers)
- I added the remaining providers in the SOT under the Focus/Others tab
  - I choose 7 providers to focus on (Most I chose based on who are writing NEW Rx's (1 week and 2 week iInsights)  but are not in my 90% club, 1 based on potential and 1 based on a virtual call)
- I scrubbed iInsights and added those not in SOT based on
  - Trintellix TRx (1 week, 2 week, 4 week)
  - Trintellix NRx (1 week, 2 week, 4 week)
  - Trintellix filter on Commercial then hit TRx
  - Top Viibryd TRx and NRx
  - CVS Health added all
  - Baycare T2 NO STEP (largest hospital system in our area)
  - Anthen Part D

**Vyvanse:**
- Focus on top 90%

**Engagement Goal:**
- 3-4/ Day  (15-20/ Week)
- Coffee's, Smoothies, lunch, breakfast, snack
- In each office have "your person" and have their phone number (ex: Sarah)
  - you Facetime and they will take phone to providers

○ will set up virtual engagement
○ set up the actual virtual call for samples (they have app on their device)
- BayCare Providers and Employees email: Firstname.Lastname@baycare.org

Messaging: (weekly messaging piggy-backing on prior week message)
    Message with A SENSE OF URGENCY- ITS TIME TO BE BOLD!!!!

    ****Think that the patient you are talking about is your mom or dad and you have one shot at getting them to take a medication and it has to be Trintellix****

- Message: I feel a massive sense of urgency to talk to you about Depression.
    - Would you agree, people are feeling pretty bad, a lot depressed? With those you are seeing are they currently taking an antidepressant or no?
    - Dr, would you agree, Even though most people are already taking an antidepressant, depressive symptoms still exist with those patients.
        ○ What are you doing different for these patients?
    - I have another doctor who started asking his pts currently on an antidepressant, "Is this how you want to feel for the rest of your life?"

- Commitment:
    ○ For the patient that is currently on an antidepressant, my ask is that you do not do the same and give him/her the same another SSRI, BUT that you switch him/her to Trintellix- you can sign for samples and give the pt. 2 weeks, have them come back after the two weeks and then ask them again "Is this the way you want to feel for the rest of your life"

    ○ For patient that has never been on an antidepressant: Gain commitment for provider to Ask patients: Is there any reason Why You would not start that patient on Trintellix?

Our Commitment:
- Every Wednesday 1:30 call to review iInsights and Messaging

Let me know if this makes sense. Call me if you have any questions.

Best Always,

Shannon Olson
Senior Sales Representative
Neuroscience Business Unit
Takeda Pharmaceuticals

 Outlook

From Hand, Matt <matt█████████████████████
Date Fri 1/8/2021 12:55 PM
To    Olson, Shannon <shannon████████████████; Davis, Jordan <jordan███████████████
Cc    Gayle-Garcia, Jodi <jodi██████████████████

Way to jump on the news/update and already start to plan how to pivot and adapt.

Look forward to discussing this in the coming days/weeks.

Have a great one.

All the best,

Matt Hand
Regional Sales Trainer – Southeast Region
Neuroscience Business Unit
Takeda Pharmaceuticals



**From:** Olson, Shannon <shannon███████████████████
**Sent:** Thursday, January 7, 2021 11:24 AM
**To:** Davis, Jordan <jordan█████████████████
**Cc:** Gayle-Garcia, Jodi <jodi████████████████████ Hand, Matt <matt█████████████
**Subject** █████████████

Good Morning

Based on yesterday's call, I updated our Q4 2021 Business Book (still cannot rename it). The Goal is to keep it focused and simple while increasing the most TRx's possible.

For Trintellix:
- Focus on Top 90% using Greg's Nov 2020 SOT ( I used the base he provided in the SOT as the for these providers)
- I added the remaining providers in the SOT under the Focus/Others tab
  - I choose 7 providers to focus on (Most I chose based on who are writing NEW Rx's (1 week and 2 week iInsights)  but are not in my 90% club, 1 based on potential and 1 based on a virtual call)
- I scrubbed iInsights and added those not in SOT based on
  - Trintellix TRx (1 week, 2 week, 4 week)
  - Trintellix NRx (1 week, 2 week, 4 week)
  - Trintellix filter on Commercial then hit TRx

 Outlook

████████████████████

From  Hand, Matt <mat████████████████████

Date  Thu 2/4/2021 5:56 PM

To    Davis, Jordan <jordan██████████; Olson, Shannon <shannon████████████████

Jordan and Shannon,

Thanks for sending this along. I was hoping to get some clarity on the list.

This is for the Trintellix "Big Dig", correct? The reason I ask is because I see what look to be Vyvanse targets? As we've discussed, this was designed for Trintellix targets to drive Trintellix business – by either uncovering new names, revisiting some you haven't called on in a while OR new strategies with HCPs you're already calling on. Any one of those types of Trintellix targets.

With that said, I'm just curious as to why the Vyvanse names are on the email/list? Please just let me know. Thanks!!!

All the best,

Matt Hand
Interim District Business Manager - Jacksonville
Neuroscience Business Unit
Takeda Pharmaceuticals

████████████████



From: Davis, Jordan <jordan████████████████
Sent: Thursday, February 4, 2021 5:34 PM
To: Hand, Matt <matt████████████████
Subject: Team St. Pete Providers

**Matt, here is our list of providers as a territory.**

Shannon

Trintellix





Jordan



 Outlook

**From** Olson, Shannon <shannon.████████████

**Date** Fri 2/5/2021 5:56 PM

**To** Hand, Matt <matt████████

Thank You

Best Always,

Shannon Olson
Senior Sales Representative
Neuroscience Business Unit
Takeda Pharmaceuticals



**From:** Hand, Matt <matt████████████
**Sent:** Friday, February 5, 2021 5:49 PM
**To:** Olson, Shannon <shannon████████████
**Cc:** Davis, Jordan <jordan████████████
**Subject:** RE: Team St. Pete Providers

Ah.. Very good.

Thank you for the clarification, and appreciate you sharing the HCPs who you've identified on the Vyvanse side as well. As we've discussed, a proactive approach to strategic territory management is key!

Have a great one.

All the best,

Matt Hand
Interim District Business Manager - Jacksonville
Neuroscience Business Unit
Takeda Pharmaceuticals



**From:** Olson, Shannon <shannon█████████████████████
**Sent:** Friday, February 5, 2021 5:40 PM
**To:** Hand, Matt <matt.█████████████
**Cc:** Davis, Jordan <jordan███████████
**Subject:** ██████████████████████

Hey there
We added Vyvanse as we are down in Vyvanse.  More a list for Jordan and I.  While we will focus on those Vyvanse providers, below are our Trintellix targets:

**Trintellix Jordan:**



**Trintellix Shannon:**



Best Always,


Shannon Olson
Senior Sales Representative
Neuroscience Business Unit
Takeda Pharmaceuticals



Olson, Shannon

Davis, Jordan

Hand, Matt

Hey there

Hope you are having a great day.  Not sure why but a lot of the lunch invites you invited me to are duplicates that I had already accepted.  I took a screen shot and circled so you could visually see what I am referencing.  The green I already accepted, the gray are the new, duplicate invites you invited me to today. Wanted to let you know that you previously sent those and I already accepted them.



**From:** Olson, Shannon <shannon ███████████
**Sent:** Thursday, March 25, 2021 5:49 PM
**To:** Davis, Jordan <jordan ████████████
**Cc:** Hand, Matt <matt ██████████
**Subject:** FW: ITL: Q1 Footprint Planning

Hey there
3 Quick things:

1. How do you want to complete FPP and 2. the Vital Signs 3 Scenarios?

3. Prior to next Monday, could you please update your part in our St Pete Book of Business File ████████ ██████████████ please use share drive so that we do not have duplicates and can continue to update one excel book. Including under target tab grouping providers who are in the same practice and in routing tab making sure the weeks flow and make logistical sense as well as each day.

My goal is for us to hit the ground running- I don't want to waste field time with either of us updating routing or driving needlessly.

Let me know how you want to handle question 1 and 2 so I can properly plan tomorrow and next week. Thanks

Best Always,

Shannon Olson
Senior Sales Representative
Neuroscience Business Unit
Takeda Pharmaceuticals



**From:** Hand, Matt <matt ███████████
**Sent:** Thursday, March 25, 2021 10:35 AM
**To:** Estrera, Theresa <theresa. ████████████████; Warner, Angie <angie ████████████>; Olson, Shannon <shannon ████████████>; Davis, Jordan <jordan ████████ Watson, Brad <brad ██████████ Comernisky, Scott <scott ██████████; Roberson, Dana <dana ████████████ Barley, Dustin <dustin ███████
**Cc:** Hand, Matt <matt ███████
**Subject:** ITL: Q1 Footprint Planning

TeAm JAX,

Just wanted to send a follow up from yesterday's East Area FPP Strategy Call. As Julie said, we are planning for a true hybrid approach – we are creating a new baseline. Let's take an intentional, strategic and disciplined

approach to create a plan that targets our most important and accessible HCPs, to set us up for success. The Vital Signs Business Application Scenarios we are currently completing play perfectly into this.



**For FPP**

- FPP Window will be open from 3/29- 4/9.
  - **My ask – Please have it done and submitted by End of Business Wednesday 4/7.**
    - This is my first time going through this process, so want to be sure to allot proper time to review plans, and if need be, discuss and make any changes prior to sending to Greg for final approval.
  - <u>Don't forget to save the Modified Coverage Report – important reference tool.</u>
- Everyone plans for their own # of calls, but want to be sure to plan/discuss as a POD
  - **Reminder: Non-negotiable expectation is everyone works the entire territory. No more splitting of the geography. Sole ownership of the HCP is the exception (3-5 at most).**
- We will once again be placing additional effort on Trintellix, same as in Q4.
  - Take same strategic approach:
    - Top Vyvanse Writers, usually those Deciles 7-10 get the P1s
    - All other targets get Trintellix P1s
- The FPP tool will be opened up 2 more times during Q1 to help account for evolving market/access – as your learn, as things change, will be able to update
  - Per Steve Green - Build a plan that meets your view of the opportunity in your territory
  - Planning for F2F/Virtual/Phone
  - Must provide the "why" you are dropping an HCP from call plan. Like in Q4, can't have "other" as a reason code.
- When we open the tool:
  - Calls will be pre-loaded/assigned to HCPs across the three connection methods – F2F/Virtual/Phone. Modify based on what you deem is realistic based on the current market/access
  - There is no optimal # of PDEs they are looking for, so do not worry about the exception warning if it is generated. Let Local Business Ownership/Knowledge (LBO) drive your decision making
  - We want to maximize Reach and Frequency with our most important customers
    - Which HCPs get 6 calls? 4 Calls? 3 Calls?
  - New addition is the Mobility Index – Green/Yellow/Red. This is based on foot traffic into that HCPs office. A new way to identify a potentially growing market.
    - When looking to place additional efforts, those Green and Yellow are good ones to place against if they are accessible.

Look forward to connecting with everyone next week to walk through the Vital Signs Applications. We can also discuss FPP, as they tie into one another so perfectly.

As always, please don't hesitate to reach out with any questions. Here to help however I can.

All the best,

Matt Hand
Interim District Business Manager - Jacksonville
Neuroscience Business Unit
Takeda Pharmaceuticals

 Outlook

---

**RE: ITL: Q1 Footprint Planning**

---

| | |
|---|---|
| **From** | Olson, Shannon <shannon ██████████ |
| **Date** | Mon 3/29/2021 6:15 AM |
| **To** | Davis, Jordan <jordan ██████████ |
| **Cc** | Hand, Matt <matt ██████████ |

We each have a tab In our excel book of business (Shannon Office Notes, Jordan Office Notes). Mine has been consistently updated with provider notes, staff notes, contact person, and office protocol.  In the past, we have discussed the goal of these page is to provide each other with office information.
Look at my Office Notes Page and please update yours prior to us meeting for FPP- thanks

Best Always,


Shannon Olson
Senior Sales Representative
Neuroscience Business Unit
Takeda Pharmaceuticals



**From:** Davis, Jordan <jordan ██████████
**Sent:** Friday, March 26, 2021 1:57 PM
**To:** Olson, Shannon <shannon ██████████
**Cc:** Hand, Matt <matt ██████████
**Subject:** RE: ITL: Q1 Footprint Planning

As far as FPP we need to alert each other about the access of offices in our half of territory. This will help us when we go back to the type of routing we had prior to the pandemic


**From:** Davis, Jordan
**Sent:** Friday, March 26, 2021 1:54 PM
**To:** Olson, Shannon <shannon. ██████████
**Cc:** Hand, Matt <matt ██████████
**Subject:** RE: ITL: Q1 Footprint Planning

Yes I will update our business book.

Do you have time Monday afternoon to go through each of the scenarios before meeting with Matt?

 Outlook

## A couple of things

From Olson, Shannon <shannon █████████████

Date  Tue 3/30/2021 9:3█ ██

To    Hand, Matt <matt█████████████

Hey there

Hope this email finds you well.  Wanted to keep you informed- and not cry through a phone call, thus the email.
Yesterday, my parents made a last minute decision to come to Florida.  While grateful to see them,  (since I have
not in a year) my emotions are mixed.   I mentioned my dad has been battling cancer and that the treatment has
been a nightmare due to human error.  The nurse never closed/locked his port, thus the chemo went into his
chest tissue instead of his blood stream.  Because of this his body, mind and overall health have rapidly
deteriorated.

My parents live here ½  the year and my dad has a lot of loose ends to tie up, thus the trip down.  I am trying to
mentally preparing for the worst but struggling thus, praying for grace.

My plan is to work the rest of this week and next Monday and Tuesday remotely.  I do not feel comfortable going
into offices as I can't risk exposure to anything.  They leave next Wednesday and after they leave I will plan to
work in the field.

With regards to our VFD tomorrow, I need to take the afternoon as vacation to pick them up.  I think it best to
reschedule the virtual field time and focus on the Vital Signs portion.  Let me know your thoughts.

Best Always,


Shannon Olson
Senior Sales Representative
Neuroscience Business Unit
Takeda Pharmaceuticals



Outlook

RE: Q42020-Q120215 ███████████

From  Davis, Jordan <jordan ██████████
Date  Wed 4/7/2021 12:10 PM
To    Olson, Shannon <shannon ██████████

Can you send me the master again? i may have been working on the duplicate.

From: Olson, Shannon <shannon ██████████████
Sent: Wednesday, April 7, 2021 12:09 PM
To: Davis, Jordan <jorda ████████████
Cc: Hand, Matt <matt ███████████ Olson, Shannon <shannon ██████████
Subject: Q42020-Q12021 ███████████

Hey there Jordan

A couple weeks ago, we discussed making sure that our routing made logistical sense.  We committed to updating and ensuring each day flowed and that the weeks made logistical and geographical sense,  so that when we go back into the field we are ready to go and not wasting time driving around.

I am adding in providers who are not currently in FPP.  I am basing it mainly off of your routing in the attached spreadsheet.  I am finding that logistically it does not make sense and that providers in the same practice are not grouped together on the same day – but instead are on different days in different weeks.  I plotted Week 1 Tuesday in Veeva so you could see what I am referring to.  Also, on this day Dr Jaime-Williams is listed twice with two different types access (one F2F, one is Virtual)

I took the time and did what I stated I would do. My days flow and make logistical sense and access is up to date.  Could you please do the same.  I have attached a copy of the spreadsheet for you to reference BUT please use our master spreadsheet that is saved in our share drive so that there are not duplicates.  If you have any questions- let me know

Outlook

RE: Q42020-Q1202 ▮▮▮▮▮

From Davis, Jordan <jordan ▮▮▮▮▮
Date Wed 4/7/2021 12:34 PM
To   Olson, Shannon <shannon ▮▮▮▮▮

I realize that you are frustrated. I am trying to get on the same page as you so we can do this correctly. I have an old spread sheet that we formerly worked off of.

**From:** Olson, Shannon <shannon ▮▮▮▮▮
**Sent:** Wednesday, April ▮ 2021 12:15 PM
**To:** Davis, Jordan <jordan ▮▮▮▮▮        >
**Subject:** RE: Q42020-Q1 ▮▮▮▮▮

Jordan that is what you always say- all our spreadsheets are in the share point drive.  I am frustrated Jordan
Best Always,

Shannon Olson
Senior Sales Representative
Neuroscience Business Unit
Takeda Pharmaceuticals
▮▮▮▮▮



**From:** Davis, Jordan <jordan ▮▮▮▮▮
**Sent:** Wednesday, April 7, 20 ▮▮▮▮▮
**To:** Olson, Shannon <shannon ▮▮▮▮▮
**Subject:** RE: Q42020-Q12021 ▮▮▮▮▮

Can you send me the master again? I may have been working on the duplicate.

**From:** Olson, Shannon <shannon ▮▮▮▮▮
**Sent:** Wednesday, April 7, 2021 12:09 PM
**To:** Davis, Jordan <jordan ▮▮▮▮▮
**Cc:** Hand, Matt <matt ▮▮▮▮▮           ▮▮▮▮; Shannon <shannon ▮▮▮▮▮
**Subject:** Q42020-Q12021 ▮▮▮▮▮

Hey there Jordan

A couple weeks ago, we discussed making sure that our routing made logistical sense. We committed to updating and ensuring each day flowed and that the weeks made logistical and geographical sense, so that when we go back into the field we are ready to go and not wasting time driving around.

I am adding in providers who are not currently in EPP.  I am basing it mainly off of your routing in the attached spreadsheet. I am finding that logistically it does not make sense and that providers in the same practice are not grouped together on the same day – but instead are on different days in different weeks. I plotted Week 1 Tuesday in Veeva so you could see what I am referring to.  Also, on this day Dr Jaime-Williams is listed twice with two different types access (one F2F, one is Virtual)

I took the time and did what I stated I would do. My days flow and make logistical sense and access is up to date. Could you please do the same. I have attached a copy of the spreadsheet for you to reference BUT please use our master spreadsheet that is saved in our share drive so that there are not duplicates. If you have any questions- let me know

 Outlook

ITL: February Cresset

From Hand, Matt <mat███████████

Date Mon 5/17/2021 8:30 AM

To   Estrera, Theresa <theresa███████████  Warner, Angie <angie█████████████; Comernisky, Scott
      <scott███████     Jackson, Teresa <teres███████████  Roberson, Dana <dana███████████████
      Barley, Dustin <dustin.barley@takeda.com>; Davis, Jordan <jordan███████████Olson, Shannon
      <shanno████████████  immel, Rebekah <rebekah███████████

Cc    Hand, Matt <mat███████

JAX,

Sending out a quick recap from the new, February Cresset data that was released this past Friday.

We have <u>5 of 9</u> who are in the top 50% (436 total).  GREAT STUFF!!!

- ### *Congrats to Team Tallahassee* leading the way!
  - ○ Angie is in **CRESSET** contention - up <u>13 spots</u> to go from 45 to **32** in the Nation!  Outstanding!
  - ○ Theresa is in **SILVER** contention – currently ranked **50** in the Nation! Great job!
- • Team Jacksonville – Dana and Dustin, up <u>10 spots</u> to go from 131 to **121** - well done!
- • St. Pete making some moves!
  - ○ Shannon – up <u>28 spots</u> to go from 142 to **114** – nicely done!
  - ○ Jordan - up <u>49 spots</u> to go from 303 to **254** – nicely done!

With one month of data left to come, folks have positioned themselves well – to close strong and to make a one last run up the Cresset rankings.  Well done to all, for all your hardwork!



| YTD NATIONAL RANK | AWARD QUALIFIER FLAG | PREVIOUS MONTH RANK | REGION ID | DISTRICT ID | FOOTPRINT ID | TERRITORY ID | JOB SHARE FLAG | TERRITORY NAME | EMPLOYEE NAME |
|---|---|---|---|---|---|---|---|---|---|
| 32 | Cresset | 45 | | | | | | Tallahassee  FL | Angela Warner |
| 50 | Silver | 47 | | | | | | Tallahassee  FL | Rita Estrera |
| 121 | | 131 | | | | | | Jacksonville  FL | Dustin Barley |
| 121 | | 131 | | | | | | Jacksonville  FL | Dana Roberson |
| 300 | | 209 | | | | | | Daytona Beach  FL | Teresa Jackson |
| 300 | | 220 | | | | | | Daytona Beach  FL | Scott Comernisky |
| 237 | | 299 | | | | | | Orlando N  FL | Vacant |
| 237 | | 299 | | | | | | Orlando  FL | Rebekah Timmel |
| 114 | | 142 | | | | | | Saint Petersburg  FL | Shannon Olson |
| 254 | | 303 | | | | | | Saint Petersburg  FL | Jordan Davis |

All the best,.

Matt Hand
Interim District Business Manager - Jacksonville
Neuroscience Business Unit
Takeda Pharmaceuticals

# EXHIBIT S



## Olson, Shannon M

Sr Sales Rep

Manager: Jodi Gayle-Garcia

Evaluated By: Mark Tate

### 2018 Year End Performance Review

Organization: Jacksonville, FL (Greg Crouch (Inherited))

Location: USA - Deerfield - Sales Remote (inactive)

04/01/2018 - 03/31/2019

## Overall Ratings and Comments

### Manager Overall Evaluation

Rating:        No Ratings - Not Rated

Comment:        Performance: Shannon has shown continued improvement with her Cresset ranking. She has move up almost 100 spots each quarter. He current performance is 106% for Trintellix. Shannon is currently qualified for the sales representative maximum impact with one month remaining.
Strengths:
Drive for Results- Shannon maximizes speaker programs, promotional funds, effective routing, to drive results.
Strategic Approach- Consistently seeks new opportunities to grow her business. Shannon has consistently achieved frequency on her most productive decile 9 &10 providers above the district, region, area, and nation. As a result, Shannon's average Trx (13.7) for her top providers is a leader. Shannon has also cultivated a productive relationship resulting in top PCP prescriber for the region.
Engage Others- As the district Trintellix lead, Shannon led T-access support program conference call with the district. Shann generated ideas to pull through instant savings cards for the district. Shannon providers regular updates with study information, iMarket, program notes, market updates to keep the team informed
Development: Shannon has an opportunity to continue to leverage her strong relationship into productive business. An opportunity exist to balance the business discussions and not rely too heavily on relationships.

### Employee Overall Evaluation

Comment:
Met and Exceeded Quarterly Sales Goals resulting in growing Trintellix Volume and Market Share

- Trintellix Market Share Averages 1% while branded competitors are: Viibryd .27%, Pristiq .05% and Fetzima 0% Recognized by Regional Manager Jennifer Jennings for growth as my territory volume growth represented 21% of

her regions total volume increase.Finished Q3 at 106% to goal growing Trintellix over 9% Finished 2018 in top 35% of region
Awarded numerous iLearn certificates for continuous individually driven learning and development
Top in district for resource utilization

- Strategically Utilized monthly budget and outspent my district mates by 20%

- Led and Outspent my district mates with speaker programs- leading and executing over $16,645 worth of
programs resulting in 8 programs with 25 key accounts turned Trintellix writers

- Top in district for new initiative of rep approved email utilizationRecognized by District Manager and District Mates for Leadership Skills
District Trintellix Lead

- Led and conducted various Conference Calls
- created a Lexapro Sell Sheet for District and Region
- ISA detailed to district specific sheet within sales aid to sell against specifc competitor
- created a Dialogue Probe Sheet for district
- Sent Monday morning emails to district- highlighting various statistics that they could use as probes and
overall disease state/ product knowledge, highlighted areas to focus on, messaging, competitive data, interesting articles etc.
Recognized by Area Trainer Allen Simmons "Your strength, as we discussed, was your ability to engage in dialogue

that created opportunities to share and you creatively utilized outside statistics and article findings to engender
conversations. For example,... "1-9 persons were put on an anti-depressant between year x through z... and 25%
of those patients experienced weight gain during that time..." Is this statistic reflective in your practice? This
questions opened up the opportunity to engage Significantly contributed to my managers 111.3% goal attainment resulting in him being #1 in Performance for

the Nation the month of November for Uloric
OWNED my territory and my accounts

- access to accounts that others including counterparts do not have access to
- reviewed weekly reports and constantly updated routing while also finding new business opportunities
- Patient Assistant Program: Spearheaded overall office call in St Pete to ensure we did not lose a Trintellix script
based on cost or managed care

## Acknowledgement

### Manager

| | | | |
|---|---|---|---|
| Entered by: | Jodi Gayle-Garcia | Date: | 06/21/2019 |
| Status: | Receipt of Review (Inactive) | | |
| Comment: | | | |

### Employee

| | | | |
|---|---|---|---|
| Entered by: | Shannon Olson | Date: | 06/27/2019 |
| Status: | Receipt of Review (Inactive) | | |
| Comment: | | | |

## Goals and Priorities

### Grow Trintellix TRx Volume to 22.8% by 3/29/19

-Grow Trintellix TRx Volume to 22.8% by 3/29/19
- Grew Trintellix Volume 19.8% in 13 weeks date ending 8/24/18

Due Date:    03/29/2019    Status:    On Track    Completion Date:

Supports:    People (Archived)

Section Summary

## Manager Evaluation

Comment:    Performance: Shannon has shown continued improvement with her Cresset ranking. She has move up almost 100 spots each quarter. He current performance is 106% for Trintellix. Shannon is currently qualified for the sales representative maximum impact with one month remaining.

Strengths:

Drive for Results- Shannon maximizes speaker programs, promotional funds, effective routing, to drive results.

Strategic Approach- Consistently seeks new opportunities to grow her business. Shannon has consistently achieved frequency on her most productive decile 9 & 10 providers above the district, region, area, and nation. As a result, Shannon's average Trx (13.7) for her top providers is a leader. Shannon has also cultivated a productive relationship resulting in top PCP prescriber for the region.

Engage Others- As the district Trintellix lead, Shannon led T-access support program conference call with the district. Shann generated ideas to pull through instant savings cards for the district. Shannon providers regular updates with study information, iMarket, program notes, market updates to keep the team informed

Development: Shannon has an opportunity to continue to leverage her strong relationship into productive business. An opportunity exist to balance the business discussions and not rely too heavily on relationships.

Performance: Shannon has shown continued improvement with her Cresset ranking. She has move up almost 100 spots each quarter. He current performance is 106% for Trintellix. Shannon is currently qualified for the sales representative maximum impact with one month remaining.

Strengths:

Drive for Results- Shannon maximizes speaker programs, promotional funds, effective routing, to drive results.

Strategic Approach- Consistently seeks new opportunities to grow her business. Shannon has consistently achieved frequency on her most productive decile 9 & 10 providers above the district, region, area, and nation. As a

## Employee Evaluation

Comment:    • Met and Exceeded Quarterly Sales Goals resulting in growing Trintellix Volume and Market Share

- Trintellix Market Share Averages 1% while branded competitors are: Viibryd .27%, Pristiq .05% and Fetzima 0% Recognized by Regional Manager Jennifer Jennings for growth as my territory volume growth represented 21% of

her regions total volume increase.Finished Q3 at 106% to goal growing Trintellix over 9%

• Finished 2018 in top 35% of region
• Awarded numerous iLearn certificates for continuous individually driven learning and development
• Top in district for resource utilization

- Strategically Utilized monthly budget and outspent my district mates by 20%

- Led and Outspent my district mates with speaker programs- leading and executing over $16.645 worth of

programs resulting in 8 programs with 25 key accounts turned Trintellix writers

- Top in district for new initiative of rep approved email utilizationRecognized by District Manager and District Mates for Leadership Skills

• District Trintellix Lead

- Led and conducted various Conference Calls
- created a Lexapro Sell Sheet for District and Region
- ISA detailed to district specific sheet within sales aid to sell against specifc competitor
- created a Dialogue Probe Sheet for district
- Sent Monday morning emails to district-highlighting various statistics that they could use as probes and

overall disease state/ product knowledge, highlighted areas to focus on, messaging, competitive data,

interesting articles etc.

result, Shannon's average Trx (13.7) for her top providers is a leader. Shannon has also cultivated a productive relationship resulting in top PCP prescriber for the region.
Engage Others- As the district Trintellix lead, Shannon led T-access support program conference call with the district. Shann generated ideas to pull through instant savings cards for the district. Shannon providers regular updates with study information, iMarket, program notes, market updates to keep the team informed
Development: Shannon has an opportunity to continue to leverage her strong relationship into productive business. An opportunity exist to balance the business discussions and not rely too heavily on relationships.

• Recognized by Area Trainer Allen Simmons "Your strength, as we discussed, was your ability to engage in dialogue

that created opportunities to share and you creatively utilized outside statistics and article findings to engender
conversations. For example, ... "1-9 persons were put on an anti-depressant between year x through z... and 25%
of those patients experienced weight gain during that time..." Is this statistic reflective in your practice? This
questions opened up the opportunity to engage Significantly contributed to my managers 111.3% goal attainment resulting in him being #1 in Performance for

the the Nation the month of November for Uloric
• OWNED my territory and my accounts

- access to accounts that others including counterparts do not have access to
- reviewed weekly reports and constantly updated routing while also finding new business opportunities
- Patient Assistant Program: Spearheaded overall office call in St Pete to ensure we did not lose a Trintellix script
based on cost or managed care

vas for Development

Area of Development- Competitive selling skills and use of patient descriptors for secondary product.

Additional Information:    - My goal for being the Trintellix Lead for my district is so I can be a solid clinical and sales expert for my district.

Status:  In Progress                                    Relates To:  Project Leadership

Start Date: Mar 1, 2018    Completion Date:  Feb 28, 2019

Section Summary

## Manager Evaluation

Comment:

## Employee Evaluation

Comment:

Met and Exceeded Quarterly Sales Goals resulting in growing Trintellix Volume and Market Share

- Trintellix Market Share Averages 1% while branded competitors are: Viibryd 27%; Pristiq 05% and Fetzima 0% Recognized by Regional

Manager Jennifer Jennings for growth as my territory volume growth represented 21% of

her regions total volume increase.Finished Q3 at 106% to goal growing Trintellix over 9%
Finished 2018 in top 35% of region
Awarded numerous iLearn certificates for continuous individually driven learning and development
Top in district for resource utilization

- Strategically Utilized monthly budget and outspent my district mates by 20%

- Led and Outspent my district mates with speaker programs- leading and executing over $16,645 worth of
programs resulting in 8 programs with 25 key accounts turned Trintellix writers

- Top in district for new initiative of rep approved email utilizationRecognized by District Manager and District Mates for Leadership Skills
District Trintellix Lead

- Led and conducted various Conference Calls
- created a Lexapro Sell Sheet for District and Region
- ISA detailed to district specific sheet within sales aid to sell against specifc competitor
- created a Dialogue Probe Sheet for district
- Sent Monday morning emails to district- highlighting various statistics that they could use as probes and
overall disease state/ product knowledge, highlighted areas to focus on, messaging, competitive data,
interesting articles etc.
Recognized by Area Trainer Allen Simmons "Your strength, as we discussed, was your ability to engage in dialogue

that created opportunities to share and you creatively utilized outside statistics and article findings to engender
conversations. For example,... "1-9 persons were put on an anti-depressant between year x through z... and 25%
of those patients experienced weight gain during that time..." Is this statistic reflective in your practice? This
questions opened up the opportunity to engage Significantly contributed to my

managers 111.3% goal attainment resulting in
him being #1 in Performance for

the Nation the month of November for Uloric
OWNED my territory and my accounts

- access to accounts that others including
counterparts do not have access to
- reviewed weekly reports and constantly
updated routing while also finding new
business opportunities
- Patient Assistant Program: Spearheaded
overall office call in St Pete to ensure we did
not lose a Trintellix script
based on cost or managed care

## Global Core Competencies : Leadership Behaviors

Please provide an overall evaluation of your Leadership Behaviors.

Manager Evaluation                          Employee Evaluation

Response:                                   Response:



**Olson, Shannon M**

Sr Sales Rep

Manager: Jodi Gayle-Garcia
Evaluated By: Jodi Gayle-Garcia

2019 Year End Performance
Review

Organization: Jacksonville, FL (Greg Crouch
(Inherited))

Location: USA - MA - Lexington - Sales Virtual
04/01/2019 - 03/31/2020.

## Manager Overall Evaluation

Rating:         No Ratings – Not Rated

Comment:        FY Q1 (April- June)
Sales Performance-
Cresset Rank: June 162
MIC Goal Attainment: Trintellix 105.01% Vyvanse 98.90
PCP Rank 162/449 (36%)
Competencies:
Impact on others and district: with the acquisition in April Shannon has made every effort to engage the team and foster a great team culture which includes building relationships with teammate and those across the district.

FY Q2 (July-September)
Sales Performance-
Cresset Rank- 225/449 (50%)
MIC Goal Attainment (AUG) Trintellix- 100.68% Vyvanse- 100.52% Mydayis- 128.26

Competencies: Shannon was on leave most of September
Collaboration: (Strength)
Builds relationships: actively reaches out to teammates for guidance and collaboration on territory needs. Shannon fosters a supportive and inclusive team culture.
Self-Awareness:
openness to feedback and is always willing to make changes that impact the territory and district in a positive way. When Shannon was alone in territory due to promotion of her partner, she proactively reached out to me to develop a plan that supported the needs of her territory for both Vyvanse and Trintellix. In addition, Shannon collaborated with other representatives to increase her knowledge of Vyvanse to gain confidence in ped offices.
Engage others:
Shannon has a new partner and we have 2 new reps starting in 2020. She has increased communication with partner and new reps to ensure they are up to speed.
FY Q3 (October-December)
Sales Performance-
Cresset Rank- 217/449
MIC Goal Attainment  Trintellix- 99.92% Vyvanse- 102.65% Mydayis 100%

Competencies:

Collaboration: (Strength)
Shannon continuously shows a respect for differing viewpoints within our team and values each person's unique identity, strengths and contribution (eg: willingness to change her routing based on business need and strategy change to be 50/50 and increase her time in the pediatric space). As a tenured rep Shannon continues to show the ability to

Self-Awareness:
Shannon continuously demonstrates a willingness to admit her mistakes and modify approach to ensure a positive outcome (eg: Shannon's ability to pivot when asked by DBM to focus on the 94% of her business and to identify new opportunities using the SOT). As a tenured rep, Shannon models professional maturity and demeanor and solicits feedback and guidance from teammates and DBM on ways to identify and improve areas of development and implements accordingly (eg: business plan development).

Engage others: Shannon continues to mentor and develop her new partner. Shannon will need to work on including her partner in strategic territory management and allow him to have input in identifying key targets and assist with business planning, routing.

Development:
Leadership: Shannon and I discussed the need to take a leadership role. She has stepped up to be the District Trintellix Lead as a means of exerting her leadership capabilities and help to develop and foster growth among the reps in our district. Self- awareness: Shannon has identified that she needs to take a leadership role on the team with developing new representatives in the district.

Career Path:  Flex role in 2020. This is a one-year commitment that allows for you to gain training experience and networking across the Bus.
YOU OWN YOUR DEVELOPMENT:  you are encouraged to seek development opportunities

NETWORKING:  Shannon has identified that she needs to take a leadership role on the team, specifically by reaching out to reps in the district to identify needs and providing resources.

DEMONSTRATING & SUPPORTING: Takeda Values, PTRB, and the 3C's.

Way Forward:
IDP: Utilizing the career path document, create a development plan that outlines your professional development for 2020. We have identified you are no longer interested at this time to apply for FLEX but will continue developing in her roles as the  Trintellix Lead. In addition, Shannon has identified a way to help upskill our new B to B reps on the Rep Basics. I look forward to seeing your development of these reps. Collaboration: Through our discussions, Shannon identified the need to have a higher level of communication with her partner Jordan including developing and maintaining a routing that impacts both Vyvanse and Trintellix and maximizes FTF time for both teammates with top HCPs for both products.  We discussed the need for a more balanced routing that reflects the 50/50 model for both reps and continue to identify

## Employee Overall Evaluation

Comment:

Rep Life:  An initiative I started to help with the development and success of new and existing district mates

Newbies: Help and guide new hires.  Conduct conference calls to answer any questions and/or concerns.  Go through each part of a reps life: samples, expense reports, product knowledge, messaging, tips for success etc

Seasoned Reps: Continue to provide "ways to improve"
- Share work I have done for personal development

Due Date    12/31/2020    Status    On Track    Completion Date

Supports.

Trintellix Lead

My goal in taking the role of Trintellix Lead is to continue to develop teammates knowledge and selling skills with depression and Trintellix.

Due Date   12/31/2020      Status   On Track      Completion Date

Supports

Status Summary

| Manager Evaluation | Employee Evaluation |
| --- | --- |
| Comment: | Comment: |

Areas for Development

Continue to Research Positions within Takeda that would fit me and allow advancement

Status   In Progress

Start Date   Mar 1, 2018    Completion Date   Feb 28, 2019

Status Summary

| Manager Evaluation | Employee Evaluation |
| --- | --- |
| Comment: | Comment: |

Leadership Behaviors

Please provide an overall evaluation of your Leadership Behaviors.

| Manager Evaluation | Employee Evaluation |
| --- | --- |
| Response: | Response:   Leadership Behaviors:  Trintellix Lead and Rep Life Initative |



## Olson, Shannon M

Sr Sales Rep

Manager: Greg Crouch
Evaluated By: Greg Crouch



2020 Year End Performance
Review

Organization: Jacksonville, FL (Greg Crouch
(Inherited))
Location: USA - MA - Lexington - Sales Virtual
04/01/2020 - 03/31/2021

Overall Ratings and Comments

## Manager Overall Evaluation

Rating:        No Ratings - Not Rated

Comment:       **Roles/Impact:**
- District Trintellix Lead
  **CORE COMPETENICES**
  **Drive for Results/Strategic Approach**
- Proactively and consistently utilized available sales tools/reports to create a strategic plan to target key HCPs within the St. Pete territory.
  - Spearheaded footprints strategic approach, data analysis and messaging strategy.
- Took lead during Prescriber Maintenance period to clean-up HCP universe, helping guide partner through importance of database management and impact on ROI/goal attainment
  **Lead Change**
- Leveraged promotion budget to set up virtual engagements with key HCPs. Lead district in Virtual Engagements for both Q3 and Q4.
  - For Jan and Feb, exceeded weekly strive goal of 15-20/wk, by averaging 4.3/day and 21.4/wk
- Successfully recruited 2 of the 3 attendees to the district's first Vyvanse – highlighting Shannon's ability to lead change and find ways to execute utilization of new resources and drive business results.
- In Q4, with additional emphasis/importance placed on using available resources Shannon led the district in mailings and emails. Sending over 100 more emails than the next closest on the team. Equally important was that Shannon sent led in DFTO and Trintellix Expert Exchange emails – two resources the organization, region and district placed even greater emphasis on.
  **Collaboration/Develop Capabilities**
- As District Trintellix Lead, partnered/collaborated with other product leads in the region to spearhead a Trintellix Patient Descriptor discussion, geared specifically towards the evolving market landscape which was being impacted by COVID.
  - Shannon led the discussion around the middle aged female patient – helping share with the region effective ways to bring the patient to life considering how the marketplace has
- During field engagement training, Shannon was a resource to teammates and the district by sharing both clinical knowledge and industry knowing by providing clarity on studies as well as shared simplified competitor messaging.
  **Opportunity/2021**
- Be at least in the "Top 50% of Cresset" – Strive to win Gold/Silver
- With focus continuing to be placed on driving Trintellix, continue to proactively look for opportunities to drive district discussions, as well as to proactively partner/collaborate with others across the district/region.
  - Ex: Constellation of Symptoms/Efficacy discussion

## Employee Overall Evaluation

Comment:       I feel and know I did the best job I could do in 2020/Q4 2021. My last time in the field was with Dr Kunins as we had a lunchtime Vyvanse Program. When given the green light to go live in field I did. I left it all out on the field. I have no regrets nor do I feel there was any more I could do than what I did. I met each assigned office where they were, I pivoted, I went above and beyond for each of my assigned

offices. I utilized every resource I could. I felt/feel such a sense of urgency to get patients our medications that I put patients, my offices, and my territory as a wholes needs above my own.

## Goals and Priorities

Research Different non-sales areas of interest within Takeda (HR, Thrive, Consumer/Employee Engagement) with the goal to solidify career path

Ambassador Program, Mentorship Programs,

Due Date:   06/30/2021      Status:   On Track        Completion Date:

Supports:

Seek opportunities to contribute to building Takeda's Brand, while also building my own brand

Due Date:                   Status:   Not Started     Completion Date:

Supports:

Territory Clean-Up/ Prescriber Maintenance

- Territory cleanup/ maintenance. Complete the Prescriber detail report maintenance
- I do feel and know going through prescriber detail report will result in positive cresset results
- Spend 1 hour each day hacking away at the report

Due Date:   03/31/2022      Status:   Not Started     Completion Date:

Supports:

## Areas for Development

Continue to Research Positions within Takeda that would fit me and allow advancement

Status:  In Progress

Start Date: Mar 1, 2018    Completion Date:  Feb 28, 2019

## Global Core Competencies & Leadership Behaviors

Please provide an overall evaluation of your Leadership Behaviors.

| Manager Evaluation | Employee Evaluation |
|---|---|
| Response: | Response:   Business Acumen/Develop Cabilities: |
| | • Prescriber Maintenance |
| | • Continued to evaluate/update routing on a quarterly basis based on strategy. |

- Consistently met/meet customers "where they were/are at"
- Quarterbacked all top accounts throughout pandemic, assessing needs and delivering
- Used and continue to critically think about each account and best business options to build lost business due to pandemic and the fact that my territory is extremely message and promotionally sensitive
- Level 2 thinking and activity with messaging, resourcing
- Goals exceeded reality by thinking outside the box and effectively utilizing all options available to move forward to meet patient and customers needs

Leadership/Self Awareness

- Trintellix Lead for district
- Led district product training, messaging, conference calls,
- Passion so strong for my role and sense of urgency that we get our customers what they need to help patients during pandemic that during one conf call I shared my "why" thus resulting in my children learning how my brother passed
- Tried new things by joining various groups within Takeda (Faith @ work, Gender Parity Group)
- On a call with Ramona she stated if we had any ideas pertaining to reaching patients and customers to be bold and reach out. I was bold and courageous. I kept a continued pulse on perception during pandemic, found an unmet need and way to connect and shared my idea. I ended up being reported to HR and Global Compliance as having "secondary income" (investigation resulted in truth of no secondary income)
- Was invited to take part in 2 conf calls with Executive Leadership pertaining to current selling environment and current territory and what was actually our new reality (couple months into pandemic)
- Was open and receptive to feedback on being a leader with my territory partner, implemented plan but was not successful as goals were not met

Managing Change/Engage Others/

- 6/26 Engagement with customers began, successfully pivoted from face to face to phone to virtual to hybrid
- Completed all new trainings Takeda initiates
- Continuously exceeded district, region and nation in engagements
- From Quarantine, Virtual School, Isolation, Back to School, to now Tsunami of Mental Health- namely anxiety and depression, managed accounts and messaging accordingly

Strategic Approach/Collaboration/Drive For Results

- Goals exceeded reality by thinking outside the box and effectively utilizing all options available to move forward to meet patient and customers needs
- Had an office champion in each office that I utilized to gain access to providers in new "virtual world" as a patient advocate while also conducting mental health checks on my office staff (Lucy- let was out, Dr Eckstein gave her Trint- she did not realize how bad she was until she was back to "herself"
- Dr Amin: new MA, hours and hours spent educating her on Trint and Vyv, assisted getting pts successfully enrolled in Help at Hand
- Virtual Speaker Programs: I had invited and pulled through 2 of the 3 attendees at one program



**Olson, Shannon M**

Neuroscience Sales Specialist
Manager: David Dees
Evaluated By: David Dees

2021 Year-End Performance
Review

Organization: Southern Florida (David Dees)
Location: USA - FL - Virtual
04/01/2021 - 03/31/2022

## Overall Comm

### Manager Overall Year-End Summary

Rating:     Descriptive Assessments - Not Rated

Comment:    *Collaboration*
·Informed both managers of Health Care Systems (BayCare, Advent Health etc) and changes dealing
with territory access. Also collaborated with Florida district regarding mindset and best practices to deal
with office access issues.
·Shared knowledge with district regarding the proper way to document catering fees/documentation
after having 1:1 with Area Administrative Assistant, Jessica Bradbury
*Lead Change*
- Shannon adapted to the changing sales environment by engaging providers in a hybrid model then
virtually. Shannon's ability to embrace the changing landscape and her customer and office
relationships proved beneficial. This model was one example used by members of her district to
maximize customer engagement while working a territory solo and virtual.

### Employee Overall Year-End Summary

Comment:    2021 was a challenging year. Probably the most challenging in my 22 year career. However, it was also
rewarding as regardless of the challenge, patients were helped and lives improved.

## Acknowledge

### Manager

Entered by:                         Date:
Status:
Comment:

### Employee

Entered by:    Shannon Olson       Date:    06/28/2022
Status:        Review Acknowledged
Comment:

## Goals and Pr

Collaboration, Drive for Results, Lead Change, Self-Awareness

·   Collaboration:

·   Continuously kept manager Matt Hand aware of Health Care Systems (BayCare, Advent Health etc) and various
changes pertaining to territory dynamics/representative access. While also collaborating with district teammates
regarding mindset and best practices as our district as a whole had experienced a lot of change.

- I participated in a 1:1 with Jessica Bradbury learning the proper way to document new catering expense fee(s) as well as proper documentation to minimize any transparency issues. This resulted in my expense reports being approved and minimal transparency requests. Shared knowledge gained with district as they too had similar issues.

- David Dees shared my highlighting providers on sign in sheets with district on conference call

- 7/20/2021: I followed up on a Takeda Portal request for Trintellix. After speaking at length to the office manager Amanda, I learned of a new virtual mental health practice that included 7 providers in various states. While at the time they were not in Florida I thought this was an opportunity for Takeda inside sales. I emailed Takeda@insi... ...t.com a summary of our call, Amanda's direct contact info and their needs (virtual vouchers)

- Consistently collaborated with Ida Galarza, Kathy Orusa and Paula Herbert post leave to get Takeda systems up and running and then all year to work together ensure my territory prescriber maintenance was/ is through

- 11/10/2021: "Unveiling our New Internal 'Just Be You' Vision"

- Read about it in Nov 3, 2021 edition of Let's Accelerate. Having 22 years with Takeda and launching Trintellix- this was an area of passion for me. I commented on the campaign and emailed everyone I found associated with the campaign (aprox 30+ Takeda employees) to express my desire to be involved in whatever way that looked like. Jaime Sullivan responded to my email and shared 2 names who were also cc'd on her email. I reached out numerous times to both individuals but hit a dead end- never heard back.

- 12/6/201: Was recognized by John Sander, Interim DBM "Shannon went 'ABOVE AND BEYOND' (PTRB) to help an HCP located in a vacant sale territory, outside her own territory."

- Dr. Jackie Hubbard proactively called Takeda management requesting more Vyvanse DFTO's. I contacted her and took care of helping her with her request (that same day)

- Collaborated with manager David Dees regarding a solution (inform the representative) for outstanding provider AOC's and a solution. A provider who has one will not be shipped samples even ones virtually signed for until AOC is resolved. David sent idea to appropriate person.

- Lead Change:
    - I successfully adapted to the changing sales environment by engaging my HCPs using hybrid then solely virtual. My ability to embrace the changing landscape as well as my customer and office relationships served me well – helping to model for others in my old and now new district how to maximize customer engagement while working a territory solo and then solo and virtual.
        - Created a St Pete Book of Business that ensured TPT, Top Peds and other Top Trintellix targets were seen/ called on with the same frequency for 2 reps when in reality I was a 1 rep team

- Drive for Results
  - Customer Engagement: Impactful, Engaging Remote/Hybrid Selling
    - Q1 2021 April- June: Leave
    - Q2: July- September: Solo/Hybrid
      - % TRx vol change
        - Trintellix = 1.36% (District -1.28%, Region -1.01%, Nation +0.10%)
        - Vyvanse= -10.36% (District -10.35%, Region -6.85%, Nation -4.92%)
      - HCP Interactions/Day
        - July 1.7/day 8.6/week
          - (first month back from leave- subtracting time spent out of field – office days, conference calls, web ex, business meetings- had 3 full days in field hence low interaction)
        - August 6.6/Day 33.2/week
          - Worked 22 days (of those 11 hours conf calls)
        - September 9.1/Day 45.6/week
          - Worked 16.5 days (11 hours conf calls)
    - Q3: October- December:  Solo/Virtual
      - Trintellix -2.71% (district .33%, Region 2.47%, Nation 1.41%)
      - Vyvanse 16.56% (district 12.29%, Region 10.45%, Nation 10.28%)
      - Averaged 5 HCP/Day 25.1 HCP/Week
      - OCE Emails  307 sent, 23% opened (district average 19%)
    - Q4: January- March:  Solo/Virtual
      - Engagements:
        - As of 3/11/2021 Total Interactions: 255 avg  20 interactions/week (per 13 weeks)
          - 75% Engage, 25% phone, 16% sampled
          - 73 virtual breakfast/lunches
      - Omni- Channel Engagement 1/1/2022- 2/14/2022
        - 587 records – 532 emails sent

| Due Date | 03/31/2022 | Status: | | Completion Date: |
|---|---|---|---|---|
| Supports: | | | | |
| Weight: | 0 | | | |

- Engage Others, Develop Capabilities, Self-Awareness

- Engage Others:
  - Mental Health- Mind Health is my passion: Thus, creating a sense of urgency in the need to treat with providers is imperative
    - 10/28/2021: Emailed district emotional success story of a mom who came in to hug the PA who "gave her her son back" (PA gave her son Trintellix) stressing 'Why we do what we do'
    - 11/1/2021: Emailed district various articles regarding mental health and post pandemic.  I summarized and highlighted stats from each article and various talking points they could use with providers
  - I created a sales call probe(s) document that I share with my district
    - Others responded positively as gave them fresh ideas
  - I created a Rep of the Future document for my district. It centered around weekly, monthly time spending tips including calendar alerts, outlook folders for easy quality conversations/ annual assessment, new resources and documents as well as a book of business
    - Others responded that this helped keep them organized and not overwhelmed
  - Had an idea that I am passionate about for a WeConnect group. Reached out to Karla Zevallos to further discuss (we shall see end result)
  - Reached out to Greg and Julie on ideas to share regarding Region and Company Culture

- Develop Capabilities:
  - QuickHelp
    - I utilized this resource to become more efficient and proficient in various Microsoft tools
      - Ranked in the 96th percentile of QuickHelp users in Takeda
- Applied for US Well-Being Champion
  - Health and Wellness is a passion of mine. This volunteer position is completely in my wheel house. I applied as I would any new job/ role thus, I asked aprox 20 fellow Takeda employees who believed that this was a Fit for me to email my manager David Dee's and Thrive to endorse me- they did unfortunately I did not get selected
- Self- Awareness:
  - Registered and completed training in areas of interest and in areas that I need to improve in
    - TET Talks, Fireside Chats, Takeda Care Learning, Virgin Pulse GO (Global Well-Being Challenge), NSBU/ USPA Coffee 'Working with Us' Ryan Glover
    - WeConnect Groups
      - Faith At Work, Black Leadership Council (BLC), Gender Parity (GET),
        - Reached out to Michael Hall to start a Faith at Work Book Club- are still discussing particulars
- Was Invited and Participated in Ignite Field Chapter CL&D Professional Development on Jan 24, 2022

Due Date    03/31/2022    Status:                    Completion Date:

Supports:

Weight:    0

- Strategic Approach

- I embraced and consistently used electronic resources to help drive ROI and TRX Growth
- I leveraged available business tool resources – Vital Signs, SOT, Veeva Suggestions, –to create strategic plans for maximizing opportunities and to overcome challenges
  - Veeva Suggestions:
    - Effectively utilized to have targeted and impactful conversations with my HCPs
- Utilized analytical skills to identify and develop solutions

Due Date    03/31/2022    Status:                    Completion Date:

Supports:

Weight:    0

Areas for Dev

## Development/Career Path

Additional Informati

  - Continue to embrace OCE resources
  - Continue to help mentor new(er) reps
  - Partner with DBM to share strategies for business opportunities
  - Continue to research other areas within Takeda that will allow for growth and advancement

Status:  Started

Start Date: Mar 1, 2018     Completion Date: Feb 28, 2019

Strategic Territory Management

Additional Information:     - Slow down and take the time to analyze the data on both macro and micro level
                            • developed business plans based off the story the data tells.

Status: Started

How did you demonstrate desired behaviors in order to achieve your goals?

Manager Year-End

Response:

### Collaboration

·Informed both managers of Health Care Systems (BayCare, Advent Health etc) and changes dealing with territory access. Also collaborated with Florida district regarding mindset and best practices to deal with office access issues.

·Shared knowledge with district regarding the proper way to document catering fees/ documentation after having 1:1 with Area Administrative Assistant, Jessica Bradbury

### Lead Change

- Shannon adapted to the changing sales environment by engaging providers in a hybrid model then virtually.  Shannon's ability to embrace the changing landscape and her customer and office relationships proved beneficial. This model was one example used by members of her district to maximize customer engagement while working a territory solo and virtual.

Employee Year-End Summary

Response:

### Lead Change:

I effectively adapted to the changing sales environment by engaging her HCPs F2F, Virtually and by phone. Shannon's ability to embrace the changing landscape will continue to serve her well – helping to model for others in the district how to maximize customer engagement while working a territory solo.

# EXHIBIT T

VIRGINIA:

BEFORE THE CIRCUIT COURT OF THE COUNTY OF ARLINGTON

VIRGINIA STATE BAR EX REL
VIRGINIA STATE BAR DISCIPLINARY BOARD
    VSB Docket No. 23-041-127923
    VSB Docket No. 24-041-129679

v.                                                      Case No. CL24001688-00

MICHAEL ALAN YODER
    Respondent

## AGREED DISPOSITION MEMORANDUM ORDER
## SIX-MONTH SUSPENSION WITH TERMS

This matter came to be heard on September 5, 2024, and September 6, 2024, before a

Circuit Court Three-Judge panel, upon the joint request of the parties for the Court to accept the

Agreed Disposition endorsed by the parties and offered to the Court as provided by the Rules of

the Supreme Court of Virginia.

The panel consisted of the Honorable Manuel A. Capsalis, Judge of the Nineteenth

Judicial Circuit, Designated Chief Judge, the Honorable Victoria A.B. Willis, Judge of the

Fifteenth Judicial Circuit, and the Honorable Cheryl V. Higgins, Judge of the Sixteenth Judicial

Circuit.

Michael A. Yoder ("Respondent") was present and was represented by counsel, Julie S. Palmer,

Esquire. The Virginia State Bar appeared through its Assistant Bar Counsel, Richard W.

Johnson, Jr. Esquire.

The Chief Judge polled the members of the panel as to whether any of them were aware

of any personal or financial interest or bias which would preclude any of them from fairly

hearing the matter to which each judge responded in the negative. Court Reporter Beverly Horne,

1

Chandler & Halasz, P.O. Box 9349, Richmond, Virginia 23227, telephone (804) 730-1222, after

being duly sworn, reported the hearing and transcribed the proceedings.

WHEREFORE, upon consideration of the Agreed Disposition, the Certification, the

Respondent's Answer, the Respondent's Disciplinary Record, the arguments of the parties, and

after due deliberation, it is:

**ORDERED** that the Circuit Court accepts the Agreed Disposition, and the Respondent

shall receive a suspension of six months (6) months with Terms. The Agreed Disposition is

attached to and incorporated in this Memorandum Order.

It is further **ORDERED** that the sanction is effective September 11, 2024.

It is further **ORDERED** that the Respondent must comply with the requirements of Part

6, Section IV, Paragraph 13-29 of the Rules of the Supreme Court of Virginia. The Respondent

shall forthwith give notice by certified mail of the Suspension of his license to practice law in the

Commonwealth of Virginia to all clients for whom he is currently handling matters and to all

opposing Attorneys and presiding Judges in pending litigation. The Respondent shall also make

appropriate arrangements for the disposition of matters then in his care in conformity with the

wishes of his clients. The Respondent shall give such notice immediately and in no event later

than 14 days of the effective date of the Suspension, and make such arrangements as are required

herein as soon as is practicable and in no event later than 45 days of the effective date of the

Suspension. The Respondent shall also furnish proof to the Clerk of the Disciplinary System of

the Virginia State Bar within 60 days of the effective date of the Suspension that such notices

have been timely given and such arrangements have been made for the disposition of matters.

It is further **ORDERED** that if the Respondent is not handling any client matters on the

effective date of the Suspension, he shall submit an affidavit to that effect within 60 days of the

effective date of the Suspension to the Clerk of the Disciplinary System at the Virginia State Bar.

The Virginia State Bar Disciplinary Board shall decide all issues concerning the adequacy of the

notice and arrangements required herein. The burden of proof shall be on the Respondent to

show compliance. If the Respondent fails to show compliance, the Board may impose a sanction

of Revocation or additional Suspension for failure to comply with the requirements of

subparagraph 13-29.

The Clerk of the Disciplinary System shall assess costs pursuant to Part 6, Section IV,

Paragraph 13-9 E of the Rules of the Supreme Court of Virginia.

It is further **ORDERED** that a certified copy of this Order be mailed to the Respondent,

Michael A. Yoder, by regular first-class mail and by certified mail, return receipt requested, at

his Virginia State Bar address of record, 2300 Wilson Blvd. Suite 700, Arlington, Virginia 22201

and by electronic mail to michael@yoderesq.com, and that a copy be sent by electronic mail to

Julie S. Palmer, Esquire, Counsel for Respondent, and to Richard W. Johnson, Jr., Esquire,

Assistant Bar Counsel, and to Joanne Fronfelter, the Clerk of the Disciplinary System, Virginia

State Bar, 1111 East Main Street, Suite 700, Richmond, VA 23219-0026.

ENTERED THIS ___9ᵗʰ___ DAY OF SEPTEMBER 2024

The Honorable Manuel A. Capsalis
Designated Chief Judge

(ENDORSEMENTS BY COUNSEL ON NEXT PAGE)

3

SEEN AND AGREED TO:


Richard W. Johnson, Jr. (#51024)
Assistant Bar Counsel
Virginia State Bar
1111. E. Main Street, Suite 700
Richmond, Va 23219-0026


Julie S. Palmer (#65800)
Counsel for Respondent
P.O. Box 70280
Richmond, Virginia 23255

4

**RECEIVED**

**Sep 6, 2024**

**VIRGINIA STATE BAR
CLERK'S OFFICE**

# VIRGINIA:

## IN THE CIRCUIT COURT FOR THE COUNTY OF ARLINGTON

**VIRGINIA STATE BAR EX REL.
FOURTH DISTRICT, SECTION I COMMITTEE
VSB DOCKET NO. 24-041-129679
VSB DOCKET NO. 23-041-127923**

      **Complainant,**

                                 **Case No. CL24001688-00**

**v.**

**MICHAEL ALAN YODER**

      **Respondent.**

## AGREED DISPOSITION
## SIX MONTH SUSPENSION WITH TERMS

      Pursuant to the Rules of the Supreme Court of Virginia, Part 6, § IV, ¶13-6.H and Va.

Code Section 54.1 – 3935, the Virginia State Bar, by Richard W. Johnson, Jr., Assistant Bar

Counsel, and Michael Alan Yoder, ("Respondent"), and Julie S. Palmer, Esq., counsel for

Respondent, hereby enter in the following Agreed Disposition arising out of the above

referenced matter.

### STIPULATIONS OF FACT

1.    Respondent was admitted to the Virginia State Bar ("VSB") in 2018. At all relevant
times, Respondent was a member of the VSB.

### VSB Docket No. 23-041-127923

2.    After hearing Respondent on a podcast, Amy Gonzalez ("Complainant") and Andrea
Gross ("Gross") retained Respondent to represent them in a potential civil claim against
their children's school, Columbus Academy ("CA"), located in Columbus, Ohio.

3.    On January 4, 2022, Complainant, Gross, and Respondent entered into an engagement
agreement[1] which stated that their deposit would be held "in a client trust account." The

---

[1] The engagement agreement stated that Respondent agreed "to represent you in litigation concerning the events, causes, and occurrences giving rise to Columbus Academy's breach of contract, ADA compliance, academic

engagement agreement further provided that Respondent would send "monthly billing statements."

4.     On January 4, 2022, Complainant and Gross each paid Respondent a $10,000 advanced legal fee via credit card for a total of $20,000. Respondent did not deposit the $20,000 advanced legal fee in his trust account. Instead, he deposited it directly into his operating account.

5.     The civil complaint was filed in the Ohio Court of Common Pleas on February 4, 2022.[2] On March 14, 2022, CA filed a Motion to Dismiss for failure to state a claim upon which relief can be granted. On April 18, 2022, Respondent filed a Notice of Voluntary Dismissal,[3] which was granted. Respondent did not immediately explain to Gross or Complainant that he would need to refile the defamation claim on or before April 18, 2023 it would be time barred. *See* Ohio Rev. Code, §2305.11 (West 2021). Respondent maintains that, after receiving CA's Motion to Dismiss and learning new information stated therein, he told Gross and Gonzalez that the defamation claim was meritless and that he could not, ethically, refile it.

6.     After Respondent dismissed the civil suit, Respondent advised Complainant and Gross that the best course of action would be to pursue a federal claim against CA. In May 2022, Respondent told Complainant that he would file a complaint in federal court "within a couple of weeks."

7.     On June 30, 2022, Respondent texted Complainant that "if he had not prepared the complaint by next Friday … the full amount of the retainer would be returned to them."

8.     Respondent did not prepare the complaint by July 7, 2022. Instead, on July 14, one week after he said he would send them the complaint, Complainant had to follow up with Respondent, which she did by text, reminding him that the goal moving forward was to file a federal complaint.

9.     On August 23, 2022, Respondent again stated, as he had almost two months earlier on June 30, that he would have a complaint for them to review.

10.    On August 26, 2022, Respondent texted that September 2 would be the new date for a rough draft of the federal complaint.

11.    On September 21, Complainant texted Respondent that they needed to "manage expectations."

12.    Respondent never provided Complainant or Gross a draft federal complaint.

---

curriculum, tax- exempt status, and other whistleblower- related claims, including without limitation, fraud and/or financially related misconduct."

[2] Respondent electronically endorsed the Complaint and noted that "Pro Hac Vice forthcoming."

[3] Equivalent of a nonsuit in Virginia.

13.    Respondent did not refund Complainant or Gross any portion of the $10,000 advanced legal fee each paid to Respondent.

14.    On January 4, 2023, Complainant and Gross terminated the representation and filed the instant bar complaint.

15.    In his interview with the bar investigator, Respondent stated that he did not mean for Complainant and Gross to take seriously his statement that he would return the advanced legal fee to them.

<u>VSB Docket Number 24-041-129679</u>

16.    On August 3, 2023, JP Morgan Chase notified the Bar that Respondent's Trust account had insufficient funds for payment.

17.    The payment that led to the overdraft was a refund to Howard Travers ("Travers"). On May 9, 2023, Travers retained Respondent to represent him in an employment matter. Travers made two credit card payments of $2,500 on May 29 and May 31, 2023. Respondent transferred the money into his operating account one day after receipt. Respondent told Foley that "all the money in IOLTA was already earned at the time it was deposited."

18.    Cheryl Torpey ("Torpey") was a former colleague of Travers who retained Respondent in a wrongful termination matter. Respondent received Torpey's advanced legal fee of $10,000 in two increments on May 30 and June 26, 2023.

19.    Respondent told Foley he had earned the advanced legal fee paid by Torpey by the time he received it. Respondent later refunded Torpey's entire fee from his Trust account.

20.    On December 7, 2022, the parents of Y. Hicks ("Hicks") retained Respondent to file suit on Hicks' behalf against Duke University. On December 12, 2022, Respondent filed a complaint on Hicks' behalf against Duke University. On December 19, 2022, Hicks' parents paid Respondent a $20,000 advanced legal fee. Respondent received the fee on December 21, 2022, and deposited it in his operating account. Respondent told Foley the entire fee was earned by the time he received the fee.

21.    Hicks told Foley that Respondent filed a lawsuit against Duke University but withdrew it without their permission. Hicks told Foley that Respondent told them the suit had been incorrectly filed. Respondent maintains the suit was withdrawn because Hicks no longer had standing and that he explained that to Hicks.

22.    Hicks advised they have demanded a refund of their $20,000 fee, but Respondent has "ghosted" them.

23.    Respondent told Foley that Hicks was still his client. Respondent stated that "this happens a lot like if I don't respond to someone or I'm not in constant communication

3

with them on a weekly basis, they like think that I'm that they're like not a client anymore or something." Respondent told Foley he had had multiple discussions with Hicks concerning the status of "Yulia's Law," which remained active but had not yet passed with the legislature.

24.    Respondent provided the Bar with a "2022 client payments record" which reflects that Jeffrey T. Hanson ("Hanson") made a $5,000 payment which Respondent deposited directly into his operating account. Respondent stated to Foley that the fee was "technically, all earned."

25.    On March 13, 2023, Respondent sent a letter to Hanson that enclosed a refund check of $740 from his Trust account. The letter advised Respondent was "returning the monies owed to you that remain in trust pursuant to the terms of the Engagement Agreement."

26.    On August 29, 2023, Respondent produced a document titled "Attorney's Fees & Hours," which appear to be invoices for each of his clients during 2022. Respondent prepared the document as an internal document and did not distribute it to his clients.

27.    Respondent stated that he did not record his hours for work performed after the advanced legal fee was earned. To prepare the "Attorney's Fees & Hours" document, he used the Excel spreadsheets, emails, bank statements, and other records in the clients' files to compile the year end itemization.

28.    Respondent did not maintain any receipt journals, disbursement journals, monthly reconciliations, or client ledgers for 2022 and 2023.

## JURISDICTION

Respondent is subject to the disciplinary authority of the Virginia State Bar under the following provision of the Virginia Rules of Professional Conduct:

**RULE 8.5    Disciplinary Authority; Choice Of Law**

(a) Disciplinary Authority. A lawyer admitted to practice in this jurisdiction is subject to the disciplinary authority of Virginia, regardless of where the lawyer's conduct occurs. A lawyer not admitted in Virginia is also subject to the disciplinary authority of Virginia if the lawyer provides, holds himself out as providing, or offers to provide legal services in Virginia. By doing so, such lawyer consents to the appointment of the Clerk of the Supreme Court of Virginia as his or her agent for purposes of notices of any disciplinary action by the Virginia State Bar. A lawyer may be subject for the same conduct to the disciplinary authority of Virginia and any other jurisdiction where the lawyer is admitted.

Because Respondent was engaged in the practice of law before Franklin County, Ohio Court of

Common Pleas when portions of the alleged misconduct occurred, the Ohio Rules of Professional Conduct apply to a portion of the misconduct and, and because Respondent was engaged in the practice of law before the Middle District of North Carolina when parts of the alleged misconduct occurred, the North Carolina Rules of Professional Conduct apply to a portion of the misconduct pursuant the following provision of the Virginia Rules of Professional Conduct:

**RULE 8.5    Disciplinary Authority; Choice Of Law**

\*\*\*

(b) Choice of Law. In any exercise of the disciplinary authority of Virginia, the rules of professional conduct to be applied shall be as follows:

(1) for conduct in connection with a proceeding in a court, agency, or other tribunal before which a lawyer appears, the rules to be applied shall be the rules of the jurisdiction in which the court, agency, or other tribunal sits, unless the rules of the court, agency, or other tribunal provide otherwise;

(2) for any other conduct, the rules of the jurisdiction in which the lawyer's conduct occurred; and

(3) notwithstanding subparagraphs (b)(1) and (b)(2), for conduct in the course of providing, holding out as providing, or offering to provide legal services in Virginia, the Virginia Rules of Professional Conduct shall apply.

Such conduct by Respondent constitutes misconduct in violation of the following provisions of the Rules of Professional Conduct:

## NATURE OF MISCONDUCT

Such conduct by Respondent constitutes misconduct in violation of the following provisions of the Rules of Professional Conduct:

## VSB Docket Number 24-041-129679

*By failing to prepare and draft a federal complaint after agreeing to do so, and giving assurances from May 2022 until September 2022 that he would provide a draft complaint to Complainant and Gross, Respondent violated Ohio Rule 1.3(a), as set forth below:*

**RULE 1.3    Diligence**

(a)A lawyer shall act with reasonable diligence and promptness in representing a client.

*By accepting $20,000 advanced legal fee from Complainant and Gross and failing to*

*deposit them into a trust account, Respondent violated Rule 1.15(a)(1) as set forth below:*

**RULE 1.15    Safekeeping Property**

(a) Depositing Funds.

      (1) All funds received or held by a lawyer or law firm on behalf of a client or a third party, or held by a lawyer as a fiduciary, other than reimbursement of advances for costs and expenses shall be deposited in one or more identifiable trust accounts; all other property held on behalf of a client should be placed in a safe deposit box or other place of safekeeping as soon as practicable.

      *By not updating Complainant and Gross, through monthly invoices as agreed upon or another form of communication, Respondent violated Rule 1.15(b)(3) and Ohio Rule 1.4(a)(3) as set forth below:*

**RULE 1.15    Safekeeping Property**
                      ***

<u>(b) Specific Duties</u>. A lawyer shall:

                               ***

(3) maintain complete records of all funds, securities, and other properties of a client coming into the possession of the lawyer and render appropriate accountings to the client regarding them.

**RULE 1.4    Communication**

(a) A lawyer shall do all of the following:

                               ***

(3) keep a client reasonably informed about the status of a matter and promptly comply with reasonable requests for information.

<u>VSB Docket Number 24-041-129679</u>

      *By accepting tens of thousands of dollars in advanced legal fees from Travers, Torpey, Hicks, and Hanson and failing to deposit them into a trust account, Respondent violated Rule 1.15(a)(1), as set forth below:*

**RULE 1.15    Safekeeping Property**

(a) Depositing Funds.

(1) All funds received or held by a lawyer or law firm on behalf of a client or a third party, or held by a lawyer as a fiduciary, other than reimbursement of advances for costs and expenses shall be deposited in one or more identifiable trust accounts; all other property held on behalf of a client should be placed in a safe deposit box or other place of safekeeping as soon as practicable.

*By maintaining earned funds in his Trust account, as Respondent acknowledged in the Travers, Hanson, and Torpey matters, Respondent violated Rule 1.15(a)(3), as set forth below:*

**RULE 1.15    Safekeeping Property**

(a) Depositing Funds.
\*\*\*

(3) No funds belonging to the lawyer or law firm shall be deposited or maintained therein except as follows:

(i) funds reasonably sufficient to pay service or other charges or fees imposed by the financial institution or to maintain a required minimum balance to avoid the imposition of service fees, provided the funds deposited are no more than necessary to do so; or

(ii) funds in which two or more persons (one of whom may be the lawyer) claim an interest shall be held in the trust account until the dispute is resolved and there is an accounting and severance of their interests. Any portion finally determined to belong to the lawyer or law firm shall be withdrawn promptly from the trust account.

*By failing to communicate with Hicks the reasons for withdrawing the complaint against Duke University, and failing to update Hicks on the status of the matter to the extent that Hicks believes Respondent no longer represents them, when Respondent believes he still does, Respondent violated North Carolina Rule 1.4(a)(3) and North Carolina Rule 1.4(b), as set forth below:*

**RULE 1.4    Communication**

(a)(3) A lawyer shall keep a client reasonably informed about the status of a matter and promptly comply with reasonable requests for information.

(b) A lawyer shall explain a matter to the extent reasonably necessary to permit the client to make informed decisions regarding the representation.

*By failing to maintain client ledgers, Respondent violated Rule 1.15(c)(2) and (4), as set*

*forth below:*

**RULE 1.15    Safekeeping Property**

(c) Record-Keeping Requirements. A lawyer shall, at a minimum, maintain the following books
and records demonstrating compliance with this Rule:

*** *

     (2) A client ledger with a separate record for each client, other person, or entity from
whom money has been received in trust. Each entry shall include, at a minimum: identification
of the client or matter; date and amount of the transaction; name of the payor or payee; source of
funds received or purpose of the disbursement; and current balance.

     (4) All records subject to this Rule shall be preserved for at least five calendar years after
termination of the representation or fiduciary responsibility.

    *Because Respondent did not maintain client ledgers, he could not reconcile the ledger
balances for his clients or reconcile the trust account balance with the client ledger balance, and
therefore he violated Rule 1.15(d)(3)(i) and (iii) as set forth below.*

**RULE 1.15    Safekeeping Property**

(d) Required Trust Accounting Procedures. In addition to the requirements set forth in Rule 1.15
(a) through (c), the following minimum trust accounting procedures are applicable to all trust
accounts.

*** *

     (3) The following reconciliations must be made monthly and approved by a lawyer in the
law firm:

         (i) reconciliation of the client ledger balance for each client, other person, or
entity on whose behalf money is held in trust;

*** *

         (iii) reconciliation of the trust account balance ((d)(3)(ii)) and the client ledger
balance ((d)(3)(i)). The trust account balance must equal the client ledger balance.

## PROPOSED DISPOSITION

Accordingly, Assistant Bar Counsel and Respondent tender to the Three-Judge Panel for

its approval the Agreed Disposition of a Six Month Suspension with Terms as representing an

appropriate sanction if this matter were to be heard through an evidentiary hearing by the Three-

Judge Panel. The terms are as follows:

1) For a period of two year(s) following the termination of Respondent's suspension, Respondent will not engage in any conduct that violates any provisions of the Virginia Rules of Professional Conduct, including any amendments thereto, and/or which violates any analogous provisions, and any amendments thereto, of the disciplinary rules of another jurisdiction in which Respondent may be admitted to practice law. The terms contained in this paragraph will be deemed to have been violated when any ruling, determination, judgment, order, or decree has been issued against Respondent by a disciplinary tribunal in Virginia or elsewhere, containing a finding that Respondent has violated one or more provisions of the Rules of Professional Conduct, *provided, however*, that the conduct upon which such finding was based occurred within the period referred to above, and provided, further, that such ruling has become final.

2) On or before December 11, 2024, Respondent will complete six hours of continuing legal education credits by attending courses approved by the Virginia State Bar in the subject matter of trust accounting and law office management. Respondent's Continuing Legal Education attendance obligation set forth in this paragraph will not be applied toward his Mandatory Continuing Legal Education requirement in Virginia or any other jurisdictions in which Respondent may be licensed to practice law. Respondent will certify his compliance with the terms set forth in this paragraph by delivering a fully and properly executed Virginia MCLE Board Certification of Attendance form (Form 2) to Bar Counsel, promptly following his attendance of each such CLE program(s).

3) Respondent will read in its entirety Lawyers and Other People's Money, 5th Edition, and Legal Ethics Opinion 1606 and Legal Ethics Opinion 1819 and will certify compliance in writing to Bar Counsel not later than 90 days following the date of entry of this Order.

4) Within thirty (30) days from the date of the Three-Judge Panel approving this Agreed Disposition, Respondent must engage the services of an accountant who is familiar with the requirements of Rule 1.15 of the Rules of Professional Conduct to review Respondent's attorney trust account record-keeping, accounting, and reconciliation methods and procedures to ensure compliance with Rule 1.15 of the Rules of Professional Conduct. Respondent is obligated to pay when due the accountant's fees and costs for services. Upon completion of the accountant's review of Respondent's trust account record-keeping, accounting, and reconciliation methods and procedures, but no later than December 11, 2024, Respondent shall certify to Bar Counsel that he has engaged an accountant and has revised his trust accounting methods and procedures based on the accountant's recommendations and the requirements of Rule 1.15 of the Rules of Professional Conduct.

5) The six-month suspension shall commence on September 11, 2024.

If any of the terms are not fully and timely met by the deadlines set forth above, Respondent agrees that the alternative disposition shall be a suspension of Respondent's license to practice law in the Commonwealth of Virginia for a period of two years. Any proceeding initiated due to failure to comply with terms will be considered a new matter, and an administrative fee and costs will be assessed pursuant to ¶ 13-9.E of the Rules of the Supreme Court of Virginia.

The Virginia State Bar and Respondent agree that, should the Three-Judge Panel reject this Agreed Disposition, the Three-Judge Panel retains jurisdiction to hear this matter on September 11, 2024 and September 12, 2024 or anytime thereafter.

If the Agreed Disposition is approved, the Clerk of the Disciplinary system shall assess costs.

Pursuant to Part 6, § IV, ¶ 13-30.B of the Rules of the Supreme Court of Virginia, Respondent's prior disciplinary record shall be furnished to the Three-Judge Panel considering this Agreed Disposition.

Richard W. Johnson Jr.
Assistant Bar Counsel
Virginia State Bar

Michael Alan Yoder
Respondent

Julie S. Palmer
Respondent's Counsel

**VIRGINIA:   BEFORE THE VIRGINIA STATE BAR DISCIPLINARY BOARD**

**IN THE MATTER OF**
**MICHAEL ALAN YODER**                    **VSB Docket No.:  25-000-135000**

### MEMORANDUM ORDER OF DISMISSAL

      **THIS MATTER** was heard on April 25, 2025, on the Rule to Show Cause why the alternative sanction of a two-year suspension as provided by Order of a Three-Judge Panel of the Arlington County Circuit Court entered on September 9, 2024, VSB Docket Nos. 23-041-127923 and 24-041-129679, should not be imposed against Respondent Michael Alan Yoder ("Respondent") for his failure to fulfill the Term ordered by the Court. This matter was heard before a panel of the Virginia State Bar Disciplinary Board ("Board") consisting of David J. Gogal, Chair, Stephanie G. Cox, Melanie A. Friend, Michael C. Moore, and Samuel Massenberg, Lay member. This matter came before the Board based on the Notice of Show Cause Hearing on Terms Violation dated March 21, 2025, pursuant to Part Six, § IV, ¶ 13-18.O of the Rules of the Virginia Supreme Court ("the Rules") and the Rule to Show Cause and Pre-Hearing Order of the Board entered March 25, 2025.

      The Virginia State Bar was represented by Richard W. Johnson, Jr, Assistant Bar Counsel ("Bar Counsel").  Respondent filed an Answer to the pleadings and participated in the pre-hearing conference, however was not present and was not represented by counsel on April 25, 2025. In the early morning hours of April 25, 2025, Respondent sent an email to the Clerk's office with a motion attached asking to appear remotely for the show cause hearing stating that an unforeseen illness prevented him from appearing in person. Prior to the start of the hearing, that motion was granted.  The Clerk sent notice to Respondent's email address advising him that his motion to appear remotely was granted and providing the link to Microsoft TEAMS with instructions for attending the hearing remotely. The Clerk reported that the email sent to Respondent showed that it had been received and read by 9:30 a.m. The Clerk also attempted to

1

call the Respondent's phone several times without reaching Respondent. Respondent did not respond to these communications from the Clerk nor appear anytime during the hearing, either remotely or in person. At 9:45 a.m., the Clerk called Respondent's name three times in the adjacent hall with no response. The Chair polled the members of the Board Panel as to whether any of them was conscious of any personal or financial interest or bias which would preclude any of them from fairly hearing this matter and serving on the panel, to which inquiry each member and the Chair responded in the negative. Beverly S. Horne, court reporter, P.O. Box 1975, Mechanicsville, Virginia 23116, (804) 730-1222, after being duly sworn, reported the hearing and transcribed the proceedings.

All legal notices of the date and place were timely sent by the Clerk of the Disciplinary System ("Clerk") in the manner prescribed by law.

Part Six, § IV, ¶ 13-18.O of the Rules provides, in relevant part, that whenever it appears that a respondent has not complied with a Term imposed in a prior disposition, Bar Counsel shall serve notice requiring such respondent to appear and show cause why the alternative disposition stated in the prior disposition should not be imposed. The burden of proof shall be on such respondent to show compliance by clear and convincing evidence. If the Board finds that such respondent has failed to comply with a Term of the prior disposition, "the alternative disposition shall be imposed."

## PROCEDURAL BACKGROUND

By an Agreed Disposition Memorandum Order of a Three-Judge Panel of the Arlington County Circuit Court in VSB Docket Nos. 23-041-127923 and 24-041-129679, entered on September 9, 2024 (the "Prior Order"), the Respondent was found, by clear and convincing evidence, to have engaged in misconduct, specifically violating Rules of Professional Conduct 1.3 (diligence), 1.4 (communication), and 1.15 (a),(b),(c), and (d) (safekeeping property). In the Prior

2

Order, the Three-Judge Panel issued a six-month suspension of Respondent's license to practice

law in the Commonwealth of Virginia with several Terms imposed on Respondent, including Term

4 which is the subject of this Rule to Show Cause.  Term 4 states as follows:

> 4) Within thirty (30) days from the date of the Three-Judge Panel approving this Agreed
> Disposition, Respondent must engage the services of an accountant who is familiar with
> the requirements of Rule 1.15 of the Rules of Professional Conduct to review Respondent's
> attorney trust account record-keeping, accounting, and reconciliation methods and
> procedures to ensure compliance with Rule 1.15 of the Rules of Professional Conduct.
> Respondent is obliged to pay when due the accountant's fees and costs for services. Upon
> completion of the accountant's review of Respondent's trust account record-keeping,
> accounting and reconciliation methods and procedures, but no later than December 11,
> 2004, Respondent shall certify to Bar Counsel that he has engaged an accountant and has
> revised his trust accounting methods and procedures based on the accountant's
> recommendations and requirements of Rule 1.15 of the Rules of Professional Conduct.

The Prior Order further provided that, in the event Respondent failed to comply with the

enumerated Terms, Respondent's license to practice law in the Commonwealth of Virginia would

be suspended for a period of two years.

## PRELIMINARY MATTERS AND EXHIBITS

VSB exhibits 1-6 were admitted without objection.  Over Bar Counsel's objection, the

Board found good cause to admit as Board's Exhibit 1, a written report from Respondent's

accountant, DC8 Financial/Tamara Batts, dated December 2, 2024.  This report was submitted by

Respondent to the Clerk and Bar Counsel electronically on the morning of the hearing, along with

his Motion to Appear Remotely. The objection was that Respondent did not timely file the exhibit.

This late submission by Respondent was in response to Bar Counsel's April 23, 2025 filing of a

Response to Respondent's Answer, which brought into question the existence of the accountant's

December 2, 2024 written report. The Board found this report to be a critical piece of evidence

directly relevant to whether or not Respondent had complied with Term 4 of the Court's order of

suspension. The Board learned, through testimony of the VSB witness Matthew Foley, Bar

Investigator, that Bar Counsel was aware of the report's existence as early as December 13, 2024. Mr. Foley sent an email to Bar Counsel after his brief phone conversation with Respondent's accountant, Tamara Batts, in December of 2024, advising that Ms. Batts had prepared a written report outlining the work she had done for Respondent regarding Term 4 of the suspension Order. The Bar failed to request, collect or review a copy of the accountant's report before filing the Notice of Show Cause for violating Term 4 of the suspension Order, or at any time before the hearing. Julie Palmer, Respondent's counsel for the underlying disciplinary matter, sent Bar Counsel proof of Respondent's compliance with Terms by email on December 11, 2024. Bar Counsel asked for, and promptly received, the contact information for Respondent's accountant. Ms. Palmer asked Bar Counsel to let her know if he needed any additional information from Respondent regarding his compliance. (See Exhibits A and B attached to VSB Response to Respondent's Answer filed April 23, 2025.) Other than the accountant's contact information, no other information was requested. At the hearing, Bar Counsel argued in closing that the accountant's report bolstered their position regarding a violation of Terms under ¶ 13-18.O, therefore there can be no claim of prejudice to the Bar in admitting this report. Given the nature and content of the accountant's report, the alleged Term violation involved, and the VSB's prior knowledge of its existence, good cause was shown and the report was admitted as Board's Exhibit 1.

PROCEEDINGS AND FINDINGS OF FACT

During the hearing the Board heard testimony from one witness, Bar Investigator Matthew Foley. The Board considered the exhibits admitted, the testimony of the witness, and the argument of Bar Counsel. Respondent did not appear and did not present additional evidence or argument. The Board then recessed to deliberate in private.

4

The Board makes the following findings of fact by clear and convincing evidence:

1.  At all times relevant hereto the Respondent was an active member of the Virginia State Bar not in good standing.

2.  An Agreed Disposition Memorandum Order was entered on September 9, 2024 by a Three-Judge Panel of the Arlington County Circuit Court in VSB Docket Nos. 23-041-127923 and 24-041-129679, which imposed a six-month suspension of Respondent's license to practice law with Terms.

3.  A specific term of the Prior Order was that Respondent hire an accountant within 30 days who is familiar with the requirements of Rule 1.15 of the Rules of Professional Conduct to review his trust account record-keeping, accounting, and reconciliation methods and procedures to ensure compliance with Rule 1.15 of the Rules of Professional Conduct. Upon completion of the accountant's review but no later than December 11, 2004, Respondent was to certify to Bar Counsel that he has engaged an accountant and has revised his trust accounting methods and procedures based on the accountant's recommendations and requirements of Rule 1.15 of the Rules of Professional Conduct. If the Respondent did not meet this term by the deadline, the Disciplinary Board would impose a two-year suspension of his license to practice law in the Commonwealth of Virginia pursuant to Part Six, § IV, ¶ 13-18.O of the Rules.

4.  Tamara Batts, Owner and Head Accountant of DC8 Financial was hired by Respondent to comply with the requirements of Term 4 of the Prior Order. On December 2, 2024, Ms. Batts prepared a written report for Respondent of her review, findings and recommendations in accordance with Rule 1.15 of the Rules of Professional Conduct. (Board Exhibit 1.)

5

5. Respondent filed his Certification of Terms with the Bar on December 9, 2024 showing his compliance with the terms of the Prior Order, including Term 4. (VSB Exhibit 4.) This was also communicated to Bar Counsel through an email from Julie Palmer, Respondent's counsel for the underlying disciplinary matter, on December 11, 2024.

6. Upon request of Bar Counsel, Ms. Palmer and Respondent provided the contact information for his accountant by email on December 11, 2025.

7. Bar Counsel tasked Matthew Foley, Bar Investigator, with making a brief inquiry to verify that Respondent's chosen accountant, Tamara Batts, Owner and Head Accountant of DC8 Financial, was a real person, was an accountant, and was familiar with Rule 1.15 of the Rules of Professional Conduct. Mr. Foley spoke with Ms. Batts by phone and confirmed this information. On December 13, 2024, Mr. Foley sent an email to Bar Counsel with this information and advised him that Ms. Batts said she had prepared a written report of the accounting services she performed for the Respondent.

8. No evidence was presented at the hearing to rebut Respondent's timely filed Certification of Compliance with Term 4 of the prior order.

The Board finds by clear and convincing evidence that Respondent has complied with the Term 4 of the Prior Order.

Accordingly, it is ORDERED that the Rule to Show Cause for Violation of Terms pursuant to Part Six, § IV, ¶ 13-18.O is dismissed.

It is further ORDERED that the Clerk of the Disciplinary System shall mail an attested copy of this order to respondent at his address of record with the Virginia State Bar, being 2300 Wilson Blvd. Suite 700, Arlington, Virginia 22201, by certified mail, return receipt requested, and a copy by electronic mail to Richard W. Johnson, Jr., Assistant Bar Counsel.

ENTERED this 7th day of May, 2025.

VIRGINIA STATE BAR DISCIPLINARY BOARD

David J. Gogal, Chair

A COPY TESTE

Joanne "Jo" Fronfelter

Clerk of the Disciplinary System
Virginia State Bar

7

**VIRGINIA:   BEFORE THE VIRGINIA STATE BAR DISCIPLINARY BOARD**

IN THE MATTER OF
**MICHAEL ALAN YODER**                     **VSB Docket No.:  25-000-135002**

<u>**MEMORANDUM ORDER OF SUSPENSION**</u>

   **THIS MATTER** was heard on April 25, 2025, upon the Virginia State Bar's

Notice of Show Cause Hearing for Failure to Comply with Part Six, § IV, ¶ 13-29 of the Rules of

the Supreme Court of Virginia issued on March 21 and April 10, 2025, and the Rule to Show

Cause and Pre-Hearing Order on March 25 and 27 and April 10, 2025. This matter was heard

before a panel of the Virginia State Bar Disciplinary Board ("Board") consisting of David J.

Gogal, Chair, Stephanie G. Cox, Melanie A. Friend, Michael C. Moore, and Samuel Massenberg,

Lay member.

   The Virginia State Bar was represented by Richard W. Johnson, Jr, Assistant Bar

Counsel ("Bar Counsel").  Respondent filed an Answer to the pleadings and participated in the

pre-hearing conference, however he was not present and was not represented by counsel on April

25, 2025. In the early morning hours of April 25, 2025, Respondent sent an email to the Clerk's

office with a motion attached asking to appear remotely for the show cause hearing stating that

an unforeseen illness prevented him from appearing in person. Prior to the start of the hearing,

that motion was granted.  The Clerk sent notice to Respondent's email address advising him that

his motion to appear remotely was granted and providing the link to Microsoft TEAMS with

instructions for attending the hearing remotely. The Clerk reported that the email sent to

Respondent showed that it had been received and read by 9:30 a.m. The Clerk also attempted to

call the Respondent's phone several times without reaching Respondent.  Respondent did not

respond to these communications from the Clerk nor appear anytime during the hearing, either

remotely or in person.  At 9:45 a.m., the Clerk called Respondent's name three times in the

adjacent hall with no response. The Chair polled the members of the Board Panel as to whether

any of them was conscious of any personal or financial interest or bias which would preclude any of them from fairly hearing this matter and serving on the panel, to which inquiry each member and the Chair responded in the negative. Beverly S. Horne, court reporter, P.O. Box 1975, Mechanicsville, Virginia 23116, (804) 730-1222, after being duly sworn, reported the hearing and transcribed the proceedings.

All legal notices of the date and place were timely sent by the Clerk of the Disciplinary System ("Clerk") in the manner prescribed by law.

Part Six, § IV, ¶ 13-29 of the Rules of the Supreme Court ("Rules") sets forth the duties of a disbarred or suspended Respondent as follows:

> 13-29.A  Duties After Suspension or Revocation. After a Suspension against a Respondent is imposed by either a Summary Order or Memorandum Order and no stay of the Suspension has been granted by this Court, or after a Revocation against a Respondent is imposed by either a Summary Order or Memorandum Order, Respondent must forthwith give notice, by certified mail, of his or her Revocation or Suspension to all clients for whom he or she is currently handling matters and to all opposing Attorneys and the presiding Judges in pending litigation. The Respondent must also make appropriate arrangements for the disposition of matters then in his or her care in conformity with the wishes of his or her clients. The Respondent must give such notice immediately and in no event later than 14 days of the effective date of the Revocation or Suspension , and make such arrangements as are required herein as soon as is practicable and in no event later than 45 days of the effective date of the Revocation or Suspension. The Respondent must also furnish proof to the Clerk within 60 days of the effective date of the Revocation or Suspension that such notices have been timely given and such arrangements have been made for the disposition of matters. The Board must decide all issues concerning the adequacy of the notice and arrangements required herein. The burden of proof is on the Respondent to show compliance. If the Respondent fails to show compliance, the Board may impose a sanction of Revocation or additional Suspension for failure to comply with the requirements of this subparagraph 13-29.

In this proceeding, the Respondent bears the burden of showing, by clear and convincing evidence, that he has complied with the requirements of ¶ 13-29, and if he has not complied, why his license to practice law in Virginia should not be further suspended or revoked.

2

## PROCEDURAL BACKGROUND

By an Agreed Disposition Memorandum Order of a Three-Judge Panel of the Arlington County Circuit Court in VSB Docket Nos. 23-041-127923 and 24-041-129679, entered on September 9, 2024 (the "Prior Order"), the Respondent was found, by clear and convincing evidence, to have engaged in misconduct, specifically violating Rules of Professional Conduct 1.3 (diligence), 1.4 (communication), and 1.15 (a),(b),(c), and (d) (safekeeping property). In the Prior Order, the Three-Judge Panel issued a six-month suspension of Respondent's license to practice law in the Commonwealth of Virginia with several Terms imposed on Respondent. It was further ordered that the Respondent must comply with the requirements of Part Six, § IV, ¶ 13-29 of the Rules.

## PROCEEDINGS AND FINDINGS OF FACT

The Board admitted VSB exhibits 1-3 without objection. Respondent did not appear in person or by counsel and did not present any evidence or argument. The Board heard testimony from one witness, Bar Investigator Matthew Foley. The Board considered the exhibits admitted, the testimony of the witness, and the argument of Bar Counsel. The Board then recessed to deliberate in private.

The Board makes the following findings of fact by clear and convincing evidence:

1. At all times relevant hereto the Respondent was an active member of the Virginia State Bar not in good standing.

2. An Agreed Disposition Memorandum Order was entered on September 9, 2024 by a Three-Judge Panel of the Arlington County Circuit Court in VSB Docket Nos. 23-041-127923 and 24-041-129679, which imposed a six-month suspension of Respondent's license to practice law with Terms effective September 11, 2024. It was further ordered

3

that the Respondent must comply with the requirements of Part Six, § IV, ¶ 13-29 of the Rules regarding duties of a suspended Respondent and, if Respondent is not handling any client matters as of the effective date of the Suspension, he shall submit and affidavit to the Clerk of the Disciplinary System of the VSB to that effect within 60 days.

3.  Respondent failed to furnish proof to the Clerk within 60 days of the effective date of the suspension that the notices required by ¶ 13-29 of the Rules had been timely given and such arrangements had been made for the disposition of client matters, In the alternative, Respondent failed to submit an affidavit to the Clerk within 60 days of suspension that he was not handling any client matters on the effective date. The effective date of the suspension was September 11, 2024. (VSB Exhibit 2.)

4.  No such proof of compliance had been filed by the Respondent as of the date of the hearing on April 25, 2025.

The Board finds that Respondent failed to prove by clear and convincing evidence that he had complied with the requirements of Part Six, § IV, ¶ 13-29 of the Rules regarding duties of a suspended Respondent as ordered.

SANCTIONS

After announcing its findings as to the violation, the Board then heard evidence and argument of Bar Counsel as to Sanctions. The VSB presented the certification of the Respondent's prior disciplinary record which consisted of one prior violation, that being the September 11, 2024 suspension with Terms issued by the Arlington County Circuit Court in VSB Docket Nos. 23-041-127923 and 24-041-129679.  No other evidence was presented. Bar Counsel argued that a six-month suspension of Respondent's license to practice law was appropriate.

4

The Board then recessed to deliberate in private as to the appropriate sanction. The Board considered the ABA Standards for imposing lawyer discipline.   In aggravation, the Board considered Respondent's prior disciplinary matter, his lack of cooperation by failing to comply with the Rules and prior Order of the Arlington County Circuit Court, and his failure to acknowledge the wrongful nature of the violation. There was no mitigation presented during the hearing for the Board to consider.

Accordingly, it is ORDERED that the Respondent's license to practice law in the Commonwealth of Virginia is suspended for ninety (90) days, effective April 25, 2025.

It is further ORDERED that, as directed in the Board's April 25, 2025, Summary Order in this matter, Respondent must comply with the requirements of Part Six, § IV, ¶ 13-29 of the Rules of the Supreme Court of Virginia. The Respondent shall forthwith give notice by certified mail, return receipt requested, of the suspension of his license to practice law in the Commonwealth of Virginia, to all clients for whom he is currently handling matters and to all opposing attorneys and presiding judges in pending litigation.  The Respondent shall also make appropriate arrangements for the disposition of matters then in his care in conformity with the wishes of his client. Respondent shall give such notice within 14 days of the effective date of the suspension, and make such arrangements as are required herein within 45 days of the effective date of the suspension. The Respondent shall also furnish proof to the Bar within 60 days of the effective day of the suspension that such notices have been timely given and such arrangements made for the disposition of matters.

It is further ORDERED that if the Respondent is not handling any client matters on the effective date of the suspension, he shall submit an affidavit to that effect to the Clerk of the Virginia State Bar within 60 days of the effective day of the suspension. All issues concerning the adequacy of the notice and arrangements required by Paragraph 13-29 shall be determined by

the Virginia State Bar Disciplinary Board, which may impose a sanction of Revocation or additional Suspension for failure to comply with the requirements of this subparagraph.

It is further ORDERED that pursuant to Part Six, § IV, ¶ 13-9 E. of the Rules of the Supreme Court of Virginia, the Clerk of the Disciplinary System shall assess all costs against the respondent.

It is further ORDERED that the Clerk of the Disciplinary System shall mail an attested copy of this order to respondent at his address of record with the Virginia State Bar, being 2300 Wilson Blvd. Suite 700, Arlington, Virginia 22201, by certified mail, return receipt requested, and a copy by electronic mail to Richard W. Johnson, Jr., Assistant Bar Counsel,.

ENTERED this 7th day of May, 2025

VIRGINIA STATE BAR DISCIPLINARY BOARD

David J. Gogal, Chair

**A COPY TESTE**
Joanne "Jo" Fronfelter

Clerk of the Disciplinary System
Virginia State Bar

6

## Search                                                    +

# Michael Yoder

Docket No. 2025-D069

# Decisions

DCCA Order (June 9, 2025)

**Summary:** In re Michael Alan Yoder. Bar No. 1600519. June 9, 2025. Yoder was suspended on an interim basis based upon discipline imposed in Virginia.

---

To search for additional disciplinary cases involving this attorney, click here



# EXHIBIT U

 Gmail

Justin Gilbert ███████████████████

---

## Your Shannon Olson case and our Knoxville, Tennessee case
5 messages

**Justin Gilbert** <justin███████████████          Mon, Mar 18, 2024 at 2:24 PM
To: dreher█████████████ myoder█████████████, Ron Rayson <ron████████████

Dear Rachel and Michael,

Greetings from Tennessee. Ron Rayson and I recently filed a race discrimination case in the Eastern District of
Tennessee. It involves a white male pharmaceutical representative (at Alkermes, Inc.) who was fired based upon
allegations made by one <u>Jodi Garcia</u>. To our surprise, we located your Shannon Olson case in Florida which mentions
the very same Jodi Garcia, also with race discrimination allegations.

We would like to speak to you about the cases. And if you like, we can provide you a copy of the Complaint in our case.

Justin

████████ (Justin cell)
          (Ron cell)

--
📄
**+Justin S. Gilbert**
**Attorney**

███████████████████████████

---

**Michael Yoder** <myod█████████████            Wed, Mar 20, 2024 at 3:33 PM
To: Justin Gilbert <justin█████████████, "dreher███████████" <dreher█████████ Ron
Rayson <ron█████████████

Hi Justin,

Feel free to give me a call. My direct is █████████████

**Michael A. Yoder, Esq.**
YODER LAVEGLIA LLP
2001 L St NW, Suite 500 | Washington, D.C. 20036

███████████████████████████

**From:** Justin Gilbert <justin█████████████
**Sent:** Monday, March 18, 2024 11:24 AM
**To:** dreher█████████████ <drehe█████████████>; Michael Yoder
<myode█████████████; Ron Rayson <ron█████████
**Subject:** Your Shannon Olson case and our Knoxville, Tennessee case

[Quoted text hidden]

---

**Justin Gilbert** <justin█████████            Wed, Mar 20, 2024 at 4:24 PM
To: Michael Yoder <myoder█████████████
Cc: Ron Rayson <ron█████████ "dreher████████ <dreher███████████

Hi Michael,

Would you be available for a call tomorrow morning if we cannot connect today?
[Quoted text hidden]

---

**Michael Yoder** <myoder                                                                    Wed, Mar 20, 2024 at 7:25 PM
To: Justin Gilbert <justin
Cc: Ron Rayson <ron                    "drehe                          <dreher

I'm free in the afternoon/evening tomorrow. I'm on the west coast so even if its late your time I'm still free
out here.

**Michael A. Yoder, Esq.**
YODER LAVEGLIA LLP
2001 L St NW, Suite 500 | Washington, D.C. 20036

---

**From:** Justin Gilbert <justin
**Sent:** Wednesday, March 20, 2024 1:24 PM
**To:** Michael Yoder <myoder
**Cc:** Ron Rayson <ron                    dreher                          dreher
**Subject:** Re: Your Shannon Olson case and our Knoxville, Tennessee case

[Quoted text hidden]

---

**Justin Gilbert** <justin                                                                    Wed, Mar 20, 2024 at 7:46 PM
To: Michael Yoder <myoder
Cc: Ron Rayson <ron                    dreher                          <drehe

Good deal. Will try to call you around 515 Eastern, 215 Pacific time.
[Quoted text hidden]

9:30





MY

Michael >



Hi Mike, Kate says to give you a text. This is Justin Gilbert, in Tennessee. I'd like to speak to Shannon Olson. Cases are similar and she might be able to help us, and we help her.

Would you be OK with it?

Yeah, I'll give you a call once I get freed up here in a bit

Cool. Thx

Mar 22, 2024 at 1:50 PM

Is it possible to talk for five minutes now?

Mar 22, 2024 at 2:54 PM

Not trying to be bothersome but Kate told me to "double and triple text" you. Ha ha.

Mar 22, 2024 at 4:17 PM

OK, here's the third text

iMessage

**Outlook**

---

**Olson lawyers, Yoder and Rachel**

---

**From** Justin Gilbert <justin███████████>

**Date** Sun 8/24/2025 8:54 AM

**To** Jared Wichnovitz <Jared███████████>; Ron Rayson <ron███████

Jared,

We began calling Mr. Yoder in March of 2024, after happening to see the Olson case through a Pacer search about Alkermes. Eventually, his assistant ("Kate") gave us his cell number, and we reached out on March 22. We finally spoke to him, inquiring whether we could meet with Ms. Olson and, to the extent we have information that might relate to Ms. Garcia or common claims, we might be able to provide same. He seemed willing for the help. But we then followed up repeatedly, with Yoder going dark on us, never putting us in touch with Ms. Olson. We continued the efforts into May 2024, at this point trying to reach his co-counsel, "Rachel," leaving her numerous messages.  Not one of those was ever returned, so we were never able to speak to Rachel. We discussed trying to reach Ms. Olson directly, but we decided that, because she was represented by counsel, we must go through her counsel.

I'll add, of course, that once you took over, we have been able to speak to Ms. Olson, meet with Ms. Olson, and we have provided information about Mr. William's experience with Ms. Garcia. That is what we envisioned back in March.

Once you get your papers drafted, if you'd like an affidavit from me or to discuss further information, I remain happy to assist.

JG

--



⁺**Justin S. Gilbert**
**Attorney**

justin@███

# EXHIBIT V

# EXHIBIT B

# UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
### TAMPA DIVISION

SHANNON OLSON,

      Plaintiff,

  v.

TAKEDA PHARMACEUTICALS
AMERICA, INC.,

      Defendant.

Case No: 8:23-CV-00590-TPB-CPT

## DECLARATION OF JODI GAYLE-GARCIA

1.

My name is Jodi Gayle-Garcia. I previously worked as a District Business Manager for Takeda. In my role as District Business Manager, I reported to Southeast Regional Business Director Greg Crouch. I have personal knowledge of the facts set forth in this Declaration, and I am of competent age and mind to give this Declaration.

2.

In my role as a District Business Manager, I began managing Shannon Olson, who was a Senior Sales Representative, on May 20, 2019. I also managed Jordan Davis, who was a Sales Representative, beginning from the time of his hire on August 19, 2019, as Olson's new counterpart in their shared territory. I continued managing those two individuals until I transitioned to another role on January 10, 2021.

3.

Although both Olson and Davis were ultimately responsible for selling products (Trintellix, Vyvanse, and Mydayis) to health professionals in their territory, the two had a number of different accountabilities, given their different job positions, different experience levels, and Olson's additional role as District Trintellix Lead. For example, I expected Olson to take on leadership responsibilities, including by training and mentoring new Sales Representatives. Davis, as a new Sales Representative, on the other hand, was not responsible for training and mentoring other new Sales Representatives. A true and correct copy of the job description for Senior Sales Representatives is attached hereto as "Exhibit 1." A true and correct copy of a document with the job description for Sales Representatives is attached hereto as "Exhibit 2."

4.

I also generally expected Olson, based on her long tenure with Takeda as a Sales Representative and then Senior Sales Representative, to have a greater knowledge level than Davis, who had no prior pharmaceutical sales experience. For example, given that Davis completed his initial training in October 2019 and the changes that resulted from the onset of the COVID-19 pandemic in early 2020, I believed that Davis required time to become acclimated to his new role. I had hoped that Olson would utilize her greater experience to assist Davis with his acclimation. Ultimately, my expectation was for Olson and Davis to work

collaboratively to ensure that the territory's needs were fully addressed, and to assist each other as needed to ensure tasks were completed.

5.

To the extent I asked Olson to complete or assist with any task pertaining to her territory, I did so because I believed that it was the best way to ensure that the territory's needs were met, including because of her experience.

6.

I communicated my concerns to Davis regarding certain performance deficits I observed with him, and concerning the need for him to correct and improve upon those deficits while he was under my supervision. A true and correct copy of Manager Quality Conversations Quarterly Feedback notes that I prepared for Davis in performance year 2020 are attached hereto as "Exhibit 3." I also engaged the then-Regional Sales Trainer, Matt Hand, to assist Davis with develop strategies to improve his performance. I did not conceal Davis's performance issues, nor would there have been any benefit to me doing so.

7.

While she was under my supervision, I did not believe that Olson had yet consistently demonstrated the competencies that would warrant her being promoted to Territory Manager, including because I wanted to see further growth in her leadership skills and sales success. In fact, one of the reasons I encouraged Olson to become Trintellix Lead was to provide her opportunities to further develop her leadership skills.

[3]

8.

While Olson and I worked together, I did not deprive Olson of any opportunity to participate or present in Executive Leadership Team ("ELT") conference calls. I have also not concealed any information from her concerning her presenting during any ELT call.

9.

I did not discipline Olson for any performance issue attributable to Davis. To the extent I had any discussions with Olson and Davis concerning what was occurring in the territory, it was because they were both responsible for the success of the territory together and I wanted them to be as successful as possible together.

10.

A true and correct copy of Davis's annual performance year for fiscal year 2019 is attached hereto as "Exhibit 4."

11.

In 2020, Davis submitted a request for prior approval of his potential outside work as a high school basketball coach. A true and correct copy of the form submitted by Davis requesting prior approval is attached hereto as "Exhibit 5." Because there was no apparent conflict between a basketball coaching position and Takeda's business, particularly because Davis was seeking approval to coach only on weeknights, Greg Crouch and I approved Davis's request to perform outside work. When I relayed the approval to Davis, I reminded him that his coaching should not interfere with his job with Takeda.

12.

Olson did not submit a request for prior approval for outside work to me. Nevertheless, after I learned that Olson's outside work was being reviewed, I provided my approval for her to engage in that outside work.

13.

I did not make any decision or take any action concerning Olson on the basis of her race or disability status, of in retaliation for any request for an accommodation or complaint she may have made. Nor did I make decisions impacting the employment of other individuals on the basis of their races or disability statuses.

14.

While I worked for Takeda, Takeda did not have any Diversity, Equity, and Inclusion ("DEI") policies, quotas, or other requirements that called for, or encouraged, me to treat any individual more or less favorably on the basis of race or disability status. Nor did I treat any individual I supervised more or less favorably on the basis of race or disability status.

15.

Exhibits 1 through 5 were created in the ordinary course and as a regular practice of Takeda's business, at or near the time of the events detailed therein, by individuals with knowledge of the matters detailed therein, and are kept in the ordinary course of Takeda's business.

I declare under penalty of perjury that the foregoing is true and correct. Executed pursuant to 28 U.S.C. § 1746.

_____
Jodi Gayle-Garcia

9/26/2024

_____
Date

# Exhibit 1



## Job Description / Role Profile

| Job/Position: | **Sr Sales Rep** | Job Code: | 50002593 |
|---|---|---|---|
| BU/Organization: | US Business Unit/ Neuroscience | Department: | Field Sales |
| Location: | | | |
| Global Reporting Level (CEO=1): | | Line Manager's Job/Position Title: | District Business Manager |

### OBJECTIVES/PURPOSE: (3-4 bullets)

The Takeda senior sales representative is responsible for selling the Takeda's family of products. This will be achieved through clinical discussions with targeted health professionals to maximize sales growth and increase product volume within a specific geography.

### SCOPE:

| | | |
|---|---|---|
| **Financial:** | Est. annual revenue range of accountability*: | _____Oku Yen |
| | Est. annual budget of responsibility: | _____Oku Yen |
| **Leadership/People:** | No. of direct reports: _____ | No. of indirect reports: _____ |
| **Geographic Scope:** | Global:_____ | Regional:__X__ |
| | Countries | United States of America |

*if applicable

### ACCOUNTABILITIES: (Describe the primary duties and responsibilities of the job. Include only the essential functions of the job. Approximately 5 – 10 bulleted task statements should be identified).

- Utilizes effective selling skills and product knowledge to influence targeted health care professionals to prescribe Takeda promoted products. Execute brand strategies to ensure a consistent company sales and marketing message.
- Pre-call plan to meet health care professionals' (HCP) needs. Leverage data and customer knowledge to build discussions around HCP's and patients' needs. Deliver accurate and timely follow-up discussions with HCP's and office staff. Foster ongoing trust with HCPs. Use the Takeda Selling Model, to influence the HCP decision making process.
- Analyze territory information to optimize routing and achieve sales results. Monitor local market conditions for changes that impact business.
- Utilizes sales tools, resources and supporting analysis to plan activity. Develop and execute plans to maximize selling resources.
- Report and monitor sample and literature use, and maintain accurate records.
- Distribute product samples in accordance with approved sampling guidelines and marketing literature to physicians and other healthcare providers (HCP's).

Takeda_0000521



## Job Description / Role Profile

- Actively monitors local market conditions for changes that impact business and takes action based on identified needs. Proactively execute plans to maximize selling resources. Models business techniques to peers that maximize sales opportunities across the district.

- Provide feedback to District Managers on market place trends, challenges, programs, response to promotion, and product access. Collaborate with DM to establish goals and implement plans to enhance current skill sets and sales results.

- Assist District Manager as needed with facilitating district meetings while modeling appropriate behavior in trying circumstances, proactively communicate strategies and model business techniques that maximize sales opportunities across the district. Share developmental experiences and encourage others to do the same.

- Assist District Manager to address district needs and and provide training/mentoring of new sales representatives.

- Collabrate with partners on routing and resource utilization to drive overall footprint performance.

- Attend all company-sponsored sales and medical meetings as directed by company management.

- Actively pursue continuous learning and professional development on efficient sales, communication & product knowledge training.

- Perform all Company business in accordance with all regulations, Company policy and procedures. Demonstrate high ethical and professional standards at all times.

- Additional duties may be assigned.

*CORE ELEMENTS RELATED TO THIS ROLE:* *(Describe what is critical and/or what differentiates this role).*

*DIMENSIONS AND ASPECTS:*

__Technical/Functional (Line) Expertise__ *(Breadth and depth of knowledge, application and complexity of technical knowledge)*

__Leadership__ *(Vision, strategy and business alignment, people management, communication, influencing others, managing change)*

__Decision-making and Autonomy__ *(The capacity and authority to make organizational decisions, autonomy in decision-making, complexity of decisions, impact of decisions, problem-solving)*

__Interaction__ *(The span and nature of one's engagement with others when performing one's job, internal and external relationships)*

Takeda_0000522



## Job Description / Role Profile

**Innovation** *(The required level of scientific knowledge, knowledge sharing, innovation and risk taking)*

**Complexity** *(Products managed, mix of businesses, internal and/or external business environment, cultural considerations)*

***EDUCATION, BEHAVIOURAL COMPETENCIES AND SKILLS:*** *(List the essential and desirable education and competency requirements to perform the primary responsibilities of the job. Any minimum requirements should be noted.)*

**Required:**

- Bachelor's degree
- *Career Path Criteria:*
  - Two years minimum pharma sales, 1 year minimum Takeda sales
  - One "Exceeds Expectations" within most recent two years at Takeda
  - See additional *Career Path* criteria

***ADDITIONAL INFORMATION:*** *(Add any information legally required for your country here*

TRAVEL REQUIREMENTS:

- Ability to drive to or fly to various meetings/client sites.
- Limited overnight travel may be required.
- Ability to attend sales meetings at off-site locations.

| Date: | Completed by: |
|---|---|

*For HR use only:*

| Legacy Organization: | |
|---|---|
| Legacy Level/Role: | |

Takeda_0000523

# Exhibit 2

R0010479 Sales Representative-NSF/PCP (Saint Petersburg, FL): R0010479 Sales Representative-NSF/PCP (Saint Petersburg, FL) (Filled)

11:16 AM
07/17/2024
Page 1 of 5

| Recruiting Start Date | 07/11/2019 - 5 years ago |
| Target Hire Date | 07/19/2019 - 4 years ago |
| Primary Location | USA - Deerfield - Sales Remote (inactive) |



**Hiring Manager**

Julie Brisch

Hiring Manager

## Overview

### Overview

Candidate Pipeline

| | |
|---|---|
| **Active Candidates** | 1 |
| **Referral** | 0 |
| **Internal** | 0 |
| **Inactive** | 71 |

Candidates by Active Stage

| Recruiting Stage Name | Count of Candidates Currently in a Stage | Drop Off | Conversion | |
|---|---|---|---|---|
| Review | 0 | 93% | 7% | |
| Screen | 0 | 60% | 40% | |
| Assessment | 0 | 0% | 100% | |
| Interview | 0 | 50% | 50% | |
| Employment Agreement | 0 | 0% | 100% | |
| Offer | 0 | 0% | 100% | |
| Background Check | 0 | 0% | 100% | |
| Ready for Hire | 1 | 0% | 0% | |

Confidential

R0010479 Sales Representative-NSF/PCP (Saint Petersburg,
FL): R0010479 Sales Representative-NSF/PCP (Saint
Petersburg, FL) (Filled)

## Candidates by Source

| Candidates | Recruiting Source |
|---|---|
| 2 | Takeda Alumni/Rehire |
| 3 | Online Job Board |
| 1 | Professional/Social Networking Site |
| 4 | Glassdoor |
| 39 | Indeed |
| 21 | LinkedIn |
| 2 | Shire- Employee Referral |

## Details

## Details

### Requisition Details

| | |
|---|---|
| Job Requisition | R0010479 Sales Representative-NSF/PCP (Saint Petersburg, FL) (Filled) |
| Supervisory Organization | Jacksonville, FL (Julie Brisch (Inherited)) (inactive) |
| Number of Openings | 0 available | 0 unavailable | 1 filled | 1 total |
| Referral Payment Plan | |
| Inbound Process | Hire: Jordan Davis |
| Available For Hire | No |
| Hiring Freeze | No |
| Requester | Jodi Gayle-Garcia (Terminated) |
| Job Application Template | Job Application Default Template effective 03/01/2018, 5:07 PM |
| Candidate Ranking Template | |
| Candidate Rating Template | |
| Primary Internal Questionnaire | |
| Secondary Internal Questionnaire | |
| Primary External Questionnaire | USA - U.S.A. External Questionnaire |
| Secondary External Questionnaire | |
| Recruiting Self-Schedule Calendars | |
| Reference Template | |
| Replacement For | Tracy Sweeney (Terminated) |
| Job Posting Title | Sales Representative-NSF/PCP (Saint Petersburg, FL) |

Hiring Requirements

Job Details

Confidential

Takeda_0000802

Case 2:23-cv-00590-JPB-TPT Document 71-14 Filed 09/27/24 Page 3 of 71 PageID
Page 803
R0010479 Sales Representative-NSF/PCP (Saint Petersburg,
FL): R0010479 Sales Representative-NSF/PCP (Saint
Petersburg, FL) (Filled)

11:16 AM
07/17/2024
Page 3 of 5

| | |
|---|---|
| **Job Profile** | USA - Sales Rep (inactive) |
| **Job Families for Job Profiles** | Sales - Field |
| **Worker Sub-Type** | Regular |
| **Worker Type** | Employee |
| **Time Type** | Full time |
| **Compensation Grade** | USA - General Medicine Sales |
| **Primary Location** | USA - Deerfield - Sales Remote (inactive) |
| **Primary Job Posting Location** | St. Petersburg, FL |
| **Additional Locations** | |
| **Additional Job Posting Locations** | |
| **Scheduled Weekly Hours** | 40 |
| **Work Shift** | |
| **Recruiting Start Date** | 07/11/2019 |
| **Target Hire Date** | 07/19/2019 |
| **Target End Date** | |

**Additional Information**

| | |
|---|---|
| **Union Membership from Job Profile** | |
| **Allowed Unions from Job Profile** | |
| **Job Description** | |

OBJECTIVES:

The Takeda sales representative is responsible for selling the Takeda family of products. This will be achieved through clinical discussions with targeted health professionals to maximize sales growth and increase product volume within a specific geography.

ACCOUNTABILITIES:

- Utilize effective selling skills and product knowledge to influence targeted health care professionals to prescribe Takeda promoted products.  Execute brand strategies to ensure a consistent company sales and marketing message.
- Pre-call plan to meet health care professionals' (HCP) needs. Leverage data and customer knowledge to build discussions around HCP's and patients' needs. Deliver accurate and timely follow-up discussions with HCP's and office staff. Foster ongoing trust with HCPs. Use the Takeda Selling Model, to influence the HCP decision making process.
- Analyze territory information to optimize routing and achieve sales results. Monitor local market conditions for changes that impact business.
- Utilize sales tools, resources  and supporting analysis to plan activity. Develop and execute plans to maximize selling resources.
- Report and monitor sample and literature use, and maintain accurate records.

R0010479 Sales Representative-NSF/PCP (Saint Petersburg,
FL): R0010479 Sales Representative-NSF/PCP (Saint
Petersburg, FL) (Filled)

11:16 AM
07/17/2024
Page 4 of 5

- Distribute product samples in accordance with approved sampling guidelines and marketing literature to physicians and other healthcare providers (HCP's).
- Collaborate with partners on routing and resource utilization to maximize overall footprint performance.
- Provide feedback to District Managers on market place trends, challenges, programs, response to promotion, and product access. Collaborate with DM to establish goals and implement plans to enhance current skill sets and sales results.
- Attend all company-sponsored sales and medical meetings as directed by company management.
- Actively pursue continuous learning and professional development on efficient sales, communication & product knowledge training.
- Perform Company business in accordance with all regulations, Company policy and procedures. Demonstrate high ethical and professional standards at all times.
- Additional duties may be assigned.

EDUCATION, EXPERIENCE AND SKILLS:

Education and Experience:
Required:

- Bachelor's degree

- Proficient in MS Office Suite

LICENSES/CERTIFICATIONS:

- Valid driver's license required.

TRAVEL REQUIREMENTS:

- Ability to drive to or fly to various meetings/client sites.
- Limited overnight travel may be required.
- Ability to attend sales meetings at off-site locations.

**Additional Job Description**

Attachments
Attachments



R0010479 Sales Representative-NSF/PCP (Saint Petersburg,
FL): R0010479 Sales Representative-NSF/PCP (Saint
Petersburg, FL) (Filled)

| Job Requisition Attachment |
|---|

Business Process History
Business Process

| Effective Date | Business Process | Initiated On | Completed On | Status |
|---|---|---|---|---|
| 07/11/2019 | Job Requisition Change: R0010479 Sales Representative-NSF/PCP (Saint Petersburg, FL) | 07/11/2019 12:21:24 PM | 07/11/2019 12:21:24 PM | Successfully Completed |
| 07/11/2019 | Job Requisition: R0010479 Sales Representative-NSF/PCP (Saint Petersburg, FL) | 07/11/2019 09:23:38 AM | 07/11/2019 09:24:50 AM | Successfully Completed |

## Job Postings

### Current

| Job Posting Details | Job Posting | Type | Posting Start Date | Posting End Date | Primary Posting | Posting Cost | Action |
|---|---|---|---|---|---|---|---|

### Historical

| Job Posting | Type | Posting Start Date | Posting End Date | Job Application Template | Posting Cost | Job Posting Details |
|---|---|---|---|---|---|---|
| Internal | Internal | 07/11/2019 | 07/18/2019 | Job Application Default Template effective 03/01/2018, 5:07 PM | 0 | Internal: Sales Representative-NSF/PCP (Saint Petersburg, FL) |
| zzdnuTakeda-Shire Internal Talent Exchange | External | 07/11/2019 | 07/18/2019 | Job Application Default Template effective 03/01/2018, 5:07 PM | 0 | zzdnuTakeda-Shire Internal Talent Exchange: Sales Representative-NSF/PCP (Saint Petersburg, FL) |
| External Careers | External | 07/11/2019 | 07/18/2019 | Job Application Default Template effective 03/01/2018, 5:07 PM | 0 | External Careers: Sales Representative-NSF/PCP (Saint Petersburg, FL) |

Exhibit 3

## Manager Quality Conversations Quarterly Feedback

| Employee Name | Jordan Davis | Performance Year | 2020 |
|---|---|---|---|
| Manager Name | Jodi Garcia | | |

### Performance and Global Core Competency Summary (strengths, opportunities, IDP progress and career development)

### FQ1'2020 (April – June) Manager Comments:

**Date Conversation took place**
- 8/11/2020

**Performance**:
- Cresset
- Current performance (4/24-6/26)
  - All three brands & compared to District, Region and Area
    - % TRx volume change
      - Trintellix =-4.08% (Region:-4.32 %; Nation: -5.45%)
      - Vyvanse = -11.46% (Region: -11.21%; Nation: -9.44%)
      - Mydayis = -11.46% (Region: -11.21%; Nation: -9.43%)
    - % market share change
      - Trintellix = -3.83% (Region: 2.65%; Nation: 3.21%)
      - Vyvanse = -5.60 % (Region:-1.24 %; Nation: -1.35%)
      - Mydayis =-5.38 % (Region:1.96 %; Nation: 2.12%)

**Build:**
- This was during the time of reactive engagement where we were not having solid product messages to HCPS.
- Jordan effectively reached out to his district mates to gain insight on how to navigate the new normal. Jordan effectively used his district mates to find solutions to "new rep issues".
- Jordan is highly engaged during "new rep" calls with Matt Hand, sharing best practices and asking questions to become a stronger sales rep.
- Jordan has become more vocal in his footprint and is effectively holding his partner accountable to her effort with Vyvanse. He has taken leadership in the footprint with Vyvanse and provide her with insight on customers she needs to focus on.

**Execute (include Veeva utilization in this area):**

**Other Notes/Contributions:**

Takeda_0000980

**Development/Making your best, better:**
   a. **Skill Development:**
      a. As a sales specialist Jordan will need to continue to work on becoming knowledgeable about tracking success and messaging. Jordan has established strong relationships with key HCPs and staff. Jordan will need to leverage these relationships to impact the business especially in the "new normal". Jordan understands the importance of the total office call and identifying key staff members to be an advocate for him in offices.
   b. **Career Path:**
      a. **YOU OWN YOUR DEVELOPMENT:** You are encouraged to seek out development opportunities that align with your career aspirations and professional development. Jordan is encouraged to take on a lead role in the upcoming lead change.
      b. **NETWORKING:** Jordan is encouraged to continue to reach out to other representatives in the region to gain knowledge and use them as a resource.
      c. **DEMONSTRATING & SUPPORTING:** Takeda Values, PTRB, and the 3C's.

---

**FQ2'2020 (July – September) Manager Comments:**

**Date Conversation took place**
- 10/22/2020

**Performance:**
- Cresset
- Current performance
  - All three brands & compared to District, Region and Area
    - % TRx volume change
      - Trintellix = % (Region: %; Nation: %)
      - Vyvanse = % (Region: %; Nation: %)
      - Mydayis = % (Region: %; Nation: %)
    - % market share change
      - Trintellix = % (Region: %; Nation: %)
      - Vyvanse = % (Region: %; Nation: %)
      - Mydayis = % (Region: %; Nation: %)

**Build:**

**Execute (include Veeva utilization in this area):**

Suggestions: 64
Mail: 29
Logistical Call HCP: 2
Logistical Call Staff: 83
Engage HCP: 0
Engage HCP w/ Meal: 4
Engage Staff w/ Meal: 0
TOTAL INTERACTIONS118

Takeda_0000981

**Other Notes/Contributions:**

**Development/Making your best, better:**

    **a. Skill Development:**

        a. As a sales specialist Jordan will need to continue to work on becoming knowledgeable about tracking success and messaging. Jordan has established strong relationships with key HCPs and staff while in the field. Jordan will need to leverage these relationships to impact the business especially in the "new normal". Jordan understands the importance of the total office call and identifying key staff members to be an advocate for him in offices. This quarter you struggled to keep up with required rep tasks that were important to the success of your footprint. This will be important for you to correct as you are now coaching in the evening and you need to ensure that the time does not interfere with your Takeda responsibilities. Below are some areas of focus that must be corrected and maintained moving forward:

- Completing your portion of the FPP data for Q3, moving forward you will need to be more efficient and specific in how you complete the plan and align with business needs.
- Returning expired samples within the appropriate time and following up with sample accountability in a timely manner.
- Complementing tasks requests from DBM. You will need to have better follow up in a timely manner on all "asks" by DBM and other internal partners. Eg: email regarding engage interactions, concur transparency responses, 60 day concur expenses.
- Customer maintenance up to date with your portion of the territory. This is your responsibility and all HCPs must within your section of the footprint must be updated, you did not enter HCPs for engages because they were not downloaded and added to the footprint. Moving forward you will need to have all your accounts updated and the appropriate HCPS/NPs added or removed from the system.
- Call entry and proper documentation. You have been provided with the correct way to enter engagements but struggled to do so for the entire quarter. As a result, you have the lowest amount of engagements on the team. Moving forward you will need to have a minimum of 3 engagements per week with ALL HCPs attended added in. In addition, you will need to enter all interaction with staff and HCPs into Veeve to ensure you are meeting the metrics provided for logistical calls, Veeve engage, sample signatures, emails, mailings etc.
- Taking the lead. You will need to be a more active and vocal participant in the development of your footprint plan, routing, and customer engagement. You will need to have a more proactive role in challenging your partner to equalizing the footprint needs.

    **b. Career Path:**

        a. **YOU OWN YOUR DEVELOPMENT:** You are encouraged to seek out development opportunities that align with your career aspirations and professional development. Jordan is encouraged to take on a lead role within the footprint and the district and take some of the responsibilities of planning and executing from his partner. This will be a great way for you to grow and develop in your role. As a way to support your needs and help with organization strategies I would like you to connect with Matt Hand (RST) weekly for one on one touchpoints.

        b. **NETWORKING:** Jordan is encouraged to continue to reach out to other representatives in the region to gain knowledge and use them as a resource. You have multiple people within out district that can support and provide guidance on areas you struggle. You will need to connect with your partner and others within the district (Terry, Angie, Scott) to help with area you are struggling with. You will also need to reach out to your DBM when you are struggling and use Matt Hand a resource.

        c. **DEMONSTRATING & SUPPORTING:** Takeda Values, PTRB, and the 3C's.

**FQ3'2020 (October - December) Manager Comments:**

Date Conversation took place
- 1/15/21

Performance:
Cresset: October 2020 (Q3)
- 199 out of 438 – Top 50%
- Current performance – QTD (10/2/20 – 12/18/20)
  - All three brands & compared to District, Region and Area
    - % TRx volume change
      - Trintellix = -0.25% (District: -1.00%; Region: -0.81%; Nation: -0.08%)
      - Vyvanse = 11.88% (District: 13.05%; Region: 8.75%; Nation: 8.18%)
      - Mydayis = 12.58% (District: -3.20%; Region: 1.12%; Nation: 1.05%)
    - % market share change
      - Trintellix = -0.10% (District: -1.25%; Region: -1.47%; Nation: -1.36%)
      - Vyvanse = 2.68% (District: 2.00%; Region: 0.11%; Nation: 0.30%)
      - Mydayis = 3.32% (District: -12.66%; Region: -6.91%; Nation: -6.31%)


Build:
Skills Development:
- **Drive for Results:**
  - Jordan continues to increase his HCP interactions.  He did come up short of the 3 per week laid out in the Q2 QC, but he increased activities with customers.
    - HCP Engage:  0 in Q2 vs 5 in Q3
    - HCP Engage w Meal: 4 in Q2 vs 26 in Q3
- **Self-Awareness:**
  - Jordan built upon feedback from Q2 QC and was more vocal and did take on more of an active role in his footprint.  Jordan took the lead on creating  the Q4 business plan and updated routing.
  - Jordan made improvements related to administrative duties and follow-up/follow-through.  He completed tasks like FPP, call entry and others as laid out by DBM in Q2 QC.
Career Path:
- **Develop Capabilities and Drive for Results:**
  - Jordan had multiple weekly 1:1s with Matt Hand (RST).  Touchpoints focused on putting in place strategies to improve better pull-through and follow up on key tasks, as well as being a more vocal active participant in footprint responsibilities.  Improvement was made, as Jordan took lead on putting together the Q4 business plan, but there still remains room for improvement regarding overall engagement and focused follow-through on tasks.
    - As a participant in the Elevated Excellence East Area training, Jordan did not follow up from 2 of the 4 calls as expected.
    - Follow up from 1:1s with Matt Hand improved, but accuracy of work (routing grid/plan) still has room for improvement.
  - Working with Matt Hand, Jordan put in place a better system to help ensure continued improvement for follow through for important tasks

**Execute (include Veeva utilization in this area):**
- Engage Meeting HCP w/ meal: 26
- Engage Meeting HCP: 5
- Phone Staff: 114
- Phone HCP: 2

**TOTAL INTERACTIONS: 147**
- Key Veeva Suggestions: 7 Trintellix Sample Orders and 1 Trintellix DFTO and 2 Veeva Suggestions for 30 Free Vyvanse trial offer redemptions
- Mail: 24

**Other Notes/Contributions:**

**Development/Making your best, better:**
**Strategic Approach:**
- With change in bag mix and Q4 push to increase share of voice with Trintellix, Jordan will continue to dig deep in iiNSIGHTS and analyze business opportunities and uncover new HCPs to help meet new expectations regarding driving Trintellix business.  (CVS Caremark/Viibryd update as well).
- Jordan will revisit HCPs that he conducted Engage Meeting w/ meal during Q2 to measure return on investment – did the appointment result in an increase in TRX?  Goal is to increase efficiency and impact of engagements.
  - Jordan will use the Q4 business plan that was developed and contains an ROI tracker, to track impact of HCP touchpoints.

**Drive for Results:**
- Jordan will look to utilize the Trintellix Speaker Exchange opportunity by getting at least 2 HCPs to attend – this will help to drive impact within his territory by utilizing a resource/initiative available to reps
- Jordan commits to continuing to follow through on all task requirements requests promptly, timely and accurately.  With many initiatives slated for Q4, effectively managing assignments and completing tasks will be critical to managing time while still connecting with HCPs, driving business and meeting overall expectations.

**Networking:**
- Jordan will proactively reach out and use resources outside of Team Jax - Amanda, Ashlea from New Hire Group
- Look for more feedback on messaging from other reps – Jordan will proactively reach out to, and look to partner with Dustin as a resource
- As was mentioned in Q2, continue to reach out when struggling.  Be proactive.

EXAMPLE

**Build:**

Takeda_0000984

- Continues to make a significant impact through the Vyvanse DBM Leadership position ranked at the top for Vyvanse Goal Attainment in Q3 (capitalized on the market surge), Worked with the Vyvanse Leads and RST to enhance the Fast Start Meeting content/workshop
- Routinely uses data to promote critical thinking amongst his team (pivot tables from the SOT report to highlight under-detailed decliners and over-detailed HCPs with little to no Rx gains)
- Came in early for the Leadership Team Meeting in January to meet with 2 other DBMs to share best practices around business analysis...presented to peers at the meeting (i.e. ways to look differently at the business)
- Provides direct and candid feedback to his team (Ex: conversation about professionalism and another conversation about time in territory/maximizing effort)

<u>Execute:</u>
- Leverages the FCL Way Forward with specific follow up to help drive priority coaching pull-through (puts the ownership on the Representative – Call me in two weeks to discuss the area of opportunity)
- Conducts routine business review with each footprint
- Proactively reaches out to peers and RBD to gain different perspectives on business challenges/opportunities as well as personnel matters
- Keeps the scoreboard present in front of his team and directly calls out where things look good and where trends need to turn

<u>Development/Making your best, better:</u>
- Uncovered a potential blind spot in not acting quickly enough when dealing with personnel challenges – his plan is to more diligently assess the situation when he sees some 'smoke'
- There's an opportunity to more consistently flex his leadership style...natural tendency is to lean more toward directing (more supportive vs. directive – Ex: take less of a role in the follow up to footprint business discussions)

## FQ4'2020 (January – March) Manager Comments:

<u>Date Conversation took place</u>
- 

<u>Performance</u>:
- Cresset
- Current performance
  - All three brands & compared to District, Region and Area
    - % TRx volume change
      - Trintellix = % (Region: %; Nation: %)
      - Vyvanse = % (Region: %; Nation: %)
      - Mydayis = % (Region: %; Nation: %)
    - % market share change
      - Trintellix = % (Region: %; Nation: %)
      - Vyvanse = % (Region: %; Nation: %)
      - Mydayis = % (Region: %; Nation: %)

**Build:**

**Execute (include Veeva utilization in this area):**

**Other Notes/Contributions:**

**Development/Making your best, better:**

Takeda_0000986

# Exhibit 4

**Davis, Jordan**

Sales Representative

Manager: Jodi Gayle-Garcia (Terminated)

Evaluated By: Jodi Gayle-Garcia (Terminated)

**2019 Year End Performance Review**

Organization: Jacksonville, FL (Julie Brisch (Inherited)) (inactive)

Location: USA - MA - Lexington - Sales Virtual (inactive)

04/01/2019 - 03/31/2020

## Overall Ratings and Comments

### Manager Overall Year-End Summary

Rating:      No Ratings - Not Rated

Comment:     FY Q2 (July-September)
Sales Performance- N/A
Cresset Rank: N/A
MIC Goal Attainment: Trintellix n/a Vyvanse n/a Mydayis n/a
Competencies
Jordan was hired 8/19/2019 and was in training for Q2.
FY Q3 (October-December)
Sales Performance-
Cresset Rank: 241/449
MIC Goal Attainment: Trintellix 99.92% Vyvanse 102.65% Mydayis 100%
Competencies:
Self-Awareness: Jordan is new to the industry and is working on his level of comfort with the job as well as his relationships with his partner and his HCPs. Jordan takes all feedback in a non-defensive manner and makes changes quickly and efficiently. In addition, Jordan maintains his composure and often seeks guidance from me and other leaders on the team (Terry Jackson) and outside the district (Lindsey Stewart) to help him overcome obstacles and use them as a resource to get better with product knowledge, manage care, and day to day business. Jordan always maintains a positive attitude and focus on business.
Strategic Approach: As the Vyvanse lead representative, Jordan effectively uses all marketing materials and executes good judgment in daily activities when making difficult business decisions. Jordan demonstrates an ability to create value for his products in the minds of physicians and provides additional resources that help patients. Jordan understands and applies the appropriate sales resources based on the specific needs of the sales situation (ie: disease state awareness and branded marketing pieces)

Development
**Skill Development:**
As a new sales specialist Jordan will need to continue to work on becoming knowledgeable about Insights, tracking success, and messaging. He is working on building strong relationships both with key HCPs and staff. Jordan understands the importance of the total office call and identifying key staff members to be an advocate for him in offices
Career Path:
**YOU OWN YOUR DEVELOPMENT**: You are encouraged to seek out development opportunities that align with your career aspirations and professional development.
**NETWORKING:** Jordan is encouraged to reach out to other representatives in the region to gain knowledge and use them as a resource.
**DEMONSTRATING & SUPPORTING:** Takeda Values, PTRB, and the 3C's.

Way Forward: Jordan is new to the industry and will need to develop his basic rep role responsibilities that will allow him to be more effective in the territory. An area that Jordan must work on is his

Takeda_0001127

willingness to speak up and provide feedback to his partner on territory management. He has great insight and a very realistic view of the territory needs and will need to share these with Shannon.

## Employee Overall Year-End Summary

Comment:

As a new representative I feel I have adapted well but I do believe I can always improve each and every day
.

## Goals and Priorities

My hire date was August 19th. I then was sent to training in Boston in late September. After completing my training in October I then began my career in the field
.

I began in the middle of quarter 3. My goal for 2019 was to learn my geography and identify the important customers to grow the business
.

Due Date:                 Status:    On Track        Completion Date:

Supports:

— Section Summary

## Manager Year-End Summary

Comment:

## Employee Year-End Summary

Comment:

## Areas for Development

### Develop in my current role

Additional Information:

I am committed to actively looking for opportunities to help me develop in my current role and will utilize my DBM and other busines partners to help develop and apply new skills and knowledge. I am utilizing lead reps to help refine my messaging
for both Vyvanse and Trintellix and effectively use these learning in the field.

Status:   Started                      Relates To:   Role 2: Develop Capabilities - Continually Develop

### I am working to continually develop as a sales representative specifically in the area of driving results.

Additional Information:

Continuously executing my work plan that supports the goals of the organization and model a high performance standard
.

Status:   Started                      Relates To:   Role 2: Drive for Results - Execute Plans

— Section Summary

Takeda_0001128

| Manager Year-End Summary | Employee Year-End Summary |
|---|---|
| Comment: | Comment: |

## Global Core Competencies / Leadership Behaviors

Please provide an overall evaluation of your Leadership Behaviors.

| Manager Year-End Summary | Employee Year-End Summary |
|---|---|
| Response: | Response: |
| | As a new representative for Takeda I am effectively and efficiently completing all tasks assigned to me and share ideas and suggestions with my DM |
| | . |
| | I demonstrate professionalism while adapting to changes in company priorities and work demands |
| | . |

Takeda_0001129

# Exhibit 5

| Date: | 9/23/2020 | Name of Employee: | Jordan Davis |
|---|---|---|---|
| Department and Function: | Neuroscience | Location: | St. Petersburg, FL |
| Job Title: | Sales Representative | Name of Manager: | Jodi Garcia |
| Name of HRBP: | Staci Thompson | Name of Outside Employer/Outside Activity: | Gaither High School |
| Address: | 16200 N Dale Mabry Hwy, Tampa, FL 33618 | | |
| Telephone: | (813) 975-7340 | Email of Supervisor or Responsible Point of Contact: | Jackie.eisenhauer@sdhc.k12.us |
| Nature of Business: | Gaither High School | Dates outside activity begins and terminates: | 11/2/2020 – 3/6/20 |
| Estimated hours required per week for outside employment/activities and scheduled times: | 10-15 Hours<br><br>Practice and games will occur after 5-6pm. | Will your activities be performed outside of Takeda work hours: | **Yes**<br><br>If No, please explain: |
| Will you be paid?: | Yes – One Time Stipend | If so, how much?: | $2,749.68 |
| Have you been asked to sign any terms and conditions related to your requested outside employment/activities? If so, please provide a copy of any such materials in connection with this request for review. | | No | |
| Does the outside employer or third-party have an existing business relationship with Takeda? If yes, please explain. | | No | |

| Describe in Detail the activities you will perform for this employer or organization: |
|---|
| I will be coaching the varsity basketball program at Gaither High School in Tampa, FL. This includes practice and games. This will occur in the evenings during the week only. |

Takeda_0000310

Please check all statements that apply to your requested outside employment/activities. For any statement checked, please provide a detailed written explanation.

- ❑ The proposed outside organization has contracts with or otherwise receives financial assistance from Takeda now or will likely seek to do so in the future.
- ❑ The activity provides (or would it potentially seek to provide) goods or services to Takeda now or in the future.
- ❑ The activity currently competes with a Takeda marketed product or a product in some stage of development or will compete in one of Takeda's therapeutic areas.
- ❑ The activity requires work during the typical Takeda workday.
- ❑ The activity has the potential to create time demands on the employee that would adversely impact his/her Takeda work or will somehow require him to perform some work in support of it during the Takeda workday.
- ❑ The activity provides (or would it potentially seek to provide) goods or services to Takeda's competitors, vendors, partners, etc.
- ❑ Involvement in the activity could impact/influence the employee's judgment/decision-making in his/her Takeda role.
- ❑ Involvement in the activity has the potential to create reputational risk for Takeda because the employee could be externally identified as a Takeda employee.
- ❑ The activity conflicts (or potentially conflicts) in some way with Takeda's core principles.
- ❑ The employee either intentionally or unintentionally could leverage his/her reputation as a Takeda employee to the benefit of the outside activity.
- ❑ Involvement in the activity could potentially jeopardize Takeda's confidential/proprietary information and/or trade secrets as the employee have difficulty not drawing on his/her knowledge of such assets in the course of working on the activity

Could the proposed outside employment/activities benefit Takeda and if so how?

_____

I am requesting permission from Takeda to engage in outside employment/activities as truthfully described in this form. I understand that providing false or incomplete information about my potential or actual involvement in outside activities may result in disciplinary action, up to and including termination of my employment, if employed.

I have thoroughly reviewed Takeda's policies, procedures, agreements, and/or guidelines related to outside employment/activities, including but not limited to Takeda's Global Code of Conduct. I understand that I may not engage in such activities if it is incompatible with my duties as a Takeda employee and/or in conflict with Takeda's interests. I further understand that Takeda may reject my request to engage in outside employment/activities. If rejected, I will not engage in those prohibited activities. If I refuse, I understand that my employment with Takeda may be immediately terminated and/or my offer of employment may be revoked.

By my signature below, I certify that the information contained within this form is true and complete to the best of my knowledge and belief. I acknowledge that this form does not change the nature of my employment with Takeda which remains at-will.

*Jordan Davis*                                          9-24-2020
Signature                                                    Date

Takeda_0000311

# EXHIBIT W

1

1          IN THE UNITED STATES DISTRICT COURT

2         FOR THE EASTERN DISTRICT OF TENNESSEE


3    ------------------------------------------------
                                )
4    TRAVIS WILLIAMS,           )
                                )
5          Plaintiff,           )
                                )
6                               ) 3:24:cv-00076
       vs.                      )
7                               )
     ALKERMES, INC.,            )
8                               )
           Defendant.           )
9    ------------------------------------------------
                         Chattanooga, Tennessee
10                       July 14, 2025

11

           DEPOSITION OF JODI GAYLE-GARCIA
12
     ------------------------------------------------
13

14

15

16

17

18

19

20

21

22

23

24

25

**Wilson Reporting Agency (423) 267-6000**
**www.wilsonreporting.com**
Case 3:24-cv-00076-DCLC-DCP    Document 53-1    Filed 08/15/25    Page 1 of 41
PageID #: 457

Page 2

```
 1  APPEARANCES:
 2          FOR THE PLAINTIFF:
 3          JUSTIN S. GILBERT, ESQ.
            Gilbert Law, PLLC
 4          100 W. Martin Luther King Blvd., Su 501
            Chattanooga, TN  37402
 5          justin@schoolworklaw.com
               -and-
 6          RONALD A. RAYSON, ESQ.
            The Law Office of Ronald A. Rayson
 7          3800 Keowee Avenue
            Knoxville, TN  37919
 8
 9          FOR THE DEFENDANT:
10          JENNIFER S. RUSIE, ESQ.
            JOHN R. ADAMS, ESQ.
11          611 Commerce Street, Su 2803
            Nashville, TN  37203
12          jennifer.rusie@jacksonlewis.com
            john.adams@jacksonlewis.com
13             -and-
            PAUL DUBOIS, ESQ.
14          Alkermes, Inc.
            900 Winter St
15          Waltham, MA 02451
16  ALSO PRESENT:  Travis Williams
17
18
19
20
21
22
23
24
25
```

Page 4

```
 1              INDEX TO EXHIBITS
 2  No. Description                              Page
 3  21 March 6, 2023 email                       122
 4  23 Investigation report form                 130
 5  24 Text on termination                       132
 6  25 Text message on novonordisc               135
 7  26 Becky Rogers post                         135
 8  27 Becky Rogers additional post              136
 9  28 Plastic hand                              144
10  29 Alkermes response to EEOC                 146
11  30 Language Matters post                     149
12  Reporter's note: Two Exhibit 21s used. Exhibit 22 number
    not assigned to any document.
13
14
15
16
17
18
19
20
21
22
23
24
25
```

Page 3

```
 1  JODI-GAYLE GARCIA:
       Examination by Mr. Gilbert                   6
 2     Examination by Mr. Adams                    157
 3
 4            INDEX TO EXHIBITS
```
```
 5  No. Description                              Page
 6   5 Garcia resume                              10
 7   6 Garcia application                         21
 8   7 2023 Handbook excerpts                     23
 9   8 Video                                      45
10   9 Mosaic and first annual #buyblack day      49
11  10 Race, equity and business breakfast event  52
12  11 Weekes message                             54
13  12 Alkermes 2022 Corporate Responsibility     56
       Report
14  13 Alkermes 2023 Corporate Responsibility     60
       Report
15  14 Alkermes 2024 Corporate Responsibility     64
       Report
16
17  15 LinkEd Pic Black Woman                     69
18  16 Game pics DBLs in line PLF 00096           86
19  17 Game pic Garcia on X PLF 00095             90
20  18 Game pics array ALKS 000097                91
21  19 Handwritten investigation notes           113
22  20 Typed investigation notes                 115
23  21 Investigation Procedures - handbook       122
       excerpt
24
25
```

Page 5

```
 1        D I S C L O S U R E
   STATE OF TENNESSEE
 2  COUNTY OF HAMILTON
   DEPONENT: JODI GAYLE-GARCIA
 3    Pursuant to the Rules and Regulations of the Tennessee
   Board of Court Reporting, I make the following
 4  disclosure:
 5    I am a Tennessee Licensed Court Reporter.  I am here
   as an independent contractor for Wilson Reporting
 6  Agency.
 7    Wilson Reporting Agency was contacted to provide court
   reporting services for this deposition.  Wilson Reporting
 8  Agency will not be taking this deposition under any
   contract that is prohibited by TCA 24-9-136.
 9    Wilson Reporting Agency has no contract/agreement to
   provide reporting services with any party to the case,
10  any counsel in the case, or any reporter or reporting
   agency from whom a referral might have been made to cover
11  this deposition.
12    Wilson Reporting Agency will charge its usual and
   customary rates to all parties in the case, and a
13  financial discount will not be given to any party to this
   litigation.
14  Sheila D. Wilson, LCR#268
   Expiration date: June 30, 2026
15
16
17
18
19
20
21
22
23
24
25
```

Case 8:23-cv-00590-TPB-CPT  Document 114-2  Filed 10/14/25  Page 120 of 171
PageID 2260
TRAVIS WILLIAMS vs.
ALKERMES INC
JODI GARCIA
July 14, 2025

Page 6

1    The deposition of JODI GAYLE-GARCIA, taken on the
2  14th of July 2025, on behalf of the Plaintiff, beginning
3  at approximately 9:27 a.m., with all participants
4  appearing remotely from their respective locations,
5  before Sheila D. Wilson, Licensed Court Reporter #268,
6  and Notary Public.
7        This deposition is taken pursuant to the terms and
8  provisions of the Federal Rules of Civil Procedure.
9        Signature of the witness is not requested.
10            / / /
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 7

1        MR. ADAMS: Counselor, are you agreeable to
2  all objections reserved except as to form?
3        MR. GILBERT: Yes.
4            JODI GAYLE-GARCIA,
5  called as a witness at the instance of the plaintiff,
6  having been first placed under oath at approximately
7  9:27a.m., was examined and testified as follows:
8        EXAMINATION.
9        MR. ADAMS: And, Justin, are you good with
10  all objections being reserved except as to form?
11        MR. GILBERT: Yes.
12            JODI GAYLE-GARCIA,
13  called as a witness at the instance of the Plaintiff,
14  having been first placed under oath at approximately 9:38
15  a.m., was examined and testified as follows:
16        EXAMINATION
17  BY MR. GILBERT:
18    Q  Ms. Garcia, my name is Justin Gilbert, and Travis
19  Williams is my client.  Mr. Williams is seated across
20  from me.  And my co-counsel is Ron Rayson, he's in here
21  too.  But it's just the three of us on our end.  Can you
22  hear me okay?
23    A  Yes.
24    Q  All right.  Have you ever testified before?
25    A  No.

Page 8

1    Q  Never given a deposition before?
2    A  No.
3    Q  Okay.  Let me give you a few ground rules.  Our
4  court reporter, Ms. Wilson, is taking down my questions
5  and your answers, so let's you and I do our best not to
6  talk on top of each other.  If you'll let me get my full
7  question out, I'll then let you get your full answer out.
8  Does that make sense?
9    A  Yes.
10    Q  You're doing a good job saying yes and no.
11  Sometimes there's a tendency to say uh-huh, huh-uh, shrug
12  the shoulders.  If you do that I may prompt you.  I'm not
13  trying to be rude, but I just want to ensure a good
14  transcript.  Okay?
15    A  Yes.
16    Q  If I ask you something you don't understand, just
17  please tell me.  I'll be happy to repeat it or rephrase
18  it for you.  Okay?
19    A  Yes.
20    Q  You understand that your testimony is under oath
21  today, no different than taking the oath in a courtroom,
22  correct?
23    A  Yes, I do.
24    Q  You and I have never spoken before today; is that
25  right?

Page 9

1    A  Yes.
2    Q  And have you ever spoken to my co-counsel,
3  Mr. Rayson?
4    A  No.
5    Q  And what about Alkermes' counsel?  Have you ever
6  spoken to Paul Dubois before today?
7    A  Yes.
8    Q  How many times would you say you've spoken to
9  Mr. Dubois?  Any idea?
10    A  No.  I don't recall.
11    Q  He is someone that you interact with frequently?
12    A  No.
13    Q  Would you say you've spoken to him more than five
14  times in your life?
15    A  I don't remember.
16    Q  And where are you located today?
17    A  My home in Tampa, Florida.
18    Q  And what about Jennifer Rusie, have you ever
19  spoken to her before?
20    A  Not until this incident.
21    Q  How many times -- or when is the first time you
22  would've spoken to Ms. Rusie?
23    A  For this incident.
24    Q  Would that have been after the lawsuit was filed?
25    A  Yes.

Case 8:23-cv-00590-TPB-CPT    Document 114-2    Filed 10/14/25    Page 121 of 171
PageID 2261
TRAVIS WILLIAMS vs.
ALKERMES INC
JODI GARCIA
July 14, 2025

Page 10

1   Q   And what about Mr. Adams, have you spoken to him
2   before?
3   A   When this was -- same as Ms. Rusie.
4   Q   After the lawsuit was filed?
5   A   Yes.
6   Q   Okay.  I emailed some exhibits last night.  Were
7   those forwarded to you, Ms. Garcia?
8   A   Yes.
9           MR. GILBERT:  All right.  I'd like to do that
10  so the witness can look through the whole document rather
11  than me trying to direct you on the screen.
12  Q   Do you have a printout of those with you or do you
13  have a computer to look at those?
14  A   I don't have a printout but I have my computer in
15  front of me.
16  Q   All right.  I'd like for you to look at Number 5.
17  It should be a resume.  At the top it says Jodi
18  Gayle-Garcia.  Do you see that?  Are you looking at that
19  one, Ms. Garcia?
20  A   I'm opening it.  Could you repeat the number,
21  please?
22  Q   Number 5.  It should say 5 Garcia Resume.
23          (Exhibit 5 is Garcia resume.)
24          MR. ADAMS:  And, Jodi, if you're having
25  trouble locating it, I can forward it to you right now if

Page 11

1   that's easier.
2           THE WITNESS:  It's just I'm -- it's a lot of
3   documents.  I'm just trying to slide through.  I was
4   trying to look at it on a different -- hold on one
5   second.
6           MR. GILBERT:  Take your time.
7           THE WITNESS:  Yep.
8   BY MR. GILBERT:
9   Q   You got it?
10  A   Yes.  Yes, I do.
11  Q   All right.  Is this a true and correct copy of
12  your resume?
13  A   Yes, it is.
14  Q   And do you know when you would have submitted this
15  resume to Alkermes?
16  A   Probably when I was hired, in 2022, or prior,
17  through my interview process in '21.
18  Q   When were you hired at Alkermes?
19  A   January -- my official start date was January
20  2022.
21          MR. GILBERT:  I'm trying to keep us going
22  consecutively.  So I'll make this Exhibit 5 because there
23  were four exhibits to Mr. Williams' deposition.
24          MS. RUSIE:  Wait.  Hold on.  Why wouldn't we
25  just make this Exhibit 1 to Jodi's deposition?

Page 12

1           MR. GILBERT:  Well, we could, but I think for
2   summary judgment and other purposes it's nice to just
3   have the documents consecutive instead of a bunch of
4   Number 1's.  So I try to do them consecutively.
5   Otherwise you have --
6           MS. RUSIE:  I've never done that in my life.
7   But it's your deposition.
8   BY MR. GILBERT:
9   Q   Exhibit 5 will be your resume.  Let me ask you
10  about your prior employment.  Looks like you worked at a
11  place called "Ta-Kee-da [phonetic].  Am I saying that
12  correctly?
13  A   "Ta-Kada." [phonetic].
14  Q   Takeda.  What did you do at Takeda?
15  A   I had two different roles.  I was a district
16  manager and I was also a training manager.
17  Q   And how long did you work at Takeda?
18  A   It was an acquisition.  It was a combination of
19  Shire and Takeda.  So, almost eight years.
20  Q   And when did you leave Takeda?
21  A   Before coming to Alkermes.
22  Q   So that would've been --
23  A   December.
24  Q   -- December of '21?
25  A   Yes.

Page 13

1   Q   And why did you leave Takeda?
2   A   For the role at Alkermes.
3   Q   So at the time you were offered the role at
4   Alkermes, you were still employed at Takeda?
5   A   Yes.
6   Q   And you were not asked to leave Takeda, I take it;
7   is that right?
8   A   Yes.
9   Q   You were asked to leave or --
10  A   I was not asked to leave Takeda, no.
11  Q   Do you know who Johanna Hernandez is?
12  A   She's an employee that works for me in South
13  Florida.
14  Q   She works for you in South Florida for Alkermes?
15  A   Yes.
16  Q   Did she also work for you at Takeda?
17  A   No, she did not.
18  Q   Did she work at Takeda?
19  A   Yes, she did.
20  Q   What was her job at Takeda?
21  A   We did not work on the same team, so I'm not quite
22  sure what her role was at Takeda.
23  Q   Did you know her at Takeda?
24  A   No, I did not.
25  Q   Did you help her get hired at Alkermes?

Min-U-Script®                Wilson Reporting Agency (423) 267-6000                (3) Pages 10 - 13
www.wilsonreporting.com
Case 3:24-cv-00076-DCLC-DCP    Document 96-1    Filed 08/15/25    Page 4 of 41
PageID #: 460

Case 8:23-cv-00590-TPB-CPT   Document 114-2   Filed 10/14/25   Page 122 of 171
PageID 2262
TRAVIS WILLIAMS vs.
ALKERMES INC
JODI GARCIA
July 14, 2025

Page 14

1   A  I hired her at Alkermes.
2   Q  Tell me about that.  How did she come to you and
3   how did you go about hiring her?
4   A  She was referred to me by someone else.  I'm sure
5   Alkermes can provide you that information.  And she went
6   through the interview process along with several other
7   candidates.
8   Q  And then you were the one who made the decision to
9   hire her?
10   A  Yes.  Her, along with a secondary candidate, was
11   sent to our regional director, and the decision would be
12   final -- final decision are made by the regional
13   director.  That's Alkermes' process.
14   Q  So you recommended her, and then the regional
15   director gave the final say?
16   A  Her, along with a secondary candidate, yes.
17   Q  Who's the secondary candidate?
18   A  At this point I don't remember.
19   Q  When was it that Ms. Hernandez was hired?
20   A  I believe the summer of '23 -- or '22.  I'm sorry,
21   I don't remember the dates.
22   Q  Okay.  And what position was she hired for at
23   Alkermes?
24   A  She's a territory business manager in Miami, in
25   South Florida, South Florida territory.

Page 15

1   Q  And she reports to you?
2   A  Yes.
3   Q  Your current job title is what?
4   A  District sales manager -- business leader, I'm
5   sorry, at Alkermes.
6   Q  Is that the position you've always held, district
7   business leader?
8   A  Yes.
9   Q  So that's a supervisory position?
10   A  Yes.
11   Q  How many employees do you supervise?
12   A  Currently seven.
13   Q  Does that still include Ms. Hernandez?
14   A  Yes.
15   Q  Was there a period of time that Ms. Hernandez left
16   Alkermes?
17   A  Yes.
18   Q  Did she explain to you why she left?
19   A  Due to the stress of what she was going through,
20   was her reason for leaving, her verbalization to me.
21   Q  Did she share with you what that stress was?
22   A  Yes.
23   Q  What verbalization of stress did she share with
24   you?
25   A  Very similar.  Anxiety, worry, retaliation.

Page 16

1   Q  Who did she fear retaliation from?
2   A  I don't know.
3   Q  What was the anxiety and the worry that she
4   expressed?
5   A  Those are the words she shared with me.  I can't
6   put words in her mouth.
7   Q  The words she expressed to you were she's leaving
8   because of anxiety, worry, and fear of retaliation?
9   A  And stress, yes.
10   Q  And stress.  And so when you heard that, what did
11   you say?
12   A  I asked her not to leave.  However, she had
13   already, you know, found a new role.
14   Q  Where was that?
15   A  I don't know.  I don't recall.
16   Q  And did she come back to Alkermes?
17   A  Yes.
18   Q  How long was she gone?
19   A  I don't remember the exact time she was gone.
20   Q  A month?  Six months?
21   A  I don't recall the exact time.  It was quite a
22   while ago.
23   Q  I'm not asking you the exact.  Can you give me an
24   estimate of how long she was gone?
25   A  I mean, a few weeks, a month.  I'm not quite sure.

Page 17

1   Q  A short period.  Okay.  And did you hire her back?
2   A  Yes.
3   Q  Same position?
4   A  Yes.
5   Q  Did she tell you she had gotten over her anxiety,
6   worry, and fear of retaliation?
7   A  She said leaving was a mistake.  That's what she
8   told me.
9   Q  And that's all?
10   A  Yes.
11   Q  Had anyone filled her position between the time
12   she left and the time she returned?
13   A  I was in the process of recruiting.
14   Q  Do you evaluate Ms. Hernandez' performance, as her
15   supervisor?
16   A  I evaluate her performance.  It's also evaluated
17   due to the numbers that she does.  It's calculated by
18   Alkermes.
19   Q  How often is her performance evaluated?
20   A  We have quarterly business reviews as a district.
21   Q  And in those quarterly business reviews do you
22   have to complete any kind of evaluation metrics or
23   performance appraisals?
24   A  All data is provided by Alkermes.
25   Q  So what is your role as the supervisor as it

Min-U-Script®                Wilson Reporting Agency (423) 267-6000                (4) Pages 14 - 17
www.wilsonreporting.com
Case 3:24-cv-00076-DCLC-DCP   Document 35-1   Filed 08/15/25   Page 5 of 41
PageID #: 461

Page 18

1  relates to performance appraisals of a person like
2  Hernandez?
3     A  Coaching and development is what a district
4  business leader does.  In terms of -- it's her messaging
5  to her customers, her business analysis, her day-to-day
6  role and making calls to her customers.  She's required
7  to meet the company standards, which is making her goal
8  attainment, her metrics per day, engaging with her
9  customers.  And those are evaluated by me during field
10  rides.
11     Q  Did you have occasion to address with her whether
12  her anxiety, worry, and fear of retaliation was affecting
13  her job performance?
14     A  That is not my role.  My role is to ensure that
15  she's in a -- performing in an exemplary way.  And she
16  never, ever brought up that situation with me again.
17  Coming back she said was the best thing that she did.
18     Q  But she did bring up to you the anxiety, the
19  stress, the fear of retaliation, and the worry.  Did you
20  encourage her to report it to human resources?
21     A  Yes.
22     Q  Do you know whether she did report it to human
23  resources?
24     A  No, I do not.
25     Q  Did you follow up with her and ask her whether she

Page 19

1  had reported it?
2     A  I just asked her did she talk to HR.
3     Q  And the answer was?
4     A  Honestly, this was two years ago.  I don't recall.
5     Q  Going back to Takeda for a moment, do you know who
6  Shannon Olson is?
7     A  Yes.
8     Q  Who is she?
9     A  She was a senior territory business manager who
10  worked in the St. Pete to -- the northern Brooksville,
11  area.
12     Q  Were you her supervisor?
13     A  Yes.  I was her supervisor for a short period of
14  time before I became the training manager.
15     Q  And what about Jordan Davis, do you know who that
16  is?
17     A  Yes.
18     Q  How long have you known Jordan Davis?
19     A  A very long time.
20     Q  When did you first meet Jordan Davis?
21     A  In high school probably.  He played basketball for
22  my husband.
23     Q  Is your husband a basketball coach?
24     A  Yes.
25     Q  Where does he coach basketball?

Page 20

1     A  In high school, Berkeley Prep.
2     Q  What city is Berkeley Prep?
3     A  Tampa, Florida.
4     Q  And Jordan Davis was a high school player for your
5  husband?
6     A  Not at that high school.
7     Q  A different high school when your husband was a
8  coach?
9     A  Yes.
10     Q  All right.  Did you hire Jordan Davis at Takeda?
11     A  Yes.
12     Q  And Shannon Olson, is she white?
13     A  Yes.
14     Q  What about Jordan Davis?
15     A  He's African American.
16     Q  Okay.  Let's go to the next exhibit, please.  I'm
17  finished with your resume.  Let's go to Number 6, the
18  employment application.  Just tell me when you've got
19  that one called up, please.
20     A  I've got it open.
21     Q  Is this a true and correct copy of your employment
22  application to Alkermes?
23     A  Yes.
24        MR. GILBERT:  All right.  We'll make that
25  Exhibit 6 to the deposition.

Page 21

1        (Exhibit 6 is Garcia application.)
2     Q  And if you'll turn to page 3 with me.  That has
3  some information about you being employed at Takeda,
4  right?
5     A  Yep.
6     Q  Did you include -- did you type in all the
7  information that's on this application?
8     A  I did.
9     Q  Okay.  It says you worked at Takeda from January
10  2021 to December 2021.  Then there is a blank for Reason
11  For Leaving.
12     A  This is an error, because that's -- as you can
13  see, my resume says something different.  This must've
14  been an error.  Because I moved from being a manager to
15  being a training manager.
16     Q  What part is there an error that you're talking
17  about?
18     A  Going from district manager to being training
19  manager.  It's the same company.
20     Q  And so the error you're talking about is where?
21  The title of training manager?
22     A  No.  I'm saying you're saying there's -- I didn't
23  leave.
24     Q  Okay.  You brought up there being an error, and
25  I'm not sure what you're talking about about an error.

Case 8:23-cv-00590-TPB-CPT　　Document 114-2　　Filed 10/14/25　　Page 124 of 171
PageID 2264
TRAVIS WILLIAMS vs.
ALKERMES INC

JODI GARCIA
July 14, 2025

Page 22

1　A　On your part. I did not leave. You said there
2　was a reason for leaving. I did not leave. It was a
3　change in title.
4　Q　Okay. On Reason For Leaving, do you see that
5　blank there?
6　A　Yes.
7　Q　There's no input there. Is that because you were
8　still employed at Takeda? Is that what you're telling
9　me?
10　A　Yes.
11　Q　Okay. How were your performance appraisals at
12　Takeda?
13　A　They were good.
14　Q　And who evaluates your performance at Alkermes?
15　A　I'm sorry? Would you repeat?
16　Q　Who evaluates your performance at Alkermes?
17　A　The regional sales director.
18　Q　And who is that?
19　A　Currently it's Elizabeth Murphy.
20　Q　Is she considered your direct report, Elizabeth
21　Murphy?
22　A　Yes.
23　Q　How long has she been your direct report?
24　A　About a year and a half.
25　Q　Who was it prior to that?

Page 23

1　A　Michael Bauer.
2　Q　And did he make performance appraisals for you?
3　A　Yes.
4　Q　And was Michael Bauer also regional sales
5　director?
6　A　Yes.
7　Q　Going back to Takeda for just a moment, why did
8　you go from district manager to training manager at
9　Takeda?
10　A　It was a promoted opportunity for me to get into
11　corporate.
12　Q　So training manager was a higher level position?
13　A　Yes.
14　Q　Let's go to Exhibit Number 7, please. Tell me
15　when you're there, Ms. Garcia.
16　　　(Exhibit 7 is 2023 handbook excerpts.)
17　A　I'm there.
18　Q　Have you ever read the Alkermes handbook?
19　A　I have glanced over it, yes.
20　Q　We've taken this page about diversity, inclusion &
21　belonging from the 2023 Alkermes handbook. The first
22　sentence there says: "Alkermes is committed to
23　diversity, inclusion and belonging throughout our
24　business." Do you agree with that?
25　A　Yes.

Page 24

1　Q　And the next page talks about Employee-Led
2　Steering Committee. Do you see that?
3　A　Yes.
4　Q　Have you ever been on the employee-led steering
5　committee?
6　A　No.
7　Q　Do you know who is on the employee-led steering
8　committee?
9　A　I don't know. This -- I don't know what the
10　steering committee is. No.
11　Q　So you don't know who would lead the steering
12　committee, I take it?
13　A　No.
14　Q　Or how many people are on the steering committee?
15　A　No.
16　Q　Or how often they meet?
17　A　No.
18　Q　First paragraph under Employee-led steering
19　committee of the handbook says that it works to "Shape
20　the organization's vision around diversity, inclusion and
21　belonging."
22　　　Have you ever seen any publications from an
23　employee-led steering committee?
24　A　No.
25　Q　Next item, same page. There is the DIB Executive

Page 25

1　Committee, do you see that?
2　A　Yes.
3　Q　The diversity, inclusion and belonging executive
4　committee?
5　A　Yes.
6　Q　It says it "consists of senior leaders at
7　Alkermes, including our CEO." Do you know how many
8　people are on that executive committee?
9　A　No, I do not.
10　Q　Have you ever met Richard Pops?
11　A　Yes, I have.
12　Q　You ever talk to him about diversity?
13　A　Yes, I have.
14　Q　Tell me about that. When was that and what was
15　exchanged between you and Mr. Pops about diversity at
16　Alkermes?
17　A　We -- the Mosaic ERG had to do a presentation to
18　this particular committee on our plans for, I believe it
19　was 2024.
20　Q　And what was your role in this presentation?
21　A　Specifically, what we were going to be doing for
22　Mosaic for 2024.
23　Q　And Mosaic is an ERG; is that right? Employee
24　resource group?
25　A　Yes.

Min-U-Script®
Wilson Reporting Agency (423) 267-6000
www.wilsonreporting.com
(6) Pages 22 - 25

Case 3:24-cv-00076-DCLC-DCP　　Document 35-1　　Filed 08/15/25　　Page 7 of 41
PageID #: 463

Page 26

1  Q  And did you lead this presentation?
2  A  I'm co-lead with my counterpart, Renato Chiarella.
3  We both did.
4  Q  And where did this presentation make place?
5  A  Waltham.
6  Q  Waltham, Mass?
7  A  Yes.
8  Q  Who else presented besides you and Renaldo?
9  A  Renato.
10 Q  Renato, I'm sorry.
11 A  At this presentation?  All ERGs had been required
12 to do that.
13 Q  Was it a PowerPoint presentation?
14 A  Yes.
15 Q  And do you still have that PowerPoint?
16 A  Renato probably does.  He's the one that created
17 the PowerPoint.
18 Q  And you said that Mr. Pops was present?
19 A  Yes.
20 Q  And you said this was the plans for the employee
21 resource group Mosaic going into 2024?
22 A  Yes.
23 Q  And what kind of plans were you-all presenting to
24 the DIB executive committee?
25 A  We were talking about which particular months we

Page 27

1  were going to be focusing on; our biopic Mental Health
2  Awareness month, all the different months that we were
3  going to be doing throughout the year, how we were going
4  to be celebrating the employees that work for Alkermes.
5  Q  Those were the only plans that were referenced?
6  A  Yhose.
7  Q  I know Mr. Pops was a member of the DIB executive
8  committee that was listening to the presentation.  Who
9  else was there listening to the presentation?
10 A  I don't recall.  Probably don't know all their
11 names.
12 Q  This page from the 2023 handbook, which is Exhibit
13 7, says:  "The DIB Executive Committee consists of senior
14 leaders at Alkermes.  Do you know who the senior leaders
15 are?
16 A  Again I'll repeat, I don't think I know everyone
17 in that room.  I don't know all their names.
18 Q  Who do you know that was in the room?
19 A  Mr. Pops.
20 Q  He's the only one you know?
21 A  That's the only person that I can recall being in
22 the room.
23 Q  Was there a human resources representative in the
24 room?
25 A  I don't remember.

Page 28

1  Q  Do you know who Kimberly Mikitka is?
2  A  Yes, I do.
3  Q  How do you know her?
4  A  Due to the situation with Mr. Williams, I had to
5  interact with her due to situations that happened after
6  he was no longer at the company.
7  Q  How many times would you say you've interacted
8  with Ms. Mikitka concerning these situations?
9  A  Maybe twice.
10 Q  And so if you would, tell me -- let's start with
11 the first time you interacted with Ms. Mikitka about a
12 situation with Mr. Williams.  When would that have been?
13 A  I don't remember the exact date.
14 Q  Do you remember the year?
15 A  It was after this incident.
16 Q  When you say "this incident," are you referring to
17 the allegations in the 2023 national sales meeting in
18 March?
19 A  Yes.
20 Q  So how long was it after that that you met with
21 Ms. Mikitka?
22 A  Probably a few months later.
23 Q  And did you request to meet with her or she with
24 you?
25 A  I didn't request to meet with her.

Page 29

1  Q  So how did that meeting come about?
2  A  Due to what I was going through and how I was
3  being treated post the NSM.
4  Q  Did she reach out to you?
5  A  It was via Stephanie.
6  Q  And who is Stephanie?
7  A  She was the prior HR lead for the Vivitrol team.
8  Q  So are you telling me that Stephanie suggested you
9  meet with Ms. Mikitka?
10 A  No.  It was -- I don't remember the specific
11 details.  All I know is that there was a conversation
12 that happened with her after the fact.
13 Q  So you met with Ms. Mikitka about something you
14 were going through.  Is that --
15 A  Yes.
16 Q  -- what I'm hearing?
17 A  Yes.
18 Q  What exactly were you going through at that time?
19 A  Being ostracized by my counterparts.
20 Q  And when you say "counterparts," do you mean your
21 fellow --
22 A  My fellow DBLs.
23 Q  -- district business leaders?
24 A  Yes.
25 Q  All of them?

Case 8:23-cv-00590-TPB-CPT    Document 114-2    Filed 10/14/25    Page 126 of 171
PageID 2266
TRAVIS WILLIAMS vs.
ALKERMES INC

JODI GARCIA
July 14, 2025

Page 30

1   A  Yes.
2   Q  What made you think you were being ostracized?
3   A  Lack of interaction, lack of engagement.
4   Q  Okay. And did you discuss with your counterparts
5 this lack of interaction and lack of engagement?
6   A  I kept to myself.
7   Q  Why did you not address with your counterparts
8 this lack of interaction and lack of engagement?
9   A  I didn't have to. I was not the one who was -- I
10 was the one that was being treated not well. It wasn't
11 my right to go to them and ask them anything.
12   Q  Did you make a report to human resources about it?
13   A  Yes.
14   Q  And to whom did you report?
15   A  At the time, it was Stephanie Walker.
16   Q  Was that a written report you made to her?
17   A  We talked on the phone.
18   Q  And it was about this lack of interaction and lack
19 of engagement by --
20   A  And feeling ostracized by my counterparts, yes.
21   Q  After the Travis Williams national --
22   A  Yes.
23   Q  -- sales meeting in --
24   A  Yes.
25   Q  -- March of '23?

Page 31

1   A  Yes.
2   Q  And when you talked to Walker about that, was that
3 a phone call or an in-person meeting, or what?
4   A  Phone call.
5   Q  And where were you at the time of that phone call
6 and where was she?
7   A  At my home.
8   Q  And so we would place this, if it was a few months
9 after, this would be -- and I won't hold you to an exact
10 date, but somewhere around May of 2023 you think?
11   A  Like I said, it was a few months later.
12   Q  Okay. And what did Ms. Walker tell you after you
13 shared how you were being treated by your counterparts?
14   A  That this was not correct, that I should not be
15 going through that. Asked me what I would need -- if I
16 needed anything; provided me with all the employee
17 support that I could get that Alkermes offers.
18   Q  And what kind of support did she offer you at
19 Alkermes?
20   A  We have employee resources that we -- mental
21 health, counseling. There's different things that
22 Alkermes offers when you're going through times of
23 stress.
24   Q  And did you take advantage of the employee health,
25 the EAP, or whatever it's called?

Page 32

1   A  Yes. I have my own therapist. Yes.
2   Q  And did Ms. Walker also suggest that you meet with
3 Kimberly Mikitka?
4   A  It was -- conversations were had about that, yes.
5 I don't remember the specifics. Again, this was two and
6 a half years ago.
7   Q  Okay. But as I understand it, you meet with
8 Ms. Walker about this ostracization, the lack of
9 interaction. And then after Ms. Walker, you have a
10 meeting with Kimberly Mikitka; is that right?
11   A  It was a conversation, yes.
12   Q  Phone conversation?
13   A  Yes.
14   Q  And where was she and where were you at the time
15 of that conversation?
16   A  I don't know where she was. I was in my office.
17   Q  And what position is Kimberly Mikitka?
18   A  I don't know her exact position, but I know she's
19 head of HR. I'm not quite sure.
20   Q  Is she higher up in HR than Stephanie Walker?
21   A  I am unsure of her title.
22   Q  So you have a phone call with Ms. Mikitka. Did
23 you place that call or did she place it to you?
24   A  I don't recall.
25   Q  How long did the call take?

Page 33

1   A  I don't recall.
2   Q  And what did you discuss with Ms. Mikitka?
3   A  Same thing that I discussed with Stephanie.
4   Q  And what, if anything, did Ms. Mikitka have to
5 say?
6   A  Same supportive.
7   Q  Did she say they would conduct any kind of
8 investigation?
9   A  That I don't recall. We didn't discuss
10 investigation. It was just me, talking about me and how
11 I was feeling.
12   Q  Did you tell either Ms. Mikitka or Ms. Walker not
13 to investigate?
14   A  No.
15   Q  Do you know whether they did an investigation?
16   A  I have no idea.
17   Q  Do you know whether they spoke to any of your
18 fellow district business leaders about your perceived
19 lack of interaction and lack of engagement?
20   A  I have no idea.
21   Q  And after you spoke to Ms. Walker, did things
22 improve with your counterparts?
23   A  It was a very long time before it did.
24   Q  How long did it take to improve?
25   A  Once we had a new regional hired.

Case 8:23-cv-00590-TPB-CPT    Document 114-2    Filed 10/14/25    Page 127 of 171
PageID 2267

TRAVIS WILLIAMS vs.
ALKERMES INC

JODI GARCIA
July 14, 2025

Page 34

1  Q  That would've been after Mr. Bauer had left?
2  A  Yes.
3  Q  When you spoke to Ms. Walker, did you feel like it
4  was discrimination?
5  A  I don't understand the question.
6  Q  When you spoke to Ms. Walker about being
7  ostracized and lack of interaction by the district
8  business leaders, did you feel like you were being
9  discriminated against?
10  A  Still don't understand the question.
11  Q  Okay.  Did you use the word "discrimination" when
12  you spoke to her?
13  A  No.
14  Q  Did you use the word "retaliation"?
15  A  No.
16  Q  Did you feel like you were being retaliated
17  against?
18  A  Yes.
19  Q  What makes you say that?
20  A  Because the entire situation was due to the fact
21  that Travis was no longer at Alkermes and how I was being
22  treated.
23  Q  And did you share that feeling with Ms. Mikitka,
24  that you felt how you were being treated was because of
25  Mr. Williams no longer being at Alkermes?

Page 35

1  A  I don't remember my exact conversation with
2  Ms. Mikitka.  Again, it's two and a half years ago.  But
3  I did use those words with Ms. Walker.
4  Q  And how long would you say that you endured this
5  ostracization, lack of interaction?  I know you said it
6  took until Mr. Bauer left, right?
7  A  No.  That's not what I said.  I said it took until
8  we had a new regional hired.
9  Q  Okay.  So you tell me, about how long did you feel
10  ostracized by your counterparts?
11  A  I don't have exact timelines.  But once my new
12  regional director was hired, there was a different -- a
13  different change in the atmosphere.
14  Q  And who was the new regional director?
15  A  Elizabeth Murphy.
16  Q  Female, right?
17  A  Yes.
18  Q  So -- and I won't hold you to an exact date,
19  because I know we're talking about some time ago, but
20  would you say you felt ostracized more than a year?
21  A  No.
22  Q  Was Ms. -- when was the new regional director
23  hired in August of 2023?
24  A  I don't know her hire date.
25  Q  All right.  So you told me you had two

Page 36

1  conversations with Ms. Mikitka.  That's the first one,
2  that we just went over, right?
3  A  That I can recall, yes.
4  Q  So when would the second conversation with
5  Ms. Mikitka have been?
6  A  Again I'll go back and tell you that I don't
7  recall, as it was two and a half years ago.
8  Q  What was the subject of the second conversation
9  with Ms. Mikitka?
10  A  Very similar.  How I was doing, how I was feeling.
11  Q  Telephone call?
12  A  Yes.
13  Q  About how far apart were these two --
14  A  I don't recall.
15  Q  A year?  Weeks?  Again, I'm not holding --
16  A  I don't recall.
17  Q  Could've been a year then?
18  A  I don't recall.
19  Q  Okay.  What was discussed in this telephone call
20  with Ms. Mikitka, the second one?
21  A  Just I stated, similarly to the first: how I was
22  doing, how I was adjusting, did I feel supported.
23  Q  And what did you say?
24  A  That I was getting there.
25  Q  And what did you mean by I'm getting there?

Page 37

1  A  I was getting there.  That takes a lot to get
2  over.
3  Q  What takes a lot to get over?
4  A  Being ostracized, being treated outside the team.
5  That was a lot to get through.
6  Q  Can you give me examples of how you were taken
7  outside the team?
8  A  Received no phone calls from my counterparts, no
9  collaboration, nothing.
10  Q  We've talked about Ms. Walker and we've talked
11  about Mikitka.  Did you share these feelings of
12  ostracization with anyone else in human resources?
13  A  No.
14  Q  With anyone within the company besides Ms. Walker
15  or Ms. Mikitka?
16  A  No.
17  Q  You've still got Exhibit 7 there before you?
18  A  Yeah.
19  Q  All right.  We were talking about the DIB
20  executive committee, and you told me you didn't know who
21  the senior leaders are, right?
22  A  Yes.
23  Q  I'm going to go through a list of names, and I'm
24  interested in whether you have ever met or spoken to
25  these people.  The first one is David Gaffin, senior vice

Case 8:23-cv-00590-TPB-CPT    Document 114-2    Filed 10/14/25    Page 128 of 171
PageID 2268

TRAVIS WILLIAMS vs.
ALKERMES INC

JODI GARCIA
July 14, 2025

Page 38

1  president, chief legal officer and chief compliance
2  officer.
3  A  Yes.  He is my ERG sponsor.
4  Q  And what is an ERG sponsor?
5  A  We have executive sponsors for every ERG within
6  the organization that provides support and guidance for
7  us.
8  Q  What about Stephen Schiavo, senior vice president,
9  human resources?
10  A  Yes.
11  Q  And in what capacity have you spoken with him?
12  A  In planning for recruiting efforts within the
13  organization, for ALPFA and different organizations that
14  we try to partner with.
15  Q  Why would you be involved in recruiting efforts at
16  Alkermes?
17  A  Not recruiting efforts.  We have -- as the Mosaic
18  team, our job is to partner with outside organizations to
19  help hire in people within the organization.  So we make
20  connections there.  So, we sponsor things like ALPFA and
21  NSN.  And that's where we kind of coordinate with HR.
22  Q  And what is ALPFA?
23  A  It is a recruiting organization for science,
24  research and development for people of Asian and Hispanic
25  descent.

Page 39

1  Q  And what about NSN?
2  A  National Sales Network is a recruiting
3  organization for sales of individuals of color.
4  Q  So the planning of the recruiting effort that
5  Mosaic was involved in, if I understand you, is setting
6  Alkermes up with these two organizations?
7  A  It's not setting them up.  It was our -- we to
8  collaborate with those people.
9  Q  And how is Mosaic involved in that?
10  A  We actually provide information for -- of ALPFA.
11  Like we sponsor an ALPFA event at corporate, and we've
12  also sponsored NSN.
13  Q  And you related that involvement of Mosaic to?
14  Stephen Schiavo.
15  A  That was already a connection prior to me being a
16  part of Mosaic.  It was a continued collaboration.
17  Q  So you gave him information about the continued
18  collaboration?
19  A  Yes.
20  Q  What about Susan Colby, director of HR, have you
21  ever spoken to her?
22  A  No.
23  Q  Katie Bizzari, senior manager, HR, performance and
24  engagement.
25  A  No.

Page 40

1  Q  Colleen Bessel, senior manager, HR business
2  partner.
3  A  No.
4  Q  Tracy Stierer, account acquisition manager.
5  A  No.
6  Q  Sandra Coombs.  C-o-o-m-b-s.
7  A  No.
8  Q  Heather Faulds.  F-a-u-l-d-s.
9  A  Don't know that name, no.
10  Q  Anne Giovanoni.
11  A  Don't know what name.
12  Q  Blair Jackson.
13  A  No.
14  Q  Todd Nichols.
15  A  Yes.
16  Q  When have you spoken to Mr. Nichols and about
17  what?
18  A  At sales meetings, at leadership development
19  meetings in regards to the Vivitrol and growth.  My job.
20  Q  And what is Mr. Nichols' job?
21  A  He is the COO.  So, he leads all of our
22  franchises.
23  Q  Sticking with Exhibit Number 7, we're still on the
24  DIB executive committee.  Do you see that?
25  A  Yes.

Page 41

1  Q  "The DIB Executive Committee consists of senior
2  leaders at Alkermes, including our CEO, and provides
3  guidance, feedback and recommendations on our overall
4  diversity, inclusion and belonging program."
5     Have you seen any guidance, feedback or
6  recommendations by the executive committee on Alkermes'
7  overall diversity?
8  A  No.
9  Q  All right.  Let's go to the next page of Exhibit
10  7.  This is the employee resource groups, or ERG, right?
11  A  Yes.
12  Q  And one of those is Mosaic; is that right?
13  A  Yes.
14  Q  And how many members are there of Mosaic?
15  A  I don't know the exact numbers.  It is volunteer,
16  and you can sign up whenever you choose.
17  Q  Are we talking like hundreds?
18  A  Again, I don't know the number.
19  Q  I don't know if there's five or a thousand.  Can
20  you give me some estimation?
21     MR. ADAMS: Objection to form.  Asked and
22  answered.
23  Q  Do you know if there's more than five?
24  A  There are more than five.
25  Q  Do you know if there's less than a thousand?

Page 42

1  A  I don't know.
2        MR. ADAMS: Same objection.
3  Q  And how many leads are there of Mosaic?
4  A  Three.
5  Q  And you're one of them, and who are the other two?
6  A  Renato Chiarella and Amanda Ng.
7  Q  And do you know if there are any district business
8  leaders on Mosaic?
9  A  Again, I don't know who -- all parts of Mosaic.
10  Q  Describe for me if you would, please, the role of
11  Mosaic at Alkermes.
12  A  Our job is to provide an opportunity to recognize
13  and celebrate all the people that work within the
14  organization and what they bring.
15  Q  So it's not an organization for minorities, it's
16  an organization to celebrate all people?
17  A  All ethnicities.
18  Q  All ethnicities?
19  A  Yes.
20  Q  Does that include Caucasian or white?
21  A  There are different ethnic groups that include
22  Caucasians and whites.  So, yes.
23  Q  What does that mean, there are different ethnic
24  groups?  Give me an example of what you mean.
25  A  Sorry?

Page 43

1  Q  You said there are different ethnic groups that
2  include white or Caucasian?
3  A  Yes.  European, Irish.
4  Q  So your testimony is, Mosaic provides an
5  opportunity for those persons as well, white Europeans
6  such as the Irish?
7  A  Yes.
8  Q  And how long have you been a co-lead?
9  A  I believe two years.
10  Q  And how did you become a co-lead?
11  A  I was asked.
12  Q  By whom?
13  A  A prior co-lead.
14  Q  Who was that?
15  A  She's no longer with the organization.  I can't
16  recall her name.  Renick Blosser was one.  And I cannot
17  remember her name to save my life.  They were the prior
18  co-leads who were stepping down.
19  Q  So it's not an elected position, I take it?
20  A  No.  It's volunteer.
21  Q  How much time do you spend with Mosaic?
22  A  Depends.  The three of us split up the
23  responsibilities.  So it depends.  Sometimes one month it
24  could be a lot and the next month it could be very
25  little.

Page 44

1  Q  Is there an average amount of time you spend per
2  month, or does it depend on which month it is?
3  A  It just depends on what's needed by the group.
4  Q  Let's take a whole year instead of trying to base
5  it monthly.
6  A  We celebrate all yearlong.
7  Q  Okay.  So in a whole year, how many hours would
8  you spend devoted to Mosaic?
9  A  I mean, that's -- I can't give an exact estimate
10  of that.  Again, it's dependent on what's needed by the
11  volunteer opportunity.
12  Q  And I'm not asking for exact.  Do you have an
13  estimate of the percentage of your time in an entire year
14  that you would devote to Mosaic?
15  A  Twenty percent.
16  Q  As a co-lead, are there any specific activities
17  that you are in charge of at Mosaic?
18  A  Could you repeat the question?
19  Q  Yeah.  As a co-lead are you in charge of any
20  specific activities for Mosaic?
21  A  Like I said, the three of us work together
22  collaboratively to support all of the different months
23  that we use to celebrate the people at the organization.
24  Q  So you don't divvy it up, you all collaborate on
25  everything?

Page 45

1  A  We collaborate, yes.
2  Q  I'm going to try to screen-share with you a
3  second, Ms. Garcia.  I'm going to show you a brief video.
4     Do you see this video on your screen, which I've
5  marked Exhibit 8?
6  A  Yep.
7        (Exhibit 8 is video.)
8  Q  Okay.  It's only 30 seconds long.  But let me just
9  play this, and then I'm going to ask you some questions
10  about it.  Okay?
11        MR. ADAMS: Justin, just at the outset, I
12  would say that we haven't seen this before, so we're
13  going to object on that basis.
14        MR. GILBERT: I've got an objection.  Hang
15  on.
16        I just want to make sure the court reporter
17  got Mr. Adams' objection?
18        Did you get that?  They objected because they
19  haven't seen it before.  Did you hear that, Ms. Wilson?
20        THE REPORTER: Yes.
21        MR. GILBERT: All right.  Let's start over
22  then.
23        (Video plays.)
24  BY MR. GILBERT:
25  Q  That's Mr. Pops on the video, right?

Case 8:23-cv-00590-TPB-CPT    Document 114-2    Filed 10/14/25    Page 130 of 171
PageID 2270

TRAVIS WILLIAMS vs.
ALKERMES INC

JODI GARCIA
July 14, 2025

Page 46

1  A  Yes.
2  Q  Do you agree Alkermes is using diversity,
3  inclusion and belonging to create a culture within
4  Alkermes?
5  A  I don't understand that question.  I've never seen
6  the video before.
7  Q  I know, but we just watched it.
8     Does Alkermes have a culture that involves the
9  importance of diversity, inclusion and belonging?
10  A  Again, I don't understand your question.
11  Q  Okay.  Do you believe that diversity, inclusion
12  and belonging are key concepts at Alkermes?
13  A  Key concepts?  That's above my pay grade.
14  Q  Okay.  Do you agree that Alkermes should mirror
15  the patients it serves or it will lack insights on those
16  patients?
17  A  Absolutely.
18  Q  And as a district business leader, how much of
19  your time is spent with direct access to patients?
20  A  We don't interact with patients, we interact with
21  physicians.
22  Q  And how many district business leaders does
23  Alkermes have?
24  A  On the Vivitrol side?
25  Q  Yes.

Page 47

1  A  Thirteen.
2  Q  And how are they divided?
3  A  There's seven in the East and six in the West, I
4  believe.
5  Q  And are you in the East or West?
6  A  The East.
7  Q  And how many of those seven are white?
8  A  I'm not sure of everyone's ethnicity on our team.
9  Q  Are any of them black?
10  A  I am.
11  Q  Do you know of any others?
12  A  No.
13  Q  What about in the West?  Do you know if there's
14  any black DBLs in the West?
15  A  I have no idea.
16  Q  Have you ever met the DBLs in the West?
17  A  Yes, I have.
18  Q  Who is Harold Weekes?
19  A  He is the HR sponsor for the ERGs.
20  Q  And where is he located?
21  A  Waltham, Massachusetts.
22  Q  Why do the ERGs have an HR sponsor?
23  A  Again, above my pay grade.
24  Q  So Mosaic has an HR sponsor, and that would be
25  Mr. Weekes?

Page 48

1  A  All the ERGs are sponsored by Mr. Weekes as the HR
2  lead.
3  Q  And why don't we just name what the ERGs are.
4  We've got Mosaic.  What are the other ones?
5  A  Mosaic, WIN.
6  Q  W-I-N?
7  A  W-I-N.
8  Q  Okay.
9  A  Pride.  There's our veterans group.  There's a
10  group for neurobehavioral -- people who suffer from
11  neurobehavioral disabilities.  And I'm forgetting one.
12  Q  Mosaic, WIN, Pride, Veterans, and then --
13  A  Oh.  Limitless, Operation Salute, Pride, WIN.  I
14  believe that's -- yeah, that's it.
15  Q  And what does WIN stand for?
16  A  Women's -- I don't know exactly.
17  Q  But Mr. Weekes would be the HR sponsor for all
18  those groups?
19  A  Yes.
20  Q  What does an HR sponsor do?
21  A  Supports us.  Makes sure that we're operating
22  through company procedures.
23  Q  As co-lead of Mosaic, would you be meeting with
24  Mr. Weekes to exchange information?
25  A  All the ERGs meet with Mr. Weekes at the same

Page 49

1  time.
2  Q  Are those regularly set-up meetings?
3  A  Yes.
4  Q  How often do they occur?
5  A  Once a month.
6  Q  Is that by Zoom?
7  A  Teams.
8  Q  Video technology, but Teams instead of Zoom, in
9  other words?
10  A  Yes.
11  Q  And is there an agenda for these monthly ERG
12  meetings with Mr. Weekes?
13  A  Usually, yes.
14  Q  And is that circulated to all the ERGs?
15  A  Yes.
16  Q  And are there minutes kept of these meetings?
17  A  I don't know.
18  Q  Who creates the agenda?
19  A  Mr. Weekes.
20  Q  Did you go to the Race, Equity and Business
21  breakfast where he spoke in Boston in 2022?
22  A  No.
23  Q  Can you look at Exhibit 9 with me, please?  Just
24  tell me when you've got it up.
25     (Exhibit 9 is Mosaic and first annual

Min-U-Script®

Wilson Reporting Agency (423) 267-6000
WilsonReporting.com

(12) Pages 46 - 49

Case 3:24-cv-00076-DCLC-DCP    Document 53-1    Filed 08/15/25    Page 13 of 41
PageID #: 469

Case 8:23-cv-00590-TPB-CPT    Document 114-2    Filed 10/14/25    Page 131 of 171
PageID 2271
TRAVIS WILLIAMS vs.
ALKERMES INC
JODI GARCIA
July 14, 2025

Page 50

1         #buyblack day.)
2    A  Yes, I see that.
3    Q  At the top there's a picture of you, and it says
4  "Jodi Gayle-Garcia reposted this."  Do you see that?
5    A  Yes.
6    Q  Where would you be reposting this?  In other
7  words, is this Facebook, LinkedIn, some other --
8    A  This was LinkedIn.
9    Q  And are you posting this on an Alkermes LinkedIn
10  or a personal LinkedIn, or what?
11    A  Personal.
12    Q  Okay.  But you're reposting something from Harold
13  Weekes, right?
14    A  Yes.
15    Q  And is that also a post on LinkedIn from Mr.
16  Weekes?
17    A  Yes.
18    Q  And I see he references "our Mosaic employee
19  resource group" there in the second paragraph.  Do you
20  see that?
21    A  Yes.
22    Q  And in the second-to-last paragraph down there, he
23  references "Alkermes' first annual at BuyBlack day,
24  encouraging employees to support Black-owned business
25  large and small around the country."  Do you see that?

Page 51

1  Second to the last --
2        MS. RUSIE:  Hashtag, not "at."
3        MR. GILBERT:  Yeah.  Excuse me.
4    Q  "Alkermes first annual #BuyBlack day, encouraging
5  employees to support Black-owned business large and small
6  around the country."  Do you see that?
7    A  Yes.
8    Q  Was Mosaic involved in the first annual #BuyBlack
9  day?
10    A  That is a national day.
11    Q  I'm talking about Alkermes' first annual at
12  BuyBlack day.
13    A  I don't understand your question.
14    Q  Was the Mosaic group involved in getting Alkermes'
15  first annual at BuyBlack day together?
16    A  It was not an Alkermes event.  BuyBlack day is a
17  national event.
18    Q  And was Mosaic involved in creating awareness and
19  support for at BuyBlack day --
20    A  Yes.
21    Q  -- within the company?
22        And was that your idea?
23    A  That was the Mosaic Black History month group
24  putting that together.  That was not my idea.
25    Q  Are you part of that group?

Page 52

1    A  I was part of that group.
2    Q  I asked you a moment ago about the Race, Equity,
3  and Business breakfast in Boston in 2022.  You told me
4  you were not at that.  But if you'll look at Exhibit 10,
5  I want to ask you if you recognize any of these faces.
6  Just tell when you've got that up, please.
7        MR. ADAMS:  I'm going to object to that
8  exhibit as not being exchanged during discovery.
9        (Exhibit 10 race, equity and business,
10         breakfast event.)
11    A  I'm there.
12    Q  Okay.  Do you recognize the person standing and
13  speaking?
14    A  Yes.  That is Pilar Vigil.
15    Q  Can you spell that name for me, please.
16    A  I don't know how you spell her name.
17    Q  Can you say it to me slowly again, please?
18    A  Pilar.
19    Q  Pilar?
20    A  Vigil.
21    Q  P-i-l-a-r and then V-i-g-i-l?  Does that sound
22  right to you?
23    A  That sounds fine.
24    Q  Okay.  And what is her position within the
25  company, if you know?

Page 53

1    A  She's no longer with the company.
2    Q  What was her position in 2022?
3    A  I don't know what her position was in 2022.  I
4  wasn't -- I mean she was the -- I'm sorry.  She was
5  the -- for me, she was -- she took care of like our
6  speaker programs -- I'm sorry, our conventions, making
7  sure our conventions were done well.  I don't know what
8  that title is called.
9    Q  Okay.  And the gentleman seated to Ms. Vigil's
10  right who's looking up at her, do you know who that is?
11    A  That's Steve.
12    Q  Schiavo?
13    A  Schiavo.
14    Q  And Steve Schiavo's position is:
15    A  He's HR.
16    Q  Have you ever discussed your feelings of being
17  ostracized by your district business leaders with Steve
18  Schiavo?
19    A  No.
20    Q  What about the lady sitting and looking directly
21  behind Mr. Schiavo, do you know who that is?
22    A  I do not.
23    Q  Now, to Ms. Vigil's left, it looks like three
24  women there.  The one in the farthest back has glasses on
25  but there's not much to see of her face.  Are you able to

Page 54

1    recognize who that would be?
2    A  No.
3    Q  And what about the one there next to the lady in
4    glasses, do --
5    A  No.
6    Q  -- you know who that is?  You don't know that one?
7    A  No.
8    Q  And then the one at the bottom right, do you know
9    who that is?
10   A  No.
11   Q  Do you know whether Ms. Mikitka reports to Steve
12   Schiavo?
13   A  I don't know that organizational chart.
14        MS. RUSIE: Hey, Justin, we've been going for
15   about an hour.  Do we want to take like a quick break?
16        MR. GILBERT: Yeah.  That sounds like a good
17   idea.
18        (Recess from 10:42 to 10:57.)
19   BY MR. GILBERT:
20   Q  Let's look at Exhibit Number 11.  Tell me when
21   you've got that one up.
22        MR. ADAMS: Justin, just at the outset, I'm
23   just going to object to the extent that it wasn't
24   produced in discovery.
25        (Exhibit 11 is Weekes message.)

Page 55

1    Q  This document appears to be a post from Mr.
2    Weekes, who we were talking about.  I want to ask you a
3    question about -- on the second page, the first sentence
4    there says "We embrace these values at Alkermes by
5    integrating DIB into every aspect of our organization."
6    Do you see that?
7    A  Yes.
8    Q  DIB being diversity, inclusion and belonging.
9        Would you agree that Alkermes integrates DIB into
10   every aspect of the organization?
11   A  Again, this is above my pay grade.  I've not seen
12   this document before.
13   Q  I'm not asking about the document, I'm asking
14   about whether you agree that Alkermes integrates DIB into
15   every aspect of the organization.  You either do or you
16   don't agree with that.
17   A  It's above my pay grade.  Aspects of -- every
18   aspect of the organization, I'm not a part of every
19   aspect of the organization.
20   Q  Okay.  What aspects of the organization are you
21   involved in?
22   A  I'm a district business leader for the Vivitrol
23   team, and I'm an ERG co-lead for Mosaic.
24   Q  Which is the employee resource group, right?
25   A  Yes.

Page 56

1    Q  And is DIB integrated into the district business
2    leader aspect of the organization?
3    A  To what extent?  I don't understand your question.
4    Q  At all.  Is diversity, inclusion and belonging a
5    part of the district business leader function?
6    A  Again, I don't understand your question.  My job
7    is to coach and develop representatives to tell Vivitrol.
8    So I don't understand your question.
9    Q  And what about your role with Mosaic, does that
10   integrate diversity, inclusion and belonging?
11   A  Yes, it does.
12   Q  How does it integrate diversity?
13   A  Mosaic is a group that celebrates, as I said
14   before, all ethnicities of the employees that work at the
15   organization.
16   Q  Including white European Americans you told me,
17   right?
18   A  Yes.
19   Q  Let's go to -- maybe we can get a little more
20   detail on some of this.  Let's go to Exhibit 12.  This is
21   a publicly available Corporate Responsibility Report.
22   And Exhibit 12 is from 2022.
23        MR. ADAMS: And, Justin, we're also going to
24   object to this document not being produced in discovery.
25        (Exhibit 12 is 2022 corporate responsibility

Page 57

1    report.)
2    BY MR. GILBERT:
3    Q  Have you ever seen this document before,
4    Ms. Garcia?
5    A  No.
6    Q  Turn to page 2, please.
7    A  I'm there.
8    Q  Okay.  Do you see the quote from Mr. Pops, CEO, on
9    the top right?
10   A  Page 2?
11   Q  The second page of the document.  It'll be page
12   21.  Do you see that.
13   A  Yes.
14   Q  If you go down beneath Mr. Pops' quotation, to the
15   second full paragraph where it says "The DIB executive
16   committee is tasked with, among other things," and then
17   it begins "Setting diversity, inclusion and belonging
18   goals for the company."  Do you see that?
19   A  Right below his quote?
20   Q  The second full paragraph below his quote.  The
21   first bullet point there.
22   A  Okay.
23   Q  Are you with me?
24   A  Yes.
25   Q  "The DIB executive committee is tasked with, among

Min-U-Script®                    Wilson Reporting Agency (423) 267-6000          (14) Pages 54 - 57
                                         www.wilsonreporting.com
Case 3:24-cv-00076-DCLC-DCP    Document 33-1    Filed 08/15/25    Page 15 of 41
                                        PageID #: 471

Case 8:23-cv-00590-TPB-CPT   Document 114-2   Filed 10/14/25   Page 133 of 171
PageID 2273

TRAVIS WILLIAMS vs.
ALKERMES INC

JODI GARCIA
July 14, 2025

Page 58

1 other things, setting diversity, inclusion and belonging
2 goals for the company."
3      Is Mosaic given the diversity goals for the
4 company?
5   A  I don't remember ever being given diversity goals.
6   Q  I take it then you've never seen any diversity
7 goals for the company?
8   A  No.
9   Q  Let's go to page 24.
10  A  I'm there.
11  Q  The second paragraph -- the first full paragraph
12 begins "We remain focused..."  Do you see that?
13  A  Yes.
14  Q  It says, "We remain focused on achieving greater
15 representation of diverse talent across our organization,
16 particularly in leadership roles, through targeted
17 recruitment and development efforts."
18      Is Mosaic involved in targeted recruitment and
19 development efforts for --
20  A  No.  We're not HR.
21  Q  You told me earlier about ALPFA and NSN, right?
22  A  Uh-huh.
23  Q  Are those recruitment efforts to help with
24 diversity?
25  A  It's not our call if Alkermes chooses to support

Page 59

1 it or not.  We just provide them with the resources, as
2 we are a resource group.
3   Q  Right.  But that's a resource to help provide
4 diverse talent?
5   A  Yes.
6   Q  And sticking with this paragraph again, the next
7 sentence there, again page 24, "We recently established a
8 working group tasked with identifying diversity-related
9 metrics pertinent to our organization, developing a
10 framework for measuring the impact of our efforts and
11 enhancing the collection and use of our diversity data."
12 Do you see that?  See where I read?
13      Ms. Garcia, I think your screen may've frozen.
14      MS. RUSIE:  We lost her.  Can we go off
15 record a second?
16      MR. GILBERT:  Sure.
17      (11:05 to 11:08 off the record.)
18 BY MR. GILBERT:
19  Q  Do you have Exhibit 12 before you, Alkermes
20 Corporate Responsibility Report --
21  A  Yes.
22  Q  -- for 2022?
23      Okay.  I think we were on page 24, and I had asked
24 you to look at the sentence "We recently established a
25 working group tasked with identifying diversity-related

Page 60

1 metrics pertinent to our organization, developing a
2 framework for measuring the impact of our efforts and
3 enhancing the collection and use of our diversity data."
4 Do you see that sentence?
5   A  Yes.
6   Q  Have you ever been on a working group tasked with
7 identifying diversity-related metrics?
8   A  No.
9   Q  Do you know if anyone from Mosaic has been put on
10 a working group tasked with identifying diversity-related
11 metrics?
12  A  I don't know.
13  Q  Do you have any understanding of what the
14 reference of "identifying diversity-related metrics"
15 means?
16  A  No.
17  Q  What about the last clause there, about the "use
18 of our diversity data," do you know how Alkermes collects
19 diversity data?
20  A  I do not.
21  Q  Let's go to 13.  This is the same Corporate
22 Responsibility Report but this one is 2023.
23      MR. ADAMS:  And we're going to object to the
24 extent that this wasn't produced during discovery.
25      (Exhibit 13 is 2023 corporate responsibility

Page 61

1 report.)
2   Q  Have you ever seen this report of Alkermes --
3   A  I need to get to the document, sir.
4   Q  Okay.
5   A  I have it open.
6   Q  Okay.  If you'll go to the second page, which is
7 actually page 20 of the document, there's a picture of
8 Mr. Weekes again, right?
9   A  Yes.
10  Q  The second paragraph says, "We actively encourage
11 Alkermes employees to proactively incorporate a focus on
12 diversity, inclusion and belonging into their day-to-day
13 work activities."
14      Do you see that?
15  A  Yes.
16  Q  Do you feel like Alkermes has encouraged you,
17 Ms. Garcia, to proactively incorporate a focus on
18 diversity, inclusion and belonging into your day-to-day
19 work activities?
20  A  I definitely don't understand that question.
21  Q  Well, I don't know, frankly, what it would mean to
22 incorporate a focus on diversity in day-to-day work
23 activities either.  If I break it down to that, do you
24 understand what that would mean, to proactively
25 incorporate a focus on diversity in day-to-day work

Case 8:23-cv-00590-TPB-CPT    Document 114-2    Filed 10/14/25    Page 134 of 171
PageID 2274
TRAVIS WILLIAMS vs.
ALKERMES INC
JODI GARCIA
July 14, 2025

Page 62

1 activities?
2    A  I know what my job title is and my job
3 description, and it doesn't include that language.
4    Q  And does your day-to-day work activities
5 incorporate diversity somehow?
6    A  No.
7    Q  Okay.  Does your day-to-day activities incorporate
8 inclusion somehow?
9    A  Again, I don't understand the question.
10    Q  This goes on to say, "In 2022," it references some
11 trainings.  Do you see that?
12    A  Yes.
13    Q  And the trainings and the discussions were aimed
14 at "identifying and addressing unconscious bias in the
15 workplace."
16       Have you ever gone to a training or facilitated a
17 discussion about unconscious bias in the workplace?
18    A  At Alkermes, no.
19    Q  Have you undergone discussions or trainings about
20 unconscious bias outside of Alkermes?
21    A  I have been -- gone through a training on
22 unconscious bias.
23    Q  Where was that?
24    A  At Takeda.
25    Q  And what is unconscious bias?  Or at least what is

Page 63

1 unconscious bias in the training that you underwent?
2    A  From what I can recall, it is your own personal
3 biases in general and being able to identify those.
4    Q  And what is the unconscious part?  Like biases
5 you're unaware of?
6    A  That is what unconscious means.
7    Q  And has Mosaic sponsored any trainings about
8 unconscious bias in the workplace?
9    A  No.
10    Q  Turn to page 22 of this document, please.  The
11 heading says Advancing Diversity, Inclusion & Belonging.
12 Do you see that?
13    A  Yes.
14    Q  The first bullet point there says that Alkermes
15 "Launched a diversity dashboard to assist in better
16 understanding the composition of our employee
17 population."  Did you know that Alkermes did that in
18 2022, launched --
19    A  I did not.
20    Q  -- a diversity dashboard?
21    A  I did not.
22    Q  Do you know what the diversity dashboard is?
23    A  I do not know.
24    Q  Do you know whether it's a tracking tool to keep
25 up with diversity metrics such as race?

Page 64

1    A  I do not.
2    Q  Do you know who would run this diversity
3 dashboard?
4    A  I do not.
5    Q  Have you ever seen any reports about company
6 diversity?
7    A  Not that I can recall.
8    Q  All right.  Let's go to Number 14, which is the
9 Corporate Responsibility Report for 2024.
10       MR. ADAMS:  We're also going to object to
11 this document as not being produced in discovery.
12       (Exhibit 14 is 2024 corporate responsibility
13              report.)
14    Q  Tell me when you've got that up?
15    A  Got it up.
16    Q  It's got a picture of Mr. Pops there in the first
17 page, right?
18    A  What page number are you on?
19    Q  The first page of the document itself, which is
20 page 19 at the top right.
21    A  Yes.
22    Q  The quote attributable to Mr. Pops begins "At
23 Alkermes, diversity, inclusion and belonging aren't just
24 words - they represent the unique and varied backgrounds
25 and experiences that our team brings to work each day."

Page 65

1 Do you see that?
2    A  Yes.
3    Q  Do you feel like diversity, inclusion and
4 belonging aren't just words at Alkermes?
5    A  Are you asking that of me personally?
6    Q  Yes.  Do you think it's more than just words,
7 diversity, inclusion and belonging, at Alkermes?
8    A  No.
9    Q  Why do you say that?
10    A  Because of what I've been through at Alkermes.
11    Q  All right.  If you look on the third page, are
12 those the ERG groups?
13    A  Yes.
14    Q  And Mosaic is the one in the middle that you're a
15 co-lead of, right?
16    A  Yes.
17    Q  And is that a fair description of what Mosaic
18 does?
19    A  Yes.
20    Q  All right.  Let's go to page 22.  In the top left
21 corner, Alkermes talks about "Advancing Diversity &
22 Belonging."  Do you see that?
23    A  Yes.
24    Q  The first arrow triangle there says "Defined
25 Alkermes' DIB strategic roadmap for the next three

Page 66

1 years." Have you seen Alkermes DIB strategic roadmap
2 from 2024, 2025 or '26?
3    A   No.
4    Q   Do you know who created the DIB strategic roadmap
5 for Alkermes?
6    A   No.
7    Q   You don't know who would be in charge of that?
8    A   No.
9    Q   But in any event, that strategic roadmap was not
10 shared with you as a co-lead of the Mosaic group,
11 correct?
12    A   Not that I can recall, no.
13    Q   Have you ever seen this Corporate Responsibility
14 Report from 2024 before today?
15    A   No.
16    Q   Look at page 23 with me, from the bottom right.
17 Did you know you were quoted in this?
18    A   No.
19    Q   So am I correct that this is the first time you've
20 ever seen this?
21    A   Yes.
22    Q   Is that even a quote from you?
23    A   It probably was. When I went to Mosaic, they
24 asked us to do a quote for our bio's, yes.
25    Q   Read the quote and tell me if that's something you

Page 67

1 remember saying.
2    A   (Reviewing document.) Yes.
3    Q   Okay. It begins, "As a woman of color and an
4 immigrant..." "Woman of color," that refers to being
5 black American; is that right?
6    A   I'm multicultural actually. I'm not black
7 American.
8    Q   Okay. Tell me what you mean by multicultural.
9    A   I'm from Jamaica, my mother is white, my father is
10 Indian black.
11    Q   Were you born in Jamaica?
12    A   Yes.
13    Q   And then you say "a woman of color and an
14 immigrant..." When did you move to the United States?
15    A   When I was 14.
16    Q   You say you are "proud to be a leader of our
17 Mosaic employee resource group," we've gone over that,
18 "and a member of our commercial team..." What is the
19 commercial team that you're a member of?
20    A   The Vivitrol sales team.
21    Q   Okay. As a district business leader?
22    A   Yes.
23    Q   And you say you've seen "firsthand the power that
24 a focus on diversity, inclusion and belonging can bring
25 to help support patient communities who are often

Page 68

1 underserved," correct?
2    A   Yes.
3    Q   Can you give me some examples of that?
4    A   Of underserved communities and how I've seen that?
5    Q   No, the -- well, yes, yes. The firsthand -- you
6 say you've seen "firsthand the power that a focus on
7 diversity, inclusion and belonging can bring to help
8 support patient communities who are often underserved."
9 What are some firsthand examples of that?
10    A   I was a special education teacher for children
11 with disabilities when I first -- that was my first job
12 out of college. And seeing kids who have disabilities
13 being provided with the correct services and the right
14 opportunities allows them to do better in school,
15 graduate middle school and go on to high school. That's
16 an underserved community. That's an example for you.
17    Q   And is Alkermes involved with special ed kids? Is
18 that something you've seen firsthand with Alkermes?
19    A   My quote was not about Alkermes.
20    Q   Oh. What was it about?
21    A   Me.
22    Q   Oh, I see. And you were a special education
23 teacher. Was that your first career?
24    A   My very first career, yes.
25    Q   All right. You said you're multicultural and -- a

Page 69

1 multicultural background. And did you say your father or
2 your mother was black -- or is black?
3    A   My father is half black.
4    Q   If you'll look at 15 with me. Is this -- tell me
5 when you've got it up.
6        MS. RUSIE: Exhibit 15 or page 15?
7        MR. GILBERT: Exhibit 15.
8        (Exhibit 15 is LinkedIn Black Woman.)
9    A   Yes.
10    Q   What is this document?
11    A   My post on LinkedIn for Black History month.
12    Q   And this is a post about a black woman?
13    A   Yes.
14    Q   And do you agree with that definition of "black
15 woman"?
16    A   Yes.
17    Q   And does that apply to you?
18    A   Yes.
19    Q   And number 2 says a black woman is "subject of
20 extreme abuse and oppression based upon the inaccurate or
21 faulty (racist) perception of inferiority by the
22 oppressor."
23        Are you saying that you yourself have been the
24 subject of extreme abuse and oppression based upon
25 inaccurate or faulty perception by an oppressor?

Min-U-Script®                    Wilson Reporting Agency (423) 267-6000                    (17) Pages 66 - 69
                                         www.wilsonreporting.com
Case 3:24-cv-00076-DCLC-DCP   Document 33-1   Filed 08/15/25   Page 18 of 41
                                         PageID #: 474

Case 8:23-cv-00590-TPB-CPT    Document 114-2    Filed 10/14/25    Page 136 of 171
PageID 2276

TRAVIS WILLIAMS vs.
ALKERMES INC

JODI GARCIA
July 14, 2025

Page 70

1    A   No.
2    Q   But you think that is an accurate definition for a
3   black woman, correct?
4    A   This is a definition.  One of many.
5    Q   And I see on your LinkedIn heading there, it says
6   "District Business Leader - Addiction."  Why do you put
7   your job title on LinkedIn?  Is that just part of the
8   software?
9    A   That's LinkedIn.
10    Q   So it shows your job when you post something?
11    A   Yes.
12    Q   And the persons that are linked to you and could
13   see this would include people at Alkermes, right?
14    A   I believe so.  I'm not the creator of LinkedIn.
15    Q   But you would know who you are linked to and who
16   follows you and who you follow, right?
17    A   It's an open platform.
18    Q   So in other words, this content was not private.
19   Anyone who's a member of LinkedIn could see it?
20    A   I believe so.  I'm not -- again, I'm not the
21   creator of LinkedIn.
22    Q   Did you click any privacy settings on LinkedIn?
23    A   Not that I'm aware of.
24    Q   When did you first meet Travis Williams?
25    A   When did I first meet him?

Page 71

1    Q   Yes.
2    A   Our first physical meeting was at a calibration
3   when I saw him in person in October.
4    Q   Did you say celebration?
5    A   Calibration.  Calibration meeting.
6    Q   Oh, okay.  And you said that was in October?
7    A   Yes.
8    Q   Which year?
9    A   '22.
10    Q   And what is a calibration meeting?
11    A   It is a performance meeting of all the DBLs and
12   the regionals, along with HR, talking about all the
13   employees that work within the region.
14    Q   Was this an in-person meeting?
15    A   Yes.
16    Q   And where did this take place?
17    A   In Tampa.
18    Q   Had you ever spoken to him previously?
19    A   On leadership calls, not -- in group setting, yes,
20   in our --
21        (Audio distortion.)
22        THE REPORTER:  Wait a minute.  I didn't hear
23   the question.
24        MR. ADAMS:  My audio had cut out there too.
25        MR. GILBERT:  Let's start over and see if we

Page 72

1   can clear this up.
2    Q   Prior to this calibration meeting in October of
3   2022, you had spoken with Mr. Williams but it was all
4   just general business topics; is that correct?
5    A   Yes.
6    Q   At the calibration meeting in Tampa, where were
7   you when you first met him?
8    A   I believe we met for dinner.  That was our initial
9   meeting, the district -- the regional meet dinner.
10    Q   And who was present for that dinner?
11    A   All of the DBLs in the East and our regional.
12    Q   And did you sit with Mr. Williams at dinner?
13    A   No.  We all were at a table, but no.
14    Q   Can you remember anything you said to him or he
15   said to you at this calibration meeting dinner?
16    A   No.
17    Q   When was the next time you met with Mr. Williams?
18    A   The national sales meeting.
19    Q   How many total conversations would you say you've
20   had with Mr. Williams?
21    A   Again, physically I've met him twice.  All of our
22   interactions were during business calls and regional
23   meetings.
24    Q   Okay.  So the first time would be the calibration
25   meeting in October of 2022, and the next time would be

Page 73

1   the national sales meeting in March of '23?
2    A   Yes.
3    Q   And those are the only times you've spoken to him
4   in person?
5    A   Yes.
6    Q   And all of your telephone calls or Zoom meetings
7   have all been business related and not personal?
8    A   We've never had -- all of our meetings have been
9   on the regional calls.
10    Q   Okay.  But they were all business related, nothing
11   personal?
12    A   Business related.
13    Q   So you've never talked to him about your love of
14   sports, I take it?
15    A   I talk to everyone in our region about my love of
16   sports.
17    Q   And has Mr. Williams ever expressed what teams he
18   roots for on any of these calls?
19    A   Yeah.
20    Q   Who does he root for?
21    A   I believe it's the Volunteers.
22    Q   And you would've learned that from these business
23   calls?
24    A   We talk -- our team will have conversation about
25   our families, about what we support.  I happen to have

Page 74

1   two kids who play college football.  I talk to everyone
2   about that.
3     Q   When you say "team," who's on the team that you're
4   referring to?
5     A   Our regional -- our leadership team.
6     Q   Okay.  And so through that you would share your
7   love of sports, the fact you've got two kids that play
8   football, and Mr. Williams would talk about how he roots
9   for the UT Vols?
10    A   Yes.
11    Q   Okay.  But then in person, you said there's only
12  been two meetings, the second of which was March of 2023
13  at the national sales meeting, right?
14    A   Yes.
15    Q   And where did that meeting take place?
16    A   Orlando, Florida.
17    Q   And how far are you from Orlando?
18    A   About an hour and 45 minutes to two hours,
19  depending on traffic.
20    Q   And as I understand it, the first day of the
21  national sales meeting would've been Thursday, March 2nd,
22  2023.  Is that right or wrong?
23    A   I don't recall.
24    Q   How long are the national sales meetings?  How
25  many days?

Page 75

1     A   Three, four days.
2     Q   Is it an annual meeting?
3     A   Yes.
4     Q   Is this the first one you'd ever been to for
5   Alkermes?
6     A   Yes.
7     Q   Are they full days each day of these three to four
8   days?
9     A   Yes.
10    Q   And do you attend various meetings with the
11  leadership team?
12    A   With our district, yes.
13    Q   Now, would Mr. Williams be part of your district?
14    A   No.
15    Q   So you would mostly be with your district team
16  members and Mr. Williams would mostly be with his
17  district team?
18    A   Yes.
19    Q   How many -- well, strike that.  Is the national
20  sales meeting, does it go beyond district business
21  leaders, or is it just district business leaders and
22  representatives?
23    A   It's the entire organization.
24    Q   And what is your understanding of the purpose of
25  the national sales meeting?

Page 76

1     A   It is to bring our people together for
2   development, and also to discuss performance and plans
3   for the next upcoming fiscal year.
4     Q   Did you have any meetings with Mr. Williams during
5   the national sales meeting?
6     A   I don't understand your question.
7     Q   Let's leave out the Amazing Race game.  I'll get
8   to that in a minute.  But leaving that aside, were there
9   any meetings where you and he would be attending
10  together?
11    A   It was the entire organization.  So everyone was
12  in different rooms.  We were all over the place.
13    Q   But you don't recall any interactions with him, I
14  take it?
15    A   Not that I can remember.  Other than our regional
16  dinner, no.
17    Q   And the regional dinner, where was that?
18    A   In Orlando.
19    Q   I mean which restaurant?
20    A   I don't remember the name of the restaurant.
21    Q   But it was during this national sales meeting?
22    A   Yes.
23    Q   And who went to this regional dinner?
24    A   Our regional and all the district business
25  leaders.

Page 77

1     Q   Would that have been Mr. Bauer, the regional?
2     A   Yes.
3     Q   Was that before or after the Amazing Race?
4     A   Before.
5     Q   And do you remember anything you said to
6   Mr. Williams at the regional dinner?
7     A   No.
8     Q   Do you remember anything he said to you at the
9   regional dinner?
10    A   No.
11    Q   Okay.  Other than this Amazing Race game, did you
12  have any conversations with Mr. Williams that you can
13  recall during the national sales meeting?
14    A   No.
15    Q   Did Ms. Hernandez attend the national sales
16  meeting?
17    A   Yes.
18    Q   Did Alkermes put everybody up in a hotel?
19    A   Yes.
20    Q   Which hotel was that?
21    A   I don't remember the hotel name.
22    Q   Were the meetings in the hotel?
23    A   Yes.
24    Q   How many reps reported to you in March of 2023?
25    A   Eight.

Page 78

1  Q  And who were they?
2  A  Tom Flanagan, Will Barnett, Lynden Hall, Joel
3  Duffey, John Flood, Johanna Hernandez, Robby Martina --
4  sorry, Menendez.  And who was my eighth?  Teresa Jackson.
5  Q  And remind me, you were in the Eastern region; is
6  that right?
7  A  Yes.
8  Q  And do you remember what states those persons that
9  you just named for me came from -- which states they were
10 over, rather?  Like Tom Flanagan, which states did he
11 work.
12 A  Alabama and the Florida Panhandle.
13 Q  And what about -- what did you say Will's last
14 name was?
15 A  Barnett.
16 Q  What was he?
17 A  Georgia.
18 Q  The next one was Linda or Lydia?
19 A  Lynden.
20 Q  Lynden.
21 A  South Carolina.
22 Q  What was the last name of Lynden?  Or is that the
23 last name?
24 A  Hall.
25 Q  Lynden Hall?

Page 79

1  A  Yes.
2  Q  Okay.  Did you say South Carolina?
3  A  Yes.
4  Q  And Flood was where?
5  A  John Flood is considered Tampa.
6  Q  And then Hernandez?
7  A  South Florida.
8  Q  And Menendez?
9  A  He's considered Southeast Florida.
10 Q  And then Jackson?
11 A  Oh, I forgot Joel.  Joel Duffey is Jacksonville,
12 and Teresa was Orlando.
13 Q  Teresa Jackson is Orlando?
14 A  Yes.
15 Q  And Joel Duffey you said is -- did you say --
16 A  Jacksonville.  The territory is called North
17 Florida.
18 Q  And those were all the reps who attended in
19 Orlando, the national sales meeting in March of 2023; am
20 I right?
21 A  Yes.
22 Q  Do all of those sales reps still report to you?
23 Are they still employed?
24 A  No.
25 Q  Which ones are no longer employed?

Page 80

1  A  Robby Menendez is no longer with the organization.
2  Teresa now works for Michael Dunkerley.  She transferred.
3  Q  Which one is Teresa?  What's her last name?
4  A  Jackson.
5  Q  All the others are still reporting to you?
6  A  Yes.  I'm sorry.  Will Barnett no longer works for
7  the organization.
8  Q  Were any of those persons terminated?
9  A  Robby Menendez.
10 Q  How do you know about that?
11 A  Excuse me?
12 Q  How do you know Robby Menendez was terminated?
13 A  Because I terminated him.
14 Q  So you have the power to fire?
15 A  With the help of HR, yes.
16 Q  And what did you fire Robby Menendez for?
17 A  Lack of performance.
18 Q  When did that happen?
19 A  Last year.
20 Q  2024?
21 A  Yes.
22 Q  Do you know if Menendez has taken any legal
23 action?
24 A  No.
25 Q  Do you know where he lives?

Page 81

1  A  Yes.  He lives in West Palm Beach, Florida.
2  Q  Do you know where he works now?
3  A  No, I do not.
4  Q  All right.  Let's talk about the Amazing Race game
5  on Thursday March 2nd, 2023.  Before we get to that, was
6  there a lead-in event that day?  In other words, what
7  happened right before the Amazing game -- Amazing Race?
8  A  I don't recall.
9  Q  And how did you learn there would be this game
10 called Amazing Race?
11 A  I don't recall specifically.
12 Q  Do you recall where the Amazing Race game was
13 held?
14 A  At the hotel.
15 Q  In a conference room in the hotel?
16 A  Yes.
17 Q  And were you told where you would sit?
18 A  We were assigned seats.
19 Q  Who assigned you your seats?
20 A  I don't know.
21 Q  How did you know where to go?
22 A  There was a sign that had my district's name on
23 it.
24 Q  Was that sign on a table?
25 A  Yes.

Case 3:24-cv-00076-DCLC-DCP    Document 83-1    Filed 08/15/25    Page 21 of 41
PageID #: 477

Case 8:23-cv-00590-TPB-CPT     Document 114-2     Filed 10/14/25     Page 139 of 171
PageID 2279

TRAVIS WILLIAMS vs.
ALKERMES INC

JODI GARCIA
July 14, 2025

Page 82

1  Q   What's the name of your district?
2  A   The Southeast.
3  Q   Southeast?
4  A   Yes.
5  Q   So there was a placard on a table that said
6  Southeast?
7  A   Yes.
8  Q   Was it a round table?
9  A   I believe so.  I don't recall.
10 Q   I take it you went there and you sat?
11 A   Yes.
12 Q   And your representatives sat with you?
13 A   Yes.
14 Q   Were all the representatives we just went through
15 present at your table?
16 A   Yes.
17 Q   So that would've been Flanagan, Barnett, Lynden
18 Hall, Duffey, Jackson, Menendez, Hernandez, and Flood?
19 A   Yes.
20 Q   And you were all at one table or were there
21 multiple tables for your group?
22 A   One table.
23 Q   So the table was big enough to accommodate all of
24 you?
25 A   Yes.

Page 83

1  Q   Was it a round table?
2  A   I don't recall.
3  Q   How many tables were in the room?
4  A   I don't know.
5  Q   So you enter the room, you go to your table,
6  everyone sits down.  Do you remember who explained the
7  game?
8  A   I believe it was Michael Bauer.
9  Q   What do you recall him saying about the game?
10 A   I don't remember specifics.  Again, this is two
11 and a half years ago.
12 Q   Generally what do you recall about how the game
13 would be played?
14 A   We were -- the DBLs were to run to the front of
15 the room based on questions that were asked of the
16 representatives.
17 Q   And who was asking these questions?
18 A   I don't recall.  It probably was Bauer.
19 Q   And you said the district business leaders would
20 run to the front of the room, right?
21 A   Yes.
22 Q   And the front of the room, was there an X on the
23 floor at the front of the room?
24 A   I don't remember.
25 Q   Why would the DBLs be running to the front of the

Page 84

1  room?
2  A   To provide the answers that the representatives
3  came up with.
4  Q   And you believe -- you're not sure, but you
5  believe it may've been Mr. Bauer who was asking the
6  questions?
7  A   Yes.
8  Q   How many rounds of questions were there?
9  A   I don't recall.
10 Q   Was Mr. Bauer standing on a stage?
11 A   I don't recall.
12 Q   Do you recall if there was a stage?
13 A   No.
14 Q   And would the DBLs consult with their
15 representatives at the table about the correct answer to
16 the question before running up --
17 A   Yes.
18 Q   Yes?
19 A   Yes.
20 Q   And would the DBL write the answer that the table
21 consulted on on a white paddle?
22 A   The representatives wrote the answer.
23 Q   On a white paddle and then handed it to the
24 district business leader who then ran to the front?
25 A   Yes.

Page 85

1  Q   And what happened if multiple district business
2  leaders arrived at the front simultaneously?
3  A   We'd have to line up.
4  Q   So it was a race to see who would get there first?
5  A   Yes.
6  Q   You agree there was light pushing and shoving in a
7  competitive nature?
8  A   Yes.
9  Q   How many times would you say you made it to the
10 first in line?
11 A   I don't recall.
12 Q   Were you ever first in line?
13 A   I don't recall.
14 Q   Do you remember how many points your team earned
15 in the Amazing Race game?
16 A   I don't recall.
17 Q   Where was your table in relationship to the front
18 of the room?
19 A   We were far right front.
20 Q   Was there a table behind you?
21 A   I don't recall.
22 Q   Was there a row of tables on the front?
23 A   Yes.
24 Q   How many rows would you say were on the front?
25 A   I don't know.

Case 8:23-cv-00590-TPB-CPT   Document 114-2   Filed 10/14/25   Page 140 of 171
PageID 2280
TRAVIS WILLIAMS vs.
ALKERMES INC

JODI GARCIA
July 14, 2025

Page 86

1  Q  When you say "we were at the far right," were you
2  up against the wall?
3  A  Not up against but close to.
4  Q  How many feet from the front where you would have
5  to take the paddle would you have been?
6  A  I don't know.
7  Q  Do you know where Mr. Williams' table was?
8  A  No.
9  Q  Did he sit with his representatives?
10  A  I don't know.
11  Q  He didn't sit at your table, right?
12  A  No.
13  Q  Let's look at Exhibit 16.
14      MR. ADAMS: We object to this, to the extent
15  that I don't believe this picture was produced in
16  discovery.  And if it was produced, can you provide a
17  Bates label number?
18      MR. GILBERT: I don't know if we provided
19  this one in discovery or not.  I can look when we take a
20  break.
21      (Exhibit 16 is game pics DBLs in line.
22      PLF 00096.)
23  BY MR. GILBERT:
24  Q  Do you have the picture up, Ms. Garcia?
25  A  Yes.

Page 87

1  Q  Is this a picture of the room where the Amazing
2  Grace -- where the Amazing Race was held?
3  A  Yes.
4  Q  And who is that on the stage there?
5  A  Michael Dunkerley.
6  Q  And who is he?
7  A  He's a district business leader in a region.
8  Q  Do you know what region he is?
9  A  I believe it's Mid-Atlantic South.
10  Q  Have you seen a video of the Amazing Race game?
11  A  No.
12  Q  Have you seen this picture before today?
13  A  No.
14  Q  Do you know who took this picture?
15  A  No.
16  Q  Do you see the legend at the bottom?  It says
17  2023_alkermes_nsm_thursday and then it has some numbers
18  and a jpg there?
19  A  Yes.
20  Q  Do you know whether Alkermes has pictures of the
21  Amazing Race game?
22  A  I don't know.
23  Q  You told me Mr. Dunkerley is on the stage there.
24  Was he keeping score?
25  A  I don't recall.  Looks like that way.  I don't

Page 88

1  know.
2  Q  The next person next to Mr. Dunkerley, that's
3  Mr. Williams holding the paddle there, right?
4  A  Yes.
5  Q  And how about the person that is seated there with
6  his hands in front of his face, do you know who that is?
7  A  Yes.  That's Jason Holbrook.
8  Q  And what region is he?
9  A  At the time, he was in Mr. Williams' district.
10  Q  So we know that would not have been your table
11  right there, correct?
12  A  Yes.
13      MR. GILBERT: Mr. Adams, I think that this is
14  PLF96.  It's probably just too black on the document.
15  Q  All right.  To the right of Mr. Williams, the
16  gentleman there that looks like he's pulling up his
17  sleeve, who is that?
18  A  Gabe Thomas.
19  Q  And where is he?
20  A  Ohio.
21  Q  And there's a gentleman partial eclipsed behind
22  him.  Who's that?
23  A  I can't see who that is.
24  Q  All right.  What about the next gentleman?
25  A  Tom Azzariti.

Page 89

1  Q  And where's he from?
2  A  New York.
3  Q  And then it looks like you're the next person in
4  line there; is that right?
5  A  Yes.
6  Q  So is this a picture taken during the Amazing Race
7  game showing how you-all would line up?
8  A  Yes.
9  Q  By this point in the game, as illustrated by the
10  picture, which is Exhibit 16, had Mr. Williams touched
11  you with his paddle in any way?
12  A  I don't remember the timing.
13  Q  On the easel there where Mr. Dunkerley is keeping
14  score, it looks like there's a point awarded to MAS.
15  What is MAS?
16  A  Mid-Atlantic South.
17  Q  Does this appear that this might be the first
18  question or possibly the second question of the game?
19  A  I don't know.
20  Q  Okay.  Did you continue playing the game after you
21  say Mr. Williams touched you with the paddle?
22  A  I don't remember when the timing of that was.
23  Q  So you have no memory of whether you continued in
24  the game after this alleged touching.  Am I understanding
25  that correctly?

Case 8:23-cv-00590-TPB-CPT   Document 114-2   Filed 10/14/25   Page 141 of 171
PageID 2281

TRAVIS WILLIAMS vs.
ALKERMES INC

JODI GARCIA
July 14, 2025

Page 90

1   A   I don't remember when -- the timing of the
2   touching.
3   Q   Okay.  Let's look at Exhibit 17.  Tell me when
4   you've got that up.
5       (Exhibit 17 is game pic Garcia on X.
6       PLF 00095.)
7   A   It's up.
8   Q   Is this a picture of you during the Amazing Race
9   game?
10  A   Yes.
11  Q   It looks like you are standing on an orange X,
12  right?
13  A   Yes.
14  Q   Is that where you-all would run to?
15  A   Yes.
16  Q   And then whoever got there first would line up
17  first and the others line up in single file behind,
18  right?
19  A   Yes.
20  Q   The man immediately behind you with the bent knee
21  and a smile on his face, who is that?
22  A   Tom Azzariti.
23  Q   Did he ever touch you during the Amazing Race
24  game?
25  A   He may've put his hand on my shoulder.  That's

Page 91

1   about it.
2   Q   And do you know who the person is behind you whose
3   face is eclipsed?
4   A   I can't tell who that is.
5   Q   At the time of this picture, do you know whether
6   anyone had touched you inappropriately with a paddle?
7   A   No.
8   Q   All right.  Let's go to 18.  Tell me when you've
9   got that one up.
10      (Exhibit 18 is game pics array ALKS 000097.)
11  A   I'm there.
12  Q   This looks like a series of pictures from the
13  Amazing Race game, right?
14  A   Yep.
15  Q   And then at the top I see your name, and I also
16  see Michael Bauer's name.  Was this a team meeting where
17  you-all were talking about the game?
18  A   Yes.
19  Q   And these are some pictures taken from the game?
20  A   Yes.
21  Q   You didn't take these pictures, I take it, right?
22  A   No.
23  Q   Who had these pictures to put them on this Teams
24  meeting?
25  A   Mr. Bauer.

Page 92

1   Q   And are the pictures -- were there several
2   pictures as indicated at the bottom of this photograph?
3   A   I just remember those photos.
4   Q   You just remember the three that are --
5   A   Yes.
6   Q   -- in the middle?  All right.
7       The one at the top left appears to be a wide angle
8   shot of the one we just looked at, which is Exhibit 17.
9   It shows you standing there on the X?
10  A   Yes.
11  Q   And who is that running towards you in that
12  picture?
13  A   Mr. Bauer.
14  Q   And the table with the chair that's closest in the
15  picture, is that where Mr. Williams' table would've been?
16  A   I don't know.
17  Q   Is your table visible in that picture?
18  A   No.
19  Q   Where would your table have been in relationship
20  to this picture?
21  A   To the right.
22  Q   Look at the picture on the bottom left where
23  you-all are in line, do you see that?
24  A   Yes.
25  Q   Who is the man with his hand upon your shoulder?

Page 93

1   A   Mr. Azzariti.
2   Q   And the gentleman next in line, a little bit in
3   the distance in the picture, is that Mr. Williams?
4   A   Yes.
5   Q   Then Mr. Bauer?
6   A   Yes.
7   Q   Then who?
8   A   Mr. Thomas.
9   Q   And by the time this photo was taken, do you know
10  whether anyone had inappropriately touched you with a
11  paddle?
12      MS. RUSIE: Objection.  Asked and answered.
13      THE WITNESS: Yes, thank you.
14  Q   You can go ahead.
15  A   I don't recall.
16  Q   Okay.  At the top of Exhibit 18 it says Friday,
17  March 24.  Is that when you-all were looking at these
18  pictures on a Teams meeting?
19  A   Yes.
20  Q   What was the purpose of that look at these
21  pictures at the Teams meeting?
22  A   I didn't post them, so I don't know.
23  Q   Why was the meeting called?
24  A   Mr. Bauer called.  It was end of celebration, just
25  end of quarter, us yet getting together.

Case 8:23-cv-00590-TPB-CPT    Document 114-2    Filed 10/14/25    Page 142 of 171
PageID 2282

TRAVIS WILLIAMS vs.
ALKERMES INC

JODI GARCIA
July 14, 2025

Page 94

1    Q   So this meeting was obviously after the national
2  sales convention had taken place, right?
3    A   Yes.
4    Q   Do you know who took the photos?
5    A   No.
6    Q   Do you know where Mr. Bauer would have gotten
7  photos?
8    A   No.
9    Q   Now, there is a word blurb in the middle of this
10 picture that says "Watch those paddles gentlemen."  Do
11 you know who wrote that?
12   A   Mr. Bauer.
13   Q   All right.  You told me multiple times you don't
14 recall when during the game you were touched with the
15 paddle.  Let me ask you this:  Did it occur while you
16 were in line at the X?
17   A   It occurred while I was in line.
18   Q   Do you remember who was in front of you or behind
19 you?
20   A   No.
21   Q   Do you remember how close to the X you were?
22   A   No.
23   Q   But you were clearly at the front of the room,
24 near the X, waiting in line?
25   A   Yes.

Page 95

1    Q   So it didn't occur during the running, it occurred
2  while you were in line?
3    A   Yes.
4    Q   Did it occur while there was some light pushing or
5  shoving or jostling to get to the X?
6    A   I don't recall.
7    Q   Did Mr. Williams say anything to you at the time
8  you say he touched you with the paddle?
9    A   No.
10   Q   So in your words, tell me what you say
11 Mr. Williams did with the paddle.
12   A   He tapped me on my butt with the paddle.
13   Q   Did you see him tap you on the butt or just feel
14 it?
15   A   I felt him tap me on my butt.
16   Q   So you did not see him tape you on the butt but
17 you did feel it?
18   A   I turned around and saw him standing right there.
19   Q   My question is whether you saw him take the paddle
20 and tap you on the butt.
21   A   No.
22   Q   All right.  You feel it and you immediately turn
23 around; is that right?
24   A   Yes.
25   Q   And you see Mr. Williams standing there?

Page 96

1    A   Yes.
2    Q   But he doesn't say anything, correct?
3    A   No.
4    Q   But you do speak, right?
5    A   Yes.
6    Q   And what do you say?
7    A   I told him my husband would fuck him up on sight.
8    Q   I mean, with that kind of language, I assume you
9  felt violated and you were angry about it?
10   A   Yes.
11   Q   Did you raise your voice to him?
12   A   I didn't yell at him.
13   Q   Did you raise your voice?
14   A   I was close enough to him to where I turned
15 around, looked at him, and told him "my husband would
16 fuck you up on sight," exactly how I'm saying it to you.
17   Q   No louder than what you're saying it to me right
18 now?
19   A   Yes.
20   Q   And did you say anything else to him?
21   A   No.
22   Q   Just "my husband would fuck you up on sight"?
23   A   Yes.
24   Q   And do you know who was in front of you?
25   A   No.

Page 97

1    Q   Do you know if anyone in line heard you say "my
2  husband would fuck you up on sight"?
3    A   No.
4    Q   You're not saying you whispered it, are you?
5    A   No.
6    Q   Was the room itself kind of loud, considering
7  there was a game going on?
8    A   Yes.
9    Q   And once you said to Mr. Williams, "my husband
10 would fuck you up on sight," what was his reaction?
11   A   I don't recall.
12   Q   Did he say anything?
13   A   No.
14   Q   And after you told him that your husband would
15 fuck him up on sight, did you then turn back around?
16   A   I think I went to my seat.
17   Q   So you left the line and went to your seat?
18   A   Yes.
19   Q   You said he tapped you on the butt.  I take it it
20 didn't physically hurt.  Am I right about that?
21   A   No.
22   Q   I'm not right or I am right?
23   A   It did not hurt.
24   Q   Okay.  I take it it didn't make a loud noise?
25   A   For me to hear, yes.

Case 8:23-cv-00590-TPB-CPT    Document 114-2    Filed 10/14/25    Page 143 of 171
PageID 2283
TRAVIS WILLIAMS vs.
ALKERMES INC

JODI GARCIA
July 14, 2025

Page 98

1  Q  You heard the tap on the butt?
2  A  I heard and I felt it, yes.
3  Q  And you leave the line and you go back to your
4  table; is that right?
5  A  Yes.
6  Q  And did you speak to anybody about what just
7  happened when you got back to the table?
8  A  No.
9  Q  And who then would be the first person that you
10  told about being tapped on the bottom by Mr. Williams?
11  A  The first person?
12  Q  Yes.  The first person you told.
13  A  My direct report.  My supervisor, Mr. Bauer.
14  Q  So it wasn't anybody at your table?
15  A  No.
16  Q  And was this after the game that you told
17  Mr. Bauer?
18  A  We were -- we'd left the room.
19  Q  Same day?
20  A  Yes.
21  Q  Was it immediately after the game was over and you
22  left the room that you told Mr. Bauer?
23  A  I don't remember the exact timing, but it was soon
24  after we left the room.
25  Q  It was before the next event?

Page 99

1  A  Yes.
2  Q  Do you remember what the next event was?
3  A  No.
4  Q  So you see Mr. Bauer at the game.  And where did
5  you say you saw him?
6  A  We were leaving the room.  We left the room.  I
7  don't remember where.
8  Q  And what did you tell Mr. Bauer?
9  A  Exactly what happened.
10  Q  Give me your words.  Tell me the words you used
11  when you spoke to Mr. Bauer.
12  A  I told him that Travis tapped me on the ass and
13  that I cussed him, that I said my husband would fuck him
14  up on sight.
15  Q  And why did you tell this to Mr. Bauer?
16  A  Because it was inappropriate for him to put his
17  hands on me.
18  Q  Did his hands ever touch you?
19  A  No.  It was inappropriate for him to touch me in
20  any way.
21  Q  And so you say to Mr. Bauer, "Travis tapped me on
22  my ass, and my husband would fuck him up on sight."  Did
23  you ask Mr. Bauer to do anything?
24  A  No.
25  Q  What did you hope would come from telling that to

Page 100

1  Mr. Bauer?
2  A  I didn't hope anything.
3  Q  So why even tell him?
4  A  It was the correct thing to do.
5  Q  Okay.  Did Mr. Bauer say anything after you told
6  him that?
7  A  His direction was for me to speak to Stephanie
8  Walker.
9  Q  And Stephanie Walker is human resources, right?
10  A  Yes.
11  Q  Was she at the national convention there in
12  Orlando?
13  A  Yes.
14  Q  And did you say anything else to Mr. Bauer or
15  Mr. Bauer say anything else to you?
16  A  No.
17  Q  Who was the next person that you spoke to about
18  Mr. Williams allegedly tapping you on the butt?
19  A  Ms. Walker.
20  Q  And when did that conversation take place?
21  A  I don't recall.
22  Q  Same day?
23  A  It was probably the same day, yes.
24  Q  So you went and found Ms. Walker?
25  A  I believe Ms. Walker found me.

Page 101

1  Q  Okay.  And tell me about that conversation.  What
2  did you tell her and what did she say?
3  A  I told her exactly what I just stated, that
4  Mr. Williams tapped me on the ass with the paddle and
5  what I said.
6  Q  Okay.  And what did she say?
7  A  She told me not to worry, you know.  She wanted to
8  make sure I was okay, and, you know, they'd get back to
9  me.  That was it.
10  Q  Had she already heard of this from Mr. Bauer?  Do
11  you know?
12  A  I don't know.
13  Q  How long was your conversation with Ms. Walker?
14  A  Maybe 5, 10 minutes.
15  Q  Were you in a conference room or private space?
16  A  I believe we were in a hallway.
17  Q  Did she take notes?
18  A  I don't recall.
19  Q  Did she ask you if there were any witnesses?
20  A  Yes.
21  Q  What did you say?
22  A  I did tell her that my representative came to me
23  and asked me if I was okay.
24  Q  Okay.  So between your conversation with Mr. Bauer
25  and Ms. Walker, you say a representative came and talked

Page 102

1  to you?
2  A  Yes.
3  Q  And where did that conversation take place?
4  A  In the hallway.
5  Q  Also right after the game?
6  A  Yes.
7  Q  And who was that representative?
8  A  Johanna Hernandez.
9  Q  And tell me exactly what she said.
10  A  She asked me if I was okay, and that she couldn't
11  believe that he did that.
12  Q  So she comes up to you and says, "Are you okay?  I
13  can't believe he did that"?
14  A  Yes.
15  Q  And what did you say?
16  A  I was fine.
17  Q  Did you ask her what she was talking about?
18  A  I knew what she was talking about.
19  Q  Did you ask her if she saw anything?
20  A  I did.
21  Q  And what did -- tell me, what did you ask her?
22  A  I asked her what did she see.
23  Q  And what did she say in response to your question
24  "what did you see"?
25  A  She saw and heard him tap me on the ass.

Page 103

1  Q  Were those her words, I saw and heard --
2  A  I don't know her exact words.
3  Q  The substance was that she saw and heard
4  Mr. Williams tap you on the ass?
5  A  Yes.
6  Q  And where was she at the time she supposedly saw
7  and heard him tap you on the ass?
8  A  At the table.
9  Q  And this table was the table at which your group
10  was sitting, on the far right; am I right?
11  A  Yes.
12  Q  And when she said that she saw and heard
13  Mr. Williams tap you on the ass, what did you say?
14  A  I told her I'm sorry she saw that, and as her
15  manager it's my duty that I will make sure that I report
16  this.
17  Q  What's that mean, as her manager you will report
18  it?  I don't follow that.
19  A  Part of my role, if my employee sees something
20  that offends them, I also have to report it.
21  Q  So until Ms. Hernandez spoke to you, had you
22  decided whether you were going to report it to human
23  resources?
24  A  No, I had not.
25  Q  But based on what she said she saw and heard, that

Page 104

1  convinced you you should go forward and make the report
2  to Ms. Walker?
3  A  It was the right thing to do.
4  Q  And so we go to Ms. Walker.  Go back to this
5  conversation.  You tell her the same thing you told
6  Mr. Bauer.  She asked you if there's witnesses, and you
7  say your representative Hernandez came up to you and said
8  that she saw and heard Mr. Williams tap you on the ass.
9  Have I got it?
10  A  Yep.
11  Q  Yes?
12  A  Yes.
13  Q  And what else did Ms. Walker say to you?
14  A  That was the extent of our conversation, as we
15  were getting ready to go into president's club.
16  Q  Did you ask her to do anything about it?
17  A  I'm sorry?
18  Q  Did you ask her to do anything about it?
19  A  No.
20  Q  Did she say she would do anything about it?
21  A  Again, she said that she hoped I was okay and that
22  they would get back to me.
23  Q  Did she say they were going to launch an
24  investigation?
25  A  Again, I don't recall her saying that.

Page 105

1  Q  Did she ask you if you minded if she spoke to
2  Travis Williams?
3  A  She -- I didn't ask for that, nor did she say that
4  to me.
5  Q  I take it you wouldn't have minded, right?
6  A  No.
7  Q  Do you know whether she did speak to Travis
8  Williams in Orlando?
9  A  I don't know.
10  Q  You said you-all were going to the president's
11  club meeting next?
12  A  The dinner, yes.
13  Q  Did you also tell Ms. Walker that your husband
14  will fuck him up on sight?
15  A  Yes.
16  Q  Did she tell you you should not have threatened
17  him?
18  A  I don't recall.
19  Q  Did she make any comment about violence,
20  threatening violence is not appropriate, Ms. Garcia?
21  A  I don't recall.
22  Q  The president's club dinner, was that held at the
23  hotel?
24  A  Yes.
25  Q  What does president's club refer to?

Case 8:23-cv-00590-TPB-CPT    Document 114-2    Filed 10/14/25    Page 145 of 171
PageID 2285

TRAVIS WILLIAMS vs.                                              JODI GARCIA
ALKERMES INC                                                    July 14, 2025

Page 106

1  A  It is our annual -- when our top representatives
2  are awarded president's club they go on a trip.
3  Q  Does that include DBLs?
4  A  Yes.
5  Q  And how many DBLs can make president's club?
6  A  One.
7  Q  And did any DBLs make president's club that year?
8  A  Yes.
9  Q  Who was that?
10  A  I don't recall.
11      MR. GILBERT: We've been going for a little
12  over an hour.  Would you-all like a little break and then
13  we can go to a new topic?
14      MS. RUSIE: Sure.
15      MR. ADAMS: Yeah, that's fine.
16      MR. GILBERT: We can keep going if you want,
17  but this would be a logical time to take a break, if
18  you'd like.
19      MS. RUSIE: Perfect.  Yeah.
20      (Recess from 12:18 to 12:34.)
21  BY MR. GILBERT:
22  Q  Ms. Garcia, we were finishing up Thursday, March
23  2nd, talking about the president's club dinner.  Did you
24  actually go to the dinner?
25  A  Yes.

Page 107

1  Q  Did you sit with your representatives at the
2  dinner?
3  A  Yes.
4  Q  Same representatives who sat at the table of the
5  Amazing Race game?
6  A  Yes.
7  Q  Did you tell anybody at your table that you told
8  Mr. Williams that your husband would fuck him up on
9  sight?
10  A  Not that I recall, no.
11  Q  And maybe just to state the obvious "fuck him up
12  on sight" means physical violence to harm Mr. Williams,
13  right?
14  A  No.
15  Q  What does "fuck him up on sight" mean?
16  A  That my husband -- if my husband -- if he put
17  his -- touched me in any way, shape or form it would be
18  an issue.
19  Q  What does that mean, "fuck you up"?
20  A  It would be an issue.
21  Q  That's what you thought "fuck you on sight" means,
22  it will be an issue?
23  A  Yes.
24  Q  All right.  So at this table you did not mention
25  that to any of your representatives, right?

Page 108

1  A  Not that I recall, no.
2  Q  Did you speak to any of the DBLs about what you
3  say happened during the dinner?
4  A  No.
5  Q  Why is that?
6  A  Because I was with my team the entire time.  Other
7  than taking a regional photo, I was with my team the
8  entire time.
9  Q  So you didn't go to any of the DBLs to see if they
10  witnessed what you say happened, correct?
11  A  No.
12  Q  Have you ever done that, asked any of the DBLs
13  whether they witnessed it?
14  A  No.
15  Q  So as of the end of the evening on March 2nd,
16  2023, the only witness that you know of to Mr. Williams
17  touching you inappropriately would be your representative
18  Ms. Hernandez; is that right?
19  A  Yes.
20  Q  And to this day do you know the identity of any
21  other witness who --
22  A  No.
23  Q  -- saw Mr. Williams allegedly touch you?
24  A  No.
25  Q  How many DBLs were there?

Page 109

1  A  As I stated before, 13.  But in that room, at
2  president's club, it's both divisions.  So it's several
3  DBLs.
4  Q  But there would've been 13 DBLs playing the game,
5  Amazing Race?
6  A  That's what I recall, yes.
7  Q  Do you believe the West DBLs were playing the game
8  along with the East DBLs?
9  A  The entire region was playing.  No, I'm sorry --
10  yes, the entire region was playing.
11  Q  Did you speak to anyone else on Thursday, March
12  2nd, 2023, about being touched, that we haven't spoke
13  about?  You told me about Bauer, you told me about
14  Hernandez, and then you told me about Walker.
15  A  Not that I recall.
16  Q  Did the meeting continue to Friday, March 3rd, the
17  national sales meeting?
18  A  Yes.
19  Q  Did you speak to anyone about it on March 3rd?
20  A  Not that I can recall.
21  Q  Did you make any further reports to anyone at
22  Alkermes?
23  A  Not that I recall.
24  Q  Is there anything you can think of that would
25  refresh your memory about making a report on March 3rd,

Page 110

1  2023?
2  A  Not that I can recall.
3  Q  Okay.  Did Stephanie Walker come back to you and
4  speak to you on Friday, March 3rd?
5  A  I don't remember when I spoke to Stephanie next.
6  Q  Did you have any more interactive activities at
7  which Mr. Williams participated?
8  A  No.  We were in district meetings on Friday.
9  Q  Did you see him at all the rest of the convention?
10  A  No.
11  Q  Did the convention, the national sales meeting,
12  did it continue through Sunday, March 5, 2023?
13  A  No.
14  Q  So when did it end?
15  A  Friday.
16  Q  Do you remember when on Friday it ended?  Half
17  day, full day?
18  A  I believe it was a half day.  I'm not quite sure.
19  Q  Okay.  Other than the conversation you told me
20  about with Hernandez in the hallway, did you speak to her
21  at all at the convention about Mr. Williams?
22  A  Not that I recall.
23  Q  When is the next time you heard from Ms. Walker?
24  A  I believe the following week.
25  Q  And how's that?  Did she call you?

Page 111

1  A  Yes.
2  Q  Would that have been Monday, March 6th, 2023?
3  A  I don't remember the specific date.
4  Q  But it was the following week?
5  A  Yes.
6  Q  And was this a telephone call or a video
7  conference?
8  A  I believe it was a telephone call.  I don't
9  recall.
10  Q  Was it scheduled in advance?
11  A  I don't recall.
12  Q  And so she reaches out to you, and what did she
13  say?
14  A  She just went over my statement.
15  Q  You say "went over my statement."  You hadn't
16  given a written statement by that point, had you?
17  A  No.
18  Q  So when you say "statement," you mean what you had
19  told her there at --
20  A  Yes.
21  Q  -- the national sales meeting?
22  A  Yes.
23  Q  And she reviewed it to make sure she understood
24  it?
25  A  She reviewed my statement.

Page 112

1  Q  Tell me what she asked of you.
2  A  I don't recall specifically what she asked, other
3  than reviewing my statement of what I told her at the
4  meeting.
5  Q  And what did you say?
6  A  Exactly what I just said earlier, that he tapped
7  me on my ass with the paddle and I told him my husband
8  would fuck him up on sight.
9  Q  And did she again ask you for witnesses?
10  A  Yes.
11  Q  What did you say?
12  A  I told her about my representative Johanna
13  Hernandez coming to me and asking me if I was okay.
14  Q  Did Ms. Walker ever ask for a written statement?
15  A  No.
16  Q  How long did this telephone call with Ms. Walker
17  last?
18  A  I don't recall.
19  Q  Did she tell you what she was going to do?  That
20  is, Ms. Walker.
21  A  No.
22  Q  She didn't tell you the next steps?
23  A  I don't recall exactly what she told me.  Again,
24  this is two and a half years ago.
25  Q  Did you understand whether she was opening an

Page 113

1  investigation or not?
2  A  I didn't ask.
3  Q  Did you review any documents in preparation for
4  your deposition today?
5  A  Review documents?
6  Q  Yes.
7  A  Other than what you sent us, no.
8  Q  This call that you had with Ms. Walker the week
9  after the national convention, was anyone else on the
10  call?
11  A  Not that I can recall.
12  Q  Let's look at Exhibit 19.
13      (Exhibit 19 is handwritten investigation
14      notes.)
15  A  I'm here.
16  Q  And when's the first time you saw these
17  handwritten notes?
18  A  This is the first time.
19  Q  Okay.  None of this is in your handwriting,
20  correct?
21  A  No.
22  Q  See the date 3/6/23 there on the top right?
23  A  Yes.
24  Q  Next to your name?
25  A  Yes.

Page 114

1   Q  I realize you didn't write this, but does this
2  appear to be notes of that phone call you had with
3  Ms. Walker after the convention?
4   A  I would assume so.  I don't know.
5   Q  I say that because if you go about halfway down,
6  there's the statement "Travis tapped me on the ass with a
7  paddle."  Do you see that?
8   A  Halfway down?
9   Q  Yeah.  Roughly.
10   A  Okay.
11   Q  That's what you told her on the phone call, right?
12   A  Yes.
13   Q  Did she ask you -- did Ms. Walker ever ask you
14  what you meant by the word "tapped," "tapped me on the
15  ass"?
16   A  I don't recall.
17   Q  Did she ask you whether it could've been an
18  accidental bumping in the rush of the game?
19   A  I don't recall.
20   Q  Is it possible it could've been an accidental
21  bumping during the rush of the game, since you didn't
22  actually see it?
23   A  For me, no.
24   Q  It's not possible?
25   A  No.

Page 115

1   Q  All right.  We'll ask Ms. Walker some more
2  questions about those notes.  But let's go to Exhibit 20.
3  Tell me when you're there.
4       (Exhibit 20 is typed investigation notes.)
5   A  I'm there.
6   Q  This document says Interview Notes: Jodi Garcia.
7  And you've probably never seen these before either,
8  right?
9   A  No.
10   Q  Is that about when your call was had with her,
11  March 6, 2023, between 12 p.m. and 1:10 p.m.?
12   A  Again, as I said, I don't remember the specific
13  date or time.
14   Q  Would it have been an hour and ten minute call?
15       MR. ADAMS:  Objection.  Asked and answered.
16   Q  Well, I'm asking, the reference there, the 12 p.m.
17  and 1:10 p.m., I'm not sure if that's a reference to --
18  it could've been at either of those times or if that's
19  the length of time if the call.  And so my question to
20  you is, would it have been more than an hour call?
21   A  I don't recall.
22   Q  Okay.  The first paragraph there begins:  "Hello,
23  Jodi.  It was brought to my attention by your manager,
24  Michael Bauer, that you had an unpleasant interaction
25  with your peer Travis Williams, DBL, at the national

Page 116

1  sales meeting last week.  Can you please tell me what
2  happened?"
3       Is that how she began the call?
4   A  I don't recall.
5   Q  Okay.  The third paragraph of these notes
6  says:  "In the hype of the game, we were all having fun
7  running up and trying to beat out their counterparts;
8  some light pushing and shoving occurred by all the DBLs
9  and the feeling in the room was fun competition."
10       Is that what you told Ms. Walker?
11   A  That is correct.
12   Q  A couple more paragraphs down, Ms. Walker
13  writes:  "Jodi shared that after the breakout session her
14  employee, Johanna Hernandez, asked her 'are you ok' and
15  she responded, saying 'yes.'  Johanna then said to Jodi
16  'I saw and heard what just happened with Travis.  He hit
17  you on the bottom with the white board and you must say
18  something to Michael Bauer.'"
19       Is that what you told Ms. Walker?
20   A  I don't recall those exact words, but if that's
21  what's there, yes.
22   Q  All right.  Second to the last paragraph
23  says:  "Jodi mentioned that during the in-person Vivitrol
24  finish strong meetings at the end of 2022, Travis was
25  verbally attacking her in front of her team."

Page 117

1       Did you tell Ms. Walker that?
2   A  Yes.
3   Q  Does that refresh your recollection about having a
4  conversation with Mr. Williams prior to the sales
5  convention?
6   A  It wasn't a conversation with Mr. Williams, it was
7  during the calibration meeting, as I stated earlier.
8   Q  Okay.  And so what did he do to be "verbally
9  attacking" you?
10   A  It was in regards to one of my representatives
11  who, in my mind, he did not know.  He was new to our
12  regional team, and he was giving his opinion on his
13  performance, which was not -- which is outside of his
14  scope, and a lot of the comments were personal about my
15  representative.
16   Q  But how was Mr. Williams verbally attacking you,
17  Jodi Garcia?
18   A  Telling me that I didn't know what I was doing,
19  telling me that I didn't understand certain things.
20   Q  Okay.  And you viewed that as a verbal attack, him
21  saying you don't know what you are doing?
22   A  Because it was out of his scope.
23   Q  Out of whose scope?
24   A  Mr. Williams.  He knew nothing about my team,
25  nothing about what we were doing.  He was new to our

Page 118

1  region, and was providing input on things that was
2  outside of his scope.
3      Q   And just so I'm clear, the verbal attack on you
4  was Mr. Williams saying "you don't know what you, Jodi
5  Garcia, are doing"?
6      A   What I was talking about, about my representatives
7  and what their performance entailed.
8      Q   And who were the witnesses, if any, to that?
9      A   That was our entire region.
10     Q   What's that mean?
11     A   I've given you that information already.  I gave
12  you the name of all of the DBLs in our region.
13     Q   So all of the DBLs in the entire region heard --
14     A   And Michael Bauer, yes.
15     Q   And Michael Bauer --
16     A   Yes.
17     Q   -- heard Mr. Williams say to you, Jodi Garcia,
18  "you don't know what you're doing"?  Yes?
19     A   I didn't say he said I didn't know what I was
20  doing.  He was trying to tell me about my representatives
21  and their performance during calibration, which he is not
22  privy to as he's not their DBL, and giving input on
23  representatives that he does not manage, which is out of
24  his scope.
25     Q   Did Mr. Williams tell you, Ms. Garcia, that "you

Page 119

1  don't know what you're doing," or did he not tell you
2  "you don't know what you're doing"?
3      A   The language that he was using was implying that,
4  yes.  Talking about my representatives, outside of his
5  scope, as he was not their DBL.  Providing input about my
6  representatives in a meeting that he was not privy to.
7      Q   But he didn't say to you "you don't know what
8  you're doing."  Am I right about that?
9      A   That was what he was implying.
10         MR. ADAMS:  Objection.  Asked and answered.
11         THE WITNESS:  Thank you.
12     Q   Well, I don't -- did you say that's what he was
13  implying?  Go ahead.  Are you saying --
14         THE WITNESS:  Do I have to explain again,
15  John?  Because I think I've answered that already.
16     Q   Yes, you do.
17         MR. ADAMS:  You can go ahead and answer,
18  Jodi.
19     Q   You said that's what he was implying?
20     A   Yes.
21     Q   And did you report him to human resources for
22  verbally attacking you with this --
23     A   No.
24     Q   -- implication?
25     A   No.

Page 120

1      Q   Did you report him to, you know, your direct
2  report, Mr. Michael Bauer?
3      A   He was in the room.
4      Q   So did you report it to him?  Did you --
5      A   No.
6      Q   -- have a conversation with him?
7      A   No.
8      Q   Did you say anything about it?
9      A   No.
10     Q   Okay.  Now, at the end of that second-to-last
11  paragraph of these interview notes which are Exhibit 20,
12  it says "She," being you, Garcia, "did say that she was
13  dishing it back out at him and didn't really think much
14  about his comments."
15         Did you tell Ms. Walker that?
16     A   Yes.
17     Q   Have you ever made a report to human resources of
18  any employee making you uncomfortable prior to this event
19  in March of 2023?
20     A   No.
21     Q   Not just at Alkermes, anywhere.
22     A   No.
23     Q   Have you ever participated in a workplace
24  investigation involving inappropriate conduct?
25     A   Not that I can recall, no.

Page 121

1      Q   Have you ever served in a human resources role at
2  any previous job?
3      A   No.
4      Q   Have you ever conducted a workplace investigation
5  to determine the credibility of allegations?
6      A   I don't understand the question.
7      Q   In your career, have you ever been in charge of a
8  workplace investigation?
9      A   Have I ever been in charge of a workplace
10  investigation?
11     Q   Yes.  To investigate something that supposedly
12  happened.  To determine truth or falsity --
13     A   No.
14     Q   -- in that role?
15     A   No.
16     Q   Let's go to Exhibit 21, please.
17     A   It's open.
18     Q   Okay.  This is a page, as you can see at the
19  bottom left, from the U.S. Employee Handbook in 2023.
20  I'm going to ask you some questions about reporting
21  procedures.  Do you see that on the bottom right?
22         MR. ADAMS:  Justin, I'm sorry, are we looking
23  at Exhibit 21?
24         MR. GILBERT:  Yes.
25         MS. RUSIE:  That's not a handbook.

Page 122

1    MR. ADAMS: Yeah, it's not a handbook.
2    MR. GILBERT: Well, let me look at my Exhibit
3  21.  Maybe I've got the wrong copy.
4    MS. RUSIE: There's also no Exhibit 22.
5    MR. GILBERT: My 21 says U.S. Employee
6  Handbook 2023.
7    Is that what yours says, Ms. Garcia?
8    THE WITNESS: No.
9    MR. ADAMS: Ours says Exhibit C at the top.
10  It's the --
11    MS. RUSIE: Anonymous email.
12    MR. ADAMS: -- anonymous email.
13    MR. GILBERT: Hang on just a second.  Let's
14  go off the record just one second.
15    (12:58 to 1:00 off the record.)
16    (Exhibit 21 is investigation procedures -
17    handbook excerpt.)
18  BY MR. GILBERT:
19  Q  Is my screen shared now with you?
20  A  Yes.
21  Q  I'm showing you PLF 00014, Reporting Procedures.
22  Do you see that?
23  A  Yes.
24  Q  In terms of the reporting procedures, this says
25  "If you feel you're being harassed, discriminated against

Page 123

1  or retaliated against, you should report it immediately
2  to your HRBP."  Do you know what HRBP stands for?
3  A  Business partner.
4  Q  Who would your HR business partner have been?
5  A  Stephanie Walker.
6  Q  Okay.  Do you know who it is now?
7  A  Karishma Desai.
8  Q  How do you spell Desai?  Is it D-e-s-a-i?
9  A  I believe so.
10  Q  It says you should report it to your HRBP or to
11  HRsensitive@alkermes.com.  Did you ever make a report to
12  HRsensitive@alkermes.com?
13  A  No.
14  Q  The next page, I'll scroll on down, it talks about
15  investigation procedures.  Do you see that?
16  A  Yes.
17  Q  It begins:  "Upon receiving a complaint, Alkermes
18  will promptly conduct a fair and thorough investigation
19  into the facts and circumstances of any claim of a
20  violation of this policy to ensure due process for all
21  parties."
22    Now, when you spoke to Mr. Bauer, did he mention
23  anything about Alkermes conducting a fair and thorough
24  investigation to ensure due process for all parties?
25  A  I don't recall.

Page 124

1  Q  And the first time you spoke to Ms. Walker there
2  at the national sales meeting on March 2nd, did she
3  mention anything about Alkermes promptly conducting a
4  fair and thorough investigation to ensure due process for
5  all parties?
6  A  I don't recall.
7  Q  And how about in your phone call with Ms. Walker,
8  did she mention it then?
9  A  I don't recall.
10  Q  Okay.  I'm finished with 21.
11    The next one I want to go to is the anonymous
12  email.
13    MR. GILBERT: And you-all do have that one,
14  right?
15    MR. ADAMS: Correct.
16    Jodi, do you have that email in front of you
17  now?
18    THE WITNESS: I do.
19    (Second Exhibit 21 is March 6, 2023 email.)
20  BY MR. GILBERT:
21  Q  It should say, at the bottom left, PLF 00074.  Is
22  that what you've got, Ms. Garcia?
23  A  Yes.
24  Q  Okay.  And Kimberly Mikitka is forwarding an
25  email.  Do you see this?

Page 125

1  A  Yes.
2  Q  And she's in HR, right?
3  A  Yes.
4  Q  And Paul Dubois' name is there.  He is the
5  in-house corporate counsel, right?
6  A  Yes.
7  Q  And then Stephanie Walker, she is the person that
8  we've been talking about you having a phone call with her
9  on March 6th, right?
10  A  Yes.
11  Q  Do you have any responsibility for IT, computer
12  stuff at Alkermes?
13  A  No.
14  Q  Do you know what an IP address is?
15  A  An IP address?
16  Q  Yes.
17  A  I mean, not really, no.
18  Q  Do you know what IP tracing is?
19  A  No.
20  Q  Do you know whether Gmail can be traced to a
21  specific device?
22  A  I don't know.
23  Q  Under oath, you know who wrote this email, don't
24  you?
25  A  I do not.

Page 126

1    Q   Are you denying that you wrote it?
2    A   Yes.
3    Q   Do you deny asking someone to write it?
4    A   Yes.
5    Q   Did you deny contributing any information in this
6    email?
7    A   Yes.
8    Q   Has this email ever been shown to you?
9    A   No.
10   Q   When is the first time you saw this email?
11   A   Today.
12   Q   And the date on this email, if you look at the top
13   right corner, is Monday, March 6, 2023.  Do you see that?
14   A   Yes.
15   Q   That is the same day that you had your call with
16   Ms. Walker, right?
17   A   Based on the document you showed me, yes.
18   Q   And if we look at the email itself, it's from a
19   Very Concerned, with the handle
20   hopeispossible7@gmail.com.  Do you see that?
21   A   Yes.
22   Q   And just for the record, to be very clear, you're
23   telling us under oath you had no involvement whatsoever
24   in the sending or the writing of this email, correct?
25   A   I did not.

Page 127

1    Q   And this says it was sent Monday, March 6, 2023,
2    at 2:52 p.m., right?
3    A   That's what it says there, yes.
4    Q   When you read this this morning, what was your
5    reaction?
6    A   I didn't read it this morning, I'm just reading it
7    right now.
8    Q   Oh.  Right now is the very first time you've seen
9    this?
10   A   Yes.
11   Q   Okay.  Well, take a minute then and read through
12   the body, because I know it's kind of small print.
13   A   (Reviewing document.)  I'm done.
14   Q   Okay.  Has anyone told you that they sent an email
15   on your behalf about Mr. Williams allegedly touching you?
16   A   No.
17   Q   So you've just now, you say, read this for the
18   first time.  What is your reaction having read it?
19   A   I mean, the person obviously was offended, but I
20   mean, I don't have a reaction.
21   Q   Do you agree it's full of lies or do you say it's
22   correct?
23   A   It's not my email.  Some of it is not correct,
24   some of it is.
25   Q   Does it surprise you that there is a witness that

Page 128

1    you don't know about?
2    A   Yeah.
3    Q   And do some of the lies surprise you?
4    A   I don't know what this person saw or feel they
5    saw, so I can't give testimony to what they saw or
6    believe they saw.
7    Q   Let me ask you about what I'm calling some of the
8    lies so we can be clear.  In the first sentence -- excuse
9    me.  The second sentence, it says "Travis Williams
10   sexually assaulted and groped Jody Garcia."  Do you see
11   that?
12   A   Where are you?  The second sentence?
13   Q   Yes.
14   A   Again, this is someone else's opinion, not mine.
15   Q   I understand that.  But you never accused Travis
16   Williams of sexually assaulting you, did you?
17   A   No.
18   Q   And you never accused Travis Williams of groping
19   you, did you?
20   A   No.
21   Q   And in fact he didn't sexually assault you or
22   grope you, did he?
23   A   He didn't grope me, he didn't sexually assault me,
24   but he touched me inappropriately.
25   Q   Let's read on.  "During the trivia game we were

Page 129

1    playing he slapped her in the derriere and then grabbed
2    and squeezed her."
3        He didn't grab and squeeze you, did he?
4    A   Not that I recall.
5    Q   Wouldn't you recall if he had grabbed and squeezed
6    you?
7    A   Yes.  He didn't, he didn't -- he tapped me, as I
8    said, he used that paddle and tapped me on the ass.
9    Q   Okay.  The next sentence says, "He put his arms
10   around her neck and pulled her in very close to him."
11       He didn't put his arms around your neck, did he?
12   A   No.
13   Q   That's outrageously false, is it not?
14   A   It didn't happen to me, no.
15   Q   Now, since this is the first time you've ever read
16   this, am I right that no one at Alkermes ever called you
17   to ask whether Mr. Williams also grabbed and squeezed
18   you?
19   A   I don't recall.
20   Q   Or that he put his arms around your neck and
21   pulled you in very close to him?
22   A   I don't recall.
23   Q   Do you recall whether anyone at Alkermes said,
24   hey, Jodi, we've got an alarming email that we would like
25   to review with you?

Case 3:24-cv-00076-DCLC-DCP    Document 83-1    Filed 08/15/25    Page 33 of 41
PageID #: 489

Case 8:23-cv-00590-TPB-CPT    Document 114-2    Filed 10/14/25    Page 151 of 171
PageID 2291
TRAVIS WILLIAMS vs.
ALKERMES INC
JODI GARCIA
July 14, 2025

Page 130

1   A  No.
2   Q  This Exhibit 22 [sic], this email, it's far
3 different than the statement that you gave Ms. Walker and
4 Mr. Bauer, isn't it?
5   A  It's not my statement.
6   Q  Didn't ask you that. I'm talking about the
7 substance is far different, right?
8   A  Yes.
9       MR. GILBERT: All right. Let's look at
10 Number 23. Do you-all have the investigation report form
11 as 23?
12       MR. ADAMS: I'm looking at it. Jodi, do you
13 have that in front of you?
14       THE WITNESS: I'm pulling it up. Got it.
15       (Exhibit 23 is investigative report form.)
16 BY MR. GILBERT:
17   Q  And I realize you didn't write this. Is today the
18 first time you've seen this document?
19   A  Yes.
20   Q  The second bolded paragraph there says Describe
21 Issue (include relevant details regarding the nature of
22 the issue). Do you see that?
23   A  Yes.
24   Q  Then three paragraphs down it says, "During one of
25 the questions, when the DBLs were at the front of the

Page 131

1 room Mr. Williams smacked Ms. Garcia on her buttocks with
2 the white board," right?
3   A  Yes, I see that.
4   Q  That's not actually the word you used. You
5 repeatedly used the word "tapped," correct?
6   A  That's the word I used, yes.
7   Q  The very last sentence in that paragraph says,
8 "According to multiple witnesses, Mr. Williams, in
9 response to Ms. Garcia, attempted to laugh it off and did
10 not respond verbally."
11       Are you able to tell me who the multiple witnesses
12 are that saw Mr. Williams' attempt to laugh it off and
13 not respond verbally?
14   A  I don't know who those witnesses are.
15   Q  Do you know if they exist?
16   A  I don't know who those witnesses are.
17   Q  Did you ever ask for Mr. Williams' employment to
18 be terminated as a result of this?
19   A  I did not.
20   Q  Did you ever ask for him to be suspended or
21 reprimanded?
22   A  I did not.
23   Q  Do you know whether Johanna Hernandez has been
24 interviewed?
25   A  Interviewed? For what?

Page 132

1   Q  In 2023, do you know whether she's been
2 interviewed as a witness to Mr. Williams allegedly
3 touching you with the paddle?
4   A  I don't know for sure, no.
5   Q  So you've never had any conversations with
6 Ms. Hernandez about whether she was interviewed?
7   A  I didn't ask her that question, no.
8   Q  Did she ever tell you that she was brought in to
9 HR to give a statement?
10   A  No.
11   Q  Did she ever tell you that she gave her version
12 via phone call?
13   A  No.
14   Q  Let's go to Number 24.
15       (Exhibit 24 is text on termination.)
16   A  Got it.
17   Q  It should be a text message from (504) 656-9407.
18 Do you see that?
19   A  Yes.
20   Q  I'll represent to you this is a text message that
21 Mr. Williams received not long after he was fired. Did
22 you send him this text message?
23   A  No, I did not.
24   Q  It says "Tennessee lost and you got fired in the
25 month of March. Damn you must be depressed as a mofo.

Page 133

1 Sucks to be you." Right?
2   A  That's what it says.
3   Q  Did you suggest to someone to write this to him?
4   A  I did not.
5   Q  Tennessee lost in March Madness around this time,
6 you knew that Mr. Williams was a Tennessee Vols fan,
7 correct?
8   A  Yes.
9   Q  How did you learn he got fired?
10   A  Actually I don't even recall how I found out he
11 got fired.
12   Q  But did you know that he was fired?
13   A  Yes.
14   Q  So you deny having any role in this text message,
15 correct?
16   A  I do.
17   Q  How long have you been on LinkedIn?
18   A  A very long time. I don't know exactly how long.
19   Q  After Mr. Williams was fired, did you go on his
20 LinkedIn page?
21   A  I went on his LinkedIn page after having a
22 conversation with Mr. Dubois. This was continuing.
23 That's the first time I've ever gone to his page.
24   Q  Okay. When did you go on Mr. Williams' LinkedIn
25 page?

Min-U-Script®    Wilson Reporting Agency (423) 267-6000    (33) Pages 130 - 133
www.wilsonreporting.com
Case 3:24-cv-00076-DCLC-DCP    Document 83-1    Filed 08/15/25    Page 34 of 41
PageID #: 490

Page 134

1    A  I don't know the exact date, but it was when I
2  realized -- when Mr. Dubois called me to let me know that
3  we were having depositions done.
4    Q  Oh, you mean recently you went on his LinkedIn
5  page?
6    A  Yes.
7    Q  Why would you go on his LinkedIn page recently?
8        MR. ADAMS: And, Jodi, just to the extent
9  that you and Paul spoke about anything, you know, don't
10 speak to those specific.
11   A  Similarly as him going on mine.
12   Q  I'm asking you why would you go on his LinkedIn
13 page?
14   A  Just to see where he was employed now.
15   Q  And what did you find?
16   A  That he's -- I believe it's Novo Nordisk.  That's
17 all.
18   Q  And why did you want to know where he was
19 employed?
20   A  Curious.
21   Q  And you did that to get prepared for this
22 deposition?
23   A  No.  Just curious.
24   Q  What about March of 20 -- well, strike that.  If
25 you are a member of LinkedIn, you can see who's looking

Page 135

1  at your page, can you not?
2    A  I don't know.  I don't know the specifics of
3  LinkedIn.
4    Q  Okay.  Didn't you look at his page in March of
5  2023 after he was terminated?
6    A  I don't recall.
7    Q  So you might have, you're just not sure?
8    A  I said I don't recall.
9    Q  Let's look at Exhibit 25.  This should be a text
10 message from an 850 code.
11       (Exhibit 25 is text message on novonordisc.)
12   A  Yes.
13   Q  That's a Florida area code, is it not, 850?
14   A  I don't know.
15   Q  This is a text message Mr. Williams received, the
16 body saying "What's novonordisc going to think about the
17 real reason you got fired?"
18       Did you send this text message to him?
19   A  No, I did not.
20   Q  Did you direct somebody to send it to him?
21   A  No, I did not.
22   Q  Who is Becky Rogers?
23   A  I have no idea.
24   Q  Look at Exhibit 26, please.
25       (Exhibit 26 is Facebook post by Becky

Page 136

1        Rogers.)
2    A  I have it up.
3    Q  It's a Facebook post from this Becky Rogers.  And
4  you're telling me you don't know who that is?  Are you --
5    A  No, I do not.
6    Q  -- Facebook friends with Becky Rogers?
7    A  No, I am not.
8    Q  Notice the date on that, March 2.  If this was
9  March 2, 2023, this would be the same day as the Amazing
10 Race game, right?
11   A  I guess that's the date.  I don't know the date of
12 the Amazing Race.
13   Q  And then March 16th she says, "Heard you got
14 fired.  Loser."  Right?
15   A  That's what it says there.
16   Q  How far do you live from Orlando?
17   A  Almost two hours.
18   Q  And look at Exhibit 27, please.  It says she's
19 from Orlando, right?
20   A  Uh-huh.
21   Q  Yes?
22   A  Yes, it says that.
23       (Exhibit 27 is Facebook post by Becky
24 Rogers.)
25   Q  And had you spoken -- well, strike that.

Page 137

1        In March of 2023, did you speak to any persons
2  outside of Alkermes about what Mr. Williams did?
3    A  I don't understand the question.
4    Q  In March of 2023, you told me you had a
5  conversation with Mr. Bauer, Ms. Hernandez, and then
6  Ms. Walker about the alleged touching, right?
7    A  Yes.
8    Q  Have you spoken to anyone else -- or did you speak
9  to anyone else in March of 2023 about what Mr. Williams
10 allegedly did?
11   A  My husband, yes.
12   Q  Okay.  Anybody else?
13   A  Not that I can recall.
14   Q  What about since March of 2023, have you spoken to
15 anyone besides Bauer, Hernandez, Walker, and your
16 husband?
17   A  Not that I can recall.
18   Q  What's your husband's name?
19   A  Renaldo.
20   Q  Garcia?
21   A  Yes.
22   Q  Have you ever asked him if he was sending text
23 messages to Mr. Williams?
24   A  Mr. Williams is not a concern for me or my family.
25   Q  Not my question.  Have you ever asked --

Case 8:23-cv-00590-TPB-CPT    Document 114-2    Filed 10/14/25    Page 153 of 171
PageID 2293
TRAVIS WILLIAMS vs.
ALKERMES INC
JODI GARCIA
July 14, 2025

Page 138

1  A  No.
2  Q  -- Renaldo --
3  A  No.  No.  And Mr. Williams is not a concern for me
4  and my family.
5  Q  You have not asked that question to your husband?
6  A  No.
7  Q  Okay.  Elizabeth Murphy O'Keefe, she's the person
8  that took Stephanie Walker's place -- excuse me.  Excuse
9  me.  She's the person that took Michael Bauer's position
10  as regional manager, right?
11  A  Yes.
12  Q  Have you shared with Elizabeth Murphy O'Keefe your
13  contention that Mr. Williams tapped you on the bottom
14  with a paddle?
15  A  My contention?
16  Q  Yes.  Have you shared that with Ms. Elizabeth
17  Murphy O'Keefe?
18  A  I've not shared the details but she knows about
19  this situation, yes.
20  Q  What have you shared with her?
21  A  The fact that I'm being deposed.
22  Q  I'm talking about before that.  When she came on
23  board and took Mr. Bauer's place, did you have any
24  conversations with her about the events at the national
25  sales meeting in 2023?

Page 139

1  A  Yes.
2  Q  Tell me what you told her.
3  A  Exactly what I stated before; that Mr. Williams
4  tapped me on the butt, exactly what I said to him, and
5  that it was reported.
6  Q  And was this a meeting of just the two of you, or
7  a phone call, or what?
8  A  I don't remember.
9  Q  Why did you think it was important that
10  Ms. O'Keefe know this?
11  A  Ms. O'Keefe came in at a time during when I was
12  being ostracized and lacked communication.  There was a
13  lot of conversation about bringing our team together, and
14  her getting information was important for her to
15  understand where I stood.
16  Q  And so you came forward and told her what you had
17  told Ms. Walker?
18  A  Yes.
19  Q  Did she indicate whether she already knew that?
20  A  I didn't ask her and she didn't press, she didn't
21  say.
22  Q  Did she hold a meeting of you and the other DBLs
23  to discuss it?
24  A  It was not to discuss Mr. Williams, it was to
25  discuss the current status of our leadership team.

Page 140

1  Q  And when you say "leadership team," what are you
2  referring to?  The status of what leadership team?
3  A  The region, the East region.
4  Q  And when was that call?
5  A  It was a meeting -- a live meeting.
6  Q  A live meeting?
7  A  Yes.
8  Q  Where was it held?
9  A  In Waltham.
10  Q  And all the DBLs came in?
11  A  Yes.
12  Q  And the subject of what you say Mr. Williams did
13  came up in that meeting?
14  A  No.
15  Q  Okay.  What was the leadership team discussing in
16  that meeting?
17  A  My feelings of being ostracized and not being
18  included, and lack of support from my other leaders in
19  feeling included on the East leadership team, and how we
20  could move forward.
21  Q  And did some of those DBLs say, "Jodi, it's
22  because no one witnessed what you're saying and we --"
23  A  No.
24  Q  Did they say "We don't believe you"?
25  A  No.

Page 141

1  Q  Did you break down crying in that meeting?
2  A  Yes.
3  Q  Did you say, "You-all don't know my history of
4  what I've been through in my life"?
5  A  No.
6  Q  Did they say anything to the effect of that's no
7  excuse to make false accusations against a man?
8  A  No.
9  Q  Was the meeting productive, in your view?
10  A  Yes.
11  Q  How so?
12  A  Because I was able to have conversations with
13  people that I had not been able to have for months on how
14  I was feeling and how they were feeling and how we could
15  move forward as a leadership team.
16  Q  Were you able to determine whether there were any
17  witnesses in that line on March 2, 2023 that heard or saw
18  what you say Mr. Williams did?
19  A  We did not discuss what happened in March of 2023.
20  Q  Do you think Mr. Bauer believed you?
21  A  I can't say what Mr. Bauer believes or doesn't
22  believe.
23  Q  Let's go back to Exhibit 18 for just a moment.
24  Tell me when you're there.
25  A  I'm there.

Min-U-Script®                    Wilson Reporting Agency (423) 267-6000                    (35) Pages 138 - 141
www.wilsonreporting.com
Case 3:24-cv-00076-DCLC-DCP    Document 53-1    Filed 08/15/25    Page 36 of 41
PageID #: 492

Page 142

1  Q   All right. This is the photograph of the Teams
2  meeting where you all are looking at the photos of the
3  Amazing Race game, right?
4  A   Yes.
5  Q   And the blurb in the middle that says "Watch those
6  paddles gentlemen," did Mr. Bauer write that?
7  A   I already stated yes, he did.
8  Q   I'm sorry, you went out on me. Say again.
9  A   I've already stated yes, he did.
10  Q   And did he make any comments about what he wrote
11  there, "Watch those paddles gentlemen"?
12  A   I don't recall.
13  Q   Did you see the blurb there, "Watch those paddles
14  gentlemen," during the Teams meeting?
15  A   Yes, I did.
16  Q   And did that offend you?
17  A   It did.
18  Q   Why did that offend you?
19  A   Because it's making mockery of something that
20  happened to me.
21  Q   Referring to Mr. Williams tapping you on the rear
22  with a paddle?
23  A   Yes.
24  Q   And so when you thought that was a mockery, did
25  you report that to anyone?

Page 143

1  A   I did.
2  Q   Who did you report it to?
3  A   To Ms. Walker.
4  Q   What did you tell her?
5  A   That I was offended by that.
6  Q   Did you ask for Mr. Bauer to be fired?
7  A   No, I did not.
8  Q   Did Ms. Walker tell you she would investigate?
9  A   I don't recall what she stated.
10  Q   Do you know if Mr. Bauer was fired for that?
11  A   I don't know why he's no longer here.
12  Q   No one at Alkermes told you the results of your
13  taking offense at the "watch those paddles gentlemen"?
14  A   I don't recall.
15  Q   How much time passed between this "watch those
16  paddles gentlemen" comment and Mr. Bauer no longer being
17  there?
18  A   I don't know.
19  Q   So you don't even know if he got fired for writing
20  that?
21  A   I don't know.
22  Q   Do you know how many years Mr. Bauer had worked at
23  Alkermes?
24  A   I don't.
25  Q   Do you know how many years Mr. Williams had worked

Page 144

1  at Alkermes when he was let go?
2  A   I don't know.
3  Q   Do you know how many years Ms. Walker had been an
4  HR --
5  A   No.
6  Q   -- manager?
7      Did you continue attending national sales
8  meetings?
9  A   Yes.
10  Q   Including in year 2024?
11  A   Yes.
12  Q   Where was that meeting held?
13  A   I believe it was Houston. I don't remember.
14  Q   And was Ms. Hernandez still reporting to you by
15  that time?
16  A   Yes.
17  Q   Take a look at Exhibit 28, please.
18      (Exhibit 28 is plastic hand.)
19  A   I have it.
20  Q   Do you recognize what that is?
21  A   It's a clapper.
22  Q   Did you bring that to the national sales meeting
23  in 2024?
24  A   Yes.
25  Q   And did you distribute these hand clappers?

Page 145

1  A   They were put on the table, yes.
2  Q   How many?
3  A   I don't recall.
4  Q   Did you purchase them?
5  A   Yes.
6  Q   And which table did you put them on?
7  A   All the tables.
8  Q   During an Alkermes meeting?
9  A   Yes.
10  Q   What kind of meeting was it that you put these
11  hand clappers on the table?
12  A   I believe it was a regional breakout session.
13  Q   So the persons that would be at the region
14  breakout session would be the district business leaders,
15  right?
16  A   And the representatives, yes.
17  Q   Had you ever -- did you do that the previous year,
18  bring hand clappers?
19  A   No.
20  Q   Has there been a meeting in 2025, a national sales
21  meeting?
22  A   Yes.
23  Q   Where was that in 2025?
24  A   I believe it was Orlando again.
25  Q   Did you attend?

Page 146

1  A  Yes.
2  Q  Did you bring a hand -- did you distribute hand
3  clappers again?
4  A  No.
5  Q  Let's look at Exhibit 29.
6     MS. RUSIE: I don't have a 29.
7     THE WITNESS: Neither do I.
8     MR. GILBERT: You're right.  Looks like I
9  left off 29.  Mind if we take a five-minute break and
10  I'll just email it to you?
11    MS. RUSIE: Perfect.
12    (Recess from 1:39 to 1:49.)
13    MR. GILBERT: Has this next document been
14  forwarded to you?
15    THE WITNESS: Is there a document number?
16    MR. GILBERT: It was forwarded just now.
17  It's 29.
18    MR. ADAMS: Jodi, I'll send it to you right
19  now.
20    THE WITNESS: Thank you.
21    MR. GILBERT: Tell me when you've got it.
22  I'll wait for you.
23    THE WITNESS: I just got it.
24    (Exhibit 29 is Alkermes response to EEOC.)
25  BY MR. GILBERT:

Page 147

1  Q  You've probably never seen this document before --
2  A  No.
3  Q  -- is that right?
4  A  No.
5  Q  I've really just got one question about it.  If
6  you'll turn to page 2, the very last paragraph.  It's a
7  factual question.
8  A  Very last paragraph.  Yeah.
9  Q  It begins "The next day, March 7..."  Do you see
10  that?
11  A  Yes.
12  Q  There's a reference to a Greg Keck, VP of Vivitrol
13  sales.  Do you see that?
14  A  Yes.
15  Q  Have you ever spoken with Greg Keck about what
16  happened at the 2023 sales convention with Mr. Williams?
17  A  I don't recall talking to him about it.
18  Q  Do you know who Greg Keck is?
19  A  Yes.  He's our VP of sales.
20  Q  I take it you've spoken to him but it's been more
21  business related?
22  A  Yes.  I've spoken to him several times, yes.
23  Q  But not in regard to Mr. Williams tapping you on
24  the bottom with the paddle, right?
25  A  Not that I recall.

Page 148

1  Q  The sentence I wanted to ask you about is the
2  third sentence in that bottom paragraph, the one that
3  says "Because multiple individuals confirmed that
4  Williams hit Garcia on her buttocks with a white
5  board..."  Do you see that?
6  A  Yes.
7  Q  The only individual that you know of would be
8  Hernandez that confirmed it, correct?
9  A  Yes.
10  Q  And then, of course, we looked at that anonymous
11  email which came in shortly after you spoke to
12  Ms. Walker, right?
13  A  Based on what you showed me, yes.
14  Q  All right.  That's what I wanted to ask you about
15  that.
16    Have you made any notes about what happened?
17  A  No.
18  Q  Have you emailed anyone about what happened?
19  A  No.
20  Q  Have you text-messaged anyone about what happened?
21  A  No.
22  Q  If you'll look at Exhibit 30 with me, please.
23  A  Uh-huh.  I'm trying to find the link where all the
24  attachments are.
25    I'm sorry, what was the number?

Page 149

1     MR. ADAMS: It's Number 30, Jodi.
2     THE WITNESS: Thank you.
3     (Exhibit 30 is Language Matters post.)
4  A  Yes.
5  Q  Is this another LinkedIn post from you?
6  A  It's something I reposted.
7  Q  Okay.  The part that is yours says "Facts!
8  Language matters!"  Right?
9  A  Yes.
10  Q  And the facts and the language that you are
11  reposting is the part in white from this Allen Sutton,
12  Dr. Allen Sutton?
13  A  Yes.
14  Q  Where he says "We are not minorities, we have been
15  minoritized.  We are not underrepresented, we have been
16  historically excluded.  Language matters."
17  A  Yes.
18  Q  And what did you understand that to mean that "We
19  are not minorities, we have been minoritized."
20  A  The words "language matters," being identified as
21  a minority, we've been minoritized.  That's the English
22  language.
23  Q  What do you draw from that?
24  A  Exactly what it states.
25  Q  Can you help me understand that?  I'm not sure of

Min-U-Script®                    Wilson Reporting Agency (423) 267-6000                    (37) Pages 146 - 149
                                         www.wilsonreporting.com
Case 3:24-cv-00076-DCLC-DCP          Document 53-1    Filed 08/15/25    Page 38 of 41
                                         PageID #: 494

Case 8:23-cv-00590-TPB-CPT    Document 114-2    Filed 10/14/25    Page 156 of 171
PageID 2296

TRAVIS WILLIAMS vs.
ALKERMES INC

JODI GARCIA
July 14, 2025

Page 150

1  the distinction myself.
2    A  That we have not been -- exactly what it states.
3  We have been minorized, and that we've not
4  underrepresented, have been historically excluded.
5  Exactly what it states.
6    Q  Do you believe that is still true today?
7    A  Do I still believe that?
8    Q  Yes.
9    A  Yes.
10   Q  And do you believe -- the "we," who is the "we"
11  referring to?
12   A  Any group of individuals that have been marginally
13  underrepresented and minoritized.
14   Q  But not whites?
15   A  I didn't say that.
16   Q  So it could be whites?
17   A  It could be anyone who feels that they have been
18  minoritized.  Again, words matter.
19   Q  Do you believe that whites have been historically
20  excluded?
21   A  I believe anyone who feels that they have been is
22  entitled to the same language as written there.
23   Q  I'm not asking whether someone can feel something.
24  I'm wondering whether you, Jodi Garcia, believe that
25  whites have been historically excluded in America?

Page 151

1    A  Do I believe?
2    Q  Right.
3    A  No.
4    Q  And what about blacks?  Do you believe that blacks
5  have been historically excluded?
6    A  Yes.
7    Q  And do you believe that is still true today, that
8  blacks are excluded?
9    A  In certain areas, yes.
10   Q  All right.  Do you know what CafePharma is?
11   A  Yes.
12   Q  What is CafePharma?
13   A  It's a crap website.
14   Q  How have you heard of it?
15   A  Reps talk about it all the time.
16   Q  In what context?
17   A  People put all kinds of junk out there on it, and
18  they talk about it, and "did you see that."  It's been
19  around for as long as I've been in the industry.
20   Q  Heavily visited by reps?
21   A  I don't know.
22   Q  What's the purpose of it, to your knowledge?
23   A  I don't know.
24   Q  Have you ever been on it?
25   A  I've looked at it, yes.

Page 152

1    Q  So what is it?  What does it do?  What is the
2  function of CafePharma, as far as you can tell?
3    A  I don't know their intent behind it.
4    Q  Well, what did you see when you visited it?
5    A  What I saw was something that was wrote about me
6  that was sent to me.
7    Q  Who sent it to you?
8    A  A friend of mine who does not work here.
9    Q  What is your friend's name?
10   A  Helena Robinson.
11   Q  How do you spell that first name?
12   A  H-e-l-e-n-a.
13   Q  And where does she work, Helena Robinson?
14   A  I believe it's Alcon Pharmaceuticals.
15   Q  And where does she live?
16   A  In Tampa, Florida.
17   Q  And how long have you been friends with
18  Ms. Robinson?
19   A  Over 20 years.
20   Q  And is she a pharmaceutical rep?
21   A  Yes.
22   Q  Did she tell you why she was on the CafePharma
23  site?
24   A  No.
25   Q  Did she say how she happened upon your name?

Page 153

1    A  No.
2    Q  What exactly did she forward you?
3    A  It was some disparaging information about me.
4    Q  And do you know who wrote it?
5    A  No.
6    Q  And did you tell her to respond?
7    A  No.
8    Q  Do you remember what the disparaging information
9  said?
10   A  I don't remember specifics but it was extremely
11  disparaging about me personally.
12   Q  And how did that make you feel?
13   A  I was offended.
14   Q  Did you feel like there wasn't anything you could
15  do about it?
16   A  I reported it to HR.
17   Q  Who did you report it to in HR?
18   A  Stephanie Walker.
19   Q  What was the content of the disparaging info?
20   A  It was personal, about me as an individual.
21  Derogatory about me as an individual.
22   Q  I know, but these are conclusions.  What were the
23  facts that were disparaging?
24   A  Language that -- about me as a woman that should
25  not be out there.

Case 8:23-cv-00590-TPB-CPT    Document 114-2    Filed 10/14/25    Page 157 of 171
PageID 2297
TRAVIS WILLIAMS vs.
ALKERMES INC
JODI GARCIA
July 14, 2025

Page 154

1    Q   What -- I'm not saying the words were true, I'm
2  just trying to find out what they were.
3    A   I don't remember the specific words, but the words
4  were disparaging about me as a woman, calling me outside
5  of my name.
6    Q   What's that mean, "calling me outside my name"?
7  You mean using a disparaging word for you?
8    A   Yes.
9    Q   Was it the bitch word?  Is that the word you're --
10   A   It was -- there was that word.  There was -- I was
11  called a whore.  There was other words that were used in
12  it.
13   Q   And what did Ms. Walker say she would do, if
14  anything?
15   A   They were going to contact CafePharma.  I
16  believe -- it was either Ms. Walker or Ms. Desai.  I
17  can't remember at this point which one it was.
18   Q   Which year was it that this happened?
19   A   I mean, it probably -- I believe it was last year,
20  early last year, probably.
21   Q   And did it get taken down from CafePharma?
22   A   I believe it was.
23   Q   Have you ever posted anything on CafePharma?
24   A   No.
25   Q   Have you ever suggested anyone else post anything

Page 155

1  on CafePharma concerning Travis Williams?
2    A   No.
3    Q   What about Helena Robinson, did you --
4    A   No.
5    Q   -- ever suggest she do it?
6    A   No.
7    Q   Is there anyone else that might have knowledge
8  about Mr. Williams allegedly tapping you on the bottom
9  with the paddle that we haven't discussed today?
10   A   No.
11   Q   Have you filed a charge of discrimination against
12  Alkermes?
13   A   No.
14   Q   Have you considered filing a lawsuit against
15  Alkermes?
16   A   No.
17   Q   When is the last time you spoke to Stephanie
18  Walker?
19   A   I'm sorry, you cut out for a second.
20   Q   Sorry.  When is the last time you spoke to
21  Stephanie Walker?
22   A   Probably -- it's been a long time, because she's
23  no longer at Alkermes.  The last time I spoke to her was
24  in her capacity as the HR business partner.
25   Q   When is the last time you spoke to Kimberly

Page 156

1  Mikitka?
2    A   Again, not since this incident.
3    Q   When does your term of co-lead of Mosaic expire?
4    A   It's a volunteer opportunity.  I make that
5  decision as to whether I want to continue.
6        MR. GILBERT: Let's take a short break.  I'm
7  just going to review my notes, and I think I'm almost
8  finished, Ms. Garcia.  We can come back in five, if
9  that's okay.
10       (Recess from 2:06 to 2:13.)
11  BY MR. GILBERT:
12   Q   Ms. Garcia, was the March 2023 national sales
13  meeting at the Orlando Hilton?  Does that sound right to
14  you?
15   A   I don't recall the exact hotel.
16   Q   Was it at 6001 Destination Parkway, Orlando,
17  Florida?  Does that help you?
18   A   I don't, I don't know the addresses in Orlando, so
19  I'm not -- I don't recall.
20   Q   Okay.  I take it then that you wouldn't remember
21  whether it was in the Florida Ballroom 4, that --
22   A   No.
23   Q   -- would be too specific.
24       All right.  I think that's all the questions I
25  have.

Page 157

1        MR. ADAMS: I just have a couple questions
2  just for clarity on the record.  It should be pretty
3  brief.
4        MR. GILBERT: Okay.
5            EXAMINATION
6  BY MR. ADAMS:
7    Q   Hey, Jodi.
8    A   Hi.
9    Q   So, one thing for clarification that Mr. Gilbert
10  had asked you earlier.  So, after Mr. Williams had tapped
11  you on the butt with the paddle, you had exited the room
12  with Johanna Hernandez; is that correct?
13   A   Yes.  My whole team exited, yes.
14   Q   Okay.  And Johanna Hernandez had brought forward
15  her concerns about what she heard and observed, she
16  brought those forward to you at that time, right?
17   A   Yes.
18   Q   Okay.  And then after that, you had gone and you
19  spoke to Mr. Michael Bauer; is that right?
20   A   Yes.
21       MR. GILBERT: Object.  Leading.
22   Q   And Michael Bauer, he had instructed you to go
23  speak with Stephanie Walker in human resources; is that
24  right?
25   A   Yes.

Case 8:23-cv-00590-TPB-CPT    Document 114-2    Filed 10/14/25    Page 158 of 171
PageID 2298

TRAVIS WILLIAMS vs.
ALKERMES INC

JODI GARCIA
July 14, 2025

Page 158

1      MR. GILBERT: Object. Leading.

2   Q  So, Johanna Hernandez brought forward her concerns

3  to you, then you spoke with Michael Bauer, and then you

4  spoke with Stephanie Walker. That's correct?

5   A  That is correct.

6      MR. GILBERT: Object. Leading.

7   Q  Okay. And then just to clarify another topic.

8  So, out of all the text messages that Mr. Gilbert had

9  shown you today, you were not involved in or you did not

10  direct in any way those text messages to be sent; is that

11  right?

12   A  I was not involved.

13      MR. GILBERT: Object. Leading.

14      MR. ADAMS: Let me just check my notes real

15  quick.

16      I think that's all I have.

17      Thank you for your time today, Jodi. We

18  really appreciate it.

19      THE WITNESS: Thank you.

20      MR. GILBERT: I don't have anything else.

21      (Signature not requested.)

22      DEPOSITION CONCLUDED AT 2:15

23

24

25

Page 159

1      REPORTER'S CERTIFICATE

2  STATE OF TENNESSEE:

3  COUNTY OF HAMILTON:

4      I, Sheila D. Wilson, Licensed Court Reporter
#268 and Notary Public, in and for the State of

5  Tennessee, do hereby certify that the deposition of JODI
GAYLE-GARCIA was reported by me, and that the foregoing

6  158 pages of the transcript is a true and accurate record
to the best of my knowledge, skills, and ability.

7      I further certify that I am not related to
nor an employee of counsel or any of the parties to the

8  action, nor am I in any way financially interested in the
outcome of this case.

9      I further certify that I am duly licensed by
the Tennessee Board of Court Reporting, as evidenced by

10  the LCR number and expiration date following my name
below.

11      In witness whereof, I have hereunto set my
hand this 3rd day of August 2025.

12

13

14

15

16

17

18

19  Sheila D. Wilson, LCR #268
Expiration date: 6/30/2026.

20  Notary Public Commission
Expires: 1/17/2027.

21

22

23

24

25

# EXHIBIT X

## IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF FLORIDA

**SHANNON OLSON**　　　　　）
　　　　　　　　　　　　　　）
　　　*Plaintiff,*　　　　　　 ）
　　　　　　　　　　　　　　）
v.　　　　　　　　　　　　　 ）　　Civil Action No. 8:23-cv-00590-TPB-CPT
　　　　　　　　　　　　　　）
**TAKEDA PHARMACEUTICALS,**　）
**USA, Inc., et al.,**　　　　　　）
　　　　　　　　　　　　　　）
　　　*Defendants.*　　　　　　）

## PLAINTIFF SHANNON OLSON'S DECLARATION IN SUPPORT OF PLAINTIFF'S 60(b) MOTION

I, Shannon Olson, being duly sworn (or under penalty of perjury pursuant to 28 U.S.C. § 1746), hereby depose and state as follows:

### 1.

I am employed by Takeda Pharmaceuticals America, Inc. ("Takeda") and have been for approximately twenty-six (26) years.

### 2.

During my tenure, I consistently received strong performance evaluations, district awards, and recognition from managers and peers, including written commendations and acknowledgment from Jodi Gayle-Garcia, Angie Warner, Debbi Owen, Milton Sanchez, and others.

3.

True and accurate (redacted) emails regarding recognition are specific to

the year 2020, which is the year that would have impacted promotion to

territory manager; includes approximately 25, including recognition from

District Managers and Sales Representatives, including: Jordan Davis, Jodi

Gayle-Garcia, Matt Hand, Greg Crouch, other District Managers, and

Colleagues are attached as **Exhibit A.**

4.

My job duties included field sales, provider education, compliance

tracking, and supporting new representatives with training and data

analysis.

5.

On or about January 2020, at the district "Fast Start Meeting," I led the

Trintellix training session, presented the Trintellix Brand Presentation,

Boulenger Study, and provided supplemental research notes on

depression and treatment approaches. True and accurate (redacted) e-

mails are attached as **Exhibit B.**

6.

Between January 13 and February 13, 2020, Sample Operations notified my colleague Jordan Davis of a sample variance. I personally worked with him to identify and correct errors in his disbursement records across multiple months.

- o Tolliver Turner of Sample Operations sent the relevant variance report.
- o Jodi Gayle-Garcia thanked me directly for assisting in resolving the issue

7.

True and accurate (redacted) copies of Paragraph 6 are attached as **Exhibits C and D.**

8.

On or about January 21, 2020, I created a district routing plan (North/South) that reorganized coverage to meet management's new provider-focused strategy. Both Mr. Davis and Ms. Gayle-Garcia approved the plan via email ("Looks great"). True and accurate (redacted) copies are attached as **Exhibit E.**

9.

Between approximately January 2020 and March 2020, Ms. Gayle-Garcia
instructed Mr. Davis to contact compliance for clarification, while thanking
me for helping him. During this period, I also scrubbed provider lists,
updated St. Petersburg contacts, and offered to help Davis with his
Vyvanse lists that he failed to complete.

10.

A true and accurate (redacted) copy of the February 13, 2020, email chain
is attached as **Exhibit F.**

11.

On or about March 3, 2020, I launched an independent mentoring and
onboarding program called "Rep Life," designed to support new
representatives, including Jordan Davis, Rebekah Timmel, and Brad
Watson.

-   I led regular conference calls to discuss sampling, expense
    reporting, product and disease-state knowledge, competitive

landscape, and marketing (A true and accurate redacted copy
is attached as **Exhibit H).**

12.

Between June and October 2020, I:

- Co-prepared management briefs on field access (June 1, 2020 –
  A true and accurate copy (redacted) is attached as **Exhibit I**);

- Circulated routing workbooks (June 6, 2020 - A true and
  accurate copy (redacted) is attached as **Exhibit J**);

- Updated provider records (July 16, 2020 - A true and accurate
  copy (redacted) is attached as **Exhibit K**);

- Prepared overlap reports (August 3, 2020 A true and accurate
  copy (redacted) is attached as **Exhibit L**); and

- Updated COVID-era target lists (October 21, 2020 – November
  5, 2020, true and accurate copies (redacted) are attached as
  **Exhibit M**)

13.

Throughout 2020–2021, I created and circulated numerous training
materials—including Trintellix savings ROI analyses, coupon-utilization
data, cognition and receptor study summaries, objection-handling notes,

and best-practice trackers. True and accurate copies(redacted) are attached as **Exhibit N.**

14.

I repeatedly received written recognition for leadership and teamwork during this period, including multiple messages from managers and peers thanking me for helping improve district operations and training new hires.

15.

Despite my performance and contributions, I was denied a promotion to Territory Manager in 2021. True and accurate copies of these correspondences (redacted) are attached as **Exhibit O)**

- Management cited a "warning letter" issued days after I raised HR concerns regarding my treatment and after my supervisor, Matt Hand, delivered my performance review.

- That review had already been finalized and discussed before the warning letter was issued.

*16.*

I was also required to continue managing Jordan Davis's compliance work
and mentoring duties after he was terminated, even after being denied the
promotion. Thus, it requires me to do two jobs.

17.

During this same period, Mr. Davis was endorsed by management and
permitted to maintain outside employment as a high school varsity
basketball coach, despite ranking near the bottom (he was ranked 65th of
66 representatives) in regional performance metrics, while I was
scrutinized for minor issues.

18.

A true and accurate copy of the September 2020 footprint planning
(redacted) are attached as **Exhibit P.**

19.

A true and accurate copy of the January 7, 2021, correspondences
(redacted) are attached as **Exhibit Q.**

20.

In or around 2021, when Jodi was my manager (I took leave in September 2019), and when Matt Hand was my manager (I took leave in April 2021), I took short-term disability leave due to medical reasons. My supervisor, Jodi Gayle-Garcia, was aware of this leave.

21.

A true and accurate copy of the 2021 emails and correspondences with Jordan and Matt regarding the Q1 Footprint planning is attached as **Exhibit R.**

22.

After returning, I experienced increased workload, heightened scrutiny, and differential treatment compared to my peers. These burdens did not exist prior to my medical leave.

23.

A true and accurate copy of my performance evaluations is attached as **Exhibit S.**

24.

My former attorney, Michael Alan Yoder, represented me in this matter through January 2025. True and accurate copies of some of his disciplinary records found on publicly accessible website are attached as **Exhibit T.**

25.

I communicated with him regarding Defendant's summary-judgment motion (Doc. 77) and understood that he was preparing and would file an opposition.

26.

I later formally learned that no opposition had been filed, and that summary judgment was granted to Defendant (Doc. 81) on January 29, 2025, without my knowledge or participation.

27.

I sent numerous evidence and documents to them that they could use to file the response. Neither Mr. Yoder nor Ms. Dreher would have a telephone conversation; they would only briefly text- they had all the information they needed to file an appropriate and solid response, but still did not.

28.

I made repeated attempts to obtain my case file from Mr. Yoder after

learning of this outcome. It took more than a month for him to release the

file to my current counsel.

29.

I have since been informed that attorney Justin Gilbert attempted to

contact Mr. Yoder and his office multiple times between March and May

2024, offering information relevant to my case. Mr. Yoder and his co-

counsel did not respond to those outreach attempts. True and accurate

copies of the emails and texts (redacted) are attached as **Exhibit U.**

30.

I was unaware of these outreach efforts or of any disciplinary proceedings

involving Mr. Yoder during the pendency of my case.

31.

I have since learned, through public disciplinary records, that Mr. Yoder

was under investigation by several Bar Associations and ultimately

suspended or disbarred during the time he represented me.  **(Ex. T)**

32.

He never informed me of the severity of things. I received a text message

that he could not do anything "Lawerly" for the time being, and Rachel

would continue to represent me. I was under the impression that this was

going to be resolved, and it would not impact my case.

33.

I have since received the declaration and deposition of Jodi Gayle-Garcia.

True and accurate copies are annexed hereto as **Exhibit V and W.**

34.

My current counsel, Jared M. Wichnovitz, Esq., entered his appearance

after the judgment and after the appeal deadline. He has since located

substantial evidence that was in prior counsel's possession but never

submitted to the Court, including deposition excerpts, emails, and

recognition materials, as well as reasonably accessible materials such as

Jodi's deposition transcript.

35.

I respectfully submit this affidavit in support of my Motion for Relief from

Judgment under Rule 60(b), to confirm that the failure to oppose summary

judgment and the withholding of key evidence were entirely outside my

knowledge or control.

DECLARATION UNDER PENALTY OF PERJURY

I declare under penalty of perjury under the laws of the United States of America
that the foregoing statements are true and correct to the best of my knowledge,
information, and belief.

Executed this __14__ day of ___October_____, 2025.

_____
Shannon Olson

Plaintiff